```
                              STATE OF NEW JERSEY
                              OFFICE OF ADMINISTRATIVE LAW
                              DOCKET NO. EDS 10706-17
```

```
_____
                              :
F.H. and M.H. o/b/o J.H.,     :
                              :
          Petitioner,         :
                              :        TRANSCRIPT
-vs-                          :            OF
                              :     RECORDED PROCEEDINGS
West Morris Regional High     :
Board of Education,           :
                              :
          Respondent.         :
_____:
```

                              April 9, 2018


BEFORE:

      THE HONORABLE THOMAS BETANCOURT, A.L.J.


APPEARANCES:

      CLEARY GIACOBBE ALFIERI JACOBS, LLC
      By: Jodi S. Howlett, Esq.
      By: Danielle Pantaleo, Esq.
      Attorney(s) for Petitioner

      WARSHAW LAW FIRM
      By: Julie Warshaw, Esq.
      Attorney(s) for Respondent

                    Transcriber: Peggy Wasco
                    CRT SUPPORT CORPORATION
                    2082 Highway 35, P.O. Box 785
                    South Amboy, N.J.  08879
                    Phone: (732) 721-4330
                    Fax:   (732) 721-7650

```
                        I N D E X                          2

    OPENING STATEMENT

  By Ms. Warshaw        8


                                                      VOIR
    WITNESS             DIRECT   CROSS   REDIRECT   RECROSS  DIRE

    JOSEPH CUSACK

  By Ms. Howlett     12/22             109
  By Ms. Warshaw              67                    113

    KENDRA DICKERSON

  By Ms. Howlett     117/131           199
  By Ms. Warshaw              166                   206      127
  By The Court       163

    TRACY COSTA

  By Ms. Howlett     216               231
  By Ms. Warshaw              228
```

E X H I B I T S                              3

| NO. | DESCRIPTION | I.D. | EVID. |
|------|------------|------|-------|
| R-1 | 504 Plan, 12/7/16 | 52 | 52 |
| R-2 | Special Education Referral Form | 58 | 59 |
| R-3 | Pre-Referral Intervention | 62 | 63 |
| R-4 | Parental Invitation to Initial Meeting, 1/3/17 | 121 | 122 |
| R-9 | Eligibility Determination Report | 154 | 155 |
| R-12 | Programs offered in BSP Program | 220 | 227 |
| R-13 | Letter from ICCPC indicating that J.H. was in their care, 10/20/16 | 47 | 47 |
| R-14 | Medical Clearance from ICCPC, 12/12/16 | 50 | 51 |
| R-15 | Letter from ICCPC with medical support, 1/6/17 | 64 | 64 |
| R-16 | Psychological Evaluation | 125 | 131 |
| R-17 | Psychiatric Evaluation, 3/15//17 | 143 | 144 |
| R-18 | Social History Report | 141 | 142 |
| R-19 | Psycho-educational Testing Report | 143 | |
| R-24 | Seventh grade report card | 98 | 99 |
| R-25 | Eighth grade report card | 22 | 23 |
| R-26 | Official student transcript | 33 | 33 |
| R-27 | 2016/17 Course Schedule | 40 | 41 |
| R-33 | Standardized testing results, 2013 | 28 | 29 |
| R-34 | NJ ASK Spring of 2014 standardized testing results in English language arts, and mathematics | 27 | 27 |
| R-35 | State assessment in science, 5/2015 | 30 | 30 |
| R-36 | PARCC Assessment, English | 36 | 37 |
| R-37 | PARCC Assessment, Mathematics | 37 | 38 |
| R-39 | Note from J.H.'s parents, 10/10/16 | 44 | 44 |

E X H I B I T S                                    4

| NO. | DESCRIPTION | I.D. | EVID. |
|------|-------------|------|-------|
| R-40 | Note from Plaza Family Medical,<br>10/11/16 | 45 | 46 |
| P-26 | Draft IEPs | 88 | 92 |
| P-29 | E-mails from parents to school<br>personnel | 189 | 211 |
| P-31 | Being Successful Program Brochure | 77 | |
| P-32 | Psychoeducational Evaluation Report<br>by Dr. Schubert, 8/21/17 | 185 | 212 |
| P-33 | Independent Psychiatric Report by<br>Dr. Ellen Platt, 9/6/17 | 186 | 212 |

                              Colloquy                         5

1              THE COURT: This is the matter of <u>F.H. and</u>

2     <u>M.H. on behalf of J.H. vs. West Morris Regional High</u>

3     <u>School Board of Education</u>.  The docket number is EDS

4     10706-17.  Today is April 9, 2018.  I am Judge

5     Betancourt.

6              Appearances for the District?

7              MS. HOWLETT: Jodie Howlett on behalf of the

8     respondent school district.

9              THE COURT: Good morning.

10             For the petitioners?

11             MS. WARSHAW: Julie Warshaw, Warshaw Law Firm,

12    representing the petitioners.

13             THE COURT: Good morning.

14             MS. WARSHAW: Good morning.

15             THE COURT: Let's address respondent's motion.

16    I'm reserving on it simply because I have not had the

17    time to review the paperwork, and particularly, the

18    recordings of the IEP meeting.  So, I can't make a

19    decision without having reviewed everything, considered

20    it, done some research, so we're going to start your

21    case today.  I'll get to it sometime this week and

22    hopefully get an order out, one way or the other, by

23    week's end or early next week.  Okay?

24             MS. HOWLETT: Your Honor, just one other

25    outstanding matter.  I believe there was briefs that

1       were filed on the scope of the hearing.

2               THE COURT: I'm going to address it.  I mean,

3       it's kind of all encompassing, in terms of the motion,

4       and so, I'm going to address all of it in one order.

5               Go ahead.

6               MS. WARSHAW: Are we going to have oral

7       argument on this motion?

8               THE COURT: No, we're not.  Okay?  I'd like to

9       actually start a hearing, as opposed to continually

10      filing motions and having arguments, arranging

11      settlement conferences that we don't do anything at

12      other than say "Hello" to each other and then you leave

13      without starting anything.  I know you guys agreed to

14      that, but I wasn't aware that we weren't going to move

15      the case the last time we were here, after we didn't

16      settle.

17              So, go ahead.

18              MS. WARSHAW: Your Honor, just to clarify for

19      the record, with last time, I had spoken to Ms. Howlett

20      the week before and she had indicated to me that there

21      was a good chance that the case was going to settle and

22      that's why I agreed, but --

23              THE COURT: I said I didn't know -- I didn't

24      know.

25              MS. WARSHAW: -- but when we came here, she

Colloquy / Opening Statement - Warshaw                7

1    had a no-pay position, which is not --

2            THE COURT: All right.

3            MS. WARSHAW: -- what we had expected.

4            MS. HOWLETT: Your Honor --

5            THE COURT: It didn't settle.  If it didn't

6    settle, it didn't settle.  I don't want to go back and

7    forth why it didn't settle or what happened.  It didn't

8    settle and we didn't move the case.  That's my -- from

9    my perspective, we didn't move the case, one way or the

10   other.  It didn't settle, but nobody called a witness,

11   so -- and I didn't know we weren't going to do anything

12   if there was no settlement.  That was just what I was -

13   - that's all I meant, okay?  I'm not mad at either of

14   you.  You're both very nice, very good attorneys, so

15   let's move on.

16            First witness.

17            MS. HOWLETT: Thank you, Your Honor.

18            THE COURT: Openings?  Because we haven't

19   started yet.  Do you want to do an opening?

20            MS. HOWLETT: The District --

21            THE COURT: The District waives?

22            MS. HOWLETT: Yeah, the District waives their

23   opening.

24            THE COURT: Okay.  Opening?

25            MS. WARSHAW: We'd like to do an opening, but

Colloquy / Opening Statement - Warshaw          8

1    also, we haven't had the benefit of a list of who's

2    going to be even called today.  We were entitled to

3    that.  I asked last week and I asked over the weekend.

4    I still haven't -- I didn't even know who was going to

5    be called today, so it's a little unfair for me to have

6    to do cross examination when I don't even know who the

7    witnesses are.

8                MS. HOWLETT: Your Honor, the petitioners were

9    provided with a witness list in accordance with the

10   pre-hearing order within the time frame provided by the

11   order and the regulations.

12               THE COURT: Okay.  So, if you have a witness -

13   - you saying that never happened?

14               MS. WARSHAW: We got a witness list but

15   there's like 19 people on the list.

16               THE COURT: That's the list.

17               MS. WARSHAW: But, Your Honor, we're required

18   to tell, you know, the respondent who we're calling at

19   what time.  They should be at least -- at least giving

20   us the names of the people who they're calling today.

21   I don't even have a list now, so that would be --

22               THE COURT: Call your first witness.

23               Well, wait a minute.  You wanted to do an

24   opening.  Go ahead.

25               MS. WARSHAW: Yes, I'd like to do an opening.

1          This -- this case is about a 17 year old

2     girl, J.H., who has been suffering from school-related

3     anxiety.  And today, and throughout this hearing,

4     you're going to be hearing testimony about how J.H.

5     came to where she is today and how she was unable to

6     attend school due to the school-related anxiety, but

7     she is now able to function in a smaller, quieter high

8     school with appropriate supports.  You will hear

9     testimony about the appropriateness of the proposed --

10    the inappropriateness of the proposed IEP, both in the

11    classification and the placement.  You will hear

12    testimony about the independent evaluations and how

13    J.H. was diagnosed with a specific learning disability

14    and sensitivity to noise and the school refused to

15    amend their proposed classification or their proposed

16    placement.

17          You will hear testimony about how the school

18    district ignored our attempts, from mid-August through

19    September, to try to get the IEP amended and to reflect

20    J.H.'s true diagnosis and her needs.  You will hear

21    about petitioner's efforts and how they had no choice

22    but to find an appropriate placement of J.H. and how

23    they had to unilaterally place her at the Purnell

24    School.  You will hear how well she is doing

25    academically, emotionally, and socially.

1        Petitioner respectfully requests that the

2    Court take into consideration all the facts, the

3    evaluation reports, and how petitioners were ignored by

4    the school district, the timing and the lack of

5    efforts, and the failures by the school district, and

6    the lack of any appropriate placement for J.H., which

7    caused J.H. to have to be unilaterally placed.

8    Petitioners believe this Court, after this Court hears

9    the testimony and examines the documentary evidence,

10   that this Court will find in favor of the petitioners.

11        THE COURT: Thank you.

12        MS. WARSHAW: Thanks.

13        THE COURT: First witness?

14        MS. HOWLETT: Thank you, Your Honor.  I'm just

15   going to grab her.

16        THE COURT: Sure.  Other than have dead time,

17   I'm going to pause it.

18        MS. WARSHAW: Your Honor, I don't know who

19   these people are.  Can they put on the record who they

20   are?

21        THE COURT: Wait for Ms. Howlett.  We're on

22   the record.  Wait for Ms. Howlett to come back.

23        MS. WARSHAW: Okay.

24        THE COURT: Other than have dead time, I'm

25   just going to pause it.

```
                          Colloquy                    11
```

 1                    (RECORDING PAUSED)

 2                    THE COURT: Okay, we're back on the record.

 3                    Have a seat right there, please.

 4                    MS. HOWLETT: Thank you, Your Honor.

 5                    THE COURT: While you were out of the room,

 6      Ms. Warshaw inquired as to the two individuals seated

 7      next to you.  I told her to wait until you came back.

 8      Would you identify them?

 9                    MS. PANTALEO: Danielle Pantaleo of Cleary

10      Giacobbe.

11                    THE COURT: How are you?

12                    MS. PANTALEO: Good.  Good morning.

13                    MR. REINEK: Good morning, Your Honor.

14      Michael Reinek (phonetic) for the District (out of

15      microphone range).

16                    THE COURT: Okay.  How are you?

17                    Good morning.  Ready to testify?

18                    THE WITNESS: Yes, sir.

19                    THE COURT: Raise your right hand.

20      J O S E P H   M I C H A E L   C U S A C K, RESPONDENT'S

21      WITNESS, SWORN.

22                    THE COURT: Thank you.  Would you state your

23      full name and spell your last name, please?

24                    THE WITNESS: Joseph Michael Cusack, C-U-S-A-

25      C-K.

Colloquy / Cusack - Direct                    12

1           THE COURT: C-U-S-A-C-K.

2           THE WITNESS: Yes, sir.

3           THE COURT: Go ahead.

4           MS. HOWLETT: Thank you, Your Honor.

5    DIRECT EXAMINATION BY MS. HOWLETT:

6           Q    Good morning.

7    A    Good morning.

8           Q    Joe -- can I call you Joe?

9    A    Sure, absolutely.

10          Q    Okay.  It's a little less formal.

11          Just for purposes of the Court, can you just

12   describe your position and place of employment?

13   A    Sure.  I'm a guidance counselor at West Morris

14   Central High School.  I've been there since July of

15   2007 and I'm a counselor for approximately 220

16   students.

17          Q    And what are some of your duties as guidance

18   counselor at West Morris Central?

19          THE COURT: Hold on.  Sorry about that.  Thin

20   walls.

21          THE WITNESS: So, primary is, I'm an

22   educational specialist, so I monitor students' academic

23   progress.  I make sure that their graduation

24   requirements are met.  I advise students on college

25   application process, career planning.  If a student is

Cusack - Direct                              13

1    in a situation where we'd require medical 504, we'll

2    implement that through the I&RS committee, CST

3    evaluations.  I participate in all of those meetings as

4    the guidance counselor.

5    BY MS. HOWLETT"

6         Q    And you said you were employed since 2007?

7    A    In West Morris Central, correct.

8         Q    And then what did you do before that?

9    A    Prior to that, I was a history teacher at Roxbury

10   High School since '96.

11        Q    Anything before that or --

12   A    College.

13        Q    College.

14   A    I graduated college in '95.

15        Q    And where did you go to college?

16   A    Sienna College in Loudonnville, New York.

17        Q    And did you get a degree there?

18   A    Yes, I have a bachelor of arts in history and a

19   secondary education certification from the State of New

20   York.

21        Q    And do you have any additional -- like a

22   master's degree or anything?

23   A    Yes, I have a master's degree from Montclair State

24   University in master of arts and social sciences with a

25   concentration in history in 2002 and I earned my school

Cusack - Direct                          14

1    counseling -- master's in school counseling from

2    Centenary College -- then Centenary College, it's now a

3    university -- in Hackettstown in 2000 and -- oh boy --

4    six -- no, seven.

5         Q    And what about licenses?  Do you have any

6    licenses through the State or --

7    A    Yes, I have a standard New Jersey teaching

8    certificate in social studies and a school counseling

9    certificate, New Jersey State School Counseling, as

10   well as a supervisor's certification and a director of

11   school counseling -- director of guidance certification

12   as well.

13        Q    Okay.  Anything else you want to tell us

14   about yourself?

15   A    No, I think that's good.

16        Q    Okay.  So let's talk.  You know why we're

17   here, the student that we're talking about.

18             MS. HOWLETT: For purposes of the record, can

19   we use her name or would you rather initials?

20             THE COURT: It doesn't matter to me, but I

21   think, probably, let's just use the initials because

22   for some reason on education matters, we've been

23   getting a lot of OPRA requests, so let's not use the

24   name.

25             MS. HOWLETT: That's fine, Your Honor.  Just

1     for clarification.

2     BY MS. HOWLETT:

3          Q    So we're going to refer to the student as

4     J.H.

5     A    Okay.

6          Q    So, can you just tell us, just off the bat,

7     how you first knew of J.H., how you first learned about

8     her?

9     A    Sure.  Well, she was added to my caseload back in

10    -- when she was in the eighth grade.  She was a -- you

11    know, we would have -- we typically do -- and again, I

12    can't remember the details, but when we have incoming

13    eighth graders, we do meetings where they're assigned

14    to our -- and we develop a schedule for the incoming

15    year.  I've worked with J.H.'s parents in the past and

16    with two of their other sons -- I know they have three.

17    I believe one other son had a -- yes, three sons -- had

18    a different counselor.  But I have worked with the

19    family since probably 2008 or nine.

20                 UNIDENTIFIED FEMALE: 2008.

21                 THE WITNESS: Yes, yes.  Oh, I'm sorry.  Yes,

22    so around there.  So, then J.H., when she enrolled in -

23    - she started in September, you know, I worked with her

24    as her guidance counselor.

25    BY MS. HOWLETT:

Cusack - Direct                              16

1       Q     And that was, for the Court's purpose,

2    September of what year?

3    A     September of 2015?  Hold on.  Can I refer to --

4       Q     No.

5    A     Okay.  All right.

6       Q     Sorry.  To your best recollection.

7    A     To my best recollection, I think her -- so, she's

8    a junior now, so this is 17/18, so 15/16.  So, '15,

9    yes.

10      Q     Okay.  If you don't --

11   A     Yeah, I believe it was September of '15.

12      Q     Did you have any first initial impressions of

13   J.H. when you met her?  I don't know if you recall when

14   you met her.

15   A     She's a lovely girl and she was a very, you know,

16   sweet young lady.  She started off -- you know, I

17   always check in on my students as they start their

18   freshman year and there was nothing that -- nothing out

19   of the ordinary.  She had -- yeah, she started off, in

20   her freshman year, she started off strong.

21      Q     Did she come into the district as classified

22   for special ed?

23   A     No, she did not.

24      Q     And when she came into the district, did she

25   have a 504 plan?

1   A    Not that I'm aware of.

2        Q    Anything like that, that you're aware of?

3   A    No.

4        Q    Is it part of your practice to review a

5   student's records when they come in?

6   A    Yes.

7        Q    So, would that include their elementary

8   school records?

9   A    Typically, we could go back to the elementary

10  school records if we're doing an evaluation, however, I

11  would usually look at the eighth grade classes, you

12  know, their grades, comments from teachers, just to

13  kind of get a general overview of the student.  I don't

14  look too far because I feel like we're a separate

15  district from the middle school and kind of like, you

16  know, kids are starting off with a clean slate and, you

17  know, I don't like to have a -- I like to develop my

18  own first impression of my students.

19       Q    When J.H. enrolled, would you have reviewed

20  any of her records?

21  A    I don't recall if I specifically -- I did, yes, I

22  would have reviewed her grades in her incoming records,

23  yes.  And standardized testing is all in the file.  All

24  of those things are there, yes.

25           MS. HOWLETT: Just give me one moment, Your

Colloquy                                    18

1    Honor.

2             MS. WARSHAW: I'm going to object to some of

3    this testimony because I know Your Honor said that

4    you're going to review the motions later on, but the

5    fact is that we did not ever receive her entire student

6    file, so I can't -- I'm at a disadvantage and my

7    clients are at a disadvantage because they have not

8    received their full -- the full standard file.

9             THE COURT: We went through this before.  You

10   said you sent it, she said she didn't have it.

11            MS. WARSHAW: Your Honor, we haven't received

12   it all.  We asked for things.  My clients signed an

13   authorization November 3rd.  They also signed an

14   authorization for Purnell School, October 17th, 2017.

15   We've never received the complete file at all.

16            THE COURT: What did you receive?

17            MS. WARSHAW: I didn't receive any of the HIB

18   investigations.  I didn't receive anything regarding

19   disciplinary issues.  I never received the e-mails and

20   the correspondence between the teachers and everything

21   regarding this child.  I didn't receive anything

22   regarding the behavioral support program and the Being

23   Successful program.  There were numerous other things

24   that I didn't receive and I've been asking for it.  I

25   even had to OPRA request them and I still didn't

                             Colloquy                    19

1      receive them all and I keep getting denials.

2                  THE COURT: Well, I'm not going to deal with

3      the OPRA, so --

4                  MS. WARSHAW: Well, I --

5                  THE COURT: I can't order anybody to comply

6      with it, so --

7                  MS. WARSHAW: But, Your Honor, if he's going

8      to talk about student files and stuff, we don't have

9      the complete file and we never received it so --

10                 THE COURT: I'm going to stop you for a

11     second.  All he's talking about is the eighth grade

12     files, which they don't have the ability to send you.

13                 MS. WARSHAW: Yes, they do.  When we asked for

14     -- my clients signed --

15                 THE COURT: The eighth grade files?

16                 MS. WARSHAW: My clients --

17                 THE COURT: It's a different district.

18                 MS. WARSHAW: It doesn't matter.  The eighth

19     grade files were brought to the high school and they

20     were --

21                 THE COURT: Stop for a second.

22                 Ms. Howlett?

23                 MS. HOWLETT: Your Honor, the petitioners were

24     provided with a true and accurate copy of the student's

25     pupil records.  If there are records that they claim

1    are in existence but aren't included, they're not in

2    existence and maintained by the District.  These, as

3    Your Honor mentioned, are records that came from her

4    elementary school, and all these documents were

5    provided to petitioner's counsel in accordance with the

6    pre-hearing order.

7             MS. WARSHAW: Your Honor, they were not

8    provided to me.

9             THE COURT: All right, well --

10            MS. WARSHAW: The only time I received records

11   --

12            THE COURT: Stop, stop.  She says "Yes," you

13   say "No," and what am I supposed to do, flip a coin?

14            MS. HOWLETT: They're in the binder, Your

15   Honor.

16            MS. WARSHAW: Your Honor, I --

17            THE COURT: You know what?  If you want to

18   brief it, brief it.  I'm going to allow him to testify

19   and if I have to -- if I have to make an exception, or

20   rather, if I have to go back to it and exclude some of

21   the testimony sometime in the future, I'm going to do

22   it.  But, you know, unless you can -- if you're going

23   to submit a motion and say what you did in terms of

24   asking for information and what you didn't get and let

25   her respond to it -- this, I sent it; this, I didn't

1    get it.  I don't have an ability to make a decision on

2    that because I don't know.

3            MS. WARSHAW: She can prove that she sent it

4    then, because, honestly, I don't have it and I got

5    different things under OPRA than I did under -- in her

6    binder, and I --

7            THE COURT: So I have an officer of the court

8    telling me she sent what she has and you're telling me

9    you didn't get it.  Again, I don't know what to do.

10           MS. WARSHAW: So she --

11           THE COURT: I'm not going to flip a coin.  I'm

12   going to let him testify.  If you want to file a motion

13   about -- in limine regarding something, feel free to do

14   it.  Right now, he's testifying.

15           MS. WARSHAW: Okay.  Well, we already sent --

16   submitted motions before the trial started regarding

17   this.  This is what we had submitted, so --

18           THE COURT: The only motion I have is the

19   District's motion.

20           MS. WARSHAW: Your Honor, we had asked for a -

21   - we had asked for a conference call and we've asked to

22   strike to strike the answer and for them not to be able

23   to present --

24           THE COURT: Well, you didn't file a motion.

25   Did you file a motion or did you --

Colloquy / Cusack - Direct                    22

1              MS. WARSHAW: I filed an informal motion to

2        the Court, yes.

3              THE COURT: Then I'll have to go back and

4        look.  I don't see it.

5              MS. WARSHAW: A few weeks ago, March 27th,

6        actually.

7              THE COURT: Okay.

8              MS. WARSHAW: Okay.  Thank you.

9              THE COURT: I'm going to let him testify.

10             Go ahead.

11             MS. HOWLETT: Thank you, Your Honor.

12       DIRECT EXAMINATION BY MS. HOWLETT (CONT'D):

13             Q    Mr. Cusack -- is it "Cusack" or --

14       A    Correct.  Cusack is fine.

15             Q    Can you just turn -- there's a binder in

16       front of you with a bunch of documents.  If you could

17       just flip to the tab marked 25 and if you can describe

18       what that document -- at the bottom it's marked --

19       excuse me -- it's marked "WM-110."

20       A    Yes.

21             Q    And if you could just describe to the Court

22       what that document appears to be.

23       A    This appears to be a copy of her final eighth

24       grade report card.

25                                      (R-25 Marked for

Cusack - Direct                                    23

 1                                    Identification)

 2           Q     And have you seen this before?

 3      A     Yes, I have.

 4                 MS. HOWLETT: Your Honor, respondent's move R-

 5      25.

 6                 THE COURT: Ms. Warshaw?

 7                 MS. WARSHAW: No objection.

 8                 THE COURT: Okay.  It's in.

 9                                    (R-25 Entered into

10                                    Evidence)

11      BY MS. HOWLETT:

12           Q     Mr. Cusack, I certainly don't want you to --

13      we can all read it, so we don't want you to, but if you

14      could just -- when you look at a student's report card

15      from their elementary school, what are some of the

16      things that you look at on a report card like this?

17      A      I look for anything that seems out of place grade-

18      wise.  I want to -- I'm looking for strengths; I'm

19      looking for weaknesses.  The eighth grade, in looking

20      at this now, language arts would have been, you know,

21      towards the end of eighth, an area of weakness, for

22      example.  She's a very talented musician.  It doesn't

23      surprise me she had A plus's in band.  She plays the

24      clarinet.  So, yeah, so grades, I would look for that.

25      I would also look for other things that might give me a

Cusack - Direct                                    24

1      red flag as to attendance issues, perhaps.  As you can

2      see, she has, you know, several absences each quarter,

3      which is not unusual.

4            Q    And would you also read the instructor

5      comments that are included?

6      A    Yes.  Yes, I mean --

7            Q    And when you read J.H.'s report card, was

8      there anything, you know, really notable in here?

9      A    No.  I mean, just similar to my first impression

10     of her, you know, she's a pleasure to have in class.

11     You know, she's a cooperative student.  You can see

12     some of these here -- "good effort," "satisfactory" --

13     shows -- you know, you can see in Spanish -- yeah.

14           Q    So, in short, did this -- did J.H.'s report

15     card raise any red flags to you?

16     A    No, not at all.

17           Q    And do you also review standardized testing?

18     A    Typically, only if it comes to a point where we

19     have to -- where we are going to be doing an I&RS

20     referral or a CST referral.  That's not something I

21     would normally go -- for every one of my students, to

22     look into their file as they come in.  If I'm seeing a

23     weakness -- let's say a student is struggling in math

24     and I -- the teacher is concerned that perhaps they're

25     at the wrong level, I would review their file and see

1    if there is a pattern of weakness in math --

2    standardized testing results for math, as an example.

3         Q    Would you have reviewed J.H.'s standardized

4    testing from elementary school?

5    A    Not from elementary school.  Typically -- I mean,

6    I believe -- again, I may have photocopied a couple of

7    the -- everything from sixth, seventh, and eighth

8    grade, NJ ASK results, yes.  From the elementary

9    schools, most likely, no.

10        Q    I'm sorry.  I went to an elementary school

11   that was K to eight, so when I say "elementary school,"

12   I just mean the sending district.

13   A    Oh, okay.  Absolutely.  Yes, I would have referred

14   to the most -- like sixth, seventh, and eighth grade, I

15   may have photocopied and I cannot remember.  If it's in

16   this file, it would be in here somewhere.  Maybe the

17   fifth grade scores or fourth or fifth grade scores may

18   be in there.  But, yes, I would refer -- through the

19   process of evaluation, I would have reviewed those

20   results.

21        Q    So now that we've clarified elementary school

22   --

23   A    Yes, I'm sorry.

24        Q    No, no, no, that's okay.  That's my

25   misunderstanding.

1          Do you also review the report cards?  You

2     said eighth grade -- I'm not testifying for you, but I

3     believe you testified earlier that you reviewed the

4     eighth grade report card.

5     A    Yes.

6          Q    Do you also review sixth and seventh grade as

7     well?

8     A    If there were a need to do so, yeah.  I mean, as

9     they're coming in, I'll look at the -- we do review the

10    eighth grade report cards when we have their meetings

11    in -- all eighth graders come up for a meeting at the

12    high school so they can get to see -- meet me, get to

13    know the building, and we develop their schedule

14    requests for the next school year, so I would refer to

15    the report card that we had as of that moment to

16    determine if the levels were the appropriate levels and

17    to kind of help the family to develop the best possible

18    schedule.

19         Q    Do you recall whether you would have looked

20    at J.H.'s report cards from sixth and seventh grade?

21    A    I do not recall.

22         Q    Not a problem.  Can I please ask you to turn

23    to R-34 and describe what that document is?

24    A    Sure.  R-34 is a copy of the NJ ASK Spring of 2014

25    standardized testing results in English language arts

1   and mathematics.

2                              (R-34 Marked for

3                              Identification)

4        Q    And have you seen this document before?

5   A    Yes, I have.

6        Q    And it's in regard to what student?

7   A    J.H.

8             MS. HOWLETT: Your Honor, we move R-34.

9             THE COURT: Any objection?

10            MS. WARSHAW: No objection.

11            THE COURT: Okay.

12                             (R-34 Entered into

13                             Evidence)

14  BY MS. HOWLETT:

15       Q    And just because there's not -- we don't have

16  to go into all the sub --

17  A    Sure.

18       Q    -- subtesting, but if you could just indicate

19  -- like, interpret this for us --

20  A    Sure.

21       Q    -- what the -- what the results of her New

22  Jersey ASK scores were.

23  A    So, for the New Jersey ASK, a proficient score is

24  200, a minimum of 200, and the proficient range is 200

25  to 249.  Anything above 250 is considered advanced

Cusack - Direct                          28

1    proficient.  Anything below 200 is considered to be

2    partially proficient.  J.H. scored 242 in English

3    language arts, and 250, at the advanced proficient

4    range, in mathematics.

5         Q    So did these scores raise any raise flags to

6    you?

7    A    Not at all, no.

8         Q    And if you could just turn to R-33, please,

9    and describe for us what that document is.

10   A    Those are the standardized testing results for

11   J.H. from the previous school year, 2013, and same --

12                                   (R-33 Marked for

13                                   Identification)

14        Q    Hold on.

15   A    Did I refer to the wrong one?

16        Q    No, you're fine.  Just hold your horses.

17   A    Okay.  Sorry.

18        Q    Have you seen this document before?

19   A    Yes, I have.

20        Q    Okay.  And it's -- and you said it's for what

21   student?

22   A    J.H.

23             MS. HOWLETT: Your Honor, we would like to

24   move R-33.

25             THE COURT: Any objection?

Cusack - Direct                              29

1          MS. WARSHAW: No, Your Honor.

2          THE COURT: Thank you.

3                                    (R-33 Entered into

4                                    Evidence)

5      BY MS. HOWLETT:

6          Q    Now we can talk about it.

7      A    Okay.

8          Q    And can you do the same thing --

9      A    Sure.

10         Q    -- and just summarize what this -- these

11     results mean?

12     A    Again, English, language arts, and mathematics,

13     she scored -- same criteria -- above a 200 is

14     proficient; above 250 is advanced -- she scored 225 in

15     both English language arts, and mathematics.

16         Q    And did those results raise any red flags for

17     you?

18     A    No.

19         Q    And can you turn to R-35?  It's marked "128"

20     on the bottom.

21     A    Yes.

22         Q    A little hard to see.  And can you describe

23     what this document is?  This one looks a little

24     different.

25     A    Yes, this appears to be a photocopy of a sticker.

1      Oh, no, I'm sorry.  This is -- this is her permanent

2      record card, so, yes, she is -- this is the science.

3      Should I go on or do I need to --

4           Q    Yeah, describe it for us, yeah.

5      A    I'm sorry.  Yes, this is the -- this is the State

6      assessment in science.

7                                         (R-35 Marked for

8                                         Identification)

9           Q    And it's for what student?

10     A    J.H.

11          Q    And is it -- is there a time frame that this

12     is for, these results?

13     A    This is May of 2015, so she would have -- right

14     before she entered.  She was in the eighth grade, so

15     right before she entered the high school.

16          Q    Have you seen this before?

17     A    Yes.

18               MS. HOWLETT: Your Honor, we'd like to move R-

19     35?

20               THE COURT: Objection?

21               MS. WARSHAW: No objection.

22                                         (R-35 Entered into

23                                         Evidence)

24     BY MS. HOWLETT:

25          Q    And can you just describe for us what the --

 1    what this means?

 2    A    It's, of course, an assessment in science and she

 3    scored 250, at the advanced proficient level.

 4         Q    Thank you.  So let's talk about J.H.'s ninth

 5    grade year.  You testified earlier that she was -- that

 6    you were assigned to her as a counselor.

 7    A    Yes.

 8         Q    So, were there any issues with her in ninth

 9    grade that you were aware of?

10    A    No, nothing stands out at all that she -- if I

11    recall, she had strong grades.  There was -- I can't

12    remember off the top of my head what her report card

13    was, but that would --

14         Q    Do you remember receiving any reports from

15    teachers --

16    A    No.

17         Q    -- that there were any issues?

18    A    Nothing.  Nobody had received -- had reached out,

19    that I remember, had reached out to me, expressing any

20    concern with her, you know, academically or socially.

21         Q    Do you recall any absence issues in ninth

22    grade?

23    A    I do recall, in discussing -- in reviewing her

24    record, that she did have -- I believe it was -- again,

25    I'm just -- this is just from memory; it may not be the

Cusack - Direct                                    32

1    exact number -- but around 16 or 15 unexcused absences,

2    but there was no pattern of anything that was alarming.

3    She -- they were scattered throughout -- spread

4    throughout the entire school year, one day here, one

5    day there, a couple of two days in a row, if I recall.

6    I believe, at some point towards the very end of the

7    school year, she had several medically excused

8    absences, according to the record.  And in order to

9    have a medically excused absence, the family just

10   provides a doctor's note, so that obviously would have

11   happened here.

12        Q    To your recollection, during ninth grade, did

13   the parents ever reach out to you with any concerns

14   about J.H. at school?

15   A    I mean, not that -- not that I recall any --

16   nothing, I mean, that would have -- I can't -- I can't

17   say for certain, but I do not recall any phone calls

18   expressing, you know, concern about academics or

19   anything else.

20        Q    Mr. Cusack, can you just turn to R-26, please

21   --

22   A    Okay.

23        Q    -- for us?  It's marked "112" at the bottom.

24   And just describe what that document is.

25   A    Sure.  This is a copy of the official student

1     transcript for J.H.  It is -- it basically is her first

2     grade -- first year of classes, so ninth grade classes.

3     There is a list of the courses, the levels at which she

4     took each course, the final course grade, and the

5     credit amounts she earned, and then the course -- the

6     block to the right is 16/17, her sophomore year, those

7     were the courses that she was enrolled in during the

8     sophomore year.  So this is not a final transcript of

9     her sophomore year; this is the final transcript that

10    we had on file as of -- when I generated the CST

11    evaluation.

12                                      (R-26 Marked for

13                                      Identification)

14         Q    So have you seen this document before?

15    A    I have seen this document, yes.  I'm sorry -- yes.

16         Q    That's okay.

17              MS. HOWLETT: Respondent would like to move R-

18    26, Your Honor.

19              THE COURT: Any objection?

20              MS. WARSHAW: No objection.

21                                      (R-26 Entered into

22                                      Evidence)

23    BY MS. HOWLETT:

24         Q    Mr. Cusack, does this -- does this accurately

25    reflect J.H.'s -- the classes which she was enrolled in

Cusack - Direct                                    34

1    and her grades for her ninth grade year?

2    A    Yes, it does.

3         Q    And can you tell us where those are shown?  I

4    think you kind of told us before, it might be on the

5    left hand side?

6    A    On the left column is the 15/16 school year, which

7    is the final -- any course that we have a final grade

8    on is from the 15/16 school year and is in the left

9    column, I'm sorry.

10        Q    We're just going to talk about 15/16 just for

11   a minute.

12   A    Sure.

13        Q    We're in ninth grade for now.  Can you just

14   tell us, what are the -- what are the "AV's" next to

15   the --

16   A    Those reflect advanced level, so -- yes, we have

17   several advanced levels.

18        Q    Yeah, can you describe the way -- every high

19   school is a little bit different, so can you describe

20   the different levels of the core classes?

21   A    Absolutely.  So, the levels start off -- if a

22   student is -- comes in under the umbrella of the child

23   study team, they may have self-contained courses, which

24   is very small level classes -- very small group of

25   students.  The next level up would be studies level.

1     That's for students that are fully mainstreamed.

2     There's usually two teachers in the room, a

3     collaborative.  And the next level above that is

4     academic.  That is the kind of first tier or your

5     college prep courses.  And then the next level is

6     advanced level, and beyond that is honors, for

7     freshman.  The only --

8          Q    A lot of different levels.

9     A    There are a lot of levels, yes.  The only

10    exception to that -- there are a couple of things;

11    maybe I'll just clarify.  Advanced Algebra I is the

12    highest level any student can take in Algebra I; there

13    is no honors level.  Band is academic.  There is --

14    students do not have the option to take an elective at

15    a higher level than academic until their sophomore

16    level.  And French I -- all foreign language that we

17    offer, the first and second year are labeled as

18    advanced.

19         Q    So, are all these courses that say "AV,"

20    those would be the advanced block of that course?

21    A    Yes.

22         Q    And can you -- again, we can all read, so you

23    don't have to go verbatim -- but can you summarize, you

24    know, her grades, or maybe indicate what her grade

25    point average would have been in ninth grade?

Cusack - Direct                                    36

1      A      Absolutely.  I mean, as of -- she was just on the

2      border of a -- she has a 3.48 GPA as of the end of her

3      freshman year -- a very strong GPA; that's honor roll.

4      Yeah, very -- she had excellent grades.

5             Q      When you saw this report card, did you have

6      any concerns about J.H. academically?

7      A      No.

8             Q      Would she have also taken standardized

9      testing during her ninth grade year?

10     A      She most likely would have, yes.

11            Q      Can I just have you turn to R-36, please?

12     And just describe to the Court what that document is.

13     A      Sure.  This is the PARCC assessment, so she

14     performed on the --

15                                         (R-36 Marked for

16                                          Identification)

17            Q      Hold on.

18     A      Oh, I'm sorry.  Yes, PARCC assessment.

19            Q      And it's for what student?

20     A      J.H.

21            Q      And is there, like, a time frame that this

22     would pertain to or taken?

23     A      This would have -- this would have been in the

24     spring of her -- of the ninth grade year; I believe

25     April.  It was held at that time, yes.

Cusack - Direct                                    37

1        Q     That's what time of year they take it?

2        A     I believe -- yes, it's always in the Spring.  Each

3    year, the actual testing dates fluctuate, but it is

4    typically April or May.

5              MS. HOWLETT: Your Honor, we'd like to move R-

6    36.

7              MS. WARSHAW: No objection.

8              THE COURT: Thank you.

9                                        (R-36 Entered into

10                                       Evidence)

11   BY MS. HOWLETT:

12       Q     And I'm sorry.  And you've seen this --

13       A     Yes, I have.

14       Q     -- have you seen this document before?  And

15   can you just describe for the Court what the results of

16   this assessment mean?

17       A     So, this is the English language arts literacy

18   report and she performed -- she earned a 758 and that

19   is -- that is proficient in the language arts testing.

20       Q     And can you just flip one more over to R-37

21   and just describe what this document is?

22       A     Sure.  This is the mathematics assessment for the

23   2015/16 school year, also taken in spring of her ninth

24   grade year.

25                                       (R-37 Marked for

Cusack - Direct                    38

1                                    Identification)

2        Q    And have you seen this document before?

3   A    Yes, I have.

4             MS. HOWLETT: Your Honor, I would like to move

5   R-37.

6             MS. WARSHAW: No objection.

7             THE COURT: Thank you.

8                                    (R-37 Entered into

9                                    Evidence)

10  BY MS. HOWLETT:

11       Q    And can you just do the same thing and

12  indicate or interpret what this report means?

13  A    Sure.  So, in this report, this is the mathematics

14  assessment, and she did not achieve the level four --

15  it's approaching expectations is what she's earned and

16  that is a 735; 750 would have been the -- I don't want

17  to say passing mark, because it's -- it's basically

18  saying it's -- met expectations is level four at 750,

19  so she was just under that.

20       Q    Anything concerning about this report?

21  A    Nothing that -- I mean, she was in the -- right in

22  the middle of middle range.  She's approaching

23  expectations.  This is the first time a lot of students

24  took this test.  It was a computerized test.  The first

25  time PARCC was administered to these students and it

Cusack - Direct                                        39

1    was a -- it's not an alarming result.  If she were down

2    in the -- you know, if she were down in the lower --

3    level one or level two, having performed as well as she

4    did in the other assessments, I would have -- I would

5    have been concerned.  But a 735 would not --- would not

6    alarm me.

7         Q    Does this document indicate what the state

8    and district averages are also?

9    A    I'm sorry.  I'm not aware of the actual averages

10   for the state or district.

11        Q    If you take a look at this document --

12   A    Yes.  Oh, I'm sorry, yes.  Yes, in the -- how

13   student -- how she compared with the other students, in

14   the lower right corner, how students in New Jersey

15   performed.  The district average was 741 and the state

16   average was 741 and J.H. scored a 735, so she was --

17   again, she was six points under the district and state

18   average.  I'm sorry -- six points under.

19        Q    Let's move onto tenth grade.

20   A    Okay.

21        Q    Anything notable between summer of ninth

22   grade and tenth grade that you're aware of?

23   A    No, nothing.

24        Q    And then what happens at the beginning of the

25   tenth grade year?  I guess that would be 16/17 (out of

Cusack - Direct                                    40

1    microphone range.)

2    A    Well, I mean, students report and they -- I mean,

3    they're the -- they've been there before and they

4    basically just roll into their first day schedule.

5    First day is -- all classes meet.  We have a rotating

6    schedule, so the first class -- all eight classes would

7    have met that first day of school.

8         Q    Do you remember anything notable about J.H.?

9    Did she appear for school?

10   A    On the -- on the first day, yes, the --

11        Q    To your recollection.

12   A    To my recollection, she was present in the opening

13   days of school.

14        Q    And can you just turn to R-27 for me, please?

15   It's marked "113" at the bottom.  And just describe

16   what this document is, at least that first page, for

17   the Court.

18   A    This is a copy of J.H.'s course schedule for her

19   sophomore year, her tenth grade year.

20                                  (R-27 Marked for

21                                   Identification)

22        Q    And that year was, as we've previously

23   discussed?

24   A    2016/17.

25        Q    And have you seen this document or generated

Cusack - Direct                              41

1    it?

2    A     Yes, I have.

3             MS. HOWLETT: Your Honor, we'd like to move R-

4    27.

5             MS. WARSHAW: No objection.

6             THE COURT: Okay.

7                                        (R-27 Entered into

8                                        Evidence)

9    BY MS. HOWLETT:

10        Q    And are these courses consistent with what

11   she did in ninth grade?  Would this be the natural

12   progression?

13   A     Yes, exactly.  She's moving -- she's moving along

14   at the progression that we would expect, having

15   performed as well as she did in her ninth grade year,

16   yes.

17        Q    And you previously testified that the "AV"

18   next to the course name indicates that it's an advanced

19   level course.

20   A     That's correct.

21        Q    Is that also true for this?

22   A     Yes, it is.

23        Q    And to your recollection, this accurately

24   reflects the courses that J.H. was enrolled in?

25   A     Yes, it does.

1      Q    Did you receive any correspondence or any

2   telephone calls or what happened with J.H. after, you

3   know, the commencement of the school year?

4   A    Sure.  In late September, mid to late September --

5   and again, I cannot remember the exact date -- I did

6   receive a phone call from Ms. H., from J.H.'s mom,

7   indicating that she was having a difficult time and

8   that she was going to be out of school.  Typically, if

9   a student is going to be out of school for a few days -

10  - if they were having her, you know, checked out -- I

11  would gather work from the teachers, communicate that

12  to the teachers, that the student is going to be out

13  for -- we're not sure.  You know, at that point in

14  time, obviously, we didn't know how long.  So, you

15  know, we requested work for her.

16      Q    So you would have done that?  You would have

17  reached out to the teachers?

18  A    Yes, yes.

19      Q    Were you surprised to hear that she was

20  having trouble?

21  A    Yes.  Yeah, I was.  You know, she had -- again,

22  freshman -- ninth grade year went well, and again, she

23  -- she's the type of student that, occasionally, I

24  would check on and we would have met in her ninth grade

25  year to schedule, and other than that, I mean, nothing

Cusack - Direct                                43

1    -- again, no red flags until that -- late that month.

2           Q    So that was late September, you testified.

3    A     Yes.

4           Q    So then what happened after you had that

5    initial -- to your recollection -- after that initial

6    communication from the parent or from Mom?

7    A     So, I -- you know, so J.H. continued to be out and

8    then I received another communication indicating that

9    she was going to be starting a program at ICCPC, and if

10   I recall correctly, it was -- depression and anxiety

11   was what the -- what she -- J.H.'s Mom had indicated.

12              THE COURT: Did you say it was depression and

13   anxiety?

14              THE WITNESS: I believe that's what -- I

15   believe that's what I recall.

16              THE COURT: Okay.  Thank you.

17              Proceed.

18              MS. HOWLETT: We'll clear it up.

19   BY MS. HOWLETT:

20          Q    Mr. Cusack, could you turn to R-39, please?

21   A     Sure.

22          Q    Thank you.  And just describe for the Court

23   what this document is.

24   A     This is a note from J.H.'s parents, dated October

25   10th, 2016.

Cusack - Direct                                    44

 1                                  (R-39 Marked for

 2                                  Identification)

 3          Q     Have you seen this document before?

 4     A    Yes, I have.

 5          Q     And did you receive a copy when it was sent

 6     to you?

 7     A    Yes.

 8               MS. HOWLETT: Your Honor, I'd like to move R-

 9     39, please.

10               MS. WARSHAW: No objection.

11                                  (R-39 Entered into

12                                  Evidence)

13     BY MS. HOWLETT:

14          Q     Now I'm just going say you can describe what

15     this document is indicating or what your impressions

16     were when you received it.

17     A    So, it basically verifies what -- you know, the

18     conversation that I had with J.H.'s Mom and Dad.  They

19     were both in communication with me.  It's that she has

20     -- should I read the first line?

21          Q     You don't have to read it verbatim --

22     A    Okay.

23          Q     -- but just what your -- your takeaway was.

24     A    It verified -- sure -- that she was -- that due to

25     what they describe as "crippling anxiety and

Cusack - Direct                               45

1    depression," that she was not able to attend school at

2    that point in time and that they were requesting home,

3    you know, tutors until she gets back on her feet, is

4    what they say.

5         Q    And will you please just flip one more, to R-

6    40?

7    A    Sure.

8         Q    And describe what this document is for the

9    Court, please.

10   A    This is a note from Plaza Family Medical, I

11   imagine her pediatrician, which verifies from a -- from

12   a medical professional that -- that J.H. was being seen

13   in their office for treatment of depression and

14   anxiety.

15                                      (R-40 Marked for

16                                      Identification)

17        Q    And, I'm sorry, did you say the date for the

18   Court?

19   A    This was -- I'm sorry -- December 11th, 2016.

20              THE COURT: October 11th.

21              THE WITNESS: I'm sorry.  October 11th, 2016.

22   Thank you.

23   BY MS. HOWLETT:

24        Q    And have you seen this document before?

25   A    Yes, I have.  Yes, I have.

1        Q    Thank you.

2            MS. HOWLETT: Your Honor, I would like to move

3      R-40, please.

4            MS. WARSHAW: No objection.

5                                    (R-40 Marked for

6                                    Identification)

7      BY MS. HOWLETT:

8        Q    And I'm sorry, you started to describe it,

9      but now, if you could just let us know what your

10     impressions of the letter were.

11     A    In order to start home instruction in our

12     district, it's policy that we receive a note from the

13     family requesting it and a medical note from a doctor,

14     verifying that this condition exists.  And therefore,

15     once we have those two documents, I am then able to

16     begin the process of home instruction.  So, it's a much

17     -- it's the next step involved in, like, kind of, you

18     know, instead of just sending work home, now we would

19     be providing actual tutors because she has -- you know,

20     to supplement the classroom time.

21       Q    And did you start that process in accordance

22     with the policy?

23     A    I did.  Well, I started this and, well, to my

24     recollection, I did start that but then she was, I

25     believe, almost immediately after this, involved in the

1   ICCPC and a private tutoring company that works for --

2   they contract with that organization -- took over the

3   actual tutoring.

4          Q    Can you turn to R-13, please?

5   A    Okay.

6          Q    Can you describe what this document is?

7   A    So, this is a document from ICCPC, indicating that

8   J.H. was now in their care, verifying that she would

9   not be out.  So, once we received this document -- I'm

10  sorry.

11                                  (R-13 Marked for

12                                  Identification)

13         Q    Have you seen this document before?

14  A    Yes, I have.  Yes, I have.

15         Q    And can you just tell us what the date is on

16  this?

17  A    October 20th, 2016.

18         Q    Thank you.

19              MS. HOWLETT: Your Honor, I would like to move

20  R-13.

21              MS. WARSHAW: No objection.

22                                  (R-13 Entered into

23                                  Evidence)

24  BY MS. HOWLETT:

25         Q    Now you can tell us what -- what the document

1       says or what your impressions of the document were.

2       A     Sure.  So, this document indicates to me --

3       indicated to me that J.H. was not going to be returning

4       to West Morris Central anytime in the very near future

5       and they indicated initially that it was a two week

6       window that they were looking at.  She would be

7       attending their partial program from 9 a.m. to 2:30

8       p.m., which is obviously during the course of our

9       normal school day, so they were requesting that we

10      transition over to American Tutor and -- for homebound

11      instruction.  So, I can't recall how that works.  I

12      believe there's an afternoon component, after the

13      morning therapy, the therapeutic component, where they

14      -- the tutors would work on the students on the

15      educational.

16           Q    So, do you recall what happened after?  So,

17      you get this document.  You've already testified that

18      the private tutoring company had taken over.

19      A     Yes.

20           Q    Do you recall what happened next?  This is

21      the end of October?

22      A     So, she enrolled in the program.  We would -- this

23      letter would have basically indicated that she was out

24      of -- going to be out of the district, out of the

25      building.  There's a designation in the attendance

Cusack - Direct                                     49

1    record, I believe it's HH, that they put in as an -- or

2    MED, which is medical.  I cannot recall which one went

3    in, but it just indicates that she's not going to be

4    attending class in the building and she was receiving

5    her partial -- the -- she was attending -- to the best

6    of my knowledge, she was attending that program at

7    ICCPC.

8         Q    And to your recollection, did you have any

9    telephone conversations?  You said earlier that you

10   were in touch with the parents.

11   A    Yes.

12        Q    Can you just describe what some of those

13   communications were like?

14   A    Well, just checking in, you know, updates, to see

15   how she's doing.  I recall that the -- I believe the

16   therapist had reached out to me at some point to --

17   just to, you know, just to kind of update.  Mostly, I

18   was in communication with the tutor company, just to

19   make sure that, you know, the educational component was

20   being taken care of.

21        Q    And then, was J.H. later cleared to return to

22   school?

23   A    Yes, she was.

24        Q    And discharged from -- was she discharged, to

25   your recollection, from whatever program she was in?

Cusack - Direct                                    50

1    A    Yes.  We would not have -- she would not have been

2    able to attend if we did not have an actual note from

3    ICCPC clearing her to return to school.

4         Q    Can you please turn to R-14 and describe what

5    that document is for the Court?

6    A    This document is dated December 12th of 2016.  It

7    is from ICCPC and it's signed --

8              THE COURT: December 2nd.

9              THE WITNESS: December 2nd -- I'm sorry --

10   December 2nd.

11   BY MS. HOWLETT:

12        Q    That's okay.

13   A    It is signed by the program psychiatrist, as well

14   as the senior clinician, and that -- in the note, it

15   states that she is -- J.H. is medically cleared to

16   return to school on Wednesday, December 7th.  The plan

17   would be for her to be with us for half days and then

18   she would continue with the program at ICCPC -- I

19   believe it would be the therapeutic component -- in the

20   afternoon.

21                                    (R-14 Marked for

22                                    Identification)

23        Q    And have you seen this document before?

24   A    Yes, I have.

25              MS. HOWLETT: Your Honor, I would like to move

Cusack - Direct                    51

1    R-14.

2              MS. WARSHAW: No objection.

3              THE COURT: All right.

4                              (R-14 Entered into

5                              Evidence)

6    BY MS. HOWLETT:

7         Q    And does this document, did it make any other

8    recommendations to you --

9    A    Yes.

10        Q    -- about what J.H. might need when she

11   returns to school?

12   A    Yes.  So, one of the things -- and anytime, with a

13   student coming back into the building, we always look

14   at a 504 plan.  Medical documentation -- again, this

15   sufficed.  And they -- we always ask -- in this

16   situation, I always defer to the professionals that

17   have been working with her.  So we basically, almost

18   verbatim, put in these recommendations into the 504

19   plan that I developed with Mrs. H. and J.H.

20        Q    And is it your common practice to review the

21   medical information and then incorporate that into a

22   504 plan?

23   A    Yes, yes.

24        Q    So what happened after you received that

25   letter, do you recall?

Cusack - Direct                                     52

1    A     So, I would have scheduled a meeting with J.H. and

2    her Mom and that would -- the purpose of that meeting

3    was to re-enter the building and also to make sure that

4    when she re-entered, that this 504 plan would be in

5    place with the supports that were recommended from --

6    from the therapist the psychiatrist, and that did take

7    place.  The 504 plan was in place when she returned.

8          Q     So did you develop a 504 plan for --

9    A     Yes, I did.

10         Q     Can you just turn to R-1, please?

11   A     Sure, yes.

12         Q     And can you just describe this document to

13   us?

14   A     Sure.  This document is the 504 plan that was

15   developed.  The date of the meeting was December the

16   7th, 2016.

17                                   (R-1 Marked for

18                                   Identification)

19         Q     And did you prepare this plan?

20   A     Yes, I did.

21               MS. HOWLETT: Your Honor, I would like to move

22   R-1.

23               MS. WARSHAW: No objection.

24               THE COURT: Okay.

25                                   (R-1 Entered into

Cusack - Direct                                    53

1                                     Evidence)

2        BY MS. HOWLETT:

3             Q    And so, what was the purpose of the 504 plan,

4        if you could just generally talk about it.

5        A    So, in this case with J.H., it was to ensure that

6        there was a smooth transition back to the high school.

7        So, she had been out at this point for over two months

8        and any time that a student is out of the building for

9        that long, you know, there's a concern that they may

10       have difficulty acclimating back, especially with, you

11       know the diagnosis that J.H. has.  So we developed

12       these accommodations to make sure that she was as

13       comfortable as possible, that she had the support in

14       the building that she needed from a psychological

15       standpoint, and also the support from an academic

16       standpoint as well.

17            Q    And there's not that many, I'm not going to

18       make you read them verbatim, obviously, but if you

19       could just describe what the accommodations are that

20       are provided in the 504?

21       A    Absolutely.  You know, we wanted to reduce as much

22       anxiety as possible, so anytime there was an

23       assessment, we offered extended time and we also

24       offered the opportunity to take those assessments in a

25       quiet setting, so she would not have had to take them

Cusack - Direct                    54

1    in a classroom with the other students.  One thing that

2    we viewed, that we've found with students with anxiety,

3    if they're allowed breaks, where the teacher is fully

4    aware that they will not be in the room. They just kind

5    of get up and they walk and we call it a walking pass.

6    Some students just need to get a little of that nervous

7    energy out and they walk around the hall and then they

8    return to class.  So, we gave J.H. that flexibility.

9    We have a room called the Zen Zone in our building

10   where it's basically about the size of this room.  It's

11   dark, dim lit.  It's got water features.  It's got

12   aroma therapy going.  It's just a quiet place of

13   relaxation where students who are stressed out can

14   access if they need to.  And then, she, of course, had

15   access to counseling in the guidance and the CST as

16   well.  Even though she did not have a -- she was not

17   under the umbrella of the CST at that time, we do have

18   psychologists on hand that were willing to meet with

19   her.

20        Q    And were -- it indicates on this document --

21   it appears to indicate that Mom and J.H. were present.

22   Is that accurate?

23   A    Yes, that is correct.

24        Q    And did they offer -- did they offer insight

25   at the meeting or any comments on the 504 plan?

Cusack - Direct                                    55

1     A     Yeah, I recall discussing what the recommendations

2     were from the middle school -- I'm sorry -- from ICCPC

3     and, you know, that's why, you know, the three of us

4     worked on this together.

5          Q     Did they raise any concerns about what was in

6     here?

7     A     Not that I recall.

8          Q     And did the parents sign the 504 plan?

9     A     Yes, they did.

10         Q     And that's indicated where?

11    A     On the second page, WM002, the participants,

12    parent and student.

13         Q     Did they sign anywhere else on this document?

14    A     The back page of where they -- the notification of

15    rights, parental, is on the back and Mrs. -- and J.H.'s

16    Mom and I signed and dated that on December the 7th.

17         Q     Thank you.  So what happened after the 504

18    plan meeting, from the entry meeting?

19    A     So, J.H. returned to school for that day.  I

20    recall specifically going -- at some point, seeing her,

21    checking in on her to see how she was doing.  I

22    specifically recall her smiling and saying things are

23    okay.  And at that moment -- you know, this was earlier

24    on in the day, and then I don't remember -- and after

25    that, the next communication I remember was, I believe,

1    that Monday, where I received, I believe, an e-mail

2    from J.H.'s Mom saying that there was a setback on

3    Friday and that she would not be in school Monday.

4         Q    Were you aware of any setbacks or issues that

5    had happened at school?

6    A    Not -- no, no -- I did not receive any

7    communications from any teachers or anyone saying that

8    there was an issue that -- no.

9              MS. HOWLETT: One moment, Your Honor.  I'm

10   sorry.

11   BY MS. HOWLETT:

12        Q    So, to your recollection, J.H. did not return

13   after that?

14   A    No, she did not come back into the building after

15   that -- I believe a day and a half that she was there,

16   perhaps.

17        Q    Now we're talking about getting up to the

18   break, right?

19   A    Yes, it's coming up at this point.  We're in

20   December, so it's coming up to the holiday break, yes.

21        Q    Do you recall receiving any subsequent

22   correspondence about -- maybe after break, about what

23   was going to happen with J.H., whether she was going to

24   return to school or receive additional treatment?

25   A    Yes.  So, I did receive communication from J.H.'s

1        parents, that they were going to take the break to

2        decide what course of action they were going to take.

3        At this point, I think, to them, I believe it was

4        clearly difficult for her to return to West Morris on a

5        full-time basis and they had mentioned specifically

6        that they were going to potentially withdraw her and

7        enroll in a small, private school.  I believe American

8        Christian was what they specifically mentioned as an

9        option they were exploring.  I don't recall if they

10       ever -- if they actually went and visited or not.  I

11       don't know.

12            Prior to that, you know -- yes -- or the other

13       option was to work on a child study team evaluation to

14       determine if she would remain in the district and to

15       see if she qualified for CST assistance.  And the

16       discussion was, would there be possibly an out-of-

17       district placement that could be appropriate for her

18       and I explained that we can't -- that's not something

19       we could even entertain until she was evaluated and

20       determined to be eligible by the child study team.  So

21       they said they were going to take the holiday break to

22       discuss that as a family and to see if they were going

23       to either withdraw her, enroll in a smaller school, or

24       pursue the CST evaluation.

25            Q     And do you recall what happened after break?

Cusack - Direct                                    58

1     A    Yes, I believe there was -- I received an e-mail

2     indicating that they would like to pursue the CST

3     evaluation and then I -- there should be a packet in

4     here somewhere which is the full report that I

5     generated, with the supporting documentation.

6              THE COURT: Just for the record, CST is child

7     study team.

8              THE WITNESS: Yes, sir.

9              MS. HOWLETT: Yes, Your Honor.

10             THE COURT: We all know what that means, but

11    somebody reading a transcript might not.

12             THE WITNESS: Sure, sure.

13    BY MS. HOWLETT:

14        Q    Mr. Cusack, could you just turn to exhibit R-

15    2?

16    A    Sure.

17        Q    (Out of microphone range) and can you

18    describe what this document is?

19    A    This is our standard special education referral

20    form.

21                                      (R-2 Marked for

22                                      Identification)

23        Q    And have you seen this before?

24    A    Yes, I have.

25        Q    Did you fill this out or did someone else

1    fill it out?

2    A    I filled it out.

3              MS. HOWLETT: Your Honor, I would like to move

4    R-2.

5              THE COURT: Any objection?

6    BY MS. HOWLETT:

7         Q    And now, this document, can --

8              THE COURT: (Out of microphone range)

9              MS. HOWLETT: I'm sorry.

10             MS. WARSHAW: No objection.

11             MS. HOWLETT: I'm sorry, Your Honor.

12             THE COURT: Thank you.

13                              (R-2 Entered into

14                              Evidence)

15   BY MS. HOWLETT:

16        Q    You stared to describe before, what is this

17   used for?

18   A    So, this is used for determining -- like,

19   basically, this is the form that's submitted to the

20   child study team, where we support -- where I advocate

21   on behalf of my student to establish -- to start this

22   child study team process -- referral process.

23        Q    Is it in triplicate form or something?

24   Because it's tough to read, like, the bottom.  Is it a

25   -- is it just a poor copy?

Cusack - Direct                                        60

1       A    No, it's just a standard -- it's actually -- I

2       think it's bright orange, so that might be why it's

3       dark.

4             Q    Right.

5       A    And I don't know why it was cut off on the bottom,

6       honestly.  I believe that would have been my last note,

7       though.  I have the original with me.  I don't know if

8       that would help.

9             Q    That's okay unless it comes up later.

10      A    Okay.

11            Q    You know, you can hold on to your file.  But

12      do you recall -- so, what was the basis for the

13      referral?

14      A    So, it was -- the -- one of the questions that

15      they had was would it be possible for J.H. to go to a

16      smaller school setting while remaining within the

17      district.  And again, the only way that that could

18      happen is if she was classified by this child study

19      team and eligible for an alternate setting.  So this --

20      so the paperwork, I gather, you know, the different

21      forms from the doctors, from ICCPC, any other

22      information, together for the CST to review to

23      determine if, in fact, she would be, you know, eligible

24      to be reviewed for a CST eval.

25            Q    So what happens to this form after you fill

Cusack - Direct                              61

1    it out?

2    A    It was submitted to Camille Greco, who is the

3    CST's administrative assistant, and she marked it

4    "Received" on January 3rd, 2017.

5         Q    And you said before that the parents

6    mentioned something about an out-of-district placement.

7    A    Yes.

8         Q    Can you talk a little bit more about what

9    they said about that?

10   A    So, they had mentioned a few names that they had

11   been interested in.  One school was a school that's

12   called Fusion Academy, which is a -- basically, it's a

13   -- from what I understand -- again, I spoke with a

14   person that represented Fusion Academy -- I believe

15   it's a one-on-one educational component where students

16   are -- and I don't know what their student population

17   is.  From what it was described, there's kind of a

18   common area where students can -- like a study lounge

19   and then they go from room to -- kind of station-to-

20   station almost, where they receive a block of time with

21   one-on-one instruction from a teacher in that area and

22   that it's purely -- again, my impression of this is

23   that it's educational, 100 percent focused on

24   educational.  I'm not aware of any therapeutic

25   component that goes along with that school -- again,

Cusack - Direct                                    62

1      that I'm aware of.  So that was one of the -- one

2      program that they had thought about, again, in addition

3      to the mentioning of looking at American Christian as a

4      possible -- like, a smaller school setting as well.

5      Those were the ones that we had -- that I recall

6      speaking to, so -- yeah.

7           Q    And at this time, had she been evaluated yet?

8      A    No, she -- this was just -- this was just the

9      paperwork that's submitted -- needs to be submitted in

10     order to schedule the eligibility -- no, I'm sorry --

11     not eligibility meeting -- the nature and the scope.

12          Q    And can you just turn to R-3, please, and

13     describe what this document is?

14     A    This is a document that indicates the pre-referral

15     intervention.  So, the District asks us to, prior to

16     doing -- to submitting a CST evaluation, what steps did

17     I take as the counselor to -- that didn't -- you know,

18     to help the student prior to, and for whatever reason,

19     did not work.  And then, you know, since these pre-

20     intervention actions did not work, now we're moving on

21     to the next step of a formal evaluation process.

22                                  (R-3 Marked for

23                                   Identification)

24          Q    And have you seen this before?

25     A    Yes, I have.

Cusack - Direct                                63

1      Q    Did you complete anything on this form?

2   A    I completed the form in entirety, yes.

3           MS. HOWLETT: Your Honor, we'd like to move R-

4   3.

5           THE COURT: Any objection?

6           MS. WARSHAW: No objection.

7           THE COURT: Thank you.

8                              (R-3 Entered into

9                              Evidence)

10  BY MS. HOWLETT:

11     Q    Mr. Cusack, this form indicates that there's

12  a section that's entitled "Other Information You Feel

13  is Important to this Referral."  Can you just read what

14  you wrote there?  Did you write the response?

15  A    I did.

16     Q    And can you just read what you wrote?

17  A    "J.H.'s parents explored private school settings

18  but have opted to keep J.H. at West Morris Central to

19  pursue the CST evaluation."

20     Q    And when is this dated, this form?

21  A    This would have been submitted with the initial

22  form, January 3rd, 2017.

23     Q    And then can you just please turn to R-15?

24  It's marked "51" at the bottom.

25  A    Sure.

Cusack - Direct                                        64

1          Q     And just indicate for the Court what this is.

2     A      This is an additional letter from ICCPC, signed by

3     Dr. Shorzan (phonetic), the program psychiatrist, and

4     Melissa Douglas, the senior clinician, and it indicates

5     it is basically the medical support for support for a

6     child study team evaluation, where they basically

7     document or summarize, I should say, the treatment that

8     they had provided up to this point, and then, using the

9     DSM -- I would imagine IV at this point in time, maybe

10    V -- they determined the actual diagnoses.

11                                    (R-15 Marked for

12                                    Identification)

13         Q     So, have you seen this document before?

14    A      Yes, I have.

15         Q     And it's dated when?

16    A      January 6th, 2017.

17              MS. HOWLETT: Your Honor, we'd like to move R-

18    15.

19              THE COURT: Any objection?

20              MS. WARSHAW: No objection.

21                                    (R-15 Entered into

22                                    Evidence)

23    BY MS. HOWLETT:

24         Q     And to your recollection, was this document

25    provided with any sort of formal assessment report or

Cusack - Direct                                65

1    evaluation report?

2    A     I don't recall receiving anything other than this

3    document.

4         Q     And again, without, you know, reading it, but

5    just --

6    A     Sure.

7         Q     What was your impression or what was your

8    takeaway when you received this document?

9    A     My takeaway was that I was very hopeful that the

10   child study team would evaluate her because this is

11   absolutely a child that was in need of some type of a

12   therapeutic assistance in addition to what she had

13   already received through ICCPC and the -- you know,

14   again, this is -- I won't read this to you, but, you

15   know, they discuss her -- that the anxiety that she's

16   feeling is preventing her from attending a regular high

17   school and, you know, that they are working with her on

18   her depression and anxiety.  It says that she's

19   improved and works, you know, in smaller class group

20   settings.  And the thing that -- the most significant

21   thing for me was when I -- with the line that says,

22   "She would greatly benefit from more time in a

23   therapeutic setting to continue progressing with her

24   anxiety and depression at school."  And the Axis I

25   diagnosis was major depressive disorder, recurrent,

1    severe, without psychotic features and generalized

2    anxiety disorder as well.

3         Q    So what would you have done with this letter

4    after you received it, if you recall?

5    A    This was part of the referral packet.

6         Q    And who do you give the referral packet to?

7    A    Again, to the CST administrative assistant.  And

8    then, the director of special services, who was Dr.

9    David Leigh at the time, would have assigned her to a

10   case manager to start the process, to build a team that

11   would assess her in different areas.

12        Q    And then, what would be your involvement

13   after a CST referral?

14   A    After that, I'm more of a participant in the

15   meetings.  My role is basically -- I'm not going to say

16   done.  I'm obviously there and attend the meetings and

17   offer input if asked, but this kind of turns it over to

18   the child study team.

19        Q    And did you wind up attending any meetings --

20   A    Yes, I did.

21        Q    -- that involved the child study team?

22   A    Yes.

23        Q    Do you recall when those were?

24   A    I cannot remember the exact date.  I would have --

25   there should be a -- something indicating the nature

Cusack - Direct / Cross                               67

1      and scope meeting, which was what -- to determine what

2      assessments would be done if, A, we are going to

3      proceed with it, and if yes was the answer, and then

4      which -- you know, the social, the psychologicals --

5      what type of assessments would be done with J.H.

6           Q    But you're not a member of the child study

7      team.

8      A    I am not.

9           Q    Did you attend an IEP meeting as well?

10     A    I did.

11          MS. HOWLETT: Your Honor, I have no further

12     questions for this witness at this time.

13          THE COURT: Cross?

14     CROSS EXAMINATION BY MS. WARSHAW:

15          Q    Hi, Mr. Cusack.

16     A    Hello.

17          Q    I'm going to refer you to --

18          MS. WARSHAW: May I approach the witness?

19     Okay.

20     BY MS. WARSHAW:

21          Q    Mr. Cusack, I'm going to show you some

22     documents here.  Can you turn to exhibit 16, please?

23     A    Yes.

24          Q    Okay.  You had previously testified that you

25     had read this letter and that you were aware of its

1    context.  Is that correct?

2              MS. HOWLETT: Your Honor, I believe this was

3    previously marked.

4              THE COURT: Yeah.

5              MS. HOWLETT: I don't know if we want to go

6    back and forth.

7              THE COURT: We don't.  We don't want to do

8    that.  If it's already -- well --

9              MS. WARSHAW: Okay.  I can refer to her

10   numbers.  That's fine.

11             THE COURT: I love when lawyers quote my pre-

12   hearing notes and I'm going to quote it back to you.

13   You're directed to do a joint exhibit list and

14   documents, if it's possible.  This certainly seems like

15   one of those times when it would have been possible.  I

16   don't want to use the same exhibit marked in a

17   different matter.  This one's already in evidence.

18             MS. WARSHAW: Okay.  Let me just find it.

19   BY MS. WARSHAW:

20        Q    Okay, R-14.  I'm going to refer you back to

21   R-14.

22   A    This binder?  The original binder?

23        Q    The other binder, yes.

24   A    Okay.

25        Q    Isn't it true that some of the accommodations

Cusack - Cross                                        69

1    listed -- that you had listed as something that the

2    school district came up with as accommodations for

3    J.H., isn't it true that they were included a few days

4    earlier in this letter from ICCPC?

5    A    Yes, that actually was the primary source that I

6    used to generate the 504 plan.  I went almost

7    exclusively on -- I trust them as the professionals

8    that have worked with her for two months, so I went

9    with -- with what they recommended.

10        Q    Isn't it true that you received a letter from

11   my clients, dated January 4th, 2017, indicating that

12   they wanted J.H. evaluated for an IEP and for home

13   instruction?

14   A    I believe I did -- I would have received a letter

15   indicating that they wanted a CST evaluation, yes.  Is

16   there a reference to that document?

17        Q    Isn't it true that you received a letter

18   dated -- I'm going to refer you to R-15.

19   A    Sure.

20        Q    Isn't it true that this letter also indicates

21   that J.H. needed a smaller class group setting for

22   school?

23   A    Yes.

24             MS. WARSHAW: We have the same exhibit but it

25   hasn't been admitted yet into evidence, so --

Cusack - Cross                                70

1           THE COURT: It's already in evidence.

2           MS. WARSHAW: I'm sorry?

3           THE COURT: It's already in evidence.

4           MS. WARSHAW: No, no, a different one.  I'm

5     going to refer to a different one, R-17.  You can do

6     (out of microphone range).  That's fine.

7           THE COURT: I'm sorry.  Thank you.  I

8     misunderstood.

9           MS. WARSHAW: It's also -- okay.

10    BY MS. WARSHAW:

11        Q    So I'm referring you to R-17.  Have you ever

12    seen this document before?

13    A    I have seen it just through the course of

14    preparing for this.  This is not something that I would

15    have received as the guidance counselor.

16        Q    Okay.  But isn't it true that you testified

17    earlier that you received the other letters from ICCPC?

18           MS. HOWLETT: Your Honor, asked and answered.

19           THE COURT: I'll allow it.  Go ahead.

20           THE WITNESS: Yes.  This is the psychiatric

21    evaluation of March 15th, that you're -- if I'm on the

22    correct one -- 17?

23           MS. WARSHAW: Yes.

24           THE WITNESS: This would have been -- I would

25    not have -- I would not have submitted this document.

1        THE COURT: To the child study team?

2        THE WITNESS: To the child study team.  This

3    was, I believe, the psychiatric evaluation that was

4    done by ICPC (sic).

5    BY MS. WARSHAW:

6        Q    Okay.  So just to be clear, are you saying

7    that you saw the other letters from ICCPC and submitted

8    them to the child study team, but after your referral,

9    you didn't see any of the letters from ICCPC?

10   A    That's -- that's correct.  This, in reference to

11   this specific document, I did not -- I have not seen

12   this until I was reviewing this binder.  That's not

13   something that I would have been -- you know, in my --

14   this is something that would have been presented during

15   the -- I believe the eligibility meeting.  That's a

16   psychiatric report.

17       Q    Okay.  But isn't it true that you attended

18   the April 6th, 2017 IEP meeting?

19   A    Yes.

20       Q    Okay.  But you're not a member of the child

21   study team.  Is that correct?

22   A    I am not.  That is correct.

23       Q    So can you explain to the Court why you

24   actually attended the April 6th, 2017 IEP meeting?

25   A    Because a guidance counselor is required by Code

1    to be present during all CST meetings for students.

2         Q    Okay.

3    A    To my knowledge, that's the -- yes.

4         Q    This report -- this report is dated March

5    15th, 2017.  Is that correct?

6    A    Yes.

7         Q    Okay.  So, at the April 6th, 2017 IEP meeting,

8    this report was discussed.  Is that correct?

9    A    Yes, this report was discussed -- was presented,

10   yes.

11        Q    Okay.  So are you aware that Dr. Shinivasin

12   (phonetic) recommended --

13             MS. HOWLETT: Your Honor, this document is,

14   number one, not in evidence, and number two, this

15   witness has testified he's not a member of the child

16   study team and not qualified to view this document.

17             THE COURT: I mean, the document, if it's

18   going to -- if you're going to ask him a question about

19   what does it say that the doctor recommended -- I'm

20   assuming it's going to go into evidence at some point

21   in time, most likely without an objection, and it

22   speaks for itself or the doctor is going to testify.  I

23   mean --

24             MS. WARSHAW: He attended the meeting in which

25   it was discussed, so I'm asking him his knowledge.

Cusack - Cross                                73

1          THE COURT: Again, you asked him what she

2     recommended.  Ask him what he knows about what happened

3     at the meeting.

4          MS. WARSHAW: I asked -- okay.

5     BY MS. WARSHAW:

6          Q    Mr. Cusack, are you aware that this report,

7     dated March 15, 2017, by Dr. Shinivasin, recommended

8     that J.H. attend an out-of-district placement?

9     A    I -- during that meeting, they -- there was -- I

10    do not recall.  This was a meeting that occurred over a

11    year ago, so I do not recall.  I did not have access --

12    I did not review this document for the context of that

13    meeting and I don't recall the exact word verbiage of a

14    meeting that happened over a year ago.

15         Q    At the April 6th, 2017 IEP meeting, isn't it

16    true that you witnessed the interim school's

17    psychologist, Sherrie Wilke, tell J.H. at that meeting,

18    when the behavioral support program was discussed and

19    J.H. started to become upset, that it is not how adults

20    act and that J.H. should have an open mind?

21    A    Those -- I can't recall if those were her exact

22    words, but I do recall her saying something to that

23    effect.

24         Q    Isn't it true that you had several

25    discussions with my clients regarding J.H.?

Cusack - Cross                         74

1      A     Oh, yes.

2            Q    Isn't it true that you discussed with my

3      clients private schools for J.H.?

4      A     Yes, they discussed -- and again, under the

5      context of whether they were going to withdraw her from

6      West Morris and enroll in a private school or through

7      the context of a CST evaluation, if an out-of-district

8      placement -- there are many different private schools

9      that are therapeutic or such -- if that was going to be

10     what would -- ultimately, an option, and that would

11     have been, you know, depending on the outcome of the

12     child study team's findings.

13           Q    Isn't it true that you informed my clients

14     that despite the recommendation by Dr. Shinivasin for

15     an out-of-district placement for J.H., the District was

16     going to offer the behavioral support program as their

17     first suggestion for J.H.?

18     A     When a student is brought to -- you know, when

19     there are different options for a student, we always

20     look for the least restrictive environment first, and

21     we wanted to try that as an option because it is -- the

22     behavioral support -- I'm sorry -- the Being Successful

23     program is a small school, as was -- you know, it's

24     kind of a small school within a school that was -- as

25     was recommended, as you're indicating by a small school

Cusack - Cross                                    75

1    type.  There are -- again, I can't speak to the numbers

2    in that room, but to my knowledge, that is a small

3    school -- a small setting that is based out of West

4    Morris Mendham High School, our sister school.

5         Q    Isn't it true that J.H. never had any

6    disciplinary issues to your knowledge?

7    A    None.  Not that I'm aware of, no.

8         Q    And isn't it true that the BSP program is

9    actually called the Behavioral Support Program?

10   A    There are two programs.  The one that's housed out

11   of West Morris Central, which is her home building, is

12   called the Behavioral Support Program.  It is also

13   referred to -- there is another program at West Morris

14   Mendham called Being Successful Program, which

15   unfortunately, use the same letters.

16        Q    When did the Being Successful Program

17   actually come into existence?

18   A    I'm not aware of that.  I do not work in that

19   building, so I'm not -- again, that's -- the behavioral

20   -- the Being Successful Program at Mendham, I can't

21   speak to when it became.  I do not know when it became

22   in existence.

23             THE COURT: Can you stop for a second, please,

24   because I want to make sure I've got it right.  The

25   Being Successful Program -- what was the other -- the

1    other BSP program?

2              THE WITNESS: So, at West Morris Central,

3    which is J.H.'s home building, it's called the

4    "Behavioral Support Program," and that's a small group

5    within our building.  It has maybe seven -- six

6    students in each class for the core subject areas.

7              At Mendham, they have a program called Being

8    Successful Program, which is also kind of a school

9    within a school.  That's -- their acronym is the Being

10   Successful Program.

11             THE COURT: Okay.

12             THE WITNESS: I believe that's -- I got it

13   right.

14             THE COURT: I'm sorry to interrupt.  Go ahead.

15   BY MS. WARSHAW:

16       Q    I'm going to refer you to P-31.  That would

17   be in the blue binder.

18   A    I'm sorry -- P-31?

19       Q    P-31.  After the brochure, turn to the --

20   this page, which is in color, which is a copy of the

21   school district website.

22   A    Yes.

23       Q    Okay?  Can you tell me -- can you verify that

24   this is the school district official website?

25   A    This is the official website for West Morris

Cusack - Cross                                    77

1    Mendham High School.

2                                    (P-31 Marked for

3                                    Identification)

4         Q    West Morris Mendham.

5    A    Mendham, yes.

6         Q    Okay.

7    A    I am based out of West Morris Central.

8         Q    Okay.  So, can you read what it says under

9    "Program of Studies?"  There are four bolded categories

10   there.  Can you read what the second one is?

11   A    Sure.  "Behavioral Support Program."

12        Q    And that's West Morris Mendham High School.

13   A    That is correct.

14        Q    Right.  That's the high school that you just

15   indicated had the Being Successful Program.  Is that

16   correct?

17   A    Yes.

18        Q    Okay.  But it's actually called the

19   Behavioral Support Program, isn't that correct,

20   according to the website?

21   A    The -- so, I don't -- I have never seen this

22   website before.  I don't know if this is -- this says,

23   "alternate student programs," just reading through

24   here.  I'm sorry, this is -- I just saw the Mendham

25   High School logo.  This is the Regional High School

1    District's website.  There are three websites -- West

2    Morris Central, West Morris Mendham, and West Morris

3    Regional High School District.  This is the West Morris

4    Regional High School District's page.  So, I'm sorry.

5    I did not -- the "Mendham" through me off.

6         Q    Mr. Cusack, isn't West Morris Regional High

7    School District -- doesn't that include West Morris

8    Central High School and Mendham High School?

9    A    Yes, it does.

10        Q    Yes, it does.  And it does say on this

11   website "Mendham High."  Is that correct?

12   A    That does say on this page "Mendham High,"

13   correct.

14        Q    Okay.  So it includes Mendham High School?

15   A    Yes.

16        Q    Okay.  So now turn to the next page.

17             THE COURT: Just to be clear, what it says on

18   there, "Mendham High," it appears to be a photograph of

19   the front of the school.

20             THE WITNESS: Yes.

21             MS. WARSHAW: Correct.

22             THE COURT: Okay.  Go ahead.

23   BY MS. WARSHAW:

24        Q    So I'm going to refer you to the next page,

25   which says, "Search Results."

Cusack - Cross                          79

1    A    Yes, okay.

2              MS. HOWLETT: Your Honor, we should

3    authenticate it.

4              THE COURT: Yeah, let's stop for a second.

5    I'm confused.  We marked as P-31, the Being Successful

6    Program Brochure.  In that, is attached a copy of, I

7    guess, a page -- a shot of, I guess, the front -- the

8    first page of the District's website.  It then has a

9    search result.  And this is all one document, and how

10   so?

11             MS. WARSHAW: This is one document.

12             THE COURT: Is this part of -- I'm not sure

13   how it's one document.  It seems to be several

14   documents.

15             MS. WARSHAW: Well, Your Honor --

16             THE COURT: And I'm not that smart.  This

17   confuses me.

18             MS. WARSHAW: Your Honor, this is -- part of

19   the issue that we had raised earlier was that we had

20   requested information regarding the Being Successful

21   Program versus the Behavioral Support Program.

22             THE COURT: I understand that.

23             MS. WARSHAW: And we never received that, so

24   this is -- this is the actual school district website,

25   copies of this, which talk about the Behavior Support

Cusack - Cross                                    80

1      Program at the Mendham High School.  There is no --

2      when you do a search, which I show the search, nothing

3      comes up for the Being Successful Program.  It only

4      comes up for the Behavioral Support Program, which --

5                MS. HOWLETT: Your Honor, I'm not sure, number

6      one, what this is probative about, and number two, this

7      appears to be a document that was created by counsel,

8      so it can't be authenticated by the witness.

9                MS. WARSHAW: I'm asking him if this is true.

10     That's all.  And if he -- if he's aware of this.

11               MS. HOWLETT: This is --

12               MS. WARSHAW: I'm not asking him if he created

13     the document.

14               THE COURT: One at a time.  One at a time.

15               MS. HOWLETT: Sorry, Your Honor.  I apologize.

16               THE COURT: I'm not that smart.

17               MS. WARSHAW: I'm not asking if he created the

18     document.  I'm asking him if he's seen this before and

19     if he's aware of this, because he just testified that

20     at one high school, it's called the Behavioral Support

21     Program, and another, it's called the Being Successful

22     Program.  But unfortunately, the school district

23     website has nothing regarding the Being Successful

24     Program.  It only has information about the Behavioral

25     Support Program.

Cusack - Cross                    81

1               THE COURT: Now you're testifying.

2               MS. HOWLETT: Your Honor --

3               MS. WARSHAW: No, I'm just telling you what it

4       says.  I'm just asking --

5               MS. HOWLETT: Your Honor, what's available on

6       the website is --

7               THE COURT: Yeah, I'm --

8               MS. HOWLETT: -- it is irrelevant.

9               THE COURT: Yeah, I don't know where we're

10      going with this, but --

11              MS. WARSHAW: Well, then I'm going to ask the

12      Court to take judicial notice of the website and what

13      it says.

14              MS. HOWLETT: We'll object to that, Your

15      Honor.

16              THE COURT: Yeah, and I'm not going to do that

17      anyway.

18              Are you responsible for maintaining the

19      website?

20              THE WITNESS: No, I am not.

21              THE COURT: You wouldn't happen to know who is

22      responsible for maintaining the website?

23              THE WITNESS: From a district standpoint, I do

24      not, no.

25              THE COURT: (Out of microphone range) and

Cusack - Cross                                    82

1       you're familiar with the two programs, though?

2                   THE WITNESS: I am only familiar with the

3       program that's at West Morris Central High School, the

4       BSP program that is --

5                   THE COURT: Don't use "BSP" because --

6                   THE WITNESS: Okay, I'm sorry.  The Behavioral

7       Support Program, yes.

8                   THE COURT: That's the only one you're --

9                   THE WITNESS: That's the one that I'm -- I

10      have a couple of students in it currently right now.  I

11      do not have any former students that are enrolled in

12      the program at Mendham.

13                  THE COURT: I'm going to let you ask him

14      questions about what he knows and not have him

15      speculate as to why the website has what it has on it,

16      because it doesn't help me.  And quite frankly, I don't

17      think it helps you either.

18      BY MS. WARSHAW:

19          Q    Mr. Cusack, are you aware that Dr. David

20      Leigh, the former director of special services, started

21      the Behavioral Support Program at the Mendham High

22      School?

23      A    I was not aware of that, no.  I'm not familiar

24      with who started that program.

25          Q    You testified that J.H. was an advanced level

1    student.  Is that correct?

2    A    Yes.

3         Q    Were you aware that the Behavioral Support

4    Program offered classes in the studies level?

5    A    I'm aware that they do offer classes at various

6    levels and they tailor it to meet the needs of the

7    individual student in the program.

8         Q    Are you aware that the school district,

9    Regional High School district website does say that all

10   special education curricula addressed the New Jersey

11   Core Curriculum Content Standards, and for purposes of

12   GPA and rank, are considered studies level for the

13   Behavioral Support Program?

14             MS. HOWLETT: Your Honor, we're back to what

15   the website says.

16             MS. WARSHAW: Well, I'm just asking if he's

17   aware of it.

18             THE COURT: Yeah, she can ask that.

19             MS. HOWLETT: Okay.  I'm sorry, Your Honor.

20             THE WITNESS: Can you repeat the question,

21   please?

22   BY MS. WARSHAW:

23        Q    Are you aware that the West Morris Regional

24   High School District website indicates that all special

25   ed curriculum address the New Jersey Core Curriculum

Cusack - Cross                                                84

1    Content Standards, and for purposes of GPA and rank,

2    are considered studies level in the Behavioral Support

3    Program?

4    A    I am not aware that the website indicates that,

5    no.

6         Q    Okay.  Are you aware that the Behavioral

7    Support Program at the Mendham High School offers study

8    level curriculum?

9    A    I am not aware of that.

10        MS. HOWLETT: Your Honor, the witness has

11   already testified that the program at Mendham High

12   School is not referred to as the Behavioral Support

13   Program; it's referred to as the Being Successful

14   Program.  I object to the question.

15        THE COURT: Answer the -- I'm going to let him

16   answer the question.

17        Answer the question.

18        THE WITNESS: I'm sorry.  Could you please

19   repeat the question?

20   BY MS. WARSHAW:

21        Q    Are you aware that the Behavioral Support

22   Program at the Mendham High School offers studies level

23   curriculum?

24   A    I'll be honest.  I am not aware of any details of

25   the Behavioral Support Program at Mendham High School -

Cusack - Cross                                    85

1      - of the Being Successful Program at the -- at Mendham

2      High School.  I'm -- that's -- I don't have any

3      students that are in the program currently.  I haven't

4      had any students that are in the program.  The program

5      that is based out of our school -- if a student is

6      transferred to the Being Successful Program at Mendham,

7      they would be brought in as a new, and most likely,

8      have a new guidance counselor that, you know,

9      specializes in that specific program.  I have students

10     that are in the Behavioral Support Program at Central

11     and I work with those students in that building -- in

12     this building.  But I will admit that I do not have any

13     real knowledge, working knowledge, of the Being

14     Successful Program at Mendham High School.

15          Q    You testified earlier, isn't it true that the

16     studies level curriculum is different from the advanced

17     level?

18     A    Every level is -- yes, there are -- there are

19     varying levels within our district, yes.

20          Q    Is it fair to say that the studies level is a

21     lower level curriculum than the advanced level

22     curriculum?

23     A    It is.  It's mainstreamed, however, it is a --

24     studies level is lower level -- a lower level course.

25          Q    And isn't it true that the Behavioral Support

Cusack - Cross                                           86

1    Program is a self-contained program for students?

2    A    Which program are you referring to -- the Mendham

3    program?

4         Q    The Mendham High School.

5    A    To my knowledge, that is one thing that I do know,

6    that, from what I understand -- from what I understand,

7    again --

8              THE COURT: The Being Successful -- we're back

9    at Mendham.

10             MS. WARSHAW: Your Honor --

11             MS. HOWLETT: Your Honor --

12             MS. WARSHAW: Your Honor, again, I'm going to

13   object because I --

14             THE COURT: You're going to object to what I'm

15   saying?

16             MS. WARSHAW: No, I'm going to object to

17   anything being referred to as the Being Successful

18   Program because I requested -- numerous times, I

19   requested documents on that, to show that it existed.

20             THE COURT: And I already ruled on that,

21   didn't I?  So I'm going to allow him to testify.  You

22   asked him -- my problem is you asked him a question

23   about the Behavioral Support Program at Mendham.  I

24   think, at Mendham, it's the Being Successful Program.

25             THE WITNESS: Yes.

1              THE COURT: So, I just don't want to confuse

2       the record, that we're asking about this BSP thing.

3       It's a little confusing.  But you asked him a question

4       about Behavior Support Program, which he's testified

5       he's familiar with, but you said "at Mendham," and from

6       what I've gotten so far from his testimony, that the

7       BSP program at Mendham is the Being Successful Program,

8       which he is not familiar with.  So, I don't know.  You

9       may have just mixed schools when you asked the

10      question, but you did ask -- I wrote "Behavioral

11      Support Program," and then I stopped because you said,

12      "at Mendham," and that's when I opened my mouth to find

13      out where you were going.

14      BY MS. WARSHAW:

15         Q    I'm going to refer you to P-26.

16              THE COURT: I take it you're withdrawing that

17      question?

18              MS. WARSHAW: I'm sorry, Your Honor?

19              THE COURT: You're withdrawing that question,

20      that I asked which program you're referring to?  You

21      were asking a question about one of the BSP programs,

22      but you said "Behavioral Support Program," and then you

23      said "at Mendham," and that's when I stopped you.

24              MS. WARSHAW: I'm going to follow up with a

25      different question.

Cusack - Cross                                88

1            THE COURT: Thank you.

2     BY MS. WARSHAW:

3         Q    Have you ever seen this document before?

4     A    I assume we're looking at the copy of J.H.'s IEP -

5     - draft  -- that says "draft" on the bottom?

6                                    (P-26 Marked for

7                                    Identification)

8            THE COURT: I didn't get the number.  I'm

9     sorry.

10           MS. WARSHAW: Oh, P-26.

11           THE COURT: Thank you.

12    BY MS. WARSHAW:

13        Q    I'm going to refer you to what's listed on

14    the bottom page as "13/22."  It's entitled "Special

15    Education Determination."

16    A    Thirteen slash 22?

17        Q    Correct.

18    A    Am I in -- am I in the correct binder?  I just

19    want to -- because I'm seeing 8/20, 9/20, 10/20, 13/20.

20        Q    No, you're too far.  Go to the first IEP.

21    This is 13/22.

22           MS. HOWLETT: I'm not sure where we are

23    either.  I don't see a 13/22.

24           THE WITNESS: I don't see a -- again, if I'm

25    in the wrong -- I might be in -- I'm in their binder.

1           THE COURT: Yeah, Ms. Warshaw, I just went

2      through every page.  The lower right hand corner,

3      correct?

4           MS. WARSHAW: Yup.

5           THE COURT: No 13/22.

6           MS. WARSHAW: Is it 13/20?  Yes.  Okay.  You

7      know what?  There's -- the way it printed, some say

8      "13/22"; the others say "13/20."  So if you have 13/20,

9      it's the same document.

10          THE WITNESS: Okay, yes.

11     BY MS. WARSHAW:

12     Q    Okay.  On the top left hand side, there's a

13     sentence that says, "At this time."  Do you see that?

14     A    Yes.

15     Q    Okay.  Can you read that sentence for me,

16     please?

17     A    "At this time, J.H. is receiving home

18     instruction."  The entire --

19     Q    Read that whole paragraph.

20     A    The whole paragraph?  Okay.  "It is recommended

21     that J.H. continue with home instruction in the morning

22     and begin attending West Morris Mendham High School's

23     Behavioral Support Program in the afternoon.  J.H. will

24     have a shortened day, from 11:30 to 2:35."

25     Q    So am I correct when it says that West Morris

1    Mendham High School has a Behavior Support Program?

2    A    I believe --

3         Q    Is that what it says?

4    A    That is what is typed in this page.

5              MS. HOWLETT: Your Honor, we --

6    BY MS. WARSHAW:

7         Q    We're going to go to page --

8              THE COURT: Wait, wait, wait.  I'm sorry.  Go

9    ahead.

10             MS. HOWLETT: Have we moved this document in?

11             THE COURT: We didn't move it yet.

12             MS. WARSHAW: No, we're going to move it

13   afterwards.

14             THE COURT: She can ask questions without

15   moving it.

16             MS. HOWLETT: That's fine.

17             THE COURT: Okay.

18             MS. HOWLETT: I was just catching up (out of

19   microphone range.)

20   BY MS. WARSHAW:

21        Q    We're going to -- I'm going to refer you to

22   page 16 of 20.

23   A    Okay.

24        Q    On the bottom third of the page, it says,

25   "Additional Special Education Program Information."  Is

Cusack - Cross                                    91

1    that correct?

2    A    Sixteen slash twenty?

3              THE COURT: Sixteen twenty in my binder says,

4    "Notice Requirements for the IEP (out of microphone

5    range)"

6              MS. WARSHAW: Fifteen twenty.

7    BY MS. WARSHAW:

8        Q    It says, "Additional Special Education

9    Program Information" about two-thirds the way down on

10   the page.  Is that correct?

11   A    Yes.

12       Q    Okay.  Can you read that paragraph, please?

13   A    "It is proposed that J.H. will continue to receive

14   home instruction with a gradual return to a less

15   restrictive setting at Mendham High School within the

16   Behavioral Support Program.  J.H. will be expected to

17   attend afternoons only for the remainder of the 2016/17

18   school year.  Transportation will be provided to bring

19   J.H. to Mendham High School.  It is anticipated that

20   J.H. will attend a full-day program for the 2017/18

21   school year."

22       Q    So, again, according to the IEP that was

23   presented to my clients at the April 6th, 2017 IEP

24   meeting which you testified that you attended, is it

25   correct that this IEP refers to the Behavioral Support

Cusack - Cross                                    92

1    Program at the Mendham High School?

2    A    "Behavioral Support Program" is what is typed in

3    this report.

4        Q    Thank you.  And I'm going to refer you to the

5    first page of the -- let's see -- I'm sorry.  I'm going

6    to refer you to the second page of the IEP.  Are you

7    listed as the guidance counselor on that IEP

8    participants meeting?

9    A    Yes, I am.

10            MS. WARSHAW: Okay.  Your Honor, I'd like to

11   move this document into evidence.

12            MS. HOWLETT: Your Honor, no objection.

13            THE COURT: Okay.

14                                    (P-26 Entered into

15                                    Evidence)

16   BY MS. WARSHAW:

17       Q    Isn't it true, Mr. Cusack, that at the April

18   6th, 2017 IEP meeting, you pulled April Osteo Banda into

19   the meeting, as she was a former teacher at the Mendham

20   High School Behavioral Support Program, and currently,

21   the district instructional technology specialist, and

22   you informed -- and she informed you and my clients as

23   to the behavioral point system and the behavioral

24   aspects of that program?

25   A    Again, I know -- I have a very limited knowledge

Cusack - Cross                                    93

1      of the program, and having know that Ms. Banda was

2      formerly in that program, I saw it as an opportunity to

3      inform and that's why I asked -- she was asked to come

4      in and explain what the program was about to J.H. and

5      her parents.

6              Q    And isn't it true she explained to you and my

7      clients that there was a point system, so if students

8      showed up at school, they would receive points?

9      A      Again, I cannot recall the exact -- exactly what

10     was discussed, you know, by her.  I can't.

11             Q    And do you know who Tracy Costa is?

12     A      I'm aware of where -- Tracy Costa, I believe, is

13     the current person who handles the Being Successful

14     Program at Mendham.  To my knowledge, that's --

15             Q    I'm going to refer you to R-2.  Do you have a

16     copy of the original documents, because it's cut off on

17     the bottom.

18     A      I'm sorry -- R-2.

19                  THE COURT: That's the --

20                  THE WITNESS: Which document -- which binder?

21     Are we in your binder or back to --

22                  MS. WARSHAW: No, I'm sorry.  Yeah, the other

23     binder.

24                  MS. HOWLETT: The black binder.

25                  THE WITNESS: Okay.

| | |
|---|---|
| 1 | THE COURT: The black one is the R and the |
| 2 | blue one is the P binder. |
| 3 | THE WITNESS: Gotcha.  All right. |
| 4 | THE COURT: He's already testified he has the |
| 5 | original. |
| 6 | THE WITNESS: Yes, I do have the original. |
| 7 | BY MS. WARSHAW: |
| 8 | Q    Do you recall what is on the original, what |
| 9 | it says on the last line or so? |
| 10 | THE COURT: How about we ask him to actually |
| 11 | read it from the original, as opposed to having him |
| 12 | recall. |
| 13 | MS. HOWLETT: Your Honor, we'd be more than |
| 14 | happy to produce the original.  I apologize for the |
| 15 | copy. |
| 16 | THE COURT: I'm going to do it when we break. |
| 17 | I'm going to get a copy made for everybody. |
| 18 | MS. HOWLETT: Thank you. |
| 19 | MS. WARSHAW: Okay.  Thank you. |
| 20 | THE COURT: Read it out loud.  What does it |
| 21 | say? |
| 22 | THE WITNESS: Oh, I'm sorry.  I thought -- I |
| 23 | thought -- read everything that's listed except what we |
| 24 | can't, obviously, read.  Okay. |
| 25 | THE COURT: Yeah, read what we can't read. |

Cusack - Cross                                           95

1              THE WITNESS: Oh, I don't have the -- I don't

2      have the original in front of me.

3              MS. WARSHAW: Okay.

4              THE COURT: Oh, I thought you --

5              THE WITNESS: I'm sorry.  I have --

6              MS. HOWLETT: The witness was instructed to

7      leave his belongings in another room, so --

8              THE COURT: Got it.  So it's available and in

9      the building today.

10             THE WITNESS: Yes.

11             MS. HOWLETT: Correct.

12             THE COURT: All right.  We'll take care of

13     that later.

14             MS. WARSHAW: Okay.  Thank you.

15     BY MS. WARSHAW:

16        Q    Mr. Cusack, you had testified that you

17     drafted this document yourself, correct?

18        A    That's correct.

19        Q    Okay.  My clients never signed it or

20     anything, but you -- you drafted this yourself.

21        A    No, the acknowledgment, I guess, would be the best

22     word to use, of -- from the parents would be the note

23     that you referenced earlier from -- I believe it was

24     January 6th, that indicated they requested the CST

25     evaluation to move forward.

Cusack - Cross                                96

1        Q    Okay.

2    A    I might be wrong on the exact date, however, but

3    you did reference something earlier to that effect.

4        Q    Were you aware that J.H. was never

5    hospitalized?

6    A    That is -- I believe -- I believed that when I

7    wrote this, this letter was -- this document -- yes, I

8    am aware of that.  I've been told now that she was not

9    hospitalized and I -- I guess I mis-documented that.

10   That was an error on my part.  I just -- having

11   generated this form in January, having -- she was in

12   the partial program, you know, for several -- two

13   months -- and I just used -- it was a poor choice of

14   words to use.  I should have said "in a therapeutic

15   setting," as opposed to "hospitalized."

16       Q    Okay.  Are you aware that it was a partial

17   day program?

18   A    Yes.  A partial day program, yes, absolutely.

19       Q    You also indicated that she refused to return

20   to school the third day.  Isn't it true that, due to

21   her anxiety, she was unable to return to school --

22            MS. HOWLETT: Your Honor, he can't --

23   BY MS. WARSHAW:

24       Q    -- as opposed to refusal?

25            THE COURT: Sustained.  How is -- how is he

1   going to know that?

2              MS. WARSHAW: Well, I'm asking the

3   characteristic of what --

4              THE COURT: You're asking him to put his head

5   -- to know what she thought.  That's what you're asked

6   him to do.

7              MS. WARSHAW: No.  Okay.  I will rephrase it.

8   BY MS. WARSHAW:

9        Q    Mr. Cusack, how did you determine that J.H.

10  refused to return to school?

11  A    Well, I received an e-mail from Mrs. -- from

12  J.H.'s mother, indicating that she was -- that she was

13  not coming into school.  I believe that was on the 10th.

14  Somewhere in here is a copy of that e-mail.  I don't

15  know which one that is referenced.

16       Q    So, when you wrote "she refused to return to

17  school," that was your word, not --

18  A    That was my word.

19       Q    -- my clients' word?

20  A    Yes, those were my words, yes.

21       Q    Okay.  And is it your understanding that,

22  based on what my client indicated to you, that J.H. was

23  unable to come to school due to her anxiety?

24  A    Again, it's possibly a poor choice of words that I

25  used in it, but, I mean, she was not present.  She was

1    not in school after that date due to her medical

2    issues, yes.

3         Q    I'm going to refer you in the black binder to

4    R-24.

5    A    Okay.

6         Q    Have you ever seen this document before?

7    A    Yes.

8         Q    Okay.  And can you -- I know that you went

9    through a little bit of this before, but can you verify

10   what grade level this was?

11   A    This was grade seven.  The document earlier was

12   grade eight.

13        Q    Okay.  And so, this was for which student?

14   A    J.H.

15                                   (R-24 Marked for

16                                    Identification)

17        Q    Okay.  And can you briefly describe what her

18   grades were in these classes?

19   A    She received for the -- well, this is not a final

20   -- I'm sorry -- yes, so a combination of A minus, A's,

21   and B's, an A plus, again, in band.  That's very strong

22   grades.

23        Q    Mostly A's, is that correct?

24   A    Yes, mostly A's, absolutely.

25        Q    Okay.

1              MS. WARSHAW: So then, Your Honor, I'd like to

2    move this into evidence even though -- I'm not sure it

3    was already put into evidence -- 24.

4              THE COURT: This was not in.

5              MS. WARSHAW: Okay.

6              MS. HOWLETT: It was not.

7              MS. WARSHAW: Okay.  So I'd like to move this

8    into evidence.

9              MS. HOWLETT: Yes, Your Honor.

10                                  (R-24 Entered into

11                                  Evidence)

12   BY MS. WARSHAW:

13        Q    Mr. Cusack, can you turn to R-25, the next

14   page?

15        A    Sure.

16        Q    And comparing her grades from R-24 for

17   language arts versus R-25 for language arts, can you

18   tell me what those grades are?

19        A    The grades are -- there's B grades, there's a bit

20   of a dip.  So, she had some B's and C pluses and C's.

21             THE COURT: Wait a minute.  I'm -- we just did

22   R-14, yes?

23             MS. WARSHAW: And then R-25.

24             THE COURT: R-24 I have as an invitation to a

25   meeting to determine special ed eligibility.

1           MS. WARSHAW: Oh, I'm sorry.  That's

2    respondents.

3                THE COURT: That's what I have.

4                MS. HOWLETT: R-24, Your Honor?

5                THE COURT: My R-24, I just flipped it and it

6    says, "Invitation to a Meeting to Determine."  That's -

7    -

8                MS. WARSHAW: I think that's P-24.

9                MS. HOWLETT: Are you in blue?

10               THE COURT: Black -- oh, I'm embarrassed.

11               MS. HOWLETT: I'm about to fire a paralegal

12   over that.

13               THE COURT: No, no.  My apologies.  Okay, go.

14               MS. WARSHAW: Okay.

15   BY MS. WARSHAW:

16       Q    So, Mr. Cusack, can you look at R-24 and 25

17   and compare her grades for language arts from seventh

18   grade to eighth grade?

19   A    So, in seventh grade, she had, in order from

20   marking period one through four, A, A minus, A minus,

21   A.  In marking period one through four on the grade

22   eight, she had a B, B minus, C, C minus, and a final

23   grade of C plus.

24       Q    As her guidance counselor, would this have --

25   these grades and the dip in the grades -- I'm sorry --

Cusack - Cross                                    101

1    as a guidance counselor -- you weren't her guidance

2    counselor at the time -- would this have been

3    significant for somebody to notice that there was a

4    change in the grades so drastically?

5    A    I wasn't something honestly that would really

6    raise a red flag.  I mean, if she were, you know,

7    failing and getting D's and F's, then I would say

8    absolutely, there's something going on here.  But, you

9    know, to go from -- again, an A minus, I believe was

10   the -- to a C plus -- I mean, it was -- I don't know

11   why, for some reason the final grade is not here, but

12   just looking at the numbers, she probably would have

13   had an A minus for the year for the grade eight.  Yes,

14   there is noticeable decline.

15        Q    Were you aware when you became her guidance

16   counselor and reviewed her eighth grade transcript that

17   she was having issues with the language arts' teacher?

18   A    I was not aware of that, no.  I don't recall.  I

19   mean, there's -- I don't recall an issue with the

20   language arts teacher being brought to my attention.

21   Perhaps it was mentioned in the meeting, but that would

22   have been in spring of 2015, so I can't really speak to

23   that.

24        Q    I'm showing you, also, R-24 and 25 with

25   regard to Spanish.

Cusack - Cross                                           102

1    A    Okay.

2         Q    She went from an A plus to a B.  Would that

3    have raised a concern for anybody?

4    A    Nothing really.  No, not --

5         Q    Were you aware that she was having some

6    issues with the teacher harassing her in Spanish in

7    eighth grade?

8    A    I was not aware of that.

9         Q    Is that something that a guidance counselor

10   would be aware of?

11   A    If it was brought to my attention, yes.

12             MS. HOWLETT: Your Honor, the witness was not

13   --

14             THE WITNESS: I was not the guidance counselor

15   then.

16             MS. HOWLETT: The student wasn't even enrolled

17   in our district during this time period.

18             MS. WARSHAW: Your Honor, he testified --

19             THE COURT: It doesn't matter.  He said he's

20   not aware, so --

21             MS. WARSHAW: All right.  But he also

22   testified that he reviewed these when she came into the

23   district, so --

24             MS. HOWLETT: But whether a teacher harassed

25   her while she was in eighth grade --

1            THE COURT: Look, when she's talking, you're

2     not.

3            MS. HOWLETT: I'm sorry, Your Honor.

4            THE COURT: All right?  And when you're

5     talking, she's not.  And when I'm talking, you're both

6     quiet, all right?  I don't like interruptions.  Let her

7     finish her statement and if you want to make an

8     objection or have something to say, I will let you say

9     it.

10            MS. HOWLETT: Thank you, Your Honor.  I

11     apologize.

12            THE COURT: Go ahead, Ms. Warshaw.

13            MS. WARSHAW: Thank you.

14            THE COURT: But he answered that he was not

15     aware that there was an issue with the Spanish teacher.

16            MS. WARSHAW: Okay.  That's fine.

17     BY MS. WARSHAW:

18       Q    Mr. Cusack, you had indicated that you had

19     reviewed J.H.'s NJ ASK results from sixth, seventh, and

20     eighth grade.  Is that accurate?

21     A    Yes, that's correct.

22       Q    Okay.  And I'm going to refer you to R-37,

23     which I believe already in evidence.  You had indicated

24     when she took the NJ ASK, her grades were in the upper

25     levels for math.  Is that fair?

Cusack - Cross                                    104

1    A    Yes, that is correct.

2         Q    Okay.

3    A    She was in the -- she was in "met expectations"

4    and "highly" -- there are a lot of forms.  I would have

5    to go back through each one, but she was either "met"

6    or "exceeded expectations" in those areas, correct.

7         Q    Okay.  So, I'm showing you what's been marked

8    R-37.  Isn't it true that, in math, she was only at the

9    level three, which was "approaching expectations?"

10   A    That is correct.

11        Q    Okay.  So, would that have raised any concern

12   for you or any of her teachers regarding her

13   performance?

14   A    No.  First, these results are -- we would not have

15   received these.  These results get sent to the Long

16   Valley Middle School from the State after they're

17   graded.  But then, they are sent along with, at a later

18   date, to our school, because we're not the same

19   district.  I wouldn't have received these, most likely,

20   until -- again, I can't say, but it's possible I didn't

21   even receive these results until the school year

22   started.

23        Q    Ninth grade --

24   A    Yes.

25        Q    -- you're talking about.

1    A    Yes.

2         Q    This was in ninth grade -- R-37.

3    A    Oh, I'm sorry.  I'm sorry.  I thought -- I'm

4    sorry.  I'm thinking -- so, we would have received

5    these over the summer of going into sophomore year is

6    when we would have received those, yes.

7         Q    Okay.  Did you ever compare her grades for

8    sixth, seventh, and eighth on the NJ ASK to her grades

9    on the PARCC test in ninth grade?

10   A    You can see the comparison, but I never did look

11   at those.  They are entirely different assessments.

12   One is pencil and paper based; one is computer based.

13   They're entirely different assessments.  So, I mean,

14   again, if she had dropped into a level, you know, level

15   two, I would have brought that to the attention --

16        Q    At any time during ninth grade, did you

17   contact my clients or anyone about J.H.'s absences?

18   A    Not to my recollection, no.

19        Q    What about in tenth grade, September through

20   October, the beginning of October of tenth grade, did

21   you ever notice or contact anyone regarding J.H.'s

22   excessive absences?

23   A    J.H.'s mother notified me in late September, so I

24   was aware.  She called me and told me.

25        Q    In ninth grade, were you aware of the reasons

Cusack - Cross                                        106

1    why J.H. was absent from school?

2    A    The only thing I could see on there, other than

3    the occasional absence, you know, was a -- towards the

4    very end of the year, several medical, and again, I

5    can't recall why she was absent.  I don't know the --

6    if I was -- I can't recall the details of why she was

7    absent.  I don't have the medical notes that were

8    submitted that would indicate why.

9         Q    So were you aware in December of 2016 -- in

10   December of 2016, were you aware that J.H. was

11   experiencing anxiety just trying to walk through the

12   door of the high school?

13   A    Again, so this is her freshman -- sophomore year?

14        Q    Sophomore year.

15   A    Sophomore year.  Yes, I mean, that was part of --

16   so, in her sophomore year, in December, yes, that was

17   the whole reason why she was at ICCPC, was to deal --

18   dealing with her anxiety issues, absolutely.  I mean,

19   the goal -- so, yeah.

20        Q    I'm going to refer you to R-1 in the black

21   binder.  Is it correct that this 504 plan was in effect

22   for 2016/2017 school year?

23   A    The -- from the December 7ᵗʰ date on, yes.

24        Q    Okay.  But through the end of June 2017 -- is

25   that correct?

1      A    Yes, that is correct.

2           Q    Okay.  And isn't it true that 504 plans are

3      meant to be in effect for one year only?  Isn't that

4      correct?

5      A    They're reviewed -- they're a one year --

6      typically, a one year document and they're reviewed at

7      the conclusion of that and new documentation is

8      requested to determine if it will be continued or

9      discontinued.

10          Q    Were you aware that when J.H. was put on home

11     instruction from December of 2016 through June of 2017

12     that she attended ICCPC at least three days a week from

13     4 to 7 p.m.?

14     A    I believe that's indicated, yes.  I mean, that

15     would be a typical progression that I would expect to

16     see, yes.

17               MS. WARSHAW: Your Honor, I need one moment,

18     please.

19               THE COURT: Sure.

20     BY MS. WARSHAW:

21          Q    Mr. Cusack, at the April 6th, 2017 IEP

22     meeting, you didn't differentiate the difference

23     between the behavioral support program at West Morris

24     Central versus the behavioral support program at

25     Mendham High School, just that J.H. had difficulty

1       walking through the door of the school at West Morris

2       Central.  Is that correct?

3                  MS. HOWLETT: Your Honor --

4                  THE COURT: That's not a question.

5                  THE WITNESS: I'm not sure -- I'm not sure

6       what -- yeah.

7                  THE COURT: Yeah, I mean, you asked him the

8       difference between two programs and then you said --

9       and he had --

10                 MS. WARSHAW: Okay.  I'll rephrase it.

11                 THE COURT: Thank you.

12      BY MS. WARSHAW:

13          Q    At the April 6th, 2017 IEP meeting, you were

14      aware that J.H. had difficulty walking in the door of

15      the school at West Morris Central.  Is that correct?

16      A    Yes, that is correct.

17          Q    Okay.  So, isn't it true that at the April

18      6th, 2017 IEP meeting, you did not distinguish whether

19      the behavioral support program at West Morris Central

20      was any different from the Mendham High School

21      behavioral support program -- that they were one and

22      the same, just different locations?  Is that correct?

23      A    No, I never implied that they were the same

24      program.  That's actually why I asked Ms. Vasser to

25      come in to clarify the -- and the -- yes, that's --

Colloquy / Cusack - Redirect                109

1            MS. WARSHAW: Your Honor, I would just renew

2       our objection to any information regarding the Being

3       Successful Program, as it was never provided to us when

4       we requested it and we requested all the information

5       for the behavioral support programs, both at each high

6       school, as well as the Being Successful Program that

7       they're claiming existed.  But I have no further

8       questions at this time.

9            THE COURT: Redirect?

10           MS. HOWLETT: Yes, Your Honor.  Just a note on

11      that last objection.  What was previously moved into

12      evidence as P-31, which was petitioner's exhibits, is

13      the brochure for the Mendham High School Being

14      Successful Program.

15           THE COURT: Actually, that wasn't moved.

16           MS. WARSHAW: No, it was not moved in.

17           MS. HOWLETT: Oh, I'm sorry.  It was not moved

18      in.  I'm noting that.

19           Yes, Your Honor, just briefly.  I'll try and

20      wrap it up.

21           THE COURT: Okay.

22      REDIRECT EXAMINATION BY MS. WARSHAW:

23      Q    Just real quickly, we're just going to fly

24      through this real quick.

25      A    Sure.

Cusack - Redirect                                110

1         Q    Can you just flip to R-15 real quickly?  I

2    know that counsel just referred you to that letter.

3    A    Sure.

4         Q    It's the January 6th letter.

5    A    Yes.

6         Q    And again, I believe you testified on this

7    earlier, but just for clarification, did you receive

8    any formal assessment report or evaluation with this

9    letter --

10   A    No, I did not.

11        Q    -- to your recollection?

12   A    Not to my recollection.  There was nothing that I

13   recall seeing with this letter.  This was just a letter

14   to support the medical basis of proceeding with the --

15   with a CST evaluation.

16        Q    And were you at the IEP meeting on May 16th,

17   2017?

18   A    Yes, I was.

19        Q    And to your recollection, what program was

20   discussed at that meeting?

21   A    The Mendham High School program.

22        Q    And did you -- referring to P-26, that's the

23   IEP for that meeting that we just discussed --

24   A    Yes.

25        Q    -- did you prepare this document?

Cusack - Redirect                          111

1   A      P-26 --

2        Q     Yeah, you're in the -- it's in the blue

3   binder.

4   A     Okay.

5        Q     It's the IEP.

6              THE COURT: What was the number for that?

7              MS. HOWLETT: It's just the IEP.  You don't

8   have to flip to it, really.

9              THE COURT: Okay.

10             MS. HOWLETT: I just wanted to ask --

11             THE COURT: I just want the numbers to be --

12             MS. HOWLETT: Oh, I'm sorry.  It's P-26, Your

13  Honor.

14             THE COURT: Thank you.

15             MS. HOWLETT: And I just want to ask the

16  witness whether he prepared this document.

17             THE WITNESS: I did not prepare this document.

18  BY MS. HOWLETT:

19       Q     And referring to -- counsel referred you to

20  J.H.'s report cards from seventh and eighth grade.

21  A     Yes.

22       Q     And just for clarification, was she enrolled

23  in your school district in seventh and eighth grade?

24  A     She was not.

25       Q     And were you her counselor during that time

Cusack - Redirect                          112

1    period?

2    A     No, I was not.

3         Q     And would you generally have knowledge of

4    whether a student not enrolled in your district is

5    having a problem with a teacher?

6    A     No.

7         Q     Do you know whether the parents ever observed

8    the program at Mendham High School?

9    A     I believe they went one -- they went one day, but

10   that's -- to my knowledge, they did go on day with J.H.

11   Again, I may be wrong, but it's my understanding that

12   they -- they did.

13        Q     Yeah, to your recollection.

14   A     To my recollection, they went to observe the

15   program at Mendham.

16             MS. HOWLETT: And last question, I believe,

17   Your Honor.

18   BY MS. HOWLETT:

19        Q     R-14 -- back to that letter from ICCPC from

20   December, if you just want to skim it real quickly.

21   Does that letter indicate anywhere that J.H. -- oh, I'm

22   sorry; I'll give you a second.

23   A     That's okay.

24        Q     I promised fast, so I'm moving right along

25   here.

Cusack - Redirect / Recross                    113

1    A    Good.

2         Q    Does that letter indicate anywhere that J.H.

3    is, quote, "having anxiety walking through the door at

4    West Morris Central?"

5    A    I'm sorry.  I just want to make sure I'm on the

6    right one.  Fourteen?

7         Q    Fourteen, yes.

8    A    Okay.  This was the note indicating that they

9    cleared her to return to West Morris Central, so, no,

10   there is no indication in here that she is not able to

11   walk through the door.

12             MS. HOWLETT: Thank you, Your Honor.  That's

13   all I have.

14             MS. WARSHAW: Your Honor, may I ask a few

15   question?

16             THE COURT: Yeah, sure.

17             MS. WARSHAW: Okay.

18   RECROSS EXAMINATION BY MS. WARSHAW:

19        Q    But, Mr. Cusack, you just testified that it

20   was your recollection that the reason she was unable to

21   return to school was because she had trouble -- one of

22   the reasons was she had trouble walking through the

23   door of the high school, as it created anxiety.  Isn't

24   that correct?

25   A    That's correct, and that was the -- December 10th,

1      I believe, was the date that she was -- that I was

2      notified she was not able to return.  This is the

3      psychiatrist's and clinician's professional opinion

4      that she is cleared to return to West Morris Central.

5          Q    Okay.  Mr. Cusack, you testified that you

6      attended the May 16th, 2017 IEP meeting, correct?

7      A    Yes, I did.  That's correct.

8          Q    Okay.  And you're aware that Dr. David Leigh,

9      the former director of special services, also attended

10     that meeting, correct?

11     A    Yes.

12         Q    Okay.  Isn't it true, at the May 16th, 2017

13     IEP meeting, Dr. David Leigh indicated to my clients to

14     go take a look at the Purnell School, that it was one

15     that had been mentioned, and that he would definitely

16     look at it?

17     A    I cannot specifically state that -- what was said.

18     My recollection was that -- I believe -- I believe this

19     entire conversation was taped, so I don't know if we

20     can go -- I don't know.  I believe he said that he --

21     when several schools were mentioned, he -- Purnell -- I

22     believe, by counsel -- he -- I recall him saying, "I

23     would consider Purnell."  I believe that would --

24     again, I can't remember word for word, but --

25         Q    And isn't it true that at that May 16th, 2017

Cusack - Recross / Colloquy                    115

1    IEP meeting that, when I asked Dr. David Leigh if the

2    school district would pay for the Purnell School, he

3    indicated "possibly?"

4    A    I can't remember what he -- again, I cannot

5    remember anything to do with finances.  I was there,

6    but I can't remember.  That's something that I just

7    wouldn't have anything to do with.

8         Q    Isn't it true, at the May 16th, 2017 IEP

9    meeting, that Dr. David Leigh said that the Purnell

10   School had a peer group there and that there were

11   certain things there that others truly, in his opinion,

12   did not offer?

13   A    Again, I can't -- I cannot recall specifically

14   things that he mentioned about -- about that -- about

15   that school.  I know the name came up.  I do -- I can

16   say -- I can say yes, that name was brought up,

17   initially by you, and then he, from what my

18   recollection was, he said that's something we could

19   talk about -- again, something to that effect.  It

20   might not be word for word, but --

21             MS. WARSHAW: All right.  Thank you very much.

22             THE COURT: Who's next?

23             MS. HOWLETT: Your Honor, could we just take a

24   short recess?

25             THE COURT: Sure.  How short?

                          Colloquy                      116

1                     MS. HOWLETT: Oh, really short.  Yeah, just to

2          regroup real quickly and --

3                     THE COURT: Eleven thirty.

4                     MS. HOWLETT: That's more than a --

5                     MS. WARSHAW: Can I ask who the next witness

6          is?

7                     THE COURT: You can ask her.  I don't know the

8          witness.

9                     MS. WARSHAW: Who's the next witness?

10                     MS. HOWLETT: Kendra Dickerson.

11                     THE COURT: The witness just asked me if I

12         wanted a copy of a document.  Yes, when you come back

13         into the room, please bring it.  Before we go on the

14         record, I'll have copies made so everybody has a copy

15         of the -- with the missing line on it.  Okay?

16                     MS. WARSHAW: Your Honor, I'm just going to

17         reserve my right in case there is something on that

18         last line that I need to ask him a question on.

19                     THE COURT: Sure.

20                     MS. WARSHAW: I'd like to be able to do that.

21                     THE COURT: Not a problem.  Okay?

22                     MS. WARSHAW: Thank you.

23                     MS. HOWLETT: Thank you, Your Honor.

24                     THE COURT: We'll go off the record.

25                             (BRIEF RECESS)

Colloquy / Dickerson - Direct                117

1          THE COURT: We're back on the record in the

2     matter of <u>F.H. and M.H. on behalf of J.H. vs. West</u>

3     <u>Morris Regional High School</u>.  The docket number is EDS

4     10706.  We have concluded Mr. Cusack's examination and

5     we have a young lady sitting here.

6              Hello.  How are you?

7              THE WITNESS: Hello.

8          THE COURT: Would you raise your right hand?

9     K E N D R A   D I C K E R S O N, RESPONDENT'S WITNESS,

10    SWORN.

11             THE COURT: State your name.  Spell your last

12    name.

13             THE WITNESS: Kendra Dickerson.  My last name

14    is D-I-C-K-E-R-S-O-N.

15             THE COURT: Thank you.

16             Proceed.

17    DIRECT EXAMINATION BY MS. HOWLETT:

18         Q    Hi, Ms. Dickerson.  How are you doing today?

19    A    Good.  How are you?

20         Q    Good.  Just for purposes of the record, we're

21    just going to establish your employment and your

22    background, so if you could just state for the record

23    what your position and place of employment is.

24    A    I'm a certified school psychologist at West Morris

25    Central High School.

Dickerson - Direct                          118

1      Q    And how long have you been a school

2   psychologist at West Mendham -- I'm sorry -- West

3   Morris?

4   A    This is my seventh year.

5      Q    And then what did you do before that?

6   A    I was -- I did an intern year as a school

7   psychologist, as well, and then, prior to that, I was a

8   graduate student.

9      Q    And where did you go to school?

10  A    I did my undergraduate at SUNY Albany in Upstate

11  New York, and then, my graduate work at Alfred

12  University in New York as well.

13     Q    And what degrees did you get from that

14  academic background?

15  A    I have a master's in school psychology and then a

16  certificate of advanced graduate study in school

17  psychology as well.  My bachelor's was in psychology.

18     Q    And are you also a case manager?

19  A    Yes.

20     Q    And you know why we're here today -- the

21  student we're talking about?

22  A    Yes.

23     Q    And we're going to refer to her as J.H. for

24  purposes of the record, so --

25  A    Okay.

Dickerson - Direct                              119

1      Q    Just so you're aware of that.  How did you

2   come to know J.H. or do you know her at all?  Give us

3   just a little background of how you kind of play into

4   everything.

5   A    I've met her briefly on a couple occasions, first

6   of which, I think -- I think I first came to kind of

7   know her through Joe Cusack, who was her guidance

8   counselor.  And I had some conversations with the

9   family when I believe they were kind of starting to go

10  through the process of the 504 and J.H. was having some

11  difficulties coming to school.

12     Q    And do you remember, like, about what time --

13  you know, what school year that would have been?

14  A    Last school year.

15     Q    Which was the -- for purposes of the record,

16  some of these questions might be a little redundant.

17  A    Okay.  Yeah, so that was the 16/17 school year.

18     Q    Did you receive a referral?

19  A    Yes.

20     Q    And is that something that you would normally

21  review, a CST referral?

22  A    Yes.

23     Q    And can you just turn -- there's two binders

24  in front of you; you're going to use the black one.

25  A    Uh huh.

Dickerson - Direct                              120

1      Q    And just turn to R-2.  It's already been

2    admitted.  It's the second tab there.

3    A    Yes.

4      Q    And is that the referral that you received

5    from Mr. Cusack?

6    A    Yes.

7      Q    For J.H.

8    A    Yes.

9      Q    And just switch to the next one, R-3.  It's

10   entitled "Pre-Referral Intervention Information."  Do

11   you also receive this as part of the referral?

12   A    Yes.

13     Q    And you've seen this before?

14   A    Yes.

15     Q    And did you review it when you received it?

16   A    Yes.

17     Q    And then what happens -- just in your general

18   practice for a second, what happens when you receive a

19   CST referral?

20   A    Typically, when the child study team receives a

21   referral, an administrative assistant will reach out to

22   the family to set up an initial planning IEP meeting

23   and it would be assigned to a case manager and the team

24   to review the initial referral packet, and then the

25   family would be invited in to discuss the nature of the

1    concern.

2         Q    Did you do that with J.H., if you recall?

3    A    Yes.

4         Q    Can you please turn to R-4?  And just before

5    we talk about the document, I'm just going to have you

6    describe what this is for the Court.

7    A    This is our standard form for an invitation to an

8    initial meeting.

9                                        (R-4 Marked for

10                                       Identification)

11        Q    And is this something that you would normally

12   send out, that you were just describing?

13   A    Typically, our administrative assistant would send

14   it out, but yes.

15        Q    Have you seen this particular form before?

16   A    Yes.

17        Q    And can you just give us the date for the

18   record?

19   A    The date on the form is January 3rd, 2017.

20             MS. HOWLETT: Your Honor, I would like to move

21   R-4.

22             THE COURT: Any objections?  Actually, this

23   one's dated -- oh (out of microphone range.)  Any

24   objection?

25             MS. WARSHAW: No.

1          MS. HOWLETT: To clarify the dates, Your Honor

2     --

3          THE COURT: No, no.  It says January 3rd.

4          MS. HOWLETT: Oh, okay.

5          THE COURT: I, for some reason, saw four.  No

6     objection.  Go ahead.   Proceed.

7                                   (R-4 Entered into

8                                   Evidence)

9     BY MS. HOWLETT:

10         Q    And Ms. Dickerson, this -- this form, does it

11    actually schedule a meeting with the parents?

12    A    Yes.

13         Q    And what was the date of that proposed

14    meeting?

15    A    January 9th at 1:37.

16         Q    To your recollection, did you actually have

17    an evaluation planning meeting?

18    A    Yes.

19         Q    At an evaluation planning meeting of this

20    nature, for an initial referral, what type of

21    information do you take into consideration when making

22    a decision as to what assessments you're going to

23    propose?

24    A    It's mainly the information that's available from

25    the referral packet.  The guidance counselor is

Dickerson - Direct                                        123

1       typically there, as well, with background information

2       about how the student has been doing, and anything else

3       that's brought to the table that's pertinent at that

4       time.

5            Q    Do you remember, from just your own memory,

6       what you would have reviewed to determine what

7       assessments you were going to propose for J.H.?

8       A    The referral packet and I believe at that time

9       there --

10               MS. WARSHAW: Could you just speak up a little

11      bit?  It's hard to hear.

12               THE WITNESS: Sure.  And I believe, at that

13      time, she did have an outside provider, so any

14      information from them would have been pertinent to

15      discuss as well.

16      BY MS. HOWLETT:

17           Q    And again, without necessarily looking, just

18      from your memory, do you recall what evaluations or

19      assessments that you had proposed or the child study

20      team had proposed?

21      A    Yeah.  I believe the child study team had

22      recommended a psychological evaluation.  (Out of

23      microphone) some emotional (out of microphone range)

24      and then an update from the treating psychiatrist at

25      the time and a social history report.

Dickerson - Direct                              124

1          Q     And were the parents present at that meeting?

2     A     Yes.

3          Q     Was J.H. present also?  Do you recall?

4     A     Yes, I believe so.

5          Q     Did the parents consent to the proposed

6     assessments?

7     A     Yes.

8          Q     Did they raise any concerns or request any

9     additional assessments or anything like that?

10    A     I don't recall.

11         Q     Do you recall whether there was a mention

12    that -- from J.H.'s parents, that J.H. was struggling

13    with any academic difficulties?

14    A     I don't recall.

15         Q     Do you recall getting any reports from any

16    teachers that indicated that there were academic issues

17    in the classroom with J.H.?

18    A     No, there was nothing at that time that we were

19    concerned academically.  The history was that she was a

20    strong academic student.

21         Q     So, to your recollection, were the proposed

22    assessments actually conducted?

23    A     Yes.

24         Q     If I could just direct you to R-16 and if you

25    could just describe, just generally, what this document

Colloquy                                             125

1      is.

2      A    This is a psychological evaluation.

3                                           (R-16 Marked for

4                                           Identification)

5           Q    Was it for J.H.?

6      A    Yes.

7           Q    Was this the evaluation report that was

8      conducted in response to the initial referral?

9      A    Yes.

10          Q    And who conducted that evaluation?

11     A    This was conducted by Sherrie Wilke.  She was --

12     at that time, I was out on maternity leave.  Sherrie

13     had attended that initial meeting with me.  It was

14     right before I went out on maternity leave, so she was

15     acting as the case manager and school psychologist at

16     the time, in my position, while I was out.

17          Q    Have you seen this document before?

18     A    Yes.

19               MS. HOWLETT: Your Honor, I would like to move

20     R-16?

21               THE COURT: Any objection?

22               MS. WARSHAW: This witness did not --

23               THE COURT: She didn't author it.

24               MS. WARSHAW: She didn't author it or

25     anything, so I'm going to object to that -- to that.

1    And also, there are a lot of mistakes in it, but --

2                 THE COURT: That's not a reason to object to

3    it.

4                 MS. WARSHAW: Right.  So, I would -- I'm going

5    to object.  She's not the author to this and --

6                 THE COURT: (Out of microphone range)

7                 MS. WARSHAW: -- she doesn't have personal

8    knowledge of it.

9                 THE COURT: Well, I'm sure she has personal

10   knowledge.

11                Are you going to call Ms. Wilke?

12                MS. HOWLETT: Not likely.  I mean, the purpose

13   of proffering it to this witness is that -- I'm not

14   going to testify for her, but it's to ask about whether

15   this document was material in her later actions at

16   proposal.

17                THE COURT: I'm going to allow it because I'm

18   guessing -- I'm not guessing -- I'm going to allow it

19   at this point.

20                You know what?  Why don't you voir dire a

21   little bit on what she knows about it and see if --

22   okay?

23                MS. WARSHAW: Okay.

24                THE COURT: You don't have to.  You want me to

25   do it?

1              MS. WARSHAW: Go ahead.  I can do it as well.

2              THE COURT: Go ahead.

3              MS. WARSHAW: Okay.

4      VOIR DIRE EXAMINATION BY MS. WARSHAW:

5         Q    Ms. Dickerson, you didn't write this report,

6      correct?

7      A    No.

8         Q    And what date did you go on maternity leave?

9      A    I went on maternity leave -- I believe it was -- I

10     think my last day was -- January 13th, 2017, I think,

11     was my last day and I came back April 17th.

12        Q    And -- okay, so this -- the evaluation report

13     was dated January 19th, 2017, so you were not present in

14     the district at that time.

15     A    No, I was on maternity leave.

16        Q    Did you have any contact with Sherrie Wilke

17     about her evaluation during the time that you were on

18     maternity leave?

19     A    No, I don't believe so.

20        Q    Okay.  So the first time that you saw this

21     document was when?

22     A    I don't recall, but I would imagine when I

23     returned from maternity leave.

24        Q    Okay.  And so, you were not present at the

25     April 6th, 2017 IEP meeting.

1    A     No, I was not.

2         Q     Okay.  So you wouldn't be able to testify as

3    to what happened at that meeting or any results that

4    were discussed at that meeting?

5    A     No.

6         Q     Okay.  You don't know if this document was

7    done in the ordinary course, according to District

8    standards, right?  You don't have personal knowledge of

9    that?

10   A     No, it's an individualized assessment, so no one

11   is typically in the room while it's administered.

12              THE COURT: Say that again.  I didn't hear

13   you.

14              THE WITNESS: It's an individually

15   administered assessment, so it would only be the

16   psychologist and the student in the room anyway, in any

17   setting.

18   BY MS. WARSHAW:

19        Q     But you --

20   A     But, no, I was not working for the District at

21   that -- I was on maternity leave during that time.

22        Q     And you cannot personally vouch for the

23   credentials or the manner in which Sherrie Wilke

24   performed this evaluation.  Is that correct?

25   A     Correct.

Dickerson - Voir Dire / Colloquy                129

1      Q    And --

2           THE COURT: You can stop.

3           MS. WARSHAW: Okay.

4           MS. HOWLETT: Your Honor, the witness isn't

5     here to testify of the probative value of the objective

6     data that's contained in the report.  It's her

7     impressions of what the report represents.  Number one,

8     she's a certified school psychologist, so she is

9     actually qualified to interpret this report, and it

10    also goes to what the District -- the information that

11    had been provided to the District and what their

12    response was.

13          THE COURT: I understand that, but what help

14    is she going to be to me?  She didn't do the report.

15    She wasn't at the IEP meeting.  She doesn't know what

16    happened at the IEP meeting.  She doesn't --

17          MS. HOWLETT: There was a subsequent -- I'm

18    sorry, Your Honor.

19          THE COURT: Go ahead.  Go ahead.

20          MS. HOWLETT: There was a subsequent -- I'm

21    trying not to stem into testimony.  There was a

22    subsequent IEP meeting and the witness is going to

23    testify to what her involvement in the drafting of the

24    IEP was, which is certainly relevant.

25          THE COURT: Did this report and the first IEP

Colloquy                                          130

1    meeting result in a proposed IEP?

2              MS. HOWLETT: No, Your Honor.

3              THE COURT: It did not.  I'm going to allow

4    it.  Go.  I'm going to allow it.

5              MS. WARSHAW: Your Honor, there is an April

6    6th, 2017 IEP that they did.  The IEP --

7              MS. HOWLETT: (Out of microphone range)

8              THE COURT: Go ahead.  Go ahead.

9              MS. WARSHAW: She wasn't around until April

10   19th.

11             THE COURT: That, I know.

12             MS. WARSHAW: But the IEP -- let me just

13   locate it.

14             THE COURT: The IEP meeting was April 6th.  She

15   wasn't there.  When was the IEP presented?

16             Do you know, Ms. Howlett?

17             MS. WARSHAW: April 6th, 2017.  She wasn't

18   there and she didn't draft the IEP.

19             THE COURT: All right.  Okay.

20             MS. HOWLETT: Can we ask the fact witness

21   whether she drafted the IEP --

22             THE COURT: We could.

23             MS. HOWLETT: -- instead of testifying for

24   her?

25             THE COURT: All right.  Go ahead.

                          Dickerson - Direct                    131

1    DIRECT EXAMINATION BY MS. HOWLETT (CONT'D):

2           Q    Ms. Dickerson, did you draft the IEP?

3    A    I did for the May meeting.

4           THE COURT: There was a second IEP meeting.

5    Yes?

6           THE WITNESS: Yes.

7           MS. HOWLETT: Yes.

8           THE COURT: I'm asking her.

9           There was a second IEP meeting --

10          THE WITNESS: In May.

11          THE COURT: -- which you were at?

12          THE WITNESS: Yes.

13          THE COURT: I'm going to allow this.  Go.  I'm

14   going to allow it.

15                                    (R-16 Entered into

16                                     Evidence)

17          MS. HOWLETT: Thank you, Your Honor.

18          THE COURT: Go.

19   BY MS. HOWLETT:

20          Q    Ms. Dickerson, did you review this document

21   that we keep talking about, R-16, as part of your --

22          THE COURT: Ms. Howlett, what I'd like you to

23   do first is get us from the first IEP meeting to the

24   second IEP meeting --

25          MS. HOWLETT: Okay.

Dickerson - Direct                              132

1           THE COURT: -- if you can with this witness.

2           MS. HOWLETT: Yes.

3      BY MS. HOWLETT:

4           Q    Ms. Dickerson, you testified before, but I

5      didn't catch the date.  Do you recall when you went out

6      on maternity leave?

7      A    I believe my last day was January 13th.

8           THE COURT: And she returned April 17th.  She's

9      testified to that.

10          MS. HOWLETT: Okay, thank you.  I just didn't

11     have that in front of me.

12     BY MS. HOWLETT:

13          Q    You testified you were not present at the

14     April meeting?

15     A    Right, I was not present at the April 6th meeting.

16          Q    Do you recall -- not being present --

17          MS. HOWLETT:  -- strike that, Your Honor.

18     BY MS. HOWLETT:

19          Q    Upon your return from maternity leave, did

20     you consult with Ms. Wilke about your existing cases

21     that she had taken over?

22     A    Yes.

23          Q    Was this one of those cases, J.H.?

24     A    Yes.

25          Q    Did Ms. Wilke report to you or provide any

Dickerson - Direct                            133

 1    case note or any information about what had transpired

 2    at the April meeting?

 3    A    She told me about the April meeting.

 4         Q    And what did Ms. Wilke report to you?

 5    A    My understanding of the April meeting was that

 6    eligibility was proposed and agreed to and they had

 7    discussed a possible placement option of the BSP

 8    program over at Mendham, and that was not agreed upon

 9    at the time, but the parents were instructed to look at

10    the program, which -- my understanding.

11              THE COURT: You need to speak up.

12              THE WITNESS: Oh, I'm sorry.

13              THE COURT: Okay.  Go ahead.

14              THE WITNESS: Yeah, so that was my

15    understanding -- was that eligibility had been

16    determined at the meeting and there had been a

17    discussion of a proposed program at the BSP program

18    over at Mendham that, to my understanding, was not

19    agreed upon at that time, but that the parents were

20    going to go look -- look at the program.

21    BY MS. HOWLETT:

22         Q    Was there an agreement that a subsequent

23    meeting would be held?

24    A    I don't -- I don't know when that was decided on,

25    but when I came back to the District, my understanding

Dickerson - Direct                                        134

1     was that there would be another meeting and that

2     attorneys would be present.

3          Q    And to your recollection, what was the

4     purpose of the second meeting?

5     A    My understanding was it was to discuss placement

6     because no -- no formal IEP had been agreed on.

7          Q    And at the May 16th meeting, did you attend?

8     A    Yes.

9          Q    And was an IEP proposed at that time?

10    A    Yes.

11         Q    And was the IEP or the proposed placement

12    discussed at that meeting?

13    A    Yes.

14         Q    In preparation for that meeting, did you

15    prepare an IEP?

16    A    Yes.

17         Q    And in preparation of that IEP, did you

18    consider this document, R-16?  It was the

19    aforementioned --

20    A    Yes.

21         Q    -- Ms. Wilke's psychological report.

22    A    Yes.  It was -- that IEP was developed in

23    conjunction with Sherrie Wilke's -- my understanding of

24    the -- what program had been proposed, and also

25    speaking with the director.

1              MS. WARSHAW: Can you speak up?  I'm sorry.

2       We can't hear you at all from the stand.

3              THE WITNESS: I'm sorry.

4              Yes, so that -- that IEP that was developed

5       was to have, you know, a more formalized --

6              MS. WARSHAW: (Out of microphone range)

7              THE COURT: It's not -- it's not the --

8              MS. WARSHAW: Maybe it's the air conditioning.

9              MS. HOWLETT: The vent or something.

10             THE COURT: Yeah, sometimes they put those --

11      that, I can't turn off because it's the other unit.

12      I'm sorry.  Okay.  I'm sorry.

13             MS. HOWLETT: No, that's okay.

14             THE COURT: I interrupted you because of the

15      fan noise.

16      BY MS. HOWLETT:

17         Q    Yes, just do your best to speak up.  I know

18      you're soft-spoken.

19      A    I'm sorry.

20         Q    It's not about you, but --

21      A    Yeah.  Yeah, the IEP was proposed to be able to

22      discuss that at the meeting because it wasn't

23      formalized, to my knowledge, at the April 6th meeting.

24      So it was information from Sherrie Wilke and, you know,

25      and conversations, you know, with the director to, you

1    know, propose the IEP -- the program.

2         Q    And did that happen at that May meeting?

3    A    Yes.

4         Q    So, going back to the psychological report of

5    Ms. Wilke, without -- I mean, we certainly don't want

6    you to read it into the record, but do you recall

7    reviewing this when you prepared the IEP?

8    A    Yes.

9         Q    Does it look familiar to you?

10   A    Uh huh.

11        Q    And can you just flip to the summary

12   conclusion?  That's what we do as lawyers, pretty much.

13   Can't really read the rest.  It's, I think, at the

14   bottom, marked 061 -- 061.

15   A    Yes.

16        Q    And again, without kind of reading it, can

17   you just, in your own words, sort of summarize what

18   your impressions were when you read this summary

19   conclusion?

20   A    I mean, as a school psychologist, we're typically

21   looking at the scores that were obtained from the

22   assessment.  The full-scale IQ from this particular

23   assessment done by Sherrie, as it's reported, is a 104.

24   Anything between 90 and 110 is considered average on

25   these types of assessments, so that, to me, would be

Dickerson - Direct                    137

1    saying that her intellectual functioning was within

2    average ranges.  And then it breaks it down into the

3    four main areas, and on this particular assessment, the

4    verbal comprehension was found to be in the high

5    average range, the perceptual reasoning was within the

6    average range at 107, working memory was in the low

7    average range with 86, and the processing speed index

8    was 94, which was within the average range.  And that

9    was the summary of the report.

10        Q    And then moving onto the next page, it looks

11   like Ms. Wilke continues to make additional -- or

12   continues to summarize her report.  That last

13   paragraph, can you talk about, in your experience as a

14   school psychologist and also as a case manager, can you

15   talk a little bit about, as compared to her peers, that

16   paragraph, what Ms. Wilke might be referring to?

17   A    Yeah.  I think for this paragraph -- and forgive

18   me; I only took a few seconds to read it -- but I think

19   that this particular paragraph is more in relation to

20   the behavioral scale.

21        Q    And what --

22   A    The BASC was given as well, yeah.

23        Q    Can you just tell us a little bit about the

24   BASC?

25   A    It's a -- it's a behavior assessment scale that,

Dickerson - Direct                          138

1    typically, it's based on -- it can be a teacher rating

2    form, a parent rating form, and a child rating form.

3    It looks like, in this report, only the child and the

4    parent were given.  But basically, it assesses -- it's

5    a -- it's kind of like a questionnaire that a student

6    would fill out themselves in regard to a lot of

7    different questions about their behavior, as well as a

8    parent would also answer that.

9         So it would tap into a lot of different things to

10   find if there's anything behaviorally or emotionally,

11   kind of, to cue into.  So it looks at things like

12   attention.  It looks at sort of, like, a student's

13   attitude towards their teachers or attitude towards

14   school and things like that.  It's just a way to gather

15   more information about the home perspective as well as

16   the student's own perspective.

17        Q    So, when it's -- it's entitled -- is it

18   "behavior" or "behavioral" -- the BASC?  It is -- but

19   it's the word "behavior."

20   A    Behavior, yeah.

21        Q    So does it just refer to things like poor

22   behavior or are we talking emotional difficulties as

23   well?

24   A    It does -- it will elicit things like -- like

25   acting out behaviors, as well as internalizing

Dickerson - Direct                        139

1    behaviors -- things like anxiety, things like

2    inattention.  So, it can be any of those things.  It's

3    a big questionnaire.

4         Q    And so, what did Ms. Wilke determine as part

5    of her review of that information?

6    A    Well, the first part, she talks about the self-

7    rating scale, so on that area, on the self-rating

8    scale, it appears that the student did not themselves

9    rate themselves in a way that would find that these

10   first areas like sensation seeking, atypicality, (out

11   of microphone range) control, attention problems,

12   hyperactivity, relations with parents, self-reliance,

13   test anxiety, anger control, and mania -- those were

14   all, like, self-reported to be typical.  And then,

15   however, the student rated herself -- the way she

16   responded on this particular form found things to be in

17   at-risk ranges in terms of her attitude towards school,

18   social stress, anxiety, depression, sense of

19   inadequacy, somatization, self-esteem, and ego

20   strength.  So those would be things that -- the way she

21   -- the way she responded to the questions on the

22   questionnaire would put the scores to be within, kind

23   of, at risk ranges or those are the types of things we

24   would be concerned with or want to pay more attention

25   to or might need additional -- warrant follow-up for

Dickerson - Direct                                    140

1     more investigation.  And then, the more significant

2     areas that she noted were attitude towards her teachers

3     and interpersonal relationships, so that would be the

4     most concerning areas.

5          Q    And when you reviewed Ms. Wilke's report,

6     what was -- what did you really take away from it?

7     What does this tell you about J.H. -- what her needs

8     might be?

9     A    Well, I mean, in terms of the intellectual

10    ability, it tells me that the student is within the

11    typical range compared to -- compared to other students

12    her age, with a little bit of a strength in the verbal

13    comprehension and verbal skills, which is really nice

14    to see, with a relative weakness in working memory.

15    And then it shows also that she was having some kind of

16    emotional or kind of internalizing concerns, like, what

17    they're -- like the way that she, herself, viewed, you

18    know, her attitude towards teachers and some of the

19    anxiety.  Yeah, that she was struggling with social

20    stress, anxiety, depression, inadequacy -- a lot of

21    those internalized struggles.

22         Q    And did you review additional reports in

23    addition to Ms. Wilke's report when you prepared the

24    IEP?

25    A    Yeah, I probably would have also referred back to

Dickerson - Direct                                    141

1     the initial referral packet and, you know, the

2     conversations with Ms. Wilke about what was planned and

3     proposed, and any other additional reports, including

4     the other things that were conducted as part of the

5     initial -- the social history report and anything from

6     their outside providers that had been provided as well.

7          Q    Just turning your attention to R-18, please,

8     and can you just describe what this document is for the

9     Court?

10    A    This is a social history report.

11                                  (R-18 Marked for

12                                  Identification)

13         Q    For J.H.?

14    A    Yes.

15         Q    And have you seen this before?

16    A    Yes.

17         Q    And then, did you conduct the social

18    assessment?

19    A    No.

20         Q    Did you review this report when you prepared

21    the IEP?

22    A    Yes.

23              MS. WARSHAW: Your Honor, I'm going to object

24    with the same objections that I had originally.  She

25    was not there.  She did not conduct this evaluation.

Dickerson - Direct                                142

1    She has no personal knowledge of this, so --

2              THE COURT: Who did it?

3              MS. HOWLETT: The school social worker, Your

4    Honor.

5              THE COURT: Are you going to call --

6              MS. HOWLETT: I didn't intend to call every

7    member of the child study team to authenticate each

8    report.  The IEP was prepared by the case manager with

9    the information that was provided to her.

10             THE COURT: I'm going to allow it.  Her

11   objection is noted.

12             Go ahead.  It's not in yet, but I'm going to

13   -- go ahead.

14             MS. HOWLETT: Well, I'm going to -- I'm asking

15   to move it.

16             THE COURT: I know you are, but -- all right.

17                                      (R-18 Entered into

18                                      Evidence)

19   BY MS. HOWLETT:

20        Q    Ms. Dickerson, was there anything notable

21   from the social assessment that was helpful in

22   preparing the IEP?

23   A    It really just provided a snapshot at that time of

24   what was -- what was being reported as to how the

25   student was functioning.  And it was an interview with

Dickerson - Direct                                    143

1    the parents, so it had information from their

2    perspective as well.

3         Q    And again, we're going to go through the same

4    process.  If you could just flip to R-19 and if you

5    could just describe what this document is.

6    A    This is a psycho-educational testing report, so it

7    would be more comprehensive than a typical

8    psychological report; it would also include educational

9    testing as well.  And my understanding was this was a

10   third party evaluation that was done later.

11                                    (R-19 Marked for

12                                    Identification)

13            MS. HOWLETT: Your Honor, I'm actually not

14   going to move this document in at the moment, so I'd

15   like to go back.  I apologize, Your Honor.

16            THE COURT: Okay.  No problem.

17   BY MS. HOWLETT:

18        Q    Ms. Dickerson, can you just switch over to

19   what's marked as R-17 and can you just describe what

20   this document is?

21   A    This is a psychiatric evaluation.

22                                    (R-17 Marked for

23                                    Identification)

24        Q    And the date?

25   A    The date on it is March 15th, 2017.

Dickerson - Direct                                    144

1          Q    And have you seen this document before?

2      A    Yes.

3          Q    And was this document a document you used to

4      propose the IEP?

5      A    Yes.

6          Q    And this is for J.H.?

7      A    Yes.

8               MS. HOWLETT: Your Honor, I'd like to move R-

9      17.

10              THE COURT: Any objection?

11              MS. WARSHAW: No objection.

12                                        (R-17 Entered into

13                                        Evidence)

14     BY MS. HOWLETT:

15         Q    Ms. Dickerson, who was the -- do you know who

16     this report was conducted by?  You didn't conduct this

17     evaluation, right?

18     A    No, I didn't conduct this evaluation.  My

19     understanding was this was her treatment provider at

20     the time.

21         Q    So this, to your knowledge, was not conducted

22     by a district employee --

23     A    No.

24         Q    -- or a child study team member?

25     A    No.

1        Q    Did you consider the psychiatric evaluation

2    report when you prepared the IEP?

3    A    Yes.

4        Q    Ms. Dickerson, if you could just turn to page

5    -- well, it's marked at the bottom "065" in that

6    report.  It's the third page, I think.  There is -- and

7    I know you're not a psychiatrist, but we just want to

8    talk about what your impressions were of what's in the

9    report.  There's some diagnoses in there and an

10   assessment and then some recommendations.  That's at

11   least how I read it.  Is that -- is that accurate?

12   A    Yes.

13       Q    Can you please talk to us a little bit about,

14   when you look at this, you know, what you're really

15   looking for?

16   A    We're looking at the summary and at the diagnosis

17   and what the -- what the recommendations are at the

18   time.

19       Q    And what was the recommendation of this

20   provider?

21   A    This provider says, "At this time, an out-of-

22   district placement is advised."

23       Q    And then there's another -- is there another

24   recommendation on the second page?

25   A    Yeah.  "J.H. needs regular follow-up with a child

Dickerson - Direct                              146

1    psychologist for medication management and a

2    psychotherapist for counseling."

3        Q    So the recommendation for an out-of-district

4    placement, did you consider the recommendation that's

5    in this report?  Is that confusing?

6    A    A little bit.

7        Q    Okay.  Strike that.  You testified earlier

8    that you considered the report when you prepared the

9    IEP.  Is that accurate?

10   A    Uh huh.

11       Q    This report indicates, as you just read, that

12   this provider was recommending an out-of-district

13   placement.

14   A    Uh huh.

15       Q    Did you see that when you reviewed the

16   report?

17   A    Uh huh.

18           THE COURT: You have to say "Yes" or "No."

19           THE WITNESS: Yes.  I'm sorry.

20           MS. HOWLETT: Sorry.

21           THE WITNESS: Yes.

22   BY MS. HOWLETT:

23       Q    Did you consider the full spectrum of program

24   and placement options when you prepared the IEP?

25   A    When I was preparing the IEP, my understanding was

Dickerson - Direct                              147

1       to be working with the team to re-establish what had

2       been -- what had been proposed at that meeting -- at

3       that April meeting.

4              Q    At the April meeting.

5       A    Uh huh.

6              Q    And how did you determine that?

7       A    Based on all the information from Ms. Wilke and

8       the -- and the reports as well.  I wasn't changing it.

9       Like, I wasn't changing that recommendation at that

10      time myself.

11             MS. HOWLETT: Just give me one second, Your

12      Honor, please.  I'm sorry.

13             THE COURT: Uh huh.

14      BY MS. HOWLETT:

15             Q    Now we're going to flip to the blue binder.

16      A    Okay.

17             Q    It's going to be P-26, so it will just be the

18      tab that says "26."  So, is this -- is this the IEP

19      that you prepared, P --

20      A    Oh, 26.

21             Q    Yeah.  Yeah, take your time.  You can look at

22      it.

23      A    Yes, this is the IEP, yes, prepared when I

24      returned, in conjunction with Sherrie Wilkes, to

25      describe -- to describe what had been proposed.

Dickerson - Direct                                148

1             THE COURT: I don't know if she asked you that

2       question.  You answered the question she asked you.

3       BY MS. HOWLETT:

4             Q    And can you take us through a little bit of

5       what -- what the proposed program was?  Or you can even

6       point to a page, whatever is easier, and then talk

7       about what the proposal was?

8       A     Yes.  The student had been on home instruction for

9       quite some time, so at that time, the proposed program

10      was to continue with some of the home instruction that

11      was being provided and gradually do a return to the BSP

12      program at Mendham High School in the courses that

13      would make sense for an easy transition for her within

14      that setting and to continue to deliver the home

15      instruction in the areas that it did not for a gradual

16      start to the Mendham BSP program.

17            Q    And that would be -- what -- for the

18      remainder of that school year?

19      A     Yeah, for afternoons only, for the remainder of

20      that academic year.

21            Q    And then what was proposed for the following

22      school year?

23      A     The BSP program at Mendham.

24            Q    And could you just tell us what "BSP" means

25      or at least what the acronym means?

Dickerson - Direct                                    149

1    A    At Mendham High School, it's the Being Successful

2    Program.  At Central High School, it's still referred

3    to as the Behavioral Support Program.  The name had

4    changed.

5         Q    And now, you don't work in the BSP, right --

6    either BSP?

7    A    No.

8         Q    Is there a difference in --

9              MS. WARSHAW: I'm sorry, Your Honor.  Could

10   you just repeat that because we can't hear your answer.

11   What was that answer?

12             THE WITNESS: At Mendham High School, the BSP

13   program is called the Being Successful Program and at

14   Central High School, it's still referred to as the

15   Behavioral Support Program.

16             MS. WARSHAW: You said something about the

17   name being changed.  What did you say?

18             THE WITNESS: I believe, at one point, it

19   might have -- I think that Mendham had called it the

20   similar acronym and I'm not sure if the name had

21   changed at some point.

22             MS. HOWLETT: She's asking -- now we're asking

23   questions.

24             THE COURT: Yeah, we're not doing -- we're not

25   doing cross yet.

1          MS. WARSHAW: We just couldn't hear her.  I

2     just wanted to clarify what she answered.  That's all.

3          THE COURT: Okay.

4          THE WITNESS: Yeah, the same acronym was used.

5     BY MS. HOWLETT:

6          Q    And we're going to get back to that, but in

7     the meantime, in your -- in the IEP that you proposed,

8     at the bottom, page -- it looks like five of twenty --

9     can you tell us what's on this page -- what "Courses of

10    Study" means?  (Out of microphone range) obvious.

11    A    Under "Courses of Study," grade nine would be what

12    courses she had already completed in grade nine.  Grade

13    ten, it would be the list of what she was currently

14    taking -- the home instruction at that time. And then

15    the proposal -- and then, it's a wrap-around IEP, so

16    grade eleven would be what was being proposed then for

17    the following academic school year.

18         Q    And then, so, grade eleven, can you just take

19    us through -- we had some prior testimony from Mr.

20    Cusack about the different levels of courses that you

21    guys have to offer.  Can you just take us through grade

22    eleven, what -- what classes and what level of those

23    classes that it was proposed that J.H. be enrolled in?

24    A    For the following school year?

25         Q    Right.

Dickerson - Direct                       151

1    A    So it wasn't for the remainder.  So, grade eleven,

2    she had -- my understanding was she had always been a

3    strong academic student and been recommended for

4    advanced level classes.  Within the BSP program, they

5    can differentiate and modify up to those levels if

6    that's what's appropriate for the students, so it was

7    being recommended that English III would be at the

8    advanced level within the BSP room.  World History

9    would be at the advanced level within the BSP.  French

10   and Algebra II would be regular classrooms.

11   Environmental Science would be academic within the

12   Behavioral Support Program.  Gym and health, band, out

13   of class support -- within the BSP program.

14       Q    So, would J.H. be taking advanced level

15   courses in the BSP, according to this IEP?

16   A    Yes, that was what was proposed.

17       Q    It's been noted that, in this IEP -- I'm

18   trying to actually get to the page.  I believe on page

19   13 and also at places on 15 -- several places

20   throughout the IEP, it refers to the Mendham High

21   School program, the BSP at Mendham High School, but it

22   identifies it as the Behavioral Support Program, as

23   opposed to what you previously testified to, that the

24   Mendham program was actually known as the Being

25   Successful Program.  Can you explain, maybe, the

Dickerson - Direct                              152

1     confusion?

2     A     At Central High School where I work, the BSP

3     program stands for the Behavioral Support Program.  My

4     understanding is that acronym was similarly used at

5     Mendham High School.  It may have been originally

6     called the Behavioral Support Program there and at some

7     time, that may have shifted and they started to call --

8     label the program as the Being Successful Program.

9     Typically, we refer to both as the BSP program.  I

10    think that's where the confusion was.

11        Q     So when you prepared the IEP, did you mean

12    the Being Successful Program or did you mean the

13    Behavioral Support Program?

14    A     I meant the Being Successful Program at Mendham

15    High School.  The distinction was really which building

16    and in which program, and it was clearly recommended

17    Mendham High School because we felt a change in school

18    would be beneficial for her.

19        Q     To your knowledge, is there a difference

20    between the two programs?

21    A     Several differences.  The nature of the room.

22    Obviously, your makeup of kids are different; it's a

23    different high school.  You know, there's, you know,

24    subtle differences between the two -- the two programs.

25    I think the reward system is a bit stronger at Mendham

Dickerson - Direct                              153

1    High School and the environment is slightly different.

2         Q    To your knowledge, did the parents go and

3    visit the Being Successful Program at Mendham High

4    School?

5    A    Yes.

6         Q    Did you accompany them there?

7    A    No.

8         Q    Was there ever any talk at the May meeting

9    which you attended -- I know you can't testify as to

10   the earlier meeting -- but the meeting that you

11   attended, about any programs at West Morris Central?

12   A    I'm sorry.  Can you repeat that?

13        Q    Did you ever have any conversations with the

14   parents about any programs at West Morris Central or

15   did you only discuss programs at Mendham?

16   A    I don't recall discussing ones at Central.  I feel

17   like we were -- the IEP team felt pretty strongly that

18   having her have a new start with a new peer group would

19   be beneficial.

20             MS. HOWLETT: One moment, Your Honor.  I'm

21   sorry.

22   BY MS. HOWLETT:

23        Q    And I guess backing up to even propose an

24   IEP, was there an eligibility determination that was

25   made?

Dickerson - Direct                              154

1    A    Yes, and my understanding is that had been made at

2    the April 6th meeting that I was not at.

3         Q    Would you have reviewed the eligibility

4    determination report?

5    A    Yes.

6         Q    Would that be part of your preparing an IEP?

7    A    Yeah.

8         Q    Can you please turn to R-9?  It's that same

9    binder.  Oh, I'm sorry; it's the black binder.  And can

10   you just describe what this document is?

11   A    This is the eligibility determination report.

12                                    (R-9 Marked for

13                                    Identification)

14        Q    Is this for J.H.?

15   A    Yes.

16        Q    Did you review this document?  Have you seen

17   this document before?

18   A    I've seen it before, yes.

19        Q    Did you review this document when you

20   prepared the IEP?

21   A    Yes.

22            MS. HOWLETT: Your Honor, I'd like to move R-

23   9.

24            THE COURT: Any objection?

25            MS. WARSHAW: Yes, Your Honor, the same

Dickerson - Direct                                    155

1    objection, the same reasons as before.  She wasn't at

2    the meeting when this was generated.  She has no

3    knowledge as to what happened at that meeting.  She

4    never authored it.  The same objections.

5              THE COURT: Overruled.

6                                        (R-9 Entered into

7                                        Evidence)

8    BY MS. HOWLETT:

9         Q    Ms. Dickerson, can you take us through what

10   this -- is this a typical eligibility determination

11   report?

12   A    Yes.

13        Q    Have you prepared these in the past?

14   A    Yes, they're typically prepared by our

15   administrative assistant with the summaries of the

16   reports and then we -- the reports that were conducted

17   as part of the evaluation process -- and then, we --

18   yeah.

19        Q    And was there a determination that J.H. was

20   eligible for special education based upon this report?

21   A    Yes.

22        Q    And what was the -- where -- where can that

23   be found?  Can you just take us through?

24   A    Yes, that's on the second page of the report and

25   that determination is made by the IEP team.

Dickerson - Direct                                    156

1          Q    Are you -- I'm sorry.  So what was the

2     classification that was determined or that J.H. was

3     determined to be eligible under?

4     A    Emotionally disturbed.

5          Q    And can you just, as a case manager and as a

6     certified school psychologist, can you just talk about

7     what that means?

8     A    Yeah.

9               MS. WARSHAW: Your Honor, is she testifying as

10    an expert or is she testifying as a fact witness?

11    Because if it's an expert, she needs an expert report

12    and curriculum vitae, which has not been provided.

13              THE COURT: Well, actually, no expert needs an

14    expert report.  It happens all the time, but experts

15    don't need a -- I've tried cases, too.  You don't need

16    an expert's report to put an expert on the stand.

17              MS. WARSHAW: But she wasn't qualified as an

18    expert.

19              THE COURT: She wasn't -- she's not asking her

20    as an expert.  She's the school psychologist.  I think

21    she would know the answer to this as the school

22    psychologist.

23              Go ahead.

24              MS. HOWLETT: And I can rephrase slightly.

25    BY MS. HOWLETT:

Dickerson - Direct                              157

1        Q    Ms. Dickerson, do you, in your role as a case

2   manager, do you make eligibility determinations or

3   assist the child study team in making eligibility

4   determinations?

5   A    I assist the child study team, yes.

6        Q    And to meet the criteria of emotionally

7   disturbed, no one's going to ask you to cite the code

8   unless you want to, but can you talk about what you, as

9   a case manager, look to when you make an eligibility

10   determination as emotionally disturbed?

11   A    Yeah.  Under that category, there -- a student

12   would have to meet the criteria under one of -- I

13   believe it's five different areas, and those are things

14   such as that the student has -- and I'm paraphrasing

15   it.

16        Q    That's fine.

17   A    I can't recite the code without it in front of me.

18   But basically, that a student has had, over a marked or

19   a long period of time, the state of -- a pervasive

20   state of unhappiness or a period of depression.  So,

21   that's one area that seems relevant.  Also, has

22   developed a tendency to have inappropriate behavior to

23   normal circumstances or to have developed sort of

24   somatization or health complaints in relation to the

25   environment.  Those are some of the areas.  And an

Dickerson - Direct                              158

1    inability to maintain satisfactory interpersonal

2    relationships between peers or teachers.  So, you know,

3    those are, under the -- under the Code, those are some

4    of the areas that you would typically -- a student

5    could be classified as emotionally disturbed for

6    exhibiting some of those characteristics.

7         Q    So, beyond those characteristics or a

8    diagnosis, when you're looking at eligibility, is there

9    anything else you look to?

10   A    To determine the eligibility, what would we look

11   to?  Yeah, in order to determine eligibility, we would

12   basically have to just establish, first, does a student

13   have a disabling condition, and that would be through

14   those reports and outside information.  And then, how

15   is that impacting the student?  Is it -- is it

16   negatively affecting?  Like, just -- just having a

17   disability alone doesn't always necessarily mean having

18   a negative educational impact, so you would look to see

19   is it affecting them.  And the third thing would be,

20   really, do they need special education and related

21   services in order to account for that disabling

22   condition.

23        Q    And when you reviewed this eligibility

24   determination report, does it appear that the parents

25   signed it?

Dickerson - Direct                      159

1    A    Yes.

2         Q    And why do you usually have parents sign the

3    eligibility determination report?  What does that mean?

4    A    It's stating whether or not they're in agreement

5    with the eligibility and allowing the IEP team to move

6    forward to develop a plan based on that finding.

7         Q    Is consent required to go forward with the

8    IEP, with the proposal of an IEP?

9    A    Yes.

10        Q    In other words, what happens if a parent does

11   not consent to the eligibility determination -- the

12   initial eligibility determination?

13   A    An IEP can't -- can't be implemented without

14   initial consent.

15        MS. HOWLETT: I'm sorry to make everybody

16   switch around, but we're going to just talk briefly

17   about the IEP again.  You can refer to it if you want.

18   It's P-26 for anyone that wants to.  It's the blue

19   binder.  Sorry.

20   BY MS. HOWLETT:

21        Q    I just want to talk a little bit more about -

22   - I know that you don't work in the BSP at Mendham, but

23   if you could just talk a little bit about what other

24   services you may have proposed or what else this IEP

25   proposes and why.  And if you're referring to anything,

Dickerson - Direct                        160

1    you can point us to a specific page, if you like.

2    A    On the bottom of -- I'm looking at the program

3    page or the program description, which has "15-20" at

4    the bottom right corner.  So, basically, just to sort

5    of summarize the IEP, the program that was being

6    recommended was the BSP program at Mendham High School.

7    My understanding is that the student had been out on

8    home instruction for really an extended period of time

9    at this point, so, coming back to a program, in my

10   experience, students really have difficulties with that

11   without a gradual return.

12       She had been doing well on home instruction, so we

13   didn't want to interfere with the processes that were

14   going well, so the recommendation was a gradual return

15   for afternoons only to Mendham High School.

16   Transportation was to be provided.  Individual

17   counseling services, weekly, was to be provided.  If

18   you flip back to 12, I believe it's 12-20 at the

19   bottom, on "Modifications," even within those settings,

20   she was to be provided with extended time for tests and

21   quizzes.  She would be allowed to meet with the school

22   counselors upon her request, so to have access to

23   counseling support, essentially, as needed, in addition

24   to those weekly individual counseling sessions that

25   were being provided; to allow her to have frequent

Dickerson - Direct                    161

1       breaks and instruct teachers to provide her with

2       structure and interim due dates for long range

3       assignments -- having them broken down -- and providing

4       frequent feedback was recommended.  So those were the

5       modifications, and as I said, the transportation was to

6       be provided, as well as the counseling support.  This

7       IEP also has some accommodations listed from her

8       standardized assessments as well.  That's on page 13-

9       20.  You know, moving forward, since it was a wrap-

10      around IEP, it was to also take into account things she

11      might need for standardized testing, which included

12      frequent breaks, small testing groups, asking for

13      clarification, having extended time.  And also, she was

14      also recommended to continue to receive the home

15      instruction in the morning as she begins to attend West

16      Morris Mendham, so she had a modified half-day schedule

17      for afternoons only.  And then on the last -- one of

18      the last pages, 14-20, there is also some room built in

19      for an extension of the attendance policy due to the

20      chronic anxiety, depression, and panic attacks which

21      she's experiencing.

22          Q    And where did -- where did those

23      modifications and that programming -- how is that

24      developed?  What is that designed to address?

25      A    Things that came out of the testing that had been

1    done previously or recommendations from the outside

2    providers, so, things like the counseling, due to the

3    school-related anxiety, extended time for some of the

4    scatter between the working memory.  It all comes from

5    those reports and the background information that we

6    had gathered as part of the IEP team.

7        Q    And at the IEP meeting that you attended, the

8    one in May --

9    A    Yes.

10       Q    -- do you recall, was the Being Successful

11   Program at Mendham High School discussed?

12   A    Yes.

13       Q    To your recollection, did the parents raise

14   any concerns about any academics?

15   A    Yes.  My recollection is the parents felt just

16   that it just wasn't the right fit for the particular

17   student and did have some concerns about how the

18   academics could be modified within that setting to her

19   levels.

20       Q    Modified to a higher level or to a lower

21   level?

22   A    To a higher level.

23       Q    Did the parents raise any concerns about J.H.

24   having any academic challenges?

25   A    I don't recall at that meeting.

Dickerson - Direct / By The Court                    163

1        Q    So, was their concern that the BSP at Mendham

2   High School would be too challenging or be not

3   challenging enough?

4   A    Possibly not challenging enough.

5            MS. HOWLETT: Just one moment, Your Honor.  I

6   think we're done.

7   BY MS. HOWLETT:

8        Q    And just to clarify, this IEP, the one that

9   we keep referring to that's P-26.  It's marked -- it

10  looks like there's handwriting on it that says "Draft."

11  It is dated in April, correct, on that cover page?  I

12  just want to make sure that everyone understands one

13  document.

14  A    Yeah.

15       Q    But your recollection, this is the document

16  that was presented at that May IEP meeting?

17  A    Yes, it was presented at the May --

18       Q    Despite the date.

19  A    I'm not really sure.  I think this was the draft

20  in the system, in the computer system.  It was the open

21  draft, which is why it's dated that way.

22  BY THE COURT:

23       Q    Let me ask a question.  It wasn't changed

24  from when you -- from the first IEP meeting to the

25  second.  Is that correct?

Dickerson - By The Court / Colloquy          164

1    A    I don't think -- I think there was an empty shell,

2    like a draft in the system from that date, the April

3    date, and that was what was added to it.  I don't think

4    it had been presented.

5         Q    The IEP that was presented at the -- at the

6    April meeting, it's this IEP that was -- that was

7    presented at the May date, correct?

8    A    I wasn't at the meeting, the April --

9         Q    You were at the May meeting.

10   A    This was -- yes, this was the IEP presented at the

11   May meeting.

12        Q    And is it the same as the one that was

13   presented at the April meeting?

14   A    I don't think any IEP -- I don't -- I wasn't at

15   the April meeting, but I don't think any IEP was

16   presented.  I think it was a discussion, from my

17   understanding, of that -- of that program.  I don't

18   know if a document was --

19        Q    So, as far as you know, this is the only one?

20   A    Yes, as far as I know, it's the only one.

21             THE COURT: Anything else after I asked a

22   couple of questions?

23             MS. HOWLETT: No, thank you, Your Honor.

24   We're done with questions for the moment.  Thank you.

25             THE COURT: Just one second while I write

Colloquy                                    165

1    myself a note.

2              Cross?

3              MS. WARSHAW: Your Honor, I have extensive

4    cross examination.  Do you want me to start now or (out

5    of microphone range?)

6              THE COURT: I don't care.  If you want to take

7    a break and go to lunch, that's fine with me.  I'll

8    work through lunch.  I don't -- it doesn't matter to

9    me.  Do you want to take a break for lunch?  I'm not

10   going to stop you, but I'm perfectly willing to work --

11   to work through lunch, if that's what you'd like to do.

12             MS. WARSHAW: We can take a break.

13             THE COURT: How long would you like?  Taking a

14   break?  Yea?  Nay?  You want a break?

15             UNIDENTIFIED MALE: If we could take five

16   minutes for a bathroom break?

17             MS. HOWLETT: Yeah, we're fine just with a

18   bathroom break and then plowing through, but --

19             THE COURT: That's fine.  All right, I'm going

20   to be magnanimous.

21                  (BRIEF RECESS)

22             THE COURT: We're back on the record on F.H.

23   and M.H. on behalf of J.H. vs. West Morris Regional

24   High School.  The docket number is EDS 10706 and we are

25   ready for cross examination.

Dickerson - Cross                              166

1          Proceed.

2     CROSS EXAMINATION BY MS. WARSHAW:

3          Q    Ms. Dickerson, I'm going to refer you to

4     what's been marked R-16 and if you could please keep

5     your voice up so we could hear you, that would be

6     great.

7     A    Okay.

8          Q    Okay.  You testified earlier that you did not

9     draft this report, that it was your replacement while

10    you were on maternity leave, Sherrie Wilke, who did it.

11    Is that correct?

12    A    Yes, that's correct.

13         Q    But you -- is it correct for me to say that

14    you reviewed it when you got back from maternity leave?

15    A    Yes.

16         Q    Okay.  Were you aware that when this was --

17    this report was generated, that my client indicated

18    that there were errors in that report?

19    A    I became aware at some -- I don't know when I

20    became aware of that, but I believe it was at the May

21    meeting.  I do recall the parents saying that there had

22    been errors in -- they felt there were errors in the

23    report, yes.

24         Q    Okay.  And you're aware that none of those

25    corrections were made to that report, correct?

Dickerson - Cross                                167

1    A    I was not aware of that, that they were corrected.

2         Q    Okay.  So, isn't it true that the heading on

3    the report says "Clifton Public Schools" and this is,

4    presumably, West Morris Regional High School District?

5    Is that correct?

6    A    Yes, yes.

7         Q    And that error was never corrected, to your

8    knowledge?

9    A    Not to my knowledge, no.

10        Q    So, would it be your opinion that "Clifton

11   Public Schools" was an error, a typo?

12   A    Yes.

13        Q    And were you aware that my clients informed

14   Sherrie Wilke that, under "Background Information,"

15   that J.H. was never hospitalized?

16   A    I'm not sure when I became aware of that, but

17   again, I believe, thinking of the May meeting, I

18   believe that I remember the parents saying that they

19   were concerned about that, yes.

20        Q    Okay.  But to your knowledge, that was never

21   corrected either in this report.

22   A    Yes.

23        Q    Yes, it was not corrected?

24   A    It was -- to my knowledge, yeah, it was not

25   corrected.

Dickerson - Cross                                       168

1      Q    Okay.  And further down in that first

2    paragraph under "Background Information," the seventh

3    line down, were you aware that my clients had discussed

4    with Sherrie Wilke that J.H. was unable to return to

5    school; not that she refused to return to school?

6    A    Yes.  Again, I believe these concerns were brought

7    up at the May meeting, yes.

8      Q    And to your knowledge, this characterization

9    was not corrected.  Is that right?

10   A    Yes.

11     Q    Yes, it was not corrected?

12   A    Yes, the report does not appear to have been

13   changed.

14     Q    So, when you were taking this report into

15   consideration, did you take into consideration my

16   clients' objections to the characterizations set forth

17   in this report or the report itself?

18   A    The questions that you're bringing up, I believe,

19   were at the May meeting, so I had read the report as

20   written.  The IEP would have been proposed based on the

21   report that I had had.

22     Q    And the IEP was written without my clients'

23   input.  Is that correct?

24   A    It was based on the information from -- that I had

25   been informed about from the April meeting, so I don't

Dickerson - Cross                                    169

1    --

2         Q    So, my clients' were not present and did not

3    give you personal input when you drafted the IEP for

4    the -- for the May 2017 IEP meeting.

5    A    Yes, that's correct.

6         Q    I'm going to refer you to page four of this

7    report, the second paragraph under "Social Emotional

8    Functioning," the fourth line down.  Again, were you

9    aware that my clients' disputed the words "school

10   avoidance" and it was actually her school anxiety?

11             THE COURT: Are you sure it's page four?

12             MS. WARSHAW: Well, that's what I -- oh, wait.

13   I'm sorry.  Wait, wait.  Hang on.  Seven -- sorry.  It

14   was hidden under my papers.

15             THE COURT: Page seven.

16   BY MS. WARSHAW:

17        Q    Under "Social Emotional Functioning," second

18   paragraph down, fourth line, were you aware that my

19   clients' had indicated to Ms. Wilke that she did not --

20   that J.H. did not have school avoidance, but she had

21   school anxiety?

22             MS. HOWLETT: Your Honor, I'm not sure the

23   witness can testify as to conversations between the

24   parents and Ms. Wilke.

25             MS. WARSHAW: Your Honor, she testified that

Dickerson - Cross                                170

1       she spoke to Ms. Wilke about what had gone on while she

2       was on maternity leave.

3                   THE COURT: Why don't you ask --

4                   MS. WARSHAW: I'm asking her if she had

5       knowledge of that.

6                   THE COURT: Did you discuss that particular

7       section with Ms. Wilke?

8                   THE WITNESS: Not that I recall.

9                   THE COURT: Okay.

10      BY MS. WARSHAW:

11          Q    Were you aware that my clients objected to

12      that characterization in this report of "school

13      avoidance" versus "school related anxiety?"

14      A    I don't believe so, no.

15          Q    Also, on the first line of that section,

16      "Social Emotional Functioning," it says, "According to

17      her hospital therapist."  Are you -- you testified that

18      you are aware that J.H. was never in a hospital.  Is

19      that correct?

20                  THE COURT: I'm going to object.  Asked and

21      answered.  She said she was aware of it.  She became

22      aware of it at the May meeting.

23                  THE WITNESS: At the May meeting.

24                  THE COURT: Per the parents.

25      BY MS. WARSHAW:

Dickerson - Cross                                    171

1        Q    I'm going to refer you to the second to last

2   page in that report, under the section, "Critical Items

3   of Note."  Did you ever have any --

4   A    I'm sorry -- where?

5        Q    The second to last page, the last line before

6   "Summary and Conclusion," --

7   A    Okay.

8        Q    -- where it says, "Sometimes threatens to

9   hurt others."  Were you aware or did you have any

10  conversation with Ms. Wilke or anyone else that my

11  client indicated that that was completely false?

12  A    I'm sorry.  Can you repeat the question?

13       Q    Okay.  So -- all right.  At the time that you

14  drafted the IEP for the May 2017 IEP meeting, were you

15  aware or did you have any prior conversations with

16  anyone to indicate that my clients felt that this never

17  occurred, where it says, "Sometimes threatens to hurt

18  others?"

19            MS. HOWLETT: Your Honor --

20            THE COURT: You've got to let her -- let her

21  ask the question.

22            Are you aware that -- I'll ask it in less

23  words.  Are you aware that the parents dispute that

24  statement?

25            THE WITNESS: No, I wasn't aware specifically

Dickerson - Cross                                    172

1    about that item.

2    BY MS. WARSHAW:

3        Q    I'm going to refer you to page four of that

4    same report.  Did you feel it was significant that

5    J.H.'s working memory score was only in the 18th

6    percentile, in the low average range?

7    A    I mean, it's typical when you do this type of

8    assessment to have some variability.  It is a low

9    average range score.  Sometimes students, in my

10   experience, that are suffering from anxiety and

11   depression and on medications, we do sometimes see a

12   little bit of a depressed score in that area.  It's

13   telling about some of her -- the way she handles

14   various information, but we also had a lot of

15   information about her performance as a student as well.

16       Q    And did you feel it was significant that her

17   processing speed was in the 34 (sic) percentile?

18   A    That's an average -- an average score.  Compared

19   to other students her age, a score of 94 is within the

20   average range.

21       Q    Were you aware that -- strike that.  Were you

22   concerned at all that J.H.'s score in the block design,

23   a score of nine, was in the low average range?  Oh,

24   that's on the next page.

25              THE COURT: (Out of microphone range) on the

Dickerson - Cross                          173

1    next page.

2              THE WITNESS: Well, the -- a score of nine

3    would typically be an average score.  It's -- it's

4    slightly lower than the way she performed in the other

5    areas in that -- in that composite, but a score of nine

6    is an average score.

7    BY MS. WARSHAW:

8         Q    Isn't a score of nine in the low average

9    range?

10   A    It's on the lower end of the average range.

11        Q    And isn't it true that J.H. --

12   A    Ten would be the midpoint, so it's slightly below

13   the midpoint, but --

14        Q    I'm sorry.  I can't hear you.

15   A    A score of 10 is the midpoint, so it's slightly

16   below the midpoint, but there's a standard deviation of

17   three, so anything typically between seven and 13 is an

18   average -- within an average score. So it's slightly

19   lower that the midpoint, but it's within the average

20   range.

21        Q    And were you aware that J.H. scored in the

22   low average range for matrix reasoning and digital

23   puzzles?

24   A    I'm sorry.  Are we looking at the same thing?

25              THE COURT: Top of the page.

Dickerson - Cross                                    174

1              THE WITNESS: The top of --

2              MS. HOWLETT: It's marked "056" at the bottom.

3              THE WITNESS: Yeah.

4              THE COURT: At the top of the page, it's in a

5        block.

6              THE WITNESS: Yeah.

7              THE COURT: It says, "Block Design, Matrix."

8              THE WITNESS: I'm looking -- what I'm looking

9        at right now, the matrix reasoning, it says the scaled

10       score is 11 and the visual puzzles is 14, both of which

11       are -- 11 is within the average range; the visual

12       puzzles is just on the cusp of the high average range.

13       BY MS. WARSHAW:

14            Q    And were you aware that J.H. scored -- were

15       you concerned about J.H. scoring in the low average

16       range for digit span and arithmetic?

17       A    A score -- again, a score of nine, the arithmetic

18       score, again, that's within the average range on this

19       particular assessment on that day that she was tested,

20       according to the report by Ms. Wilke.  But a nine is --

21       again, a 10 would be the midpoint and there -- it would

22       be just within -- within the average range.  The digit

23       span score is in the lower -- low average range.

24            Q    And would you say that J.H.'s score in the

25       symbol search of five was in the low average range?

Dickerson - Cross                                      175

1      A    Yes.

2           Q    And did any of those concern you?

3      A    Yes.  I mean, there is variability, again, with

4      these scores.  I mean, it would be typical to have some

5      variability.  Those scores are within the low average

6      range and (out of microphone range.)  I'd have to go

7      back to the body of her report.

8           Q    And isn't it true that J.H. performed in the

9      high average range for verbal reasoning abilities?

10               THE COURT: You changed pages?

11               MS. WARSHAW: No, that's on the same page --

12     the bottom -- the bottom paragraph.

13               THE COURT: Oh, I'm sorry.  Thank you.

14               THE WITNESS: Yes, the verbal comprehension

15     index, she scored a 116, which is within the high

16     average range.

17     BY MS. WARSHAW:

18          Q    Okay.  Turning to the next page, third

19     paragraph down, starting with the fifth line of the

20     third paragraph down, the third full paragraph.  It

21     says, "A weakness in mental control."  Can you read

22     that, please?

23     A    "The student's abilities to sustain attention,

24     concentrate, and exert mental control are a weakness

25     relative to her non-verbal and reasoning abilities."

Dickerson - Cross                              176

1        Q     And the next line?  The next line -- "A

2     weakness."

3     A     "A weakness in -- a weakness in mental control may

4     make the processing of complex information more time

5     consuming for J.H., draining her mental energies more

6     quickly, as compared to others at her level of ability

7     and perhaps result in more frequent errors on a variety

8     of learning or complex work tasks."

9        Q     Did those statements concern you with regard

10    to J.H.?

11    A     Yes.  And again, sometimes it's not uncommon for a

12    student who is experiencing anxiety to have some

13    difficulties concentrating.  It's not uncommon for us

14    to see that area slightly depressed sometimes.

15       Q     Was any further testing done by the school

16    district with regard to these scores?

17    A     No, not to my knowledge.  And part of that, I

18    believe it's also --

19             THE COURT: There's no question.

20             MS. WARSHAW: There's no question.

21             THE WITNESS: Oh, I'm sorry.

22    BY MS. WARSHAW:

23       Q     I'm going to refer you to P-26 in the blue

24    binder.  In P-26, there are actually two IEPs here.  Is

25    that correct?  One has one through 22 and the other one

Dickerson - Cross                                 177

1    has one through 20 -- the pages -- or do you just have

2    the one through 20?  I have both.

3    A    I have two pages -- like, a cover page and a sign-

4    in -- sign-in page, and then I have a whole -- the IEP.

5       Q    Okay.  All right.  So, I'm going to ask you

6    about these two cover pages.

7             THE COURT: Wait a minute.  I don't think I

8    have two cover pages on P-26.

9             MS. WARSHAW: Do you have the first --

10            THE COURT: I do, yes.

11            MS. WARSHAW: Okay.

12            THE COURT: It's like the third page?

13            MS. WARSHAW: Correct.  The first two pages

14   say --

15            THE COURT: Okay.

16            MS. WARSHAW: -- one through 22 and it says

17   "Draft" on it.

18            THE COURT: Right, and you got one --

19            MS. WARSHAW: And then it says --

20            THE COURT: Okay.  Thank you.

21            MS. WARSHAW: The next one says "one through

22   20."  Okay, that's what the confusion was, because I

23   have both in my --

24            THE COURT: It's in there.  It's in the

25   binder.  Okay.

Dickerson - Cross                                      178

1          MS. WARSHAW: Okay, great.

2          THE COURT: Thank you.

3     BY MS. WARSHAW:

4          Q    Okay.  So, going to the first page of the P-

5     26, can you tell us what the first two pages are?  And

6     they're labeled -- the first page says "1 out of 22"

7     and the second page says "2 out of 22."

8     A    This is a typical cover page for an IEP, the first

9     page.

10         Q    And who's listed as the case manager?

11    A    Myself, Kendra Dickerson.

12         Q    On both pages?

13    A    Yes.

14         Q    And the date of the IEP meeting on those two

15    pages is what?

16    A    4/6/2017.

17         Q    And is the word "Handwritten Draft" on the

18    first page?

19    A    Yes.

20         Q    Okay.  I'm going to refer you to the third

21    page in the exhibit, which is -- it says, "1/20."  Who

22    is listed as the case manager on that?

23    A    Sherrie Wilke.

24         Q    Okay.  And what is the date of the IEP

25    meeting?

1    A    4/6.

2         Q    Okay.  And the next page, who is listed as

3    the case manager?

4    A    Sherrie Wilke.

5         Q    And does this IEP have anything that says

6    "Draft" on it, on that front page?

7    A    No.

8         Q    Okay.  So is it fair to say that the IEP that

9    does not have the word "Draft" on it was the IEP

10   presented at the April 6th, 2017 meeting where Sherrie

11   Wilke was the replacement school psychologist?

12             MS. HOWLETT: Your Honor, the witness

13   testified she wasn't present at the April meeting.

14             THE COURT: I think --

15             MS. HOWLETT: And she also testified that she

16   wasn't sure that an IEP was presented at that meeting.

17             THE COURT: I'm going to let her go with this

18   because I want to know.

19             Go ahead.  Answer the question, if you know.

20   If you don't know, you don't know.

21             THE WITNESS: I don't know.

22   BY MS. WARSHAW:

23        Q    Okay.  But this -- the IEP that you had

24   drafted for the May 2017 IEP meeting, the only

25   difference was these two pages.  Is that correct?

Dickerson - Cross                                    180

1    A    No.  To my knowledge, an IEP was not presented at

2    the -- at the April 6ᵗʰ meeting, so the IEP that's here

3    would be the one that was at the May meeting, to my

4    knowledge.

5         Q    What I'm asking you is, when you drafted the

6    IEP, the only change that you made was changing the

7    case manager and writing "Draft" on it.  Is that

8    correct?

9    A    No.  All of the information had to be inputted

10   into the system and the IEP had to be written out.

11        Q    Okay.  So it's your testimony that at the

12   April 2017 IEP meeting, no IEP was provided to my

13   clients?

14   A    Not to my knowledge, no.

15        THE COURT: I'm going to ask a question, if

16   you don't mind.

17        The IEP we're looking at -- setting aside the

18   two different cover pages and (out of microphone range)

19   pages -- the actual IEP draft itself, you inputted all

20   this information?

21        THE WITNESS: Yes.

22        THE COURT: Thank you.

23        Go ahead.

24        MS. WARSHAW: Okay.

25   BY MS. WARSHAW:

Dickerson - Cross                                    181

1      Q    I'm going to refer you to page --

2           MS. WARSHAW: Sorry, Your Honor.  I need to

3      find it.

4      BY MS. WARSHAW:

5      Q    I'm going to refer you to page five of 20.

6      On the bottom, where it says "Grade Eleven," some of

7      those courses have "BSP" listed next to them.  Is that

8      correct?

9      A    Yes.

10          Q    Okay.  And others do not.

11     A    Yes.

12          Q    Is it your understanding that the courses

13     that do not have "BSP" listed, that J.H. would take

14     those classes in general education classes?

15     A    Yes, yes.

16          Q    So she would have to navigate through the

17     Mendham High School to get to a general ed class for

18     French III, Algebra II, Phys Ed, Health, Band?  Is that

19     correct?

20     A    My knowledge is that I believe those courses --

21     French III -- were not offered within the BSP, so they

22     could either take it with the mainstream setting or an

23     Educere.  Sometimes, Educere is delivered to the

24     classroom.

25          THE COURT: That wasn't -- that wasn't the

Dickerson - Cross                           182

1    question.

2                    THE WITNESS: Oh, I'm --

3                    THE COURT: The question was, did she have to

4    navigate through the school to get to these classrooms?

5                    THE WITNESS: Yes.

6                    THE COURT: Okay.

7    BY MS. WARSHAW:

8         Q    And I'm going to refer you to page eight out

9    of 20.  The first paragraph, it says -- well, I'm going

10   to use "J.H." -- "J.H. will continue to take courses at

11   college-prep level in order to work towards completion

12   of graduation."  That's not advanced level classes,

13   correct?  That's college-prep classes.

14   A    It could be academic or above, yeah.  It could be

15   advanced as well.

16        Q    It could be what?  I'm sorry.  I didn't hear

17   you.

18   A    Advanced, as well.

19        Q    But college-prep level, it says, so is that a

20   different level than advanced classes?

21   A    College-prep level is considered anything academic

22   level or above, so advanced, honors -- it could all be

23   considered college-prep.

24        Q    Okay.  And were you aware when you inputted

25   all this information for this IEP that J.H. was going

Dickerson - Cross                                    183

1    to be placed in the Behavioral Support Program at

2    Mendham High School, as stated in this IEP?

3    A     The BSP program, yes.  Yes, at Mendham.

4          Q     The Behavioral Support Program at Mendham

5    High School.

6    A     At Mendham, yes.

7          Q     And you were aware at the time that it was

8    called the Behavioral Support Program?

9    A     To my -- to my knowledge, they were both called

10   BSP, both at Central and at Mendham.  At the time, it

11   was my understanding that it was called the Behavioral

12   Support Program, but it -- yes, the IEP was for the

13   Mendham High School program.

14         Q     To your knowledge, did there come a time when

15   there were independent evaluations done for J.H.?

16   A     Yes.

17         Q     Okay.  And do you recall what those were?

18   A     I believe that resulted from the May meeting and I

19   think it was a psychoeducational report and a

20   psychiatric report.

21         Q     And do you recall when you received the

22   actual psychoeducational report?

23         MS. HOWLETT: Your Honor, we're going to

24   object to anything that happened after the -- this is

25   the subject of our motion to exclude, so I just want to

Dickerson - Cross                                      184

1    -- I understand Your Honor's position earlier, but I

2    want to, for the purpose of the record --

3              THE COURT: Objection, is noted.

4              MS. HOWLETT: Thank you.

5              THE COURT: I'm going to allow it and I have

6    to decide a motion --

7              MS. HOWLETT: Thank you, Your Honor.

8              THE COURT: -- and unfortunately, my daughter

9    got married.  Well, fortunately, my daughter got

10   married.  I shouldn't say "unfortunately."

11             MS. HOWLETT: Just for the purposes of the

12   record, I understand you're going to allow it.

13             THE COURT: I was out most of the last week,

14   so -- okay.  Proceed.

15             MS. WARSHAW: I'm sorry.  I don't remember my

16   question.

17   BY MS. WARSHAW:

18        Q    When did you receive the independent

19   psychoeducational report?

20        A    I don't recall exactly when it was received, but I

21   believe it's on the document.  It was faxed over.

22        Q    Okay.  I'm going to refer you to what's been

23   marked P-32 in the blue binder, starting with the

24   second page.  Do you recognize this document?

25        A    Yes.

Dickerson - Cross                                    185

1        Q    Okay.  And isn't it true that the date of

2    this report is August 17ᵗʰ, 2017 -- I'm sorry -- August

3    21ˢᵗ, 2017?

4              MS. HOWLETT: Your Honor, the date speaks for

5    itself.

6              THE COURT: That's all right.

7              THE WITNESS: The report is dated August 21ˢᵗ,

8    2017.

9                                    (P-32 Marked for

10                                   Identification)

11   BY MS. WARSHAW:

12       Q    So is it fair to say that you received a copy

13   of this report in August of 2017?

14   A    August or when I returned in September.

15       Q    Okay.

16   A    This was the end of the month.

17       Q    Is it fair to say that this report was

18   available to the school district and to my clients

19   prior to the start of school for the 2017/2018 school

20   year?

21   A    I don't know when it -- I don't know when it was

22   received.

23       Q    Are you aware that -- that Dr. Schubert

24   (phonetic) diagnosed J.H. with a specific learning

25   disability in this report?

                          Dickerson - Cross                    186

1    A     Yes, I've read it in this report.

2         Q    And is it fair to say that, following receipt

3    of this report, the school district did not schedule

4    any type of IEP meeting?

5    A     To my knowledge, no, they did not.

6         Q    Is it fair to say that, following receipt of

7    this report and the diagnosis of specific learning

8    disability, that the school district did not amend the

9    IEP?

10   A     That's correct.

11        Q    Is it fair to say that the school district,

12   after receipt of this report of specific learning

13   disability, did not consider changing J.H.'s proposed

14   IEP or classification?

15   A     That's correct.

16        Q    I'm going to refer you to what's been marked

17   P-33 for identification.  Have you seen this report

18   before?

19   A     Yes.

20        Q    Okay.  Isn't it true this is the independent

21   psychiatric report by Dr. Ellen Platt?

22   A     Yes.

23                                    (P-33 Marked for

24                                    Identification)

25        Q    Okay.  And it's dated September 6th, 2017.  Is

Dickerson - Cross                                    187

1      that correct?

2      A    Yes.

3               THE COURT: Your objection is noted, Ms.

4      Howlett.

5               MS. HOWLETT: Thank you, Your Honor.

6      BY MS. WARSHAW:

7          Q    And isn't it true that you had correspondence

8      with my clients, via e-mail, regarding obtaining a copy

9      of this report in August of 2017?

10     A    I don't recall specifically.

11         Q    Okay.  And if you look at the bottom of the

12     page -- it's upside down -- but isn't it true that

13     there is a fax date of September 14th, 2017?

14     A    Yes.

15         Q    And were you -- did you read this report?

16     A    Yes.

17         Q    Okay.  And isn't it true that on page 11 of

18     this report, the top paragraph, it indicates that,

19     "J.H. remains exceedingly emotionally fragile and the

20     probability of her attending her school is extremely

21     low at this time?"

22     A    Yes.

23         Q    And isn't it true that, following receipt of

24     this report, the school district did not schedule an

25     IEP meeting to amend the IEP?

Dickerson - Cross                               188

1       A     Not to my knowledge, no.

2             Q     And isn't it true that the school district

3       did not take this report into consideration in

4       determining an appropriate classification or placement

5       of J.H.?

6       A     Yes.

7             Q     Yes?  Can you clarify what that means?

8             THE COURT: She answered "Yes" to your

9       question.

10      BY MS. WARSHAW:

11            Q     Is it -- is it true that --

12            THE COURT: They did not take it into

13      consideration.

14      BY MS. WARSHAW:

15            Q     Okay.  They did not take into consideration.

16      A     Yes.

17            Q     Okay.  So is it fair to say that the District

18      paid for two independent evaluations and they did not

19      take either one into consideration when deciding what

20      would be appropriate for J.H. for her placement for the

21      2017/2018 school year?

22      A     Yes.

23            Q     I'm going to refer you to what's been marked

24      P-29 in the blue binder.  Can you tell the Court what

25      this is, the first page?

Dickerson - Cross                                    189

1    A    It's an e-mail from -- from the parent regarding

2    those reports.

3                              (P-29 Marked for

4                              Identification)

5         Q    And what's the date of this e-mail?

6    A    Friday, August 25th, 2017.

7         Q    And isn't it true that this e-mail is from my

8    client to you --

9    A    Yes.

10        Q    -- requesting -- requesting the results of

11   Dr. Schubert's independent psychoeducational evaluation

12   report?

13   A    Yes.

14        Q    And isn't it true that my client is

15   requesting, on August 25th, 2017, prior to the 2017/18

16   school year starting, to call her "as school is almost

17   here and we need to discuss what is best for J.H.?"

18   A    Yes.

19        Q    And then, the last -- isn't it true that this

20   e-mail also states, from my client to you, that she

21   would call you again to try to contact you that morning

22   because they would like to make a decision as soon as

23   possible?

24   A    Yes.

25        Q    And did you understand that that decision was

Dickerson - Cross                                    190

1    whether or not J.H. was going to attend school in the

2    district?

3    A    I'm sorry.  Can you repeat that?

4         Q    Did you understand that that e-mail was

5    regarding whether or not my clients were going to send

6    J.H. to the school district for the 2017/2018 school

7    year?

8              MS. HOWLETT: Your Honor, that's completely

9    speculative.

10             MS. WARSHAW: Well, I'm asking her

11   understanding of what this e-mail was.

12             MS. HOWLETT: She's asking the witness to

13   speculate as to what the intention of the parent was

14   when she sent the e-mail.

15             MS. WARSHAW: No, I'm asking her what her

16   understanding of -- as to what my client said to her.

17             MS. HOWLETT: The e-mail speaks for itself.

18             THE COURT: Yeah, the e-mail does speak for --

19   it's clear to me, the parent wants to have a

20   conversation about the report, so --

21             MS. WARSHAW: Okay.  Thank you.

22             THE COURT: -- that's what it says.  We don't

23   need to go further than that.  I got it.

24             MS. WARSHAW: Okay.

25   BY MS. WARSHAW:

Dickerson - Cross                                   191

1      Q    I'm going to refer you to the next page.  Can

2    you tell us what the first e-mail is and who -- who got

3    a copy of that?

4    A    The first e-mail is directed to Mr. Cusack, the

5    guidance counselor.  It's from the student's parents.

6    I was cc'd on that, so I would have seen the e-mail as

7    well.

8      Q    Can you speak up?  I'm sorry; it's hard to

9    hear you.

10   A    I'm sorry.  So, the first e-mail is an e-mail to

11   the student's guidance counselor from her parents and I

12   was cc'd on that, so I would have seen it as well.

13     Q    Okay.  And what's the date of that e-mail?

14   A    Friday, September 8th, 2017.

15     Q    Okay.  And that's prior to the school

16   district starting school or is that the day the school

17   district started for 2017/2018 school year?

18   A    I believe it was about a week in.  I believe we

19   started on August 28th.

20     Q    Okay.  And can you read what that says?

21   A    The e-mail?

22     Q    Yes.

23   A    "Hi, Joe.  In the phone conversation I had with

24   you and Kendra back on August 25th, you indicated that

25   J.H. would be coming back to West Morris as a general

Dickerson - Cross                                    192

1       education student with a 504.  We were confused at the

2       time, since she was already determined to be eligible

3       for special services with the previously proposed IEP.

4       Since then, I have spoken to Kendra and she indicated

5       that the team is waiting for the results from Dr.

6       Platt's office to schedule a new IEP.  Can you please

7       supply us with the proposed plan for J.H. in writing?

8       Thank you.  Regards."

9            Q    So is it your understanding that my clients

10      were still trying to schedule a new IEP based on the

11      independent evaluation results?

12                THE COURT: Let me answer.  Of course they

13      were.  That's what it said.

14                MS. WARSHAW: I want her understanding of

15      that.  It's important because, obviously, there's a

16      miscommunication.

17                THE COURT: There seems to be.

18                MS. WARSHAW: So I'd like --

19                THE COURT: Answer the question.

20                MS. WARSHAW: -- to make sure her (out of

21      microphone range.)

22                THE COURT: You know what?  You convinced me

23      to be quiet.

24                Go ahead.  Answer the question.

25                THE WITNESS: My understanding at the time was

Dickerson - Cross                                          193

1    they hadn't agreed to the initial IEP, so she still

2    would have been considered a general education student

3    with the previously proposed 504 plan at that time --

4    yeah.

5    BY MS. WARSHAW:

6        Q    And was it your understanding that my client

7    was requesting a new IEP?

8    A    Yes.

9            MS. HOWLETT: Your Honor, that's not -- that's

10   not what the e-mail says.

11           THE COURT: Well, it's --

12           THE WITNESS: I think they were asking for the

13   504.

14           THE COURT: When there's an objection and the

15   lawyers are talking, you really shouldn't be answering

16   anything because I have to decide whether I'm going to

17   let you.

18           MS. HOWLETT: Your Honor, the e-mail speaks

19   for itself and the parent is not requesting --

20           THE COURT: Yeah.  The e-mail says --

21           MS. HOWLETT: We're speculating.

22           THE COURT: Okay.  Well, we're not

23   speculating.  They asked for a new IEP -- to schedule a

24   new IEP.

25           MS. HOWLETT: They --

Dickerson - Cross                        194

1           THE COURT: That's what it says.

2           MS. HOWLETT: No, that's not.  It says, "She

3      indicated," which means Kendra, "indicated that the

4      team is waiting for results from Dr. Platt's office to

5      schedule a new IEP."  But there's a pretty important

6      distinction there --

7           THE COURT: There is.

8           MS. HOWLETT: -- between requesting an IEP

9      meeting and summarizing a previous conversation with

10     Ms. Dickerson.

11          THE COURT: Okay.  And the question asked was?

12          MS. WARSHAW: Was her understanding that my

13     clients were requesting a new IEP, based on the fact

14     that there were independent evaluations?

15          THE COURT: You can answer that.  I'll allow

16     that.  Yes or no?

17          THE WITNESS: I don't -- I don't really --

18          THE COURT: You don't know?

19          THE WITNESS: I'm sorry.  I just -- I'm having

20     a hard time understanding the --

21          THE COURT: Yeah, I agree.

22          THE WITNESS: Because there's a couple

23     different things involved here.

24          THE COURT: I'm going to boil it down.  If I

25     misstate it, stop me.

Dickerson - Cross                                    195

1          MS. WARSHAW: Okay.

2          THE COURT: The question is, was it your

3    understanding that the parents were requesting a new

4    IEP?

5          THE WITNESS: From this e-mail?

6          THE COURT: From this e-mail.

7          THE WITNESS: It was my understand they were

8    looking for copies of either the 504 plan or the

9    proposed IEP.

10          THE COURT: Okay.

11          THE WITNESS: And my understanding at the time

12   was that we were under -- we were working with legal

13   counsel, so the next IEP meeting would be scheduled

14   through the attorneys.

15          THE COURT: Okay.

16          THE WITNESS: That was my understanding.

17          THE COURT: That's your answer.

18   BY MS. WARSHAW:

19     Q    And just to be clear, there was no other IEP

20   meeting that was ever scheduled for J.H.  Is that

21   correct?

22   A    Not to my knowledge, no.

23     Q    I'm going to refer you back to R-16, what's

24   been marked "WM058" -- that page.

25          THE COURT: I'm sorry, Ms. Warshaw -- WM0 --

Dickerson - Cross                                    196

1              MS. WARSHAW: Five eight.

2              THE COURT: Thank you.

3              THE WITNESS: Where?

4              MS. WARSHAW: The black binder.

5              THE WITNESS: The other binder?  Sorry.

6              MS. WARSHAW: Sorry.  It's a little confusing.

7              THE WITNESS: I'm sorry.  What --

8              MS. HOWLETT: Tab 16.

9              THE COURT: Ms. Wilke's report.

10             THE WITNESS: Okay.

11             THE COURT: Turn to the page that's marked

12      "WM058" and (out of microphone range.)

13             THE WITNESS: Okay.

14      BY MS. WARSHAW:

15         Q    This report refers to the B-A-S-C-2, the

16      BASC.  Isn't it true that this is a subjective test and

17      it's subject to interpretation?

18      A    It is a standardized questionnaire, so there are

19      scores that correlate with -- with specific categories.

20         Q    But these questionnaires are answered by

21      individuals and not based on what the choices are

22      provided -- is that correct -- in the test?

23      A    It's a questionnaire that's filled out by -- in

24      this case, it was the parents and the student.

25         Q    Okay.  So their responses are subjective,

1    based on their own positions, correct?

2    A    Yes, their perspective, yes.

3         Q    And were you aware that J.H. was in the

4    school at the time that she was taking this test?

5              THE COURT: In the school physically or

6    attending the school?

7    BY MS. WARSHAW:

8         Q    Physically -- physically in the school.

9    A    Physically came in for the assessment.

10        Q    And were you aware that, that day, that she

11   was experiencing anxiety as a result of being in that

12   school that day?

13   A    I wasn't present.

14        Q    Can anxiety affect the answers on the BASC-2?

15   A    Yes.

16        Q    Do you know when the name changed at the

17   Mendham High School from Behavioral Support Program to

18   Being Successful Program?

19   A    I don't know when exactly it changed.  I don't

20   know.

21        Q    You had indicated that the reward system was

22   stronger at the Mendham High School Behavioral Support

23   Program.  Is that correct?

24   A    Yes.

25        Q    So, is it true that students would get points

Dickerson - Cross / Colloquy                    198

1    for showing up and staying awake in class?

2    A    I would need to refer to the document, but there

3    is, yes, set criteria.  I know attendance is part of

4    that, yes.

5         Q    And to your knowledge, did J.H. have any

6    disciplinary issues?

7    A    Not to my knowledge.

8         Q    And you were at the meeting, the May 16th,

9    2017 IEP meeting where Dr. David Leigh attended.  Is

10   that correct?

11   A    Yes.

12        Q    Okay.  Were you aware that he indicated that

13   the Purnell School was a good option for J.H. to look

14   at?

15   A    As I -- as I recall, I think he said that out of

16   some of the ones that you had -- you had mentioned --

17   you were present and mentioned several placements.  I

18   believe he said it was something to consider.

19             MS. WARSHAW: Can I have a moment, please,

20   Your Honor?

21             THE COURT: Sure.

22             MS. WARSHAW: I think we're done.  Thank you.

23             THE COURT: Okay.

24             Do you have any redirect?

25             MS. HOWLETT: I do, Your Honor.  I'll try --

Colloquy / Dickerson - Redirect                    199

1          THE COURT: We're going to take -- I need five

2     minutes.

3          MS. HOWLETT: Sure, Your Honor.

4          THE COURT: Okay?

5          MS. HOWLETT: Yes.

6          THE COURT: I need -- just so you know -- I

7     need to go check my blood sugar.  I don't want to pass

8     out on the bench.

9                    (BRIEF RECESS)

10         THE COURT: Okay, we're back on the record

11    after a brief break.  We're about to start redirect,

12    correct?

13         MS. HOWLETT: Yes, Your Honor.  I will, again,

14    try and be brief.

15    REDIRECT EXAMINATION BY MS. HOWLETT:

16    Q    Ms. Dickerson, counsel asked you,

17    extensively, questions about Ms. Wilke's report.  Did

18    you, in addition to Ms. Wilke's report, did you also

19    review the correspondence that came directly from

20    ICCPC?

21    A    Yes.

22    Q    And that documentation, did it talk about the

23    or at least refer to the partial care program that she

24    was -- that she had attended -- that J.H. had attended?

25    A    Yes.

Dickerson - Redirect                                    200

1          Q     To your knowledge, had the parents submitted

2     any written objection to Ms. Wilke's report?

3     A     Not to my knowledge.

4          Q     Did you receive anything from the parents in

5     writing, requesting that an amendment be made to the

6     report?

7     A     That was discussed at the May meeting.  I remember

8     a discussion.  I didn't see any formalized document for

9     that, no.

10         Q     So did you receive anything in writing?

11    A     No.

12         Q     And to your knowledge, has anyone at the

13    district received any such writing from the parents?

14    A     No.  Not to my knowledge, no.

15         Q     Counsel asked you about subtests on the -- in

16    Ms. Wilke's report.  Can you just tell us, generally,

17    how do you consider subtests when you're reviewing, you

18    know, a psychological assessment or when you conduct a

19    psychological assessment?

20    A     Subtests are individual, brief -- brief tasks that

21    a student -- that a student does.  They measure very

22    specific things, and in most cases, two or three

23    subtests are required to get a composite score, to look

24    at a particular area.

25         Q     So, when you reviewed Ms. Wilke's report,

Dickerson - Redirect                      201

1     were the results -- were J.H.'s results on the subtests

2     a red flag to you?

3     A     There was one with a score of five that was a bit

4     of a red flag.  I'd have to -- could I refer to that

5     one?  I mean, that would be --

6          Q     You can.  I mean, I'm really asking you

7     generally about -- about the subtests and what your

8     impression was on the report.

9     A     Uh huh.

10         Q     You know, more than revisiting it.

11    A     Yeah, typically, there is some variability amongst

12    a report.  It's not uncommon to see some variations.

13    (Out of microphone range) is slightly different.  Most

14    of those scores were within the average to above

15    average range, with a few that were a little bit on the

16    lower end, and then that one particular low score.

17         Q     So, generally, would a single low subtest be

18    cause for concern?

19    A     Not usually, no.

20         Q     Going to the IEP and the proposed program and

21    the modifications and accommodations -- everything

22    that's incorporated within that -- the related

23    services, were there -- was there anything in the IEP

24    that was an attempt to address concerns related to

25    J.H.'s potential difficulty concentrating or attention

Dickerson - Redirect                              202

1    issues that might have been related to her anxiety?

2    A    Yeah.  I mean, the program in general is a smaller

3    class setting.  Things like frequent breaks, things

4    like extended time, options to see, you know,

5    counselors -- access -- all of that is to help address

6    the issues of anxiety.

7         Q    Counsel asked you questions about the

8    proposed course offerings and I believe you testified

9    that the -- I don't have the courses in front of me,

10   but that some of the -- I think it was French, maybe

11   Algebra, were offered in a general education setting.

12   Is that -- was that your testimony?

13   A    Yes, yes.

14        Q    You also mentioned -- you also testified that

15   in addition to the general education setting, a student

16   could be provided with Educere.  Is that --

17   A    Yes.

18        Q    And what is Educere, just for the record?

19   A    Educere is an online delivery system for courses

20   that can be brought to the BSP room if a student is

21   feeling anxiety in a larger class setting.  They can do

22   it online with assistance in the BSP classroom.

23        Q    So if a student is receiving certain

24   coursework via Educere, they wouldn't necessarily have

25   to navigate through the high school.

Dickerson - Redirect                                      203

1    A    Yes.

2              THE COURT: Can you spell Educere?

3              MS. WARSHAW: E-D-I-C-E-R-E.

4              THE COURT: A little louder.

5              MS. WARSHAW: E-D-I-C-E-R-E.

6              MS. HOWLETT: E-D-U --

7              UNIDENTIFIED MALE: E-D-U-C-E-R-E.

8              THE WITNESS: Yeah.

9              THE COURT: E-D-U --

10             UNIDENTIFIED MALE: C-E-R-E.

11             MS. WARSHAW: C-E-R-E.

12             MS. HOWLETT: C-E-R-E.

13             THE COURT: Thank you.  Go ahead.

14   BY MS. HOWLETT:

15        Q    I am going to turn your attention -- it's the

16   blue binder.  It's P-32.  It's Dr. Schubert's report

17   and correspondence.  Can you just turn to the first

18   page of --

19   A    I'm sorry.  What number?

20        Q    P-32.  And you're in blue, right?

21   A    Yes.

22        Q    Yeah.  Did you review this letter from Dr.

23   Schubert that's dated December 13th?  It's the first

24   page of the exhibit.

25   A    Yes.

Dickerson - Redirect                                204

1        Q    And she says, "The evaluation concluded."

2   Can you just -- well, you don't have to read all, like,

3   the -- but can you summarize what she was concluding?

4   A    She was concluding that J.H. meets the diagnostic

5   criteria within the DSM-IV for a specific learning

6   disorder with impairment in mathematics, specifically,

7   with fluent calculation, moderate.

8        Q    Does a DSM diagnosis always result in a

9   classification for special education?

10  A    No.

11       Q    Can you have a diagnosis without meeting the

12  criteria for special education under the Code?

13  A    Yes.

14       Q    Did you have Dr. Schubert's report when you

15  proposed the -- when you proposed the IEP at the May

16  IEP meeting?

17  A    No.

18       Q    To your knowledge, is the District permitted

19  to implement an initial IEP without parental consent?

20  A    No.

21       Q    I'm just going to turn you to P-29.  That was

22  the e-mail correspondence that counsel referred you to

23  earlier.

24  A    Twenty-nine?

25       Q    Yeah, it's exhibit 29, but I think it's the

Dickerson - Redirect                                  205

1    second page.

2              THE COURT: The blue binder?

3              MS. HOWLETT: Yes, Your Honor, same binder.

4    BY MS. HOWLETT:

5         Q    This is the e-mail you guys talked about

6    before that we kind of disputed.  Do you recall looking

7    at this?

8    A    Yes.

9         Q    Okay.  Just bringing you back.  Counsel asked

10   you and had read portions of the parents' e-mail at the

11   top.  Can you please read the first line of Mr.

12   Cusack's response?  I believe it's right below.

13   A    Yes.  Mr. Cusack wrote, "Hello, Mr. and Mrs. H.  I

14   am not sure if you were referring to the proposed IEP

15   or the 504 plan.  If you need a copy of any IEP

16   proposal, Kendra would have that documentation.  I have

17   attached a copy of the 504 plan that we developed last

18   December when J.H. was returning to school.  This plan

19   would still be in effect for the 2017/18 school year

20   here at West Morris Central."

21        Q    That's good.  Thank you.  And did the parent

22   respond?  Does it appear that the parent responded to

23   that?

24   A    Yes, the chain just continues.  "Hi, Joe.  Thank

25   you for the information.  Regards."

Dickerson - Redirect / Recross                    206

1      Q    And in that e-mail from the parent, did --

2      did she request an IEP meeting?

3      A    Not in this e-mail, to my knowledge.

4      Q    Counsel asked you questions about what

5      transpired at the May IEP meeting.

6      A    Uh huh.

7      Q    Specifically, some things that Dr. Leigh had

8      referred to.

9      A    Uh huh.

10     Q    To your recollection, at the meeting, did Dr.

11     Leigh discuss the BSP program at Mendham?

12     A    Yes.

13     Q    Was it spoken about at length?

14     A    Yes.

15     Q    Is the director of special services a member

16     of the child study team?

17     A    Not -- no, not usually.

18          MS. HOWLETT: Your Honor, that's all the

19     questions I have.

20          MS. WARSHAW: Of course.

21          THE COURT: The record doesn't reflect I just

22     stared at Ms. Warshaw and she's smiling.

23          Go ahead.  Recross.

24     RECROSS EXAMINATION BY MS. WARSHAW:

25     Q    I'm going to refer you back to P-29, on the

Dickerson - Recross                                207

1    e-mail from Mr. Cusack to my clients, dated September

2    11th, 2017.  It's the second page of that exhibit.  Were

3    you aware that the -- that Mr. Cusack indicated that a

4    504 plan is typically in effect for only one year at a

5    time?

6    A    I'm sorry, can --

7               MS. HOWLETT: Your Honor --

8               THE COURT: She wasn't here.

9               MS. WARSHAW: Okay.  I'll rephrase it.

10   BY MS. WARSHAW:

11       Q    Are you aware that 504 plans are typically

12   only in effect for one year at a time?

13               MS. HOWLETT: Your Honor, is this related to

14   redirect?

15               THE COURT: I don't think so.  It's regarding

16   the --

17               MS. WARSHAW: You just asked --

18               THE COURT: At least, ostensibly, it's related

19   to the e-mail that Cusack sent.

20               MS. WARSHAW: Well, she just read it into --

21   and --

22               THE COURT: Yeah, I get that, but the -- I get

23   it.

24               The question is, are you -- okay -- are you

25   aware that a 504 plan is usually just for one year?

Dickerson - Recross                                    208

1              THE WITNESS: It's usually updated yearly, but

2        it's not -- it can be up to three years.

3              THE COURT: Okay.  There's your answer.

4        BY MS. WARSHAW:

5          Q    And were you aware that the 504 plan that was

6        issued in December of 2016 was going to be the same 504

7        plan in effect for the 2017/2018 school year without

8        any modifications or updates?

9              MS. HOWLETT: Your Honor, now we're definitely

10       off of the scope.

11             THE COURT: Yeah, we're off the scope.

12             MS. WARSHAW: Well, she was reading this in

13       and I think this is important to distinguish the

14       difference.

15             THE COURT: Well, you asked her if that was

16       the plan that was going to be in effect for the

17       following school year.

18             MS. WARSHAW: I didn't get an answer from that

19       one.

20             THE COURT: Well, that's because you got an

21       objection.  I'm not going to have her answer.

22       BY MS. WARSHAW:

23         Q    What is the typical procedure for reviewing -

24       - I'm sorry.  What is the typical procedure for the

25       child study team once they receive new information

Dickerson - Recross                              209

1    about a student?

2    A    I'm sorry.  I don't really understand your

3    question.

4         Q    Okay.  Once an IEP is proposed and new

5    information such as independent evaluations are done

6    and they say something different, what is the procedure

7    for the school district, typically, to address those

8    changes?

9    A    It -- there wasn't a typical procedure.  My

10   understanding was that there was already legal counsel,

11   so it wouldn't -- that would be -- I'm not -- I'm

12   honestly not sure.

13           THE COURT: You're not sure because counsel

14   was involved or you're not sure as a general -- as a

15   general statement?

16           THE WITNESS: I mean, it depends on the

17   results of the assessments and if they -- I guess I

18   just -- I'm not really sure what would have been the

19   next -- I don't know.

20   BY MS. WARSHAW:

21        Q    At the May 2017 IEP meeting which you

22   attended, you just testified that you talked about

23   Educere.  Isn't it true that Dr. David Leigh had

24   indicated that J.H. could take gym class, like

25   volleyball rules and stuff, online?

Dickerson - Recross                                 210

1   A    Yes.

2        Q    Isn't it true that in the Behavioral Support

3   Program at the Mendham High School, J.H. would not be

4   able to have science labs or anything like that?  She

5   would have to go to the general education classes to do

6   that.

7   A    I believe she was involved with physics.  I would

8   have to -- I would have to look.  I think that was one

9   of the courses she was doing on Educere, and if she

10  wanted to join that, at that time of the year, it would

11  have been within a mainstream setting or to continue on

12  Educere.  Environmental Science was offered within the

13  BSP program.

14       Q    She wasn't taking environmental science.  Is

15  that correct?

16            THE COURT: That wasn't the question.  The

17  question was, if she had to take a lab --

18            THE WITNESS: A lab, yes.

19            THE COURT: -- would she have to do that in

20  the classroom?

21            THE WITNESS: I believe a lab would have to be

22  on Educere or in a classroom.

23  BY MS. WARSHAW:

24       Q    A general education classroom.  Is that

25  correct?

Dickerson - Recross / Colloquy                211

1    A    Yes.

2              MS. WARSHAW: Your Honor, at this time, I'd

3    just like to enter the evidence that we have been

4    discussing.

5              THE COURT: Sure.

6              MS. WARSHAW: Okay.

7              THE COURT: Let's go through them.

8              MS. WARSHAW: P-29.

9              THE COURT: Which is?

10             THE WITNESS: The e-mail correspondence that

11   we've been going through.

12             THE COURT: Any objection?

13             MS. HOWLETT: The only problem with the e-mail

14   -- just the first two pages of P-29.

15             THE COURT: What about them?  P-29, is it just

16   the first two pages?  Actually, the 504 plan is

17   referenced as an attachment to Mr. Cusack's e-mail, so

18   that does kind of make it complete.

19             MS. HOWLETT: (Out of microphone range), Your

20   Honor, but I do see what you're saying about the

21   attachment.  No objection, Your Honor.  Thank you.

22             THE COURT: Okay.

23                              (P-29 Entered into

24                              Evidence)

25             MS. WARSHAW: We talked about P-32, which was

Colloquy                                              212

1     both of Dr. Schubert's reports.

2              MS. HOWLETT: No objection, Your Honor.

3     Except for the previously objected --

4              THE COURT: Right.

5              MS. HOWLETT: -- due to the scope and date.

6              THE COURT: Right.

7                                    (P-32 Entered into

8                                    Evidence)

9              MS. WARSHAW: P-33, Dr. Platt's report.

10             THE COURT: Same objection.

11             MS. HOWLETT: Same.  Thank you, Your Honor.

12             THE COURT: I'm going to allow it in and when

13    I decide, I'll reference it in the decision.  If I

14    decide not to allow it, then I'll strike it.  But right

15    now, it's in with that objection noted.

16             MS. HOWLETT: Understood, Your Honor.

17             THE COURT: Okay?

18                                    (P-33 Entered into

19                                    Evidence)

20             MS. WARSHAW: R-37, I'm not sure was put in or

21    not.

22             THE COURT: I'll tell you in a second.  R-37

23    is in.

24             MS. WARSHAW: It's in already.  Let's see.  R-

25    27, I believe is already in.

Colloquy                                    213

1                THE COURT: Yes.

2                MS. WARSHAW: P-26, the IEPs.

3                MS. HOWLETT: That's already in.

4                THE COURT: Already in.

5                MS. WARSHAW: Okay.  R-16 is in, right?

6                THE COURT: Uh huh.

7                MS. WARSHAW: Okay.  I think we're done.

8                THE COURT: I'm just going through my notes to

9        double check here.  Yeah, I think you're right.  I

10       think we've covered them all.

11               Okay, you can step down.  Thank you.

12               THE WITNESS: Thank you.

13               THE COURT: Next witness.

14               MS. HOWLETT: Yes, Your Honor.  We just have

15       one more witness scheduled for today and I think (out

16       of microphone range.)

17               (Whereupon witness exits the courtroom)

18               THE COURT: And you two need to call Diana and

19       schedule dates.

20               MS. HOWLETT: I think we responded via e-mail.

21               THE COURT: Okay.  I have one date left, I

22       think.

23               MS. WARSHAW: Which date was that because

24       there was -- we have experts that need to be scheduled

25       and --

Colloquy                                          214

1              THE COURT: I have a limited number of dates

2       as you both know.  If your experts can't make it when

3       I'm available, I don't know what else to do.  I'm not

4       trying to tell anybody that you can't have your

5       experts, but you know, I'm not coming in on Saturday.

6       I'm making a joke.  You know I have committed dates.

7       Plus, you get a hold of two during the week and you

8       can't schedule anything on Thursday, that gives me two

9       days in a week I can schedule EDS cases and I have a

10      pretty substantial calendar without EDS.  So, that's

11      the beast.  I read the report.  Did you read the report

12      about how bad we are at doing EDS?

13             MS. WARSHAW: I wrote part of that report,

14      yes.

15             THE COURT: You left out the part about how

16      counsel keep asking for adjournments.

17             MS. WARSHAW: No, that --

18             THE COURT: I'm not pointing fingers at

19      anybody in this room, but --

20             MS. WARSHAW: I think that's very true.

21             THE COURT: That's a substantial problem.

22             MS. WARSHAW: That is in the report, too.

23             THE COURT: (Out of microphone range) discuss

24      that on the record --

25             MS. WARSHAW: We definitely addressed that.

Colloquy                                    215

1           THE COURT: -- but it might as well be on the

2      record.

3           MS. WARSHAW: (Out of microphone range), yeah,

4      absolutely.

5           THE COURT: Ms. Howlett, before we just

6      convolute the record completely with our thoughts about

7      how poorly we do EDS here, go get your other witness.

8           MS. HOWLETT: Okay.  Thank you.

9           MS. WARSHAW: Who is it?

10          MS. HOWLETT: Tracy Costa.

11        (Whereupon Ms. Howlett exits the courtroom)

12          MS. WARSHAW: Tracy who?

13          THE COURT: Costo, I believe she said.

14          UNIDENTIFIED MALE: Costa, C-O-S-T-A.

15          THE COURT: Costa.

16     (Whereupon Ms. Howlett and witness enter the courtroom)

17          THE WITNESS: Good afternoon.

18          THE COURT: Good afternoon, Ms. Costa.  How

19     are you?

20          THE WITNESS: I'm well.  How are you?

21          THE COURT: Thank you.  I'm fine.  Have a

22     seat.

23          THE WITNESS: Okay.  I didn't want to sit

24     unless I was supposed to.

25          THE COURT: Raise your right hand.

Costa - Direct                                216

1    T R A C Y   C O S T A, RESPONDENT'S WITNESS, SWORN.

2              THE COURT: State your name.  Spell your last

3    name.

4              THE WITNESS: Tracy Costa, C-O-S-T-A.

5              THE COURT: Go ahead.

6    DIRECT EXAMINATION BY MS. HOWLETT:

7         Q    Hi, Ms. Costa.  How are you doing?

8         A    I'm well.  How are you?

9         Q    Good.  We just need to establish for the

10   record a little bit about your background.

11        A    Okay.

12        Q    So I just have some really general questions.

13   Your position and place of employment?

14        A    I work at West Morris Mendham High School as a

15   school social worker.

16        Q    And how long have you held that position?

17        A    Thirteen years.

18        Q    And what are some of your general duties as a

19   school social worker?

20        A    I am a case manager, where I manage students that

21   are classified for special education and related

22   services.  I provide school-based counseling for

23   students, I provide crisis counseling for students,

24   collaboration with teachers.

25        Q    And so, you said you -- you testified you've

Costa - Direct                                    217

1    been doing that for 13 years.  What did you do before

2    that?

3    A    Before that, I worked at Family Intervention

4    Services as a crisis counselor and supervisor.  I used

5    to go into people's homes and provide therapy once they

6    were screened but not found in need of hospitalization

7    for psychiatric reasons.

8         Q    And how long did you do that for?

9    A    I did that for five and a half years.

10        Q    And do you remember what you did before that?

11   A    Before that, I was in undergraduate school and I

12   worked in a group home for developmentally disabled

13   adults.

14        Q    And where did you go to school?

15   A    I graduated Kean University for my undergrad and

16   Fordham University for my grad.

17        Q    And what certs or degrees do you hold from

18   those schools?

19   A    I have a bachelor's of social work and a master's

20   of social work and I'm a certified school social

21   worker.

22        Q    So, as far as licenses, any --

23   A    A licensed social worker.

24        Q    And anything else?

25   A    I think that's about it.

Costa - Direct                                    218

1              THE COURT: That's enough.

2              THE WITNESS: Yeah, I think so.

3     BY MS. HOWLETT:

4         Q    In your role at Mendham High School, do you

5     work in the BSP program?

6     A    Yes.

7         Q    And how long have you been part of the BSP

8     program?

9     A    Since it was created.

10        Q    Do you remember when that was?

11    A    My best guess would probably be about six, seven

12    years ago.

13        Q    There's been a lot of discussion about the

14    name of the program --

15    A    Yes.

16        Q    -- at Mendham High School.

17    A    Yes.

18        Q    What's the current name of the program?

19    A    The Being Successful Program.

20        Q    Did it have a -- was it previously referred

21    to as something else?

22    A    Yes.

23        Q    And what was that?

24    A    Behavioral Support Program.

25        Q    And when -- do you recall when the name

Costa - Direct                                          219

1     changed?

2     A     No, I do not recall.  The best of my -- maybe

3     three years ago.

4          Q     Was it changed prior to the 16/17 school

5     year?

6     A     Yes.

7          Q     Not to reiterate, but -- so, during the 16/17

8     school year, was it referred to as the Being Successful

9     Program?

10    A     Yes.

11         Q     Is it important, what it's called?

12    A     The name changed; the services did not change.

13         Q     Can you talk a little bit about what the

14    services are, just generally, and then we can get more

15    specific in a minute.

16    A     It is to provide an environment for students that

17    might be having a difficult time in the mainstream

18    classes for social emotional reasons.  They might have

19    difficulties with the size of classes, the delivery of

20    academic material, as well as individualizing the

21    academics to provide them services where, if we have to

22    stop an English class to address a social emotional

23    issue without it hindering their progress academically

24    or socially and emotionally.

25         Q     Do all the students in the BSP program --

Costa - Direct                                220

1    (out of microphone range) BSP program at Mendham have

2    disciplinary issues?

3    A    As a whole, no.

4         Q    Are there students that attend the BSP that

5    do not have disciplinary issues?

6    A    Yes.

7         Q    There's a black binder in front of you.

8    A    Yes.

9         Q    Can you please open it to number 12, exhibit

10   number 12?

11   A    Yes.

12        Q    Have you seen this document before?

13   A    I have.

14        Q    Do you know who drafted this document?

15   A    I do not.

16        Q    But you have reviewed it?

17   A    Absolutely.

18        Q    To your knowledge as being part of the BSP

19   for the past seven years, is this document reflective

20   of the program that's offered in the BSP?

21   A    Yes.

22                                      (R-12 Marked for

23                                      Identification)

24        Q    If you turn to the second page of the

25   document, which is marked "WM043" at the bottom --

1      A      Yes.

2              Q      -- it describes the target population.

3      A      Yes.

4              Q      You don't have to read it verbatim

5      necessarily -- you can use some of your own words --

6      but can you describe what the target population of the

7      BSP is?

8      A      It's really for the students that have social

9      emotional anxiety, depression, social anxiety, have a

10     difficult time maybe sustaining a whole class, coming

11     to school on a regular basis or on time, so they may

12     have a lot of tardies or absences.

13             Q      Does the target population include students

14     that suffer from major depressive disorder?

15     A      Yes.

16             Q      What about school-related anxiety?

17     A      Yes.

18             Q      And I'm sorry.  Before, you mentioned

19     attendance issues.

20     A      Yes.

21             Q      Is that one of the target populations BSP is

22     designed to --

23     A      Yes.

24             Q      So the word "behavioral" is referred to in

25     here --

Costa - Direct                                          222

1    A     Uh huh.

2          Q    -- in the document, generally.  Is

3    "behavioral" designed to refer specifically to

4    disciplinary issues or can it refer to other emotional

5    issues?

6    A    It really covers a large gamut of diagnoses and,

7    for the lack of better words, behaviors we may see.

8    So, behaviors might be resistance to coming to school,

9    it could be not completing homework, to shutting down a

10   class.  "Behaviors" has a wide range of descriptors.

11         Q    And if you just flip to, I think, the next

12   page -- yeah -- "044" at the bottom.  It talks about

13   staffing.  Can you describe what sort of staff are in

14   the BSP?

15   A    So, we have three full-time teachers, so the

16   teacher that is highly qualified in a certain academic

17   area teaches.  We also have a paraprofessional, an

18   aide, in each class that we have, as well as myself,

19   that provides school-based counseling, as well as some

20   of the other case managers that do school-based

21   counseling as well.

22         Q    And how many students are in BSP?

23   A    Currently, we have 25.

24         Q    Do you know what the ratio is in the room?

25   A    I do not know.

Costa - Direct                                           223

1        Q    Is it always around 25 students or does it

2    fluctuate?

3    A    We fluctuate.

4        Q    And is the BSP contained in a single

5    classroom or is their multiple?  Can you just paint the

6    picture for us of what it looks like?

7    A    We have two classrooms that are adjoined by a

8    shared door, so we'll have two sections possibly going

9    on at the same time.  We also utilize adaptive PE, so,

10   obviously, that's in another room as well.

11       Q    Can students receive advanced placement

12   classes in BSP?

13   A    Not in BSP; outside of BSP.

14       Q    Outside of BSP meaning --

15   A    In the mainstream -- in the mainstream classes.

16       Q    And what if a student is struggling with

17   being in the mainstream?

18   A    What happens is, they are assigned a responsible

19   teacher within the special education department.  That

20   teacher then tracks that student and is in constant

21   communication with all teachers involved with that

22   student.  So, whether that student's teacher is in the

23   BSP program, as well as outside -- so we can provide

24   supports in and outside of the program.

25       Q    Can the BSP adapt to any academic level to

Costa - Direct                                              224

1    meet an individual student's needs?

2    A    To provide extra assistance and things of that

3    nature?  I'm just trying to get a clarification.

4         Q    Well, I guess both ways.  I guess the

5    question is, once the student's academic needs are

6    identified in an IEP, do you review that as part of a

7    student coming into BSP?

8    A    Yes.

9         Q    Is the BSP adapted -- can the BSP adapt

10   academically to make academics either less or more

11   challenging --

12   A    Yes.

13        Q    -- depending on the student's needs?

14   A    So, we have really mainly two levels of classes

15   within the BSP, so we have studies and we have

16   academic, which is a college-prep level.  So, the

17   students are taught the material, but their assessments

18   and what they produce is different.  So, the teachers

19   that are -- the teachers are asking those students for

20   one set of work for studies and one set of academic,

21   just like the mainstream.

22        Q    And we had some earlier -- strike that, Your

23   Honor.  If a student is, like you indicated, if a

24   student is struggling going into their mainstream

25   classes, as part of the BSP, are they offered some sort

Costa - Direct                                    225

1    of accommodation to meet that --

2    A    Sometimes they are unable to attend a mainstream

3    class for a lot of different reasons.  It could be

4    something from home; it could be something that

5    happened in school.  So, myself, along with the

6    teachers, will address that.  Maybe that day, they

7    didn't end up going to class because we had to address

8    an issue and we have to address that issue for them to

9    be successful in the academic area, so there are times

10   they might miss class.  But then, the communication is

11   with those teachers that -- that they missed class.

12        Q    Let's talk about students that are

13   struggling, that have school-based anxiety, so they're

14   having trouble maybe getting into the -- into the high

15   school building to begin with.

16   A    Yup.

17        Q    Have you seen situations like that as part of

18   your BSP?

19   A    Yes.

20        Q    And what are some of the services that you

21   provide to students like that?

22   A    So, we have a wide range of services.  We have

23   students that will not come into the school building,

24   so we've gone out to the home to work with them there,

25   to then bring them back into the school building.  When

Costa - Direct                                    226

1    they come back into the school building, sometimes they

2    get to the door and that's good for that day.  And

3    then, maybe the next time, they come into the lobby or

4    into my office.  You know, the goal is for them to get

5    into the building first, for them to feel comfortable

6    and confident, to establish relationships with

7    teachers, to then gradually get them into the

8    classroom.  It all depends on how severe their anxiety

9    is.

10        Q    So, do you gear those sort of services,

11   accommodations, to the specific student's needs?

12   A    Yes.

13        Q    The document that's in front of you, P-12 --

14   R-12, excuse me -- it includes, on page 045, and I

15   believe, on 046, it kind of goes on, and incentive

16   program or a points program.  Can you describe what

17   that's all about?

18   A    So, they have a general point system which is in

19   this document, and then it is individualized for the

20   student.  So, if the student is, you know, showing

21   proficiency with completing assignments, but their big

22   issue is attending school on a regular basis, we'll

23   create an individualized incentive for them about, you

24   know, how we can get them into the school building,

25   what they will earn to be able to get into the school

1    building, and things of that nature.

2         Q    So, is the incentive program really geared

3    towards disciplinary issues or is it more geared

4    towards --

5    A    Positive, to get them into the school and have

6    them feel comfortable within the building; to feel

7    success.

8         Q    Are there also accomplishments or incentives

9    for completion of work?

10   A    Yes.

11        Q    And a consistent attendance?

12   A    Yes.  It all depends on what the individual's

13   needs are.

14        MS. HOWLETT: Your Honor, I don't think we

15   moved in R-12.  We'd like to.

16        THE COURT: We didn't.

17        Any objection?

18        MS. WARSHAW: The only objection is to the --

19   to what it's called, the Being Successful Program,

20   because nobody seemed to be able to establish the date

21   of when that happened and the IEP doesn't say that, so

22   -- but other than that, we'll accept the document.

23        THE COURT: It's in.

24                              (R-12 Entered into

25                              Evidence)

                                    Costa - Cross                                    228

 1                MS. HOWLETT: Thank you, Your Honor.

 2                THE COURT: Noted.

 3                MS. HOWLETT: We do not have any more

 4       questions for this witness at this time.

 5                THE COURT: You're up.

 6       CROSS EXAMINATION BY MS. WARSHAW:

 7           Q    Ms. Costa, isn't it true that you had one

 8       conversation with my clients?

 9       A    I don't recall.

10           Q    Do you recall her daughter, J.H.?

11       A    I don't.

12           Q    You don't recall them coming to visit the BSP

13       program at the Mendham High School?

14       A    I don't.

15           Q    Okay.  Isn't it true that the Behavioral

16       Support Program at the Mendham High School, you do

17       whatever you can to get the kids to come to school?

18       A    Yes.

19           Q    And isn't it true that students who are

20       advanced levels in academics would have to take their

21       classes in the general education setting, not in the

22       Behavioral Support Program?

23       A    Can you clarify that?  I'm not -- you said

24       "advanced in academics."  I'm not sure what you're

25       asking.

Costa - Cross                                    229

1        Q    If you have a student who's at an advanced or

2    honors level academics, they would have to take their

3    high level classes in the general ed setting --

4    A    Correct.

5        Q    -- if they were in the Behavioral Support

6    Program at Mendham High School.

7    A    Correct.

8        Q    Is that correct?

9    A    Uh huh.

10       Q    Yes, that's correct?

11            THE COURT: Yes.

12   BY MS. WARSHAW:

13       Q    And the Behavioral Support Program is a self-

14   contained program.  Is that correct?

15   A    It is not a self-contained.  They're not in there

16   all day.

17       Q    Okay.  Isn't it true that the Behavior

18   Support Program at Mendham High School used to be only

19   one classroom, rather than two?

20   A    No, we had multiple classrooms; they just weren't

21   side-by-side.

22       Q    And I'm going to refer you to what was marked

23   P-12.

24            MS. HOWLETT: P-12 or R-12?

25            MS. WARSHAW: R-12.  I'm sorry.

Costa - Cross                                          230

1        MS. HOWLETT:  No, I just wanted to --

2   BY MS. WARSHAW:

3        Q    On the first page, under "Target Population,"

4   isn't it true that this refers to students that have a

5   pattern of school failure that's either emerging or

6   pervasive?

7   A    I'm not clear what you're asking.

8        Q    Isn't it true that students that are in the

9   Behavioral Support Program at Mendham High School have

10  a pattern or school failure or -- that it's either

11  emerging or pervasive?

12  A    School failure in what way?

13       Q    It says "school failure" in your own

14  brochure, so --

15  A    Well, I'm not too sure what you're asking -- if

16  you're asking academics or if you're asking social

17  emotional.  I'm not sure what you're asking.

18       Q    Okay.  In the Behavioral Support Program at

19  Mendham, isn't it true that students have academic

20  failures?

21  A    No, not all the time.

22       Q    But some do.  Isn't that correct?

23  A    Some may struggle academically, yes.

24       Q    And isn't it true that some of the students

25  at the Behavioral Support Program at Mendham High

Costa - Cross / Redirect                       231

1    School have behavioral issues?

2    A    Such as?

3         Q    Such as they've been suspended or issues with

4    behavior in class.

5    A    I don't have anybody in the program like that.

6         Q    Have you ever had anybody in the program like

7    that?

8    A    Yes.

9         Q    And referring to page four of the R-12, under

10   "Incentive Program," isn't it true that it states that

11   students can earn up to 13 points per class by showing

12   up on time, remaining alert, participating, respect

13   oneself and others, and accomplishments?

14   A    Yes.

15        Q    And isn't it true that in order to go on a

16   field trip, a monthly field trip, they have to earn a

17   certain number of points?

18   A    Yes.

19             MS. WARSHAW: All right.  No further

20   questions.

21             MS. HOWLETT: I just have one, Your Honor, if

22   you don't mind.

23             THE COURT: I don't mind.

24             MS. HOWLETT: We're all here anyway.

25   REDIRECT EXAMINATION BY MS. HOWLETT:

Costa - Redirect / Colloquy                    232

1        Q    Ms. Costa, with the incentive program, what's

2        the benefit that you've seen, as part of the BSP, of a

3        program like that?  Or have you seen a benefit?

4        A    It provides them a purpose.  A lot of times, you

5        have students that have issues that might get in the

6        way of them seeing positive things, and when they start

7        earning things and seeing good, it gives them

8        incentives.  It gives them reasons to keep succeeding.

9        Q    In your experience in your seven years of

10       working at BSP, have you seen improvement in students

11       with their inability to come to school?

12       A    Yes.

13       Q    Have you seen students make progress as far

14       as their school-related anxiety goes?

15       A    Yes.

16            MS. HOWLETT: No further questions, Your

17       Honor.

18            THE COURT: You can step down.  Thank you.

19            THE WITNESS: All right.

20            THE COURT: Okay.  Do we have a date in play?

21            MS. WARSHAW: It was June 4th, but we got a

22       note from Diana that it was no longer available and I

23       think there was one other date that she was

24       contemplating.

25            THE COURT: The question is, do I have a date

Colloquy                                            233

1     in play, because I'm not leaving here today without a

2     date in play.

3                 MS. WARSHAW: Good.

4                 MS. HOWLETT: I thought May 30th, was on the

5     table, so I'm not sure what happened to May 30th.

6                 THE COURT: I'm going go off the record.  I'm

7     going to go find out, so --

8                 MS. HOWLETT: Thank you, Your Honor.

9                 MS. WARSHAW: How many more dates do you need?

10              {Whereupon, the proceedings were adjourned.}

11                            * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

234

1    STATE OF NEW JERSEY }

2    COUNTY OF    }

3

4          I, Peggy Wasco, assigned transcriber, do

5    hereby affirm that the foregoing is a true and accurate

6    transcript of the proceedings in the matter of <u>F.H. and</u>

7    <u>M.H. on behalf of J.H. vs. West Morris Regional High</u>

8    <u>Board of Education</u>, bearing Docket No. EDS 10706-17,

9    heard on April 9, 2018 before the Office of

10   Administrative Law Court.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF NEW JERSEY
OFFICE OF ADMINISTRATIVE LAW
OAL DOCKET NO. EDS 10706-17

```
_____:
                           :
F.H. AND M.H.              :
ON BEHALF OF J.H.,         :
                           :
          Petitioner,      :
                           :          TRANSCRIPT
-vs-                       :              OF
                           :     RECORDED PROCEEDINGS
WEST MORRIS REGIONAL HIGH  :
SCHOOL BOARD OF            :
EDUCATION,                 :
                           :
          Respondent.      :
_____:
```

April 23, 2018

BEFORE:

    THE HONORABLE THOMAS BETANCOURT, A.L.J.

APPEARANCES:

    WARSHAW LAW FIRM, LLC
    By: Julie Warshaw, Esq.
    Attorney(s) for Petitioner

    CLEARY, GIACOBBE, ALFIERI & JACOBS
    By: Jodi S. Howlett, Esq.
    Attorney(s) for Respondent

                    Transcriber: Deborah Plyler
                    CRT SUPPORT CORPORATION
                    2082 Highway 35, P.O. Box 785
                    South Amboy, N.J.  08879
                    Phone: (732) 721-4330
                    Fax:   (732) 721-7650

I N D E X                                                    2

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DAVID LEIGH | | | | |
| By Ms. Howlett | 5 | | 48 | |
| By Ms. Warshaw | | 18 | | 55 |
| F.H. | | | | |
| By Ms. Warshaw | 59 | | 133 | |
| By Ms. Howlett | | 122 | | |
| M.H. | | | | |
| By Ms. Warshaw | 135 | | | |

E X H I B I T S                                    3

| NO. | DESCRIPTION | I.D. | EVID. |
|-----|------------|------|-------|
| P-14 | Parent Letter to Cusack - 10/15/16 | | 4 |
| P-16 | Not Identified | | 4 |
| P-19 | Parent Letter to Cusack | | 4 |
| P-26 | Draft IEP - May 16, 2017 | | 4 |
| P-50 | CD Recording of May 16, 2017 IEP Meeting | 27 | 27 |
| R-10 | Draft IEP - May 16, 2017 | | 52 |

Colloquy                                    4

1          THE COURT: All right.  There we go.  Okay.

2     We're on the record for a continued hearing on <u>F.H. and</u>

3     <u>M.H. On Behalf Of J.H. vs. West Morris Regional High</u>

4     <u>School Board of Education</u>, the Docket Number is EDS

5     10706-2017, today is April 23rd, I am Judge Betancourt.

6          Appearances for the Petitioner?

7          MS. WARSHAW: Julie Warshaw, the Warshaw Law

8     Firm, representing the Petitioners.

9          THE COURT: Good morning.

10         MS. HOWLETT: Good morning, Your Honor.  Jodi

11    Howlett, Clearly, Giacobbe, Alfieri & Jacobs, on behalf

12    of the Respondent School District.

13         THE COURT: Good morning.  All right.  Before

14    we went on the record we did some housekeeping off the

15    record and the following exhibits are in P-14, P-16,

16    P-19 and P-26 without objection.

17         So, your next witness, Ms. Howlett.

18                              (P-14, P-16, P-19

19                               and P-26 Entered

20                               into Evidence)

21         MS. HOWLETT: Yes, Your Honor.  Just one

22    moment, please -- (out of microphone range)

23         THE COURT: Good morning.

24         Mr. LEIGH: Good morning.

25         THE COURT: Have a seat and raise your right

Colloquy / Leigh - Direct                          5

1      hand, please.

2      D A V I D   L E I G H, RESPONDENT's WITNESS SWORN.

3                  THE WITNESS: I do.

4                  THE COURT: Thank you.  State your name please

5      and spell your last name.

6                  THE WITNESS: David Leigh, L-E-I-G-H.

7                  THE COURT: Proceed.

8                  MS. HOWLETT: Thank you, Your Honor.

9      DIRECT EXAMINATION BY MS. HOWLETT:

10          Q     Good morning, Dr. Leigh.

11     A     Good morning.

12          Q     How are you?

13     A     Good.  How are you?

14          Q     Good.  So I have to establish for the Court

15     who you are so I'm going to ask you some general

16     questions about your employment and background, so if

17     you want just to for the record just state your current

18     position and place of employment.

19     A     So there are two, one I am currently the Principal

20     of the New Alliance Academy which is a therapeutic high

21     school in Paramus, New Jersey, and I also do part-time

22     private practice work in Florham Park and Morristown as

23     a licensed Psychologist.

24          Q     And how long have you held both of those

25     positions?

Leigh - Direct                                                    6

1     A     So I've been the Principal of New Alliance Academy

2     since August 1, 2017 and I've been in private practice

3     since 2004.

4           Q     And what did you do before that?

5     A     I was Director of Special Services and in public

6     schools for 26 years, first as a School Psychologist

7     for 9 years and the last 17 as the Director of Special

8     Services, the last 8 of which were at the West Morris

9     Regional School District as Director.

10          Q     And what district did you work in before West

11    Morris?

12    A     Randolph.

13          Q     Was there another district before that also?

14    A     Morris Hills Regional.

15          Q     Any more?

16    A     A School Psychologist at High Point Regional.

17          Q     Okay.  And where did you go to school?

18    A     So a Bachelor's at SUNY Stony Brook, Montclair

19    State for the Certification as a School Psychologist

20    and a Master's in Educational Counseling, and Rutgers

21    Graduate School of Applied and Professional Psychology

22    for my Doctorate in School Psychology.

23          Q     Are there any other licenses or degrees that

24    you haven't already described that you hold?

25    A     The Principal Certificate which I, you know,

Leigh - Direct                                          7

1      achieved through NJ EXCEL.

2          Q    Okay.  And you know why we're today and what

3      student that we're referring to.

4      A    Yes.

5          Q    We're going to refer to her as "J.H.", I

6      think that's what we agreed on in our last proceeding,

7      so just a little bit of background about how or what

8      your role as the -- or your role was -- you're no

9      longer the Director, what your role is in relation to

10     the Child Study Team as the Director of Special

11     Services and if you just want to just describe that

12     generally?

13     A    Sure.  So as the Director I would oversee all of

14     the Special education programs and services provided

15     throughout the District, which were two high schools.

16         I worked closely with each of the Child Study Team

17     members who were the Case Managers of all the students

18     who were eligible for special education and related

19     services and we worked closely in terms of ensuring

20     that we were complying with the law, that we offering

21     programs and services that were aligned to the

22     continuum of options and we worked hard to develop in

23     District programs that we felt were appropriate, so

24     that was basically it.

25         Q    And would the Child Study Team Case Managers

Leigh - Direct                                         8

1    consult with you if they had questions about

2    eligibility or programming and things like that?

3    A    Yes.

4         Q    Was that regularly part of your duties?

5    A    Yes.

6         Q    Dr. Leigh, can you just tell us a little bit

7    about how you kind of came into the case regarding

8    J.H.?

9    A    Sure.

10        Q    If you recall.

11   A    Sure.  So I remember that Joe Cusack was the

12   Guidance Counselor and Kendra Dickerson was the Case

13   Manager, there was a period of time there where Kendra

14   was out on maternity leave and there was a maternity

15   leave replacement.

16        What I recall was that J.H. was struggling

17   significantly with anxiety and depression and had --

18   and this was now at the beginning of sophomore year,

19   was out and was at a program called, "ICCPC," and was

20   there for anxiety and depression and tried to come back

21   for a short period in December of 2016 but after a

22   couple of days that didn't work.

23        A 504 Plan was put into effect and subsequently a

24   referral to the Child Study Team where an evaluation

25   took place during that winter and we then met to offer

Leigh - Direct                                              9

1    a program.

2              Q     Were you part of the eligibility

3    determination or at those meetings?  Do you recall?

4    A     I do not recall being at the eligibility

5    determination meeting.

6              Q     We had previous testimony that the Case

7    Manager involved -- I know that you just mentioned too

8    that there was a maternity replacement, the Case

9    Manager is listed as Ms. Dickerson.

10   A     Okay.

11             Q     Did you -- did Ms. Dickerson provide you with

12   any documentation to review as far as, you know, making

13   any determinations about J.H.?

14   A     She did, I mean, she -- we reviewed the reports

15   together, that was part of what I tended to do quite

16   often with the Case Managers.  So, yes, we reviewed

17   those reports and the evaluations, so the Psychiatric

18   Evaluation and the Psychological Evaluation.

19             Q     There's a binder in front of you, a black

20   binder.

21   A     Okay.

22             Q     Could you just turn to the tab marked R-16?

23   A     So I'm seeing a lot of numbers --

24             Q     Or it's probably just 16.

25   A     "16"?

1        Q    Yeah.

2    A    Okay.  Yeah.

3        Q    I'm sorry.

4    A    That's okay.  Yes.

5        Q    Have you seen that before?  Does that look

6    familiar?

7    A    Yes.

8        Q    And can you just describe what that is?  It's

9    already been moved into evidence, but --

10   A    It's a Report of the Psychological Evaluation

11   conducted by Sherry Wilk.

12       Q    And did you review that report when you were

13   consulting with Ms. Dickerson?

14   A    Yes.

15       Q    And can you just flip over to the next one,

16   17?

17   A    Sure.

18       Q    And just kind of do the same thing and if you

19   could just tell me what that is?

20   A    It's a Psychiatric Evaluation conducted by ICCPC.

21       Q    And did you see that before?

22   A    Yes.

23       Q    And is that something that you went over with

24   Ms. Dickerson?

25   A    Yes.

Leigh - Direct                                    11

1    Q    Just a couple more and if you could just look

2    at 13, 14 and 15?

3    A    Sure.

4    Q    And go through each of those individually and

5    just let me know if you've seen those and if those were

6    also documents that you considered when you consulted

7    with Ms. Dickerson?

8    A    Sure.  This is a memo dated, "10/20/2016," from

9    ICCPC from the program Psychiatrist and the Senior

10   Clinician, Ms. Dolgos (phonetic), number 14 is also

11   ICCPC from the same two professionals dated,

12   "12/2/2016," and the next document is from the same two

13   professionals from ICCPC dated, "January 6, 2017."

14   Q    And have you seen those before?

15   A    Yes.

16   Q    So after reviewing that documentation did you

17   consult with Ms. Dickerson about what the appropriate

18   program might be for J.H.?

19   A    Yes.

20   Q    And what was your recommendation or your --

21   what did you offer as far as consulting with Ms.

22   Dickerson as for as the programming for J.H.?

23   A    The BSP Program at Mendham High School.

24   Q    And can you tell us a little bit -- we've had

25   some previous discussions about the BSP, but it would

Leigh - Direct                                    12

1    be helpful if you could describe --

2    A    Sure.

3        Q    -- your involvement in the BSP and what the

4    program is all about?

5    A    So I joined the District in West Morris as the

6    Director in August of 2009 and one of the first charges

7    to me as the new Director was to create a program for

8    students with emotional/psychiatric disorders or

9    conditions that would be based at Mendham High School.

10       There was a history in the District of having a

11   BSP Program at West Morris Central but there was a

12   feeling that there could be a different version of this

13   program that could target the needs of a different type

14   of student and so we embarked on researching the

15   different kinds of programs that were public school

16   based.

17       Again, the goal is to create as many opportunities

18   in District in the least restrictive setting so in

19   doing that we came up with a program where we offer all

20   of the core academic content areas as a replacement

21   class which offers a better teacher to student ratio so

22   that the students get more individualized support in a

23   less overwhelming setting because there's fewer

24   students in the classroom.

25       The teachers are selected very carefully, of

Leigh - Direct                                    13

1        course they're Certified Special Education Teachers,

2        they're highly qualified in their content area, but

3        you're looking for teachers who really have a skill,

4        and this is a special skill, in working with students

5        that are fragile emotionally.

6            As that program developed -- in year one it

7        started with 3 students, it evolved into a program that

8        over the next 6, 7 years on average was meeting the

9        needs of students, you know, anywhere from 18 up to 28

10       students a year who were accessing the program on a

11       part-time or even full-time basis.

12           The reality was a student can go into that program

13       and be there for the entire school day if that was

14       necessary.  It offered the core academic classes, it

15       included Adaptive Physical Education that was very low

16       stress, there was a Yoga instructor brought in every

17       Friday where the students were learning relaxation

18       techniques.

19           And we also incorporated a Transition Program

20       where the structured learning experienced Coordinator

21       who was working closely with the teaching staff because

22       we offered a post secondary planning course and so this

23       was for students who would then be taking an internship

24       and assessed for what type of internship might work for

25       them as they prepared for life after high school.

Leigh - Direct                    14

1        So, again, there were multiple components to the

2    program.  There was a point system that was

3    incorporated that was daily and weekly and it was

4    really just to have feedback to the students that

5    they're on track and that they're meeting their goals.

6        We tried to create a family atmosphere up there

7    because the students that ended up being placed in the

8    program -- it was attracting a student who was

9    struggling academically and/or socially and that impact

10   emotionally was causing them to shut down and shut down

11   to the extent that they were having a very difficult

12   time, many of them, getting to school regularly.

13       And so we needed to create a therapeutic setting

14   with a primary Child Study Team member who would

15   provide therapeutic support, Teachers that were very

16   sensitive and skilled in working with the students, and

17   a system that would support the students for knowing

18   that they were making progress.

19       We were trying to get kids that were really stuck

20   emotionally and trying to get them unstuck, more

21   confident, and back to performing to their potential,

22   For some students they could access the general ed

23   setting, others could not, the goal was for them to

24   eventually do that, that's the goal under the least

25   restrictive environment, so that's the gist of the

Leigh - Direct                              15

1    program.

2           Q     And can the -- as far as the academics go,

3    can the BSP be tailored to meet an individual student's

4    academic needs or challenges or perhaps even providing

5    a more aggressive academic environment?

6    A     Absolutely, absolutely.  There's no doubt that the

7    Teachers in that -- in those classes were skilled at

8    differentiating the instruction.  It's a key and that's

9    why it's a smaller class size, that's why there's a

10   Teacher Assistant in each of those sections so that

11   there's two adults in each of the rooms in each course.

12          And the fact was that we had students there that

13   were quite capable academically, had no learning

14   challenges, were bright, we absolutely college -- you

15   know, on a college path and, you know, our Teachers

16   were able to meet their needs.

17          The reality was this is -- you know, it was a

18   program that we were primarily concerned with the

19   emotional challenge but we were equally concerned with

20   ensuring that the students were challenged

21   academically.

22          Q     Could you just turn to tab 12?

23   A     Sure.

24          Q     Have you seen this before?

25   A     Yes.

Leigh - Direct                          16

1          Q     Is this an accurate description of what the

2     BSP Program is in your opinion?

3     A     Yes.

4          Q     So let's talk about J.H. specifically and I

5     know, you know, we're going into the recesses here

6     because it's been a while but as much as you can

7     remember, can you talk about why you thought the BSP

8     might be appropriate specifically for J.H.?

9     A     Yes, J.H. presented with both an academic skill

10    set and a psychiatric profile that was consistent with

11    the type of student that was being targeted through the

12    BSP and that is students who are really primarily

13    struggling with anxiety and depression.

14          And, again, it was the combination of the two and

15    from what I recall J.H. was having trouble having

16    insight as to what the issues were that were really

17    impacting the ability to get into school and to perform

18    and to be productive consistently and that program was

19    all about in real time trying to help the student

20    understand what their anxiety was, what the sources

21    were, and to target how to manage that -- and how to

22    manage those.

23          There was a good ratio of male to female, it was

24    about a 50/50 split and so we definitely felt like that

25    family atmosphere, the close knit, the skill set of the

1    Teachers and the therapeutic support would be -- would

2    be an appropriate fit.

3                MS. HOWLETT: Just one moment, Your Honor.

4                THE COURT: Hm-hm.

5    BY MS. HOWLETT:

6        Q    We had attended an IEP meeting back in April

7    of 2017 which we had previous testimony on and we had

8    stipulated to the IEP that was proposed on that day.

9    Can you talk about some of the other things that were

10   discussed at the meeting, there has been some

11   discussion about considering some other out of District

12   placement schools?

13   A    Sure.  So I believe that there was a question

14   asked as to, "Well, if the BSP Program didn't work,

15   then what?"  And I believe my response, you know,

16   regarded the notion that well, we look under the least

17   restrictive environment, we look at the different

18   program options, and then we offer a program with the

19   supports that we feel is appropriate in District which

20   is a good place to start if we feel that it's

21   appropriate and we did.

22        But if that did not work we would then look at New

23   Jersey approved private day placements that were

24   therapeutic in nature to provide the support that was

25   needed. I think there was a question about which ones

Leigh - Direct / Cross                    18

1      and I believe I mentioned a few that came to mind that

2      I thought could be a potential fit and I believe then

3      there was a discussion about which of the programs that

4      the family was interested in or was thinking about in

5      addition, you know, in conjunction with their Attorney.

6          Q    To your recollection did the Child Study Team

7      actually propose any out of District placements?

8      A    No.

9          Q    Did you have discussions with J.H.'s parents

10     about potential program options aside from the IEP

11     meeting, maybe telephone conferences or other meetings

12     about the BSP, to your recollection?

13     A    Not to my recollection.

14         Q    Okay.

15             MS. HOWLETT: I have no further questions,

16     Your Honor, at this time.

17             THE COURT: Cross?

18             MS. WARSHAW: Okay.

19     CROSS EXAMINATION BY MS. WARSHAW:

20         Q    Dr. Leigh, I'm going to refer you to R-12 and

21     the program that you started was the Behavioral Support

22     Program.  Is that correct?

23     A    Yes.

24         Q    But this program is listed as the, "Being

25     Successful Program."  Correct?

Leigh - Cross                              19

1      A    Correct.

2           Q    Were you aware that the April 6, 2017 IEP

3      referred only to the Behavioral Support Program at the

4      Mendham High School?

5      A    Not to my recollection.

6           Q    And to your knowledge J.H. never had any

7      behavior issues.  Correct?

8      A    Correct.

9           Q    And the --

10     A    Well, let me -- let me clarify, "Behavioral

11     issues," there can be a wide interpretation of that so

12     not coming to school is a behavioral issues, not being

13     in school is a behavioral issue.

14          Certainly we did not have any evidence that while

15     in school there were problems with authority, but not

16     coming to school is an issue behaviorally.

17          Q    So from your perspective it was the school

18     refusal.  Is that what you're saying?

19     A    There is many different interchangeable

20     descriptions, there's school phobia, there's school

21     avoidance, there's school refusal, often they're used

22     and people understand that the notion is that the

23     student is not coming to school.

24               MS. WARSHAW: I'm sorry, Your Honor.

25               THE COURT: Take your time.

1          MS. WARSHAW: I have to find my version of it.

2     BY MS. WARSHAW:

3          Q    So I'm going to refer you to the page what's

4     marked as WM-043 of that brochure, it's the second

5     page, and in the fifth line down for the, "Target

6     Population," isn't it true that it talks about,

7     "Students who have a pattern of school failure that

8     either is emerging or pervasive?"

9     A    Yes.

10         Q    Okay.  And isn't it true that when we were at

11    the IEP meeting in May of 2017 you described the

12    Behavior Support Program as one where a student can

13    take gym class online?

14    A    If necessary.

15         Q    And we had had a discussion about how the

16    adaptive gym class for special education students was

17    not appropriate for J.H. and she would have to take say

18    volley ball online in the Behavior Support Program.

19    Isn't that correct?

20    A    I do not recall that specifically but that could

21    have been.

22         Q    So she wouldn't be put in a general education

23    gym class.

24    A    Correct.

25         Q    Correct?

1    A    Correct.

2         Q    Okay.  And you had indicated that the BSP

3    Program, the Behavior Support Program, had core classes

4    but for a student who was college bound and they wanted

5    to take advanced classes they would have to go to the

6    general ed classes.  Is that correct?

7    A    That is not correct.

8         Q    You didn't say that at the May 16, 2017 IEP

9    meeting?

10   A    I did not and would not say that.

11        Q    So in your view is there any time that a

12   student in the Behavior Support Program would need to

13   go to the general ed classes?

14   A    If they needed to take an IB or an AP course, yes,

15   those -- that level of course is not offered through

16   the BSP.

17        Q    Okay.  And in order to get to one of those

18   general ed classes they would have to go through the

19   crowded hallways and be in the regular Mendham High

20   School.  Is that correct?

21   A    Not necessarily, there are accommodations that you

22   can provide that allow you to avoid crowded hallways,

23   that was something we did all the time.

24        Q    But the general ed classes that you had that

25   were offered would be AP level and higher level classes

1    they would be actual general ed classes.

2    A    Correct.

3         Q    Correct?

4    A    Correct.

5         Q    And it's your testimony that you did not

6    attend any of the IEP meetings prior to May 16, 2017.

7    Correct?

8    A    I do not recall.  I remember -- I remember one

9    meeting and then a mediation session, that's what I

10   recall.

11        Q    And if I told you that one meeting was the

12   May 16, 2017 IEP meeting would that be correct?

13   A    That would be correct.

14        Q    And isn't it true that any other information

15   that you had regarding what did or did not occur at the

16   prior IEP meetings came from the members of the Child

17   Study Team because you did not attend any of the

18   meetings prior to May 16, 2017?

19   A    I believe so.

20        Q    And were you aware that the April 6, 2017 IEP

21   was the same IEP that was proposed at the April 6, 2017

22   meeting as well as the May 16, 2017 meeting?

23   A    Yes.

24        Q    Isn't it true that you asked my client at the

25   May 16, 2017 IEP meeting that -- if she had visited the

Leigh - Cross                                      23

1    Purnell School?

2    A    I do not recall.

3         Q    Isn't it true that at the May 16, 2017 IEP

4    meeting you indicated to my clients to, "Go take a look

5    at the Purnell School, you know, that's one that's been

6    mentioned that, you know, I would definitely have to

7    look at?"

8    A    So let me provide the context --

9         Q    I'm just asking you to answer, did you say

10   that or not?

11   A    No.

12        Q    Isn't it true that at the May 16, 2017 IEP

13   meeting you indicated that you thought, "The Purnell

14   School had a peer group?"

15   A    Yes.

16        Q    Isn't it true that at the May 16, 2017 IEP

17   meeting when I asked you if the School District would

18   pay for the Purnell School you indicated, "Possibly, of

19   everything you mentioned that might be something we'll

20   talk about?"

21   A    I do not recall.

22        Q    Isn't it true that at the May 16, 2017 IEP

23   meeting you said that the Purnell School had a peer

24   group there and there are certain things there that the

25   others truly in your opinion did not offer?

Leigh - Cross                                    24

```
1    A    I do not recall.

2             MS. WARSHAW: Your Honor --

3             THE COURT: I'm listening.

4             MS. WARSHAW: -- I would like to -- I would

5    like to submit the recording of the May 16, 2017 IEP

6    meeting and if I need to play it for the witness I can

7    at some point as evidence that what he's testifying --

8             THE COURT: I've already listened to it.

9             MS. WARSHAW: Correct, you have.

10            THE COURT: I have.  I really don't want to

11   play it here.

12            MS. WARSHAW: Okay.

13            THE COURT: I think it's going to take up time

14   and I --

15            MS. WARSHAW: I would like to offer it into

16   evidence then as P-50.

17            THE COURT: Do you have an objection?

18            MS. HOWLETT: So long as it's admitted in its

19   entirety.

20            THE COURT: In its entirety.

21            MS. HOWLETT: Yes, Your Honor.

22            THE COURT: Yeah.

23            MS. HOWLETT: No objection.

24            THE COURT: Okay.  It's in.

25            MS. WARSHAW: Okay.  Thank you.
```

Leigh - Cross                                    25

1              THE COURT: Do we have -- is it marked?

2              MS. WARSHAW: My client sent you a copy --

3              THE COURT: I have it.

4              MS. WARSHAW: -- and it's P-50.

5              THE COURT: I have --

6              MS. WARSHAW: The CD.

7              THE COURT: The CD, so do you want to mark

8       that P-50?

9              MS. WARSHAW: Correct, Your Honor.

10             THE COURT: All right.  P-50 is the IEP

11      meeting and it appears -- did you get the same copy,

12      because I listened to it and it does appear to be the

13      entire meeting?

14             MS. WARSHAW: Yes, it is.

15             MS. HOWLETT: Yes, Your Honor.  And I note for

16      the record that that recording was not provided within

17      the "Five Day Rule".  I was provided with the

18      evidentiary documents that were provided by the

19      Petitioners and it was provided subsequently in an

20      email, I did not receive a CD or any other like hard

21      copy version or a transcript or anything like that.

22             THE COURT: Noted.

23             MS. HOWLETT: Thank you.

24             MS. WARSHAW: Your Honor, just so the record

25      is clear that the District also tape recorded that

Leigh - Cross                        26

1      meeting.

2                    THE COURT: I know.

3                    MS. WARSHAW: She did receive a copy by a CD

4      and she --

5                    THE COURT: That's why I had Diana ask you the

6      question --

7                    MS. WARSHAW: I personally mailed it.

8                    THE COURT: That's why I had Diana ask you the

9      question before I opened it.

10                   MS. WARSHAW: Yes.

11                   THE COURT: And by the way we're not allowed

12     to use media in our State provided computers so I have

13     and IT has a pending question, how am I supposed to

14     listen to it?  I'm going to listen to it anyway but how

15     am I supposed to listen to it without getting into

16     trouble with Homeland Security?

17                   MS. WARSHAW: Okay.  Thank you.

18                   THE COURT: All right.

19                   MS. WARSHAW: So I'll let the record --

20                   THE COURT: For the record, I'm going to let

21     it in.  I understand your objection, you know, but our

22     Rules of Evidence are so lax that --

23                   MS. HOWLETT: Understood, Your Honor, I have

24     to note it for the record.

25                   THE COURT: -- anything goes and it is

1    relevant and since you were both there.

2                                    (P-50 Marked for

3                                    Identification and

4                                    Entered into

5                                    Evidence)

6              MS. WARSHAW: Okay.  Thank you, Your Honor.

7    BY MS. WARSHAW:

8         Q    Were you ever aware that at the April 6,

9    2017 IEP meeting my clients indicated that they did not

10   agree with the characterizations of some of the fact

11   set forth in the Psychological Evaluation conducted by

12   Ms. Wilk?

13             MS. HOWLETT: Your Honor, objection, Dr. Leigh

14   stated that he wasn't at the April meeting so he can't

15   possible testify as to what was said.

16             MS. WARSHAW: I'm not asking what he said, I'm

17   asking if he was aware of the fact that my clients

18   objected to it at that meeting.  He indicated that he

19   spoke to --

20             THE COURT: He can answer --

21             MS. WARSHAW: -- the other Child Study Team

22   members.

23             THE COURT: He can answer that.

24             THE WITNESS: No.

25   BY MS. WARSHAW:

Leigh - Cross                                    28

1          Q    Isn't it true that at the May 16, 2017 IEP

2     meeting the parties, including Counsel, discussed the

3     issue that my clients did not agree with the

4     characterizations of some of the facts set forth in the

5     Psychological Evaluation Report conducted by Ms. Wilk?

6     A    I do not recall.

7          Q    Okay.

8               MS. WARSHAW: Again, Your Honor, I'm going to

9     refer to the recording, it speaks for itself.

10              THE COURT: It does.

11    BY MS. WARSHAW:

12         Q    You were present at the May 16, 2017 IEP

13    meeting where my clients described their experience at

14    their visit to the Behavioral Support Program at the

15    Mendham High School.  Correct?

16    A    Correct.

17         Q    You were present at the May 16, 2017 IEP

18    meeting where my clients described the reasons why they

19    felt that the Behavioral Support Program at the Mendham

20    High School would not be an appropriate placement for

21    J.H.  Is that correct?

22    A    Correct.

23         Q    You were also present at that May 16, 2017

24    meeting but despite my clients expressing their

25    concerns with the Behavioral Support Program at the

Leigh - Cross                                    29

1    Mendham High School these concerns were not added to

2    the proposed IEP.  Is that correct?

3    A    I do not recall.

4         Q    Are you aware that Ms. Dickerson testified in

5    this case that she put the IEP together for the May 16,

6    2017 IEP meeting from the information provided to her

7    by the Child Study Team?

8              MS. HOWLETT: Your Honor, he wasn't here for

9    that testimony.

10             MS. WARSHAW: I'm asking if he was aware of

11   it.

12             THE COURT: I'm going to allow it.

13             THE WITNESS: I do not recall.

14   BY MS. WARSHAW:

15        Q    Isn't it true that while you were the

16   Director of Special Services Ms. Dickerson had been on

17   maternity leave for a few months and therefore did not

18   have any contact with my clients to obtain their input

19   for formulating the IEP prior to the May 16, 2017 IEP

20   meeting?

21   A    She was out for a few months, whether or not she

22   had input or not I do not know.

23        Q    And the Child Study Team presented the

24   proposed IEP to my clients that was dated April 6, 2017

25   at the May 16, 2017 IEP meeting.  Correct?

Leigh - Cross                                           30

1    A    Correct.

2         Q    And isn't it true that no changes were made

3    to the proposed IEP at that meeting, the May 16, 2017

4    meeting, despite the concerns raised by my clients and

5    me?

6    A    The proposed program continued to be the BSP at

7    Mendham.

8         Q    But no changes were made to the

9    characterizations or the errors in the Psychological

10   Evaluation by Ms. Wilk either.  Correct?

11   A    No changes were made to the Psychological.

12        Q    And my clients concerns were not added to the

13   IEP.  Is that correct?

14   A    I do not know.

15        Q    And the IEP that was formulated on April 6,

16   2017 was presented to my clients both at that meeting

17   as well as the May 16, 2017 meeting without their

18   input.  Is that correct?

19   A    I do not know.

20        Q    I'm going to show you what's been marked

21   P-26.

22             THE COURT: That's the other books.

23   BY MS. WARSHAW:

24        Q    And I think it's also --

25             MS. HOWLETT: I believe it's R-10 -- (out of

Leigh - Cross                          31

1     microphone range)

2                  MS. WARSHAW: It's R-10?

3                  MS. HOWLETT: Yeah.

4                  MS. WARSHAW: Okay.  Let's see if we can keep

5     it in -- (out of microphone range)

6                  THE COURT: Weren't you guys supposed to

7     confer?  I actually put the word "Shall" into the

8     Order.  R-10.  Well, you know, I say that because I'm

9     often -- I'm often admonished by Counsel because I

10    don't comply with my own order and yet neither to

11    Counsel.

12                 MS. WARSHAW: We'll get to that, Your Honor.

13                 THE COURT: It's a quandary.

14                 MS. WARSHAW: We'll get to that.

15                 THE COURT: So we're on R-10.

16                 MS. WARSHAW: Your Honor, R-10 there --

17                 THE COURT: Is the Draft IEP.

18                 MS. WARSHAW: Correct, except then that is --

19    that is numbered 1 through 22.

20                 THE COURT: Right.

21                 MS. WARSHAW: Okay.  We're going to refer to I

22    think P-26 because that's not necessarily the same.

23                 THE COURT: No, it's different.

24                 MS. WARSHAW: Correct.

25                 THE COURT: How did that happen, did you

1       figure it out yet?

2                   MS. WARSHAW: Yes.

3                   THE COURT: You did?

4                   MS. WARSHAW: Yes, I did.  The one that is 1

5       through 20 is the IEP that was presented to my clients

6       April 6, 2017.

7                   THE COURT: Okay.

8                   MS. WARSHAW: The one that's marked, "Draft,"

9       which now has Kendra Dickerson as the Case Manager as

10      opposed to Sherry Wilk.

11                  THE COURT: Well, the ones I have -- you said

12      R-10 and R-26 (sic) both say, "Draft."

13                  MS. WARSHAW: Okay.  If you take R-20 -- if

14      you take P-26 --

15                  THE COURT: Oh, is it that --

16                  MS. WARSHAW: It's behind it, there's both of

17      them there.  They should be, at least the first two

18      pages will be there and P-26.

19                  THE COURT: I got it.

20                  MS. WARSHAW: You got it.  So the P-26 the

21      difference is --

22                  THE COURT: That they changed -- the numbers

23      changed.

24                  MS. WARSHAW: The numbers changed and 1

25      through 20 had Sherry Wilk listed as the Case Manager

Leigh - Cross                                    33

1     during the time that Kendra was --

2                    THE COURT: She was on vacation.

3                    MS. WARSHAW: -- on maternity leave.

4                    THE COURT: On maternity leave, that's not a

5     vacation.

6                    MS. WARSHAW: 1 through 22 now says, "Draft,"

7     on it, I don't know who wrote that but it says,

8     "Draft," on it.

9                    THE COURT: But didn't -- I think we

10    established that.

11                   MS. WARSHAW: That that was Kendra Dickerson?

12                   THE COURT: I think we established that who --

13    that she wrote "Draft" on it.

14                   MS. WARSHAW: No, I don't think we did.

15                   THE COURT: Okay.

16                   MS. WARSHAW: Okay.  So, okay, I'll try to use

17    -- okay, I'm going to refer you to R-10 on page 3/20.

18    BY MS. WARSHAW:

19        Q    Okay. I'm showing you what's been marked R-10

20    on page 3/20 with the heading, "Present Levels of

21    Academic Achievement and Functional Performance."

22                   MS. HOWLETT: I believe that's marked 3 of 22

23    in R-10.

24                   MS. WARSHAW: Oh, okay.  Mine is 3 of 20.

25    Okay.

Leigh - Cross                                34

1              THE WITNESS: Okay.

2      BY MS. WARSHAW:

3          Q    Under the section it says, "Describe the

4      concerns of the parents."  Do you see that section?

5      A    I do.

6          Q    Okay.  There is no mention in that section of

7      my clients concerns with the Behavior Support Program

8      at the Mendham High School.  Is that correct?

9      A    That's correct.

10         Q    In that same section there is no mention of

11     the out of District placements that my clients were

12     consider -- were discussing.  Is that correct?

13     A    Correct.

14         Q    And in that same section there is no mention

15     of my clients going to see other schools such as the

16     Purnell School.  Is that correct?

17     A    Correct.

18         Q    Okay.

19             THE COURT: I'm going to ask you a question,

20     why would that be in an IEP?

21             THE WITNESS: It wouldn't be in that section.

22             THE COURT: Okay.  Go.

23     BY MS. WARSHAW:

24         Q    Well, it talks about the concerns of the

25     parents.  If the parents are included as members of the

Leigh - Cross                              35

1    Child Study Team their concerns and their issues with

2    regard to the IEP are typically put into this section

3    or another section of the IEP.  Isn't that correct?

4    A    But not the options considered and rejected.  So

5    the options that we look at, whatever they are, if

6    they're considered and rejected they don't go in that

7    section.  What we would talk about in that section are

8    the concerns and this was the synopsis provided by Ms.

9    Dickerson, this is how she captured the wording of how

10   she interpreted the concerns.

11        Q    But she wasn't at the April 6, 2017 IEP

12   meeting.  Correct?

13   A    I don't recall.

14        Q    And so if my clients had expressed concerns

15   at the April 6, 2017 IEP meeting their concerns should

16   have been reflected in this section called, "Describe

17   the concerns of the parent."  Isn't that correct?

18   A    This is the section to capture the concerns.

19        Q    So, again, if my clients had expressed

20   concerns both at the April 6, 2017 IEP meeting as well

21   as the May 16th IEP meeting their concerns should have

22   been expressed in this section.  Isn't that correct?

23   A    This is where the concerns are expressed.

24        Q    Isn't it true that J.H. did not have any

25   issues with completing her work on home instruction,

1    her homework or her studies?

2    A    I don't have a specific detail on that.  I do

3    recall that the documentation from ICCPC was describing

4    that she was struggling to be productive, so whether

5    that carried over into the one on one with the home

6    instruction, it may or may not have occurred.

7         Sometimes we do see that when students are working

8    one to one and in tutoring they are able to produce

9    more effectively than when they're in that classroom

10   setting.

11        Q    And when J.H. was on home instruction she got

12   good grades.  Isn't that correct?

13   A    I do not know.

14        Q    I'm going to refer you to page 19 of 22 --

15   A    Is that the same document?

16        Q    You have 1 through 22.  Correct?  It should

17   be 19/22.

18   A    I'm not seeing anything that says 19/22.

19             THE COURT: It would be in the --

20             MS. WARSHAW: The bottom corner.

21             THE COURT: -- in the black binder, R-10.

22             MS. HOWLETT: What page was that?

23             MS. WARSHAW: 19/22.

24             THE WITNESS: What's the heading at the top of

25   the page?

1    BY MS. WARSHAW:

2         Q    "Rational for removal from General

3    Education."

4    A    Okay.

5         Q    Okay.  You testified that the Teachers at the

6    Behavioral Support Program at Mendham High School were

7    Special Education Teachers.  Is that correct?

8    A    Yes.

9         Q    They are not General Education Teachers.

10   Correct?

11   A    Yes, correct.

12        Q    And referring to R-10 page 19/22 in the

13   middle of the page it says, "A reward system focusing

14   on positive behavior support is also used to help

15   foster social connections and encourage academic

16   motivation."  Is that correct?  Would you say that's an

17   accurate account of what the Behavior Support Program

18   is about?

19   A    It's a part of what it does, yes.

20        Q    And in the Behavior Support Program there

21   are rewards for, "Showing up to school."  Is that

22   correct?

23   A    You earn points by being there.

24        Q    And you earn points by, "Being alert in

25   school.  Is that correct?

Leigh - Cross                                    38

1    A    Yes.

2         Q    And is it fair to say that there is a

3    difference between school refusal and school related

4    anxiety?

5    A    Well, school related anxiety is a broader category

6    and it can lead to school refusal.

7         Q    I'm going to show you what's been marked

8    R-14, have you ever seen this letter before?

9    A    Yes.

10        Q    Where you aware that this letter indicated

11   that J.H.'s Counselor and Psychiatrist recommended a

12   504 Plan for J.H. due to her extreme anxiety regarding

13   school?

14   A    I certainly recall seeing -- I recall seeing his

15   letter so, yes.

16        Q    I'm going to show you R-15 and, again, you

17   were aware that Melissa Dolgos and Dr. Srinivasan

18   (phonetic) were treating J-H.  Is that correct?

19   A    Yes.

20        Q    And isn't it true that this letter on the

21   sixth line down indicates that, "J.H.'s anxiety has

22   prevented her from being able to attend a regular high

23   school as she feels judged, pressured and scared?"

24   A    That is what it says.

25        Q    And Mendham High School is a regular high

Leigh - Cross                                          39

1    school.  Isn't that correct?

2    A    Yes, it is.

3         Q    And both of these letters were available to

4    the Child Study Team prior to formulating the April 6,

5    2017 IEP.  Is that correct?

6    A    Yes.

7         Q    I'm going to refer you to R-17 and you've

8    seen this report from Dr. Srinivasan before.  Is that

9    correct?

10   A    That is correct.

11        Q    And what is the date on this letter?

12   A    "March 15, 2017."

13        Q    And this letter indicates that on the -- on

14   the third page that Dr. Srinivasan recommended an, "Out

15   of District placement."  Is that correct?

16   A    On the third page?

17        Q    Under, "Recommendations."

18   A    That is correct.

19        Q    And this report was also available to the

20   Child Study Team prior to the April 6, 2017 IEP

21   meeting.  Correct?

22   A    That is correct.

23        Q    And these were also available prior to the

24   May 16, 2017 IEP meeting.  Is that correct?

25   A    Correct.

Leigh - Cross                                    40

1        Q    Okay.  I'm going to refer you back to R-10,

2   the same page we were on where it said, "Parent

3   concerns," it should be 3 of 22.  Do you have that

4   page?

5   A    Yes.

6        Q    Okay.

7             THE COURT: I'm sorry, which page are we on?

8             MS. WARSHAW: 3 of 22, 3/22.

9             THE COURT: Thanks.

10            MS. WARSHAW: It's the same page we were on

11  before the, "Present Levels of Academic Achievement and

12  Functional Performance."

13  BY MS. WARSHAW:

14       Q    In the first section it says, "Consider

15  relevant data and list the sources used to develop this

16  IEP."  Do you see that section?

17  A    Yes.

18       Q    Does it say anywhere in that section anything

19  about the three letters that we just talked about from

20  Dr. Srinivasan and Melissa Dolgos?

21  A    It does not.

22       Q    So is it fair to say that if it's not listed

23  in that section these letters were not considered in

24  the development of this IEP?

25  A    Actually not.  It refers to, "Recent evaluation,"

Leigh - Cross                                    41

1    and while that's global that can certainly include all

2    sources including letters that are coming in from

3    outside sources that are evaluative in nature.

4           Q    Do you know for a fact that these three

5    letters were considered in determining this April 6,

6    2017 IEP?

7    A    Yes.

8           Q    Did you personally consider these three

9    letters from J.H. treating Physician and her Counselor

10   when determining this April 6, 2017 IEP?

11   A    Yes.

12          Q    And in the Parent Concerns section isn't it

13   correct that we had a discussion about classifying J.H.

14   as Other Health Impaired at the May 16, 2017 IEP

15   meeting?

16   A    I do not recall.

17          Q    Okay.

18               MS. WARSHAW: Again, Your Honor, I refer to

19   P-50 --

20               THE COURT: Hm-hm.

21               MS. WARSHAW: -- for clarification.

22   BY MS. WARSHAW:

23          Q    Is it fair to say that the proposed IEP

24   presented to my clients at the May 16, 2017 IEP meeting

25   was a final IEP and no changes were made to that IEP?

Leigh - Cross                              42

1    A    I don't -- I do not believe that changes were made

2    to that IEP.

3         Q    Were you ever aware that my clients did not

4    sign the April 6, 2017 IEP?

5    A    Yes.

6         Q    Okay.  I'm going to show you R-16 and you

7    testified before that you've seen this before.

8    Correct?

9    A    Correct.

10        Q    And you see the heading on this report, it

11   says, "Clifton Public Schools."  Is that correct?

12   A    That is correct.

13        Q    And that is actually a mistake because Ms.

14   Wilk was working for the West Morris Regional High

15   School District.  Isn't that correct?

16   A    That is correct.

17        Q    So that's a typo would you say on that

18   report?

19   A    It is.

20        Q    And at the time that the May -- the April 6,

21   2017 IEP was presented to my clients at the May 16,

22   2017 IEP meeting you were aware that my clients

23   disputed the wording and characterizations within Ms.

24   Wilk's Report.  Is that correct?

25   A    I do not recall.

Leigh - Cross                                43

1      Q    And you don't recall at the May 16, 2017 IEP

2    meeting we had a discussion about the characterizations

3    and the errors in this report.

4    A    I do not recall.

5      Q    So to your knowledge no corrections were made

6    to Ms. Wilk's Report.

7    A    To my knowledge.

8      Q    And were you aware that Ms. Wilk found in her

9    report that J.H. scored in the "Low Average" range for,

10   "Working Memory?"

11   A    Yes.

12     Q    And were you also aware that J.H. scored in

13   the "Low Average" range for, "Block Design?"

14   A    Yes.

15     Q    Were you aware that J.H. scored in the "Low

16   Average" range for, "Matrix Reasoning?"

17   A    Yes.

18     Q    And were you aware that J.H. scored in the

19   "Low Average" range in, "Digital Span?"

20   A    If it's in this report then I'm aware.

21     Q    So you're also aware that J.H. scored in the

22   "Low Average" range for, "Arithmetic?"

23   A    It's in the report, yes.

24     Q    And the same with, "Symbol Search," she

25   scored in the "Low Average" range.

Leigh - Cross                                   44

1    A    "Symbol Search," yes.

2         Q    And were you also aware in that report it

3    indicates that J.H. scored in the "Low Average" range

4    for her ability to, "Sustain attention, concentration

5    and exert mental control?"

6    A    Yes, that would be referring back to the Digit

7    Span score.

8         Q    And her -- and J.H. was found to have a,

9    "Processing Speed," of only in the, "34th," percentile.

10   Is that correct?

11   A    Correct.

12        Q    Isn't it true that J.H. had school related

13   anxiety and not school avoidance or school refusal?

14   A    Again, she had school related anxiety and she also

15   had school refusal, she did not come to school.

16        Q    And is it your opinion that J.H. did not come

17   to school because it was intentional and she was

18   purposely not going to school?

19   A    She was not coming to school, I mean, that's the

20   bottom line.  She was not coming to school and

21   obviously the evaluations indicate that she had

22   anxiety, she had depression and she was really

23   struggling.

24        Q    And to your knowledge isn't it true that Ms.

25   Wilk had no supporting documentation to make a

Leigh - Cross                                    45

1    statement in her report that J.H., "Sometimes threatens

2    to hurt others?"

3                    MS. HOWLETT: Your Honor -- (out of microphone

4    range)

5                    THE WITNESS: I cannot speak to that.

6                    THE COURT: Yeah, he can't.  Sustained.

7                    MS. WARSHAW: If it's within his knowledge,

8    that's all I'm asking for.

9                    THE WITNESS: It's not within my knowledge.

10                   MS. WARSHAW: Okay.

11   BY MS. WARSHAW:

12        Q    Were you aware that Ms. Wilk refused to

13   change this statement in her report even though it was

14   not true?

15   A    I have no knowledge of that.

16        Q    Were you aware that in the April 6, 2007

17   (sic) IEP if J.H. -- if the Behavior Support Program

18   did not offer advance classes for her she could have

19   home instruction on those classes?

20   A    I was not at that meeting.

21                   MS. WARSHAW: Can I have one moment with my

22   clients?

23                   THE COURT: Sure.

24                   MS. WARSHAW: Okay.

25   BY MS. WARSHAW:

Leigh - Cross                                    46

1        Q    Dr. Leigh, are you aware that Ms. Costa

2    testified earlier that in the event a student needed a

3    higher level class that they would have to go to the

4    general ed setting when they were in the Behavior

5    Support Program at the Mendham High School?

6    A    So I'm not aware of her testimony or specifically

7    what she said or how she characterized that.

8        Q    It was your testimony that if a student who

9    was academically capable and they wanted to take higher

10   level classes that those classes would be offered in

11   the general education setting.  Isn't that correct?

12   A    That is not correct.

13       Q    Isn't that what you said at the May 16, 2017

14   IEP meeting?

15   A    I did not say that.  What I could have said was

16   for students that are at the academic advanced level we

17   will challenge them, we will differentiate, that's what

18   we do.  For somebody who is at AP or IB level that

19   would be something that we would need to find a

20   different way of offering, that could be done online or

21   they would go to the gen ed setting.

22       We were always very creative in what we did, we

23   would tailor our programs individually based on need

24   and what I recall saying was if there is a class that

25   isn't going to be a good fit through the BSP we would

Leigh - Cross                                              47

1    provide it through a one on one experience.

2        Q    In the Behavior Support Program at the

3    Mendham High School is a self-contained behavioral

4    program.  Correct?

5    A    It's a self-contained program for students with

6    emotional and psychiatric conditions.

7             MS. WARSHAW: I'm sorry, Your Honor, I just

8    have to find something.

9             THE COURT: Hm-hm.

10   BY MS. WARSHAW:

11       Q    Dr. Leigh, isn't it true that the Behavior

12   Support Program is described as, "To address the needs

13   of disaffected and at risk students?"

14   A    That may be part of the description.

15       Q    I'm going to refer you back to -- what's the

16   number, R-12.  Under, "Target Population," can you read

17   the first sentence, please?

18   A    "The BSP is for students in grades 9 to 12 who are

19   manifesting anxiety, depression, OCD, school avoidance,

20   social challenges, disruptive behaviors and academic

21   underachievement due to lack of productivity and follow

22   through."

23       Q    And to your knowledge J.H. never had

24   disruptive behaviors in school.  Correct?

25   A    Correct.

Leigh - Redirect                                    48

1          Q    And she was not an academic underachiever.

2     Is that correct?

3     A    I think it would depend on when you were taking a

4     look at her academic performance.  During the time when

5     she was out of school her productivity I'm sure went

6     down for a period of time.  She, I do believe, was

7     working well with the home instructors, but I don't

8     believe that part of her profile was that she was an

9     academic underachiever.

10         Q    Can you describe for me what is meant by a,

11    "Disaffected learner?"

12    A    A disaffected learner is somebody who is not

13    engaged with the content to the extent that we would

14    like them to be, they are less interested and they are

15    in a sense not performing to potential academically.

16              MS. WARSHAW: Okay.  No further questions.

17    Thank you.

18              THE COURT: Redirect?

19              MS. HOWLETT: Just -- just a few.

20    REDIRECT EXAMINATION BY MS. HOWLETT:

21         Q    While you're on R-12, Dr. Leigh --

22    A    Yeah.

23         Q    -- in that description of the, "Target

24    Population," to your recollection did J.H. manifest

25    anxiety?

Leigh - Redirect                                    49

1    A    Yes.

2         Q    Depression?

3    A    Yes.

4         Q    School avoidance in some form?

5    A    Yes.

6         Q    And can you clear up the Mendham High School

7    Program -- the name of the Mendham High School Program,

8    what is the name of the Mendham High School Program?

9    A    It's the Being Successful Program.  So a year into

10   the program we got together, myself and the staff and

11   we actually opened up to the students and got their

12   input as well, because we wanted a different kind of

13   feel to the program, a different connotation.

14        The BSP, everybody always referred to it and still

15   do as "BSP", but the notion really was that this was a

16   distinct program from the one at Central and we wanted

17   an acronym that would more appropriately capture what

18   was happening there so we came up with Being

19   Successful.

20        Q    And regardless of the name, can you talk

21   about the distinction between the program at Central

22   and the program at Mendham?

23   A    Yeah, I would say that the distinction is that the

24   program at Mendham is a more comprehensive program, the

25   one at Central I view as more part-time and I think

Leigh - Redirect                               50

1      through the years probably it was taking on a more a

2      student where there were more behavioral issues in

3      nature and maybe more of that disaffected learner.

4           Over at Mendham it really was evolving into the

5      program that was taking students more with the anxiety

6      and depression and the combination of the two.

7      Students who had been in and out of hospital settings,

8      intensive outpatient programs, students with more clear

9      cut psychiatric conditions impacting school attendance

10     and learning.

11          Q    Okay.  Going to the May meeting when the

12     Purnell School was brought up, when Counsel had asked

13     you a question about that and you said that there was

14     some context involving your mention of Purnell School,

15     can you describe what you mean by that?

16     A    Sure.  So when they had asked for, you know, what

17     are some programs and if not BSP or if BSP didn't work

18     I floated a few programs such as Homestead and

19     Hunterdon Prep and then asked what programs are you on

20     your side looking at and there were three that came up.

21          One was Fusion, Fusion is a one to one program,

22     it's not approved as a therapeutic school, you're with

23     a Teacher for each of the content areas.  The other was

24     the FlexSchool, I really didn't know much about that,

25     it's fairly new, I believe it's been around since 2013.

1          It's a twice exceptional school for both gifted

2      learners, a 120 IQ and above, and some other exception

3      that you have.

4          And then the third one was Purnell and what I said

5      at that point was of the three -- because I certainly

6      don't endorse one to one learning, I don't think that

7      prepares you for the real world and twice exceptional,

8      that's not what the record was showing, and of the

9      three at least Purnell offered a peer group.

10         It is a school, it's not a therapeutic school,

11     it's not what I was recommending, it was not what was

12     being proposed, but it's a school and if the family was

13     going to be choosing to not work under our least

14     restrictive environment and our process and was going

15     to go an invest funds at least it was a school, and

16     that was the context under which that statement was

17     made.

18         Q    Thank you, Dr. Leigh, I just have a couple of

19     quick questions.  You testified earlier that you

20     weren't at that April meeting, did the Child Study Team

21     report to you why that meeting had been terminated?  Do

22     you recall?

23     A    I do not recall.

24         Q    Okay.  Was the May IEP meeting a continuation

25     of the April meeting or was it --

Leigh - Redirect                              52

1    A    Yes.

2         Q    If you could just turn to something real

3    quick for me, R-10, that's the IEP that we've been

4    using today.

5    A    Yeah.

6              MS. HOWLETT: Should we remove R-10, I know

7    it's duplicative, Your Honor, or would you just rather

8    stick with P-26 or 29?

9              THE COURT: Actually R-10 doesn't have the

10   second -- the first two pages so --

11             MS. HOWLETT: Okay.  P-26?

12             THE COURT: It's a little confusing in terms

13   of the numbering but I think we'll -- P-26 is in and

14   we'll move R-10 in as well.  I don't -- it doesn't --

15                              (R-10 Entered into

16                              Evidence)

17             MS. HOWLETT: Thank you, Your Honor.

18   BY MS. HOWLETT:

19        Q    So, Dr. Leigh, if you could just turn to tab

20   10 and then on the bottom marked WM-034 and on this

21   page there's a section that says, "Describe any options

22   considered and the reason those options were rejected."

23   Is this the section of the IEP where you would list

24   other considerations?

25   A    Yes.

Leigh - Redirect                              53

1      Q    And can you just read that -- because it's

2   short I'll have you read it, just that short paragraph

3   that's in there -- in that box, please?

4   A    Sure.  "Mr. and Mrs. H. requested that J. be

5   allowed to attend the Fusion Academy, a private

6   alternative high school for students that is not a New

7   Jersey approved special education program.  This option

8   was rejected by the District as it offers students a

9   one to one learning experience which is highly

10  restrictive, additionally this program does not offer

11  therapeutic support on campus."

12     Q    And then in that same if you could flip

13  backwards to the page that's marked WM-026 and this

14  page is entitled, "Behavioral Interventions."  What do

15  you use this page for in an IEP?

16  A    So if there is a specific behavior that is in any

17  way impacting or impeding learning we would create some

18  type of intervention.

19     Q    And for J.H. there's a, "Target behavior,"

20  listed on this page, can you tell us what that target

21  behavior is?

22  A    "School attendance."

23     Q    And then you spoke earlier about -- kind of

24  at length actually about the positive behavioral

25  supports and the BSP, so how do behavioral supports

Leigh - Redirect                              54

1    assist a student that's having school attendance

2    issues?

3    A     Right.  So a student who is having trouble getting

4    to school is their emotions are overwhelming them in a

5    way where the most important piece of school -- you

6    can't access an education if you're not there, so it's

7    literally the most important behavior so we have to

8    create an environment that supports their wanting to be

9    there.

10          So being there is number one and them being there

11   has to result in them being recognized for that because

12   that's a big step for them when they've had a pattern

13   of having struggled with that so that's why it is part

14   of the point system, the recognition of it, and why it

15   leads to participation in certain field trips that are

16   offered to the students.

17          Again, those field trips were rewards and it's

18   also for bonding because they are struggling in that

19   much larger context and many times that's them feeling

20   socially isolated or alienated.  So this is more of a

21   family experience and a bonding experience and those

22   reinforcers are used to support -- those positive

23   behavioral supports are used to support important

24   behaviors and really an incredibly important one which

25   is school attendance.

Leigh - Redirect / Recross                          55

1      Q    And then can you -- thank you, Dr. Leigh.

2    Can you just flip to the tab marked 15 that Counsel

3    asked you about before, it was a letter from ICCPC.

4    A    Yes.

5      Q    And could you just read it's like the third

6    to the last sentence that says, "She would greatly?"

7    A    Yes, "She would greatly benefit from more time in

8    a therapeutic setting to continue progressing with her

9    anxiety, depression and function in school."

10     Q    And would you describe the BSP as a

11   therapeutic setting?

12   A    Yes.

13     Q    And then R-17 or tab 17, I'm sorry, this is

14   Dr. -- I'm not going to be able to say her name

15   correctly, Srinivasan, she made a recommendation that

16   Counsel asked you about before, "At this time an out of

17   District placement is advised."  Did Dr. Srinivasan

18   ever come and visit the BSP?

19   A    No.

20     Q    And I just -- (out of microphone range)

21          MS. HOWLETT: No further questions, Your

22   Honor.

23          THE COURT: Recross?

24          MS. WARSHAW: Yeah.

25   RECROSS EXAMINATION BY MS. WARSHAW:

Leigh - Recross                    56

1      Q    Dr. Leigh, were you ever made aware that J.H.

2    was diagnosed with a, "Specific Learning Disability?"

3    A    No.

4           THE COURT: Aren't we a little bit outside the

5    scope of direct, that wasn't even brought up?

6           MS. WARSHAW: Okay.

7    BY MS. WARSHAW:

8      Q    You had testified that there is a point

9    system in the BSP Program, isn't it true that if the

10   students do not earn a certain number of points they

11   are not permitted to attend the field trips?

12   A    Yes.

13     Q    And when you mentioned the Purnell School at

14   the May 16, 2017 IEP meeting you were aware that they

15   have a full-time Counselor in that program.  Is that

16   correct?

17   A    No.

18     Q    So you're not aware that they also have a

19   Psychologist -- (out of microphone range)

20   A    I was not aware -- I was not aware at that

21   meeting.

22     Q    But you've sent other students to the Purnell

23   School prior to this, isn't that correct, so you're

24   aware of what they have at the Purnell School?

25   A    I am not very -- I know what the Purnell School is

Leigh - Recross / Colloquy                    57

1    about, I know the gist of it, it's for students with

2    learning differences, that's really who they target,

3    it's not a therapeutic school.

4              MS. WARSHAW: No further questions.

5              THE COURT: You can step down.  Thank you very

6    much, Doctor.

7              THE WITNESS: Thank you.

8              MS. HOWLETT: Your Honor, upon reflection our

9    next witness will probably be redundant testimony so

10   we're actually preferring not to call her --

11             THE COURT: Okay.

12             MS. HOWLETT: -- and rest at this time.

13             THE COURT: Okay.

14             MS. HOWLETT: Thank you, Your Honor.  Can we

15   just let her know?

16             THE COURT: That would be a good idea.

17             MS. HOWLETT: Yeah, she -- (out of microphone

18   range)

19             THE COURT: All right.  We'll take a five

20   minute break as well.

21             MS. HOWLETT: All right.  Thank you, Your

22   Honor.

23                     (BRIEF RECESS)

24             THE COURT: All right.  Let's go back on the

25   record.

1          MS. WARSHAW: Your Honor, first we're going to

2    make a motion for a directed verdict because --

3          THE COURT: Denied -- (laughter)

4          MS. WARSHAW: I thought you would, but I have

5    to put it on the record.

6          THE COURT: I don't think -- I don't think our

7    rules allow for that.

8          MS. WARSHAW: Yes, they do.

9          THE COURT: They do?

10         MS. WARSHAW: Yes.

11         THE COURT: Could you point it out to me

12   because I read them like -- I read them all the time --

13         MS. WARSHAW: Yeah.

14         THE COURT: -- and I never saw that?  Anyway,

15   denied -- (laughter)

16         MS. WARSHAW: Okay.  You don't even want to

17   hear my arguments?

18         THE COURT: No, and no disrespect meant but at

19   this point the School District has certainly met its

20   burden.

21         MS. WARSHAW: Okay.  We're going to call Mr.

22   H.

23         MR. H.: Should I bring this up -- (out of

24   microphone range)

25         MS. WARSHAW: Yes.

Colloquy / F.H. - Direct                    59

1           THE COURT: Good morning.

2           MR. H.: Good morning.

3           THE COURT: You know the drill -- (laughter)

4           MR. H.: Yes, sir.

5           THE COURT: Raise your right hand, please.

6    F.   H., PETITIONER SWORN.

7           THE WITNESS: I do.

8           THE COURT: Thank you.  State your name and

9    spell your last name, please.

10          THE WITNESS: F.C.H. -- (the Petitioner states

11   and spells his last name for the record)

12          THE COURT: Proceed.

13          MS. WARSHAW: How do you want to proceed with

14   the names, do you want initials as well?

15          THE COURT: Well, he just put his name on the

16   record.

17          MS. WARSHAW: I know.

18          THE COURT: And the transcriber -- they always

19   refer to them by initials anyway.

20          MS. WARSHAW: Okay.  As long as it's

21   transcribed that way.

22          THE COURT: And for the transcriber, use F.H.

23   -- (laughter)

24          MS. WARSHAW: Okay.

25   DIRECT EXAMINATION BY MS. WARSHAW:

F.H. - Direct                                60

1      Q    Can you tell us where you're employed?

2    A    I work for the NASDAQ Stock Exchange in New York

3    City.

4      Q    Okay.  And your daughter for purposes of the

5    record is J.H.  Is that correct?

6    A    Correct.

7      Q    Okay.  What school did J.H. attend for middle

8    school?

9    A    The Long Valley Middle School.

10     Q    Okay.  Can you describe for the Court what

11   your daughter's experience was in middle school in the

12   public school district?

13   A    Well, in middle school she had kind of a rough

14   time, she was starting to feel a little depressed, she

15   was struggling a bit, and she had a couple of Teachers

16   that didn't help her along.  She had a Spanish Teacher

17   and an English Teacher that kind of she felt were

18   bullying her and making it difficult for her.

19     Q    Was she a good student academically?

20   A    Yes.

21     Q    And when you say that, "She was struggling,"

22   what do you mean by that?

23   A    I mean emotionally, you know, I think this is

24   where the anxiety and depression was starting to creep

25   in although it wasn't always obvious to us, the

F.H. - Direct                              61

1   parents.

2        Q    Did you at any point during middle school

3   request that your daughter be evaluated by the Child

4   Study Team?

5   A    No.

6        Q    Okay.  Any reason why?

7   A    Well, she was doing well academically and

8   emotionally, although she -- you know, we could tell

9   that she was having problems, she seemed to be holding

10  it together and we felt that when she left the middle

11  school and got in the high school a new environment

12  would -- would help her out.

13       Q    Can you describe for us what you observed

14  with J.H. regarding school when she entered ninth

15  grade?

16  A    Ninth grade, in ninth grade again she was doing

17  well academically.  She was, you know, active in school

18  and seemed to be having some again difficulties but

19  again nothing that we thought was anything serious.

20       Q    Was she having difficulties in any areas

21  other than school?

22  A    With friends she was -- she was having some issues

23  keeping and holding friends.

24       Q    Starting in tenth grade do you -- can you

25  describe for the Court what happened at the beginning

F.H. - Direct                            62

1    of tenth grade?

2    A    In the beginning of tenth grade she started out

3    and she started being very anxious and depressed and I

4    think having panic attacks, I believe my wife brought

5    her home from school a couple of times, and finally in

6    the beginning of October she felt she could no longer

7    go to school because of her anxiety.

8        Q    And what about her anxiety prevented her from

9    getting into the school?

10   A    It was just this overwhelming feeling of walking

11   in the door of that big school that triggered something

12   inside her that made it -- it just kind of crushed her

13   and that she couldn't be in there.

14       Q    Outside of school in tenth grade did she have

15   this overwhelming feeling that she couldn't walk into

16   places or was it just related to this school?

17   A    Just the school.

18       Q    And you mentioned it was a, "Big school," was

19   there any other qualities about the school that caused

20   her to get anxious?

21   A    Yes, I believe, you know, the hallways were

22   crowded, for lunch there often wasn't enough seating

23   for the students so they would sit along the lockers

24   and eat lunch in the hallway and so it was just very --

25   it was just very busy and very noisy.

1          Q     Did there come a time when J.H. attended a

2     therapeutic day program?

3     A     Yes.

4          Q     Can you tell me what happened with regard to

5     that program?

6     A     After we realized that J. was having trouble going

7     back to school we looked around for several options as

8     to what we could possibly do for her and we were told

9     about this therapeutic day program called the, "ICCPC,"

10    and we took J. there to talk to a Psychiatrist and

11    Counselor and they recommended that she come there as

12    part of a therapeutic program that would be helpful to

13    her to get her back to high school after a certain

14    time.

15         Q     And how long did she attend that program?

16    A     I believe that was from the end of October through

17    the beginning of December.

18         Q     And do you recall if at any time in October

19    you notified the School District that there were issues

20    with J.H.?

21    A     Yes, definitely right away after she told us she

22    couldn't, you know, go to the school we were on the

23    phone to the Guidance Counselor and, you know, getting

24    in touch with the Teachers to let them know what the

25    situation was.

F.H. - Direct                                        64

1          Q    I'm going to show you what's been marked

2     P-12.  Do you recognize this?

3     A    Yes.

4          Q    And who wrote this letter?

5     A    My wife and I sent this to Mr. Cusack who was

6     J.'s Guidance Counselor.

7          Q    Okay.  And at this point in this letter are

8     you requesting a, "Home tutor?"

9     A    Yes.  This was in the very beginning before we had

10    talked to the ICCPC and we -- in talking with Mr.

11    Cusack on the phone we felt that a home tutor would

12    help us out until we got things straightened out.

13              MS. WARSHAW: Your Honor, I would like to move

14    that into evidence.

15              MS. HOWLETT: It's already moved as R -- (out

16    of microphone range) R-39.

17              MS. WARSHAW: Okay.

18    BY MS. WARSHAW:

19         Q    I'm going to refer you to P-13, which is also

20    P -- or also R-40 and I believe that's already in

21    evidence.  Do you recognize this letter?

22    A    Yes.

23         Q    And who is this letter from?

24    A    This is from J.'s Pediatrician, at Family -- Plaza

25    Family Care, it is written to explain that she is --

F.H. - Direct                                    65

1    she has looked at J. and she -- and it would be best if

2    she did not attend school but had home bound

3    instruction because of her depression and anxiety.

4         Q    I'm going to refer you to P-14, have you ever

5    seen this before?

6    A    Yes.

7         Q    And can you describe what this is?

8    A    This is a letter to J.'s Guidance Counselor and to

9    the Assistant Principal of the school, it is talking

10   about J. entering the ICCPC and that she would have

11   tutoring in the second of the day and in the first half

12   of the day she would get therapeutic instruction -- or

13   help and it's saying that we would not need the home

14   tutors that we had requested because tutoring was going

15   to be provided by the ICCPC in conjunction with the

16   school.

17   A    And who was this email sent to Mr. Broad

18   (phonetic) and Mr. Cusack.

19        Q    Both from the School District.

20   A    Yes.

21        Q    And what is the date of this email?

22   A    Is, "October 15, 2016."

23             MS. WARSHAW: Your Honor, I would like to move

24   this into evidence.

25             MS. HOWLETT: I think that was already moved

F.H. - Direct                          66

1     this morning.

2               THE COURT: Me too, that was one of the things

3     you brought up when we were off the record.

4               MS. WARSHAW: Oh, okay.  Good.  Okay.

5     BY MS. WARSHAW:

6          Q    I'm going to refer you to P-15 and we had

7     discussed this letter before.  Are you aware of this

8     letter?

9     A    Yes.

10         Q    Okay.  And this was also sent to the West

11    Morris High School.

12    A    Correct.

13         Q    Okay.  I'm going to show you what's been

14    marked P-17, which I believe is also R-1.  Do you

15    recognize this document?

16    A    Yes.

17         Q    And this document was put into place when and

18    for what reason?

19    A    This was put into place in the beginning of

20    December when J. was going back to school after being

21    at the ICCPC for a while.  It was felt that she could

22    try and attend school again and we had asked for a 504

23    Plan for her to help in that transition back to school.

24         Q    And when J.H. tried to return back to school

25    when was that time frame?

F.H. - Direct                                      67

1    A    That would have been right around December 6th I

2    believe that she went back to school.

3         Q    And what happened?

4    A    Well, she was just supposed to go for two half

5    days -- or for half days for that week and she was able

6    to make it through two days and then the anxiety and

7    depression again got the best of her and she couldn't

8    -- she couldn't return.

9         Q    And do you know what about going back to

10   school sparked that, her anxiety?

11   A    I think it was just -- well, I don't know just, I

12   don't even think she really knows exactly what it was,

13   but certainly it was -- it was the impact of walking

14   into that school and into that big environment that

15   certainly triggered her problems.

16             MS. HOWLETT: Your Honor, is the witness

17   testifying from his own personal knowledge?

18             THE COURT: Yeah, I was just going to say if

19   you don't know, you don't know.

20             THE WITNESS: Okay.

21             THE COURT: And you kind of hinted you didn't

22   really know and I don't think --

23             THE WITNESS: I'm sorry.

24             THE COURT: -- I don't think J. knows.

25             THE WITNESS: Yeah, I don't.

F.H. - Direct                                68

 1              THE COURT: You know, at least at this point I

 2     don't think she knows.

 3     BY MS. WARSHAW:

 4         Q    I'm going to show you what's been marked

 5     P-19.

 6     A    P-19.

 7         Q    Following J.H. -- her return for two days to

 8     school, what happened after that?

 9     A    We were in touch with Mr. Cusack to inform him of

10     what had happened and we then decided to request a

11     Child Study Team and an eval -- an IEP evaluation for

12     her and this is our formal request for that as well as

13     for her to receive home instruction while that was all

14     being taken care of.

15              MS. WARSHAW: I'm not sure if this is in or

16     not but I would like to move this into evidence.

17              MS. HOWLETT: It came in this morning.

18              MS. WARSHAW: It came in?  Okay.

19     BY MS. WARSHAW:

20         Q    Okay.  I'm showing you what's been marked

21     P-20, which I believe is also R-15, have you seen this

22     before?

23     A    Yes.

24         Q    And can you look at the fifth line from the

25     bottom which says, "J.H. greatly improved," can you

F.H. - Direct                                    69

1    read that sentence, please?

2    A    "J.H. greatly improved while in program" -- I'm

3    sorry.  "J.H. greatly improved while in program due to

4    the fact that she was able to be in a smaller class

5    group setting, process her feelings and emotions, and

6    received more individualized attention for school

7    work."  Continue?

8         Q    No.  Okay.

9              MS. WARSHAW: Your Honor, I believe this is

10   already in evidence but to make sure it's in evidence.

11             MS. HOWLETT: It is, Your Honor.

12             THE COURT: R-15?

13             MS. HOWLETT: R-15.

14             MS. WARSHAW: It's also R-15.

15             MS. HOWLETT: Yes.

16             THE COURT: Hm-hm.

17   BY MS. WARSHAW:

18        Q    When you asked for the Child Study Team to

19   evaluate J.H., what evaluations to your knowledge did

20   they do?

21   A    Two were done, there was a Psychological

22   Evaluation and a Social Evaluation.

23        Q    Can you turn to P-21 which I believe is also

24   R-18, have you seen this report before?

25   A    Yes, this is the report from the Social Worker.

F.H. - Direct                                    70

1          Q    Okay.  Did you discuss this report at any of

2     the IEP meetings with the school?

3     A    Yes, I believe the Social Worker went over it at

4     the IEP meeting.

5          Q    Okay.

6     A    Oh, no, no, that's not true, she wasn't there.

7     No, so we never -- no, we didn't.

8          Q    Okay.  Did you have any issues with this

9     report?

10    A    No.

11         Q    I'm going to show you what is P-22 which is

12    also R-16.  Can you tell me what this report is?

13    A    This is the Psychological Evaluation that was done

14    by the School -- the stand-in School Psychologist,

15    Sherry Wilk.

16         Q    Okay.  Did you discuss this report at any of

17    the IEP meetings?

18    A    This we discussed at the IEP meeting, yes, on

19    April 6th.

20         Q    April 6th, and can you tell me if at that time

21    you raised any issues with regard to the accuracies or

22    the characterizations in this report?

23    A    Yes, we had several issues with the information in

24    this report.

25         Q    Can you tell me what those issues were?

F.H. - Direct                                        71

1    A      Yes, some of them were -- first of all, you know,

2    we've talked about this before it says, "Clifton Public

3    Schools," and that's -- that's incorrect.

4           In the paragraph under, "Background Information,"

5    it says, "J. was hospitalized on 9/22/16," she was

6    never hospitalized, that was a clinic that she went to.

7    It says that -- later in that paragraph that, "She

8    refused to go back to school," and we had an issue with

9    that, we said that she couldn't go back to school

10   because of her anxiety.

11          What else -- and then going to the back of the

12   report there's a section here under, "Parent Rating

13   Scales," and some information based on the parents

14   rating of J.'s behavior and some of these things were

15   just not true.

16          On the back page of that it says that, "She lacks

17   creativity," which is not true.  That, "She has trouble

18   getting others to work together effectively," not true.

19   That, "She has difficulty at seeking out and finding

20   information of (sic) her own," not true.  And the thing

21   that really upset us is that it says that, "She

22   sometimes threatens to hurt others," now this is being

23   what the parents reports and we said that is absolutely

24   not true and they are not factual statements.

25          Q    And what if anything was done as a result of

1    you and your wife indicating to Ms. Wilk that these

2    were inaccurate?

3    A    We were kind of put off a bit and to my knowledge

4    none of our changes were ever made.

5         Q    And there were two IEP meetings, one on April

6    6, 2017 and one on May 16, 2017, were any of your

7    changes to this report incorporated in the IEP

8    presented to you on the May 16, 2017 IEP meeting?

9    A    No.

10        Q    Did we discuss at the May 16, 2017 IEP

11   meeting that these changes had not been made to this

12   report?

13   A    Yes.  Yes, you brought that up towards the end of

14   the meeting that we had issues with this Psychological

15   Report and we wanted changes made and they had not been

16   made.

17        Q    And since the May 16, 2017 IEP meeting to

18   your knowledge no other IEP has been presented to you

19   and no changes have been made to this Psychological

20   Report.

21   A    That is correct.

22        Q    I'm going to refer you to the front page of

23   this report under, "Background Information," the second

24   line from the bottom of the first paragraph it says,

25   "She refused to go back to school."  Is that an

F.H. - Direct                                73

1    accurate statement?

2    A     No, my wife and I felt that was not an accurate

3    statement.  It kind of cast J. as having, you know,

4    behavioral -- or being a problem, but it was because of

5    anxiety and she was unable to go back to school.

6          Q     And at any point at one of these IEP meetings

7    did you question the scores in the "Low Average" range

8    and what they meant?

9    A     Could you repeat that, please?

10         Q     At any of the IEP meetings, either in April

11   or May of 2017, did you ever question the findings that

12   said "Low Average"?

13   A     Yeah, we were curious about that and what the

14   implications meant.

15         Q     And were you ever told any answer to your

16   concerns?

17   A     Well, we were told that she's in the "Low" range

18   but it was okay.

19         Q     Okay.  I'm going to have you turn to P-23

20   which is -- are you familiar with this report?

21   A     Yes.

22         Q     Okay.  And are you aware that Dr. Srinivasan

23   has requested an out of District placement?

24   A     Yes.

25         Q     Was it your understanding that this was an

F.H. - Direct                                    74

1    out of District placement or a therapeutic out of

2    District placement?

3    A    Out of District placement.

4         Q    I'm going to show you what's been marked

5    P-24, have you ever seen this document?

6    A    Yes, yes.

7         Q    What was your understanding -- strike that.

8    Did you attend an eligibility meeting?

9    A    Yes, this is the invitation to that eligibility

10   meeting.

11        Q    What was your understanding at the time that

12   you attended the eligibility meeting as to what the

13   District was going to do?

14   A    We were going to go over the reports that -- the

15   evaluations that had been done, the Psychological and

16   the Social Evaluation, and we were going to discuss an

17   IEP for J., J.H.

18             MS. WARSHAW: Your Honor, I would like to move

19   P-24 into evidence.

20             THE COURT: I think it's already in under "R".

21             MS. WARSHAW: It may be.

22             THE COURT: Yeah, well --

23             MS. WARSHAW: The back and forth, we can do it

24   -- (out of microphone range)

25             THE COURT: Yeah, but it's a little

1    disconcerting to me that this was addressed to both of

2    you, why do I have to go back and forth between

3    documents when my pre-hearing order said to consult and

4    do a Joint exhibit list and almost all of it would have

5    been in one book on a Joint exhibit list as opposed to

6    me having to go back and forth between two binders that

7    have virtually the same information?

8            And before -- when we're done here, I'm

9    directing both of you to confer and present me with one

10   book that has everything in it as opposed to me going

11   back and forth, both of you.  Go ahead.

12   BY MS. WARSHAW:

13       Q   I'm going to refer you to what's been marked

14   P-25 which I believe part of it is R-7.  On the first

15   page of this document is that your signature?

16   A    Yes.

17       Q   I'm going to refer you to the third page of

18   that document, it says -- partway down it says,

19   "Psychiatric Evaluation Summary," under the,

20   "Recommendations," what does that say?

21   A    I'm sorry, where?

22       Q   On the third page it says, "Eligibility

23   Determination Report," and then just the second read

24   heading it says, "Psychiatric Evaluation Summary."

25   A    Hm-hm.

F.H. - Direct                                76

1        Q    Okay.  Right under that it says,

2    "Recommendations," what is that recommendation?

3    A    "At this time an out of District placement is

4    advised, J." -- oh, J.H.

5        Q    Okay.  I'm going to refer you to the next

6    page of this document.

7    A    Yes.

8        Q    Is that your signature?

9    A    Yes.

10       Q    Okay.  Can you tell me what the heading is

11   just above your signature?

12   A    "Waiver of Notice (sic)."

13       Q    And can you read what it says?

14   A    "I hereby way the 15 day notice requirement to

15   permit the IEP Team to proceed to present the IEP

16   program and placement."

17       Q    So at the time that you signed this Notice of

18   Waiver (sic) what was your understanding as to what you

19   were signing?

20   A    That we were going to be looking into the IEP, it

21   was going to be presented, and we were going to look at

22   the -- what was advised which was the BSP Program at

23   Mendham High School, gather some information and make

24   changes and modifications as appropriate as more

25   information came in and as we assessed the program.

1          Q    At this time that you signed this did you

2     have any awareness or knowledge that you were

3     consenting to anything other than waiving the 15 day

4     notice?

5     A    No, no.

6          Q    And in that sentence it says that the IEP

7     Team will proceed to present the IEP, is that what

8     you're referring to where they would show you what the

9     IEP says and you would go from there?

10    A    Correct.

11         Q    On that same page there is another heading

12    above the Notice of Waiver, can you read that?

13    A    "Statement of Eligibility."

14         Q    Yes.

15    A    "Review of the records and consideration of the

16    cognitive functioning, academic achievement, learning

17    styles, and adaptive behavior indicates that J. is

18    eligible for Special Education and Related Services as

19    (sic) meets the criteria of Emotionally Disturbed."

20         Q    Does it say anywhere that J.H. would be

21    classified as, "Emotionally Disturbed?"

22    A    No, it just says she, "Meets the criteria."

23         Q    So when you signed this form were you in any

24    way under the impression that you were consenting to

25    the classification of Emotionally Disturbed?

F.H. - Direct                                    78

1    A    No, my wife and I made it very clear at the

2    meeting that we did not feel that was the correct

3    classification and we wanted that changed and we were

4    led to believe that as part of this process of the IEP

5    that it could be changed and it would be changed at a

6    later date.

7         Q    And when you're referring to a, "Meeting,"

8    that was -- what was the date of that meeting?

9    A    April 6th.

10        Q    So is it fair to say that the language of --

11   it was your understanding that the language of the

12   Notice of Waiver indicated that you were signing so

13   that the IEP Team could proceed to present the IEP

14   sooner to you?

15             MS. HOWLETT: Your Honor, this is leading.

16             THE COURT: It is but I'm going to allow it.

17   Go ahead.

18             THE WITNESS: Yes, you know, time was of the

19   essence, we wanted to have an opportunity to look at

20   the BSP Program.  The way we left this April 6th meeting

21   was that we would look at the BSP Program and see if it

22   was a fit for J., J.H.

23             THE COURT: I have a question.  The BSP

24   Program was mentioned at the eligibility meeting.

25             THE WITNESS: Yes.

F.H. - Direct                                79

1           THE COURT: Hm-hm.  And it was discussed.

2           THE WITNESS: Yes.

3           THE COURT: All right.  When you signed this

4      you read the part that said that it was a

5      recommendation for an out of District placement.

6           THE WITNESS: Yes.

7           THE COURT: You read that.

8           THE WITNESS: Yes.

9           THE COURT: Did you discuss that as well?

10          THE WITNESS: Yes, we did discuss that because

11     we had looked at, you know, a couple of schools --

12          THE COURT: No, see I'm talking -- that's why

13     I asked the question about you said you talked about

14     the BSP at -- the program.

15          THE WITNESS: Correct, yeah.

16          THE COURT: So I'm a little confused as to

17     where this meeting went and maybe you could help me

18     out.

19          THE WITNESS: Sure.  So the IEP recommendation

20     -- we were presented the IEP rec --

21          THE COURT: Right.

22          THE WITNESS: -- at the meeting and that said

23     -- that recommended to the BSP Program.

24          THE COURT: That's not what I just read.

25          MS. WARSHAW: Your Honor, just to clarify,

F.H. - Direct                                    80

1    this Eligibility Report was also -- this happened

2    before and then right after that they had the IEP

3    meeting.

4              THE COURT: This was all in one day.

5              MS. WARSHAW: Yes.

6              THE COURT: Okay.

7              MS. WARSHAW: Yes.  Does that clarify it?

8              THE COURT: Now I'm clarified.  Counsel

9    clarified it for me.

10             MS. WARSHAW: Sorry.

11             THE COURT: Okay.

12             THE WITNESS: It's all one blur to me.

13             MS. WARSHAW: You took my question.

14             THE COURT: I'm sorry.

15             MS. WARSHAW: That's okay.

16             THE COURT: You know, if I don't ask it right

17   away I forget.

18             MS. WARSHAW: No problem.

19             THE COURT: All right.  Thank you.  Go ahead.

20   BY MS. WARSHAW:

21       Q   At the time that you signed the Notice of

22   Waiver if you had known it was meant -- if you had

23   known that you were agreeing to classify your daughter

24   as Emotionally Disturbed would you have signed it?

25       A   No, no, we said we disagreed with that.

F.H. - Direct                                           81

1      Q    Did anyone at any time indicate what it meant

2    for J.H. to meet the criteria of being Emotionally

3    Disturbed?

4    A    Meet the criteria, no, I don't believe so.  No, we

5    were told that that was the only term that could be

6    used for her, that was the only explanation we got.

7      Q    And at the April 6, 2017 IEP meeting when you

8    discussed the classification was that -- who told you

9    about that that was the only classification that could

10    be given to you?

11    A    That was Sherry Wilk, the Psychologist.

12      Q    And can you describe for the Court any more

13    about your discussions with Sherry Wilk about what --

14    or anything that happened at the April 6, 2017 IEP

15    meeting?

16    A    Yes, so the IEP was presented -- well, we all went

17    there, my wife, my daughter and I all went there, and

18    Sherry Wilk asked my daughter to sit outside while we

19    discussed the various reports.

20      So we went through the Psychological Evaluation

21    and the IEP and that took about an hour and then -- so

22    J. was outside by herself all that time and then we

23    brought her in and sort of rehashed the same thing with

24    her and then at the end it was said that the school was

25    recommending the BSP Program, the Behavior Support

F.H. - Direct                                    82

1    Program, and Mr. Cusack started to explain a little bit

2    about it and then J. asked what her other options might

3    be.

4        And the Psychologist said, "Well, at this time

5    there aren't any other options, this is what we're

6    going with," and J. started to get upset and the

7    Psychologist started telling her, you know, repeatedly

8    over that, you know, "This is not the way adults

9    behave, you have to have an open mind, you know, stop

10   being upset," you know, those kinds of things which my

11   wife and I did not appreciate at all.

12       And so finally J. got upset enough that it was

13   suggested that she take a break and leave the room with

14   my wife which she did and then when they left the

15   Psychologist told those of us that were left in the

16   room that she couldn't tell if J. was faking it or not

17   and it was basically at that point that I said to

18   myself I need to get a lawyer.

19       Q    Okay.  I'm going to refer you --

20            MS. WARSHAW: Your Honor, I would like to move

21   P-25 into evidence, It is a little bit different than

22   R-9.  It's missing one of the pages so I would like to

23   -- mine is complete.

24            THE COURT:  Well, here's what we're going to

25   do, you two are going to confer and present me what you

F.H. - Direct                                    83

1        want as Joint exhibits.

2                    MS. WARSHAW: Okay.

3                    THE COURT: And then we'll exclude the

4        redundancy in the two books.  All right.  Anything

5        that's not redundant that you want to move in we'll

6        entertain when the case is over.  I'm not going to do

7        this piecemeal because I'm getting confused and you do

8        not want me confused when I'm writing the decision.

9                    MS. HOWLETT: Okay.

10                   MS. WARSHAW: So can we enter P-25 into

11       evidence?

12                   THE COURT: We're not entering anything --

13                   MS. WARSHAW: No.

14                   THE COURT: -- until you do what I just told

15       you to do.

16                   MS. WARSHAW: Okay.

17                   THE COURT: So some time after today you two

18       can confer and come up with a Joint exhibit book and

19       present that and then anything that's not redundant

20       that's in your respective books we can move.  But I'm

21       not doing any more -- there's no more -- nothing else

22       is going into evidence today until you do what you were

23       supposed to do initially and confer.

24       BY MS. WARSHAW:

25            Q    I'm going to show you --

F.H. - Direct                              84

1          THE COURT: And then when -- I'm sorry, when

2     we reconvene on whatever date that is in the future, I

3     know we have more days, but whenever our next date is

4     the first thing we're going to do is the evidence, all

5     right, so we can just get that all straightened out.

6          Thank you.  Go ahead.

7     BY MS. WARSHAW:

8          Q    I'm going to show you what's been marked

9     P-26.

10    A    26.

11         Q    When you arrived at the April 6, 2017 IEP

12    meeting were you handed an IEP?

13    A    Yes.

14         Q    Okay.  I'm going to refer you to the third

15    page of P-25 -- I'm sorry --

16         THE COURT: 6.

17         MS. WARSHAW: P-26.

18    BY MS. WARSHAW:

19         Q    Okay.

20    A    What page?

21         Q    From this point back is this the IEP that you

22    were handed?

23    A    Yes.

24         Q    And who is listed as the Case Manager?

25    A    The Case Manager on this, "Sherry Wilk."

F.H. - Direct                                    85

1          Q      Did you have any input in putting this IEP

2     together?

3     A      No.

4          Q      And after your discussions with the Child

5     Study Team at the April 6, 2017 IEP meeting did you

6     have any other input into the IEP that was presented to

7     you at the May 16, 2017 IEP meeting?

8     A      No, other than the points we brought up at the

9     April 6th meeting.

10         Q      Were any of your points incorporated into the

11    IEP that was provided to you in May at that IEP

12    meeting?

13    A      No.

14         Q      When -- I'm going to refer you tot he first

15    two pages of P-26, actually the first page, when was

16    the first time that you saw the word "Draft" written on

17    the IEP?

18    A      When I was presented with this book.

19         Q      Okay.  When you were at the IEP meeting in

20    May of 2017 did the IEP that you were presented have

21    the word "Draft" on it?

22    A      Not that I'm aware of, no.

23              THE COURT: The draft -- the one that says,

24    "Draft," would have been presented at the April

25    meeting.  Correct?

F.H. - Direct                                86

1              MS. WARSHAW: No.  It was at the -- that's the

2        one that says Kendra Wilk (sic) --

3              THE WITNESS: Oh, yes.

4              MS. WARSHAW: -- Dickerson, she was on

5        maternity leave at the April 6th meeting, she was at the

6        May meeting.

7              THE COURT: Okay.

8              MS. HOWLETT: The only difference is the cover

9        page, that's -- (out of microphone range)

10             THE COURT: I understand that.  Okay.  Go

11       ahead.

12       BY MS. WARSHAW:

13          Q    Did the school offer J.H. an out of District

14       placement at any time?

15          A    No.

16          Q    Did the school offer J.H. a therapeutic out

17       of District placement at any time?

18          A    No.

19          Q    Did you agree to have your daughter attend

20       the Behavioral Support Program at Mendham High School?

21          A    No.

22          Q    When was the first time that you've ever

23       heard about the Behavioral Support Program?

24          A    I believe our -- J.H.'s Guidance Counselor

25       mentioned it to us as one of the options that would be

F.H. - Direct                                87

```
 1    considered.

 2              THE COURT: Could you give me a time frame on

 3    that?

 4              THE WITNESS: That would have probably been

 5    when she returned to school in December and was unable

 6    to attend and we started looking at other options.

 7              THE COURT: Thank you.

 8    BY MS. WARSHAW:

 9       Q    Did you hear about the Behavioral Support

10    Program in December or was it at the IEP meeting in

11    April of 2017?

12    A    Well --

13              MS. HOWLETT: He just testified --

14              THE COURT: He just testified --

15              MS. WARSHAW: I'm just trying to clarify --

16              THE COURT: I just asked him the question and

17    he said, "December."

18              MS. WARSHAW: Okay.

19              THE COURT: When J. went back to school from

20    Mr. Cusack, correct, he was the Guidance Counselor?

21              THE WITNESS: Correct.

22              THE COURT: Okay.

23              THE WITNESS: It was officially presented at

24    the IEP.

25              MS. WARSHAW: Okay.  That's right.
```

F.H. - Direct                                    88

1          THE WITNESS: Yeah.

2     BY MS. WARSHAW:

3          Q     When was the first time that you ever heard

4     the term, "Being Successful Program?"

5     A     Not until we received, again, this book with --

6     with the brochure in it.  We never heard those words

7     spoken, we never saw them in print, and anybody who

8     ever referred to it to us called it the, "Behavioral

9     Support Program."

10         Q     And so the IEP that was presented to you both

11    at the April 6, 2017 IEP meeting and the May 16, 2017

12    IEP meeting referred to the program as the Behavioral

13    Support Program at Mendham High School.  Was that your

14    understanding?

15    A     The documents did, yes.

16         Q     And at some point your wife and your daughter

17    went to see the Behavioral Support Program, do you

18    recall when that was?

19    A     That would have been after the April meeting, some

20    time in April I believe.

21         Q     When was the first time that you heard about

22    the Purnell School as a possible school for J.H.?

23    A     We actually had a list of 20 schools in the area,

24    the Purnell School was on that list, but J. had

25    rejected it initially because she didn't want to go to

F.H. - Direct                                      89

1    an all girls school so it was not one of the ones that

2    we considered or looked at.

3         Q    Was the Purnell School ever mentioned at one

4    of the IEP meetings?

5    A    No -- well, at the -- I'm sorry, at the May 16th

6    meeting it was mentioned.

7         Q    Can you tell the Court what was said about

8    it?

9    A    Okay.  So we were having the IEP meeting and you

10   brought up some of the schools we had looked at, Flex,

11   Fusion, and you mentioned another -- you know, Purnell

12   as a possible school.

13        And then after the meeting was over David Leigh

14   came up to us and said, "Did you -- did you look at the

15   Purnell School?"  And we said, "No, we hadn't looked at

16   it," and he said, "Why don't you take a look at it, it

17   would probably be worth looking at?"  And then you

18   asked him, "Is that something the District would

19   consider for J.?"  And he said, "Possibly, it's got the

20   peer group that you're looking -- that she needs," and

21   that kind of thing.  So it was at that point -- only at

22   that point that we actually went to look at it.

23        Q    And had you previously requested an out of

24   District placement to a different school to the Child

25   Study Team?

 1     A     J. initially -- J.H. initially was -- thought that

 2     Fusion might be a good fit for her and we had visited

 3     there and they had said that other school districts

 4     send children there so we thought that would be

 5     something that we could explore.

 6          Q     And at the May 16, 2017 IEP meeting is it

 7     fair to say that you expressed concerns about the

 8     Behavioral Support Program at the Mendham High School

 9     for J.H.?

10     A     Yes, yes.

11          Q     And what did -- do you recall what you

12     expressed were some of your concerns?

13     A     Well, again it was walking into a big school, you

14     know, the very fact that she had to walk into the door

15     and that she had to walk through a crowded hallway to

16     get to the BSP Program room and then once there, you

17     know, you couldn't -- you really couldn't leave because

18     she would be in this -- you know, in this environment

19     that was -- you know, that caused the anxiety.

20          So it would be, you know, sort of in this

21     self-contained room that she would be -- that she would

22     be in the whole time.  Other issues were that, you

23     know, they couldn't offer, you know, Gym or something

24     like that where she could get out because, you know,

25     she couldn't go into the mainstream classes,

1      And we didn't -- and of course she couldn't go to

2    the mainstream classes for any advanced work that she

3    needed to do.  I think we brought up issues with, you

4    know, Lab classes like Chemistry and Physics where you

5    would need to be in a Lab, how would that be done and

6    it didn't seem like that had a solution for that.

7      Music, you know, they really didn't have a

8    solution for that.  I think David Leigh mentioned they

9    could bring in a piano but she played the clarinet so,

10   you know, and she -- you know, that you typically play

11   in an band or something and how would that be done.

12      So we had a lot of issues with it and also with

13   the peer group that would be there, it seemed like it

14   was a mixed bag of students from being rebellious

15   students to students having, you know, other issues and

16   that, you know, all of them might not be college bound

17   and we wanted J. in a peer group that, you know, that

18   was academically challenged and where her peers were

19   looking to go to college.

20      Q    Do you recall at the May 16, 2017 IEP meeting

21   if there was any discussion about her taking Gym online

22   such as volleyball?

23   A    Yes, I believe that that was the explanation as to

24   how Gym would be done, she would go online at the -- in

25   the BSP room and do a program there for Gym.

F.H. - Direct                                    92

1          Q    So was it your understanding that the BSP,

2     the Behavioral Support Program, did or did not have

3     higher level academic classes?

4     A    It was our understanding that -- well, we were

5     kind of confused, from the visit to the BSP, you know,

6     we were told that to take higher level academic classes

7     you would have to take them in the mainstream and then

8     Dr. Leigh told us in the -- in the May 16th meeting that

9     they would bring in a private tutor for the advanced

10    classes.

11         Q    Were you aware of any differences between the

12    Behavioral Support Program at the Mendham High School

13    and the Behavioral Support Program at West -- Central

14    High School?

15    A    Yes, we were sort of told by Joe Cusack that the

16    one in Mendham might be better for J.H. because the one

17    in West Morris that the kids there might have had more

18    behavioral issues, rebellious issues and, you know,

19    lack of attending school issues and that kind of thing,

20    that was it.

21         Q    Were you ever informed that the Behavioral

22    Support Program in Mendham High School was for

23    psychiatric reasons or was it described to you has a

24    behavior class?

25    A    Yes, we were never told that it was for

F.H. - Direct                                              93

1      therapeutic or anything like that.  It was -- it was,

2      you know, an academic level class and, you know, it was

3      just to get the kids to get in the door and attend high

4      school more or less.

5           Q    To your knowledge were any of the concerns

6      that you raised at the May 16, 2017 IEP meeting

7      incorporated into another IEP?

8      A    No.

9           Q    After the May 16, 2017 IEP meeting did you

10     have any discussions with the District about changes to

11     the IEP or the placement?

12     A    After the May meeting with the District, no, no.

13          Q    Was there any explanation provided to you by

14     Kendra Dickerson as to why there were no further

15     discussions between you and the Child Study Team?

16     A    When are you asking this because she testified

17     that after that meeting there was --

18               MS. HOWLETT: Your Honor -- (out of microphone

19     range)

20               THE WITNESS: Oh, I'm sorry.

21               THE COURT: Yeah.

22     BY MS. WARSHAW:

23          Q    Were you aware --

24     A    I don't know what the question --

25          Q    Okay.  Let's rephrase it.  Were you ever

F.H. - Direct                                94

1    provided with an explanation as to why there were no

2    further discussions between you and the Child Study

3    Team after the May 16, 2017 IEP meeting?

4    A    No.

5         Q    Were you aware of any contacts between

6    Counsel regarding issues with the IEP and placement and

7    classification?

8    A    Yes, that the -- that the Counselors were talking

9    about it.  Is that what you mean?  Yes.

10        Q    Were you aware of that?

11   A    Yes, yes.

12        Q    I'm going to show you what's been marked

13   P-27, have you seen this email before?

14   A    Yes, we received a copy of it, we were CC'd on it.

15        Q    What's the date of this email?

16   A    "May 22, 2017."

17        Q    And who is this email between?

18   A    This is an email between you and Jodi -- and Jodi

19   Howlett.

20        Q    Okay.  Is there any mention in this email

21   about any changes that needed to be made?

22   A    Yes, this is about you requesting changes to be

23   made.

24        Q    Okay.  And what were the changes to be made

25   for?

F.H. - Direct                                    95

1    A    "Several changes that need to be made including"

2    -- (reading out of microphone range)

3              MS. HOWLETT: Your Honor, the witness didn't

4    draft this email.

5              THE COURT: Yeah, that's what I'm thinking.

6              MS. HOWLETT: He said he's never seen it

7    before and now we're --

8              MS. WARSHAW: He did -- (out of microphone

9    range)

10             THE COURT: No, he said he saw it.

11             MS. HOWLETT: I'm sorry, he did see it?

12             THE COURT: He did say he saw it.

13   BY MS. WARSHAW:

14        Q    Were you aware that there were requests made

15   by Counsel to the Attorney for the District that -- to

16   correct the errors in the Psychological Report as well

17   as changes to the IEP?

18   A    Yes.

19        Q    Were you aware that Counsel was discussing in

20   this email the classification issue?

21   A    Yes.

22        Q    And is there a mention that you were

23   disagreeing with the Behavioral Support Program?

24   A    Yes.

25        Q    And is there a mention that you were going to

1    locate other -- other appropriate out of District

2    schools?

3    A    Yes, that is mentioned here.

4         Q    And is there a request to toll the time, a

5    15 day time frame, to have the IEP come into effect?

6    A    Yes.

7         Q    Okay.  I'm going to refer you to the second

8    page of P-27.  Were you also aware that there was

9    another email between Counsel?

10   A    Yes.

11        Q    And you were copied on this.

12   A    I was, yeah.

13        Q    What is the date of this email?

14   A    This is, "May 26, 2017."

15        Q    Okay.  Can you read this email?

16             THE COURT: It speaks for itself, I don't --

17             MS. WARSHAW: It speaks for itself?

18             THE COURT: Yes, if it's going to come into

19   evidence I don't need -- I don't need Mr. H. to read it

20   to me.

21             MS. WARSHAW: Okay.

22   BY MS. WARSHAW:

23        Q    Turning to the next page, were you aware that

24   there was another email from Counsel to the District in

25   August of 2017?

F.H. - Direct                    97

1    A    Yes, "August 18, 2017."

2         Q    And attached to this email was there another

3    letter from the ICCPC?

4    A    Yes.

5         Q    And what is the date of that letter?

6    A    This is, "8/17/2017."

7         Q    Turning two more pages, were you aware of

8    another email that was sent to Counsel in August of

9    2017?

10   A    Yes, this is dated, "August 24, 2017."

11        Q    Turning a few more pages there is a letter,

12   were you aware that there was a letter sent, "August

13   26, 2017?"

14   A    August 26th, yes.

15        MS. WARSHAW: Your Honor, I'm going to allow

16   these to speak for themselves as to the correspondence.

17        THE COURT: If they're going to come in, yes,

18   I don't need them read to me.

19   BY MS. WARSHAW:

20        Q    Turning two more pages, were you also aware

21   of another email dated, "August 29, 2017," to Counsel?

22   A    Yes.

23        Q    Turning another page, were you aware that

24   there was another letter to Counsel dated, "September

25   16, 2017?"

F.H. - Direct                                    98

1    A    Yes.

2         Q    And were you aware that during the time of

3    August through mid September there was no communication

4    or response to any of these correspondence from Counsel

5    for the District?

6    A    That is my understanding.

7         Q    And in August and September of 2017 were you

8    still attempting to find an appropriate placement for

9    your daughter for that school year?

10   A    Yes.

11            MS. WARSHAW: Your Honor, I would like to move

12   P-27 into evidence when -- well, I'm just preserving my

13   right.

14   BY MS. WARSHAW:

15        Q    I'm going to refer you to P-28.  Can you tell

16   the Court what this is?

17   A    This is a letter from J.H.'s Therapist at ICCPC,

18   Melissa Dolgos, and it is a letter that was written in

19   August of 2017 explaining that she is working with J.

20   and recommending a placement that would be appropriate

21   for J. based on her current state of progress.

22        Q    I'm going to have you read from the third

23   line down, can you read the few sentences please where

24   it says, "She has struggled?"

25   A    "She has struggled in large -- with engaging in

1    large group settings due to feeling overwhelmed and

2    having thoughts that others were going to judge her for

3    what she says.

4        "I was able to encourage J. to try and attend

5    school again for approximately two days last year and

6    she continued to report anxiety due to the large

7    population of students and the size of her classes.

8    She was unable to complete her academic assignments due

9    to the anxiety causing her confusion and delaying her

10   ability to function in school.

11       "While in smaller group settings I have noticed

12   that J. was able to progress in managing her anxiety.

13   She became more open and engaged and identified that

14   her anxiety lessened throughout time.  I have worked

15   with J. for almost one full year and throughout that

16   time have seen her progress when she is in smaller

17   settings where she can get more attention and feel less

18   anxious.

19       "J. is a very mature and bright person, she excels

20   better when people around her are mature and college

21   bound rather than peers who have behavioral issues.

22   Throughout my time with her J. has never demonstrated

23   any negative behaviors or came to the program due to

24   behavioral issues.  She also does not respond well with

25   others around her have behavioral issues as it

F.H. - Direct                                    100

1    distracts her and causes her to become anxious again.

2          "She will be continuing treatment here at ICCPC

3    throughout the school year and will not need to be --

4    and will not be in need of therapy while in school.

5    She will need a structured but non-strict educational

6    environment as she functions better with more flexible

7    schedules.  It is highly recommended that she be placed

8    in a school that can meet these needs in order for J.

9    to function academically and succeed."

10         Q    And the date of this letter is that -- was

11   this sent to -- I'm sorry, strike that.  Was this

12   letter sent to the School District in August of 2017?

13   A    Yes, I believe it was.

14              MS. WARSHAW: I would like to move this into

15   evidence as well.

16              THE COURT: Again, I'm not accepting anything

17   until you guys work it out.

18              MS. WARSHAW: I know, I'm just preserving it.

19              THE COURT: Whatever you don't work out we'll

20   discuss before we start taking testimony at the next

21   session.

22   BY MS. WARSHAW:

23         Q    I'm going to show you what's been marked

24   P-29, have you seen these emails before, the first two

25   pages?

F.H. - Direct                              101

1    A    Yes, yes.

2         Q    And the date of this email on the first page?

3    A    The first page is, "Friday, August 25, 2017."

4         Q    And can you give a quick synopsis as to what

5    this email says?

6    A    This has to do with J.'s testing results with Dr.

7    Shuberth.  We're asking -- my wife is asking that

8    Kendra Dickerson give her a call so that we can discuss

9    the results because school is almost here and we need

10   to decide what we're going to do about J.'s school for

11   the year.

12        Q    Okay.  I'm going to refer you to the next

13   page, have you seen this email before?

14   A    Yes.

15        Q    And, again, can you give us a quick synopsis

16   as to what this says?

17   A    Yeah, this is from, "Friday, September 8th," it's

18   to Joe Cusack, our Guidance Counselor, and she's

19   talking about a phone conversation that was had on,

20   "August 25th," wherein we were informed that J. would be

21   coming back to West Morris as a general education

22   student with a 504 and this would be the old 504 that

23   she had way back in December.

24        And it says that we were confused because she was

25   already determined to be eligible for Special Services

F.H. - Direct                                    102

1    with a previously proposed IEP and we're trying to get

2    information and if we can get a plan proposed in

3    writing for J.

4           Q    Were you aware that the School District paid

5    for any independent evaluations?

6    A    Yes, the school paid for two independent

7    evaluations.

8           Q    And what were they?

9    A    One was a Psychological Evaluation and one was an

10   Academic Evaluation.

11          Q    Okay.  Do you recall who did those

12   evaluations?

13   A    Yes, it was Dr. Shuberth and Dr. Platt.

14          Q    I'm going to refer you to P-32 and we're

15   going to start with the second page.  Do you recognize

16   this report?

17   A    Yes, this is Dr. Shuberth's Psychological Report.

18          Q    And are you aware of the date of this report?

19   A    The date is --

20          Q    On page 15.

21   A    Page 15?

22          Q    Yeah, of the report.

23   A    "8/21/17."

24          Q    So in your own words do you recall what Dr.

25   Shuberth found with regard to your daughter?

F.H. - Direct                                          103

1              THE COURT: Are you going to call Dr.

2      Shuberth?

3              MS. WARSHAW: She's on the list, yeah.

4              THE COURT: I didn't ask you if she's on the

5      list.  Are you going to call her?

6              MS. WARSHAW: Yes.  Yeah, we have --

7              THE COURT: Then let her explain her report.

8              MS. WARSHAW: Well, I would like to know his,

9      you know, his understanding of it.

10             THE COURT: Well, you have him looking --

11     leafing through the report to read me what the Doctor

12     says.

13             MS. WARSHAW: Okay.

14             THE COURT: If he under -- if he understands

15     what it says he doesn't need to read through the report

16     he can just tell me what he understood the report to

17     say.

18             MS. WARSHAW: Okay.

19     BY MS. WARSHAW:

20         Q    Were you aware that --

21             THE COURT: And ask a direct question.

22             MS. WARSHAW: I'm sorry?

23             THE COURT: Ask a direct question.

24             MS. WARSHAW: Okay.

25     BY MS. WARSHAW:

F.H. - Direct                          104

1          Q    To your knowledge did Dr. Shuberth diagnose

2     you daughter with a --

3               THE COURT: A direct question would be, do you

4     under -- do you know what the diagnosis was of your

5     daughter?

6               THE WITNESS: The exact diagnosis I cannot

7     recall honestly.

8               THE COURT: Okay.

9     BY MS. WARSHAW:

10         Q    At any time were you made aware that your

11    daughter was diagnosed with a Specific Learning

12    Disability?

13    A    Yes, yes.

14         Q    Do you recall who diagnosed that?

15    A    I don't remember which -- which report came up

16    with that.  I know that that was, you know, the outcome

17    of one of these two reports that she had a learning

18    disability but I don't remember which Doctor came up

19    with that.

20         Q    That's fine.  Was this report provided to the

21    District?

22    A    Yes, the District ordered the report so they got

23    it before we did.

24              MS. WARSHAW: Again, I'm going to preserve my

25    right to --

F.H. - Direct                           105

1              THE COURT: Hm-hm.

2              MS. WARSHAW: -- to put this into evidence.

3       BY MS. WARSHAW:

4         Q    To your knowledge did the School District

5       contact you in any way after receiving Melissa Dolgos'

6       Report of August 17, 2017 to change or modify the IEP?

7       A    No.

8         Q    To your knowledge did the School District

9       contact you in any way to change or modify the IEP once

10      they received Dr. Shuberth's Report?

11      A    No.

12        Q    I'm going to refer you to P-33.  Do you

13      recognize this report?

14      A    Yes, this is Dr. Platt's Report.

15        Q    And to your knowledge the School -- did the

16      School District have a copy of this report as well?

17      A    Yes.

18        Q    And to your knowledge did Dr. Platt mention

19      that J.H. had a Specific Learning Disability?

20      A    Yes.

21        Q    To your knowledge after receiving this report

22      from Dr. Platt did the School District at any time

23      contact you or offer to change or amend the IEP for

24      J.H.?

25      A    No.

F.H. - Direct                                106

1      Q    Prior to the first day of public school did

2    you have an IEP in place for J.H.?

3    A    No.

4      Q    Prior to the first day of school or on the

5    first day of school as well at the public school did

6    you have an updated 504 Plan for J.H.?

7    A    Updated, no.

8      Q    And is it fair to say that Melissa Dolgos'

9    August 17, 2017 Report and Dr. Shuberth's August 21,

10   2017 Report were received by the District prior to the

11   start of the public school -- school year?

12   A    Yes.

13     Q    Once the School District received Dr.

14   Shuberth's and Dr. Platt's independent reports did the

15   School District ever call another IEP meeting prior to

16   or after the start of school for J.H.?

17   A    No.  We never heard from the school pretty much

18   all summer and into the -- into September.

19          MS. WARSHAW: Again, I'm going to request to

20   move this into evidence.

21          THE COURT: Okay.

22   BY MS. WARSHAW:

23     Q    I'm going to have you go back to P-29 to the

24   third page.  Is this the outdated 504 Plan that the

25   District --

F.H. - Direct                              107

1         MS. HOWLETT: Your Honor -- (out of microphone

2    range)

3              THE COURT: Hm-hm.

4              MS. WARSHAW: Okay.

5    BY MS. WARSHAW:

6         Q    What's the date of this -- of this 504 Plan?

7    A    It's 29?

8              THE COURT: Are you on P-29 because P-29 is

9    not the 504 Plan?

10             THE WITNESS: Yeah, I think it's --

11             MS. WARSHAW: P-29, it's the third page, it's

12   not the -- it's the 504 Plan.

13             THE COURT: Oh, it's the attachment to the

14   email.

15             MS. WARSHAW: Yes, the attachment to the

16   email.

17             THE WITNESS: Oh, oh?

18             MS. WARSHAW: It should be the third page.

19             THE COURT: Well, he stated -- he already said

20   it was never revised.

21             MS. WARSHAW: Okay.

22             THE WITNESS: Oh, okay, this one.  Yes, this

23   is the one she got initially in December.

24   BY MS. WARSHAW:

25        Q    Was there any meeting that you attended or

F.H. - Direct                                    108

1    received notice of prior to this 504 Plan being

2    implemented for the 2017/18 school year?

3    A    No.

4         Q    At the May 16, 2017 IEP meeting did you or

5    wife specifically inform the Child Study Team and Dr.

6    David Leigh that you were going to unilaterally place

7    your daughter in an out of District placement if you

8    could not work out an IEP?

9    A    Yes.

10        Q    When was the first time that you went to

11   visit the Purnell School?  Do you recall?

12   A    It was after the May 16th meeting, I don't recall

13   how long after that.  My wife and daughter went shortly

14   after that and then I went on another occasion with

15   them.

16        Q    I'm going to show you what's been marked

17   P-35, have you ever seen this letter?

18   A    35, yes.

19        Q    And can you describe for the Court briefly

20   what this letter is?

21   A    This is a letter from my wife and I to the

22   Principal at West Morris Central basically informing

23   him that J. would not be returning to the high school

24   and that she was enrolled at the Purnell School.

25        Q    Okay.  Do you believe that you and your wife

F.H. - Direct                                    109

1   did everything to -- you could to reach an amicable

2   resolution with the District prior to placing your

3   daughter at the Purnell School?

4   A    Yes.

5        Q    And is your daughter attending the Purnell

6   School?

7   A    She is.

8        Q    Have you noticed any change in her since she

9   started attending the Purnell School?

10  A    Yes, night and day, she's made tremendous progress

11  since she was there.

12       Q    And can you describe for the Court a little

13  bit about that progress?

14  A    Sure.  She has -- she's able to make friends now,

15  she has many -- a couple of close friends, her anxiety

16  levels are low.  She was able to participate and had a

17  lead in the school musical The Adams Family, she played

18  Gomez.

19       So she is really coming out and academically she

20  is, you know, getting "A's" and "B's" and doing really

21  well and just a wonderful experience and that school

22  helps so many girls that I really think the District

23  should consider placing people there.

24       Q    Were you at any time aware that your daughter

25  was diagnosed with an issue with acute sounds bothering

F.H. - Direct                          110

1    her?

2    A    Yes, she would complain about the noisiness of the

3    halls and she would complain about if we had the TV on

4    -- even though we're old, we're not that old where we

5    have it blasting but she would complained about that,

6    so she had a sensitivity to noise.

7         Q    Now did there come a time that J.H. saw an

8    Audiologist?

9    A    Yes.

10        Q    Okay.  I'm going to refer you to P-34, have

11   you ever seen this document before?

12   A    34, yes.

13        Q    And can you just briefly describe what this

14   is?

15   A    The is the result of J. visiting an Audiologist to

16   -- Dr. Hanna, to see what her hearing situation was and

17   basically he came up that she did have a sensitivity to

18   sound -- to noise.

19        Q    And did you see Dr. Hanna as a result of

20   someone else referring -- indicating that she had a

21   problem with noise?

22   A    Yes, one of the -- Dr. Shuberth or Dr. Platt, I

23   can't remember which one had said that there might be

24   an auditory issue that was increasing her anxiety and

25   inability to be in a large school setting.

F.H. - Direct                               111

1          THE COURT: This report is dated, "February

2     28, 2018?"

3               MS. WARSHAW: Okay.  "March" --

4          THE COURT: Since the cover letter has no date

5     on it.

6               MS. WARSHAW: The first -- it's, "March 26,

7     2018."

8               THE COURT: March 26th.  I get it.  Okay.

9               MS. WARSHAW: At the top of the page.

10              THE COURT: The top of the page?

11              MS. WARSHAW: Yes, the top.  P-35 -- or P-34

12    we're on, it says, "Hunterdon Audio" -- (out of

13    microphone range)

14              THE COURT: Yeah, but I don't see a date at

15    the top of the page.

16              UNIDENTIFIED FEMALE: They put it in the wrong

17    spot, it's on the top right.

18              THE COURT: But the date on the top of the

19    page is the --

20              THE WITNESS: The "Date of Birth"

21              THE COURT: It's the "Date of Birth" of the --

22    (out of microphone range)

23              UNIDENTIFIED FEMALE: It's to the left -- (out

24    of microphone range)

25              MS. WARSHAW: Oh, okay.

F.H. - Direct                                    112

1              THE WITNESS: Oh, I'm sorry, to the left above

2        the name, J.H.

3              MS. WARSHAW: It's to the left.

4              THE WITNESS: It says, "3/26/18," where it has

5        our address.

6              THE COURT: Oh, I see it.  Okay.  Thank you.

7        I need stronger glasses.

8              THE WITNESS: Me too.

9              THE COURT: But the date I read was from page

10       2.

11             MS. WARSHAW: Correct.  That was --

12             THE COURT: Okay.  That was the "Date of

13       Exam".

14             MS. WARSHAW: -- "February 28, 2018."

15             THE COURT: Okay.  Very good.  Thank you.

16       BY MS. WARSHAW:

17         Q   I'm going to refer you to P-30, have you ever

18       seen this document before?

19       A   Yes, yes.

20         Q   Okay.  And can you briefly describe for the

21       Court what this says and who it's from?

22       A    This is from the ICCPC, it's from her Psychiatric

23       Nurse Practitioner who monitors J.'s or J.H.'s medicine

24       and it states that, "The medication that she's on has

25       had a positive outcome and that she's doing very well

F.H. - Direct                                113

1    in school."

2                MS. WARSHAW: I would like to move this into

3    evidence as well.

4    BY MS. WARSHAW:

5        Q    I'm going to show you what's been marked

6    P-38 and going to the last page, have you ever seen

7    this before, "Authorization to Release Records?"

8    A    Oh, yes.

9        Q    And what was the date of this that it was

10   signed?

11   A    "November 3, 2017."

12       Q    And to your knowledge did the School District

13   ever produce these documents that was requested?

14   A    No.

15       Q    You indicated that your daughter goes to the

16   Purnell School now and are you paying the tuition bills

17   for that?

18   A    Yes.

19       Q    I'm going to refer you to P-37, have you ever

20   seen this -- these documents before?

21   A    37?  Oh, yes, these are the tuition bills.

22       Q    Can you review these pages and let the Court

23   know if these are true and accurate copies of the

24   statements from the Purnell School?

25   A    Yes.  Yes, they are, as well as copies of our

F.H. - Direct                                    114

1    checks for some of the expenses.

2              MS. WARSHAW: I would like to move as

3    evidence.

4    BY MS. WARSHAW:

5         Q    Can you tell the Court whether or not the

6    Purnell School has any supports for J.H.?

7         A    Yes, she has a Counselor available, I believe the

8    Counselor only has three students -- or six students

9    that she is counseling so they break it up that way.

10   In addition I believe there's a Psychiatrist that comes

11   to the school three times a week.

12        Q    And were you aware with the Behavioral

13   Support Program how many students would be -- strike

14   that.  Were you aware at the Behavioral Support Program

15   that the Guidance Counselor had a number of students

16   that they were responsible for counseling?

17        A    The Guidance Counselor?

18        Q    Yes.

19        A    I'm trying to understand the question.

20             THE COURT: How many students does the

21   Guidance Counselor in the BSE (sic) Program have if you

22   know?

23             THE WITNESS: I don't know that.

24             THE COURT: I didn't think you did.

25             THE WITNESS: I don't know that.

F.H. - Direct                          115

1    BY MS. WARSHAW:

2         Q    Do you know if the Guidance Counselor is

3    responsible for counseling at the Behavioral Support

4    Program also counseled the students throughout the

5    Mendham High School?

6    A    Are we -- I never met the Guidance Counselor at

7    the BSP.

8         Q    Okay.  I'm going to refer you to P-40, have

9    you ever seen this before?

10   A    Yes.

11        Q    Do you know who Megan DuVall is?

12   A    Megan DuVall is J.H.'s Counselor at Purnell.

13        Q    And what is the date of this letter on the

14   first page?

15   A    "10/12/17."

16        Q    I'm going to request that you read the second

17   paragraph, please.

18   A    "I have been meeting with J. weekly and she

19   explains how she is enjoying coming to Purnell and is

20   starting to feel as though she is good at school.  She

21   has been opening up and is willing to work on some of

22   her social anxiety surrounding school.  She appears to

23   be really trying to find herself here and is enjoying

24   doing so.  I think Purnell has been a great fit for J.

25   thus far."

F.H. - Direct                                    116

1        Q    Turning to the next two pages, have you ever

2    seen this report before?

3    A    Oh, yes.  Ah-ha, yes.

4        Q    Without going through all the details does --

5    do you -- can you summarize for the Court what this

6    says from Megan DuVall?

7    A    She just feels that J. is doing very well and has

8    changed dramatically since she first came and is just

9    having -- having a great experience.

10       Q    I'm going to refer you to P-41.

11            MS. WARSHAW: I would like to move P-40 into

12   evidence.

13            THE COURT: Again, I'm not taking anything

14   into evidence until you guys figure it out.  If there's

15   objections you'll make objections when we start at the

16   next session.

17   BY MS. WARSHAW:

18       Q    I'm going to refer you to P-41.

19   A    Yes.

20       Q    Have you seen that before?

21   A    Yes, hm-hm.

22       Q    And can you briefly describe for the Court

23   what this is?

24   A    This is from the Head of Purnell School, Ann

25   Glass, and it is a list of J.'s classes and her grade

F.H. - Direct                                    117

 1    point average or grade percentage.

 2            Q    And what is the date of this?

 3    A    "October 15, 2017."

 4            Q    So that would have been just the first

 5    marking period.  Correct?

 6    A    Yes.

 7            Q    I'm going to have you turn to P-42, have you

 8    seen this before?

 9    A    Yes.

10            Q    And can you briefly describe for the Court

11    what this is?

12    A    This is J.'s -- she called it a, "Report Card,"

13    for Purnell for the academic year 2017/2018.

14            Q    And what is your understanding of how J.H.

15    was doing in school during those marking periods?

16    A    All "A's" from what I see.

17            Q    I'm going to have you turn to P-43.

18    A    Yes.

19            Q    Have you seen this before?

20    A    Yes, this is for the eleventh grade report card.

21            Q    Okay.  And, again, to your knowledge how is

22    J.H. doing at the Purnell School in these marking

23    periods?

24    A    Again, all "A's".

25            Q    I'm going to refer you to P-44, have you seen

F.H. - Direct                                    118

1      this before?

2      A     Yes, yes.

3           Q     And can you briefly describe for the Court

4      what this is?

5      A     This is a letter from the College Board who

6      administers the SAT to J.H. that she has been approved

7      for the following accommodations on the College Board

8      SAT tests and it lists the accommodations that she is

9      entitled to based on her disabilities or whatever you

10     call them.

11          Q     And these accommodations from the College

12     Board are based on her Specific Learning Disability.

13               MS. HOWLETT: Your Honor --

14               THE COURT: Sustained.

15     BY MS. WARSHAW:

16          Q     Is that your understanding?

17               MS. WARSHAW: Well, I need to know his

18     understanding of that.

19               MS. HOWLETT: It's -- (out of microphone

20     range)

21               THE COURT: Well, you need -- yeah, I'm going

22     to sustain it, you know.

23               MS. WARSHAW: Okay.

24     BY MS. WARSHAW:

25          Q     Can you -- on the first page of the College

F.H. - Direct                              119

1    Board letter could you read the, "Accommodations," that

2    she was receive -- that she was approved for?

3    A    "A four function calculator, the use of the

4    calculator for the Math sections that do not permit the

5    use of a calculator.  Reading, 50 percent, time and a

6    half.  Writing, 50 percent, time and a half.

7    Mathematics Calculations an additional 50 percent, time

8    and a half."

9         Q    Do you recall ever drafting an affidavit?

10   A    Yes.

11        Q    Do you recall when that was?

12   A    Oh, the affidavit?  I don't recall when that was,

13   some time after the May 16th meeting.

14        Q    And do you recall what was in that affidavit?

15   A    Several things but -- but in that affidavit was a

16   detailed list of the -- all the problems that we had

17   with the Psychologist's Report and the IEP.

18        Q    And to your knowledge did the School District

19   receive a copy of that?

20   A    Yes.

21        Q    I'm going to refer you to P-5 on the second

22   page.

23   A    P-5, the second page, yes.

24        Q    Is that the affidavit that you're describing?

25   A    This is, yes.

Colloquy                                    120

1          THE COURT: P-5 is -- oh, it's the second

2     page.

3          THE WITNESS: The second page, right, it's an

4     affidavit?

5          THE COURT: Why are we revisiting an affidavit

6     filed in support of a motion for summary decision that

7     was denied?

8          MS. WARSHAW: Because he was -- he put down

9     all the information that was a concern and even then

10    there was still no discussion whatsoever about trying

11    to even get her back to school or anything like that

12    and that there was -- there was no issues.  It was just

13    another proof that he has told the District over and

14    over again that there was issues.

15         THE COURT: He's testified that he's done

16    that.

17         MS. WARSHAW: Okay.  I think we're done.

18    Thank you.

19         THE COURT: One second.  Do you want to take a

20    lunch break before you start cross or do you want to

21    just work right through?  It's up --

22         MS. HOWLETT: I'm going to be brief, I don't

23    think that it's going to take that long.

24         THE COURT: Okay.

25         MS. HOWLETT: But it's up to -- I know Your

Colloquy                                    121

 1    Honor may want to take a break, so.

 2              THE COURT: Nobody cares what I want.

 3              THE WITNESS: How's your sugar?

 4              THE COURT: My sugar is good today.  Thank

 5    you.

 6              MS. HOWLETT: Your opinion is the only one

 7    that really matters here, so.

 8              THE COURT: I wish that were true -- no, I'm

 9    only kidding.

10              MS. HOWLETT: I really -- I really will be

11    brief though.

12              THE COURT: Brief -- go ahead.

13              THE WITNESS: Well, excuse me, could I have a

14    drink of water?

15              THE COURT: You can -- you know what, yeah,

16    let's take a quick --

17              MS. HOWLETT: Okay.  Yeah, that's fine.

18              THE COURT: -- a quick break.

19              MS. HOWLETT: Sure.

20              THE COURT: And then we'll start cross.

21              MS. HOWLETT: Yeah, that's actually -- (out of

22    microphone range)

23              THE WITNESS: Thank you.

24              THE COURT: I'll go check my blood sugar.

25                        (BRIEF RECESS)

F.H. - Cross                                    122

1              THE COURT: Ready?

2              MS. HOWLETT: Yes, Your Honor.

3              THE COURT: All right.  After a brief break

4       we're back on the record and we're going to start

5       cross.

6       CROSS EXAMINATION BY MS. HOWLETT:

7              Q    Hi, Mr. H.  How are you?

8       A    Hi.

9              Q    I'm going to try and keep it as brief as

10      possible so we can keep it moving.  So you testified

11      earlier that you said that you had a list of like 20

12      school that you were thinking about for J.H., why did

13      you compile that list of schools?

14      A    Well, it was part of, you know, putting together

15      all the information we possible could to try and figure

16      out a solution for her situation.

17             Q    So when was that that you put that together?

18      A    That was -- when did we put that together?  That

19      was I think after we realized that she couldn't go back

20      to the high school after the December 7th week.

21             Q    So after December that's when you guys

22      explored sending her other places.

23      A    Yeah, I believe so.

24             Q    And is that when you mentioned Fusion to the

25      District as well?

F.H. - Cross                                        123

1    A    Well, we looked at it during that time and I

2    believe we started mentioning it, you know, at the --

3    at the IEP on April 6th.

4         Q    Turning to the black binder --

5    A    Hm-hm.

6         Q    -- in front of you, it's going to be the tab

7    marked 3.

8              MS. HOWLETT: This was previously introduced,

9    Your Honor -- (out of microphone range) This is a

10   Referral -- a Pre-Referral Intervention Information

11   Form.

12   BY MS. HOWLETT:

13        Q    In this -- on this form under, "Other

14   information you feel is pertinent to this referral," we

15   had previous testimony that I believe Joe Cusack had

16   prepared this form, it says, "Mr. and Mrs. H. explained

17   a private school setting, they have opted to keep J. at

18   WMC and pursue the CST evaluation."  Is that accurate?

19   A    "Explained a private school" -- yes, yes.

20        Q    So this is dated, "January 3rd."

21   A    "January 3rd."

22        Q    So is it fair to say you had conversations

23   with Mr. Cusack before January 3rd about placing J. in a

24   private school, J.H.?

25   A    Yes, yes, during that time we talked to the

F.H. - Cross                                          124

1    Guidance Counselor about, you know, what various

2    options we had all along.

3         Q    So that was before she was even classified.

4    Right?

5    A    January 3rd -- yes.

6         Q    And it was also before you received Dr.

7    Srinivasan's Report suggesting an out of District

8    placement.  Is that correct?

9    A    Yes.

10        Q    So at the time that you discussed out of

11   District schools and private school placements with the

12   District at that time there was no clinical

13   recommendations that J.H. couldn't return to school.

14   A    I'm sorry, repeat that again.

15        Q    When you had this discussion with the staff

16   and with Mr. Cusack and compiled this list of private

17   schools at that time did you have any clinical

18   recommendations that J. --

19   A    Oh, no.  We were just analyzing the options.

20        Q    And to the contrary ICCPC had actually

21   cleared J.H. to return to school on a part-time basis.

22   A    Yes.

23        Q    Which you later testified that it didn't work

24   out but that was the recommendations at that time.

25   A    But for December -- yeah.

F.H. - Cross                                    125

1          Q    Okay.  Earlier when your Attorney asked you

2     some questions about the eligibility determination

3     meeting you had testified that you made it clear at the

4     meeting that you wanted the classification changed.  Is

5     that accurate?

6     A    Correct, yes.

7          Q    And then -- so what did you want the

8     classification changed to?

9     A    Well, I didn't know what all the possible

10    classifications were but I knew that there were other

11    ones besides Emotionally Disturbed and I knew that that

12    one -- we didn't feel that that one was appropriate for

13    J.

14         So it was sort of at that point that I realized we

15    were kind of out of our depth with all the legal terms

16    and that we had to get help.

17         Q    Understood.  So what was your opposition to

18    the term, "Emotionally Disturbed?"

19    A    Emotionally Disturbed I think to us connotated

20    that she, you know, had a mental illness, that she was

21    rebellious, that she was not -- you know, had

22    longstanding problems, which just didn't describe her.

23              THE COURT: I'm going to ask you a question,

24    did you have any idea what the -- what Emotionally

25    Disturbed meant in the context of Special Education at

F.H. - Cross                                    126

1      that time?

2                    THE WITNESS: At that time, no, I hadn't --

3                    THE COURT: Thank you.  That's all I needed to

4      know.

5                    THE WITNESS: -- seen the list.

6      BY MS. HOWLETT:

7           Q     You testified that at the May IEP meeting

8      that -- I have this language that you said but you can

9      correct me, you said, "No points were incorporated into

10     the IEP," I believe you were referring to the points

11     that you had brought up in the April meeting.

12     A     Yes, yes.

13          Q     And that your concerns weren't addressed.

14     A     Right.

15          Q     The IEP, however, does state that you and

16     your wife requested the Fusion Academy, so how do you

17     think the District got that information into the IEP?

18     A     That -- was that in -- that was probably in the

19     first one, the April 6th.  Right?

20          Q     So that information must have been provided

21     -- was that information provided by you and Ms. H. to

22     the District that you were considering Fusion?

23     A     Yes, somehow they -- that must have been provided.

24     I'm not sure when we would have mentioned that, I'm not

25     sure when we -- when we actually looked at Fusion.

1          Q    So it's not accurate that none of your

2     concerns were or points were put into the IEP.  Is that

3     correct?

4     A    Well, okay, that's true, yeah.  We were thinking

5     more of the corrections that we had from the April 6th

6     meeting.

7          Q    Understood.  You testified earlier that no

8     one had informed you that the BSP was a therapeutic

9     type of program.

10    A    That's -- that's correct.

11         Q    So at the May meeting Dr. Leigh didn't

12    discuss any of the therapeutic supports that the BSP

13    had to offer?

14    A    Oh, in May, yes.  Not at -- not in April, we

15    didn't know.

16         Q    Okay.

17    A    So we didn't know that until May, yeah.

18         Q    I got it.  Are you aware that the School

19    District is not permitted by law to implement an IEP --

20    an initial IEP without parental consent?

21    A    Not allowed to without parental -- yeah.  I guess

22    so, yeah.

23         Q    So that unless you -- just bringing it back

24    to what's going on here, that if you and Ms. H. or one

25    of you did not sign the IEP that the District couldn't

F.H. - Cross                                    128

1    provide J.H. with Special Education and Related

2    Services.  Did you understand that?

3    A    Well, they couldn't provide us with the IEP they

4    proposed, yes.

5         Q    And are you aware that the "15 Day", quote

6    "Rule" that your Counsel brought up earlier, that that

7    doesn't apply in an initial IEP situation?

8    A    No.  Again, I didn't know all the legalese.

9         Q    I got you.  Earlier Ms. Warshaw also asked

10   you to look over some tuition documents, I think it was

11   marked as P-37 which we haven't moved yet, can we just

12   refer to that?

13   A    Sure.

14        Q    It's the blue binder, Mr. H.  Thank you.

15             THE COURT: I'm going to pause for just -- I

16   got to run and get another pad.

17             MS. HOWLETT: Sure.

18             THE COURT: No, I didn't pause it,  Hold on.

19                    (BRIEF PAUSE)

20             THE COURT: Okay.  Go ahead.

21   BY MS. HOWLETT:

22        Q    If you could just turn to the second document

23   in P-37 --

24             THE COURT: 37 or 47?

25             MS. HOWLETT: 37.

1                THE COURT:  Thank you.

2      BY MS. HOWLETT:

3           Q    It looks like a cancelled check, is that

4      accurate?  Is that one of your cancelled checks or a

5      check that was --

6      A    That was cashed by the school, yes.

7           Q    That was cashed and it was cashed by what

8      school, the Purnell School?

9      A    The Purnell School, yeah.

10          Q    And what's the date of that check?

11     A    "August 31, 2017."

12          Q    Okay.  And if you could just turn to P-35,

13     and you testified earlier that that's the letter that

14     you sent to the District to advise the District that

15     you were enrolling J.H. into the Purnell School.  Is

16     that correct?

17     A    Yes.

18          Q    I'm sorry, you needed a second to get there,

19     sorry.

20     A    Yes.

21          Q    And do you see when it's marked "Received" by

22     the District at the bottom?

23     A    "Received 9 -- September 25th."

24          Q    And your letter otherwise doesn't appear to

25     be dated, do you know when this was actually sent to

F.H. - Cross                                    130

1    the District?  If you recall, it doesn't have a date on

2    it, so.

3    A    I think it was whenever the requirement was that

4    we had to inform the school that we weren't coming

5    back.  I don't recall when in September that was but

6    there was some requirement that we had to tell them or

7    less, you know, the Truant Officers would come.

8         Q    Right, I get you.

9    A    Yeah.

10        Q    Do you know why there's a discrepancy that

11   you paid the Purnell School on August 31st but the

12   District didn't receive notice that J.H. was going to

13   the Purnell School until the end of September?

14   A    Well, we had to, you know, put a down payment on

15   Purnell just to make sure she had some place to go and,

16   you know, we were hoping to -- that we could resolve

17   something, but we had to keep our options open at that

18   point because we didn't know what was going to happen.

19        Q    After sending this letter to the District did

20   you ever send any subsequent letter requesting --

21   specifically requesting a new IEP?

22   A    Which letter?

23        Q    Oh, I'm sorry.  After you sent -- you and Ms.

24   H. sent P-35 to the District, that's the one you're

25   looking at.

F.H. - Cross                                    131

1    A    Oh, yeah, yeah.  Okay.

2         Q    After that did you ever write a second letter

3    requesting an IEP from the District?

4    A    After September --

5         Q    If you recall.

6    A    -- 25th, I don't recall the dates.  No, I don't

7    recall.

8         Q    Did you ever write a subsequent letter to

9    the District indicating your intent to re-enroll J.H.

10   in the District?

11   A    Attempt to re-enroll, I don't -- I don't believe

12   so.

13        Q    Are you aware that the District is not

14   required to provide a student that's not enrolled in

15   the School District with an IEP?

16   A    Not enrolled -- yes, correct.

17        Q    You testified earlier that J.H. was diagnosed

18   with a Learning Disability or at least that was your

19   understanding.  Is that accurate?

20   A    Yes, yes.

21        Q    Do you know is the Purnell School approved

22   for Special Education?

23   A    Special Education, no.

24        Q    Are -- the teaching staff members, are they

25   Special Education Teachers?  Do you know?

F.H. - Cross                                         132

1    A    I don't know.

2         Q    Is J.H. receiving services at the Purnell

3    School related to her noise sensitivity?

4    A    No, just the -- just the nature of the school

5    helps her there.

6         Q    Do you recall when you filed for due process

7    or when through Counsel you filed a petition for due

8    process?  Do you remember when that was?

9    A    I believe it was some time after the May 16th

10   meeting.

11        Q    It's actually marked as P-1, your Due Process

12   Petition.  I believe it is, at least that's what I have

13   -- (out of microphone range)

14             THE COURT: Nope.

15             MS. HOWLETT: Do you see it, Your Honor, P-1?

16             THE COURT: Well, that's the -- I'm looking

17   for the --

18             MS. HOWLETT: I mean, it's a matter of record,

19   so it's --

20             THE COURT: Yeah.  "5/30."

21             MS. HOWLETT: Right.

22   BY MS. HOWLETT:

23        Q    May 30th, does that sound like that would be

24   about right?

25   A    That sounds about right, yeah.

F.H. - Cross / Redirect                          133

1          Q    Okay.  So all the reports that Ms. Warshaw

2     had asked you about before, they were all prepared

3     after this matter was already in litigation.  Isn't

4     that correct?

5     A    Correct.

6               MS. HOWLETT: I believe that's all the

7     questions I have, Your Honor.

8     REDIRECT EXAMINATION BY MS. WARSHAW:

9          Q    Okay.  Mr. H., I'm going to refer you back to

10    P -- I'm sorry, R-3.

11    A    R-3, yes. The, "Pre-Referral Intervention

12    Information."

13         Q    Did you write or sign this document?

14    A    No.

15              THE COURT: R-3.  Right?  I'm sorry.

16              MS. WARSHAW: R-3.

17              THE COURT: I was making a note for myself.

18    R-3.  Okay.

19    BY MS. WARSHAW:

20         Q    Do you recall the first time that you ever

21    saw this document?

22    A    No, actually I don't remember this one.

23         Q    When you daughter went to see Dr. Hanna was

24    it in preparation for litigation or was it a follow-up

25    from what Dr. Shuberth had diagnosed her with?

F.H. - Redirect / Colloquy                    134

1    A    It was a follow-up from Dr. Shuberth because she

2    had recommended that we have Audiologist check her out.

3         Q    Do you recall the date that the Purnell

4    School started for the 2017/18 school year?

5    A    The date they -- no, I don't recall the date.

6              MS. WARSHAW: I have no further questions.

7    Thank you.

8              THE COURT: You can step down.  Thank you.

9              THE WITNESS: Thank you.

10             THE COURT: Okay.  Again, since you guys don't

11   listen to me, are you taking lunch or are we going to

12   work through?

13             MS. WARSHAW: We'll work through.

14             THE COURT: Okay.  You didn't even ask your

15   adversary if she agreed with that.

16             MS. HOWLETT: I would like to work through.

17             THE COURT: Okay.  Thank you.

18             MS. HOWLETT: Thank you.

19             MS. WARSHAW: Okay.  I'm going to call Mrs. H.

20             THE COURT: Have a seat.  Raise your right

21   hand.

22   M.   H., PETITIONER SWORN.

23             THE WITNESS: I do.

24             THE COURT: State your name.

25             THE WITNESS: M.H. -- (The Petitioner states

M.H. - Direct                                    135

1    her name)

2              THE COURT: You don't have to spell your last

3    name, your husband already did it.  Proceed.

4              MS. WARSHAW: Okay.

5    DIRECT EXAMINATION BY MS. WARSHAW:

6         Q    Mrs. H., we're going to try very hard not to

7    repeat what your husband has said so it won't be

8    duplicative, so we'll do the best we can.  Okay.  Can

9    you please describe for the Court your knowledge about

10   what if anything occurred in middle school with your

11   daughter?

12   A    Yes, in middle school in eighth grade that's when

13   she first started having panic attacks and ended up at

14   the Nurse's office due to her fear of two of the

15   Teachers in middle school.

16        Q    And was she having any issues academically in

17   middle school?

18   A    Well, eighth grade her grades slipped a bit but

19   generally they were good.

20        Q    Do you know why her grades slipped a bit in

21   eighth grade?

22   A    Yeah, because she was anxious about situations in

23   school.

24        Q    And can you describe for the Court what if

25   anything happened in ninth grade for your daughter?

M.H. - Direct                              136

1    A    In ninth grade she pretty much -- she tried very

2    hard to keep it together and she kept a lot to herself.

3         Q    How did she do academically in ninth grade?

4    A    I think she did pretty well in ninth grade.

5         Q    The beginning of tenth grade --

6    A    Hm-hm.

7         Q    -- did -- can you describe for the Court what

8    you believe happened?

9    A    So she started the year off and then I think it

10   was only a couple weeks in I think I had to pick her up

11   from school and she was -- you know, confided to me

12   that she was suffering from depression and at that

13   point I immediately started researching for therapists.

14        Q    And do you know what the basis for her

15   depression was?

16   A    Well, it's hard to say exactly but certainly the

17   school anxiety was a factor.

18        Q    Do you know why she was suffering from school

19   related anxiety and what was the basis for that?

20   A    Difficulty in relationships with other people and

21   overwhelmed by the -- just the general experience of

22   the big high school.

23        Q    Can you describe for the Court what happened

24   after she initially told you that she was depressed?

25   A    Then actually I think I sent her back to school

M.H. - Direct                              137

1    the next day and then I think I realized the enormity

2    of it and then took her to -- through a recommendation

3    of a friend I took her to ICCPC in Parsippany and then

4    she was let in I believe the Monday.  I think I took

5    her on a Friday and they talked to her and then she

6    started on Monday.

7         Q    Okay.  And that was a part-time day program.

8    Is that what it is?

9    A    Yeah, I believe it was 9 to 2 or 2:30, hm-hm, and

10   then the rest was tutoring.

11        Q    Did there come a time where you notified the

12   school that she was having issues?

13   A    Yeah, pretty much almost from the beginning and

14   first I reached out to all her Teachers by email and

15   Mr. Cusack because at that point I didn't really know

16   -- I didn't really know what was going on and I just

17   said she was having some difficulties right now.

18        Q    And at some point was your daughter placed on

19   home instruction?

20   A    Yes.

21        Q    Can you describe for us what events

22   transpired that that came about?

23   A    She completed her program at ICCPC in the middle

24   of December -- well, I'm sorry, prior to that the

25   intent was to complete her program and then to return

M.H. - Direct                              138

1    to West Morris.  She tried to return to West Morris for

2    a couple days and found it overwhelming, so then at

3    that point after the Christmas break she started home

4    instruction from I think it was like January 4th to the

5    end of June and completed her sophomore year.

6              THE COURT: She stayed on home instruction

7    through the end of the sophomore year.

8              THE WITNESS: Yes.

9              THE COURT: Thank you.

10   BY MS. WARSHAW:

11        Q    When did J.H. start seeing Melissa Dolgos?

12   A    That was from the beginning when she was in

13   Parsippany so that would be October 2016 -- yeah, 2016.

14        Q    And to your knowledge did -- at any time did

15   Melissa Dolgos indicate that J.H. had behavior issues?

16   A    No.

17        Q    At any time did J.H. receive a 504 Plan?

18   A    She did on the first day of December I think -- I

19   guess it was December 6th or 7th, I don't remember.  We

20   sat down in Joe Cusack's office and he showed us that

21   504 Plan which I believe we signed.

22        Q    Once your daughter was placed on home

23   instruction had did she do academically?

24   A    She did fine, she did very well.

25        Q    And when she was on home instruction how was

M.H. - Direct                                    139

1    her anxiety levels?

2    A    It was much lower.

3         Q    And did there come -- there came a time that

4    J.H. was evaluated by the Child Study Team, did you

5    request that or did the School District request it?

6    A    We requested that.

7         Q    Just going back I'm going to show you what's

8    been marked P-19, did you sign this letter?

9    A    Yes.

10        Q    And that was sent to Mr. Cusack.  Is that

11   correct?

12   A    Yes.

13        Q    I'm going to refer you to P-25, is that your

14   signature on the first page?

15   A    Yes.

16        Q    And I'm going to refer you to the last page,

17   is that your signature on the last page?

18   A    Yes.

19        Q    And when you signed this agreement or this

20   page --

21   A    Hm-hm.

22        Q    -- what did you think that you were signing?

23   A    We thought we were moving ahead with trying to

24   find a solution for J. because once we signed this I

25   believe it was maybe a day or two afterwards we went to

M.H. - Direct                                    140

1    see the BSP Program.  We thought we were moving ahead

2    to try and find a solution for her and we thought that

3    was just fast tracking the -- the 15 day notice.

4         Q    Does it say anywhere that your daughter would

5    be classified as Emotionally Disturbed?

6    A    No.

7         Q    Were you ever told by anybody what

8    Emotionally Disturbed meant?

9    A    No.

10        Q    Did you ever object to your daughter being

11   classified as Emotionally Disturbed?

12   A    Yes.

13        Q    And do you recall when that was?

14   A    Yes, that was the April 6th meeting.  We came in

15   with our highlighted copy of the report and went

16   through all the things that were inaccurate.

17        Q    And do you -- you mentioned a, "Report,"

18   which report did you bring in that was highlighted?

19   A    It was Sherry Wilk's Psychological Evaluation, I

20   don't know the exact title of it.

21        Q    I'm going to show you what's been marked

22   P-22, is that the report that you're referring to?

23   A    Yes, that's it.

24        Q    Okay.  In your words can you please tell us

25   what your issues were with regard to this report?

M.H. - Direct                                    141

1    A    Well, it just characterized her inaccurately I

2    thought.  I mean, you know, it looked like she was

3    belligerent, it looked -- that she refused to go to

4    school, I interpret that as being belligerent.  It said

5    she was hospitalized and she wasn't, she was in a day

6    program, you know, and it had -- it had a bunch of

7    errors in it.

8         I thought her personality was not char -- you

9    know, we filled out these multiple choice forms and

10   they claim that they took the information from them and

11   put it in here but it didn't -- it did not at all

12   accurately describe her.

13        Q    Do you believe that those inaccuracies

14   affected the outcome of that report?

15             MS. HOWLETT: Objection, Your Honor --

16             THE COURT: Sustained.

17             MS. HOWLETT: -- it's speculative.

18             THE COURT: She's not in Ms. Wilk's head.

19             THE WITNESS: I'm sorry, could you say that --

20             THE COURT: Don't answer the question I

21   sustained the objection.

22             THE WITNESS: Oh.

23   BY MS. WARSHAW:

24        Q    Do you believe that that report inaccurately

25   described your daughter?

1    A    Yes.

2         Q    Do you request at any time that changes be

3    made to that report?

4    A    Yes.

5         Q    When did you request the changes?

6    A    April 6th.

7         Q    Did there come another time when you also

8    requested that these -- the changes be made?

9    A    Yeah, I believe we brought it up at the May 16th

10   meeting as well.

11        Q    And to your knowledge were any of these

12   changes ever made?

13   A    Not to my knowledge.

14        Q    Can you describe for us what happened at the

15   April 6, 2017 IEP meeting?

16   A    Yes.  So, as my husband mentioned, we were brought

17   to the meeting and J. was to sit in the hallway and we

18   thought it was going to be for a brief period of time

19   but she was stuck out there for quite a long period of

20   time.  Then she was called in with us and we, once

21   again, went over the information from the reports and

22   her IEP proposed -- the proposed IEP for her.

23        Q    And what if anything happened?

24   A    Well, it was a very uncomfortable situation

25   because we had already made the corrections and then

M.H. - Direct                                   143

1    once J. was in there she -- Mrs. Wilk was telling her

2    these were -- "This is what we are going to do," and J.

3    said, "What are my other options?"  And she said,

4    "Well, this is it, this is what we're proposing," and

5    that's when J. was upset.

6         Q    Did you have any other concerns that you

7    raised at the April 6, 2017 IEP meeting?

8    A    Related to the -- creating a new IEP, relating to

9    the report?

10        Q    Okay.  Let me clarify.  Did you receive a

11   copy of an IEP at the April 6, 2017 IEP meeting?

12   A    Yes.

13        Q    And what programs specifically did it refer

14   to as the proposed placement for J.H.?

15   A    For the Behavioral Support Program in Mendham.

16        Q    And did you have any objections to that

17   program at that time?

18   A    No, because I hadn't seen it then.

19        Q    Did you describe any -- did anybody describe

20   for you what that program was at that IEP meeting?

21   A    Yes, Mr. Cusack explained a little bit of it and

22   then the woman that used to work at that program was

23   walking by the office and they pulled her in to explain

24   a little bit more information about the meeting (sic).

25        Q    And do you recall what they explained to you

M.H. - Direct                                    144

1    about what the Behavioral Support Program at Mendham

2    was?

3    A    Yeah, you know, she said it was -- I don't

4    remember her exact words but that it was in a

5    self-contained room and that it's a smaller group of

6    kids and it was to encourage kids to try to get to

7    school and she talked a little bit -- she may have

8    talked about the point system and she talked about the

9    flexibility to get the kids to complete their work, I

10   don't remember a lot of details, no.

11        Q    Okay.  Did there come a time when you did go

12   see the Behavioral Support Program?

13   A    Yes, I did.

14        Q    Did you speak to anybody there?

15   A    Yes, I did.

16        Q    Did anybody go with you to see the program?

17   A    J. and I went to see the program.

18        Q    And who did you speak to when you got there?

19   A    First we were downstairs and we spoke to Tracy

20   Costa.

21        Q    And what did Ms. Costa tell you?

22   A    Well, she sort of was giving us an idea about the

23   program and she said,  "Basically we're trying to get

24   the kids to just get in the door and get to school and

25   make it through as much of the say as possible."  She

M.H. - Direct                                    145

1    told us about the point system, the reward systems, the

2    special trips.  She told us how -- about getting work

3    from the mainstream Teachers, I don't remember too much

4    else.

5         Q    Did she mention anything about the course

6    offerings in the Behavioral Support Program?

7    A    I don't remember if we talked specifically about

8    course offerings then.  I think she -- I think we knew

9    that -- I think what she told us was that if we did

10   need to take a higher level course that we would have

11   to go into the mainstream classes -- she would have to

12   go into the mainstream classes.

13        So I knew we were talking about something like

14   Physics and she said, "No, that wasn't offered, you

15   would have to go into the mainstream class."

16        Q    Do you recall if there were any other courses

17   that were not offered at the Behavioral Support

18   Program?

19   A    Well, obviously they can't do Gym or any of the

20   other electives.  I think if it was a language you had

21   to have it on the EduShare, which is that computer

22   program, so it was -- and when we went -- I'm sorry, go

23   ahead.

24        Q    No, no.  Go ahead.

25   A    No, when we -- then we -- then J. and I went up to

1    the room and we saw the kids in the BSP Program and

2    they were -- several of them were on their own doing

3    their own thing and working on their computers.

4         Q    Can you describe where this Behavioral

5    Support Program is located in the high school?

6    A    Yeah, I remember it being on the second floor so

7    you had to work through the hallways to get there, up

8    the stairs and down the hall to the room.

9         Q    And what did you -- was it one room or two

10   rooms?

11   A    I believe it was one room, a room smaller than

12   this room.

13        Q    And do you recall how many students were in

14   that room?

15   A    At that particular time maybe -- maybe ten, I

16   don't remember exactly.

17        Q    Did you speak to anybody else while you were

18   at the Behavioral Support Program?

19   A    I did but I don't remember talking about -- I

20   think she told me a little bit, like there was a

21   Teacher's Aide in the room, maybe one or two, I don't

22   remember.  I don't remember going into any detail about

23   the room with her but I seem to remember having

24   conversations about the kids going in and out a lot.

25   Some kids would go in, some kids go out, back and forth

M.H. - Direct                                    147

1    to the mainstream and back in again.

2         Q    Do you recall if they mentioned it was a

3    behavior class or was it more of a psychological or

4    psychiatric class?

5    A    I never heard anything about psychiatric or -- I

6    just knew it was called the, "Behavioral Support

7    Program," that was the title that I was told it was

8    called.

9         Q    Did anyone ever explain to you the types of

10   issues the children had who are in the Behavioral

11   Support Program?

12   A    I believe Tracy Costa said that most of the kids

13   have trouble getting to school or staying in school,

14   getting to school and staying in school.  So the

15   emphasis -- what I took away from that meaning it was a

16   point system for staying in school.

17        Q    After seeing the Behavioral Support Program

18   at Mendham High School did you believe that it was a

19   good fit for J.H.?

20   A    No.  And I actually let, you know, J.H. decide,

21   "What do you think," you know, "How do you think this

22   will work?"  And we both talked about it and she didn't

23   think so and, no, I didn't think it would work for her

24   because well, physically, first of all it's in a big

25   building and she has to navigate to the room and out of

1       the room, if she wants to go to more advanced classes

2       my understanding was that she had to go to mainstream

3       classes.

4            People were working individually on their

5       computers, it wasn't like a Teacher in a class

6       teaching.  It was everybody doing their own work and it

7       didn't seem like -- it reminded me of when I used to

8       work in the Resources -- the Resource Rooms in school,

9       so everybody doing their own thing and it just didn't

10      seem appropriate for her.

11           I can't speak to what the intentions were of the

12      kids in there but it didn't seem like a highly academic

13      college bound program.

14           Q    Did you ever express your concerns about the

15      Behavioral Support Program to the Child Study Team?

16      A    Yes.

17           Q    When was that?

18      A    Let's see, so we went -- I don't remember

19      specifically.  I know we went after the April meeting,

20      I don't know the date that we went to go see it.  I

21      don't remember if it was before the May 16th meeting or

22      at the May 16th meeting.

23           Q    And what if anything was the response to you

24      sharing your concerns about the Behavioral Support

25      Program to the Child Study Team?

M.H. - Direct                                149

1    A    I don't think there were any other options at that

2    point or they didn't give us any other alternatives.

3         Q    The IEP that was presented to you at the May

4    16, 2017 IEP meeting, was that the same IEP that was

5    drafted in April of -- 6th of 2017?

6    A    Yes, I believe so.

7         Q    When the May 16, 2017 IEP meeting occurred

8    you were handed an IEP -- an IEP, did you have any

9    input into the formulation of that IEP?

10   A    No.

11        Q    Had you ever been consulted about what your

12   concerns were or anything to put in that IEP?

13   A    No.

14        Q    After you expressed concerns about the

15   Behavioral Support Program at the May 16, 2017 IEP

16   meeting, were any changes made to the IEP?

17   A    No.

18        Q    Have you ever heard of the Being Successful

19   Program?

20   A    Not until I saw it in the book that was presented,

21   the binder.

22        Q    To your knowledge the program that was

23   presented for your daughter was the Behavioral Support

24   Program --

25   A    Yes.

M.H. - Direct                                    150

1       Q    -- at the Mendham High School.

2    A    Yes, it was in the IEP.  That's what it said the

3    Behavioral Support Program.

4       Q    Is there any difference to your knowledge

5    between the Behavioral Support Program at the Mendham

6    High School versus the one at West Morris or West --

7    sorry, Morris Central?

8    A    No, the only -- what I remember from the April 6th

9    meeting was that Joe Cusack saying that maybe it would

10   be better for her to go to the Mendham BSP Program but

11   I don't remember any details as to why, other than it

12   not being in West Morris Central.

13      Q    Was it your understanding that the Behavioral

14   Support Program at Mendham had the same grade level or

15   multi-grade levels?

16   A    Multi-grade levels.

17      Q    When was the first time that you heard about

18   the Purnell School?

19   A    Well, as my husband mentioned there was a list

20   that we -- initially we were in sort of "What do we do"

21   kind of panic and we started looking at schools, but I

22   didn't -- but we did not seriously consider it at all,

23   in fact I think it was crossed off the list, until May

24   -- at the May meeting when Dr. David Leigh suggested we

25   go look at it.

M.H. - Direct                                   151

1        Q    Do you recall the date that you first went to

2    see the Purnell School?

3    A    I actually do, I think it was May 25th.

4        Q     After the May 16, 2017 IEP meeting did you

5    have any correspondence with anyone from the District

6    regarding an IEP or a 504 Plan?

7    A    I don't believe so, no.

8        Q    Did you ever reach out to Kendra Dickerson

9    regarding an updated IEP?

10   A    I believe I did in an email.

11       Q    I'm going to show you P-29, can you tell me

12   if you recognize those emails?

13   A    Hm-hm, yes.

14       Q    Did you write them?

15   A    Yes.

16       Q    And at the time that you wrote this, "August

17   25, 2017," email to Kendra Dickerson --

18   A    Yes.

19       Q    -- had you seen Dr. Shuberth's Report?

20   A    Let's see, I'm trying to remember exactly when I

21   saw it.  I think I was waiting from the school -- I was

22   waiting for the school to send me the report because I

23   was told that the Psychologist wanted to go over the

24   report with me but it took a while to get that.

25       Q    Did the Psychologist ever go through the

M.H. - Direct                          152

1    report with you?

2    A    I don't believe so.

3         Q    What was your understanding as to Dr.

4    Shuberth's Report?

5    A    Well, I was really glad she had the evaluation

6    done because I would see that she had -- we suspected

7    it but it was then confirmed that she did have a Math

8    learning disability.

9         Q    And you say that you, "Suspected," that she

10   had a Math learning disability, can you elaborate on

11   that a little bit?

12   A    Well, she had some struggles with memory and

13   calculation and that she just -- that I sort of noticed

14   over the years and it sort of -- it confirmed what I

15   suspected.

16        Q    Did Dr. SHuberth make any recommendations

17   about a follow-up for J.H.?

18   A    Yes, she recommended to have -- to have her tested

19   by an Audiologist.

20        Q    I'm going to refer you to P-34, is this the

21   report that you talked about --

22   A    Yes.

23        Q    -- from the Audiologist?

24   A    Yes.

25        Q    Okay.  I'm going to also refer you back to

M.H. - Direct                                   153

1    P-32, the first page, can you just tell me what that is

2    as well?

3    A    This is a letter from Dr. Shuberth confirming

4    that, "J. meets the criteria for, "F81.2, Specific

5    Learning Disorder with impairment in Mathematics,

6    specifically with fluent calculation, moderate

7    dyscalculia -- dyscalculia."

8        Q    Prior to the first day of school, of public

9    school, did you have any IEP in place?

10   A    For the 2017 school year, no, none that was

11   appropriate.

12       Q    Prior to the first day of school, of public

13   school, did you have an updated 504 Plan in place?

14   A    No.

15       Q    What was the date that J.H. started at the

16   Purnell School?

17   A    I think it was September 11th or about that, if

18   that was a Monday, it was the Monday.

19       Q    As of September 11th had you heard back from

20   the District regarding any changes or modifications to

21   the proposed IEP?

22   A    No.  The only -- I had a conversation with Kendra

23   and Joe and they mentioned that she would be entering

24   the school as a general ed student with a 504 Plan,

25   that was a phone conversation in I think the end of

M.H. - Direct                                154

1    August.

2         Q    Did you have any meeting for updating the 504

3    Plan for the start of the 2017/2018 school year?

4    A    No.

5         Q    Did you have any input into the 504 Plan

6    proposed for the 2017/18 school year?

7    A    No.

8         Q    Did there come a point in time where J.H.

9    started improving and -- emotionally and needed a

10   different environment from home school -- home

11   instruction?

12   A    Yes, in fact when we were talking to Dr. Shuberth

13   at the initial interview -- and I believe that was the

14   beginning of August, she had an interview and she asked

15   J. if she was ready to try and go back to school and

16   she said, "Yes," she was, she was ready to try a new

17   school.

18             THE COURT: To try a new school, is that what

19   you said?

20             THE WITNESS: She said she was ready to try --

21   I don't remember if she said a new school or whether

22   she said a school, I can't -- I don't know for sure,

23   school.

24   BY MS. WARSHAW:

25        Q    I'm going to show you what's been marked

M.H. - Direct                               155

1   P-28, have you seen this document before?

2   A    Yes.

3        Q    And can you briefly describe what this

4   document is and when it's dated?

5   A    Its dated, "August 17, 2017," and it's a letter

6   from Melissa Dolgos talking about what would be the

7   best environment for J. and school.

8        Q    And to your knowledge was this sent to the

9   School District prior to Dr. Shuberth's Report?

10  A    I believe so because I think Dr. Shuberth's Report

11  was like the 21st of August.

12       Q    To your knowledge did Melissa Dolgos ever

13  speak to or have any interactions with Dr. Shuberth

14  regarding your daughter?

15  A    Not that I know of.

16       Q    I'm going to show you what's been marked

17  P-33, have you seen this document before?

18  A    Yes.

19       Q    And can you just briefly tell the Court what

20  this is?

21  A    This is the evaluation by Dr. Platt that was done

22  at the end -- the very end of the summer I believe.

23       Q    To your knowledge did Dr. Platt indicate J.H.

24  Had a Specific Learning Disability?

25  A    Yes.

                         M.H. - Direct                    156

1       Q    Following receipt of this Psychiatric Report,

2    the independent evaluation by Dr. Platt, did the School

3    District indicate that it would change or modify or

4    alter in any way the IEP that was proposed at the May

5    16, 2017 IEP meeting?

6    A    No.

7       Q    What prompted you to unilaterally place your

8    daughter at the Purnell School?

9    A    It was her junior year of high school and we had

10   to make an important decision, we couldn't have her

11   languishing, you know, and maybe getting into the room

12   and maybe not getting into the room at the BSP in

13   Mendham.

14       I couldn't -- we couldn't gamble on that to see if

15   she would -- you know, if she would even walk in the

16   door and to waste weeks and months struggling with her

17   anxiety and trying to even get into a place and then

18   not even have a rigorous curriculum to go -- on top of

19   that, it was just not an appropriate placement for her.

20       Q    Do you believe that you did everything you

21   could to work with the District to come up with an

22   appropriate placement for your daughter?

23   A    Yes, absolutely.  And my I comment about the Platt

24   --

25           THE COURT: No.

M.H. - Direct                            157

1           THE WITNESS: Okay.

2           THE COURT: You can only ask -- answer the

3    questions --

4           THE WITNESS: Okay.

5           THE COURT: -- that are asked.

6           THE WITNESS: Okay.

7           THE COURT: Which I'm sure you're going to be

8    asked in about ten seconds.  Go ahead.

9           THE WITNESS: Okay.

10   BY MS. WARSHAW:

11      Q    What if anything were you impressions with

12   regard to Dr. Platt's Report?

13   A    Well, related to Dr. Platt's Report the -- we

14   repeatedly tried to get this appointment to have it

15   before September and it was held up at the Board

16   Office.  We called multiple times to try and get her in

17   there so we could get a proper consultation and before

18   West Morris started so we would know what to do.

19      Q    I'm going to show you what's bee marked P-35,

20   do you recognize this document?

21   A    Yes.

22      Q    There is no date on this document for when it

23   was written.  Is that correct?

24   A    That is correct.

25      Q    Okay.  Since your daughter started at the

M.H. - Direct                              158

1   Purnell School have you noticed any changes in her?

2   A    Yeah, huge changes.  As my husband commented,

3   she's just a different person now.  It's a very calming

4   experience there because it's set up like a -- almost

5   like a family farm and it's -- she receives a lot of

6   support there.

7        At the Purnell School, even thought it's not

8   technically a therapeutic school, it has a tremendous

9   amount of support and therapy, as she has a Counselor,

10  she has an Advisor, and there is a Learning

11  Psychologist there as well.

12       Q    And with regard to the noise level there has

13  she commented about that?

14  A    Yeah, it's pretty non-existent.  Also, they have

15  -- she has a quiet place where she can rest in between

16  classes.  It's sort of set up like a -- almost like a

17  college schedule that you can go back and rest between

18  classes, it's very quiet there.

19       Q    And academically does she have supports in

20  her classes as well?

21  A    Yeah.  And she also -- her Math Teacher is also a

22  Special Ed Teacher.  I just wanted to let you know, she

23  has a Special Ed Math Teacher and they do what they

24  call, "Reverse learning," where they watch a video and

25  then they do all their work in the class in very small

1    groups, there's maybe six or eight girls in each class.

2    You cannot fall under the crack -- in the crack --

3    under the cracks in that school, it's just not

4    possible, there's -- it's a very small group of people.

5         Q    Do they have any social supports for her?

6    A    They have lots of social supports.  Social

7    therapeutic or social -- in what aspect of social?

8         Q    Do they promote friendships in any way?

9    A    Yeah, absolutely.  She's made two very dear

10   friends and because it's such a small group of girls

11   it's -- it's a family atmosphere.

12        Q    Do they have any group meetings or anything

13   like that that would promote socialization?

14   A    All the time.  I mean, they have morning meetings

15   three times a week, you know, they eat lunch together,

16   it's a very close knit group.

17             MS. HOWLETT: Your Honor, are we testifying

18   based upon a factual basis or personal knowledge?  I'm

19   sorry for -- (out of microphone range)

20             THE COURT: I have no idea, I was waiting for

21   you to object.

22             MS. HOWLETT: Okay.  I've been wanting to, I'm

23   objecting.

24             THE COURT: Okay.  Is this on personal

25   observations or discussions with J.?

M.H. - Direct                                    160

1              THE WITNESS: I'm sorry?

2              THE COURT: Is your testimony based on

3    personal observations or discussions with J.?

4              THE WITNESS: Personal observations.

5              THE COURT: Okay.  I'll allow it.

6    BY MS. WARSHAW:

7         Q    Is your daughter attending the Purnell School

8    every day or is she having any absentee issues?

9         A    Every day.

10        Q    I showed your husband some reports from Megan

11   DuVall and Ms. Glass regarding your daughter at the

12   Purnell School, have -- were you aware of those reports

13   as well?

14        A    Yes.

15        Q    And I also showed your husband report cards

16   from the first few marking periods as well as the third

17   marking period for your daughter at the Purnell School,

18   were you aware of those as well?

19        A    Yes.

20        Q    To your knowledge has J.H. ever been a

21   behavior issue?

22        A    No.

23        Q    Would you consider her a disaffected learner?

24        A    No.

25        Q    Has -- to your knowledge has she ever had a

M.H. - Direct                    161

1    pattern of school failure?

2    A    No.

3         Q    To your knowledge has she ever been defiant

4    of school rules?

5    A    No.

6         Q    Has -- to your knowledge has J.H. ever

7    refused to attend school?

8    A    No.  She didn't refuse to attend school, she was

9    unable to attend school.

10        Q    To your knowledge is the Purnell School one

11   that gets the students into college?

12   A    They have a hundred percent rate of college attend

13   -- attendance.

14        Q    Does the Behavioral Support Program have a

15   hundred percent rate of getting kids into college to

16   your knowledge?

17   A    Not to my knowledge.

18            MS. HOWLETT: Your Honor, I object, I don't --

19   (out of microphone range)

20            THE COURT: Yeah, sustained.

21            MS. WARSHAW: So it's --

22            THE COURT: Well, how does she know that?

23            MS. WARSHAW: I'm just asking, maybe she asked

24   the question, maybe she read about it.

25            THE COURT: And she said, "Not to my

Colloquy                                    162

1      knowledge."

2                  MS. WARSHAW: Okay.  Then not to her

3      knowledge.

4                  THE COURT: Sustained, the question wasn't

5      asked.

6                  MS. WARSHAW: No further questions.

7                  THE COURT: Cross?

8                  MS. HOWLETT: No, I have no questions, Your

9      Honor.

10                 THE COURT: You may step down.  Thank you.

11                 THE WITNESS: Okay.

12                 THE COURT: Somebody is not efficient because

13     we need more witnesses.

14                 MS. WARSHAW: I didn't know who her witnesses

15     were going to be, so I kind of -- (out of microphone

16     range)

17                 THE COURT: You got a witness list, that's all

18     you get.  That's all you get, you keep asking -- you

19     keep raising the same issue.

20                 MS. WARSHAW: I do -- (out of microphone

21     range)

22                 THE COURT: I mean, I tried cases for 35

23     years, you get a witness list, you get -- they don't

24     tell you when they're going to show up, they don't tell

25     you if they're going to call them or not going to call

Colloquy                                          163

1      them.  You get a witness list, that's all you get,

2      that's all you ever get.

3            MS. WARSHAW: I just needed another day --

4      (out of microphone range) So I didn't know, I planned

5      for two witnesses.

6            THE COURT: That's fine, I mean, that wasn't

7      unreasonable.  It was more of a joke on my part that we

8      weren't efficient because we did move quickly.

9            MS. WARSHAW: I wasn't repetitive.  Right?

10           THE COURT: No, no.

11           MS. WARSHAW: Okay.

12           THE COURT: Well, yeah, a little bit but

13     that's okay.  All right.  So when is our next date?

14           MS. WARSHAW: July -- (out of microphone

15     range)

16           THE COURT: It's July?

17           MS. HOWLETT: Yeah, the end of July I think.

18           THE COURT: All right.  That gives you guys

19     plenty of time to go through your respective books and

20     come up with one that has everything.  I understand

21     there's going to be some -- some that's not redundant,

22     but not a lot, and those things that are not redundant

23     that have been -- that have been marked and discussed

24     you could move them when we start.

25           We'll do that on the record and if there's

1    any objection to anything we'll discuss it then and

2    I'll rule on it then.

3              MS. WARSHAW: Okay.

4              THE COURT: I anticipate most of it is going

5    to come in.  All right.  Thank you.

6              MS. HOWLETT: Thank you.

7              MR. H.: Thank you, Your Honor.

8              MS. H.: Thank you.

9              MS. WARSHAW: Thank you.

10             {Whereupon, the proceedings were adjourned.}

11                         * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

165

1    STATE OF NEW JERSEY }

2    COUNTY OF ESSEX      }

3

4            I, Deborah Plyler, assigned transcriber, do

5    hereby affirm that the foregoing is a true and accurate

6    transcript of the proceedings in the matter of <u>F.H. and</u>

7    <u>M.H. On Behalf Of J.H. vs. West Morris Regional High</u>

8    <u>School Board of Education</u>, bearing Docket No. EDS

9    10706-17, heard on April 23, 2018 before the Office of

10   Administrative Law Court.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF NEW JERSEY
OFFICE OF ADMINISTRATIVE LAW
OAL DOCKET NO. EDS 10706-17

_____
                           :
F.H. and M.H. on behalf    :
of J.H.,                   :
                           :
          Petitioner,      :
                           :          TRANSCRIPT
-vs-                       :              OF
                           :      RECORDED PROCEEDINGS
WEST MORRIS REGIONAL       :
HIGH BOARD OF EDUCATION,   :
                           :
          Respondent.      :
_____:


                    July 25, 2018


BEFORE:

     THE HONORABLE THOMAS BETANCOURT, A.L.J.


APPEARANCES:

     WARSHAW LAW FIRM, LLC
     By:  Julie Warshaw, Esq.
     Attorney(s) for the Petitioner

     CLEARY GIACOBBE ALFIERI JACOBS LLC
     By:  Jodi S. Howlett, Esq.
     Attorney(s) for Respondent




                    Transcriber:  Lee A. Romano
                    CRT SUPPORT CORPORATION
                    2082 Highway 35, P.O. Box 785
                    South Amboy, N.J.  08879
                    Phone: (732) 721-4330
                    Fax:   (732) 721-7650

I N D E X                                          2

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| MELISSA DOLGOS | | | | |
| By Ms. Warshaw | 5 | | 61 | |
| By Ms. Howlett | | 45 | | |
| ELLEN M. PLATT | | | | |
| By Ms. Warshaw | 64 | | 97 | |
| By Ms. Howlett | | 88 | | |

E X H I B I T S                                    3

| NO. | DESCRIPTION | I.D. | EVID. |
|-----|-------------|------|-------|
| P-46 | Curriculum vitae of Dolgos | | 12 |

Colloquy                                                    4

1              THE COURT:  This is the continued hearing of

2    F.H. and M.H. on behalf of J.H. v. West Morris Regional

3    High School Board of Education, docket number EDS

4    10706-2017.

5              Today is July 25th and I am Judge Betancourt.

6              Appearances for Petitioner?

7              MS. WARSHAW:  Julie Warshaw, Warshaw Law Firm

8    representing the Petitioners.

9              THE COURT:  Good morning.

10             MS. WARSHAW:  Good morning.

11             MS. HOWLETT:  Good morning, Your Honor.  Jodi

12   Howlett, Cleary Giacobbe Alfieri Jacobs on behalf of

13   Respondent School District.

14             THE COURT:  Good morning.  We finished with

15   your last witness, correct?

16             MS. WARSHAW:  Correct.

17             THE COURT:  So your next witness please?

18             MS. WARSHAW:  Yes.  We call Melissa Dolgos

19   please.

20             THE COURT:  Have a seat.  How are you?

21             THE WITNESS:  Good.  How are you?

22             THE COURT:  Would you raise your right hand?

23   M E L I S S A   D O L G O S, PETITIONER'S WITNESS,

24   SWORN:

25             THE COURT:  State your full name, spell your

Dolgos - Direct                                    5

1    last name.

2              THE WITNESS:  Melissa Ellen Dolgos, D-O-L-G-

3    O-S.

4              THE COURT:  Proceed.

5    DIRECT EXAMINATION BY MS. WARSHAW:

6         Q    Okay.  Hi Ms. Dolgos.  How are you?

7    A    Good.  How are you?

8         Q    Good.  Thank you for coming today.

9              So I'm going to be asking you some questions

10   and then I just ask if you keep your voice up because

11   it -- everything is being recorded today.  Okay?

12   A    Okay.

13        Q    If you have any questions just let us know.

14   Okay?

15   A    Okay.

16        Q    Can you tell us where you are employed?

17   A    Immediate Care Children's Psychiatric Center.

18        Q    And is that also ICCPC?

19   A    Yes.

20        Q    Okay.  How long have you been employed there?

21   A    Three years.

22        Q    And could you please tell the Court what's

23   the highest degree that you hold?

24   A    I have a Masters of Arts and I have my license --

25   my license associated counselor degree.

Dolgos - Direct                                    6

1        Q    And what is your current job title?

2     A    Senior clinician.

3        Q    And what are your job responsibilities?

4     A    My job responsibilities are to conduct family and

5     individual therapy sessions along with group family --

6     group therapy sessions.  Also, you know, I am in charge

7     of trying to help the interns and provide

8     administrative or clinical advice.

9        Q    And how long have you held the title that you

10    have right now?

11    A    I've held that I think for about almost two years

12    now.

13       Q    And what title did you hold before that?

14    A    Just a regular clinician.

15       Q    Are you supervised by a licensed

16    psychiatrist?

17    A    Yes.

18       Q    And who is that?

19    A    Dr. Srinivasan.

20            THE COURT:  Spell that.

21            THE WITNESS:  S-R-I-N-I-V-A-S-A-N.

22            THE COURT:  Thank you.

23    BY MS. WARSHAW:

24       Q    And do you consult with Dr. Srinivasan on a

25    regular basis?

1    A    Yes, every day.

2         Q    And do you consult with Dr. Srinivasan on

3    your clients?

4    A    Yes.

5         Q    And when you were the counselor for J.H. did

6    you consult with Dr. Srinivasan on a regular basis

7    about J.H.?

8    A    Yes.

9         Q    Could you please tell the Court about where

10   you went to school?

11   A    I went to Fairleigh Dickinson University for

12   graduate school and East Stroudsburg University for

13   undergraduate.

14        Q    And I'm going to show you --

15             MS. WARSHAW:  May I approach the witness?

16             THE COURT:  Please.

17   BY MS. WARSHAW:

18        Q    Okay.  I'm going to give you a binder.  Okay?

19   A    Okay.

20        Q    I want you to turn to exhibit 46.

21             THE COURT:  Which binder are we --

22             MS. WARSHAW:  The Plaintiff's, P-46.

23   BY MS. WARSHAW:

24        Q    Do you recognize this document?

25   A    Yes.

Dolgos - Direct                                    8

1          Q    And can you tell the Court what this is?

2     A    This is my curriculum vitae.

3          Q    And could you briefly tell the Court your

4     employment history?

5     A    So prior to Immediate Care I worked at Gen Psych

6     which is another partial hospitalization and IOP

7     program for about two years and before that I worked at

8     a residential facility for a few months when I was

9     licensed.  Prior to my license I had experience as case

10    management with mentally ill clients at Easter Seals.

11         Q    And ICCPC, is that a full hospitalization

12    program or a partial hospitalization program?

13    A    Partial.

14         Q    Your curriculum vitae says that you have

15    experience in group individual counseling for

16    adolescents.  Can you just briefly describe a little

17    bit more about what you do with that?

18    A    Yes.  So -- the program is a day program from nine

19    a.m. to 2:30 p.m. and there's five groups a day.

20    Groups are varied on different topics such as anxiety,

21    school issues, family issues, pretty much a variety of

22    topics every day.  They -- they change.  They also get

23    some kind of cognitive behavior therapy and --

24    dialectal behavior therapy and art therapy.  So --

25         Q    And can you describe the program that J.H.

Dolgos - Direct                                                              9

1    was involved in?

2    A    Yes.  She was there -- she was in after school for

3    a little bit which is a four to seven program for three

4    hours a day and then she was in the day program and

5    it's the same kind of group criteria.  They don't

6    change.  It just varies from three hours to five hours

7    a day.  She also got individual therapy with me and

8    family therapy.

9        Q    And your curriculum vitae indicates that you

10   have extensive experience working with -- in

11   therapeutic settings.  Can you briefly describe a

12   little bit more about the therapeutic settings that

13   you've had experience with?

14   A    Yes.  The therapeutic settings are, you know, this

15   is an intensive level of care.  So it's the next level

16   from inpatient hospitalization.  So I've had a lot of

17   experience with that with immediate care and then Gen

18   Psych.  Prior to that was a higher level of care called

19   residential.  So that was really intensive therapy and

20   then prior to that was more of an outpatient therapy

21   basis.  I've had experience in all of that.

22       Q    Okay and your curriculum vitae indicates that

23   you were trained in dialectic behavior therapy?  Can

24   you explain to the Court what that is?

25   A    So yeah when I was at Gen Psych they had us do a

1    40 hour intensive training of dialectical behavior

2    therapy which are, you know, pretty intense modules for

3    people that have a lot of emotional disregulation,

4    impulsivity, -- they need help with mindfulness and

5    they need help with a lot of family and teenage

6    dilemmas.

7        Q    Are you familiar with individual education

8    programs or IEPs?

9    A    Yes.

10       Q    Could you briefly describe your experience

11   with IEPs?

12   A    Most of the kids that come to this higher level of

13   care have an IEP through the school district.

14       Q    And what is your experience working with

15   children with anxiety?

16   A    I have a lot of experience with that.

17       Q    Can you -- is -- is anxiety one of the

18   primary issues that you deal with at ICCPC?

19   A    Yes, among -- among others yes.  Anxiety is pretty

20   primary.

21       Q    And what if any experience do you have

22   working with children with specific learning

23   disabilities?

24   A    I have experience with that as well.  We have a

25   lot of ADHD or Asperger clients that need a lot of

Dolgos - Direct                                      11

1    adjustment in how they're learning and adjustment in

2    the groups.  So --

3                MS. WARSHAW:  Your Honor, at this time I'd

4    like to enter P-46 into evidence and offer Melissa

5    Dolgos as an expert.

6                MS. HOWLETT:  Your Honor, we have no -- the

7    Respondent has no objection to P-46, but I'm not sure

8    what this --

9                THE COURT:  Yeah.  There's no proffer --

10   she's an expert in what?

11               MS. WARSHAW:  She's an expert in counseling

12   adolescents and anxiety.

13               MS. HOWLETT:  Your Honor, there's been no

14   expert report presented and based upon the testimony

15   and the voir dire by the Counsel I -- I don't think

16   that they've met the burden to show that she's an

17   expert in counseling adolescents and anxiety.

18               THE COURT:  I agree.

19               MS. WARSHAW:  Your Honor, we have several

20   letters that said she was a treating psychologist or

21   therapist for J.H. throughout this process.  We have

22   multiple letters from her that the District has

23   accepted and has used in their determinations for their

24   IEP regarding this student.  I'm happy to ask her more

25   questions if you'd like regarding that, but she was a

Dolgos - Direct                              12

1    treating counselor for this -- this individual.

2              THE COURT:  In anxiety, specific to anxiety.

3    You didn't give me anything about anxiety her training

4    or background in it at all.

5              MS. WARSHAW:  Okay.  I'm --

6              THE COURT:  Other than that she --

7              MS. WARSHAW:  -- happy to ask more questions

8    --

9              THE COURT:  -- other than that she sees lots

10   of kids with anxiety.

11             MS. WARSHAW:  I'm happy to ask --

12             THE COURT:  Go ahead.

13             MS. WARSHAW:  -- her more questions.

14                                  (P-46 was received

15                                   in evidence.)

16   BY MS. WARSHAW:

17        Q    Okay.  Ms. Dolgos, can you specifically state

18   your experience dealing with adolescents and anxiety

19   with regard to any of your employments that you had?

20   A    Yes.  So in -- within the facilities that I've

21   worked there have been kids that come in with

22   generalized anxiety or, you know, phobia disorders,

23   agoraphobia.  So through experience I've learned how to

24   manage kids with anxiety, you know, work with schools

25   and making adjustments and families making adjustments

Dolgos - Direct                                    13

1    to help understand the concept of anxiety and how

2    overwhelming it is.

3         Q    And through your training have you had any

4    specific certifications that you've received or

5    anything regarding anxiety or depression?

6    A    Just that dialectical behavior therapy which is a

7    -- component of various disorders.

8              THE COURT:  What was that?

9              THE WITNESS:  The dialectic behavior therapy

10   certification, the 40 hour training that I had done.

11   It didn't cover any specific disorder.  It covered a

12   variety of disorders.  It's primarily made for

13   borderline personality, but it incorporates with a lot

14   of other diagnoses.

15   BY MS. WARSHAW:

16        Q    And how long have you been -- let's go back

17   to your experience with ICCPC.  Can you describe for me

18   the number of patients that you have that you counsel

19   regarding anxiety, depression and school related

20   issues?

21   A    All the kids that come to the program have school

22   related issues.  They are not able to function or go to

23   school.  So that's why they come to the higher level of

24   care.  So, I mean, typically we have a case load of

25   about 40 to 60 kids and I would say almost all of them

1   have anxiety or depression.

2        Q    And you meet with them individually for

3   counseling?

4   A    Yes.  Not all 40 or 60, but yes.

5        Q    How many sessions do you run per week of

6   individual counseling?

7   A    Two to three sessions a week.

8        Q    And are they with the same students or with -

9   - do they vary?

10  A    They vary.

11       Q    So in a program such as yours how often does

12  a student see you for counseling?

13  A    With -- on my case load which I can hold up from

14  ten to 14 clients, that -- I at least see them two to

15  three times a week.  So it is the same clients.  It's

16  just not just the one client.  I guess I was confused

17  by your question with varying.  Yeah.

18       Q    Okay and when you worked for Gen Psych you

19  had the title of therapist.  Is that accurate?

20  A    Yes.

21       Q    Okay.  So in that setting your curriculum

22  vitae indicates that you provided individual therapy to

23  adolescents and adults and those with special needs.

24  Can you describe for me the therapies that you

25  conducted in -- at Gen Psych?

Dolgos - Direct                    15

1    A    Yes.  So it was the same concept of group and

2    individual and family therapy.  I had to adjust, you

3    know, the methods that I used for the clinical

4    background depending upon what the kids' needs were or

5    the adults.

6         Q    And have you ever completed any in service

7    trainings?

8    A    Yes.

9         Q    And can you describe for me whether or not

10   they relate to training in dealing with children with

11   anxiety, depression, school related issues?

12   A    Yes.  I've also been to conferences related to

13   anxiety, social anxiety, school anxiety and in service

14   wise, you know, ADHD and learning disorders and anxiety

15   as well.  So --

16        Q    And what type of -- can you describe for me

17   approximately how many conferences you've been to and -

18   - and if you recall who ran those conferences?

19   A    It was an NJCA conference.  It was a New Jersey

20   conference.  I can't -- it was various people running

21   it, but they -- I've been to about three of the all

22   weekend conferences.

23        Q    And you also dealt with students in crisis on

24   the hotline at Gen Psych.  Is that accurate?

25   A    Yeah.

Dolgos - Direct                              16

1      Q    Can you describe for me what issues you face

2  with the hotline as well?

3  A    That was more for danger to self, suicide risk,

4  self harm.

5      Q    And do -- did many of those people that you

6  spoke to have issues with anxiety and depression?

7  A    Yes.  A lot of times it was more over thinking,

8  worrying, a lot of the underlying issues of anxiety.

9      Q    And you also have experience as a New Jersey

10 mentor.  Can you describe for me the therapy that you

11 provided to those adolescents and whether or not it

12 related to anxiety, depression, school related issues?

13 A    Yes.  That was more intensive level.  That was

14 residential.  So it was more -- it -- it wasn't

15 necessarily anxiety at that point, but it was more

16 behavioral issues.

17     Q    And have you -- have you yourself run any in

18 service trainings for other employees or staff

19 regarding anxiety, depression or school related issues?

20 A    Yeah.  We had in service at ICCPC not too long ago

21 about deconstructing anxiety and -- and how to get to

22 the core root of it.

23          THE COURT:  Did you run that?

24          THE WITNESS:  I did not run it.  I learned it

25 at the conference and then we had to reteach it to the

1    staff.

2    BY MS. WARSHAW:

3         Q    So were you one of the people who retaught it

4    to the staff?

5    A    Yeah, myself and -- and one of my coworkers.

6         Q    And do you have any other experience with

7    degrees or conferences or in service trainings that you

8    have experience in the areas of anxiety, depression and

9    school related issues?

10   A    Not that I can think of.

11              THE COURT:  Have you ever testified in court

12   before as an expert?

13              THE WITNESS:  No.

14              THE COURT:  Have you written any articles

15   regarding anxiety that have been --

16              THE WITNESS:  No.

17              THE COURT:  I'm not going to qualify her as

18   an expert.  You can ask her questions in her capacity

19   as a counselor at ICCPC and --

20              MS. WARSHAW:  Okay.

21              THE COURT:  -- give it whatever weight I deem

22   appropriate.

23              MS. WARSHAW:  Okay.

24              THE COURT:  And that's no disrespect meant to

25   you.

Dolgos - Direct                                        18

1          THE WITNESS:  No.  I -- yeah -- it's okay.  I

2    have a lot of experience.  I would not say I'm an

3    expert either.

4    BY MS. WARSHAW:

5          Q    Ms. Dolgos, did you have the opportunity to

6    meet and work with my client, J.H.?

7    A    Yes.

8          Q    Okay.  Can you tell me how long you worked

9    with J.H.?

10   A    I had her from October 2016 to December 2016 and

11   then from January 2017 to June 2017.

12         THE COURT:  Give me those dates again please.

13         THE WITNESS:  It was October to December of

14   2016 and then it was January to June of 2017.

15         THE COURT:  Thank you.

16         THE WITNESS:  You're welcome.

17   BY MS. WARSHAW:

18         Q    And in what capacity did you work with J.H.?

19   A    I worked with her as her primary clinician.  So I

20   was the person that she would go to for individual

21   therapy, crisis management.  I also had her in groups a

22   couple times and I did family work with her and her

23   parents.

24         Q    Okay.  Can you turn to exhibit P-15?

25   A    Okay.

Dolgos - Direct                                    19

1          Q     Do you recognize this document?

2     A     Yes.

3          Q     And --

4               MS. HOWLETT:  I think this was remarked as a

5     joint exhibit.

6               THE COURT:  I --

7               MS. WARSHAW:  Okay

8               THE COURT:  Not to beat a dead horse, I -- I

9     don't want to be going back between the three binders

10    now.

11              MS. HOWLETT:  Yeah.  It was remarked as joint

12    12, Your Honor.  J -- J-12.

13              THE COURT:  Before we move on, we'll work --

14    we'll work that way through it.  I don't want to

15    disrupt the hearing.  When we're done today you're

16    going to cull what's out of your -- out of your binder

17    -- respective binders that's now a joint exhibit and

18    just you can email me or let me know so I'll pull it

19    out so it's not in and let me know if it's in evidence

20    and you can remark it as a joint exhibit.  When I have

21    to go to write this up I really don't want to work out

22    of three binders with the same --

23              MS. WARSHAW:  Understood, Your Honor.

24              THE COURT:  Okay.  So what's the number now?

25    J what?

1            MS. HOWLETT:  J-12.

2            THE COURT:  Thank you.

3            MS. HOWLETT:  I believe is what Counsel's

4    referencing.

5    BY MS. WARSHAW:

6        Q    Have you seen this document before?

7    A    Yes.

8        Q    Okay.  Can you tell me the date of this

9    document?

10   A    October 20th, 2016.

11       Q    And did you sign this document?

12   A    Yes.

13       Q    Did you write it?

14   A    Yes.  I cowrote it with Dr. Srinivasan.

15       Q    And can you describe for the Court what this

16   document says?

17   A    It is just a letter to notify the school that J.

18   was admitted to the program and the expectation that we

19   have for her length of stay and also since she will be

20   missing school we wanted her to get the tutoring

21   services that we offered.

22       Q    And this letter's addressed to who?

23   A    To West Morris Central, the high school and then

24   it was attention Joe -- Joe Cusack (phonetic) because

25   he was the contact I had.

1         Q    And in this letter you requested home

2    instruction for the purposes of what?

3    A    Since she's missing school we have to request that

4    she gets an educational component.

5         Q    Do you recall why J.H. was admitted to the

6    partial hospitalization program?

7    A    Yes.  She came in with severe depression and

8    anxiety.

9         Q    And was that anxiety related to anything

10   specific?

11   A    It was a lot of anxiety related to school.

12        Q    During the time that J.H. was in the partial

13   hospitalization program did you notice any

14   improvements?

15   A    Yes.

16        Q    Can you describe for me what those

17   improvements were?

18   A    Yeah.  With -- over time with the individualized

19   attention that she received and our groups are small.

20   We have about, you know, five to six kids per group,

21   and I think that that smaller atmosphere helped her to

22   start to open up socially and engage and -- and

23   therapeutic needs that she had for group.

24        Q    Okay.  Can you turn to the next exhibit?

25             MS. HOWLETT:  Did we admit that?

                              Dolgos - Direct                    22

1      BY MS. WARSHAW:

2           Q    It's going to be J-13.  You're going to have

3      P-16 --

4                THE COURT:  No, no.  We're not --

5                MS. WARSHAW:  -- in your binder.

6                THE COURT:  -- cross-referencing.

7                MS. WARSHAW:  Just for -- for the witness,

8      because that's in her binder.

9                THE COURT:  Here.

10               MS. WARSHAW:  That's all.

11               THE WITNESS:  J-13?

12     BY MS. WARSHAW:

13          Q    J-13.

14     A    Okay.  Okay.

15          Q    Do you recognize this document?

16     A    Yes.

17          Q    And who signed this document?

18     A    Myself and Dr. Srinivasan.

19          Q    And did you --

20               THE COURT:  Please describe it for us.  It's

21     a letter?

22               THE WITNESS:  It is a letter.  Yes.

23               THE COURT:  Dated?

24               THE WITNESS:  To West Morris Regional High

25     School dated 12/2/2016.

Dolgos - Direct                                        23

1              THE COURT:  12/2/16?

2              THE WITNESS:  Yes.

3              THE COURT:  Thank you.

4       BY MS. WARSHAW:

5          Q    And did you consult with Dr. Srinivasan in

6       writing this document?

7       A    Yes.

8          Q    And you both signed it?

9       A    Yes.

10         Q    And can you please tell the Court what this

11      document is about?

12      A    It is the medical clearance for J. to return to

13      school and the transition plan.

14         Q    And can you describe what the transition plan

15      would be?

16      A    Half days of school in the mornings and then

17      coming to ICCPC in the afternoon.  We usually start off

18      with half day transitions for kids that have the higher

19      level of care to go back to school.

20         Q    And can you recall why J.H. was medically

21      cleared to return to school?

22      A    As I stated before she was doing a little bit

23      better in groups, you know, and -- and she was a little

24      bit more social and we -- she was willing to try to go

25      back to school with the help and support of ICCPC.

Dolgos - Direct                                           24

1       Q    Did you receive any response to this letter

2    from the School District?

3    A    No.  They just needed the letter.

4       Q    Okay and can you describe for me what in

5    general you look at as far as improvement for J.H. and

6    what factors you used to determine whether or not she

7    was ready to return to school in December of 2016?

8    A    With the higher risk behaviors that she came in

9    with had to have been decreased and, you know, coping

10   skills had to be in place and demonstration that she

11   was implementing them and just an improvement in mood

12   and affect and of course Dr. Srinivasan had medication

13   management which I think also helped with the mood.  So

14   --

15      Q    And what is your understanding as to what

16   happened to J.H. when she tried to return back to

17   school in December 2016?

18   A    She went back, I think I encouraged her to try a

19   couple days.  She went back two days and she just had a

20   lot of anxiety when she went back.

21      Q    And --

22           MS. HOWLETT:  Your Honor, is this personal

23   knowledge or is this --

24           THE COURT:  I was thinking the same thing.

25           MS. WARSHAW:  I was --

1   BY MS. WARSHAW:

2        Q    Is -- based on what you've just testified to,

3   can you describe for me whether or not that was told to

4   you by someone or did you observe that yourself?

5   A    No.  I -- I observed that.  I -- from her -- from

6   the notes that I've had in the past and everything she

7   went back two days.

8        Q    And during those two days were you in touch

9   with J.H. at all?

10  A    Yes.  She was coming to program for the half days.

11       Q    Okay.  So did she tell you what she was

12  feeling during those two days when she went back to

13  school --

14  A    Yes.

15       Q    -- in December 2016?

16  A    Yes.

17       Q    And did you observe her in an anxious state

18  during those two days?

19  A    Yes.  She did come back to program quite anxious.

20       Q    And can you describe for me what you did as a

21  result of her anxious state?

22  A    I tried to work with her on what we could do to

23  make school, you know, help her to feel better at

24  school.  I tried to contact, you know, the school

25  regarding maybe the 504 plan that we could implement

1    for her to make it more comfortable and I worked with I

2    think, you know, Mom and Dad as well on what we could

3    do as a team to help J. go to school.

4         Q    And did you contact somebody at the School

5    District about the 504 plan?

6    A    Yeah.  Joe Cusack was my -- was my contact.

7         Q    And what if anything occurred during that

8    conversation?

9    A    They were willing to implement what was written on

10   the 504 plan.  They were willing to try or to maybe try

11   a different program if that wouldn't work.  I think

12   they were considering ESS for her.

13        Q    What's ESS?

14   A    Effective School Solutions.

15        Q    And to your knowledge did they ever amend a

16   504 plan?

17   A    I don't know.  I didn't have follow up with that.

18             THE COURT:  Can you describe to me what

19   Effect, because I never heard that before?

20             THE WITNESS:  Effective School Solutions?

21             THE COURT:  Yes please.

22             THE WITNESS:  It's a specialized program

23   within the public high school that has like smaller

24   classes, more contained classes, but usually you need

25   an IEP for that which is the individualized education

1    plan which she didn't have at the time.

2              THE COURT:  Thank you.

3    BY MS. WARSHAW:

4         Q    And during those two days that J.H. was --

5    had a difficult time at school, what if anything was --

6    was the outcome of the counseling that you provided for

7    her?

8    A    So the outcome was that, you know, she at least

9    did what -- she was willing to try to go to school

10   which, you know, was really great on her part, because

11   most of the kids, you know, if they're defiant or

12   behavioral they won't go to school, which J. was

13   willing to try.  Her anxiety just overwhelmed her.

14        Q    As J.H.'s counselor, did you find that her

15   behavior was willful or defiant in any way?

16   A    No.

17        Q    With your knowledge of J.H., do you believe

18   that J.H.'s anxiety was a conscious behavior or

19   something that was over -- that she was overwhelmed

20   with?

21   A    I think she was just really overwhelmed and not

22   ready to, you know, really utilize coping skills

23   effectively at that time because the anxiety was

24   severe.

25        Q    And after those two days in December of 2016,

Dolgos - Direct                                      28

1     do you know if J.H. went back to school?

2     A     I'm sorry.  What date?

3          Q     After those two days in December of 2016 when

4     she tried to go back to school and was anxious, to your

5     knowledge did she go back to school after that?

6     A     No.

7          Q     And it was your understanding that for the --

8     in December when she was trying to go back to school

9     that she was supposed to return to school on a full

10    time basis?

11    A     No.  We typically do the half day transition and

12    we would contact them when she's ready to go back full

13    time.

14         Q     And in -- in your December 2nd, 2016, letter

15    did you make any other recommendations to the School

16    District?

17    A     Just with the 504 and accommodations that she

18    would need going back due to the anxiety, such as like

19    taking breaks or, you know, maybe trying to take tests

20    in a private room.

21         Q     And at the time that you and Dr. Srinivasan

22    wrote the December 2nd, 2016, letter did you feel that

23    J.H was suffering from anxiety in any other areas of

24    her life aside from attending school?

25    A     No -- just school and social peer related anxiety.

Dolgos - Direct                                      29

1          Q    And does your -- sorry -- does your December

2     2nd, 2016, letter include any other recommendations

3     regarding her being successful at school?

4     A    Just the coping skills and breaks that we

5     recommended.

6          Q    Who came up with these recommendations for

7     J.H. to be successful at school?

8     A    Well, I collaborate with Dr. Sriniavasan on a

9     regular basis, but we have a -- a weekly team meeting.

10    So we talk about the case more in depth then and

11    together we kind of decided that's what maybe benefit

12    J., but we also have to go through, you know, sorry,

13    J.H. and her family to discuss that.  So --

14         Q    And was J.H. part of that discussion?

15    A    Yes.  After I -- I -- I collaborated with the

16    Doctor I collaborated with J.H. and the family to see

17    if they were in agreement.

18         Q    To your knowledge did J.H. ever receive a 504

19    plan?

20    A    I -- I don't think so.

21              THE COURT:  Do you know or you don't know?

22              THE WITNESS:  I don't know.  She discharged

23    shortly after the December period.

24              THE COURT:  Thank you.

25    BY MS. WARSHAW:

1    Q    Did the School District to your knowledge

2    consult with you or Dr. Srinivasan when they -- when

3    they wrote a 504 plan?

4    A    No.

5    Q    Based on your knowledge of J.H., did she ever

6    have any behavior issues?

7    A    No.

8    Q    To your knowledge if J.H. was around others

9    with behavior issues do you think that would have

10   affected her positively or negatively?

11   A    Negatively.

12   Q    And why would you say that?

13   A    With J.'s -- sorry -- J.H.'s anxiety the way it

14   was, she was highly affected by loud noises and -- and

15   peers that had a lot of severe issues and would be loud

16   and inappropriate in groups.  So a lot of times she

17   would need to take breaks which portrayed in school

18   settings.

19   Q    Okay.  I'm going to show you what's been

20   marked J-14.  Do you recognize this?

21   A    Yes.

22   Q    Can you tell the Court what this is?

23   A    This is a letter dated January 6th, 2017.

24        THE COURT:  January 6th?

25        THE WITNESS:  Yes.

Dolgos - Direct                                31

1          THE COURT:  Thank you.

2          THE WITNESS:  To Joe Cusack.

3     BY MS. WARSHAW:

4          Q    And who signed this letter?

5     A    Myself and Dr. Srinivasan.

6          Q    And did you consult with Dr. Srinivasan with

7     writing this letter?

8     A    Yes.

9          Q    Can you describe for the Court what this

10    letter says?

11    A    It's a recommendation for her to be assessed for

12    an individualized education plan, IEP.

13         Q    And what was the basis for recommending that

14    she be assessed for an IEP?

15    A    Because she had difficulty returning to school in

16    December and she needed I think more intensive

17    accommodations due to the severity of her anxiety.

18         Q    Okay.  There is a sentence in this letter.

19    Can you tell me what this means, "J.H.'s anxiety has

20    also prevented her from being able to attend a regular

21    high school as she feels judged, pressured and scared?"

22    A    So as she reported in sessions there was a lot of

23    fear of the large hallways, the noises, the peers in

24    the school.  She felt a lot of judgment from the peers

25    as she did not relate to them.

Dolgos - Direct                                         32

1        Q    Do you recall why she didn't relate to the

2   peers?

3   A    She has a lot of social anxiety to begin with and

4   it was difficult for her to connect with peers and it

5   was just a lot of them had a lot of -- they were loud

6   and already friendly and it just scared her to be a

7   part of that.

8        Q    Can you also describe what you meant in your

9   letter when you said, "J.H. greatly improved while in

10  program.  Does in fact that she is able to be in small

11  group -- small class group settings process her

12  feelings and emotions and receive more individualized

13  attention from school work."

14  A    Um-hum.

15       Q    Can you describe what you meant by that

16  sentence?

17  A    So since the groups are small with approximately

18  five to six kids per group, if they get larger we

19  usually end up splitting the groups in our program, she

20  seemed to be more comfortable when that happened,

21  because sometimes the groups were a little bit larger

22  and she did get more anxiety when that happened and

23  then she had individualized tutoring since she was out

24  of school which she seemed to excel with.

25       Q    And you indicated in this letter that she

Dolgos - Direct                                    33

1    greatly improved when she received more individualized

2    attention for school work.  Can you describe or can you

3    give some examples as to what she excelled in when she

4    had the individualized work?

5    A    She just seemed to have better grades, the anxiety

6    seemed to decrease.  I can't talk about the academic

7    component itself, because I wasn't -- that's a separate

8    component from the clinical, but yeah.

9         Q    Did J.H. ever report to you that that was a -

10   - a better learning environment for her?

11   A    Yes.  She said that it was better to have somebody

12   walk her through the steps and to be more patient with

13   her.

14        Q    You indicated in your letter dated January

15   6th, 2017, that one of J.H.'s diagnosis was axis four

16   educational social support.  Could you tell me what

17   that means?

18   A    So that means -- like there's primary stressors

19   upon diagnosis and the primary stressor for her was

20   education which is why she was, you know, having a hard

21   time with going back to school and then social support

22   meaning that there was a lot of lack of peer support

23   that she had, a lot of social anxiety, very little

24   social support outside of the immediate family.

25        Q    To your knowledge did J.H. have friends at

Dolgos - Direct                                34

1    the regular high school?

2    A    No.

3              MS. HOWLETT:  Your Honor, again is this

4    personal knowledge or --

5              THE WITNESS:  This is what --

6              MS. WARSHAW:  I asked her if it was --

7              THE COURT:  She was answering.  Go ahead.

8              THE WITNESS:  That's what J. report -- sorry

9    -- J.H. reported to me.

10             THE COURT:  You could say J.

11             THE WITNESS:  Okay.

12             THE COURT:  Just when the transcripts get

13   done it's going to get washed out.

14             THE WITNESS:  Okay.

15             THE COURT:  And --

16             THE WITNESS:  I'm like --

17             THE COURT:  They'll put the initials in.  So

18   you don't have to worry about it.

19             THE WITNESS:  Okay.

20             THE COURT:  All right.

21             THE WITNESS:  That's what, you know, I mean I

22   did work with her on social aspects a lot.  She did

23   have friends at times, but there was a lot of anxiety

24   that caused her to not maintain friendships,  a lot of

25   fear of judgment, worrying,  over analyzing things that

Dolgos - Direct                                    35

1    peers would say.  So it affected her friendships.

2    BY MS. WARSHAW:

3         Q    To your knowledge did J.H. have a learning

4    disability?

5    A    Not to my knowledge, but there is no evidence for

6    that.

7         Q    And you also indicated in your letter dated

8    January 6th, 2017, that J.H. had major depressive

9    disorder, recurrent severe without psychotic features

10   and generalized anxiety disorder.  Can you describe for

11   the Court what that means?

12   A    So depression would mean, you know, sadness,

13   isolation, sometimes suicidal thoughts, you know, low

14   self esteem.  Without psychotic features just means

15   that she didn't have delusions or hallucinations.

16   There was no, you know, psychosis and generalized

17   anxiety is basically having anxiety on a regular basis

18   caused by various issues with peers in school and --

19   and family.

20        Q    I'm going to show you what's been marked J-

21   16.  Can you tell me what that is?

22   A    This is dated March 15th, 2017, and it's a

23   psychiatric evaluation.

24             THE COURT:  By whom?

25             THE WITNESS:  By Dr. Srinivasan.

1    BY MS. WARSHAW:

2         Q    Did you consult with Dr. Srinivasan regarding

3    what to include int his evaluation?

4              MS. HOWLETT:  Your Honor, did she prepare

5    this evaluation?  This appears to be signed by the

6    Doctor.

7              MS. WARSHAW:  I'm just asking her if she --

8              THE COURT:  She asked her -- I'm going to

9    allow that question.  Go ahead.

10             THE WITNESS:  We did -- we did talk about him

11   doing the evaluation and he took initiative on writing

12   it himself and preparing the questions and the wording

13   himself, but we did talk about him doing the

14   evaluation.

15   BY MS. WARSHAW:

16        Q    Okay.  Were you aware of what the evaluation

17   said regarding J.H.?

18   A    He shared it with me after he wrote it.

19             THE COURT:  I'm not going to allow her to

20   testify about somebody else's report.

21             MS. WARSHAW:  I understand.  This is already

22   -- it is a joint exhibit.

23             THE COURT:  Okay.

24             MS. WARSHAW:  So --

25             THE COURT:  But I don't need her to interpret

Dolgos - Direct                           37

1      it.  If Dr. S. is going to come in, great.

2                   MS. WARSHAW:  Okay.

3                   THE COURT:  If he's not going to come in, I

4      can read it myself.

5                   THE WITNESS:  Okay.

6                   THE COURT:  Okay.  And I said "Dr. S.,"

7      because I can't pronounce his name.

8                   THE WITNESS:  We call him Dr. S. anyway.

9                   THE COURT:  There you go.  See that.

10                  THE WITNESS:  Yes.

11     BY MS. WARSHAW:

12          Q    Did you ever discuss with Dr. Srinivasan an

13     appropriate educational placement for J.H.?

14          A    Yes.

15          Q    And can you describe for me what that

16     discussion was?

17          A    Basically we -- we both agreed that it was better

18     for her to be in a smaller educational environment,

19     that would help her with her, you know, learning needs

20     and her anxiety.

21          Q    Did there ever come a time when you were made

22     aware of the District's intention to place J.H. in a

23     different high school in the District in a self

24     contained behavior class?

25          A    Yes.  They did mention that.

Dolgos - Direct                          38

1      Q    And who mentioned that to you?

2      A    Joe Cusack I -- I believe mentioned that.  I'd

3      have to check.

4           Q    And did he describe to you what that program

5      was?

6      A    Yeah.  That would be the Effective School Solution

7      program, the ESS program.  It's a smaller component of

8      the regular high school that would have contained

9      classrooms and they have therapists there as well.

10          Q    And was it your understanding that J.H. would

11     have to go to another large high school to get to that

12     program?

13     A    Yes.

14          Q    Was that a learning environment that you and

15     Dr. Srinivasan agreed with?

16     A    No.

17          Q    Can you describe why?

18     A    Him and I discussed how, you know, we just

19     encouraged J. to go look -- J. to go look at it and she

20     did go look at it from the records that I remember in

21     my notes, but she -- it was still too large of a school

22     environment for her.  She did better in the

23     individualized setting like in our program.  So we

24     recommended something that was a little bit smaller

25     even than that program.

Dolgos - Direct                                    39

1      Q      In general are there various underlying

2      factors that can cause anxiety?

3      A      Yes.

4             Q      And in general does anxiety affect people

5      differently?

6      A      Yes.

7             Q      Do you have an opinion as to -- based on your

8      treatment of J.H. as to the underlying cause of her

9      anxiety, if -- if you haven't already stated it?

10     A      Most of her anxiety did stem from educational and

11     social support that we talked about.

12            Q      Did there come a time when you were made

13     aware that the school district wanted to classify J.H.

14     as emotionally disturbed?

15     A      Yes.

16            Q      And did you agree with the proposed

17     classification emotionally disturbed?

18     A      No.

19            Q      Can you describe why?

20     A      Most of the kids that have emotionally disturbed

21     as the diagnoses in the IEP are behavior, like

22     oppositional defiant kids or kids that have more severe

23     issues.

24            Q      Did you ever review any of the evaluations

25     conducted by the District in support of their proposed

Dolgos - Direct                    40

1    IEP?

2    A    Yeah, it was shared with me after it was written.

3         Q    Do you recall who shared it with you?

4    A    I believe Mom gave me a copy of it.

5         Q    Do you ever recall reviewing an educational

6    evaluation by the School District?

7    A    The -- the IEP plan, is that what you're asking?

8    Did I --

9         Q    Did you -- do you recall any educational

10   evaluation conducted by a child study team?

11   A    No.  Dr. Srinivasan had to do the report.

12        Q    Okay.  Based on your experience as a

13   therapist, can you comment as to whether or not you

14   think learning disabilities can cause anxiety for

15   students?

16   A    Yes.  They can.  If there's difficulty focusing,

17   frustration with, you know, not understanding something

18   in -- in a classroom, but they have fear of asking for

19   help, that can all lead to anxiety.

20        Q    Do you typically review IEPs for your

21   patients?

22   A    Yes.

23        Q    Showing what's been marked J-19.  Can you

24   tell me what date this is?

25   A    This is dated August 17th, 2017.

1      Q    And can you describe what this document is?

2      A    This is a letter, just describing to the school

3      J.'s anxiety and the effects that it has on her

4      education.

5      Q    And did you write this letter?

6      A    I did.

7      Q    Can you describe for the Court specifically

8      what this letter says?

9            MS. HOWLETT:  Your Honor, I'm going to object

10     to the witness' testimony on the basis of Your Honor's

11     order regarding the snapshot rule and the evidence

12     presented as this letter's dated after the IEP was

13     presented in April 2017.  This letter is dated in

14     August 2017.  Pursuant to Your Honor's order, "The

15     Petitioner shall be permitted to submit evidence dated

16     after the date of the IEP only for the purpose of

17     demonstrating that the District failed to comply with

18     the IDEA after the date of the IEP."  It appears that

19     this testimony is going to be substantive as to what

20     this letter entails.

21            THE COURT:  Ms. Warshaw?

22            MS. WARSHAW:  Your Honor, this letter was

23     dated in August of 2017, plenty of time for the

24     District to amend the IEP.  They had at least one

25     independent evaluation at that time and they failed to

Dolgos - Direct                                          42

1    do so.  We have a right to show that they had plenty of

2    time to amend the IEP and failed -- failed to do so and

3    that that was their responsibility and their violation

4    of the IDEA, because they at the day that school

5    started there was nothing in place for this child.

6    There was no appropriate placement whatsoever and they

7    had plenty of time and knowledge to -- to do that.

8            THE COURT:  I'm going to allow it.  You can

9    address it on cross and when you submit -- when you

10   submit your closing statements you can address it as

11   too late.

12           MS. HOWLETT:  Thank you, Your Honor.

13           THE COURT:  Okay.  Proceed.

14           MS. WARSHAW:  Okay.  Thank you.

15   BY MS. WARSHAW:

16       Q    Okay.  Ms. Dolgos, can you please describe

17   for the Court what this letter states?

18       A    It's a description of how, you know, she -- she

19   was unable to complete most of her assignments due to

20   anxiety and confusion and it was also just describing

21   how from my -- my point of view that, you know, what

22   I've seen clinically that there was no behavioral

23   issues as the IEP stated that there were.

24       Q    And is it fair to say that you again

25   requested that J.H. be provided with small classroom

Dolgos - Direct                                              43

1    with college bound peers?

2    A    Yes.

3        Q    And what if anything did you say int his

4    letter about her struggling in large group settings?

5    A    It just -- it affects her anxiety more and it

6    causes more confusion for her and she just -- she --

7    she shuts down usually when she is in those larger

8    group settings.

9        Q    You also indicated specifically in this

10   letter about why J.H. was unable to return to school

11   after the two days in December of 2016.  Can you

12   describe for the Court what the reasoning is that you

13   put in this letter?

14   A    I have to refresh my memory.  I'm sorry.

15       Q    Sure.  Take your time.

16           THE COURT:  Didn't we address that already?

17           MS. WARSHAW:  It is in this letter --

18           THE COURT:  No, but didn't this witness

19   address that already --

20           THE WITNESS:  Yeah.  It was --

21           THE COURT:  -- through previous testimony why

22   -- why J. didn't go back to school?

23           MS. WARSHAW:  Right, but it's also included

24   in this letter which is pertinent, because it also went

25   to the District again reiterating her concerns and

Dolgos - Direct                                          44

1   again they didn't do anything.

2              THE COURT:  Okay.  But the letter speaks for

3   itself and I'm going to read it because it's a joint

4   exhibit.  So it's already in.

5              MS. WARSHAW:  Okay.

6              THE WITNESS:  Okay.

7              THE COURT:  Ask another question please.

8   BY MS. WARSHAW:

9       Q    In this letter dated August 17th, 2017, did

10  you make a recommendation regarding a school that

11  offers therapy?

12  A    I made -- I - we suggested a structured but non --

13  non-strict educational environment that can help her

14  function better with more flexible schedules for her.

15      Q    So did you recommend a therapeutic placement

16  or a non-therapeutic placement for J.H.?

17  A    It -- we didn't specify therapy.  We just said

18  smaller school.

19      Q    Okay.  I'm going to show you what's been

20  marked P-30 which is not to my knowledge a joint

21  exhibit.

22             THE COURT:  Which books?  You could just put

23  it up here.

24  BY MS. WARSHAW:

25      Q    Have you ever seen this letter before?

                          Dolgos - Cross                    45

1    A    No.

2         Q    Is Evelyn Kaminsky (phonetic) somebody who

3    works at ICCPC?

4    A    Yes.

5         Q    Okay.  Thank you.  Did you ever become aware

6    that J.H. was undergoing independent evaluations and

7    she was diagnosed with a specific learning disability?

8    A    No.

9              THE COURT:  What was the answer?

10             THE WITNESS:  No.

11             MS. WARSHAW:  All right.  No more questions

12   at this time.

13             THE COURT:  Before you start cross I want to

14   take a short break for me.

15             MS. HOWLETT:  Sure, Your Honor.

16             THE COURT:  Okay.

17             MS. HOWLETT:  Thank you.

18             THE COURT:  Five minutes.

19                  (BRIEF RECESS)

20             THE COURT:  Okay.  We're back from the break.

21             Cross, Ms. Howlett?

22             MS. HOWLETT:  Thank you, Your Honor.

23   CROSS-EXAMINATION BY MS. HOWLETT:

24        Q    Good morning.

25   A    Good morning.

1        Q    Melissa -- can I call you Melissa?

2    A    Yes.

3        Q    It's just easier, right?

4    A    Yes.

5        Q    Okay.  So I'm going to try and make this as

6    quick as possible.  You testified earlier that you

7    treated or provided counseling to J. through June 2017?

8    A    Um-hum.

9        Q    You're not seeing her anymore?

10   A    No.

11       Q    And at that time do you recall what her

12   educational situation was?  Was she planning on

13   attending school?

14   A    No.  We were -- I know that they were planning on

15   doing a different placement, but it was summertime.  So

16   there wasn't really a lot of school involvement at that

17   point.

18       Q    And by "they" do you mean, like, "the

19   family?"

20   A    The family, yes.

21       Q    In your letters, J-13, you probably don't

22   have to even flip to it.

23   A    Okay.

24       Q    You talked about transition -- a transition

25   plan?

1    A    Um-hum.

2         Q    And you said you normally recommend

3    transition planning for kids that are having school

4    anxiety-- related anxiety?

5    A    Yes.

6         Q    Can you describe what that looks like

7    normally?

8    A    Yeah.  Any kid that usually goes from school to

9    our higher level of care, we contact the schools about

10   half day transitions just to make it easier for the

11   mental health and -- and emotional aspect of the kids

12   and the schools are usually accommodating to that.

13        Q    Is the goal to get kids back into school --

14   A    Yes.

15        Q    -- on a full time basis?

16   A    Yes.  It's a slow transition.

17        Q    Was that initially your goal for J.?

18   A    Yes.

19        Q    Are you aware that the -- the IEP that the

20   District provided for J. actually provides for a half

21   day transition program?

22   A    I -- I don't remember.  I haven't seen the IEP in

23   a while.  No.

24        Q    Do you know if she had a half day transition

25   program for her current school placement?

Dolgos - Cross                              48

1    A    No.

2          Q    No, you don't know or no, she didn't?

3    A    I -- I don't believe she did.  No.

4          Q    You said that J. was suffering from social

5    and peer related anxiety.

6    A    Um-hum.

7          Q    Can you talk a little bit more about that,

8    what she reported to you?

9    A    Yes.  J. has always had difficulty making friends

10   in the school settings.  She has a hard time just, you

11   know, contacting peers and collaborating and -- and

12   fitting in and it's the large social settings she

13   hasn't really been able to function in those when I had

14   her.  She had difficulty, you know, leaving the house,

15   just the social atmosphere in general scared her.

16         Q    So social atmospheres in general were an

17   issue for her?

18   A    Yes.

19         Q    So that's not necessarily just school.  It

20   could be any sort of social situations?

21   A    Correct.

22         Q    And what do you usually recommend for -- in

23   your experience for individuals that are having, you

24   know, trouble with social anxiety?

25   A    We usually try to have them, you know, start off

1    in like a small setting as, you know, such as ourselves

2    -- like ICCPC and then maybe transition to social

3    groups outside of school that are groups in like

4    depression or anxiety as well, things that -- they can

5    relate to when they leave our program.

6         Q    You mentioned using coping skills and breaks

7    or recommending things like that for kids that are

8    suffering from especially school related anxiety.  Is

9    that --

10   A    Um-hum.

11        Q    -- is that accurate?  So what does that look

12   like, coping skills and breaks?  Can you talk a little

13   bit more about that?

14   A    Yes.  So most of the time if -- if kids are

15   returning to school with anxiety we recommend that they

16   at least maybe can work out a plan where they can go

17   see the guidance counselor and, you know, take breaks

18   to go to the bathroom maybe like once or twice per

19   class depending upon what the school agrees to and

20   coping skills would be -- you know, that would be more

21   or less just deep breathing and -- and teachers trying

22   to help or professionals in the school that can try to

23   help with anxiety, have them come down.  So --

24        Q    Do you still have the joint binder in front

25   of you?  Oh, I think so.

 1    A     Yeah.

 2          Q     Can you just turn to J-9?  It's the IEP.

 3    A     Okay.

 4          Q     And then if you flip through on the bottom

 5    it's going to be marked "WM028."  See the little

 6    numbers at the bottom?

 7    A     Yup.

 8          Q     Okay.

 9    A     Okay.

10          Q     Have you -- you testified earlier I believe

11    that you reviewed the IEP.  Is that --

12    A     I did see it, yes, when they first got it.

13          Q     At some point.

14    A     Um-hum.

15          Q     Can you -- this page, it's entitled

16    modifications, supports and progress reports?

17    A     Um-hum.

18          Q     At the -- at the top box you'll see filled

19    in, were -- were you aware that the IEP provides for

20    extended time on tests and quizzes?

21    A     Yes.  I believe that that was on there.  Yes.

22          Q     And meeting with the counselor, the school

23    counselor upon J.'s request whenever she needed to?

24    A     Um-hum.

25          Q     And frequent breaks?

Dolgos - Cross                              51

1    A    Yes.

2          Q    That sounds like what you were recommending

3    as far as coping skills and breaks for school related

4    anxiety.  Does that --

5    A    Yeah.

6          Q    -- sound accurate?

7    A    Yes.

8          Q    You spoke earlier about your joint letter

9    with Dr. S.  I'm not even going to attempt to say it,

10   from January.  That was J-14 just for reference.

11   There's a recommendation in here that -- that J. be

12   assessed and approved from an IEP.

13   A    Right.

14         Q    What -- what's the basis for that?

15   A    We usually consider that when kids are having a

16   really hard time to go to school to make it easier for

17   them to transition to school and we collaborate with

18   the schools on that recommendation.

19         Q    Are you personally familiar with the

20   Administrative Code regarding eligibility for special

21   ed.?

22   A    No.  Usually the schools would tell me whether or

23   not they qualify before assessing.

24         Q    Right.  You testified earlier that you didn't

25   agree with the classification of emotionally disturbed.

Dolgos - Cross                                          52

1    I think it's because you said that most kids with

2    emotionally disturbed are behavioral, they have ODD and

3    more severe issues.

4    A    Um-hum.

5         Q    Does that sound accurate?

6    A    Yes.

7         Q    So what classification did you think was

8    appropriate for J.?

9    A    I was just thinking maybe more along the lines of

10   either assessing for ADHD or learning, you know, a

11   learning disability, because I know she had

12   difficulties in math, but that's all I was aware of.

13        Q    How did you know she had difficulties in

14   math?

15   A    That was reported with the tutoring, that she had

16   -- she --

17        Q    The tutor reported to you or --

18   A    Yeah.  She needed more help with the math

19   component.

20        Q    And ADHD, does she have an ADHD diagnosis?

21   A    No.  I mean, I'm not the specialist in IEPs.  I

22   just didn't think that emotionally disturbed really fit

23   J.  Sometimes IEPs have other health impaired or they

24   have less severe diagnoses.

25             MS. HOWLETT:  Your Honor, I'm just going to

Dolgos - Cross                                                    53

1    refer to the Code which isn't obviously in evidence,

2    but --

3    BY MS. HOWLETT:

4         Q    Are you aware that the criteria for

5    emotionally disturbed includes an inability to build or

6    maintain satisfactory interpersonal relationships with

7    peers and teachers?

8              MS. WARSHAW:  Objection, Your Honor, because

9    --

10             THE COURT:  No.  I want to hear it.

11             THE WITNESS:  No.

12   BY MS. HOWLETT:

13        Q    Are you aware that the criteria for

14   emotionally disturbed includes a general pervasive mood

15   of unhappiness or depression?

16   A    No.

17        Q    Or that the criteria includes a tendency to

18   develop physical symptoms or fears associated with

19   personal or school problems?

20   A    No.

21        Q    Are those the type of characteristics that

22   you would use to describe to J.?

23   A    Some of them I think, yes.

24        Q    An inability to build or maintain

25   satisfactory interpersonal relationships with peers and

1    teachers?

2    A    Yes.

3        Q    A general pervasive mood of unhappiness or

4    depression?

5    A    Yes.  Depression was better when she went to

6    school, but yeah, I think that would still qualify.

7        Q    A tendency to develop physical symptoms or

8    fears associated with personal or school problems?

9    A    Yes.

10           MS. HOWLETT:  And Your Honor, for the record

11   that's N.J.A.C. 6A:14 --

12           THE COURT:  I know what it is.  Thank you.

13           MS. HOWLETT:  Okay.  I just didn't know for

14   the record purposes.

15           THE COURT:  I was --

16           MS. HOWLETT:  I know Your Honor knows.

17           THE COURT:  -- I was going to ask her that

18   question myself.

19           MS. HOWLETT:  Recording.

20           THE COURT:  Thank you.

21   BY MS. HOWLETT:

22       Q    You testified earlier that J. had some

23   difficulty returning to school when she tried --

24   A    Um-hum.

25       Q    -- in December and my  notes say that you

Dolgos - Cross                                    55

1    testified that she needed more intensive accommodations

2    due to the severity of her anxiety.  What type of

3    accommodations were you referring to?

4    A    Well, this is before the IEP got implemented.  So

5    I -- I would say that that's why in January we

6    recommended that.

7         Q    Okay.  That --

8    A    Yeah.

9         Q    -- was the --

10   A    Um-hum.

11        Q    Right.  What type of accommodations in school

12   do you generally recommend for students that are

13   suffering from school related anxiety?

14   A    It's -- it's pretty much the same that we --

15   that's on her IEP, the -- the breaks, individualized

16   help with guidance counselors, sometimes ability to use

17   coping skills, you know, within the classroom,

18   sometimes classrooms don't allow certain coping skills.

19   So we make accommodations.

20        Q    Right.

21   A    Yeah.

22        Q    Have you ever been to West Morris Central

23   High School?

24   A    No.

25        Q    Or West Morris or Mendham High School, yeah.

Dolgos - Cross                            56

1      A     No.

2            Q     West Morris Mendham.  Have you ever observed

3      the being successful program at Mendham High School?

4      A     No.

5            Q     Did you contact anyone from the program at

6      any time?

7      A     No.

8            Q     Do you know how many students are in the

9      program?

10     A     No.

11           Q     Or what the characteristics of the students

12     in the program are?

13     A     No.

14           Q     So in this January letter you recommended a

15     therapeutic setting to continue progressing with

16     anxiety, depression and function in school.

17     A     Um-hum.

18           Q     Not to be redundant, but as far as

19     therapeutic setting, what -- can you describe what you

20     meant by that?

21     A     Just to have access to therapeutic needs in

22     school, whether it's a counselor or extra services with

23     aids or whatever she could get.

24           Q     And J-19, that was that last letter that

25     August one that was -- that you spoke about before,

                           Dolgos - Cross                    57

1    testified to.

2    A     Um-hum.

3          Q    I noticed that Dr. S. didn't send this

4    letter.  Is there -- but he had signed all the previous

5    letters that had gone to the -- the school.

6    A     Right.

7          Q    Is there a reason why he didn't sign this

8    one?

9    A     He wasn't involved at that time, because I think

10   they followed up with Evelyn Kaminsky for outpatient

11   which is why she wrote the October letter.  J. was

12   discharged in June, but I did follow up with her in the

13   summer at least twice a month for just regular

14   outpatient therapy and then that's -- I stopped seeing

15   them briefly after that and then I think they were

16   seeing Evelyn.

17         Q    So what prompted you writing this letter in

18   August?

19   A     Just to further explain the emotional component of

20   J. and the anxiety.  You know, I wasn't aware of what

21   emotionally disturbed actually meant.  So I just wanted

22   to clarify what my perspective was.

23         Q    Did anyone ask you to write this letter?

24   A     Yes.  The family asked me to write it.

25         Q    Did they say why?

Dolgos - Cross                                58

1    A    No.  I --I mean, I can't remember actually.  It's

2    -- almost a year ago.

3         Q    That's okay.  Questions I have to ask.

4    A    Okay.

5         Q    So just to clarify, you stopped treating her

6    in June and the family contacted you at some point

7    after that?

8    A    No.  We had a follow up plan for outpatient.

9         Q    Okay.

10   A    So in the summer the plan was for her to continue

11   with mea and then during the school year find a

12   different therapist starting the next school year.  So

13   she did see me in the summer prior to September.

14        Q    So in your previous letters you had

15   recommended a therapeutic setting, access to a

16   counselor, everything that you had testified to

17   already.  In -- in this letter you said that she's not

18   in need of therapy while in school.  Can you explain

19   that?

20   A    I guess because the plan was that she was going to

21   have outpatient therapy outside of school.  So I

22   figured that would be enough for her after further

23   evaluation.  In -- in the summer she seemed to be doing

24   better, but she also wasn't in school.  So yeah.

25        Q    So is that ordinary for a student with major

Dolgos - Cross                                    59

1      depressive disorder and school related anxiety not to

2      need any therapeutic supports in school?

3      A     Not necessarily, no.  I mean, it depends upon

4      where -- you know, where they're at with their ability

5      to -- to manage their anxiety and at that time she was

6      doing better.  So I figured outpatient maybe would be

7      more -- you know, enough if -- since school -- there

8      was a hard time with her going to school, but as long

9      as the accommodations were in place which they were

10     from the IEP which I also think is why I recommended

11     outpatient outside of school.

12          Q     So you recommend the outpatient with the

13     assumption that she would be provided with those --

14     with the -- what was the IEP?

15     A     IEP, yeah.

16          Q     So that -- your recommendation here for not

17     being in need of therapy while in school, that was

18     really -- that recommendation was based on the fact

19     that you believed that the IEP would be implemented?

20     A     Yes.  I guess -- I guess too part of me meant that

21     like not necessarily, she doesn't need a therapeutic

22     school.  So I -- I think that my wording maybe could

23     have been better in this letter honestly, but just some

24     kind of -- she needed some kind of therapy outside of

25     school, but not within the school necessarily.

Dolgos - Cross                                    60

1      Q    So when you wrote this letter you still were

2   recommending that she receive frequent breaks?

3   A    Yeah.  I mean, I -- I definitely think that the

4   structured but not strict educational environment can

5   help her function better.  It was just in general like

6   having her to be an environment that's smaller, but I

7   didn't want to necessarily recommend therapeutic school

8   without a -- a doctor signing off on it.  So yeah.

9      Q    Do you think that J. needed to have access to

10   a counselor while in school?

11   A    I mean, at the time it -- it probably would have

12   been helpful for her to have a counselor in school,

13   yes, and I mean, I also thought maybe she would stick

14   with me outside of school.  So I wasn't really sure

15   what the transition plan would be come the school year.

16          MS. HOWLETT:  Just one moment, Your Honor.

17   I'm sorry.

18   BY MS. HOWLETT:

19      Q    Were you aware that the IEP couldn't be

20   implemented because the parents didn't consent to it?

21   A    No.

22      Q    Were you aware that the District offered J. a

23   504 plan for the 2017-'18 school year?

24   A    No.  I -- I -- I know I wrote the letter and I --

25   I didn't -- you know, she was discharged for a couple

Dolgos - Redirect                                    61

1    of weeks in December and then come January I know that

2    it wasn't implemented, but I'm not sure why.  So --

3         Q    That was the '16-'17 school year?

4    A    Right.

5         Q    Are you aware that the District offered J. a

6    504 plan for the upcoming year?

7    A    No.

8         Q    For the '17-'18 school year?

9    A    No.

10        MS. HOWLETT:  Your Honor, I have no further

11   questions at this time.

12        THE COURT:  Any redirect?

13        MS. WARSHAW:  Yes.

14   REDIRECT EXAMINATION BY MS. WARSHAW:

15        Q    Ms. Dolgos, you indicated that you were in

16   agreement with some of the modifications set forth in

17   the IEP.  Were you aware of the actual placement that

18   the District wanted to put J.H. in in that IEP?

19   A    I honestly do not remember what they suggested.  I

20   think at the -- I think it was ESS program, but I -- I

21   can't recall for a fact.

22        Q    Did any of your recommendations or Dr.

23   Srinivasan's recommendations include putting J.H. in a

24   self contained behavioral class in a large high school?

25   A    No.

1          Q    So you're not aware that that is the

2     placement that was proposed in the IEP?

3               MS. HOWLETT:  Your Honor, this is one,

4     assuming facts that are in evidence.  Counsel's

5     characterizing for her and we've already had testimony

6     about that.

7               THE COURT:  Sustained.

8               MS. HOWLETT:  Thank you.

9     BY MS. WARSHAW:

10         Q    You had indicated that J.H. was suffering

11    from school related anxiety.  Would you say that her

12    anxiety was -- or that she had generalized pervasive

13    mood or depression throughout every aspect of her life

14    or just related to school?

15    A    For depression or anxiety?

16         Q    Let's start with anxiety.

17    A    Anxiety was mostly related to school.  Some peer

18    social anxiety as I mentioned.

19         Depression was mostly a personal issue that she

20    was suffering with.

21         Q    So in your letters when you indicated a

22    therapeutic setting were you referring to a therapeutic

23    out of District placement or a school environment with

24    supports?

25    A    Just school environment with supports.

Dolgos - Redirect                                                    63

1          Q    Were you aware that the IEP proposed by the

2     District did not address her math issues?

3                MS. HOWLETT:  Your Honor, this is --

4     objection.

5                THE COURT:  Remember the IEP, she already

6     said that.

7                THE WITNESS:  Should I answer the question?

8     I don't know --

9                THE COURT:  No.

10               THE WITNESS:  Oh, okay.

11               MS. WARSHAW:  Okay.  Okay.  That's okay.

12    BY MS. WARSHAW:

13         Q    Ms. Dolgos, do you use the Administrative

14    Code definition of emotionally disturbed when you

15    determine your diagnosis of a student?

16    A    No.  We just use the DSM criteria for mental

17    health diagnoses.

18               MS. WARSHAW:  Okay.  No further questions.

19               THE COURT:  Okay.  You can step down.

20               THE WITNESS:  Okay.

21               THE COURT:  Thank you very much.

22               MS. WARSHAW:  I'm going to show our next

23    witness in.

24               THE COURT:  Now?

25               MS. WARSHAW:  I'm getting our next witness.

Platt - Direct                                    64

1    She's having trouble parking.

2                   THE WITNESS:  Do you want me to --

3                   THE COURT:  You can just leave that there.

4                   THE WITNESS:  Okay.  Okay.

5                   THE COURT:  You're free to go.  Thank you.

6                   THE WITNESS:  All right.  Thank you.

7                   THE COURT:  While Ms. Warshaw's doing that,

8    my secretary just handed me a note.  So I'm going to go

9    find out what that note is about.

10                       (Pause in recording.)

11                  THE COURT:  Okay.  Ms. Warshaw has located

12   her witness.

13                  How are you?  How are you?

14                  THE WITNESS:  Okay.

15                  THE COURT:  Do me a favor and raise your

16   right hand?

17   E L L E N   M.   P L A T T, PETITIONER'S WITNESS,

18   SWORN:

19                  THE COURT:  State your name, spell your last

20   name.

21                  THE WITNESS:  Ellen M. Platt, P-L-A-T-T.

22                  THE COURT:  Thank you.  Proceed.

23   DIRECT EXAMINATION BY MS. WARSHAW:

24       Q    Okay.  Dr. Platt, could you please state your

25   full name for the record and your job title?

Platt - Direct                                   65

1     A     Ellen M for Michelle Platt, P-L-A-T-T.  I'm a

2     child and adolescent psychiatrist.

3                THE COURT:  Child what psychiatrist?

4                THE WITNESS:  Child and adolescent.

5                THE COURT:  Okay.

6                THE WITNESS:  Well, also and general

7     psychiatrist.

8                MS. WARSHAW:  Okay.  Your Honor, although --

9     in your J-21, do you have Dr. Platt's curriculum vitae?

10    Because I didn't see --

11               THE COURT:  I hope so.

12               MS. WARSHAW:  -- that.

13               THE COURT:  Dr. Platt, you have -- you have

14    the joint exhibit book there?

15               MS. WARSHAW:  It should be a black book.

16               THE WITNESS:  Yes, I do.

17               THE COURT:  Could you look to see if J-21 is

18    your C.V.?

19               MS. WARSHAW:  Otherwise I have it.

20               THE WITNESS:  J-21 is --

21               THE COURT:  Just 21.  Number --

22               MS. HOWLETT:  It's not included, Your Honor.

23    I can save everybody time.  It's not --

24               THE COURT:  Okay.

25               MS. HOWLETT:  -- in J-21.

Platt - Direct                                          66

1          MS. WARSHAW:  Okay.  Then I'm going to use my

2      exhibit.

3              THE COURT:  Okay.

4      BY MS. WARSHAW:

5          Q    Okay.  Dr. Platt --

6              THE COURT:  Let's stop for a second.  Are we

7      going to -- are we going to challenge her credentials?

8              MS. HOWLETT:  No.  We'll stipulate to --

9              THE COURT:  Okay.  What are you offering her

10     as?

11             MS. WARSHAW:  She's an expert in --

12             THE COURT:  In child and adolescent

13     psychiatrist.

14             MS. WARSHAW:  Correct.

15             THE COURT:  Psychiatry.  Sorry.

16             MS. WARSHAW:  And she's done independent --

17             THE WITNESS:  Correct.

18             MS. WARSHAW:  -- evaluations.  So --

19             THE COURT:  You're qualified.

20             THE WITNESS:  Thank you.

21             THE COURT:  You're welcome.

22             MS. WARSHAW:  Thank you, Your Honor.

23             THE COURT:  All right.  J-21's her C.V.  What

24     -- what's the P number?

25             MS. WARSHAW:  So --

Platt - Direct                                   67

```
1            THE COURT:  I'm sorry.

2            MS. WARSHAW:  P-33.

3            THE COURT:  P-33 is her C.V.

4            MS. WARSHAW:  Has her -- yes.

5            THE COURT:  And she's qualified as an expert

6     without objection.  Okay.

7            MS. WARSHAW:  Okay.  Well, that saves a lot

8     of questions.

9            THE COURT:  It certainly does.

10    BY MS. WARSHAW:

11        Q    Okay.  You were hired -- am I correct that

12    you were hired by the West Morris Regional High School

13    District to perform an independent evaluation of J.H.?

14    A    Yes.

15        Q    Were you ever informed by the School District

16    as to what this independent evaluation was going to be

17    used for?

18    A    Well, they sent me referral information which I

19    always request prior to doing an evaluation so that I

20    understand the basic issues that have been going on

21    with any student.

22        Q    And do you recall what information the

23    District sent to you regarding J.H.?

24    A    I -- they sent me --

25            MS. HOWLETT:  Is the witness referring -- it
```

Platt - Direct                                          68

 1          looks like --

 2                    MS. WARSHAW:  I can refer you --

 3                    MS. HOWLETT:  -- she has her own file.

 4          BY MS. WARSHAW:

 5               Q    Okay.  In -- I can refer you to your report.

 6          Would it be in your report?

 7          A    It should be.  Yes.

 8               Q    Okay.  So let's go to the black binder, J-21.

 9          That should be your report.

10          A    Yes, it is.

11               Q    Okay.  Can you -- just for the record can you

12          state the date of that report?

13          A    The date of the consultation was September 6th,

14          2017.

15                    MS. HOWLETT:  And Your Honor, for the record

16          I just want to maintain my objection the date of this

17          report is after the IEP was --

18                    THE COURT:  Understood.

19          BY MS. WARSHAW:

20               Q    So you were going to state the documents that

21          were sent to you by the School District prior to you

22          writing your report.  Can you state those for the

23          record?

24          A    Well, yes, actually they're listed in my report.

25          The documents that I received included a social history

Platt - Direct                                    69

1    by the school social worker, Ms. Goldberg (phonetic),

2    that was dated 1/18/17, a psychological evaluation by

3    the school psychologist Sherry Wilk (phonetic) dated

4    1/19/17, a psychiatric evaluation by Dr. Shankar

5    (phonetic) Srinivasan dated 3/15/17, an IEP dated April

6    6, 2017, a letter from Melissa Dolgos, licensed

7    associate counselor and senior clinician dated 8/17/17,

8    psycho-educational report by Natalie Shuberth

9    (phonetic), Psy.D., BCBAD, dated 8/21/17.

10        Q    Did the School District provide you with any

11   educational testing that the School District did?

12   A    If they had -- it would have been listed in these

13   documents.

14        Q    Okay.  Great.  So based on the information

15   that you were provided do you feel that your

16   independent evaluation report is a fair and accurate

17   representation of what was going on with J.H.?

18   A    Yes, I do.

19        Q    And is it fair to say that your findings and

20   conclusions are based on a reasonable degree of medical

21   certainty with your expertise as a psychiatrist?

22   A    Yes.

23        Q    I'm going to refer you to page ten of your

24   report.  In the third paragraph, you refer to J.H. as

25   being extremely fearful of entering school buildings,

Platt - Direct                                        70

1   appearing phobic and she describes becoming weak and

2   unable to proceed -- proceed upon approaching the

3   school.  Can you tell the Court what those are symptoms

4   of?

5   A    Wait just one second.  Exactly where -- oh, I see

6   it.  Okay.  Okay.  Well, they could be symptoms of a

7   number of different disorders.  They could be symptoms

8   of a generalized anxiety disorder.  They could be

9   related to a depressive disorder.  They could also be

10  related to a developmental disorder.

11       Q    Can you describe for the Court what the

12  substance of your report says regarding J.H., what your

13  findings were?

14  A    Well, I think that I found her to be relatively

15  non-functional at the time that I saw her.  She had

16  severe anxiety.  She had irrational fears.  She felt

17  socially excluded.  She had been at a treatment center,

18  intensive outpatient treatment center, ICCPC, for some

19  time and she also presented with features of depression

20  and related anxiety.  So her overall presentation was

21  that she was highly symptomatic and honestly I would

22  say at best marginally functional.

23       Q    And what did you attribute the underlying

24  reasons for being in this dysfunctional state?  Was it

25  related to anything in particular?

1    A     It was related to her neuro-behavioral structure

2    which was manifested in a very aggressive way when she

3    attended school.

4          Q     On page 11 of your report, the first

5    paragraph, can you describe for the Court what you

6    meant by that as well, where it begins with, "She

7    remains exceedingly emotionally fragile?"

8    A     That --

9          Q     The first four lines of page 11.

10   A     That's not the first four lines on this page 11.

11         Q     Oh, okay.  Then it's different.  I have page

12   12 of 15, on the bottom.

13   A     This page 12 is --

14         Q     Okay.  If you go back --

15   A     The reason -- the reason is that this was a draft

16   which I sent prior to sending the final report, but I

17   typically send a draft to the District.  So the staff

18   will have a sense of my general overview.

19         Q     Okay.  So I'm looking at the final draft

20   which is what I had in P -- in my exhibits.  So why

21   don't we refer to the final draft?  Because that was

22   the final report, correct?

23   A     Yeah.  Yes.

24         Q     Okay.  Was there any changes in your draft

25   report after you showed it to the District and your

Platt - Direct                                72

1    final report?

2    A    I would honestly have to go over it line by line,

3    but typically the changes are grammar, spelling, tense

4    and things of that nature.  There are occasions when I

5    may add information that I received after the initial

6    information or sometimes I will re-review the case and

7    alter -- want to add something to my determination.

8        Q    Okay.  Do you recall if you reviewed the case

9    again after you sent your draft to the District and

10   added or changed anything in your report?

11   A    I -- I keep a lot of -- of those things.  So if

12   you just hang on I will --

13            MS. HOWLETT:  Your Honor, I believe the

14   witness is referring to her own personal notes that are

15   --

16            THE WITNESS:  It is personal notes.  Yes.

17            MS. HOWLETT:  Right. I just want to bring

18   that to the Court's attention.  We don't have -- I

19   don't know what she's --

20            THE COURT:  I don't know either.  You're not

21   going to be referring to them, because she doesn't have

22   them.

23            THE WITNESS:  Okay.  That's fine.

24            MS. WARSHAW:  I don't have them either.  So -

25   -

Platt - Direct                                    73

1              THE COURT:  Yeah.  We don't have them either.

2              MS. WARSHAW:  Okay.  Did --

3              THE COURT:  All right.  I'm just going to

4        stop for a second.

5              The draft is what number?

6              MS. WARSHAW:  Well, I haven't seen -- I

7        haven't seen the joint exhibit book.  I didn't get a

8        copy of it.  So I sent -- I sent the list of what the

9        exhibit should be to Ms. Howlett.  She did the -- the

10       book.

11             THE COURT:  She did the book.

12             MS. WARSHAW:  I didn't see the book.  So what

13       I'm saying for my joint exhibit was supposed to be the

14       final copy of the report, because --

15             THE COURT:  Okay.

16             MS. WARSHAW:  -- that's what I have.

17             THE COURT:  Stop for a second.

18             Doctor, in the exhibit book, the report

19       you're looking at is your draft report?

20             THE WITNESS:  Correct.

21             THE COURT:  Okay and that's the joint exhibit

22       book?

23             THE WITNESS:  That is --

24             MS. WARSHAW:  Yes.

25             THE WITNESS:  -- this book.  Yes.

1        MS. WARSHAW:  I have is the final copy which

2   is what I have been referring to in -- in the -- in the

3   Petitioner's exhibit.  So if I could refer to --

4        THE COURT:  Let's get a final copy.

5        MS. WARSHAW: -- refer to that?

6        THE COURT:  Yeah and that's P what?

7        MS. WARSHAW:  That is -- that's P-33.  It

8   includes --

9        THE COURT:  P-33 is the final copy?

10        MS. WARSHAW:  Final copy and her curriculum

11   vitae.

12        THE COURT:  C.V. and what number is in the

13   joint book?  What --

14        MS. WARSHAW:  That is J-21.

15        THE COURT:  J-21 is the Doctor's draft copy.

16   Counselors?  We're going to eliminate the draft copy

17   from -- at P-21 and go with the -- with the final copy?

18   Does that make the most sense?

19        MS. WARSHAW:  Yes.

20        MS. HOWLETT:  Yes, Your Honor.  P-33 in place

21   of J --

22        THE COURT:  P-33 --

23        MS. HOWLETT:  -- 21.

24        THE COURT:  -- in place of J-21, correct?

25        MS. WARSHAW:  Yes.

Platt - Direct                              75

1               MS. HOWLETT:  Correct, Your Honor.

2               THE COURT:  All right.  So J-21 --

3               THE WITNESS:  So now I --

4               THE COURT:  -- is not going to be in

5       evidence.

6               THE WITNESS:  So where -- P-33 --

7               MS. WARSHAW:  So in the --

8               THE WITNESS:  -- would be in the other book?

9               MS. WARSHAW:  In the blue book.

10              THE COURT:  In the other book.  If you need

11      some room, Doctor, you can just put some of the stuff

12      up here out of the way.  Let me get this out of the

13      way.

14              THE WITNESS:  Well, since we're not going to

15      use this --

16              THE COURT:  Well, you -- you may eventually,

17      but you can leave it there for now.

18              THE WITNESS:  Okay.

19              THE COURT:  Okay.  Okay.  We're just on the

20      same page.

21              MS. WARSHAW:  And so --

22              THE COURT:  So that's page 11.

23              MS. WARSHAW:  Just to be clear, yes, P-33 is

24      now in evidence?

25              THE COURT:  P-33 is in because it was -- was

Platt - Direct                                    76

1      going to be a joint exhibit.

2                  MS. WARSHAW:  Yes.

3                  THE COURT:  So it's in and J-21 is going to

4      be excluded because of it's only the draft.

5                  MS. WARSHAW:  Yes, Your Honor.

6                  THE COURT:  Okay.  Good.  Let's get back to

7      the questions.

8      BY MS. WARSHAW:

9          Q    Okay.  So on the first four lines of page 11

10     on your final -- final report, can you describe for the

11     Court what you meant by this statement?

12     A    Are you referring to the statement, "She remains

13     exceedingly emotionally fragile" --

14         Q    Yes.

15     A    -- "and the probability of her attending school is

16     extremely low at this time."  Well, to expand upon

17     that, when I saw J. she was as I said before marginally

18     functional.  She was very depressed.  She manifested

19     her depression interpersonally and behaviorally and her

20     energy level was low.  So the probability of her being

21     able to act -- go to school, et cetera, was limited.

22     She also indicated fearfulness and what I would -- what

23     I refer to in the report is a hint of inappropriateness

24     which references a kind of a disconnection to what the

25     events and people going on -- people around her and the

1    events going on around her.

2         Q    You mentioned behavioral.  Did you -- what is

3    the basis of that?  Were there any disciplinary actions

4    or anything that you are referencing or --

5    A    No.  Her behavior which had become exceedingly

6    withdrawn.

7         Q    And you refer to a disconnect to the events

8    and people.  Is that related to her extreme anxiety?

9    A    That's on page nine, which paragraph?

10        Q    Are you referring to a specific paragraph on

11   page nine?

12   A    No.  I -- I want to know where you're --

13        Q    Oh, you had just mentioned that you found a

14   disconnect to events and people and I'm asking you if

15   that is related to her extreme anxiety?

16   A    Oh, yes.

17        Q    Okay.

18   A    Yes.

19        Q    And going back to the first four lines of

20   page 11, where you indicated, "She requires an academic

21   environment with the capability of a great deal of

22   emotional awareness and intervention."  Were you

23   referring to like an out of District therapeutic

24   setting or some supports within a school?

25   A    I was referring to an alternative setting.

Platt - Direct                           78

1          Q    Okay.  And in your professional opinion could

2     you describe for me what type of learning environment

3     would have been appropriate for J.H.?

4     A    She required an environment where -- where she

5     would be shielded or protected from the provocations,

6     the standard interactions of standard peers that would

7     be found in a typical high school.  She needed a -- she

8     needed to be separated from that.  She needed a place

9     where she believed that her emotional reactivity could

10    be understood.

11         Q    On page 11 at the end, the last paragraph,

12    you refer to DSM five criteria that J.H. met.

13    A    Um-hum.

14         Q    Could you review what those mean for the

15    Court?

16    A    Well, these are diagnoses and DSM is a new

17    diagnostic -- relatively new diagnostic manual that is

18    a little bit more detailed and specific than prior

19    manuals.

20         Do you want me to go through each diagnosis?

21         Q    If you could and -- and just highlight for

22    the Court what you meant by these, what your findings

23    were?

24    A    She had a history of major depressive disorder

25    which was documented in the information from ICCPC and

Platt - Direct                                          79

1        Dr. Srinivasan also noted "with irrational thinking."

2    My mental status examination of her -- let me just turn

3    to that -- did include what I call an empty depressed

4    mood and truncated responses, a posture which indicated

5    that she was distant and separate from -- or wanted to

6    be distant and separate from me at that time, but I

7    would assume that that was regarding everybody that she

8    encountered.

9        She moved very slowly.  That's what psycho-motor

10   retardation references and she spoke slowly in a

11   monotone voice and those are frequently symptoms of

12   depression.

13       Q    You noted that she had a DSM five -- she met

14   the criteria for specific learning disorder with

15   impairment in mathematics, specifically with fluent

16   calculations moderate.  Is that something that you also

17   found?

18   A    I did not assess for that.  That was part of the

19   history.

20       Q    Okay.  You recommended a central auditory

21   processing disorder evaluation.  Can you tell me the

22   basis of that?

23   A    Let me reference that.

24       Q    That's the last --

25   A    I know where that is.

Platt - Direct                                    80

1        Q    Okay.

2   A    I just want to find my -- the details that led me

3   to that.

4        Q    It's mentioned in the -- the middle small

5   paragraph on page 11 of your report.

6   A    Yes.  I know that, but I'm -- I -- I want to -- I

7   want to find the specific details, that is the clinical

8   details.

9             The history indicated that a central auditory

10  processing dysfunction which I am not an expert in, but

11  which in a sort of -- colloquial way means that a

12  person can literally hear what you're saying, but their

13  brain does not process the words.  So that they don't

14  actually understand it and then when they follow

15  through with behavior, their behavior may not be

16  connected to what you asked or what you said.

17       Q    In the DSM five criteria it says on the -- I

18  guess the second line in that paragraph on page 11, the

19  last paragraph, it says in parentheses "with irrational

20  thinking."  Can you describe what is meant by

21  "irrational thinking?"

22  A    Okay.  When I interviewed her she explained that

23  at times she would try to talk to herself to drown out

24  noise and the noise was internal noise and I would

25  consider that to be an example of irrational thinking.

1      Q    Could anxiety cause someone to have

2    irrational thinking?

3    A    Yes.

4      Q    Do you believe that anxiety was the basis for

5    J.H. having this irrational thinking?

6    A    Yes.

7      Q    In your professional opinion in general,

8    could a person think rationally in one situation and

9    then in another situation if they're under high anxiety

10   think irrationally?

11   A    Yes.

12     Q    Are irrational fears or phobias considered

13   behaviors?

14   A    They are behaviors.  They're based on obviously

15   feelings that a person has.

16     Q    Are they willful or intentional behaviors?

17   A    No.

18     Q    On page 13, you list -- actually 13 and 134,

19   you list 14 recommendations for J.H. and in section two

20   --

21   A    You mean recommendation two?

22     Q    Recommendation two.  You indicated that you -

23   - that J.H. would benefit from academic environment

24   that was structured, monitored and designed to

25   accommodate her academic needs and provide emotional

1    support and therapeutic input.  Could you describe for

2    me what was the basis of this and what you envisioned

3    would be an appropriate placement for her?

4    A    The basis was that she was unable to attend school

5    because of a build up of emotional distress and so when

6    she would return to school her school would have to

7    provide enough of a comfort level so that she would

8    experience emotional support from the staff and that

9    she would not be provoked by aspects of the environment

10   and therapeutic input meaning supportive input,

11   typically with a staff member that had some education

12   in mental health, mental health processes and in

13   school.

14        Q    And also on page 13 you indicated that if

15   these recommendations were not implemented that there

16   would be no change in her anxiety towards school.  Do

17   you -- can you describe that recommendation a little

18   bit more thoroughly for the Court?

19   A    Is that in number two?

20        Q    I believe it is.  Yes.

21   A    Okay.  Oh, right, "Without these issues being

22   addressed the manner in which J. deals with school is

23   not likely to change."  She was unable to function in

24   her current academic environment and in order to enable

25   her to function her school setting had to provide

Platt - Direct                                            83

1    enough of a comfort level, reduced stimulation,

2    communicate specific support for her and that would in

3    the school setting contribute to her ability to

4    stabilize internally and then inter personally.

5          Q    You indicated that she needed a learning

6    environment with reduced stimulation.  Can you describe

7    what you mean by that?

8    A    I mean a learning environment with a modest number

9    of students, a -- I'll use the word small, but a small

10   building that is not overwhelming to navigate and

11   measured input by the staff.  So for example, in a

12   standard educational placement if a student is walking

13   down the hall and doing something that a teacher thinks

14   is untoward, the teacher may respond in any way at all,

15   maybe in a sensitive matter, maybe in a direct matter

16   or maybe in an insensitive matter -- manner, but she

17   really needed to be in a place where there was never

18   any question that the staff would respond to her in a

19   sensitive manner.

20         Q    Were you aware that the School District

21   wanted to put J.H. in a self contained behavioral class

22   in a large high school?

23              MS. HOWLETT:  Your Honor, I'm objecting

24   again, same basis as before.

25              THE COURT:  I agree.

Platt - Direct                              84

1    BY MS. WARSHAW:

2         Q    Were you aware that the District wanted to

3    put her in a self contained classroom in a high school?

4              MS. HOWLETT:  This is leading, Your Honor.

5              THE COURT:  It is also, but that's -- the

6    questions on both sides have been leading up to this

7    point.

8              MS. HOWLETT:  Well, I'm on cross, Your Honor.

9              THE COURT:  On direct before.  Apparently it

10   doesn't apply in EDS settings.

11             Restate the question.

12   BY MS. WARSHAW:

13        Q    Okay.  Were you aware of the type of learning

14   environment that the School District wanted to place

15   J.H.?

16   A    No.

17        Q    Would in your professional opinion a self

18   contained class in a large high school be appropriate

19   for J.H.?

20   A    No.

21        Q    Can you explain why?

22   A    Well, first of all, a student has to arrive at

23   school and if it's a large public high school that

24   usually means a school bus that's unsupervised and

25   unmonitored, which would be a problem.

1          It would mean entering a school with many other

2     students that are in all sorts of communication with

3     each other and activity.  That would be a problem for

4     her.

5          It would mean when she's navigating the hallways

6     that there would be unstructured, unanticipated

7     responses from other students that may or may not have

8     something to do with her, but that would be

9     overwhelming to her.

10         It also might mean that another staff member might

11    see her appearing to daydream or something of that

12    nature and intervene in a non-therapeutic manner.

13    Situations such as that.

14    Q    Are you familiar with the classification of

15    emotionally disturbed in the education setting?

16    A    I am familiar with the term.  I am not familiar

17    with the actual details as they're written in the

18    manual.

19    Q    Are you familiar enough with IEPs and the

20    definition of emotionally disturbed to formulate an

21    opinion as to whether or not J.H. could be classified

22    as emotionally disturbed?  Would that be appropriate?

23              THE COURT:  Sustained.

24              MS. HOWLETT:  Objection.

25              THE WITNESS:  Well --

Platt - Direct                                    86

1            THE COURT:  She just -- don't answer.  When I

2       say --

3            THE WITNESS:  Sorry.

4            THE COURT:  No, no.  It's okay.  Nobody

5       explained the rules to you.

6            If one of -- one of the attorneys objects to

7       a question you just don't answer it and then I'll make

8       -- I'll make a ruling.  If I say "sustained" you're not

9       answering it.

10           THE WITNESS:  Okay.

11           THE COURT:  If I say "overruled," you're

12      answering it.

13           THE WITNESS:  Okay.

14           THE COURT:  Okay?  All right.  Right now it's

15      sustained.

16           She just said she wasn't familiar with the

17      E.D. classification.

18           MS. WARSHAW:  She --

19           THE COURT:  She wasn't.  So how are you --

20           MS. WARSHAW:  She said she was --

21           THE COURT:  -- going to -- how is she going

22      to answer that question?

23           MS. WARSHAW:  Because she said she was

24      familiar with the -- the definition of it, but --

25           THE COURT:  No, she said --

Platt - Direct                                       87

1              MS. WARSHAW:  -- not the classification.

2              THE COURT:  Well, that's what we're talking

3      about.  The classification in the Code for -- for

4      emotionally disturbed in terms of an IEP is one thing

5      and the clinical classification -- since she doesn't

6      know what the Code says in terms of definition I'm not

7      going to let you ask her the question.

8      BY MS. WARSHAW:

9          Q    In your expert opinion, was J.H.'s

10     sensitivity to noise a cause of her anxiety?

11     A    Yes.

12         Q    In your professional opinion was J.H.'s

13     specific learning disability a cause of her anxiety?

14     A    Yes.

15         Q    Are you familiar with the Pernell (phonetic)

16     School?

17     A    I only know the name.

18         Q    When dealing with a student with anxiety is

19     it fair to say that if you change the anxiety provoking

20     situation that the anxiety could get better?

21     A    Yes.

22         Q    Was it your expectation that your report

23     would be used to help determine an appropriate

24     placement for J.H.?

25     A    I thought that it would be included in other

Platt - Cross                                         88

1       material that the child study team had.

2                    MS. WARSHAW:  No questions.

3                    THE WITNESS:  Okay.

4                    THE COURT:  Cross?

5                    MS. HOWLETT:  Yes, Your Honor.  Thank you.

6       CROSS-EXAMINATION BY MS. HOWLETT:

7            Q    Good morning, Dr. Platt.  How are you?

8       A    Hi.

9            Q    Still morning for a little bit longer.

10                You testified earlier about -- in describing

11      your report that J. was marginally functional.  I think

12      that's the term you used.  You saw her in September.

13      She wasn't at -- in school at that time and she hadn't

14      attended school since December which you acknowledge in

15      your report.  So what do you think the basis of her --

16      the issues with her functionality were in September?

17      A    In September?

18           Q    When you saw her.

19      A    Okay.  I -- I thought that she had not at that

20      point had sufficient treatment to get on a better

21      emotional track.

22           Q    When you say "sufficient treatment" can you

23      describe what you were thinking?

24      A    I think she was at ICCPC at that time and it

25      appeared as if she needed additional therapy and she

1    also needed to gain a perspective about her

2    expectations of what was possible academically.

3         Q   On -- and I apologize if the page numbers are

4    a little bit different, it was what you were looking at

5    before.  It's my page 11.  It's after that part that

6    Counsel asked you about with the emotionally fragile,

7    that line.  It might be 11 or 12 on your copy.  I don't

8    have that one.

9    A    I'm not finding it quickly, but -- oh, it's at the

10   top of page 11.

11        Q   Okay.  Can you just hold that page open for a

12   little bit?  In that next paragraph, I -- my copy says,

13   "Mother indicates."

14   A    That's correct.

15        Q   Okay.  Can you talk about what you were

16   describing in this paragraph that Mom was reporting to

17   you?

18   A    So -- well, I urged Mom to convey the -- well, the

19   description of J.'s impulsive and erratic anger to the

20   therapist and so that they could add that to what they

21   already knew about her irrational fears, to be sure

22   that they had -- the therapist had all of the

23   information or additional information about her

24   clinical condition at the time.

25        Q   So it says in here that Mom was reporting

 1   that she was having irrational fears and pervasive mood

 2   disturbances and avoidant behaviors even when not under

 3   stress.

 4   A    Could you just tell me where?

 5        Q    Oh, yeah, I'm sorry.  It's in that paragraph.

 6   A    Okay.

 7        Q    Like halfway -- maybe three-quarters of the

 8   way down.

 9   A    Okay.  I have it.  Yes.

10        Q    So is it safe to say that -- or fair to say

11   that J. was exhibiting -- or under some stressors that

12   weren't related to school?

13   A    She might have been.

14        Q    And she was -- it was reported to you -- was

15   it reported to you that she was exhibit irrational

16   fears and anxiety even though she hadn't been in school

17   for several months at that point when you saw her, at

18   least nine months?

19   A    I think so.  Yes.

20        Q    So the effect that you described before and

21   the way that she presented, that was even in the

22   absence of attending school?

23   A    Right.

24        Q    Would you be surprised to learn that only a

25   couple days after you met with her that she attended

Platt - Cross                                  91

1    school full time?

2              MS. WARSHAW:  Objection to the --

3              THE WITNESS:  I --

4              MS. WARSHAW:  -- couple days reference.

5              THE COURT:  Couple of days.

6              MS. HOWLETT:  August 11th, I believe -- I'm

7    sorry -- September 11th.  I don't know the exact date

8    that --

9              THE COURT:  Within a week?

10             MS. HOWLETT:  Within a week.

11             THE COURT:  Within a week.

12             THE WITNESS:  I wouldn't necessarily be

13   surprised depending upon what the specific arrangements

14   were for her.

15   BY MS. HOWLETT:

16        Q    Would you be surprised to learn that she

17   attended school -- a non-therapeutic school

18   environment?

19   A    Well, I'd want to know for how long and what the

20   circumstances were.  In other words, I can't answer

21   that yes or no question.

22        Q    That's fair.  When you used the term

23   "behavior" before, I assume you're using it in a -- a

24   clinical type of way, we aren't clinicians.  So we

25   typically think about behavior maybe I a different

Platt - Cross                                                    92

1      manner.  Can you just describe when you use the word

2      "behavior" what that might refer to?

3      A    Okay.  So behavior that she displayed when I saw

4      her included a lot of anxiety and the way that I

5      described it was she projected tension, sat with her

6      arms tightly crossed, indicated posture that was ill at

7      ease, but part of the tension is what's known as

8      psycho-motor retardation which is pretty classical -- a

9      pretty classical symptom of depression.  So could you

10     just ask the question again, because I can -- I'm gong

11     to give -- I can give you more mental status

12     information, but I want to make sure I'm answering your

13     question.

14          Q    Yeah.  No.  Thank you, Dr. Platt.  We're

15     really just trying to get to the sense of when you use

16     the term "behavior."  You're not necessarily referring

17     to what -- what the common sense of aggressive or

18     erratic, behavior -- do you use behavior to describe a

19     bunch of different types of --

20     A    You're correct and my use of the term in regard to

21     her was immediate interaction, immediate response to

22     the environment that she was in.

23          Q    Did -- in your assessment of J. did you

24     observe or find that she had an inability to build or

25     maintain inter personal relationships with her peers?

Platt - Cross                                      93

1    A    Well, I never saw her with her peers.  So I

2    couldn't say by direct observation, but I certainly

3    thought that based on what I knew about her.

4         Q    Based upon what was reported to you?

5    A    Yeah, and also based upon her presentation in the

6    interview which would suggest that there was some

7    limitation in her peer relationships.

8         Q    Did she present with a pervasive mood of

9    unhappiness or depression to your recollection?

10   A    Pardon?

11        Q    To your recollection.

12   A    She did.  Yes.

13        Q    And did -- did in your observation did -- or

14   review of her the information that was provided to you,

15   did she present with fears associated with school or

16   being around other people?

17   A    Well, she looked fearful when she was with me.  So

18   I considered that to be significant.  She -- some of

19   the self harming behaviors that she had did relate to

20   school as for example she said she hated school since

21   sixth grade, she couldn't relate to the kids, but she

22   also said everybody hated school, but I did extrapolate

23   from her comment that her feelings and behaviors were,

24   yes, related to school.

25        Q    You testified earlier that you were not -- or

Platt - Cross                                    94

1    you're not familiar necessarily with the specific

2    definition of emotionally disturbed under the

3    Administrative Code.  Are you aware that the

4    Administrative Code and the DSM do not necessarily have

5    the same criteria?

6    A    I -- if I thought about it I would be aware, yes.

7         Q    Have you ever been to Mendham High School?

8    A    No.

9         Q    Have you ever observed the Being Successful

10   program at Mendham High School?

11   A    The what program?

12        Q    The Being Successful program?

13   A    Oh, no.

14        Q    The BSP.

15   A    No.

16        Q    When you made your recommendations, we talked

17   about those earlier, Counsel had --

18   A    Um-hum.

19        Q    -- asked you about those 14 recommendations,

20   do you think that J. would have benefitted from having

21   access to a counselor throughout the school day?

22   A    She could.

23        Q    What about a transition program where she

24   slowly went from a half a day or portions of a day into

25   maybe -- with the goal of getting into a full day at

Platt - Cross                              95

1    school?

2    A    Well, that by itself is theoretically possible,

3    but that does not include other exposures within the

4    building that could affect her, unmonitored,

5    unanticipated types of interactions.

6         Q    So a program that limited those types of

7    interactions, would that be beneficial to J.?

8    A    Well, they pretty much have to be absent, not just

9    limited.  She was very fragile at the time and any

10   interaction was really very risky.

11        Q    So when you say -- you commented before about

12   maybe a traditional high school or -- or a big space

13   versus a small space, I think you even commented on the

14   word "small," in your opinion what -- what do you

15   consider to be a small environment?  You talked about a

16   lot of kids coming to school at the same time and J.

17   having to interact with them and so what -- what in

18   your vision or expertise would you consider to be a

19   small environment?

20   A    Well, small meaning a building that is not -- I

21   don't know what Mendham High School looks like, but I

22   have been in a number of high schools and typically

23   they're three or four stories and many rooms on each

24   floor, et cetera.  So my image of a place where she

25   would be comfortable would be a setting much smaller

Platt - Cross                                          96

1    than that with a -- with things like entrances and

2    exits that are monitored and controlled with options in

3    terms of where kids could have lunch and interact with

4    others and where there is some control to the noise

5    level and where there is immediate access to support

6    staff and yes, a -- a daily counselor.

7         Q    So some therapeutic supports at school?

8    A    I would say some therapeutic support in the

9    context of a -- of an atmosphere that she experienced

10   as therapeutic.

11        Q    Can you just explain what you mean by that?

12   A    In the context of an atmosphere where she would

13   not be overwhelmed by number of people, by size, by

14   having -- thinking that she might have to navigate a

15   long distance between this location that she would have

16   to go to and that location that she would have to go to

17   and where she had immediate access or fairly immediate

18   access to support staff.

19        Q    And by "support staff" you mean -- can you

20   describe what you mean by that?

21   A    Support staff meaning special education teachers,

22   counselors, therapists, psychologists, I guess staff of

23   that nature, perhaps -- perhaps an educational

24   specialist, but that is kind of out of my territory,

25   but in thinking about the totality of things that she

1    would need I would mention that.

2         Q    And besides this report and this -- you've

3    met with J. once.  Is that correct?  And have you met

4    with her since then?

5    A    I have not.

6         Q    Or before this report did you meet with her?

7    A    No.

8         Q    Or her family?

9    A    No.

10        MS. HOWLETT:  Thank you, Your Honor.  I have

11   no further questions.

12        THE COURT:  Any redirect?

13        MS. WARSHAW:  Sure.

14   REDIRECT EXAMINATION BY MS. WARSHAW:

15        Q    You had indicated that the additional

16   information that Counsel was talking about that the

17   mother -- that you noted the mother shared in your

18   report, does that assist with determining what would be

19   an appropriate educational placement for a child?

20   A    Can you reference the --

21        Q    Oh, sure.

22   A    -- exact --

23        Q    It's on my page 11 or it's that paragraph

24   that said, "Mother indicates."

25   A    Okay.

Platt - Redirect                                    98

1        Q     You had -- you had specified that that was

2    additional information to give to the therapist that

3    would help in the treatment of J.H.  Is -- is that a

4    fair characterization?

5    A     Yes, it is.

6        Q     Okay.  So would that information be helpful

7    to the School District to determine an appropriate

8    placement for J.H.?

9    A     Perhaps.

10       Q     And even if J.H. suffered from extreme

11   anxiety and it's pervasive depression, even if that, is

12   it in -- in your opinion would it be appropriate just

13   to address that aspect of a child or all of her needs

14   in a learning environment?

15   A     I'm not sure that I completely understand the

16   question, but her emotional issues were so pervasive

17   that -- that the totality of her had to be understood

18   and addressed.

19       Q     So would you have expected the -- the School

20   District to determine a placement based on her

21   emotional needs as well as her academic needs of having

22   a disability?

23   A     Well, I would say primarily her emotional needs,

24   but I mean, at some point her academic needs would have

25   to be included.

Platt - Redirect                              99

1         Q    So if I -- if I told you that in her current

2    placement she has special education teachers, access to

3    counselor --

4              MS. HOWLETT:  Your Honor, these are all facts

5    that aren't in evidence.

6              THE COURT:  Very true.

7              MS. WARSHAW:  I'm just asking if that would

8    be appropriate in her -- would that fit within her

9    definition of what would be appropriate for her?

10             MS. HOWLETT:  It sounds like the BSP, Your

11   Honor.

12             THE COURT:  Sounds like.  You know what?

13   I'll allow it.  Go ahead.

14             MS. WARSHAW:  Thank you.

15             THE COURT:  You can answer the question,

16   Doctor.

17             THE WITNESS:  Could you ask the question

18   again?

19   BY MS. WARSHAW:

20        Q    Sure.  If -- if I told you that J.H. was in a

21   learning environment right now where she had access to

22   a counselor and weekly sessions, she had special

23   education teachers, small classes and a -- a -- a

24   psychologist that came a few times a week, would that

25   fit into the definition of what you believe would be

1    appropriate --

2    A    It would.

3         Q    -- environment for her?

4    A    It would.

5         Q    And if I told you that she only had five or

6    six kids in -- in her class and she had her own dorm

7    room to go to in between classes to, you know, do her

8    homework or just to get away, would that fit into

9    something like the learning environment that you are

10   describing?

11   A    Yes.

12        Q    So if -- if I told you that J. -- when J.H.

13   arrives to school she checks in with the nurse -- well,

14   before school starts as well as in health center as

15   well as at the end of the day, would that also be

16   within your definition of what would be appropriate for

17   J.H. for a learning environment?

18   A    Well, I actually think it's mandatory.  So yes.

19             MS. WARSHAW:  No further questions.  Thank

20   you.

21             THE COURT:  Do you have any --

22             MS. HOWLETT:  I have no --

23             THE COURT:  -- any --

24             MS. HOWLETT:  -- questions, Your Honor.

25             THE COURT:  Thank you, Doctor.  You're

                              Colloquy                    101

1    excused.

2              THE WITNESS:  Can I just leave this here?

3              MS. WARSHAW:  Yes.

4              THE COURT:  Yes.

5              MS. WARSHAW:  Thank you very much.

6              THE COURT:  Do you have another witness?

7              MS. WARSHAW:  I have one more witness, yes,

8    Your Honor.  The fourth one is going to come in August.

9    She couldn't make it suddenly.  So --

10             THE COURT:  Okay.

11             MS. WARSHAW:  Can we take a five minute

12   break?

13             THE COURT:  Sure.

14             MS. WARSHAW:  Okay.

15                      (BRIEF RECESS)

16             THE COURT:  J., how are you?

17             J.H.:  I'm good.

18             THE COURT:  Okay.  I'm sure your -- your

19   attorney told you what I said --

20             J.H.:  Yeah.

21             THE COURT:  -- when I asked you to leave the

22   room.  I didn't meant to be abrupt with you, but it is

23   highly unusual for the child and you're still a child

24   in a special education case to testify.  It's really --

25   and I don't mean -- I don't mean to be disrespectful.

1    It is not going to help me make a decision what you're

2    going to tell me.  What's going to help  me make a

3    decision are the factual statements that were made to

4    me by the various witnesses from the school and by the

5    -- by the witnesses that were called by your attorney

6    to tell me what situation you're in and how that could

7    be remedied.

8         So what you're going to tell me is you're going to

9    help me -- it's highly unusual and quite frankly I

10   didn't notice you were there in the beginning and -- I

11   didn't, because I was -- I had this view and you were -

12   - you were -- your face was blocked out by the thing.

13   When I finally realized well, that's a young girl

14   there, that must be J.

15        Had I known initially I would have asked you and

16   your Mom to go sit outside, because what has to be said

17   about your situation can be trying to you and I think

18   it's -- I really personally think it's not appropriate

19   for you to be here and listen to what has to be said.

20   I mean, in your situation it's not quite as bad as

21   other children that have special ed. needs, but to hear

22   what has to be said can be -- can be problematic for

23   you.

24            So I understand you wanted to testify, that

25   you're strong and you want to go forward with that, but

Colloquy                                          103

1      I'm not going to allow it and I'm -- so for that matter

2      we're done today.  Okay.

3                Okay?  We're done.  Very good.  Our next date

4      is the 29th, yes?  You have one more witness?

5                MS. WARSHAW:  I have three more witnesses.

6                THE COURT:  Excuse me?

7                MS. WARSHAW:  I have three more witnesses.

8                THE COURT:  You have three more witnesses?

9      Oh, I thought you only had one.  Let's go off -- we

10     don't need to be on the record.

11               {Whereupon, the proceedings were adjourned.}

12                             * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF NEW JERSEY }

2    COUNTY OF     }

3

4          I, Lee A. Romano, assigned transcriber, do

5    hereby affirm that the foregoing is a true and accurate

6    transcript of the proceedings in the matter of <u>F.H. and</u>

7    <u>M.H. on behalf of J.H. v. West Morris Regional High</u>

8    <u>Board of Education</u>, bearing Docket No. EDS 10706-17,

9    heard on July 25, 2018, before the Office of

10   Administrative Law Court.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                  STATE OF NEW JERSEY
                                  OFFICE OF ADMINISTRATIVE LAW
                                  OAL DOCKET NO. EDS 10706-17
```

```
_____
                            :
F.H. AND M.H. ON BEHALF     :
OF J.H.,                    :
                            :
          Petitioner,       :
                            :            TRANSCRIPT
-vs-                        :                OF
                            :        RECORDED PROCEEDINGS
WEST MORRIS REGIONAL        :
HIGH BOARD OF EDUCATION,    :
                            :
          Respondent.       :
_____:
```

                              August 29, 2018


BEFORE:

     THE HONORABLE THOMAS BETANCOURT, A.L.J.


APPEARANCES:

     WARSHAW LAW FIRM, LLC
     By:  Julie Warshaw, Esq.
     Attorney(s) for the Petitioner

     CLEARY GIACOBBE ALFIERI JACOBS LLC
     By:  Jodi S. Howlett, Esq.
     Attorney(s) for Respondent

                         Transcriber:  Lee A. Romano
                         CRT SUPPORT CORPORATION
                         2082 Highway 35, P.O. Box 785
                         South Amboy, N.J.  08879
                         Phone: (732) 721-4330
                         Fax:   (732) 721-7650

I N D E X                                                    2

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| NICOLE DOWD | | | | |
| By Ms. Warshaw | 5 | | 26 | |
| By Ms. Howlett | | 25 | | |
| CHRISTINE DUVALL | | | | |
| By Ms. Warshaw | 28 | | | |
| By Ms. Howlett | | 38 | | |
| NATALIE SCHUBERTH | | | | |
| By Ms. Warshaw | 43 | | 84 | |
| By Ms. Howlett | | 79 | | |

E X H I B I T S                                3

| NO. | DESCRIPTION | I.D. | EVID. |
|-----|-------------|------|-------|
| P-40 | Duvall's observation notes | | 43 |
| P-42 | 2017-2018 fall term report card | | 19 |
| P-43 | 2017-2018 spring interim report card | | 19 |
| P-44 | College Board accommodation letter | | 25 |
| P-48 | Duvall curriculum vitae | | 43 |
| P-49 | Letter | | 19 |

Colloquy                                                    4

1          THE COURT:  Okay.  This is the continued

2     hearing in the matter of F.H. and M.H. on behalf of

3     J.H. v. West Milford -- West Milford -- West Morris

4     Regional Board of Education, docket numbers EDS 10706-

5     17.

6          Today is the 20 -- August 29, 2018.  I'm

7     Judge Betancourt.

8          Appearances for Petitioners?

9          MS. WARSHAW:  Julie Warshaw, Warshaw Law Firm

10    on behalf of Petitioners.

11         THE COURT:  Good morning.

12         MS. HOWLETT:  Jodi Howlett, Cleary, Giacobbe,

13    Alfieri, Jacobs, on behalf of Respondent School

14    District.

15         THE COURT:  Good morning.  Good morning to

16    you unknown person.

17         THE WITNESS:  Good morning.

18         THE COURT:  I assume she's your witness?

19         MS. WARSHAW:  Yes, Your Honor.

20         THE COURT:  Would you raise your right hand

21    please?

22    N I C O L E   D O W D, PETITIONER'S WITNESS, SWORN:

23         THE COURT:  Thank you.  State your name and -

24    -

25         THE WITNESS:  Nicole -- Nicole Dowd.

Dowd - Direct                                              5

1           THE COURT:  Spell your last name.

2           THE WITNESS:  D-O-W-D.

3           THE COURT:  Thank you, Ms. Dowd.  Proceed.

4           MS. WARSHAW:  Okay.  Thank you.

5    DIRECT EXAMINATION BY MS. WARSHAW:

6           Q    Ms. Dowd, where are you employed?

7    A    Purnell (phonetic) School.

8           Q    And how long have you been employed there?

9    A    This will be my second year.

10          Q    What is your job title?

11   A    I'm a teacher in the STEM department as well as a

12   learning specialist in our LAC program.

13          MS. HOWLETT:  Your Honor, can I ask what the

14   proffer of this witness is?

15          THE COURT:  You can.

16          MS. WARSHAW:  Part of the -- the case is that

17   we placed her unilaterally at the Purnell School and

18   part of it also is to show that she's doing well and

19   also what the issues are that the Purnell School has

20   seen when she got there as well as now and those are

21   relevant to our case as to, you know, why this is an

22   appropriate placement for her.

23          MS. HOWLETT:  Your Honor, Respondent objects

24   to this witness.  As per Your Honor's order, the

25   Court's order, first of all this witness -- it's from

1    Purnell School which the student was placed after the

2    date of the IEP and has no relevance to whether the

3    District offered the student FAPE.

4              MS. WARSHAW:  And Your Honor, you had allowed

5    us to file an amended complaint and in that amended

6    complaint it not just looks at the time that the IEP

7    was initiated, but it also goes through the time that

8    the parties were trying to work something out for

9    placement as well as the independent evaluation --

10             THE COURT:  Settlement discussions are not

11   coming into play here at all.  I'm not going to --

12             MS. WARSHAW:  I'm sorry?

13             THE COURT:  You're talking about settlement

14   discussions?

15             MS. WARSHAW:  No, but it was during the time

16   frame that we were trying to work something out plus

17   the independent evaluations came in and that is part of

18   --

19             THE COURT:  After the IEP?

20             MS. WARSHAW:  -- our -- correct, but that's

21   also part of the due process action.  We're not just

22   looking at the -- the moment in time that the IEP was

23   formulated.  We're looking at whether or not that IEP

24   would have even met her needs and also, you know, the

25   independent evaluations and what they were and -- and

Dowd - Direct                                    7

1     if they were applied and also the unilateral placement

2     and whether or not that was appropriate and she is

3     going to testify as well as our next witness about the

4     appropriateness of the Purnell School.

5              THE COURT:  Your next witness is also from

6     the Purnell School?

7              MS. WARSHAW:  Yes and she's the counselor at

8     the Purnell School.

9              THE COURT:  Last word.

10             MS. HOWLETT:  This witness and any witness

11    from Purnell School has no relevance as to whether the

12    District complied with the IDEA or whether the IEP was

13    reasonably calculated to offer meaningful educational

14    benefit to this student.  So we object.

15             MS. WARSHAW:  Your Honor, I have to show that

16    the --

17             THE COURT:  Last word means last word.

18             All right.  I'm going to take five minutes.

19    I'm going to think about this seriously, because I'm

20    not sure I'm going to allow this witness.

21                       (BRIEF RECESS)

22             MS. WARSHAW:  -- do that.  There's only a few

23    of them.

24             THE COURT:  Okay.  We're back on the record.

25    We had some colloquy about joint exhibits and

                        Dowd - Direct                        8

1    Petitioner's exhibits and Respondent's exhibits which

2    will be rectified before we're finished I'm sure.

3    Actually I'm not sure, but I hope so.

4            All right.  I've made a decision.  I'm going

5    to allow Ms. Dowd to testify.  You can proceed with

6    your direct.

7            And your objection is noted, Ms. Howlett.

8            MS. HOWLETT:  Thank you, Your Honor.

9    BY MS. WARSHAW:

10       Q    Ms. Dowd, can you describe for us your job

11   responsibilities at the Purnell School?

12   A    I am a teacher there.  So I teach math and science

13   classes as well as I meet students one on one with --

14   if they need some remediation or help with executive

15   functioning.

16       Q    Are you also a school counselor as well?

17   A    No, I am not.

18       Q    No.  Okay.  Did you have J.H. -- and we're

19   going to refer to the Petitioner as J.H., her initials.

20   Was J.H. in any of your classes at the Purnell School?

21   A    Yes.  She was in my algebra two class.

22       Q    And how would you characterize your

23   relationship with J.H.?

24   A    I knew her as a student in my class as well as she

25   was my advisee for the school year.  So I met her once

Dowd - Direct                                          9

1   a week to talk about how she was feeling at school and

2   academics.

3        Q    And what is your -- what are your job

4   responsibilities as school advisor?

5   A    We are the contact with a student's parent and as

6   I said we meet them once a week and go over academics

7   as well as anything the student may wish to talk about.

8   So that can vary.

9        Q    Do you recall any issues regarding J.H.

10  academically that you would have discussed with her?

11  A    No.

12       Q    Can you please describe for the Court what

13  J.H. was like emotionally when she first started at the

14  Purnell School?

15  A    She was quiet and reserved.

16       Q    Anything else?

17  A    No.

18       Q    Okay and can you describe for the Court what

19  J.H. was like academically when she first started at ht

20  Purnell School?

21  A    She was a very conscientious student, always

22  arrived on time with the right materials, good listener

23  in class.

24       Q    Were you ever made aware that J.H. had a

25  specific learning disability in math?

Dowd - Direct                                    10

1    A    Yes.

2                MS. HOWLETT:  Your Honor, objection.  That's

3    --

4                THE COURT:  Sustained.

5                MS. HOWLETT:  Thank you.

6                THE COURT:  Where are you going with that?

7                MS. WARSHAW:  I'm just asking her whether or

8    not she was made aware of that because my next

9    questions would talk about whether or not she gave any

10   accommodations for her.

11               MS. HOWLETT:  That's a fact not in evidence,

12   Your Honor.  We haven't established that the student

13   has a learning disability in math.

14               MS. WARSHAW:  Okay.  Our next -- one of our

15   next witnesses will certainly do that and also in our

16   joint exhibit binder is the report from Dr. Schuberth

17   which diagnoses her as specific learning disability.

18               MS. HOWLETT:  Under the DSM, Your Honor, not

19   the Code.

20               THE COURT:  Got it.  Ask another question.

21   BY MS. WARSHAW:

22        Q    Did you ever provide -- strike that.

23               I'm going to refer you to what's been marked

24   P-49.  Turn to that exhibit in the binder in front of

25   you.

Dowd - Direct                                11

1          Can you identify what that is?

2    A    It's a letter I wrote describing J. at our school

3    this past year.

4          Q    And in this letter in the fifth paragraph do

5    you identify some issues that J.H. had with regard to

6    learning?

7    A    I did.

8          Q    And what are those?

9    A    Slower processing speed and dyscalculia.

10              THE COURT:  Say that last one again.

11              THE WITNESS:  Dyscalculia.

12              MS. WARSHAW:  Can you --

13              THE COURT:  Thank you.

14              MS. WARSHAW:  Do you want it spelled, Your

15   Honor?

16              THE COURT:  No.  I want to know what it is.

17              MS. WARSHAW:  Okay.  That's what my next

18   question was.

19              THE COURT:  Thank you.

20   BY MS. WARSHAW:

21         Q    Can you describe for the Court what

22   dyscalculia is?

23   A    It's a math learning disability.

24              MS. HOWLETT:  Your Honor, is this witness

25   qualified to diagnose --

Dowd - Direct                                    12

1          THE COURT:  That was going to be my next

2     question.  Why don't you ask her that?  What's her

3     background in -- able to diagnose --

4          MS. WARSHAW:  I'm not asking her to diagnose

5     it.

6          THE COURT:  Well, you're going to have to if

7     she's going to testify about it.  If she doesn't have a

8     background in this I'm not going to allow it.

9          MS. WARSHAW:  I'm just asking her what this

10    was.

11         THE COURT:  No, no.

12         MS. WARSHAW:  Ms. Dowd --

13         THE COURT:  No, no.  She just testified that

14    she identified it.  That was your question.  In

15    paragraph five did you identify issues with her

16    education or words to that effect and she said, "Yes.

17    Slower processing speed and," could you say that last

18    word again?

19         THE WITNESS:  Dyscalculia.

20         THE COURT:  Thank you.

21         MS. WARSHAW:  I'm not -- okay.  I will

22    clarify with my question.

23         THE COURT:  Please.

24    BY MS. WARSHAW:

25         Q    Ms. Dowd, did you diagnose J.H. with these

Dowd - Direct                                    13

1    two issues or were they told to you at some point?

2    A    They were told to me.

3         Q    Okay.  Who told you?

4    A    We have an educational psychologist at Purnell and

5    she told us information.

6         Q    And what's that person's name?

7    A    Martha Torrez (phonetic).

8         Q    Okay.  Thank you.

9              In your classroom did you provide any

10   accommodations for J.H.?

11   A    Yes.  She was always allowed for untimed tests and

12   quizzes as well as use of a calculator.

13        Q    You mentioned something in your letter about

14   a flipped classroom.  Can you describe what that is?

15             THE COURT:  A flip, F-L-I-P?

16             MS. WARSHAW:  Flipped, F-L-I-P-P-E-D.

17             THE COURT:  Thank you.

18             THE WITNESS:  That is where for certain

19   lessons I make a video that the students will watch on

20   their own time.  It's a short, ten to 15 minutes where

21   they can get some of the definitions in the beginning

22   concepts and have the ability to rewind it, take notes

23   at their own speed, come into class all ready with

24   questions.

25   BY MS. WARSHAW:

Dowd - Direct                                    14

1          Q    And can you describe the learning environment

2     in your classroom at the Purnell School?

3     A    We have small classrooms.  There was usually eight

4     to ten students in a class, quiet, individualized

5     attention.

6          Q    Can you describe for us the academic level of

7     the students at the Purnell School?

8     A    It is a college preparatory school.  So they --

9     all our classes are geared towards that and there's 100

10    percent college admission for our last graduating

11    class.

12         Q    And in your opinion do you feel that J.H. fit

13    into that academic environment?

14    A    She did.

15         Q    If a student is feeling stressed or needs a

16    break during school at the Purnell School do they have

17    a place to go?

18    A    They do.  In between classes they may go to their

19    dorm room or if it's during a class they may go to the

20    health center and sit with the nurse or there's some

21    quiet rooms in there they can go or speak with the

22    counselor.

23         Q    And even if a student is not a residential

24    student are they assigned a dorm room?

25    A    They are.

Dowd - Direct                                     15

1      Q    And where do the students eat lunch at the

2    Purnell School?

3    A    In the dining hall.

4      Q    And how many students are at the school?

5    A    This past year there was 58 students.

6            THE COURT:  How many?

7            THE WITNESS:  Fifty-eight.

8            THE COURT:  Thank you.

9    BY MS. WARSHAW:

10      Q    To your knowledge does J.H. have friends at

11    the Purnell School?

12    A    Yes, she does.

13      Q    And how -- if you can describe for the Court

14    how J.H. did academically in your class as well as if

15    your advisor, if you knew of anything personally about

16    the other classes?

17    A    J.H. made all A's last -- last year at Purnell

18    School.  She did very well.  As her advisor speaking to

19    other teachers they always had very positive things to

20    say about her and her school work.  In my class it was

21    the same.

22      Q    And to your knowledge did J.H. take advantage

23    of the accommodations that you provided in your class

24    for her?

25    A    She always had her calculator out.  I don't

Dowd - Direct                                    16

1    remember if she always used the extended time, but it

2    was always offered to her.

3         Q    To your knowledge has J.H. ever had any

4    behavior issue at school?

5    A    No.

6         Q    To your knowledge did you notice a difference

7    in J.H.'s level of anxiety and depression from the time

8    that she started at the Purnell School until the time

9    at the end of the school year?

10   A    I -- I don't know.

11        Q    Did J.H. ever talk to you about attending

12   college?

13   A    Yes, she did.

14        Q    To your knowledge has she visited any

15   colleges or universities?

16   A    Yes.  She did.  She has.

17        Q    I'm going to refer you to P-42 and P-43.  Can

18   you look at those exhibits?

19   A    Yes.

20             MS. HOWLETT:  Your Honor, these exhibits come

21   again after -- they're not in compliance with the

22   Court's order where the Petitioner is only permitted to

23   enter or submit evidence after the date of the IEP for

24   the purpose of demonstrating that the District didn't

25   comply with the IDA.  So I'm just curious how these

Dowd - Direct                                    17

1     documents do that.

2                  THE COURT:  I don't know what they are.  What

3     are they?

4                  MS. WARSHAW:  They're report cards with a --

5     from the Purnell School.

6                  THE COURT:  I'll allow the report cards.

7     BY MS. WARSHAW:

8          Q    Have you seen these report cards before?

9     A    Yes.

10         Q    Okay.  To your knowledge are they --

11                 THE COURT:  P-42 is a report card for which -

12    - which --

13                 MS. WARSHAW:  It's the first --

14                 THE COURT:  -- is it -- is it a marking

15    period?  Is it this year?  Last year?

16                 MS. WARSHAW:  Correct.  It's the first

17    marking --

18                 THE COURT:  Let's identify it so I know what

19    it is.

20                 MS. WARSHAW:  Okay.

21    BY MS. WARSHAW:

22         Q    Ms. Dowd, can you describe for us what the

23    report card is and what time frame for --

24                 THE COURT:  Start with --

25                 MS. WARSHAW:  P-42.

Dowd - Direct                                    18

1              THE COURT:  Thank you.

2              THE WITNESS:  P-42 is the fall term report.

3              THE COURT:  For which year?

4              THE WITNESS:  So it would have been 2017-

5     2018, the fall term.

6     BY MS. WARSHAW:

7         Q    And to your knowledge is -- is that report

8     card accurate as her advisor?

9     A    Yes.

10        Q    And you had testified that she received all

11    A's.  Is that accurately reflected in that report card?

12    A    Yes.

13        Q    And are there comments in that report card

14    from her teachers?

15    A    Yes, there is.

16        Q    Turning to P-43, can you identify the time

17    frame for those -- that report card?

18    A    This was the -- in the spring of 2017-2018 school

19    year, interim.  So halfway into the spring term.

20        Q    And can you tell me if those grades

21    accurately reflect your knowledge of J.H.'s grades at

22    that time?

23    A    Yes, they do.

24        Q    Okay and are those all A grades as well?

25    A    They are.  Yes.

Dowd - Direct                                              19

1          Q    And are there comments by all the teachers

2     about her performance?

3     A    Yes.

4               MS. WARSHAW:  Your Honor, I'd like to enter

5     those into evidence.  P-49 which is her letter as well

6     as P-42 and P-43.

7               MS. HOWLETT:  Your Honor, I maintain my

8     objection.

9               THE COURT:  I'm going to allow them.

10                                    (P-42, P-43 and P-49

11                                     were received in

12                                     evidence.)

13    BY MS. WARSHAW:

14         Q    You mentioned earlier that J.H. uses a

15    calculator.  Do you know if she was ever approved for

16    using a calculator for any other entity?

17    A    For the college boards she was allowed extended

18    time as well as the use of a four function calculator

19    on the non-calculator portion.

20         Q    I'm going to refer you to P-44 and can you

21    tell me if you recognize that document?

22    A    It's from the college board for J.H.'s

23    accommodations.

24         Q    Okay and just for the Court's knowledge the

25    college board is for what?

Dowd - Direct                                    20

1    A    It would be for the -- the PSAT and the SAT.

2              THE COURT:  Is this a letter?

3    BY MS. WARSHAW:

4         Q    Is that -- can you describe what that

5    document is?

6    A    It is a letter from the college board to J.H.

7    telling her what she has been approved on for their

8    testing.

9              MS. HOWLETT:  Your Honor --

10             THE COURT:  Okay.

11             MS. WARSHAW:  And those --

12             MS. HOWLETT:  -- we object again to this.  I

13   don't -- I don't know how this demonstrates whether the

14   District complied with the IDEA.

15             THE COURT:  Neither do I, but I'm going to

16   allow it.

17             MS. WARSHAW:  Your Honor, there's more to

18   this than just the District complying to the IDEA.  We

19   also have to show that the -- that the placement was

20   appropriate for her that unilaterally placed her and

21   I'm demonstrating that, that this was appropriate for

22   her as well as that she was receiving --

23             THE COURT:  I understand --

24             MS. WARSHAW:  -- accommodations --

25             THE COURT:  -- what you're doing.  First, you

Dowd - Direct                                      21

1   got to establish that FAPE wasn't offered.  I mean, at

2   this point -- I know you made a motion to dismiss which

3   I denied, because we don't have that rule, but at this

4   point the School District established FAPE.  You

5   haven't rebutted it yet and you're going on to whether

6   or not the placement was correct.

7              MS. WARSHAW:  Well, there is another witness

8   coming --

9              THE COURT:  Okay.

10             MS. WARSHAW:  -- today that the expert

11  witness that will certainly address that as well.

12             THE COURT:  Okay.  I'm going to allow the

13  questions and -- and --

14             MS. WARSHAW:  Thank you, Your Honor.

15             THE COURT:  Okay.  Go ahead.

16             MS. WARSHAW:  Your Honor, I have to note at

17  this time the concern of Petitioners that the Court has

18  indicated that the School District has demonstrated

19  FAPE when we're still in the middle of presenting

20  evidence as to whether or not --

21             THE COURT:  I'm questioning -- I'm

22  questioning why you're presenting a witness who's --

23  who's -- who's -- who's -- who's testimony seems to be

24  that the Purnell School is the appropriate placement.

25  That may well be and she's certainly testifying to

Dowd - Direct                                      22

1    that, but I mean, there's -- it's a two prong test.

2    The first test is whether or not FAPE was offered.  If

3    FAPE wasn't offered then this is the appropriate next

4    step and you --

5              MS. WARSHAW:  Correct.

6              THE COURT:  -- haven't addressed FAPE in your

7    -- in your case.  Ms. Howlett has in her case

8    obviously.  That's her burden.

9              MS. WARSHAW:  Well, we -- we have addressed

10   it with certain witnesses to date, but also we have

11   another witness coming at 10:30 that will address it as

12   well.

13             THE COURT:  Very well.  Thank you.

14   BY MS. WARSHAW:

15        Q    Okay.  Can you just -- Ms.  Dowd, can you

16   just clarify for the Court what accommodations J.H. was

17   approved for by the college board?

18        A    A four function calculator for use on the math

19   sections, reading, writing and math calculations time

20   and a half.

21             THE COURT:  That's the extended time?

22             THE WITNESS:  Yes.

23             THE COURT:  Okay.  Thank you.

24   BY MS. WARSHAW:

25        Q    Based on your knowledge of J.H. do you feel

Dowd - Direct                                              23

1    that she would be able to learn using a computer based

2    online program as opposed to a classroom?

3    A    No.

4         Q    And can you describe why not?

5    A    Her accommodations may still not be used or her

6    disabilities recognized and she wouldn't be allowed to

7    have that one on one interaction with the teacher.

8              MS. WARSHAW:  No further questions.

9              THE COURT:  I have a question.  You're not

10   going to know the answer to that.  That was offered --

11   was it online -- online -- online computer classes

12   offered to J.H. as part of the IEP?  I don't recall.

13             MS. HOWLETT:  No, Your Honor.

14             THE COURT:  It wasn't.

15             MS. HOWLETT:  It was an in District

16   placement.

17             THE COURT:  Okay.

18             MS. WARSHAW:  Your -- the --

19             THE COURT:  I'm not -- somehow -- and I have

20   -- I've reviewed the notes this morning, but I don't

21   remember -- I remember somehow that that came up during

22   the course of this, but I don't -- I don't -- I don't

23   seem to have it in my notes and I -- I just want some

24   clarity on -- on -- I mean, you asked the question and

25   I -- I know there's a reason for it, but I -- help me

Dowd - Direct                                24

1    here.

2              MS. WARSHAW:  Your Honor, in the behavior

3    support program she was offered online programs such as

4    gym class and if she was unable --

5              THE COURT:  That's what it thought.

6              MS. WARSHAW:  Right and -- and if she was not

7    able to go into the general ed. setting for college

8    preparation classes she could do it online in the

9    behavior support program.

10             THE COURT:  I thought that was part of your

11   case.

12             MS. WARSHAW:  Correct.

13             THE COURT:  Ms. Howlett?

14             MS. HOWLETT:  There could be alternatives for

15   that if she --

16             THE COURT:  Yeah.

17             MS. HOWLETT:  -- but that -- that's not what

18   the IEP provides.

19             THE COURT:  Okay.  All right.  I may ask you

20   both to address it in your closings, because I think

21   that's an important -- that's an important element for

22   me to know.  Okay?

23             MS. WARSHAW:  Your Honor, I'd like to just

24   enter P-44 into evidence.

25             MS.  HOWLETT:  We maintain our objection,

Dowd - Cross                                    25

1    Your Honor.

2                THE COURT:  Over your objection.

3                                    (P-44 was received

4                                    in evidence.)

5                THE COURT:  Cross?

6                MS. HOWLETT:  Thank you, Your Honor.

7    CROSS-EXAMINATION BY MS. HOWLETT:

8         Q    Just a couple questions, Ms. Dowd.  Just give

9    me one second.  I'm sorry.

10               What sort of licenses and certifications do

11   you hold?

12   A    I have a teaching certification in Georgia.  I'm

13   in the process of transferring it to New Jersey.

14        Q    So you don't have a teaching certificate in

15   New Jersey?

16   A    Not at this time, no.

17        Q    Do you have a -- are you a licensed LDTC?

18   A    No.

19        Q    Are you a licensed school psychologist?

20   A    No.

21        Q    Do you have any qualifications that allow you

22   to diagnose disabilities in children?

23   A    No.

24        Q    Do you have a certification in special

25   education?

Dowd - Redirect                          26

1    A    In Georgia.

2         Q    In Georgia.  Did you ever observe the Being

3    Successful program at Mendham High School?

4    A    I did not.  No.

5         Q    Did you review the IEP that the District

6    provided to J.H.?

7    A    I never saw that, no.

8              MS. HOWLETT:  No further questions, Your

9    Honor.

10             THE COURT:  Any redirect?

11             MS. WARSHAW:  Yes.

12   REDIRECT EXAMINATION BY MS. WARSHAW:

13        Q    Ms. Dowd, did -- did you ever diagnose J.H.

14   with any type of learning disability?

15   A    No.

16             THE COURT:  Yeah.  We established --

17             MS. WARSHAW:  Were you informed --

18             THE COURT:  -- we established that.  I got

19   that.  You cleared it up.

20             MS. WARSHAW:  Okay.

21             THE COURT:  All right.  It was the school

22   psychologist who informed her of that.

23             MS. WARSHAW:  Correct.

24             THE COURT:  Okay.

25   BY MS. WARSHAW:

Dowd - Redirect                                      27

1          Q    Okay.  Ms. Dowd, can you just please tell the

2     Court the degrees that you hold?

3     A    I have a Bachelors degree in math from University

4     of Chicago and MST in mathematics from the University

5     of Florida.

6          Q    Thank you.

7               THE COURT:  Okay.  You can step down.  Thank

8     you very much.

9               So we can take a ten -- half an hour break

10    for your next witness?

11              MS. WARSHAW:  I have another witness and then

12    there's a third one.

13              THE COURT:  Oh okay.  All right.  So we can

14    keep moving.  Great.

15              MS. WARSHAW:  Yes.

16              THE COURT:  All right.

17              THE WITNESS:  Do you want me to leave this

18    here?

19              THE COURT:  Yes please.  Leave that there.

20              MS. WARSHAW:  Thank you.

21              THE COURT:  All right.  I'm just going to

22    pause the recording until the next witness.

23                   (Pause in recording.)

24              THE COURT:  Good morning.

25              THE WITNESS:  Good morning.

Duvall - Direct                         28

1          THE COURT:  Would you raise your right hand

2     please?

3     M E G A N   C H R I S T I N E   D U V A L L,

4     PETITIONER'S WITNESS, SWORN:

5          THE COURT:  Thank you.  Would you state your

6     name and spell your last name please?

7          THE WITNESS:  Megan Christine Duvall, that's

8     D-U-V-A-L-L.

9          THE COURT:  M-E-G-H-A-N?

10          THE WITNESS:  M-E-G-A-N.

11          THE COURT:  M-E-G-A-N.  I should have asked

12     you to spell both.

13          Proceed.

14     DIRECT EXAMINATION BY MS. WARSHAW:

15     Q    Ms. Duvall, thank you for coming.  Can you

16     please tell us where are you employed?

17     A    I'm employed at the Purnell School.

18     Q    And how long were you employed there?

19     A    I was employed for two years.

20     Q    And what is your job title?

21     A    School counselor.

22     Q    And did you hold that position the whole time

23     you were at the Purnell School?

24     A    Um-hum.  I held it for two years and then I was

25     director advising this last year as well.

Duvall - Direct                              29

1          THE COURT:  I'm sorry.  Director of what?

2          THE WITNESS:  Advising.

3          THE COURT:  Okay.

4     BY MS. WARSHAW:

5          Q    So were you J.H.'s counselor?

6     A    Yes.

7          Q    Were you also her advisor?

8     A    No.

9          Q    And what were your job responsibilities as

10    the school counselor?

11    A    So I focus mainly on the social emotional.  I

12    didn't do the academics or the scheduling.  That was

13    somebody else.  So I did guidance lessons, group --

14    group counseling and individual counseling.

15         Q    I'm going to show you what's been marked P-

16    48.  Can you turn to that exhibit?

17    A    Yup.

18         Q    And can you identify for the Court what that

19    is?

20    A    That is my curriculum vitae.

21         Q    How long have you been a therapist or a

22    school counselor?

23    A    Well, school counselor the last two years at the

24    Purnell School.  Before that I was a regular therapist

25    doing mobile therapy work in people's houses.

Duvall - Direct                          30

1       Q    And how long did you do that?

2   A    I did that for -- so my husband was in the

3   military.  So I graduated with a Masters in 2014 and

4   from there we moved a couple different places, because

5   he was in training, but while I was there I worked at a

6   place called Shelter Care.  That is for students who

7   are going into juvenile detention or coming out of it

8   and I was their counselor working with them and then

9   from there I did mobile therapist work and then I was a

10  school counselor at Purnell.

11      Q    And can you tell me how many years you've

12  worked with adolescents?

13  A    Since -- well, that -- since I've graduated since

14  2014.  Before that I did my internship for a year.  So

15  I would say five years.

16      Q    And have you worked with adolescents with

17  anxiety and school related anxiety?

18  A    Yes.

19      Q    And how about depression?

20  A    Yes.

21      Q    And you testified that you had occasion to

22  work with J.H.  Can you describe the work that you did

23  with J.H.?

24  A    Yeah.  We met once a week and I've met with her

25  since the beginning of the year, because I knew coming

Duvall - Direct                                    31

1   in that she had anxiety and depression in the past.  So

2   we met weekly and we really worked on coping skills and

3   utilizing them and just how she is adjusting to this

4   new school.

5        Q    And can you describe J.H. at the time that

6   she entered the Purnell School?

7   A    Sure.  When she first got there -- her first day I

8   think she had a little bit of harder time.  She was

9   very anxious about coming.  Then she didn't stay for --

10   all the activities and in her first month just watching

11   her, she was-- she kind of kept to herself at first

12   just because I think she was new.  It's a new

13   environment, but after about the second month she was

14   really putting herself out there, making friends,

15   sitting with new people and just she was -- she was

16   getting out of her comfort level.  She was getting out

17   of her shell.

18        Q    And can you describe J.H. emotionally from

19   your knowledge, you know, at the end of this school

20   year how was she?

21   A    Well, yeah.  So at the beginning of the school

22   year when I first started counseling her she was very

23   shy, very reserved, didn't want to give too much

24   information at first, but by the end of the year she

25   was excited to come to our counseling session.  She was

Duvall - Direct                          32

1    like -- I want to talk to you about this week, so she

2    was always willing to talk and like divulge so much

3    information just to like tell me and get off her chest

4    and see what's going on so we can process it together.

5         Q    And in -- in your opinion do you feel that

6    J.H. gained coping skills with her anxiety and

7    depression?

8    A    Yes.

9         Q    I'm going to refer you to P-40.

10   A    Okay.

11        Q    Can you describe for me what those are?

12   A    Those are just my observations from -- that I

13   wrote down about J. for the first about month of

14   school.

15        Q    Okay and what's the date of that report?

16   A    October 12th, 2017.

17             THE COURT:  Is it a report or is it --

18             MS. WARSHAW:  I'm sorry.  A letter.

19             THE COURT:  It's a letter.  Okay.

20             MS. WARSHAW:  A letter.

21             THE COURT:  Thank you.

22   BY MS. WARSHAW:

23        Q    Can you describe for the Court, just

24   summarize kind of what is in that -- that letter?

25   A    Yes.  The first paragraph just says how she has

Duvall - Direct                                    33

1    been adjusting to Purnell and I said so far she's very

2    organized, she's up to date on all of her class work,

3    she's not really stressed out about that and then I

4    ended it with -- she's opening up and willing to work

5    on some social anxiety with surrounding school.  So

6    that's when she really started opening up and trusting

7    me.

8         Q    And can you describe the school setting at

9    the Purnell School?

10   A    Sure.  Purnell is about 58 girls and it's a very

11   small environment.  We're very small community.  The

12   classroom sizes are small between five and it gets as

13   big as 20 if that's a new seminar, but that only meets

14   twice a week.

15        It's just very a safe space.  There -- they get

16   comfortable with each other because they're always

17   there the same people, because it's a boarding school.

18   So they feel comfortable with the teachers and we get

19   to know them on different levels and just speaking up

20   more in class.

21        Q    To your knowledge did J.H. have some friends?

22   A    Yes.

23        Q    Yes?

24   A    Um-hum.

25        Q    Okay.  If you turn the page, there's another

Duvall - Direct                                              34

1    letter.  Did you write this?

2    A     Forty-one?

3         Q    It has the letterhead on it.  It says,

4    "Purnell School."

5                 THE COURT:  What was the number?

6                 MS. WARSHAW:  It's also P-40.

7                 THE COURT:  Oh, it's the same --

8                 MS. WARSHAW:  It is.  It's just the next

9    page.

10                THE WITNESS:  Yes.  I wrote that.

11   BY MS. WARSHAW:

12        Q    And is there a date on this letter?

13   A    There's not a date and I apologize.  I'm looking

14   at that, but I remember writing it in the spring, the

15   second semester.

16        Q    Okay.  Can you describe to the Court what

17   this letter says about J.H.?

18   A    This is just about her progress from when she

19   started and then how she is, I mean that second

20   semester and basically how much she has come out of her

21   shell.  For instance one thing I'm going to name in

22   here is, you know, she does have performance anxiety

23   and she has anxiety around some classrooms, but by the

24   second semester she was a lead in the school play that

25   she had to try out for and sing in front of everybody.

Duvall - Direct                                        35

1      She stayed in like a dance class.  She doesn't want a

2      dance class.  She tried it and she had anxiety with it,

3      but she stayed in it and she killed it, like she did so

4      well.  So she's just trying new things and like getting

5      past her anxiety and coping with them so she can do fun

6      thing and get out of her comfort zone.

7           Q    Are there any other types of therapy aside

8      from counseling available at the Purnell School?

9      A    So I was the only school counselor there for two

10     years.  They got a school psychologist this last year

11     and now they just hired another psychologist.

12          Q    And does the -- does the psychologist that

13     was there for this year to your knowledge did that

14     person ever meet with J.H.?

15     A    I don't know.  I'm not sure.

16          Q    If a student is stressed or -- or needs a

17     break, is there a place for them to go at the Purnell

18     School?

19     A    And that's what's -- what's great about it.  They

20     can go to the dorm room.  That's their safe space.  A

21     lot of the times though the girls actually come to the

22     health center.  They come to the health center to just

23     relax in my office if they want to or in the health

24     center they have rooms they can go to to just rest and

25     like deep breath before they go back out.

Duvall - Direct                                    36

1          Q    And did J.H. ever take advantage of those --

2     those services available?

3     A    Only -- I -- for me when she came to see me

4     outside of our counseling session only one time.

5          Q    And to your knowledge how was J.H. performing

6     academically at the Purnell School?

7     A    To the best of my knowledge she's doing very well.

8     Once a week we have wellness meetings and we go over

9     academic and social supports with the various --

10    teachers, various amount of teachers and she was never

11    brought up academically.  She never struggled.  She was

12    never one of our students that we worried about

13    academically at all.  She was always one -- higher

14    achieving ones.

15         Q    Were you ever informed that J.H. had a

16    specific learning disability or any type of learning

17    disability?

18    A    At the beginning of the year.

19              MS. HOWLETT:  Object, Your Honor.

20              THE COURT:  I'm going to allow it.  Go ahead.

21    Answer the question.

22              THE WITNESS:  Yeah, at the beginning of the

23    year.

24    BY MS. WARSHAW:

25         Q    And do you know who informed you of that?

Duvall - Direct                                    37

1    A     The school psychologist.

2          Q     To your knowledge has J.H. ever had any

3    behavior issue at school?

4    A     No.

5          Q     And can you describe the academic rigor or

6    the Purnell School?

7    A     Sure.  It's -- it's a college prep school.  So I

8    think what makes Purnell a little different than the

9    public schools or any other school is they go through

10   the same amount of work, they just focus on it a little

11   longer and like really dive into it and get more

12   information instead of just going to it real quick and

13   skipping over it.  So we just dive into things.

14         Q     Did J.H. ever talk to you about attending

15   college?

16   A     Yes.

17         Q     To your knowledge has she visited any

18   colleges?

19   A     Yes.

20         Q     I'm going to refer you to what's been marked

21   P-42 and 43.

22   A     Um-hum.

23         Q     Have you ever seen those reports before?

24   A     No.  I haven't.

25         Q     Okay.  Were you aware that J.H. was approved

Duvall - Cross                                         38

1    for accommodations through college board?

2    A    Yes,7

3         Q    Did you ever see any kind of letter, anything

4    indicating such?

5    A    No, just the school psychologist mentioned it in

6    our wellness meeting.

7         Q    And do you have an opinion as to based on

8    your information from J.H. and your meetings with her

9    as to what she is doing to ensure that her anxiety and

10   depression are under control?

11   A    Yeah.  I think just from our meetings she has

12   learned some coping skills, like she takes a break --

13   if she starts getting anxious she knows when to walk

14   away and just take a breath before she comes back.  She

15   likes to process things.  So that's when she'd come to

16   me to talk about things, anything that's on her mind.

17   She likes to listen to music and write music sometimes.

18   So that's like her main coping skills.  That really

19   worked for her.

20             MS. WARSHAW:  No further questions.

21             THE COURT:  Cross?

22             MS. HOWLETT:  Briefly, Your Honor.

23   CROSS-EXAMINATION BY MS. HOWLETT:

24        Q    Good morning, Ms. Duvall.

25   A    Good morning.

Duvall - Cross                                        39

1          Q    What sort of licenses and certifications do

2     you hold?

3     A    Yeah.  I have a school counseling license in the

4     State of New Jersey and I'm currently a licensed

5     associate counseling in the State of New Jersey as

6     well.

7          Q    So is that the educational services

8     certificate?

9     A    No.  So I'm -- I'm getting my license in licensed

10    professional counseling, before I get there I have to

11    have 4,000 hours of supervised hours before I get that.

12    So right now I'm intermediate, because I passed the

13    test.  So I'm just a licensed associate counselor in

14    the State.  So I can do agency and school for that.

15         Q    So you don't hold an educational services

16    certificate through --

17    A    School counseling.

18         Q     -- the Department of Education?

19    A    School -- yes.  I have a school counseling

20    license.

21         Yes, I have a school counseling license for the

22    State of New Jersey.

23         Q    The --

24    A    And I hold it from the education.  Yes.  It's from

25    the Board of Education.

Duvall - Cross                              40

1          MS. HOWLETT:  Your Honor can ask her a

2     question.

3               THE COURT:  Let her -- let her finish --

4               THE WITNESS:  I'm sorry.

5               THE COURT:  -- the question.  That's okay and

6     do me a favor, talk a little slower.

7               THE WITNESS:  Okay.  Sorry.

8               THE COURT:  I'm old.  I don't --

9               THE WITNESS:  I'"m a fast talker.  Yes.  I

10    know.  I'm sorry.

11    BY MS. HOWLETT:

12         Q    Do you hold an instructional certificate

13    through the Department of Education?

14    A    Instructional?  No.

15         Q    Do you hold an educational services personnel

16    certificate through the Department of Education?

17    A    Yes.

18         Q    Okay.  Thank you.

19              Counsel asked you about P-40.  Those are two

20    of the letters that you indicated that you drafted.

21    One of them's dated in October and you said that the

22    other one's undated, but you recall -- I believe you

23    testified that you recalled writing that in the spring.

24    A    Yes.

25         Q    Is that correct?  What caused you to write

Duvall - Cross                          41

1      these letters?

2      A    The first one, the school asked me to do it, the

3      admissions director, Kate Davis and so I just wrote it

4      and then the second one Julie reached out to me.  That

5      was in -- March, because I remember I was on spring

6      break when that happened.

7           Q    Okay.  So Counsel asked you to write the

8      letter?

9      A    Um-hum.

10          Q    Thank you.  Did you ever observe the being

11     successful program at Mendham High School?

12     A    Um-um.

13          Q    Did you review the IEP that the District

14     provided for J.?

15     A    No, because that's not my role.

16               MS. HOWLETT:  No further questions, Your

17     Honor.

18               THE COURT:  Any redirect?

19               MS. WARSHAW:  No.  Thank you, Your Honor.

20               THE COURT:  You can step down.  Thank you.

21               THE WITNESS:  Thank you.

22               THE COURT:  You have one more today?

23               MS. WARSHAW:  One more.

24               THE COURT:  They're not here yet?

25               MS. WARSHAW:  I can check.

Colloquy                                42

1          THE COURT:  Okay.  Let me pause the recording

2     while you do that.  If not, we'll take a break.

3                    (BRIEF RECESS)

4          THE COURT:  We're back on the record.

5          Good morning.  How are you?

6          THE WITNESS:  Good morning.  Good.  How are

7     you?

8          THE COURT:  Very good.  Would you please

9     raise your right hand?

10    N A T A L I E   S C H U B E R T H, PETITIONER'S

11    WITNESS, SWORN:

12         THE COURT:   Thank you.  Would you state your

13    name and spell your last name please?

14         THE WITNESS:  Natalie Schuberth, S-C-H-U-B-E-

15    R-T-H.

16         THE COURT:   Any relation to the theater

17    people?

18         THE WITNESS:  No.

19         THE COURT:  Too bad.

20         THE WITNESS:  Not that I know of.

21         THE COURT:  Okay.  Ms. Warshaw, go ahead.

22         MS. WARSHAW:  Thank you.  Your Honor, before

23    we start with Dr. Schuberth, can -- I'd like to enter

24    P-48 and P-40 into evidence from the last witness.

25         MS. HOWLETT:  Maintain my objection, Your

1    Honor.

2              THE COURT:  Okay.  They're in over Ms.

3    Howlett's objection.

4                                   (P-40 and P-48 were

5                                   received in

6                                   evidence.)

7              MS. WARSHAW:  Thank you.

8              THE COURT:  Okay.

9              MS. WARSHAW:  Okay.  Thank you.

10   DIRECT EXAMINATION BY MS. WARSHAW:

11        Q    Hi Dr. Schuberth.  Thank you for coming in.

12             Can you please tell the Court just your

13   involvement with this case, how you came about to know

14   J.H.?

15   A    Sure and where do I find my report?

16        Q    I can show you.  It's going to be in a

17   smaller binder.  I can give you mine.

18             THE COURT:  Is that in the joint exhibits?

19             MS. WARSHAW:  It's joint exhibit 31.

20             THE WITNESS:  So I was contacted, I think it

21   was by you about a year ago to do an independent

22   psycho-educational evaluation on the student.

23   BY MS. WARSHAW:

24        Q    Okay.  Thank you.  Can you please tell the

25   Court the highest degree that you have?

Schuberth - Direct                    44

1    A    Doctorate in psychology.

2         Q    And where are you employed?

3    A    Alexander Road Associates.

4         Q    It's J-31 so you know.

5              THE COURT:  Alexander who?

6              THE WITNESS:  Alexander Road Associates.

7              MS. HOWLETT:  J-18?

8              MS. WARSHAW:  Oh I'm sorry.  Your --

9              THE COURT:  Thirty-one she said.

10             MS. WARSHAW:  -- your resume.  The resume --

11             THE WITNESS:  That's my resume.

12             MS. WARSHAW:   Okay.

13             THE WITNESS:  Okay.  I was just looking --

14             THE COURT:  J-31 is the report?

15             MS. HOWLETT:  Is the resume.

16             MS. WARSHAW:  J-31 is her curriculum vitae.

17             THE WITNESS:  Okay.  I know that one.

18             THE COURT:  Okay.

19             THE WITNESS:  I know what's --

20             THE COURT:   Thanks.

21             MS. WARSHAW:  J-18 is her report.

22             MS. HOWLETT:  I mean, Your Honor, we'll

23        stipulate that Dr. Schuberth is an expert and that her

24        C.V. speaks for itself unless Your Honor wants to hear

25        her qualifications.

Schuberth - Direct                              45

1           THE COURT:  I do not.

2           MS. HOWLETT:  Do you promise to look --

3           MS. WARSHAW:  -- resume.

4           THE COURT:  I promise.  I read everything.  I

5      read everything I get.

6           MS. HOWLETT:  And we have no objection to

7      entering it.

8           THE COURT:  I read everything I get.  I read

9      my notes over and over again.  I actually listen to the

10     -- to the -- to the hearing recordings again, because

11     I'm not that smart and I need to refresh everything in

12     my head.  That's why I asked you that question, because

13     I knew that somewhere in the back of my head and I -- I

14     didn't write it down for some reason, but I knew it had

15     to -- that question was asked about online learning,

16     but I'm sorry.  Go ahead.  Okay.  You're an expert

17     without objection in psychology, yes?

18           THE WITNESS:  Yes.

19           THE COURT:  Okay.  Go ahead.

20     BY MS. WARSHAW:

21          Q    All right.  Okay.  We're going to skip a lot

22     of the questions that I was going to ask you about your

23     qualifications because you've just been entered in as

24     an -- as an expert in evidence.

25           I'm going to refer you to J-18 in that

Schuberth - Direct                      46

1   binder.  That should be a copy of your report.

2   A    Um-hum.

3        Q    Is that correct?  Okay.  So when you were

4   hired to perform independent evaluation are you

5   typically provided with documents to review?

6   A    Yes.

7        Q    And can you tell me in general what documents

8   you typically received and from who?

9   A    That's on page four.  So it was the previous

10  psychological testing from the school and her

11  psychiatric evaluation and a report card.

12       Q    And did you ever receive an educational

13  evaluation from the child study team?

14  A    No.

15       Q    Do you know if one was conducted?

16  A    No.

17       Q    And did the school district provide you with

18  a reason as to why you were doing this independent

19  evaluation?

20  A    No.  I didn't really talk to the school other than

21  to get the records.

22       Q    Okay.

23            THE COURT:  I'm sorry.  I wasn't -- I wasn't

24  clear as to why the -- that question was asked.  The

25  school --

Schuberth - Direct                              47

1              MS. WARSHAW:  Sometimes the schools will

2       contact the independent evaluators and explain what

3       they need or what the purpose of the evaluation is.

4       I'm just asking her in general if -- if that was done

5       in this case.

6              THE COURT:  Okay.

7              MS. WARSHAW:  That's all.

8              THE COURT:  Thanks.

9       BY MS. WARSHAW:

10         Q   I'm going to refer you to the first page of

11      your report.  You have a section called "Reasons for

12      Referral."

13      A     Um-hum.

14         Q   Can you just briefly describe what your

15      understanding of why you were doing this independent

16      evaluation?

17      A     That J. was diagnosed with depression and anxiety

18      and she has been having trouble going to school, but

19      she wanted to go to school.  So to try to figure out if

20      there's some underlying reason why that's been

21      difficult.

22         Q   When you see school testing have you ever

23      seen it without an educational evaluation?

24      A     Not that I can remember.  It's usually I.Q.

25      testing and educational and some emotional screener.

Schuberth - Direct                                48

1        Q    And can you describe for us the types of

2   reports -- types of testing that you did in general for

3   J.H.?

4   A    I did intellectual, educational, executive

5   functioning, memory and emotional.

6        Q    When J.H. was taking the tests -- the tests

7   and performing the tests in your presence did you make

8   any observations about her?

9   A    She was really quiet and reserved, but she

10  persisted with testing.  She would answer my questions,

11  but she didn't really initiate conversation and she

12  worked slowly and was slow to even start to answer and

13  then while she was answering she was kind of thinking

14  and answering slowly.

15       Q    Okay.  We're going to take your report and

16  kind of go step by step.

17  A    Okay.

18       Q    So you have a heading on page -- on page four

19  of your report, it says "Assessment of Intellectual

20  Functioning."

21  A    Um-hum.

22       Q    Could you walk us through some of your

23  findings under this heading?

24  A    Sure.  Give me one second to look at the scores.

25       So her overall intelligence was measured in the

Schuberth - Direct                                    49

1    average range.  So that's just where it should be.

2    It's not a bad word.  Just statistically where most

3    people her age fall.  So her overall I.Q., her verbal

4    skills, her visual spatial skills were average.  Her

5    processing speed was also average, but statistically it

6    was weaker than her other skills and working memory was

7    low average.  That was her lowest score.  So working

8    memory and processing speed were significant

9    weaknesses.  So in the classroom that would be that she

10   just needs a little more time to take in information to

11   answer questions and that it -- she may have some

12   trouble with retaining information the first time that

13   she hears it.

14        Q    And can you define like exactly what working

15   memory is?

16   A    Sure.  It's taking in information, manipulating it

17   in your head and spitting it back out.  So this might

18   be like mental math or remembering a phone number and

19   entering it at the same time or taking notes while

20   listening to the lecturer.

21        Q    And can you also just define what processing

22   speed is?

23   A    Sure.  This is how quickly someone takes in

24   information, makes a decision and acts on it.  So again

25   this would be like answering questions on tests or

1    writing notes.

2         Q    So having scores for working memory in the

3    low average range, could that affect J.H.'s ability to

4    learn?

5    A    Yes.  It could.

6         Q    In what way?

7    A    Again it might take her a little bit longer to

8    answer questions.  She might miss some information as

9    she's taking notes, because that's a very active

10   process where you have to listen to information, write

11   it down while continuing to listen to what's coming in.

12   So she may miss some things.

13        Q    And having a -- a weakness in processing

14   speed, could that also affect J.H.'s ability to learn?

15   A    Yes.

16        Q    In -- in what way?

17   A    Again that she might need repetition, she might

18   miss some things and then she would need more time to

19   answer and to do her work.

20        Q    Okay.  Let's turn to the next heading in your

21   report on page six, "Executive Functioning Memory and

22   Learning."  Could you walk us through your findings in

23   that section?

24   A    Sure.  Are we skipping "Academics?"

25        Q    Did I skip "Academics?"

Schuberth - Direct                    51

1    A    Sorry.

2         Q    I'm sorry.  Hang on.  Oh, you're right.

3    Sorry.  Let's do that first.  "Assessment of Academic

4    Functioning," can you walk us through your findings in

5    that section please?  That's on page five of your

6    report.

7    A    Okay.  So her -- most of her scores were above

8    grade level.  Most of her scores were actually above

9    high school level.  So her language abilities were

10   average or above for the most part.  Her reading

11   abilities were average or above and her writing was

12   average or above.  The only outlier was her math.  So

13   when it was untimed she scored above high school level,

14   but when there was a time limit her math skills looked

15   like a sixth grader and so she needed more time to

16   really show her really advanced math abilities.  So

17   that tells us that there's a learning disability and

18   specifically in math fluency.  So timed math.

19        Q    Okay and having this outlier of math being

20   such a discrepancy, would that affect J.H.'s ability to

21   learn?

22   A    Yes.

23        Q    And in what way?

24   A    So timed math tasks might underestimate her true

25   abilities and because it takes her longer class work

Schuberth - Direct                    52

1    and homework may take her longer and it would take her

2    away from other tasks.  It also could just be really

3    frustrating and exhausting for her, taking her away

4    from other subjects.

5         Q    Okay.  Now let's turn to page six, "Executive

6    Functioning Memory Learning."  Can you describe for us

7    the findings in that section of your report?  It's on

8    page six.

9    A    Sure.  So with that -- I'm sorry.  I forgot, with

10   the previous, because I just saw, I'm looking at the

11   scores, that her reading was actually at a college

12   level, but when things were timed she did lower.  So

13   oral word fluency also, not just the math fluency.  So

14   this is how quickly she can generate responses.  So she

15   gets there eventually and will have a grade level or

16   even better response, but it will take a little bit

17   more time.  I kind of see it as like a computer when

18   you have a lot of windows open.  So it's doing complex

19   things, but it slows it down a little bit and so that

20   kind of feeds into you were asking about executive

21   functioning and memory.  So her verbal memory was

22   better than her visual memory.  So she struggled with

23   specifically design memory was in the low average.  So

24   this is like abstract things which kind of feeds into

25   that and is congruent with that issue in math.  She did

1      best -- unlike most people she did best at remembering

2      a list of words that were unrelated as opposed to a

3      story.  So that tells me that she might get overwhelmed

4      if there's too much extra information and she has

5      trouble picking out the most important parts.  So in a

6      classroom it would be really important to really

7      highlight the most important parts for her and to

8      repeat things.

9          Also with the executive functioning she showed

10     good flexibility of thinking and problem solving.  The

11     only issues were when things were timed.  Then she --

12     her responses looked like they were lower than her true

13     abilities than -- than her I.Q. score says she can do

14     because of that time limit if that makes sense.

15         Q    So you had found very low range for

16     immediate memory.  Can you describe what that is for

17     the Court?  On page seven.

18     A    The immediate verbal memory was in the low average

19     range and immediate visual memory was in the very low

20     range or fourth percentile.  So with verbal that means

21     again that she had trouble recalling what she heard.

22     Later when she was given multiple choice it did -- we

23     can see that it did get in there.  So again she's

24     trying really hard, but her brain was just kind of

25     fighting her a little bit where it was hard for her to

Schuberth - Direct                    54

1      recall all of the information, particularly when it was

2      visual.  So she did better only than four percent of

3      people her age when it was only visual.  She needs the

4      verbal or verbal and visual together which is what the

5      WISC-V immediate symbol translation shows.  So she

6      needs multiple sources and types of information.

7           Q    And what does it mean to score in the very

8      low range for the D-KEFS verbal fluency test on page

9      seven of your report?

10     A    Again that's going to the lower processing speed

11     and that she might be slower to respond, but that says

12     nothing about the quality of the response.

13          Q    And you also indicated that she scored in the

14     low average range for color naming on page seven.  Can

15     you describe what that is?

16     A    Again I feel like a broken record, but same thing.

17     She was consistent at least that it -- that she's slow

18     to respond, she's methodical, but the content is good.

19          Q    And you mentioned in your report on page

20     eight about J.H.'s attention and could you describe how

21     her attention issues would affect her in a classroom?

22     A    Yes.  So she did not meet criteria for ADHD, but

23     she had some trouble with attention particularly this

24     could mean that she's just not attending or more likely

25     a lot of the time she was attending to everything and

Schuberth - Direct                      55

1    not able to pick out the most salient points.  So that

2    could be really overwhelming in a classroom and can

3    kind of make someone just shut down and also just miss

4    the most important part.

5         Particularly for her she was really sensitive to

6    sound.  So when there's a lot of auditory stimulation

7    it might be hard for her to pick out the important

8    things that a teacher is saying.

9         Q    Would that affect her in other areas of a

10   school?

11   A    Yes.  So I talk about in the recommendations

12   schools a lot more than just a classroom.  So you have

13   -- particularly the cafeteria can be really

14   overwhelming for kids like this and hallways can be an

15   overwhelming place for a lot of us in high school.  So

16   yeah, it would affect her across the board.

17        Q    Okay.  On page nine of your report it

18   indicates that J.H. scored in the at risk levels for

19   shifting, working memory, task completion and is there

20   anything different in these that you haven't already

21   described to the Court or is there something new that

22   would be affecting her ability to learn?

23   A    So this unlike the other ones, this is the answers

24   to a questionnaire that she filled out.  So the other

25   things we've been talking about is me seeing her work

Schuberth - Direct                              56

1      in real time.  This is her perception of herself, but

2      it very much parallels the things I was seeing.  It

3      might be hard for her to move her attention from one

4      thing to another, the issues with memory that we talked

5      about and she felt like she had trouble getting things

6      done within the time limit, which again makes sense

7      with the fluency and processing speed we've talked

8      about.

9             Q    And on page nine you have a heading, "Social

10     Emotional Adaptive Functioning."  Is that what you were

11     just describing, how she rated herself or is there

12     something else in there as well of your findings?

13     A    There's more ratings of herself that also look at

14     not just executive functioning, but behavioral and

15     emotional functioning.

16            Q    And what were your findings in that?

17     A    That she rated that she has a negative view of

18     school or that -- more so a negative view of herself in

19     school at that time and that she was struggling with

20     anxiety or with stress particularly social and

21     interpersonal and that she felt pretty badly about

22     herself.  So that's what the sense of inadequacy is,

23     that no matter how hard she tries it doesn't matter.

24     She was feeling pretty defeated and depressed.

25            Q    And what was the date of your report as well

Schuberth - Direct                      57

1    as the dates that you saw J.H.?

2    A    I saw her in 2017 on July 31st, August 2nd and

3    August 3rd.  It was about eight hours total together.

4              THE COURT:  All three days?

5              THE WITNESS:  I'm sorry?

6              THE COURT:  All three dates was a total of

7    eight hours?

8              THE WITNESS:  Yeah.

9              THE COURT:  Thank you.

10   BY MS. WARSHAW:

11        Q    On page 11 of your report, there is a chart

12   in the middle and can you describe for me what this

13   test is and what your findings were?

14   A    Sure.  So this is just the I.Q. testing that we

15   talked about already and next to her previous I.Q.

16   scores that were done as part of the school's

17   evaluation six months earlier.  So I just wanted to see

18   -- and -- and the scores were pretty consistent between

19   the two.

20        Q    So I'm going to -- this might be a little

21   confusing, but I'd like you to look at both the school

22   report as well as your findings and just compare a few

23   of the findings.  Okay?

24   A    Okay.

25        Q    So the school report is located in J-15 which

Schuberth - Direct                          58

1    is -- it should be the same booklet and I'm looking at

2    the fourth page and fifth page of --

3              THE COURT:  J-15 is -- you're free to

4    disagree, but what exactly is J-15?

5              MS. WARSHAW:  That is the school

6    psychological report --

7              THE COURT:  Thank you.

8              MS. WARSHAW:  -- that was done.

9              THE WITNESS:  Okay.

10             MS. WARSHAW:  Okay.

11             THE COURT:  Did you review this when you did

12   your report?

13             THE WITNESS:  Yes.

14             THE COURT:  Okay.  Thank you.

15   BY MS. WARSHAW:

16        Q    Okay.  So let's go through a few things.  So

17   when you go to the school report, page four, at the top

18   section it says, "Composite Score Summary, Working

19   Memory."  Can you tell us what that score was?

20        A    Yes.  So she --

21        Q    Do you see that?

22        A    -- she got a standard score of 86 which puts --

23   put her in the 18th percentile.  So she did better only

24   than 18 percent of people her age, even though her I.Q.

25   is way higher than that, in working memory.  So again

Schuberth - Direct                    59

1       this is the ability to take in information and

2       manipulate it in your head and spit it back out which

3       is a lot of what's happening at school with answering

4       questions, both in the classroom and on tests.

5           Q    And that was categorized as the low average

6       range.  Is that --

7       A    Correct.

8           Q    -- fair and accurate?

9       A    Yes.

10          Q    Okay and when you go to your report the

11      working memory, can you describe what you found?  If it

12      was consistent with the school district?

13      A    Yes.  It was consistent.  It was in the low

14      average range.

15          Q    Okay.

16      A    In the ninth percentile.

17          Q    Turning to the -- the fifth page of the

18      school district's psychological report you'll see block

19      design.  Can you describe what that is?

20      A    Yes.  The person has a stimulus book in front of

21      them that has a picture of a design with blocks and

22      then she actually gets physical blocks and she has to

23      make the same design and it's within a time limit.

24          Q    And can you describe, you know, what the

25      range of that score was that the school district found?

Schuberth - Direct                    60

1    A    You mean just how to interpret the nine?

2         Q    Yes.

3    A    That was in the average range compared to peers.

4         Q    And in your report on page 11 you also tested

5    for block design.  Was your score comparable to that of

6    the school district's?

7    A    Yes.

8         Q    Going down on the school district's report,

9    page five of their psychological report, in the section

10   that says, "Working Memory Subtest Score Summary for

11   digit span arithmetic," can you describe for me those

12   scores and what the range -- were for those?

13   A    On the test -- the school scores?

14        Q    Yes.

15   A    Digit span was in the low average range.  So this

16   is her ability to take in numbers and then rearrange

17   them in a certain way in real time out loud.  So just

18   the auditory input.  So again think about lectures in

19   class or people talking to you and then arithmetic was

20   timed mental math and that was in the average range.

21        Q    And going to your findings for digit span and

22   arithmetic on page 11 of your report, did you come up

23   with comparable results?

24   A    Digit span, yes.  It was statistically the same

25   and low average.  It was -- the arithmetic was a little

Schuberth - Direct                    61

1   lower in the testing that I did and it was in the low

2   average range.

3        Q    Okay.  Going back to the school district's

4   report, page five, under "Processing Speed Subtest

5   Score Summary," it says "Symbol Search 5."  Could you

6   describe what that is and what the range of that score

7   is?

8   A    Yes.  So that was even below low average.  That

9   was borderline impaired.  So that was quick -- how

10  quickly she could scan a page and notice similarities.

11       Q    And going to your report with the same

12  testing, page 11 for Symbol Search, is your score

13  comparable to what the school district found?

14  A    Yes.

15       Q    In your professional opinion was there a

16  discrepancy between these scores and her overall I.Q.

17  functioning?

18  A    Between the working memory and processing speed --

19       Q    On --

20  A    -- on her overall --

21       Q    Yes.  On scores --

22  A    I'm sorry.  I'm not sure what you mean.

23       Q    -- that -- okay.  Let me rephrase that.  In

24  your professional opinion was there a significance to

25  the low average and the borderline scores in these

Schuberth - Direct                       62

1    areas compared to her overall functioning?

2              MS. HOWLETT:  Objection, Your Honor.  I'm not

3    sure what she means by "significance."

4              THE COURT:  Yeah.  I'm finding a hard time

5    following.  Are we talking about -- are we talking

6    about the school's report?

7              MS. WARSHAW:  Yes.

8              THE COURT:  Or her -- because her report and

9    the school reports are -- seem to be fairly in sync

10   with -- except my notes except for -- for one thing

11   where she found her to have -- on the math, she found

12   her to be low average on the working memory and -- I'm

13   sorry.  If I misstate something jump in.

14             THE WITNESS:  Okay.  You got it.

15             THE COURT:  All right.  The Doctor found

16   working memory in math in low average and the school

17   found it as average and so far that's the only

18   discrepancy I note between her findings and the school

19   findings based on her testimony so far.  So your

20   question is regarding the school's report or her

21   report?

22             MS. WARSHAW:  With regard to the school's

23   report.

24             THE COURT:  Okay.  Because you're asking for

25   an opinion.  I just need to know what the opinion

Schuberth - Direct                          63

1    relates to.

2              MS. WARSHAW:  Okay.  No problem.

3              THE COURT:  Thank you.

4    BY MS. WARSHAW:

5         Q    Okay.  With regard to the School District's

6    report, in your opinion would there have been a

7    discrepancy with these scores compared to some of her

8    other scores which were in the higher average range?

9         A    Yes.  I would consider working memory and

10   processing speed relative weaknesses in my test results

11   which were pretty much the same as the school's.

12        Q    And can you describe if you haven't already

13   if there's anything new the significance of this

14   discrepancy in the School District's psychological

15   evaluation?

16        A    Sorry.  Say that again.

17        Q    Okay.  Let me rephrase that.

18             In your opinion if the School District came

19   up with these discrepancies would that have warranted

20   further testing?

21        A    I don't know.  That's hard to answer, but I think

22   -- I think I get your first question now, that it would

23   impact or it would reflect issues in the classroom,

24   again in terms of taking in information which is what

25   learning is and then I did the academic testing because

Schuberth - Direct                    64

1    that hadn't been done yet and so I wanted to see how it

2    was impacting specific subject areas.

3         Q    Thank you.  Okay.  In the back of your report

4    there are a bunch of charts.  Are those reflective of

5    the written synopsis that you did in the rest of your

6    report?

7    A    Yes.

8         Q    Okay.  Is there anything different in those

9    charts that is not reflected in the written format of

10   your report?

11   A    No.

12        Q    Okay.  Do you have an understanding as to

13   what it means to be emotionally disturbed?

14             MS. HOWLETT:  Your Honor, object to that.

15   Emotionally disturbed general?  Emotionally disturbed

16   under the Code?

17             THE COURT:  Yeah.  I mean --

18             MS. HOWLETT:  Are we talking about --

19             THE COURT:  -- I'm going to allow the

20   question, but clarify --

21             MS. WARSHAW:  Okay.

22             THE COURT:  -- clarify the question please.

23   BY MS. WARSHAW:

24        Q    Do you have an understanding of what it means

25   to be emotionally disturbed in the sense of classifying

1    a student under the IDEA?

2    A    Not really.  It's not an DSM diagnosis and so I

3    don't really deal in that.

4         Q    What if anything did you find with regard to

5    J.H.'s emotional state?

6    A    So the things that she was endorsing was really

7    being hard on herself, wanting to go to school, but not

8    being able to which would then -- I think because of

9    that anxiety and feeling overwhelmed and so then that

10   was leading to feeling badly about herself and

11   depression.

12        Q    You had mentioned something about noise.

13   Could you describe for the Court what you found with

14   regard to noise issues?

15   A    Sure.  So there's one test of auditory attention,

16   when the person puts on headphones and has to listen to

17   sounds and respond to certain sounds and as soon as she

18   started she lowered the sound significantly to the

19   point -- I've never ran -- I've done hundreds of these.

20   I've never written this in a report before or really

21   noticed it where -- I don't know how she heard it, but

22   she turned it down so low.  So it was really noticeable

23   to me that sound of that testing to bother her.  So I

24   asked her about it and she said that she's been told

25   that she's sensitive to noise.  So then I was thinking

Schuberth - Direct                           66

1    that that probably is feeding into issues at school,

2    because like we were talking about before, the

3    cafeteria and the hallway could be really loud or in

4    the classroom the teacher might be talking and

5    someone's tapping their foot in the back and someone

6    else is whispering and the clock is going and so it's

7    hard for her to focus on and process what the teacher

8    is saying in that setting.

9         Q    Okay.  Could you please turn to page 13 of

10   your report?  And is it fair to say that page 13, 14

11   and 15 of your report contains your recommendations?

12   A    Yes.

13        Q    And can you tell us on page 13 what the

14   diagnosis was that you came up with?

15   A    Yeah.  There were three, so specific learning

16   disorder with impairment in mathematics, specifically

17   with fluent calculation moderate.  So that's a really

18   long way of saying a learning disability in math

19   fluency or speed, times math and then major depressive

20   disorder, recurrent episode moderate and generalized

21   anxiety disorder.

22        Q    And can you go step by step through your

23   recommendations for the Court?

24   A    Okay.  All of them?

25        Q    In -- you know, maybe you could summarize?

Schuberth - Direct                               67

1    Let's start with -- let's start with number two.

2    A     Okay.  So basically trying to take all that

3    information together and synthesize it, it seemed like

4    J. would benefit from -- or sorry -- J.H. would benefit

5    from a small classroom setting in a small school

6    setting without overwhelming stimulation and the other

7    things that relates to that were the relative

8    weaknesses in processing speed or anything that

9    required timing, math fluency, oral fluency, anxiety

10   and depression.  So that she needs extra time to

11   process information and to formulate responses, but she

12   can do it and then I talk about ways to work on the

13   anxiety and helping her speak up for herself to

14   teachers when she hasn't gotten all the information and

15   that she needs to be in a classroom where she's

16   challenged at her intellectual level.

17        Q    You specifically say in -- in part two that

18   she needs academically vigorous classroom based on her

19   ability and achievement scores.  Is that -- would you

20   categorize that as a college bound classroom?

21   A     Yes.

22        Should I keep going to number three?

23        Q    Yes, please.

24   A     Okay.

25        Q    Thank you.

Schuberth - Direct                                68

1    A     Sorry.  And because of the hypersensitivity to

2    noise that I noticed, I'm not an audiologist.  It was

3    just kind of qualitative that I noticed it and so I was

4    recommending auditory processing evaluation to

5    understand that piece better and then in the meantime

6    just accommodations, like noise canceling headphones or

7    being able to listen to headphones with music to kind

8    of make the environment less overwhelming, being able

9    to take breaks in -- in a quiet space.  So maybe this

10   was a guidance office, but not necessarily to talk to

11   the person, just to have a quiet space and then because

12   cafeterias can be so overwhelming and she was having

13   trouble making friends, possibly having a smaller like

14   some school guidance counselors will have like lunch

15   bunch groups in the guidance office.  So it would help

16   with getting her out of that noisy environment and help

17   with trying to build relationships with a smaller group

18   of people.

19        In terms of testing accommodations, because of the

20   weakness in processing speed and math fluency and

21   anxiety and depression which also can slow someone

22   down, that she would benefit from expanded time on

23   tests, a distraction free setting, especially because

24   she's so sensitive to noise and breaks if she does get

25   overwhelmed.

Schuberth - Direct                              69

1          Because of the math disability that she might need

2    accommodations like doing every other math problem for

3    homework just to check for understanding without

4    causing like unnecessary frustration and allowing extra

5    time for math tests.

6          Because -- with the memory findings, that means in

7    the classroom that she would need information presented

8    in a verbal and a pictorial way together and that's how

9    her brain really maximized memory and not to have too

10   much extra information in that.  That's not relevant,

11   because she has trouble picking out those salient

12   points.

13         That she would benefit from continue -- from

14   counseling and support in the school to deal with the

15   anxiety and helping her build friendships and then I

16   have some accommodations for just kind of executive

17   functioning and structure of a classroom so that she

18   might especially with the auditory sensitivity be

19   better sitting next to the teacher, reducing assignment

20   length so she doesn't get overwhelmed, so she can still

21   show her abilities.

22         Kind of chunking information.  So not throwing too

23   much at her at one time, but delivering it in chunks,

24   making directions really clear, making sure directions

25   are auditory and written down.  So she can refer back

Schuberth - Direct                    70

1     to them, especially because she's less likely to ask

2     for help at that point because she was so anxious.

3          That it should still be paced at her level.  So

4     not too low and not too high and that she might need

5     step by step instructions.

6          I'm almost there.

7          And then on page 15, breaking tasks into shorter

8     segments.  Again so she doesn't get overwhelmed and can

9     feel a sense of accomplishment and keep going and build

10    that momentum and continuing to reinforce her at home

11    and at school for this and then continued therapy to

12    build up her distress tolerance and coping with anxiety

13    and depression, build up her self image, noticing

14    negative thoughts and challenging them, regulating her

15    emotions and helping her interact with others more

16    effectively and then just kind of the usual re-

17    evaluation and some information for families.

18         Q    Did you make any recommendations for J.H. to

19    be in a behavior oriented class?

20    A    No.

21         Q    Would you recommend her being in a self-

22    contained class where they use a reward or token

23    economy systems?

24    A    No, because usually those might be paced too low

25    for -- she still needs instruction that's at high

Schuberth - Direct                        71

1      school level or above.

2              Q     Is it fair to say that putting J.H. in a

3      large high school would be contrary to your

4      recommendations?

5      A     It's definitely more likely for her to be

6      overwhelmed in that large high school and not thrive.

7              Q     In your professional opinion if J.H. had to

8      take a class through an online computer program would

9      she be able to learn in that way?

10     A     She might, but it wouldn't be optimal, because she

11     needs that visual and auditory and the ability to ask

12     for clarification and then I always worry with online

13     schooling that people miss out on the social aspect

14     which is really important.

15             Q     Can a student suffering with a disability,

16     like a -- a learning disability, could that create

17     anxiety in a student?

18     A     Yes.

19             Q     In what way?

20     A     If they're not performing that they would like to,

21     if they're highly motivated and they don't understand

22     why they might be putting in a lot of work and the

23     output is just not quite where they wanted to be.

24             Q     Do you think that was affecting J.H. in this

25     situation?

Schuberth - Direct                    72

1    A    Yes.

2         Q    I'm going to show you what's been marked J-

3    20.   Can you look at that?

4    A    Sure.

5         Q    Can you just describe for the Court what that

6    is?

7    A    It's a letter that I wrote just clarifying some of

8    the psychology jargon that in the newer version of DSM

9    specific learning disorder with impairment in

10   mathematics specifically with fluent calculation

11   moderate is the same as a mathematics disorder which is

12   a learning disability in the previous version of the

13   DSM.

14        Q    So is it just for clarification is it fair to

15   say the specific learning disorder with impairment in

16   mathematics specifically fluent calculation is the

17   actual name used for this type of specific math

18   disability in the DSM 3?

19   A    DSM 5.

20        Q    DSM 5.

21   A    Yes.

22        Q    Sorry.

23   A    Yes.

24        Q    Okay.  So in this case a disorder is the same

25   thing as a disability?

Schuberth - Direct                                73

1    A    Yes.

2         Q    In your professional opinion would a large

3    high school with crowded hallways and general ed.

4    classes be an appropriate educational setting for J. --

5    for J.H.?

6    A    No, that would definitely be more difficult for

7    her.

8         Q    Socially and academically in your opinion

9    what level would J.H. be best at?

10   A    Academically she should definitely be challenged

11   at a high school level, because I know that there --

12   she talked about how she will get bored and kind of

13   tune out if it's too easy and socially she was

14   struggling, but I think she had the skills, just needed

15   some more support to make that happen.

16        Q    In your professional opinion would a self

17   contained multi grade level class be an appropriate

18   placement for J.H.?

19             MS. HOWLETT:  Your Honor, there's a lot of

20   speculation in all these hypothetical questions that --

21             THE COURT:  There is.

22             MS. HOWLETT:  -- we're going to object to.

23             THE COURT:  Okay.  I'm going to allow it

24   anyway, but your objection is noted.

25             MS. HOWLETT:  Thank you.

Schuberth - Direct                    74

1            THE COURT:  Self contained multi --

2            MS. WARSHAW:  Multi grade level.

3            THE WITNESS:  So usually I think -- kids with

4      intellectual disabilities or autism being in those

5      types of classrooms and J.'s pretty typical kid, just

6      has -- needed a little more support in math fluency.

7      So that wouldn't have been my recommendation.

8      BY MS. WARSHAW:

9          Q    You indicated -- well, we didn't go through

10     your -- all of your qualifications, but as one of your

11     qualifications are you a board certified behavior

12     analyst?

13     A    Yes.

14         Q    Okay and so as a BCBA are you trained to

15     evaluate people with behavior issues?

16     A    Yes.

17         Q     In your expert opinion if you had seen

18     behavior issues of concern would you have noted those

19     in your report?

20     A    Yes.

21         Q    Based on your evaluation of J.H. would you

22     say in your professional opinion that J.H.'s anxiety

23     was wilful behavior?

24     A    No.

25         Q    How about her depression?

Schuberth - Direct                          75

1    A    No.

2          Q    I'm going to show you what's marked J-1 in

3    that book.

4    A    Okay.

5          Q    Okay.  This document was provided to J.H. by

6    the School District.  Can you go through the --

7               THE COURT:  Let's identify it.  I don't know

8    what it is.

9               MS. WARSHAW:  Sorry.

10              Can you --

11              THE COURT:  What is that?

12              MS. WARSHAW:  -- tell the Court what that is?

13              THE COURT:  You tell me what it is.

14              THE WITNESS:  It's the 504 student

15   accommodation plan from the high school.

16   BY MS. WARSHAW:

17         Q    Can you go to the section where it says the -

18   - basically the accommodations and review them and tell

19   me if they complied with your recommendations for J.H.?

20   A    So it says reasonable -- or sorry -- extended time

21   on quizzes and tests, assessments in a private setting

22   and the ability to take breaks when she's anxious.  So

23   those are consistent -- oh, sorry, there's more.  Sends

24   own -- being able to talk to a counselor.  So I do

25   think she needs all of that, but I don't think it would

Schuberth - Direct                                   76

1     be sufficient.

2                    THE COURT:  Why?

3                    THE WITNESS:  Because it doesn't address the

4     learning aspects of her needing repetition and

5     clarification in actual instruction and the noisy areas

6     like the cafeteria or hallways.

7     BY MS. WARSHAW:

8         Q    I'm going to refer you to J-9, the -- do you

9     recognize this document as -- as an IEP?

10    A    Yes.

11        Q    Okay.  So page numbers are going to be a

12    little difficult, but -- because it's a little cutoff

13    on my version.  So we're going to -- I'm just going to

14    count the pages --

15    A    Okay.

16        Q    -- and let's see if we get to the same page.

17             Okay.  On my version it's the 14th page and

18    it says, "Modification, Supports, Progress Reports."

19    A    Okay.  I think I'm there.

20        Q    In the first section it talks about

21    modifications in the general ed. curriculum.  Can you

22    tell me if those modifications that were in this

23    proposed IEP are consistent with your findings?

24    A    Yes.

25        Q    And do you believe that these modifications

1    alone would be sufficient for J.H. in a general ed.

2    setting?

3    A    No.  I don't think it would address getting her

4    back into the classroom.

5         Q    And would they address her academic needs?

6    A    No.  It doesn't talk about modified assignment

7    length or some of the teaching methods that we talked

8    about.

9         Q    And again placing J.H. in a regular high

10   school in a general ed. type setting or even in the

11   self contained class within a general high school,

12   would that be consistent with your findings?

13   A    I guess it just would have to be a small -- a

14   smaller school and still age appropriate material.

15        Q    In your professional opinion based on the

16   scores and the information with the I.Q., the

17   discrepancies in the psychological report by the child

18   study team, do you feel that it was prudent for them

19   not to ask for further information?

20             MS. HOWLETT:  Objection, Your Honor.  I'm not

21   sure what that means.

22             THE COURT:  I'm not sure either.  Did you

23   read the IEP?

24             THE WITNESS:  Not the IEP, but the testing.

25   I had access -- the school shared that with me.

1           THE COURT:  What was the question?

2           MS. WARSHAW:  Based on her knowledge of the

3      discrepancy in the scores that the School District had

4      in their psychological report, in her opinion would it

5      have been the next step would have been to have more

6      testing done?

7           THE COURT:  You read this whole report, you

8      said that?

9           THE WITNESS:  Yes.  I mean, I don't like to

10     critique other professionals' work, but usually when I

11     see school reports there are those three components we

12     talked about.

13          THE COURT:  No, I don't want "usually."  I

14     want this one.

15          THE WITNESS:  Yeah.

16          THE COURT:  Usually doesn't help me.

17          THE WITNESS:  Okay.  Well, yeah, there was no

18     educational.  So it just doesn't say one way or the

19     other whether there's a learning disability, which is

20     why I tested just to see.

21          THE COURT:  So the question was after reading

22     the school's report would you -- do you think they

23     should have ordered more testing?

24          THE WITNESS:  I like data.  So yes, I would

25     do more.

Schuberth - Cross                          79

1        THE COURT:  That's not the question though.

2        THE WITNESS:  Yes.

3        THE COURT:  The question is based on what the

4   school did, do you think the school should have ordered

5   more testing, not because you like data?

6        THE WITNESS:  Yeah.  I don't think that

7   there's sufficient information.  I think more -- more

8   testing.

9        THE COURT:  Okay.  Thank you.

10        MS. WARSHAW:  No further questions.

11        THE COURT:  Cross?

12   CROSS-EXAMINATION BY MS. HOWLETT:

13        Q    Hi Dr. Schuberth.  How are you?

14   A    Hi.  How are you?

15        Q    I'm just going to piggy back on that last

16   question.  On what basis did you think that the -- that

17   the school should have done more testing after reading

18   Dr. Welk's (phonetic) report?

19   A    Can you remind me where that is?

20        Q    Well, you just testified to the -- to the

21   Court that you felt that the School District -- should

22   have done additional testing.  So what's that --

23   w4hat's your basis for that?

24   A    To understand whether there's a learning

25   disability underneath that could be leading to the

Schuberth - Cross                                    80

1    anxiety.  So sometimes kids who are getting straight

2    A's or A's and B's can still have an underlying

3    learning disability if they're really smart.  Their

4    ability's just -- or their actual skills aren't

5    measuring up to their natural ability and that leads to

6    tension and anxiety.

7         Q    So what in the report specifically would

8    trigger your opinion that educational testing was

9    warranted?

10   A    Because it's hard to say if there's a learning

11   disability or not without any educational testing.

12        Q    So you recommend that any kid that presents

13   with anxiety has educational testing?

14   A    It's hard to say in general, but probably.

15        Q    Did J. present with an inability to build or

16   maintain interpersonal relationships with her peers?

17   Do you think that's a fair description of J.?

18   A    From their report, yes.

19        Q    Did she present or report to you that she had

20   a general pervasive mood of unhappiness or depression?

21   A    Recently due to all this, yes.

22        Q    What do you mean by that?

23   A    That she's not someone that I see as just

24   persistently depressed or having a more depressive

25   Eeyore kind of personality, but because she wanted to

Schuberth - Cross                                    81

1        succeed and she wasn't able to get herself in school

2        that discrepancy was causing depression.

3             Q    Did she have any fears or any sort of

4        symptoms related to school problems?

5        A    I mean, anxiety about attending.

6             Q    Are you familiar with the Administrative Code

7        having to -- or regarding the criteria for special

8        education?

9        A    Not in detail, no.

10            Q    So are -- are you aware that -- that a

11       student or -- strike that.

12                 Are you aware that a child may qualify for a

13       disability under the DSM, but that may not qualify for

14       criteria for special education?

15       A    Yes.

16            Q    Are you a learning consultant, a certified

17       learning consultant?

18       A    No.

19            Q    Did you ever observe the Being Successful

20       program at Mendham High School?

21       A    I'm not familiar with the school.

22            Q    Counsel asked you before about J-20, it was a

23       letter that you wrote.

24       A    Um-hum.

25            Q    Why did you write that letter?

Schuberth - Cross                          82

1    A    Ms. Warshaw contacted me just asking for

2    clarification if that's the same as a -- the diagnosis

3    in my report is the same as a learning disability.

4         Q    So the basis for your letter was that Counsel

5    asked you to write it?

6    A    Yes.  She didn't dictate what I would say, but she

7    just asked me whether it was a learning disability or

8    not and to put it in writing.

9         Q    A learning disability under the Code or a

10   learning disability under the DSM?

11   A    Under the DSM.

12        Q    Can you just flip back to -- Counsel asked

13   you questions about J-1, which is the 504 plan.  Can

14   you just clarify what the -- what the date of that 504

15   plan is?  Do you see a date on it?

16   A    Date of meeting, 12/7/2016.

17        Q    And then Counsel asked you about the IEP.

18   There's a meeting date on that as well.  Can you just

19   flip to that?  That was J-9, just -- I know you're

20   flipping all over there.

21   A    Meeting date and start date was 4/6/2017.

22        Q    And when did you meet with J.?  Do you

23   remember?

24   A    In the summer of 2017, July and August.

25             MS. HOWLETT:  Just give me one moment, Your

Schuberth - Cross                                           83

1    Honor.

2    BY MS. HOWLETT:

3        Q    As part of the records that you reviewed, do

4    you recall reviewing any of J.'s grades?

5    A    Yes.  I had a report card.

6        Q    Did you have a report card?  And her

7    standardized assessments, were they included also, like

8    ASK scores or --

9    A    No.

10       Q    -- PARC or anything like that?

11   A    No.

12       Q    Besides the -- sorry.  You found a -- a --

13   severe discrepancy in math fluency subtraction

14   according to page 17 of your report.  Is that accurate?

15   A    One second as I look at the scores.  Yes.

16       Q    Is that a subtest?  What is that, math

17   fluency subtraction?

18   A    Yes.  It's a subtest.  So there are three fluency

19   subtests where they have to answer as many addition,

20   subtraction and multiplication questions that they can

21   in 60 seconds.

22       Q    Did she have any severe discrepancies on any

23   of the other areas of testing, on the -- on the WIAT?

24   A    The overall math fluency score was statistically

25   below her I.Q.

Schuberth - Redirect                                    84

1          Q     And was that based solely upon the math

2     fluency subtraction subtest?

3     A     No.  That was when all three were taken together.

4          Q     But that was factoring in the -- the low

5     score on the math fluency subtraction --

6     A     Yes.

7          Q     -- subtest?  Was J.'s mathematics composite

8     score, was there a severe discrepancy with that score?

9     A     No.  There was no time limit for those subtests.

10              MS. HOWLETT:  I have no further questions,

11     Your Honor.

12              THE COURT:  Any redirect?

13              MS. WARSHAW:  Yes.  Can I have a moment

14     please?

15              THE COURT:  Sure.

16              MS. WARSHAW:  Thank you.

17     REDIRECT EXAMINATION BY MS. WARSHAW:

18          Q     Dr. Schuberth, do you recall what J.H.'s

19     grades were that you received?

20              MS. HOWLETT:  Without --

21              THE COURT:  Without looking.

22              MS. HOWLETT:  -- without looking.

23              THE WITNESS:  No, but it --

24     BY MS. WARSHAW:

25          Q     Is it in your --

Schuberth - Redirect                    85

1    A    -- I think they're --

2          Q    -- report?

3    A    -- in the report.

4          Q    Okay.

5    A    There are A's -- A's and B's and I have specific

6    subjects for each.

7          Q    I'm sorry.  Say that again.

8    A    That they were all A's and B's and I wrote the

9    specific subjects.

10         Q    Okay.  Great.  I'm going to refer you back to

11   the School District's psychological reports and their

12   findings.

13              MS. HOWLETT:  Your Honor, is this relative to

14   cross?

15              THE COURT:  No, it's not.

16              MS. WARSHAW:  Okay.  It was.  Okay.

17              THE COURT:  She didn't ask a question about

18   the School District's psychological report, not one.

19              MS. WARSHAW:  Okay.  No further questions.

20              THE COURT:  You can step down.  Thank you,

21   Doctor.

22              THE WITNESS:  Okay.  Thank you.

23              THE COURT:  Next witness?

24              MS. WARSHAW:  We're done.

25              THE COURT:  You're done.  You rest?

1          MS. WARSHAW:  Yes, we do.

2          THE COURT:  Okay.

3          MS. WARSHAW:  Thank you.

4          THE COURT:  Thank you both.

5          All right.  I assume you both want to submit

6    written post hearing briefs or whatever we call them

7    here.

8          MS. WARSHAW:  Yes, Your Honor.

9          THE COURT:  Yes?  Okay.  All right.  So let's

10   -- and I assume we're -- we're going to -- we have all

11   the transcripts but this one I believe.

12         MS. WARSHAW:  Actually, Your Honor, I was on

13   the phone with Jill Davis (phonetic) --

14         THE COURT:  We'll stop -- we don't need to

15   have this on the record --

16         MS. WARSHAW:  Okay.

17         THE COURT:  -- that we're talking about

18   transcripts.

19         {Whereupon, the proceedings were adjourned.}

20                         * * * * *

21

22

23

87

1    STATE OF NEW JERSEY }

2    COUNTY OF ESSEX       }

3

4            I, Lee A. Romano, assigned transcriber, do

5    hereby affirm that the foregoing is a true and accurate

6    transcript of the proceedings in the matter of <u>F.H. and</u>

7    <u>M.H. on behalf of J.H. v. West Morris Regional High</u>

8    <u>Board of Education</u>, bearing Docket No. EDS 10706-17,

9    heard on August 29, 2018, before the Office of

10   Administrative Law Court.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25