# WARSHAW LAW FIRM, LLC

266 King George Road, Suite I
Warren, New Jersey 07059
Phone: (973) 433-2121
Fax: (973) 439-1047
jwarshaw@warshawlawfirm.com
clientservices@warshawlawfirm.com
www.warshawlawfirm.com

Julie M.W. Warshaw, Esq. *~^
Alycia Swift, Esq. *~

*Of Counsel:*
David B. Warshaw, Esq. *~^
William Jeffery, Esq. *

Licensed in New Jersey *
Licensed in New York ~
Licensed in Massachusetts ^
Licensed in Pennsylvania `

December 13, 2018

STATE OF NEW JERSEY
OFFICE OF ADMIN LAW
2018 DEC 17 P 3: 46
RECEIVED

Via email at diana.batista@oal.nj.gov and Priority Mail
Honorable Thomas Betancourt, A.L.J.
Office of Administrative Law
State of New Jersey
33 Washington Street, 7th Floor
Newark, New Jersey 07102

Re: F.H. and M.H. o/b/o J.H. v. West Morris Regional High School District Board of Education
OAL Docket No.: EDS 10706-2017
Agency Ref. No.: 2017 26311

Dear Judge Betancourt:

This office represents the Petitioners in the above referenced matter. Enclosed please find Petitioners' post-submission brief in support of their due process action. In addition, I have attached an email copy of the transcripts from the due process hearing for the Court's review.

Thank you for your time and attention to this matter.

Respectfully Submitted,

By: _____
Julie Warshaw, Esq.

JW/
Enclosures

cc:   Jodi Howlett, Esq. (Via Email)
       F.H. and M.H. (Via Email)

**Batista, Diana**

| | |
|---|---|
| **From:** | Tina Bienkowski <tbienkowski@cgajlaw.com> |
| **Sent:** | Wednesday, January 16, 2019 5:45 PM |
| **To:** | Batista, Diana |
| **Cc:** | Jodi Howlett; jwarshaw@warshawlawfirm.com |
| **Subject:** | [EXTERNAL] EDS 10706-2017 / West Morris Regional/J.H. |
| **Attachments:** | LT Judge with Post-Hearing Brief.pdf |

Re:    F.H. and M.H. o/b/o J.H. v. West Morris Regional High School District Board of Education
        OAL Dkt. No.: EDS 10706-2017
        Agency Ref. No.: 2017-26311

Ms. Batista:

Please see attached correspondence enclosing Post-Hearing Brief in connection with the above-referenced matter which I am forwarding on behalf of Jodi S. Howlett, Esq.

Thank you.

Tina

**Tina Bienkowski, Paralegal**
Cleary I Giacobbe I Alfieri I Jacobs, LLC
www.cgajlaw.com I tbienkowski@cgajlaw.com
955 State Route 34, Suite 200
Matawan, NJ 07747
732.583.7474 (x.169) phone
732.290.0753 facsimile

This email and any attachments thereto are intended for the exclusive use of the addressee. The information contained herein may be privileged, confidential or otherwise exempt from disclosure by applicable laws, rules or regulations. If you have received this email in error and are not the intended recipient, you are hereby placed on notice that any use, distribution, copying or dissemination of this communication is strictly prohibited. If you have received this in error, please notify the sender immediately at (732) 583-7474 and delete this email and any attachments immediately. Thank you for your cooperation.

**WARSHAW LAW FIRM, LLC**
**Julie Warshaw, Esq. (ID# 027931993)**
266 King George Road, Suite I
Warren, New Jersey 07059
Phone (973) 433-2121
Fax (973) 439-1047
jwarshaw@warshawlawfirm.com
Attorney for Petitioners

| | |
|---|---|
| F.H. and M.H. o/b/o J.H., Minor Child | State of New Jersey |
| | OFFICE OF ADMINISTRATIVE LAW |
| Petitioners, | |
| | OAL Docket No.: EDS 10706 2017 |
| vs. | Agency Ref. No.: 2017-26311 |
| | |
| West Morris Regional High School District Board of Education, | **POST SUBMISSION BRIEF** |
| | |
| Respondent. | |

STATE OF NEW JERSEY
OFFICE OF ADMINISTRATIVE
2018 DEC 11 P
RECEIVED

**PETITIONERS' POST SUBMISSION BRIEF AND SUMMATION IN SUPPORT OF THEIR POSITION THAT THE SCHOOL DISTRICT DENIED J.H. FAPE IN THE LRE AND THAT THEIR UNILATERAL PLACEMENT AT THE PURNELL SCHOOL WAS APPROPRIATE ENTITLING THEM TO PREVAIL**

On the Brief:
Julie Warshaw, Esq.
December 10, 2018

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**                                                    **4**

**TRIAL EVIDENCE**                                                          **7**

**PROCEEDINGS**                                                             **7**

**LEGAL ARGUMENT**                                                          **7**

**POINT I -**   **THE SCHOOL DISTRICT HAS THE BURDEN OF PROOF TO DEMONSTRATE THAT THE IEP WAS APPROPRIATE AND THEY PROVIDED FAPE IN THE LRE**                                                **7**

    **A.**   **THE SNAPSHOT RULE LEADS TO THE CONCLUSION THAT THE IEP WAS INAPPRPRIATE WHEN IT WAS DRAFTED**                         **9**

    **B.**   **AN ANALYSIS OF THE <u>ENDREW</u> DECISION REVEALS THAT THE SCHOOL DISTRICT FAILED ITS OBLIGATIONS UNDER THE IDEA**                                                              **13**

    **C.**   **THE APRIL 6, 2017 IEP WAS PREDETERMINED AND DENIED FAPE**                                                              **14**

    **D.**   **THE SCHOOL DISTRICT COMMITTED PROCEDURAL AND SUBSTANTIVE VIOLATIONS OF THE IDEA RESULTING IN A DENIAL OF FAPE**                                                     **18**

**POINT II-**   **THE SCHOOL DISTRICT FAILED TO EVALUATE J.H. IN ALL AREAS, THEREBY VIOLATING THE IDEA**                               **20**

**POINT III-**   **THE APRIL 6, 2017 IEP FURTHER DENIED J.H. A FAPE IN THE LRE**                                                           **27**

    **A. <u>J.H does not meet the criteria for classification of Emotionally Disturbed</u>**   **27**

    **B. <u>Petitioners did not consent to a classification of Emotionally Disturbed</u>**   **37**

    **C. <u>Respondent Offered No Proof to Dispute the Classification of J.H.'s Specific Learning Disability or her sensitivity to noise</u>**   **40**

    **D. <u>The Behavioral Support Program was not appropriate and denied FAPE in the LRE</u>**   **41**

    **E. <u>The Purnell School was not predetermined by Petitioners</u>**   **47**

**POINT IV-**     **THE SCHOOL DISTRICT FAILED TO PROVIDE J.H. WITH AN IEP AT THE BEGINNING OF THE 2017-2018 SCHOOL YEAR DENYING HER FAPE**     **50**

**POINT V-**     **PETITIONERS GAVE PROPER UNILATERAL PLACEMENT NOTICE**     **52**

**POINT VI-**     **THE PURNELL SCHOOL IS AN APPROPRIATE LEARNING ENVIRONMENT FOR J.H.**     **53**

**POINT VII-**     **THE COURT COMMITTED REVERSIBLE ERROR**     **59**

**CONCLUSION**     **65**

## TABLE OF AUTHORITIES

Baer v. Klagholz, 339 N.J. Super. 168 (App. Div. 2001)                                    8

Batchelor v. Rose Tree Media Sch. Dist., 759 F.3d 266 (3d Cir. 2014)            10, 61, 62

Blunt v. Lower Merion School Dist., 767 F. 3d 247 (3d Cir. 2014)                   20

Board of Education of Hendrick Hudson Central School Dist., Westchester Cty. V. Rowley, 458
U.S. 176 (1982)                                                                    13, 18

Cane v. E. Meadow Union Free Sch. Dist., 514 F.3d 240 (2d Cir. 2008)              10, 61

Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186 (2nd Cir. 2005)                    50

C.H. v. Cape Henlopen School Dist., 606 F. 3d 59 (2010)                            18, 19

David D. v. Dartmouth School Committee, 775 F.2d 411 (1st Cir. 1985)               62

D.B. ex rel. H.B. v. Gloucester Tp. School Dist., 751 F. Supp. 2d 764 (D. N.J.
2010)                                                                              14, 59

D.C. v. Mount Olive Twp. Bd. of Educ., 2014 U.S. Dist. LEXIS 45788, *50-51, 2014 WL
1293534 (D.N.J. Mar. 31, 2014)                                                     19

Deal v. Hamilton County Bd. of Educ., 392 F.3d 840 (6th Cir.2004)                  14

DM v. New Jersey Dept. of Educ., 801 F. 3d 205 (3d Cir 2015)                        50

Drinker v. Colonial Sch. Dist., 78 F.3d 859 (3d Cir. 1996)                          52

Endrew F. v Douglas County School District, 137 S. Ct. 988 (2017)         11, 13, 14, 18, 22

FRY v. Napoleon Community Schs., 788 F.3d 622 (6th Cir. 2015)                       50

Fuhrmann v. East Hanover Bd. of Educ., 993 F. 2d 1031(3d Cir. 1993)                8, 10, 22

G.R. o/b/o L.R. v. Tewksbury Town. Bd. of Educ., OAL DKT. No. EDS2189-02 pg. 10 (August
22, 2002)                                                                          28

IUE-CWA v. Visteon Corp. (In re Visteon Corp.), 612 F.3d 210 (3d Cir. 2010)        9, 10

Knable ex rel. Knable v. Bexley City Sch. Dist., 238 F.3d 755 (6th Cir. 2001)      18

Lamie v. United States Tr., 540 U.S. 526 (2004)                                     9

Lascari v. Board of Education of the Ramapo Indian Hills Regional High School District, 116 N.J. 30, 44, 560 A.2d 1180 (1989)                                                                                    8

Mary Courtney T. v. Sch. Dist., 575 F.3d 235, 2009 U.S. App. LEXIS 17001, *32 (3d Cir. Pa. 2009)                                                                                                                    18

Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist., 288 F.3d 478 (2d. Cir. 2002)                                                                                                              10, 61, 62

P.P. v. W. Chester Area Sch. Dist., 585 F. 3d 727 (3d Cir. 2009)                     22

Roland M. Concord School Committee, 910 F.2d 983 (1st Cir. 1990)                    10

Spielberg v. Henrico County Public Schools, 853 F.2d 256 (4th Cir.1988)            14

Springer v. Fairfax County Schoolboard, 134 F.3d 659, 663 (4th Cir. 1998)          28

Thomas v. Cincinnati Bd. of Educ, 918 F.2d 618 (6th Cir. 1990)                      52

Valentino C. v. Sch. Dist of Phila., 2004 U.S. Dist. Lexis 2114, *17 (E.D.Pa. January 30, 2004)                                                                                                                       52

**STATUTES, CODES, RULES**
34 C.F.R. § 300.12(d)(3)(i)                    8
34 CFR § 300.323                              50
34 C.F.R. Section 300.7 (c)(9)               35

20 U.S.C. § 1414(a)(1)(D)(I)                 37
20 U.S.C. § 1414(a)(1)(D)(II)                37
20 U.S.C. §1415(o)                           10
20 U.S.C. §1415(f)(3)(B)                    9, 62
20 U.S.C. § 1414(d)(1)(B)                    22
20 U.S.C. § 1414(b)                          22
20 U.S.C. § 1414(d)(1)(A)(i)(IV)            22
20 U.S.C. § 1414(d)(3)(D)                    22
20 U.S.C. § 1414(d)(3)(F)                    22
20 U.S.C. § 1415(j)                          52
20 U.S.C. § 1415(l)                          52

29 USCS §§ 790 et seq                        61
20 USCS §§ 1400 et seq                       61
20 USCS §§ 1411 et seq                       61

N.J.A.C. §6A:14-2.7(k)                       19
N.J.A.C. 6A:14-2.5(a)(1), 2.5(c)(5) 210 and 3.4(i)    22
N.J.A.C. § 6A:14-3.5(c)(5)                  28, 29
N.J.A.C. § 6A:14-3.5(c)(12)(i)              40
N.J.A.C. 6A:14-2.3                          51

N.J. Ct. R. 1:12-1(d)     64
N.J. Ct. R. 1:12-1(g)     64

## TRIAL EVIDENCE

Petitioners shall rely upon all of the joint exhibits, Petitioners' exhibits, and testimony of witnesses and expert witnesses, which were set forth in the Due Process hearings that took place in this matter on April 9, 2018, April 23, 2018, July 25, 2018, and August 29, 2018. Please see attached summaries of trial witness testimony that further demonstrate that J.H. was denied FAPE in the LRE for the 2016-2017 and 2017-2018 school years and that Petitioners are entitled to: (1) be declared the prevailing party in this matter; (2) have their unilateral placement declared appropriate; and (3) receive reimbursement for past expenses and payments moving forward.

## PROCEEDINGS

On May 30, 2017, Petitioners filed their Request for Due Process. On September 19, 2017, Petitioners filed a motion for summary decision, which was denied by this Court. On October 18, 2017, Petitioners filed a motion to amend their Request for Due Process and included a copy of their Amended Request for Due Process. This Court granted Petitioners' motion. Petitioners' Amended Request for Due Process included the results of the two (2) independent evaluations by experts, Dr. Ellen Platt and Dr. Natalie Schuberth, including their findings, and updated facts that had occurred since the initial filing for Due Process. Respondent filed a Cross-Petition for Due Process on February 12, 2018, and a Motion in Limine to limit the scope of the Due Process hearing, which was denied by this Court. Thus, all evidence must be considered by this Court as set forth in Petitioners' Amended Request for Due Process. Despite settlement negotiations, settlement was not reached, and a Due Process hearing was held on April 9, 2018, April 23, 2018, July 25, 2018, and August 29, 2018.

## LEGAL ARGUMENT

**POINT I -  THE SCHOOL DISTRICT HAS THE BURDEN OF PROOF TO DEMONSTRATE THAT THE IEP WAS APPROPRIATE AND THEY PROVIDED FAPE IN THE LRE**

7

In a due process action, the school district has the burden of proof to show that they have provided a free and appropriate public education (FAPE) in the least restrictive environment (LRE). "[I]t is quite clear that when a change in a child's IEP is sought, regardless of whether the party seeking the change is the school district or the parents, the burden of showing that the placement is "appropriate" rests with the school district. Lascari v. Board of Education of the Ramapo Indian Hills Regional High School District, 116 N.J. 30, 44, 560 A.2d 1180 (1989). See also Fuhrmann v. East Hanover Bd. of Educ., 993 F. 2d 1031, 1034-1035 (3rd Cir. 1993).

It is well-established that "the obligation of parents at the due-process hearing should be merely to place in issue the appropriateness of the IEP." Lascari, supra, 116 N.J. at 46.  The burden then shifts to the school district to prove that the "IEP was appropriate." Ibid.  "[I]n determining whether an IEP was appropriate, the focus should be on the IEP actually offered and not on one that the school board could have provided if it had been so inclined." Ibid.

The Supreme Court has further recognized that "the purpose of the IEP is to guide teachers and to insure that the child receives the necessary education." Lascari, supra, 116 N.J. at 48 (internal citations omitted).  As such, "school personnel, in consultation with the child's special education teacher, shall determine the level of educational services required for the student to appropriately progress in the general curriculum and appropriately advance toward achieving the goals set forth in the child's IEP." Baer v. Klagholz, 339 N.J. Super. 168, 208 (App. Div. 2001) (quoting 34 C.F.R. § 300.12(d)(3)(i)).  "Without an adequately drafted IEP, it would be difficult, if not impossible, to measure a child's progress, a measurement that is necessary to determine changes to be made in the next IEP." Lascari, supra, 116 N.J. at 48. Further, "an IEP that is incapable of review denies parents the opportunity to help shape their

child's education and hinders their ability to assure that their child will receive the education to which he or she is entitled." Id. at 49.

## A. THE SNAPSHOT RULE LEADS TO THE CONCLUSION THAT THE IEP WAS INAPPRPRIATE WHEN IT WAS DRAFTED

Petitioners do not agree that the snapshot rule applies in this matter. Respondent's attempt to limit the scope of the due process hearing is prohibited by a plain reading of the clear statutory language of the IDEA.  Significantly, at 20 U.S.C. §1415(f)(3)(B), the IDEA identifies the sole limitations for a due process hearing, including the subject matter of the hearing itself:

> Subject matter of hearing. The party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice filed under subsection (b)(7), unless the other party agrees otherwise.

No other limitations, exclusions, and/or or provisions are set forth in the statute with regard to the subject matter of the hearing. See generally 20 U.S.C. §1415.  Therefore, it must be enforced as written, and this Court must consider all issues that were pled in Petitioners' Amended Request for Due Process and presented at the Due Process hearing. It is well-established that when the language of a statute, such as the IDEA, is clear and plain, it must be enforced by the court according to its terms.  IUE-CWA v. Visteon Corp. (In re Visteon Corp.), 612 F.3d 210, 219 (3d Cir. 2010) (citing Lamie v. United States Tr., 540 U.S. 526, 534 (2004)). This is because it is the function of Congress, and not the court, to create legislation.  Id. at 220. The Court "will only give effect to the law Congress has enacted," and will not impose its own reading or restrictions.  Id. at 237.

Pursuant to a clear and plain reading of the IDEA, the only issues precluded from consideration at a due process hearing are those that were not properly noticed in the due process complaint.  20 U.S.C. §1415(f)(3)(B).  Here, however, Petitioners simply seeks the adjudication of the issues noticed in their Amended Request for Due Process, as this Court allowed Petitioners

to file said Amendment, which provided sufficient notice to Respondent of the issues in this case. Should Congress have intended these properly-noticed issues to be limited at the due process hearing, it would have expressly stated so in the IDEA, particularly because Congress took the affirmative step of limiting the subject matter to issues contained in the due process complaint. It should be noted here that the IDEA actually <u>encourages</u> the presentation of any and all issues to the Administrative Hearing Officer during a due process hearing, as the filing of a separate due process complaint is permitted to raise any issues that were not originally included in the filing. <u>See</u> 20 <u>U.S.C.</u> §1415(o).

Because no such limitations exist, where Congress took care to specifically outline other inapplicable limitations, it would be error to preclude them here. <u>See</u> <u>IUE-CWA</u>, <u>supra</u>. Since Petitioners have an obligation to exhaust their remedies, it is imperative that all of their claims are heard and considered by this Court. See <u>Cane v. E. Meadow Union Free Sch. Dist.</u>, 514 F.3d 240, 245-246 (2d Cir. 2008) (<u>quoting</u> <u>Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.</u>, 288 F.3d 478, 487 (2d. Cir. 2002)); See also <u>Batchelor v. Rose Tree Media Sch. Dist.</u>, 759 F.3d 266, 275 (3d Cir. 2014). Therefore, this Court must consider all evidence presented at the Due Process hearing, including all evidence, even if outside the snap shot rule, but within Petitioners' Amended Request for Due Process.

However, since this Court already determined that it would apply the snap shot rule, it should only be applied in a limited capacity. The Court must look at the information that the school district had or should have had at the time that they drafted the proposed initial IEP and determine if it was appropriate. This is because "[a]ctions of school systems cannot . . . be judged exclusively in hindsight." <u>Fuhrmann v. E. Hanover Bd. of Educ.</u>, 993 F.2d 1031, 1040 (3d Cir. 1993). The <u>Fuhrmann</u> Court cited with approval the First Circuit's observation that "an individual education program ("IEP") is a snapshot, not a retrospective." <u>Id.</u> (<u>citing</u> <u>Roland M.</u>

Concord School Committee, 910 F.2d 983, 992 (1st Cir. 1990)). Thus, "[i]n striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted." Ibid.

In the present case using the snapshot rule, the Court must examine the information that the district had available to it at the time that they drafted the April 6, 2017 IEP, including the results of the psychological and social assessments conducted by it and the lack of an educational evaluation, which was the choice of the child study team. Ms. Wilk's psychological report identified certain weaknesses in various areas of J.H.'s learning. Despite having this knowledge, the district failed to conduct an educational evaluation. At no time during the initial drafting of the IEP did the district have or consider J.H.'s educational needs, as reflected in the lack of goals and objectives or accommodations in academics.

Moreover, there are requirements that every IEP must have which the April 6, 2017 IEP was lacking in this case:

> The IDEA requires that every IEP include "a statement of the child's present levels of academic achievement and functional performance," describe "how the child's disability affects the child's involvement and progress in the general education curriculum," and set out **"measurable annual goals, including academic and functional goals,"** along with a "description of how the child's progress toward meeting" those goals will be gauged. §§ 1414(d)(1)(A)(i)(I)-(III). The IEP must also describe the "special education and related services ... that will be provided" so that the child may "advance appropriately toward attaining the annual goals" and, when possible, "be involved in and make progress in the general education curriculum." (emphasis added) See § 1414(d)(1)(A)(i)(IV); See Endrew, infra.

In the present case, the April 6, 2017 initial IEP (See J9) did not include any statements or present levels of academic achievement and functional performance from J.H.'s teachers, including those who taught her the prior academic year. Further, the April 6, 2017 lacked any information from the home instructors as to her progress, or any academic information as to her performance from any tutor at ICCPC. Thus, at the time that the district child study team drafted

the April 6, 2017 IEP, they failed to consider or obtain any information about J.H.'s academic performance.

The April 6, 2017 IEP also did not have any description as to how J.H.'s disability affected her involvement and progress in the general education curriculum; specifically, there was no mention of her academic weaknesses found by Ms. Wilk, the school psychologist, or any mention of said weaknesses and her actual specific learning disability following receipt of Dr. Schuberth's report. There were no measurable annual goals, including academic and functional goals or how J.H.'s progress toward meeting those goals would be gauged. There were no academic goals and objectives listed in the IEP, and there were none listed in the outdated 504 Plan either, which the district predetermined would be appropriate for her for the start of the 2017-2018 school year. There were no special education services outlined to meet academic goals and objectives as none existed, despite having sufficient information as to J.H.'s learning issues. In addition, the April 6, 2017 IEP was never amended or updated when the independent reports were received, which is a substantive violation of J.H.'s rights under the IDEA and ultimately denied her FAPE in the LRE.

None of the foregoing deficiencies were corrected or addressed in the IEP presented to the Petitioners at the May 16, 2017 IEP meeting because the district provided the exact same IEP as they did in the April 6. 2017 IEP meeting, except the case manager's name was changed. Even taking the snapshot rule further, if this Court looks at the information that the school district had at the time that they were in receipt of the two (2) independent evaluation reports and before the 2017-2018 school year began, taking a snapshot then (as this Court is required to do) leads to an identical conclusion. This is because the district had information about J.H. having a specific learning disability and noise sensitivity; nonetheless, it failed to call an IEP meeting and failed to provide J.H. with an IEP that reflected her actual needs and disabilities, despite having already

found her eligible for special education services. The school district denied J.H. her rights by simply implementing an outdated 504 Plan for the 2017-2018 school year without any changes from the following year and without addressing her educational needs. Since the school district had the consent of Petitioners for the determination that J.H. was eligible for special education services (despite not agreeing to the actual classification), the district had an obligation to provide services to meet her needs as a special education student, and not as a general education student. As a consequence, these violations, taken individually and cumulatively, and even through the snapshot rule, reveal substantive violations that denied Petitioners their rights under the IDEA, and denied J.H. a FAPE in the LRE. Thus, Petitioners are entitled to prevail.

### B. AN ANALYSIS OF THE ENDREW DECISION REVEALS THAT THE SCHOOL DISTRICT FAILED ITS OBLIGATIONS UNDER THE IDEA

In order to determine if the initial proposed IEP was appropriate even looking at it under the snapshot rule, the Court must apply the new standard set forth in the 2017 Endrew case. The United States Supreme Court in Endrew F. v Douglas County School District, 137 S. Ct. 988 (2017), held:

> To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. The "reasonably calculated" qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials. [Rowley, at 207] The Act contemplates that this fact-intensive exercise will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians. Id., at 11. See also Board of Education of Hendrick Hudson Central School Dist., Westchester Cty. V. Rowley, 458 U.S. 176, 207 (1982).

As stated, the school district failed to address any academic concerns or disabilities, as well as placement concerns expressed by Petitioners and J.H., in their April 6, 2017 IEP. Even after receipt of the independent evaluation results, the school district failed to call an IEP meeting, or amend or update the placement, classification, goals and objectives, present levels of performance, and instead, decided to ignore their own findings of eligibility for special education

service, giving J.H. an outdated 504 Plan as a general education student for the 2017-2018 school year. The district predetermined the IEP, services, classification, goals and objectives, and placement, without any consultation with the Petitioners or J.H., thereby denying Petitioners their rights and a FAPE in the LRE. Under Endrew, the April 6, 2017 IEP was not reasonably calculated to enable J.H. to make progress appropriate in light of her circumstances since it failed to address her actual disabilities and needs. Thus, the proposed IEP was not appropriate to meet J.H.'s academic needs, or to address her specific learning disability and sensitivity to noise, and the placement would not have addressed said issues as well. Thus, Petitioners are entitled to prevail because the IEP was not appropriate under the Endrew standard, thus denying J.H. a FAPE in the LRE.

## C.   THE APRIL 6, 2017 IEP WAS PREDETERMINED AND DENIED FAPE

Predetermination of an IEP can be grounds for finding a violation of the IDEA, in particular because predetermination can serve to exclude parents from meaningfully participating in the decision-making process. See Spielberg v. Henrico County Public Schools, 853 F.2d 256, 259 (4th Cir.1988); Deal v. Hamilton County Bd. of Educ., 392 F.3d 840, 857-58 (6th Cir.2004); see also D.B. ex rel. H.B. v. Gloucester Tp. School Dist., 751 F. Supp. 2d 764, 771 (D. N.J. 2010).

Notably, the Court in D.B. held that, "it is essential that the IEP is created prior to any final placement decisions." D.B., supra, 751 F. Supp. at 771. In the D.B. case, the school officials "refused to discuss any alternative placements." Ibid. The case manager testified she had determined before the IEP meeting that there were no other alternative placements, despite the parents trying to discuss the matter further. Id. at 771-772. The Court held in the D.B. case that the IEP was predetermined because the school district had come to conclusions about placement without input from the parents and failed to listen to the parents' concerns. Id. at 772.

Similarly, in the present case, on April 6, 2017, at the initial IEP meeting, the IEP presented to the Petitioners was fully completed with the Behavioral Support Program already listed; identification of the classes J.H. was to take; and the social emotional goal and five objectives listed. This April 6, 2017 IEP was clearly a final IEP and not a draft IEP. On the IEP that was 22 pages, someone wrote "Draft" on the front cover; this was the IEP that had Ms. Dickerson as the case manager. While there is no information as to who from the district, or its attorney, added that word to the front cover of the IEP, it nonetheless was the same IEP as the one presented at the April 6, 2017 IEP meeting, only the latter did not have the word "draft" on it. It was presented as a final IEP and it was handed to the Petitioners as such.

At the April 6, 2017 meeting, Petitioners discussed with the child study team their concerns about the Behavioral Support Program; they discussed J.H.'s academic needs as well as her emotional needs; they questioned if there were any other placements for J.H., as J.H. was in attendance; and broke down crying when she heard that the Behavioral Support Program was the proposed placement. M.H. testified that at the April 6, 2017 IEP meeting, that Ms. Wilk had J.H. wait out in the hallway while they discussed her report. Then, M.H. testified: Well, it was a very uncomfortable situation because we had already made the corrections and the once J. was in there she -- Mrs. Wilk was telling her these were -- "This is what we are going to do," and J. said, "What are my other options?" And she said, "Well, this is it, this is what we're proposing," and that's when J. was upset. (April 23, 2018, 148:15-25; 153:1-5). F.H. testified that neither parent had any input into putting the IEP together. The suggestions at the April 6, 2017 meeting were not incorporated into the May 16, 2017 proposed IEP. (April 23, 2018, 85:1-12). Thus, it is clear that the Behavioral Support Program was predetermined, and Petitioners confirmed that none of their concerns were included in the IEP presented to them at the May 16, 2017 IEP meeting. As the testimony revealed, despite all of the discussions and Petitioners' concerns, the

April 6, 2017 IEP was never amended to include said issues. Thus, it was predetermined and denied FAPE.

In addition, Ms. Dickerson testified that she attended the May 16, 2017 IEP meeting, and that the exact same IEP was presented to the Petitioners at that meeting as the IEP presented to them at the April 6, 2017 IEP meeting. Aside from the word "Draft" written on the front cover, the only difference was the case manager's name was changed from Ms. Wilk to Ms. Dickerson (clearly an administrative change). Not even the date of the IEP was changed. None of the parental concerns were changed to reflect the discussions and concerns expressed by the Petitioners and J.H. at the April 6, 2017 IEP meeting. Further, in between the time of the April 6, 2017 IEP meeting and the May 16, 2017 IEP meeting, Petitioners and J.H. had visited the Behavioral Support Program and spoken to staff there and had discussions with the case manager and Joe Cusack about the proposed placement as well as other out of district placements (not about the Purnell School though as Petitioners had not considered that school at that time), and none of those concerns were added to the IEP for the May 16, 2017 IEP meeting. Further, once the district received the two (2) independent evaluation reports from Dr. Platt and Dr. Schuberth, none of this information was added to the initial IEP.

Furthermore, Petitioners even wrote emails to the case manager, Ms. Dickerson and to Joe Cusack regarding discussing the results of the independent evaluations as well as requesting a discussion with them about the placement for J.H. Petitioner's email dated August 25, 2017 to Kendra Dickerson specifically stated:

> I left you a message on your answering machine and wanted to follow up with an email. I understand that Mike Reinknecht said that you would be contacting me regarding [J.H.'s] testing results with Dr. Schuberth. Please call me today so we can **discuss** this. As school is almost here we need to decide what is best for [J.H.]. I will call again to try to contact you this morning as we would like to make our decision as soon as possible. (emphasis added) (See P29)

Petitioners sent another email to Joe Cusack and to Kendra Dickerson dated September 8, 2017, indicating that they had a phone conversation with them on August 25, 2017 and they were told that J.H. would be coming back to West Morris as a general education student with a 504 Plan. They indicated that they "were confused at the time since she was already determined to be eligible for special services with a previously proposed IEP. Since then I have spoken to Kendra and she indicated that the team is waiting for results from Dr. Platt's office to schedule a new IEP. Can you please supply us with the proposed plan for [J.H.] in writing?" (See P29)

The response from the school district was on September 11, 2017 from Joe Cusack which stated in part, "I am not sure if you are referring to the proposed IEP or the 504 plan. If you need a copy of any IEP proposal, Kendra would have that documentation. I have attached a copy of the 504 plan that we developed last December when [J.H.] was returning to school. This plan would still be in effect for the 2017-2018 school year here at WMC." (See P29).  These responses from the district demonstrate that there was no discussion with the Petitioners about the content of the IEP or putting back into place an outdated 504 Plan. There was no discussion about the placement for J.H. and what would be beneficial to meet her needs. The district instead predetermined that she belonged in the Behavioral Support Program at a different high school and then when the Petitioners questioned this, the district retaliated and instead just gave them an outdated 504 Plan without any updates or changes and placed J.H. as a general education student without any supports or special education to address her learning needs. At this time, the district already had both Dr. Schuberth's and Dr. Platt's reports and according to Ms. Dickerson's testimony, she had read these independent reports. Therefore, knowing that J.H. was diagnosed with a specific learning disability and had an acute sensitivity to noise, the school district failed to amend the IEP and then failed to provide any services to J.H. by giving her an outdated 504 plan without any mention of academic issues and without any modification of its terms or

services. Thus, Petitioners have met their burden of proof that the IEP and the 504 Plan were predetermined without any parental input and that denied Petitioners their due process rights under the IDEA and denied J.H. FAPE in the LRE. Petitioners respectfully request that they are declared the prevailing party in this action.

### D.   THE SCHOOL DISTRICT COMMITTED PROCEDURAL AND SUBSTANTIVE VIOLATIONS OF THE IDEA RESULTING IN A DENIAL OF FAPE

Under the IDEA, the inquiry is twofold. First, did the school district comply with the procedures set forth in the IDEA and second, did the school district fulfill its obligations to provide the student with a FAPE. C.H. v. Cape Henlopen School Dist., 606 F. 3d 59, 66 (2010); See also Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley, 458 U.S. 176, 206-07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Procedurally, the "IDEA sets out a variety of procedures to be followed in the creation of the IEP. For instance, the IEP is to be prepared at a meeting including a qualified representative of the local educational agency, the child's teacher, a special education teacher, the child's parent or guardian, and, where appropriate, the child." Id. § 1414(d)(1)(B). Id., at 65-66.

When parents challenge a school's provision of a FAPE to a child, a reviewing court must (1) consider whether the school district complied with IDEA's procedural requirements and (2) determine whether the educational program was "reasonably calculated to enable the child to receive educational benefits." Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982); See also Mary Courtney T. v. Sch. Dist., 575 F.3d 235, 249, 2009 U.S. App. LEXIS 17001, *32 (3d Cir. Pa. 2009); (See also the updated standard set forth in the Endrew case). In some cases, a procedural violation can rise to the level of a denial of FAPE but only if "such violation causes substantive harm to the child or his parents." C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 66 (3d Cir. 2010) (citing Knable ex rel. Knable v. Bexley City

Sch. Dist., 238 F.3d 755, 765 (6th Cir. 2001)). Substantive harm occurs if the preponderance of the evidence indicates that:

> [T]he procedural inadequacies— (I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii); *accord* 34 C.F.R. § 300.513(a)(2); N.J.A.C. §6A:14-2.7(k)" See C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 67 (3d Cir. 2010); D.C. v. Mount Olive Twp. Bd. of Educ., 2014 U.S. Dist. LEXIS 45788, *50-51, 2014 WL 1293534 (D.N.J. Mar. 31, 2014).

In the present case, the school district committed a procedural violation of the IDEA because they failed to have any general education teacher at the April 6, 2017 IEP meeting, as per the attendance sheet. (J9), where it states that Tamara Wubbenhorst was supposed to attend and did not. There was no general education teacher to discuss J.H.'s academic progress in her classes, even if she was not in school. Someone should have discussed her progress and decline in grades for 8th grade and her progress through home instruction and instruction at ICCPC but they failed to do so. There was also no special education teacher present at the IEP meeting. The attendance sheet indicates that David Ehasz was the special education teacher that was supposed to attend but there is no signature on the attendance sheet. Further, Belina Goldberg-Rappaport, who conducted the social assessment was not in attendance either, and Petitioners had several corrections and concerns about her report that needed to be made and were not. Further, the district has failed to produce any waiver signed by Petitioners indicating that they waived their right to have these members of the child study team not attend the initial IEP meeting. Thus, since Petitioners were unable to obtain the needed changes and characterizations changed in the social assessment or discuss the results with the person who actually conducted the assessment and they did not waive their right to have a general education and special education teacher present, the district not only committed procedural violations but they rose to the level of

substantive violations since they led to the Petitioners and J.H.'s rights to decision making in the IEP process being denied. This lack of attendance also led to no changes to the IEP and no meaningful discussion about J.H.'s actual needs and what would be an appropriate placement for her. Thus, all of the elements have been met by Petitioners and they are entitled to prevail.

**POINT II-    THE SCHOOL DISTRICT FAILED TO EVALUATE J.H. IN ALL AREAS, THEREBY VIOLATING THE IDEA**

Under the IDEA, school districts must work with parents to design an IEP, which is a program of individualized instruction for each special education student. "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." Blunt v. Lower Merion School Dist., 767 F. 3d 247, 268 (3d Cir. 2014). In this case, since there was no educational evaluation conducted by the school district and no general or special education teachers even attended the IEP meeting, the district could not determine J.H.'s actual current educational performance was and what goals and objectives she needed to meet her educational needs. In fact, the proposed IEP dated April 6, 2017 did not have any educational goals and objectives, in violation of J.H.'s rights. In fact, on page 11 of 22 of the proposed initial IEP, under Goals and Objectives, it states, "Academic and/or Functional Area" Social/Emotional." (J9) The only "annual Measurable Academic and/or Functional Goal" was J.H. "will increase her ability to manage anxiety pertaining to school related functioning." There are five objectives listed that J.H. "will be able to identity and articulate 2-3 triggers of anxiety," "will learn to use an anxiety scale to gauge and measure the strength of her emotional reactions to triggers," "will identify up to 3 strategies (i.e. Mindful Tool) that can be used to reduce anxiety," "will increase attend [sic] at school in accordance with her schedule," and "will seek support when feeling anxious." None of these goals and objectives relate at all to J.H.'s educational needs or present levels. Thus, this initial IEP failed to address any of J.H.'s learning

disabilities or needs. Without an initial educational evaluation, there was no possibility for the school to meet J.H.'s needs. However, at the time that they drafted the initial IEP and presented it predetermined to the Petitioners, they had information about issues and weaknesses in J.H.'s learning, contained in Ms. Wilk's psychological evaluation report, including low average scores in working memory and processing, block design, digit span, arithmetic, and symbol search yet, the child study team failed to address them. They had knowledge that J.H.'s grades went down in 8th grade. Ms. Wilk even stated in her psychological report (J15) that J.H.'s:

> [A]bilities to sustain attention, concentrate, and exert mental control are a weakness relative to her nonverbal and verbal reasoning abilities. A weakness in mental control may make the processing of complex information more time consuming for [J.H.], draining her mental energies more quickly as compared to others at her level of ability, and perhaps result in more frequent errors on a variety of learning or complex work tasks.

Further, Ms. Wilk found that J.H.

> [P]erformed better than approximately 34% of her peers on the processing speed tasks… [J.H.'s] performance on the subtests that compose the PSI is quite variable; therefore, the PSI score should be interpreted with caution. She performed much better on Coding… which is more demanding of find-motor skills, short term memory, and learning ability, than on Symbol Search… which is more demanding of attention to detail and visual discrimination. Processing visual material quickly is an ability that [J.H.] performs less well than her verbal reasoning ability. (J15)

Ms. Wilk also found that,

> Processing speed is an indication of the rapidity with which [J.H.] can mentally process simple or routine information without making errors. Because learning often involves a combination of routine information processing (such as reading) and complex information processing (such as reasoning), a relative weakness in the speed of processing routine information may make the task of comprehending novel information more time-consuming and difficult for [J.H.]. Thus, this may leave her less time and mental energy for the complex task of understanding new material. (J15).

The district ignored this information about J.H.'s issues with learning, despite their obligation to evaluate J.H. in all areas of suspected disability. This is because the "school district must conduct an evaluation of the student's needs, assessing all areas of suspected disability, before

providing special education and related services to the child." P.P. v. W. Chester Area Sch. Dist., 585 F. 3d 727, 730 (3d Cir. 2009) (citing 20 U.S.C. § 1414(b)).

Despite these obligations, the district failed to conduct an educational evaluation to pursue these findings. There were no goals and objectives listed in the initial IEP to address these learning issues. Therefore, even using the snapshot rule, and evaluating the matter under the new standard in Endrew, the initial IEP predetermined by the district, and which remained substantively unchanged when represented to the Petitioners at the May 16, 2017 IEP meeting, denied J.H. FAPE in the LRE. Petitioners respectfully request that they be declared the prevailing party.

The IEP must also consider any evaluations and reports obtained by the parents or the school district. 20 U.S.C. § 1414(b)(2)(A); 34 C.F.R. § 209.300.304(b)(1); N.J.A.C. 6A:14-2.5(a)(1), 2.5(c)(5) 210 and 3.4(i). See 20 U.S.C. § 1415(b)(6)(A); see also Fuhrmann, supra. Once the district had the independent evaluation reports from Dr. Platt and Dr. Schuberth, indicating that J.H. needed a small school learning environment; that it was unlikely that she would be able to return to high school; and that she had a specific learning disability and an acute sensitivity to noise, the district had an obligation to consider them. However, it is clear that the district did not consider them as they failed to amend the IEP or call an IEP meeting, or further evaluate. The district did not have a valid IEP for J.H. at the start of the 2017-2018 school year and instead, they failed to provide any IEP or an appropriate 504 Plan for her at the start of the 2017-2018 school year.

Here, the IEP should have been changed because it must be considered a "fluid" document, insofar as it can be changed by agreement, 20 U.S.C. § 1414(d)(3)(D), or by amendment, 20 U.S.C. § 1414(d)(3)(F). Thus, because they can and must be amended and changed to meet the changing needs of a student, the school district was obligated to consider the

independent evaluation findings and incorporate them into the IEP. The school district failed to do that and failed to call an IEP meeting to even discuss the findings. Thus, again, this reinforced that their April 6, 2017 IEP was predetermined, and the school district was in violation of Petitioners rights and denied J.H. a FAPE in the LRE.

Dr. Natalie Schuberth, a licensed BCBA and psychologist, testified as an expert and indicated that "she cannot remember ever seeing school testing without an educational evaluation. Usually, it's an I.Q. testing and educational and emotional screeners." (August 29, 2018, 47:22-25). Dr. Schuberth's testing reviewed that J.H.'s "overall intelligence was measured in the average range. So that's just where it should be. It's not a bad word. Just statistically where most people her age fall. So her overall I.Q., her verbal skills, her visual spatial skills were average. Her processing speed was also average, but statistically it was weaker than her other skills and working memory was low average. That was her lowest score. So working memory and processing speed were significant weaknesses. So in the classroom that would be that she just needs a little more time to take in information to answer questions and that it -- she may have some trouble with retaining information the first time that she hears it." (August 29, 2018, 48:18-25; 49:1-13). When asked about her findings, Dr. Schuberth explained the following:

Q     And can you define like exactly what working memory is?

A     Sure. It's taking in information, manipulating it in your head and spitting it back out. So this might be like mental math or remembering a phone number and entering it at the same time or taking notes while listening to the lecturer.

Q     And can you also just define what processing speed is?

A     Sure. This is how quickly someone takes in information, makes a decision and acts on it. So again this would be like answering questions on tests or writing notes.

Q    So having scores for working memory in the low average range, could that affect
     J.H.'s ability to learn?

A    Yes.  It could.

Q    In what way?

A    Again it might take her a little bit longer to answer questions.  She might miss
     some information as she's taking notes, because that's a very active process
     where you have to listen to information, write it down while continuing to listen
     to what's coming in.  So she may miss some things.

Q    And having a – a weakness in processing speed, could that also affect J.H.'s
     ability to learn?

A    Yes

Q    In – in what way?

A    Again that she might need repetition, she might miss some things and then she
     would need more time to answer and to do her work

(August 29, 2018, 49:14-25; 50:1-19).

Dr. Schuberth also indicated that with regard to math, "when it was untimed she scored

above high school level, but when there was a time limit her math skills looked like a sixth

grader and so she needed more time to really show her really advanced math abilities. So that

tells us that there's a learning disability and specifically in math fluency. So timed math."

(August 29, 2018, 51; 52:1-4).

Dr. Schuberth also testified that the math discrepancy could affect her ability to learn.

Timed math tasks may undermine her true ability because she needs a longer time frame do the

work. It may take her away from other tasks and could be frustrating and exhausting for her. In

addition, Dr. Schuberth found that J.H.'s "reading was at a college level but when it was timed,

her scores were lower.  She also had an oral word fluency issue, not just math.  "So this is how

quickly she can generate responses.  So she gets there eventually and will have a grade level or

even better response, but it will take a bit more time." (August 29, 2018, 52:5-17). Dr. Schuberth

also testified that "her verbal memory was better than her visual memory.  So she struggled with specifically design memory was in the low average.  So this is like abstract things which kind of feeds into that and is congruent with that issue in math.  She did best -- unlike most people she did best at remembering a list of words that were unrelated as opposed to a story.  So that tells me that she might get overwhelmed if there's too much extra information and she has trouble picking out the most important parts.  So in a classroom it would be really important to really highlight the most important parts for her and to repeat things." (August 29, 2018, 52:21-25).

Furthermore, Dr. Schuberth found that J.H.'s "immediate verbal memory was in the low average range and immediate visual memory was in the very low range or fourth percentile.  So with verbal that means again that she had trouble recalling what she heard. Later when she was given multiple choice it did -- we can see that it did get in there.  So again she's trying really hard, but her brain was just kind of fighting her a little bit where it was hard for her to recall all of the information, particularly when it was visual.  So she did better only than four percent of people her age when it was only visual.  She needs the verbal or verbal and visual together which is what the WISC-V immediate symbol translation shows.  So she needs multiple sources and types of information… Scoring in the very low range of the D -KEFS verbal fluency test means a lower processing speed; she might be slower to respond but it does not cover the quality of the response. Scoring in the low average range for color naming might mean she's slow to respond, methodical but the content is good." (August 29, 2018, 53:18-25; 54). Dr. Schuberth also testified that J.H. "had some trouble with attention particularly this could mean that she's just not attending or more likely a lot of the time she was attending to everything and not able to pick out the most salient points.  So that could be really overwhelming in a classroom and can kind of make someone just shut down and also just miss the most important part. Particularly for her she was really sensitive to sound.  So when there's a lot of auditory stimulation it might be hard for

her to pick out the important things that a teacher is saying." (August 29, 2018, 54:19-25). Dr. Schuberth indicated that J.H.'s sensitivity to noise would affect her "across the board" in other areas of school such as in the cafeteria and hallways. (August 9, 2018, 54:9-16). J.H. rated herself as at risk in the areas of shifting, working memory and task completion, which paralleled what Dr. Schuberth found. (Augsut 29, 2018, 56:2-8). Dr. Schuberth testified that J.H. "would benefit from a small classroom setting in a small school setting without overwhelming stimulation and the other things that relates to that were the relative weaknesses in processing speed or anything that required timing, math fluency, oral fluency, anxiety and depression." (August 29, 2018, 67:4-10). Dr. Schuberth testified that she would not recommend a behavior-oriented class or a self-contained class because they are usually "paced too low for-- she needs instruction that's at high school level or above." She also indicated that since J.H. needed visual and auditory and the ability to ask for clarification, and without a social aspect, computer learning would not be optimal for her. (August 29, 2018, 69: 18-25; 71:1-13).

When asked about scores found by the school psychologist, Ms. Wilk in her report, Dr. Schuberth's scores were consistent in working memory in the low average range of 9th percentile, block design, digit span, arithmetic, and symbol search. All of these scores were consistent between Ms. Wilk's findings and Dr. Schuberth's findings indicating that at the time that the school district predetermined their initial IEP for J.H., they had scores indicating J.H. had issues with her learning and they ignored them. For an initial IEP, the school district must ensure that they have all of the relevant information about the student to make a determination about eligibility and services. They failed to conduct an educational evaluation. Further, the school district failed to include any academic goals and objectives in the IEP and they failed to recognize that Ms. Wilk's scores warranted an educational evaluation. When, asked by the Court if reading the school report, they should have ordered more testing, Dr. Schuberth testified,

"Yeah. I don't think that there's sufficient information. I think more-more testing." (August 29, 2018, 78:21-25). Importantly, Dr. Schuberth indicated that J.H. "presented a general pervasive mood of unhappiness or depression recently due to all this. She is not someone that is just persistently depressed or having a more depressive Eeyore personality. She wanted to succeed and was not able to get herself into school which was causing depression." (August 29, 2018, 80:19-25; 81:1-2).

Thus, once the school district determined that J.H. was eligible for special education services, even if there was no agreement as to the classification, placement and services, and once the district had the independent evaluation reports, they had an obligation to ensure that the IEP was in place and that it reflected J.H.'s actual disabilities and they failed to do so. Thus, Petitioners must prevail as the school district denied J.H. FAPE in the LRE at the time that they drafted the initial IEP, and after they received the two independent evaluation reports and failed to call another IEP meeting or amend the IEP to reflect the new reports they were obligated to review and consider. This meant that J.H. did not have a valid IEP that reflected her needs and disabilities for the remainder of the 2016-2017 school year and at the start of school for the 2017-2018 school year. This denied J.H. FAPE in the LRE.

**POINT III-    THE APRIL 6, 2017 IEP FURTHER DENIED J.H. A FAPE IN THE LRE**

### A. J.H. does not meet the criteria for classification of Emotionally Disturbed

Petitioners do not dispute that J.H. is eligible for special education and related services. However, Petitioners did not agree to the term "emotionally disturbed" and they did not agree to the placement proposed and the lack of academic goals and objectives. The school district incorrectly classified J.H. as emotionally disturbed in its April 6, 2017 IEP. Under New Jersey law, classification of emotionally disturbed means:

A condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a student's educational performance due to:

i.     An inability to learn that cannot be explained by intellectual, sensory or health factors;

ii.     An inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

iii.     Inappropriate types of behaviors or feelings under normal circumstances;

iv.     A general pervasive mood of unhappiness or depression; or

v.     A tendency to develop physical symptoms or fears associated with personal or school problems.

N.J.A.C. § 6A:14-3.5(c)(5). Thus, in order to qualify for special education services as emotionally disturbed, a student must demonstrate (a) one of the five listed symptoms, (b) over a long period of time, (c) to marked degree and (d) that this must adversely affect the student's educational performance. See Id; See also, Springer v. Fairfax County Schoolboard, 134 F.3d 659, 663 (4th Cir. 1998), G.R. o/b/o L.R. v. Tewksbury Town. Bd. of Educ., OAL DKT. No. EDS2189-02 pg. 10 (August 22, 2002).

A review of the pertinent facts as well as the reports from ICCPC, and independent evaluators, Dr. Schuberth and Dr. Platt, support Petitioners' argument that J.H. does not meet the criteria for a classification of emotionally disturbed. In particular, Dr. Schuberth in her independent psychoeducational report indicated that J.H. met the criteria for the diagnosis of Specific Learning Disorder as well as Major Depressive Disorder, Recurrent Episode and Generalized Anxiety Disorder. See J18, Dr. Schuberth's Report dated August 21, 2017. J.H.'s therapist, Melissa Dolgos noted that in a small group setting, J.H. was able to manage her anxiety and that she excels better when people around her are mature and college bound. See J19, Ms. Dolgos Report dated August 17, 2017.

Further, J.H. does not exhibit one of the five marked symptoms contained in the definition of Emotionally Disturbed. Even, if for argument's sake, J.H. exhibits one of the five marked symptoms, she does not meet the remaining requirements set forth in the definition: that this behavior occurs over a long period of time, to a marked degree and that this must adversely affect the student's educational performance. J.H. had an undiagnosed learning disability in math and an acute sensitivity to sounds, which the school district missed under their Child Find obligations and in their IEP evaluation process. (See J18, Dr. Schuberth's report, pages 13-15).

Further, according to the definition of emotionally disturbed, a person can only be diagnosed as such if they have "An inability to learn that cannot be explained by intellectual, sensory or health factors." See N.J.A.C. § 6A:14-3.5(c)(5). Here, there were intellectual and sensory factors that were causing and significantly contributing to J.H.'s inability to learn in a large school with large general education classes and noisy crowded hallways. This learning environment that J.H. was in and the one that the district wanted to place her in in the Behavioral Support Program at the West Morris Mendham High School, were both large schools, many students, noisy hallways, with large general education classes. This type of learning environment was not appropriate to meet J.H.'s needs and that is why she was not learning or would not have been able to learn in the Behavioral Support Program, along with the other factors as to why this program would not have been appropriate for J.H. Therefore, J.H. has never met the criteria for being classified as emotionally disturbed.

Ms. Dolgos testified that she did not meet the criteria for Emotionally Disturbed. She worked with J.H. from October 2016-December 2016 and from January 2017-June 2017. (July 25, 2018, 18:8-11). She and Dr. Srinivasan wrote a letter to the school dated October 20, 2016 indicating that J.H. needed an educational component during the time that she was to be at ICCPC. (J12). She testified that when J.H. came in with severe depression and anxiety related to

school. However, while J.H. was at the partial hospitalization program, she noticed improvements. She was helped by the small groups of 5-6 kids. She opened up socially and participated in the group. (July 25, 2018, 21:7-22). She testified that in December 2016, J.H. was willing to try to go back to school with the assistance of ICCPC as she exhibited better coping skills. She and Dr. Srinivasan sent a letter to the school indicating such. (J13). She testified that she observed J.H.'s anxiety during the time that she was trying to reenter school. (July 25, 2018, 24: 15-20; 25; 26:1-3). She indicated that J.H.'s behavior was not willful or defiant. (July 25, 2018, 27:8-16). Ms. Dolgos also testified that J.H. was not experiencing anxiety in other areas of her life outside of attending school – it was just school and social peer related anxiety. July 25, 2018, 28:21-25). The school did not consult with her or Dr. Srinivasan for what should be in the 504 Plan or an IEP. Ms. Dolgos testified that J.H. did not have any behavioral issues and that if she was around others with behavioral issues, it would affect her negatively. She was highly affected by loud noises and peers with severe issues would be loud and inappropriate in groups. (July 25, 2018, 30:8-18; 31:5-17). Ms. Dolgos testified that "J.H.'s anxiety has prevented her from being able to attend a regular high school as she feels, judged, pressured and scared means that J.H. reported a lot of fear in the large hallways, noises, peers in school. She felt judgment by her peers because she did not relate to her peers." Further, J.H. did not relate to her peers because she had a lot of social anxiety to begin with which made it difficult for her to connect with them. They were loud and "already friendly" and it scared her to be a part of it." She also testified that at ICCPC, "J.H. greatly improved while in program. Does in fact mean that she is able to be in small groups – small class group settings process her feelings and emotions and receive more individualized attention from school work" means that she is more comfortable when a larger group is split into two. There are small groups with 5-6 kids, but if they get larger, the group is split into smaller groups. She gets more anxious in the larger groups. She has individualized

tutoring which she excelled at. (July 25, 2018, 31:1-15; 32). She testified that she discussed the appropriate educational placement for J.H. with Dr. Srinivasan. They both agreed that a smaller environment would help her with her learning needs and anxiety.

After speaking to Mr. Cusack and hearing the type of placement that they proposed at the Behavioral Supports Program, Ms. Dolgos and Dr. Srinivasan both agreed that it was still too large of a school setting for her and that she needed a more individualized setting in a smaller program. (July 25, 2018, 37-38). She testified that she became aware that the district wanted to classify J.H. as emotionally disturbed but did not agree with it because most kids that have this diagnosis have things like oppositional defiance or more severe issues. (July 25, 2018, 39:12-23). She also noted that "Learning disabilities can cause anxiety for students as there is difficulty focusing, frustration with, not understanding something. They have a fear of asking for help which leads to anxiety." (July 25, 2018, 40:12-19). She referred to her report dated August 17, 2017 which she wrote to the school outlining the effects J.H.'s anxiety has on her education. She testified that she did not see that there were behavioral issues as the IEP stated existed. She again requested the small classroom environment with college-bound peers. She stated that large group settings effects J.H.s anxiety more and causes more confusion for her. She shuts down. ICCPC suggested a school that would be a structured but non-strict educational environment that can help J.H. function better with more flexible schedules. ICCPC did not suggest specific therapy, just suggested a smaller school. (July 25, 2018, 42-44:9-18). She was also not aware that J.H. had independent evaluations or that she was diagnosed with a specific learning disability. (July 25, 2018, 45:5-8).

Ms. Dolgos also testified that "... J. has always had difficulty making friends in the school settings. She has a hard time just, you know, contacting peers and collaborating and -- and fitting in and it's the large social setting she hasn't really been able to function in those when

31

I had her. She had difficulty, you know, leaving the house, just the social atmosphere in general scared her." (July 25, 2018, 48:9-16). She did not agree with the classification of Emotionally Disturbed and stated that she thought J.H. should be assessed for ADHD or learning disabilities because she knew she had difficulties in math which was reported from the tutor. She does not have an ADHD diagnosis. She did not think emotionally disturbed fit J.H. and noted that IEP's have another category of other health impaired or a less severe diagnosis. (July 25, 2018, 52:9-24). She testified that none of the recommendations from ICCPC included placing J.H. in a self-contained behavioral class in a large high school. (July 25, 2018, 61:22-25).

With regard to the classification of Emotionally Disturbed, Dr. Ellen Platt, Licensed Psychiatrist, testified as an expert, that she was hired by the school district to conduct an independent evaluation of J.H. (J21, CV and September 6, 2017 report). Dr. Platt did not at any time indicate that J.H. met the criteria of being Emotionally Disturbed. In fact, she stated that J.H.'s sensitivity to noise and her learning disability were causes of her anxiety. She testified:

> Q   In your expert opinion, was J.H.'s sensitivity to noise a cause of her anxiety?
> A   Yes.
> Q   In your provisional opinion was J.H.'s specific learning disability a cause of her anxiety.
> A   Yes.

(July 25, 2018, 87:9-14). Dr. Platt further testified that in her report, she described J.H. as being extremely fearful of entering school buildings, appearing phobic as describing becoming weak and unable to proceed, could be symptoms of a number of disorders, related to a depressive disorder or related to a developmental disorder. (July 25, 2018, 69:14-22). She explained that when she stated in her report that J.H. "remains exceedingly emotionally fragile and the probability of her attending school is exceedingly low at this time" she was indicating that J.H." was marginally functionally, very depressed, manifested depressional interpersonally and behaviorally, her energy was low so the probability of her going to school was limited. She

indicated fearfullness and a hint of inappropriateness which references a kind of a disconnection

to events and people around her," relating to her extreme anxiety. (July 25, 2018, 76:12-25; 77:1-

16). With regard to the anxiety that J.H. felt while being in the large public high school, Dr. Platt

testified that J.H. required a "learning environment with reduced stimulation as a "learning

environment with a modest number of students" and "a small building that is not overwhelming

to navigate and measured input by the staff. So for example, in a standard educational placement

if a student is walking down the hall and doing something that a teacher thinks is untoward, the

teacher may respond in any way at all, maybe in a sensitive matter, maybe in a direct matter or

maybe in an insensitive matter -- manner, but she really needed to be in a place where there was

never any question that the staff would respond to her in a sensitive manner." She stated that

although she was not aware of the type of learning environment that the school district wanted to

place J.H. but in her opinion, a self-contained class in a large high school would not be

appropriate. She did indicate that "[w]ithout these issues being addressed in the matter in which

J. deals with schools is not likely to change. She was unable to function in her current academic

environment and in order to enable her to function her school setting had to provide enough of a

comfort level, reduced stimulation, communicate specific support for her and that would in the

school setting contribute to her ability to stabilize internally and then inter personally. (July 25,

2018, 80:22-25; 82; 83:8-19). She explained her reasoning as follows:

Q      Can you explain why?

A      Well, first of all, a student has to arrive at school and if it's a large public high
       school that usually means a school bus that's unsupervised and unmonitored,
       which would be a problem.

       It would mean entering a school with many other students that are in all sorts of
       communication with each other and activity. That would be a problem for her.

       It would mean when she's navigating the hallways that there would be
       unstructured, unanticipated responses from other students that may or may not
       have something to do with her, but that would be overwhelming to her.

It also might mean that another staff member might see her appearing to daydream or something of that nature and intervene in a non-therapeutic manner. Situations such as that. (July 25, 2018, 84:22-25).

Dr. Platt also indicated that if the anxiety provoking situation is changed, the anxiety could get better. (July 25, 2018, 87:18-21). Thus, it appears that Dr. Platt believed that with the right learning environment, J.H. could be successful.

When Dr. Platt was asked hypotheticals about J.H.'s learning environment, she testified that she felt that it would be appropriate for her. Dr. Platt stated as follows:

"Q      Sure. If -- if I told you that J.H. was in a learning environment right now where she had access to a counselor and weekly sessions, she had special education teachers, small classes and a -- a – a psychologist that came a few times a week, would that fit into the definition of what you believe would be appropriate --
A      It would.
Q      -- environment for her?
A      It would.
Q      And if I told you that she only had five or six kids in -- in her class and she had her own dorm room to go to in between classes to, you know, do her homework or just to get away, would that fit into something like the learning environment that you are describing?
A.      Yes.
Q      So if -- if I told you that J. -- when J.H. arrives to school she checks in with the nurse -- well, before school starts as well as in health center as well as at the end of the day, would that also be within your definition of what would be appropriate for J.H. for a learning environment?
A      Well, I actually think it's mandatory. So yes." (July 25, 2018, 99:20-25; 100:1-18).

In her report, Dr. Platt also recommended that J.H. be tested for Central Auditory Processing and noted that she had a specific learning disability as per her history. (July 25, 2018, 79:20-22; 80:9-16). Thus, Dr. Platt's professional medical opinion was that J.H., in the appropriate educational environment that was a small school, small number of students, reduced noise, with a therapeutic component, she would be successful. When describing the specific learning environment at the Purnell School, Dr. Platt agreed that it sounded appropriate for her needs. Therefore, based on

34

expert testimony and that of Ms. Dolgos, J.H. does not fit within the classification of Emotionally Disturbed.

Even an examination of the facts before the child study team at the time that they drafted the April 6, 2017 IEP, shows that the child study team had information within their own psychological evaluation, which indicated that J.H. had learning issues. Moreover, the school district failed to do an educational evaluation, despite it being common accepted practice to do so, it is part of a full evaluation of a student and that student's educational needs, they had information at that time to warrant such an evaluation, and they had evidence that J.H.'s grades had been slipping. They assumed incorrectly that the issues of school related anxiety were due to an Emotional Disturbance instead of looking further.

On the other hand, J.H. did in fact meet the criteria of Other Health Impaired because she had an acute sensitivity to sounds, causing her to become anxious, which affected her ability to learn. The combination of these issues along with having a specific learning disability qualified J.H. under the classification of Other Health Impaired. The Individuals with Disabilities Education Act ("IDEA") defines Other Health Impaired:

> Having limited strength, vitality, or alertness, **including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment,** that— (a) is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis [a kidney disorder], rheumatic fever, sickle cell anemia, and Tourette syndrome; and (b) adversely affects a child's educational performance. (emphasis added) See 34 C.F.R. Section 300.7 (c)(9)

It is important to note that Dr. Schuberth's independent evaluation report specifically recommends that J.H. be further evaluated as to the underlying cause of her extreme sensitivity to sounds and noises and Dr. Platt's report recommends further testing for Central Auditory Processing. (See J18, Dr. Schuberth's report, page 13 and J21, Dr. Platt's report, page 11). Moreover, due to J.H.'s underlying generalized anxiety, she had a "heightened alertness to

environmental stimuli that results in limited alertness with respect to the educational environment." Therefore, she met the definition of Other Health Impaired.

It is also important to note that Dr. Schuberth diagnosed J.H. with a Specific Learning Disability. Although the actual name is a Specific Learning Disorder, that is from the language set forth in the DSMIII under the definition of a Specific Learning Disability. The wording does not change the fact that it is a Specific Learning Disability as per the DSMIII and the IDEA and therefore, once the district received Dr. Schuberth's independent report, the child study team should have considered the diagnosis and changed her classification to Specific Learning Disability or Other Health Impaired to encompass her extreme sensitivity to sound and noise and determined an appropriate placement for her based on one of these classifications. The district did not do that.

Even after Dr. Schuberth's and Dr. Platt's independent evaluation reports were provided to the district, the district still failed to propose a different classification or placement for J.H. Instead, the district sent an email to Petitioners, after the 2017-2018 school year started, that they were going to consider her a general education student with her old outdated Section 504 Plan, which called for home instruction, to be implemented in her school placement.

Petitioners placed J.H. at the Purnell School where she has been attending classes since September 2017. J.H. has been thriving at the Purnell School and she her school related anxiety is under control and she is performing well academically as she is getting all "A" grades, she has made friends, and she sees the counselor there each week for support. J.H.'s school related anxiety was exacerbated by the setting at a larger public high school such as West Morris. It was not an indication that she is emotionally disturbed. Once she was enrolled in a school with a different setting that met her individual needs as a student, her anxiety was better managed, and she was able to thrive. If J.H. was truly emotionally disturbed, she would not demonstrate the

ability to thrive academically in another school environment.   Dr. Natalie Schuberth testified on August 29, 2018 and indicated that, "A student suffering with a disability like a learning disability can have anxiety if the student does not perform as well as he or she wishes to, if the student highly motivated and putting in a lot of work but the output is not quite where the student wants it to be." (August 29, 2018, 71:15-23).

### B. **Petitioners did not consent to a classification of Emotionally Disturbed**

In order to have a valid IEP, the district needed to obtain informed consent from the Petitioners in order to find J.H. eligible for special education services as well as to classify her and implement an IEP.   Pursuant to 20 U.S.C. § 1414(a)(1)(D)(I), "[t]he agency proposing to conduct an initial evaluation to determine if the child qualifies as a child with a disability as defined in section 602 shall obtain informed consent from the parent of such child before conducting the evaluation[;] [p]arental consent for evaluation shall not be construed as consent for placement for receipt of special education and related services." Further, "[a]n agency that is responsible for making a free appropriate public education to a child with a disability under this part shall seek to obtain informed consent from the parent of such child before providing special education and related services to the child." 20 U.S.C. § 1414(a)(1)(D)(II).

Here, Petitioners did not agree to classify J.H. as Emotionally Disturbed.  Respondent argues that Petitioners consented to the classification because they signed the Eligibility Determination Report on April 6, 2017.  However, Petitioners testified that they only consented to J.H. being eligible for special education and related services. In fact, Petitioners objected to the language "emotionally disturbed" being included in the eligibility determination report and were informed that this was the only term the psychologist was permitted to use.  Petitioners specifically testified that they did not consent to J.H. being classified as Emotionally Disturbed. F.H. testified as follows:

Q      On that same page there is another heading above the Notice of Waiver, can you read that?

A      "Statement of Eligibility."

Q      Yes.

A      "Review of the records and consideration of the cognitive functioning, academic achievement, learning styles, and adaptive behavior indicates that J. is eligible for Special Education and Related Services as (sic) meets the criteria of Emotionally Disturbed."

Q      Does it say anywhere that J.H. would be classified as, "Emotionally Disturbed?"

A      No, it just says she, "Meets the criteria."

Q      So when you signed this form were you in any way under the impression that you were consenting to the classification of Emotionally Disturbed?

A      No, my wife and I made it very clear at the meeting that we did not feel that was the correct classification and we wanted that changed and we were led to believe that as part of this process of the IEP that it could be changed and it would be changed at a later date.

Q      And when you're referring to a, "Meeting," that was -- what was the date of that meeting?

A      April 6th.

(April 23, 2018, 77:11-25; 78:1-9).

\*\*\*

"Q      At the time that you signed the Notice of Waiver if you had known it was meant -- if you had known that you were agreeing to classify your daughter as Emotionally Disturbed would you have signed it?

A      No, no, we said we disagreed with that."

(April 23, 2018, 80:21-25).

\*\*\*

"Q      Did anyone at any time indicate what it meant for J.H. to meet the criteria of being Emotionally Disturbed?

A      Meet the criteria, no, I don't believe so.  No, we were told that that was the only term that could be used for her, that was the only explanation we got.

Q       And at the April 6, 2017 IEP meeting when you discussed the classification was
        that -- who told you about that that was the only classification that could be given
        to you?

A       That was Sherry Wilk, the Psychologist.

Q       And can you describe for the Court any more about your discussions with Sherry
        Wilk about what -- or anything that happened at the April 6, 2017 IEP meeting?

A       Yes, so the IEP was presented -- well, we all went there, my wife, my daughter
        and I all went there, and Sherry Wilk asked my daughter to sit outside while we
        discussed the various reports.

        So we went through the Psychological Evaluation and the IEP and that took about
        an hour and then – so J. was outside by herself all that time and then we brought
        her in and sort of rehashed the same thing with her and then at the end it was said
        that the school was recommending the BSP Program, the Behavior Support
        Program, and Mr. Cusack started to explain a little bit about it and then J. asked
        what her other options might be.

        And the Psychologist said, "Well, at this time there aren't any other options, this
        is what we're going with," and J. started to get upset and the Psychologist started
        telling her, you know, repeatedly over that, you know, "This is not the way adults
        behave, you have to have an open mind, you know, stop being upset," you know,
        those kinds of things which my wife and I did not appreciate at all.

        And so finally J. got upset enough that it was suggested that she take a break and
        leave the room with  my wife which she did and then when they left the
        Psychologist told those of us that were left in the room that she couldn't tell if J.
        was faking it or not and it was basically at that point that I said to myself I need to
        get a lawyer."

(April 23, 2018, 81:1-25; 82:1-18).


        Petitioners also disagreed with the factual inaccuracies and terms used to describe their

daughter in the school district evaluation reports, specifically in Ms. Wilk's psychological report,

beginning with the heading which read, "Clifton Public School" and that J.H. was in a

hospitalization program rather than an out-patient partial hospitalization program. The district

refused to correct said inaccuracies, descriptions, and mischaracterizations in the reports.  Thus,

Petitioners only consented to find J.H. eligible for special education services but not to her being classified as Emotionally Disturbed. The school district has failed to meet its burden of proof.

### C. **Respondent Offered No Proof to Dispute the Classification of J.H.'s Specific Learning Disability or her sensitivity to noise**

Respondent is attempting to dispute a diagnosis of Specific Learning Disability without offering any proof to suggest otherwise. In May 2017, Petitioners requested an independent psychiatric and psycho-educational assessment. The School District approved this request and in July and August 2017, an independent psycho-educational evaluation of J.H. was conducted by Dr. Natalie Schuberth, Psy.D., BCBA-D. There was no testimony presented at trial that disputed Dr. Schuberth's report, which diagnosed J.H. with a Specific Learning Disorder with impairment in mathematics and an extreme sensitivity to sounds and noise.

Pursuant to N.J.A.C. § 6A:14-3.5(c)(12)(i), a "specific learning disability can be determined when a sever discrepancy is found between the student's current achievement and intellectual ability in one or more areas....(5) Mathematical calculation; (6) Mathematical problem solving." The School District offers no evidence to suggest that Dr. Schuberth's report or diagnosis is incorrect, nor does the School District offer evidence to suggest that J.H. does not have a "Specific Learning Disability" as defined by the DSMIII, the IDEA, or N.J.A.C. § 6A:14-3.5(c)(12). Dr. Schuberth also provided detailed testimony regarding her findings, as set forth in detail herein. The district failed to provide any expert witness to dispute Dr. Schuberth's expert findings. Thus, Petitioners have proven that J.H. did in fact have a specific learning disability and a sensitivity to noise that affected her academic success in the public school.

Further, the independent psychiatric report from Ellen Platt, D.O., provides additional support for the diagnosis of Specific Learning Disorder as well and that J.H. also meets the criteria for Major Depressive Disorder and General Anxiety Disorder. The School District has offered no evidence to demonstrate that this expert report is inaccurate or should not be relied

upon. It is important to note, however, that neither Dr. Schuberth nor Dr. Platt diagnosed J.H. as "Emotionally Disturbed." Without further evidence to contradict their diagnoses, the School District must accept their reports and uncontroverted testimony by these two experts, as accurate and change J.H.'s classification from "Emotionally Disturbed" to "Specific Learning Disability" or "Other Health Impaired." The unsupported classification of Emotionally Disturbed by the district was not correct and did not accurately reflect the actual diagnosis of J.H. Therefore, the April 6, 2017 IEP did not meet J.H.'s needs as it was inaccurate and failed to provide services she needed. Thus, Petitioners are entitled to prevail.

### D. The Behavioral Support Program was not appropriate and denied FAPE in the LRE

The Behavioral Support Program (BSP) contained within the April 6, 2017 IEP at the Mendham High School was not an appropriate placement for J.H. Petitioners did not agree to a diagnosis of Emotionally Disturbed, nor did they agree to placement in the BSP. The BSP, offered to Petitioners as the "Behavioral Support Program" in the April 6, 2017 IEP, and referred to as the Being Successful Program by the district's counsel, is a behavioral program that focuses on strengthening student behaviors such as responsibility for one's self and school assignments, socialization skills, and self-confidence. F.H. testified regarding the BSP program being inappropriate for J.H.:

Q    And had you previously requested an out of District placement to a different school to the Child Study Team.

A    J. initially -- J.H. initially was -- thought that Fusion might be a good fit for her and we had visited there and they had said that other school districts send children there so we thought that would be something that we could explore.

Q    And at the May 16, 2017 IEP meeting is it fair to say that you expressed concerns about the Behavioral Support Program at the Mendham High School for J.H.?

A    Yes, yes.

Q    And what did -- do you recall what you expressed were some of your concerns?

A     Well, again it was walking into a big school, you know, the very fact that she had to walk into the door and that she had to walk through a crowded hallway to get to the BSP Program room and then once there, you know, you couldn't -- you really couldn't leave because she would be in this -- you know, in this environment that was -- you know, that caused the anxiety.

So it would be, you know, sort of in this self-contained room that she would be -- that she would be in the whole time. Other issues were that, you know, they couldn't offer, you know, Gym or something like that where she could get out because, you know, she couldn't go into the mainstream classes,

Q     So was it your understanding that the BSP, the Behavioral Support Program, did or did not have higher level academic classes?

A     It was our understanding that -- well, we were kind of confused, from the visit to the BSP, you know, we were told that to take higher level academic classes you would have to take them in the mainstream and then Dr. Leigh told us in the -- in the May 16th meeting that they would bring in a private tutor for the advanced classes.

Q     Were you aware of any differences between the Behavioral Support Program at the Mendham High School and the Behavioral Support Program at West – Central High School?

A     Yes, we were sort of told by Joe Cusack that the one in Mendham might be better for J.H. because the one in West Morris that the kids there might have had more behavioral issues, rebellious issues and, you know, lack of attending school issues and that kind of thing, that was it.

Q     Were you ever informed that the Behavioral Support Program in Mendham High School was for psychiatric reasons or was it described to you has a behavior class?

A     Yes, we were never told that it was for J.H. therapeutic or anything like that. It was -- it was, you know, an academic level class and, you know, it was just to get the kids to get in the door and attend high school more or less.

Q     To your knowledge were any of the concerns that you raised at the May 16, 2017 IEP meeting incorporated into another IEP?

A     No.

Q     After the May 16, 2017 IEP meeting did you have any discussions with the District about changes to the IEP or the placement?

A     After the May meeting with the District, no, no."

(April 23, 2018, 89:23-25; 90; 91; 92; 93:1-12).

After receiving the April 6, 2017 IEP, she had no objection to the Behavioral Support Program in Mendham being listed because she had not yet seen the program. The program was explained to her by Mr. Cusack and a woman who used to work at the program (April 23, 2018, 143:10-25). M.H. testified that the woman explained that "it was in a self-contained room and that it's a smaller group of kids and it was to encourage kids to try to get to school and she talked a little bit – she may have talked about the point system  and she talked about the flexibility to get the kids to complete their work … ." (April 23, 2018, 144:3-10).

M.H. went with J.H. to see the Behavioral Support Program at Mendham High School and spoke with Tracy Costa. M.H. testified that Ms. Costa told them the program was to try to get the kids in to the school and for the students to make it through as much of the day as possible. Ms. Costa discussed the point system, reward systems, special trips and getting work from mainstream teachers. She does not remember anything about discussing course offerings except they were told that if J.H. needed higher level courses, she needed to be in mainstream classes. M.H. testified that she knew J.H. could not take gym or any of the other electives. A language had to be on EduShare, [sic] a computer program. M.H. and J.H. witnessed the students on their own on their computers. They had to work through the hallways to get to the program, up the stairs and down the hall to a small room. There were about ten students and a Teacher's Aide or two in the room during the visit. The students were coming and going a lot in and out of the room. (April 23, 2018, 144:11-25, 145; 146; 147:1).

M.H. further testified:

"Q     After seeing the Behavioral Support Program at Mendham High School did you believe that it was a good fit for J.H.?

A     No. And I actually let, you know, J.H. decide, "What do you think," you know, "How do you think this will work?" And we both talked about it and she didn't think so and, no, I didn't think it would work for her because well, physically,

> first of all it's in a big building and she has to navigate to the room and out of the room, if she wants to go to more advanced classes my understanding was that she had to go to mainstream classes.
>
> People were working individually on their computers, it wasn't like a Teacher in a class teaching. It was everybody doing their own work and it didn't seem like -- it reminded me of when I used to work in the Resources -- the Resource Rooms in school, so everybody doing their own thing and it just didn't seem appropriate for her.
>
> I can't speak to what the intentions were of the kids in there but it didn't seem like a highly academic college bound program"

(April 23, 2018, 147:17-25; 148:1-13).

M.H. testified that J.H. has never had a behavioral issue, is not a disaffected learner, has never had a pattern of school failure, has never been defiant in school and has never refused to attend school. She was not able to attend school. (April 23, 2018, 160:20-25; 161:1-9).

M.H. told the Child Study Team her concerns after the April meeting, probably at or after the May 16th meeting about the Behavioral Support Program. The child study team did not give the Petitioners any other options. The IEP presented at the May meeting was the same one presented at the April meeting. M.H. had no input into the formulation and was never consulted about her concerns. No changes were made to the IEP after the parents expressed concerns. M.H. never heard about the Being Successful Program until seeing it in the binder and only knew about the Behavioral Support Program. (April 23, 2018, 148:14-25; 149).

Dr. David Leigh also testified about the Behavioral Support Program. He indicated that:

> The reality was a student can go into that program and be there for the entire school day if that was necessary. It offered the core academic classes, it included Adaptive Physical Education that was very low stress, there was a Yoga instructor brought in every Friday where the students were learning relaxation techniques.
>
> And we also incorporated a Transition Program where the structured learning experienced Coordinator who was working closely with the teaching staff because we offered a postsecondary planning course and so this was for students who would then be taking an internship and assessed for what type of internship might work for them as they prepared for life after high school.

44

So, again, there were multiple components to the program. There was a point system that was incorporated that was daily and weekly and it was really just to have feedback to the students that they're on track and that they're meeting their goals.

**\*\*\***

And so we needed to create a therapeutic setting with a primary Child Study Team member who would provide therapeutic support, Teachers that were very sensitive and skilled in working with the students, and a system that would support the students for knowing that they were making progress.

We were trying to get kids that were really stuck emotionally and trying to get them unstuck, more confident, and back to performing to their potential. For some students they could access the general ed setting, others could not, the goal was for them to eventually do that, that's the goal under the least restrictive environment, so that's the gist of the program.

(April 23, 2018, 12; 13; 14; 15:1-21).

Dr. Leigh further testified that the BSP program is one where the student can take a gym class online if necessary, but he did not recall, in response to Petitioners' counsel's question, whether or not he stated during the May 2017 IEP meeting that J.H. was not a candidate for the adaptive gym class for special education students and that she would have to take volleyball on line. However, Dr. Leigh stated J.H. would not be placed in a general education gym class. (April 23, 2018, 20:10-25). Dr. Leigh stated that the student would need to go to a general education class for an IB or an AP course as they are not offered through the BSP. (April 23, 2018, 21:11-16).

Tracy Costa, a social worker in the Behavioral Support Program testified herself that the Behavioral Support Program did not offer advanced placement classes and that students would have to take said classes outside the Behavioral Support Program in the general education classes. Further, they worked to get students to come into the building. If J.H. had been allowed to testify, she would have indicated that she was looking for a placement where she could take high level advanced courses because she wanted to apply to and attend a competitive college. Taking lower level classes in the Behavioral Support Program would not have helped her achieve her goal of attending a prestigious college. Ms. Costa testified as follows:

Q   Can you talk a little bit about what the services are, just generally, and then we can get more specific in a minute.

A   It is to provide an environment for students that might be having a difficult time in the mainstream classes for social emotional reasons. They might have difficulties with the size of classes, the delivery of academic material, as well as individualizing the academics to provide them services where, if we have to stop an English class to address a social emotional issue without it hindering their progress academically or socially and emotionally."

(April 9, 2018, 219:13-24)

"Q   Do all the students in the BSP program --(out of microphone range) BSP program at Mendham have disciplinary issues?

A   As a whole, no.

Q   Are there students that attend the BSP that do not have disciplinary issues?

A   Yes."

(April 9, 2018, 219:25; 220:1-6).

"Q   Can students receive advanced placement classes in BSP?

A   Not in BSP; outside of BSP.

Q   Outside of BSP meaning –

A   In the mainstream – in the mainstream classes."

(April 9, 2018, 223:11-15).

"Q   And what if a student is struggling with being in the mainstream?

A   What happens is, they are assigned a responsible teacher within the special education department. That teacher then tracks that student and is in constant communication with all teachers involved with that student. So, whether that student's teacher is in the BSP program, as well as outside – so we can provide supports in and outside of the program."

(April 9, 2018, 223:17-24).

"Q   Can the BSP adapt to any academic level to meet an individual student's needs?

A   To provide extra assistance and things of that nature. I'm just trying to get a clarification.

Q   Well, I guess both ways. I guess the question is, once the student's academic needs are identified in an IEP, do you review that as a part of a student comping into BSP?

A      Yes.

Q      Is the BSP adapted – can the BSP adapt academically to make academics either less or more challenging –

A      Yes.

Q      -- depending on the student's needs?

A      So, we have really mainly two levels of classes within the BST, so we have studies and we have academic, which is a college-prep level. So, the students are taught the material, but their assessments and what they produce is different. So, the teachers that are – the teachers are asking those students for one set of work for studies and one set of academic, just like the mainstream."

Q      And we had some earlier – strike that, Your Honor. If a student is, like you indicated, if a student is struggling going into their mainstream classes, as part of the BST, are they offered some sort of accommodation to meet that –

A      Sometimes they are unable to attend a mainstream class for a lot of different reasons. It could be something from home; it could be something that happened in school. So, myself, along with the teachers, will address that. Maybe that day, they didn't end up going to class because we had to address an issue and we have to address that issue for them to be successful in the academic area, so there are times they might miss class. But then, the communication is with those teachers that – that they missed class."

(April 9, 2018; 224; 225:1-11)

"Q      Let's talk about students that are struggling, that have school-based anxiety, so they're having trouble maybe getting into the – into the high school building to begin with.

A      Yup.

Q      Have you seen situations like that as part of your BSP?

A      Yes.

Q      And what are some of the services that you provide to students like that?

A      So, we have a wide range of services. We have students that will not come into the school building, so we've gone out to the home to work with them there, to then bring them back into the school building. When they come back into the school building, sometimes they get to the door and that's good for that day. And then, maybe the next time, they come into the lobby or into my office. You know, the goal is for them to get into the building first, for them to feel comfortable and confident, to establish relationships with teachers, to then gradually get them into the classroom. It all depends on how severe their anxiety is."

(April, 9, 2018; 225:12-25; 226:1-9).

"Q     If you have a student who's at an advanced or honors level academics, they would have to take their high level classes in the general ed setting --

A     Correct.

Q     -- if they were in the Behavioral Support Program at Mendham High School.

A     Correct.

(April 9, 2018; 229:1-7).

Clearly, based on the testimony stated above, the BSP is a point-based incentive program that rewards students for showing up on time, remaining alert, and participating. (P31) The BSP does not cater to students who are on a college track because many advanced classes are not offered. If students want to be on a college track, they need to take classes in the larger general education setting or on the Educere computer-based program, including classes like gym, as the BSP only offers Adaptive Physical Education classes. This is a direct contradiction of what J.H. requires and Dr. Schuberth was very clear that computer-based programs would not have met J.H.'s needs. J.H. would have had to go to the general education classes through crowded noisy hallways to get to those classes in order to meet her educational needs of taking advanced level classes. Thus, the self-contained multi-grade level Behavioral Support Program would not have met J.H.'s needs socially, emotionally, and academically and would have denied her FAPE in the LRE.

As for the actual program contained within the IEP that was offered to J.H. at the April 6, 2017 eligibility determination meeting and again at the May 16, 2017 IEP meeting, the program is referred to as the Behavioral Support Program. (J9). In fact, it says "Behavioral Support Program" on pages 10, 13, 16, 18, 19 and 20 of the proposed IEP. (J9). Respondent's counsel asserts on page 16 of her brief that these are just "typographical error" and that the actual name of the program is "Being Successful Program." Counsel offered a brochure for that name in

(P31) but there is no date of that brochure, but it does describe in detail the reward and punishment system for behaviors and that the students have do their school work in order to earn privileges. J.H. never had an issue doing her school work during home instruction and she certainly does not have any issues with doing her school work at the Purnell School. However, counsel's representation that the Behavioral Support Program in several places in the IEP were merely typographical errors was a blatant falsehood.

Not only was the name of the program incorrect, the entire premise of the program was incorrect and inappropriate for J.H. She was never a behavior issue. Dr. Schuberth did not make any recommendations for J.H. to be placed into a behavior-oriented class. (August 29, 2018, 69:18-20). She stated she is a board-certified behavior analyst trained to evaluate people with behavior issues. (August 29, 2018, 74:9-16). Dr. Schuberth testified that she would have placed it in her report if she saw J.H. with behavior issues of concern. (August 29, 2018, 7:17-20). Her anxiety was not willful behavior. (August 29, 2018, 74:21-24). J.H.'s depression was not willful behavior. (August 29, 2018, 74:25; 75). Dr. Platt noted the there was no behavioral issues with J.H. There were no disciplinary actions. (July 25, 2018, 77:2-7).

J.H. had anxiety related to the large school and the overwhelming noise at that school. She was on a college track and needed to take advanced general education classes, which were not offered in the Behavioral Support Program and even Dr. David Leigh, the former Director of Special Services indicated that if J.H. was in the program, she would have to go to the general education classes through crowded and noisy hallways to take the classes she needed to apply to college. She would also have to take gym class on-line to avoid the large general education gym classes in the school. She would be in a self-contained one classroom in the middle of the school, with students of varying ages, grade levels, and behavior issues. This was not the appropriate environment for her to learn and, although there was access to guidance counselors, they were

49

not there all of the time and the district called it a "therapeutic setting," which is not what J.H. needed to meet her needs. Even if the BSP followed the April 6, 2017 IEP, there were no educational goals and objectives and no accommodations or services related to her learning disability. Thus, it denied J.H. FAPE in the LRE.

The report from J.H.'s therapist, Melissa Dolgos at ICCPC confirms that J.H. "excels better when people around her are mature and college bound rather than peers who have behavioral issues." (J19) Ms. Dolgos indicates that J.H. has never had any negative behaviors and that she is distracted when others around her have behavioral issues. From this, it follows that the BSP is not the best placement for J.H. The behavior component of the program, the incentive and rewards based on behavior do not adequately address J.H.'s individual needs.

Further, J.H.'s needs were also outlined specifically by independent evaluators, Dr. Natalie Schuberth and Dr. Ellen Platt, both of whose reports were ignored by the district and instead the district ignored the eligibility determination, failed to find an appropriate placement for her by the start of the 2017-2018 school year, and they unilaterally determined that they would treat her as a general education student with an old outdated 504 Plan that called for home instruction, but the district argued that she was not entitled to a home instruction stay put program. Thus, the district has failed to meet its burden of proof that they provided J.H. with a FAPE in the LRE. Petitioners are entitled to be declared the prevailing party and pursue fees.

### E. The Purnell School was not predetermined by Petitioners

Respondent's counsel has asserted that Petitioners predetermined that they wanted J.H. to attend the Purnell School. First, predetermination does not apply to the parents only to the school district in predetermining an IEP. Second, Joe Cusack testified that he had only spoken to the Petitioners about the American Christian Academy and the Fusion Academy, both of which were

rejected by the school district as they felt she needed a therapeutic learning environment. Dr. David Leigh testified as follows:

> Sure.  So when they had asked for, you know, what are some programs and if not BSP or if BSP didn't work floated a few programs such as Homestead and Hunterdon Prep and then asked what programs are you on your side looking at and there were three that came up. One was Fusion, Fusion is a one to one program, it's not approved as a therapeutic school, you're with a Teacher for each of the content areas.  The other was FlexSchool, I really didn't know much about that, it's fairly new, I believe it's been around since 2013.  It's a twice exceptional school for both gifted learners, a 120 IQ and above, and some other exception that you have.

> And then the third one was Purnell and what I said at that point was of the three -- because I certainly don't endorse one to one learning, I don't think that prepares you for the real world and twice exceptional, that's not what the record was showing, and of the three at least Purnell offered a peer group.

> It is a school, it's not a therapeutic school, it's not what I was recommending, it was not what was being proposed, but it's a school and if the family was going to be choosing to not work under our least restrictive environment and our process and was going to go an invest funds at least it was a school, and that was the context under which that statement was made.

(April 23, 2018, 50:11-25; 51:1-17).

Interestingly, the school district at first claimed that they would not pay for the Purnell School because it was not a therapeutic school and then when they decided to treat her as a general education student with an outdated 504 Plan, they claimed she did not need a therapeutic school because she was a general education student, despite their insistence that she was Emotionally Disturbed.

Moreover, at the May 16, 2017, Dr. Leigh, the former Director of Special Services at that time, was the one who suggested that the family look at Purnell School for J.H. At his suggestion, J.H. visited the school and after consultation with her therapist, felt that it would be an appropriate place for both her academic and social needs.  An out-of-district placement at the Purnell School, with small classes, an appropriate peer group, a full-time counselor on staff and a three day a week psychologist, would allow J.H. to meet and develop friendships as she

continued with her therapeutic component at ICCPC where she has trusted therapists and appropriate services. M.H. testified that while she and her husband had put a list together of schools initially because they did not know what to do about J.H., they had crossed the Purnell School off the list until Dr. Leigh brought it up at the May IEP meeting. She went to visit the Purnell School on May 25. (April 23, 2018, 150:17-25; 151:1-3). F.H. testified the parents had previously put a list of 20 different schools but J.H. did not want to go to an all-girls school. However, it was mentioned at the May 16, 2017 IEP meeting by Dr. Leigh. F. H. testified regarding the Purnell School and his conversation with Dr. Leigh:

> "Q   Can you tell the Court what was said about it?
>
> A   Okay.  So we were having the IEP meeting and you brought up some of the schools we had looked at, Flex, Fusion, and you mentioned another -- you know, Purnell as a possible school.
>
> And then after the meeting was over David Leigh came up to us and said, "Did you -- did you look at the Purnell School?"  And we said, "No, we hadn't looked at it," and he said, "Why don't you take a look at it, it would probably be worth looking at?"  And then you asked him, "Is that something the District would consider for J.?"  And he said, "Possibly, it's got the peer group that you're looking -- that she needs," and that kind of thing.  So it was at that point -- only at that point that we actually went to look at it.

(April 23, 2018, 89:9-23; 90:1-25; 91:1-25; 92:1-25; 93:1-12).

Therefore, the Purnell School was not even considered by Petitioners until Dr. Leigh suggested it to them at the May 16, 2017 IEP meeting. The parties participated in unsuccessful mediation on July 27, 2017, at which Petitioners indicated that they would start looking at schools and notified the district that if the matter could not be amicably resolved, then the Petitioners would seek an out of district placement for J.H. and seek reimbursement for such unilateral placement from the district. Petitioners did not even apply to the Purnell School until August 2017. Thus, the Purnell School was not predetermined by Petitioners.

**POINT IV-    THE SCHOOL DISTRICT FAILED TO PROVIDE J.H. WITH AN IEP AT THE BEGINNING OF THE 2017-2018 SCHOOL YEAR DENYING HER FAPE**

Under the IDEA, a State must provide a free appropriate public education to all students with intellectual disabilities. See 20 U.S.C. § 1412(a)(1)(A). In order to satisfy the procedural requirements of the IDEA, an individualized education program — frequently abbreviated as "IEP" — must be created and in effect for each child with disabilities by the beginning of each school year. See 20 U.S.C. §§ 1412(a)(4), 1414(d)(2)(A). See also DM v. New Jersey Dept. of Educ., 801 F. 3d 205, 209 (3d Cir 2015); FRY v. Napoleon Community Schs., 788 F.3d 622, 625 (6th Cir. 2015); Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 194 (2nd Cir. 2005); see also 34 CFR § 300.323 which states that "[a]t the beginning of each school year, each public agency must have in effect, for each child with a disability within its jurisdiction, an IEP, as defined in § 300.320."

The School District violated the procedural requirements of the IDEA because J.H. did not have an IEP in effect the beginning of the 2017-2018 school year, despite being found eligible for special education services. Instead, on September 11, 2017, days after the school year began, the School District sent Petitioners an email stating that the district in effect de-classified J.H. by considering her a general education student with a 504 Plan that was drafted in December 2016 and was not complete or up to date. This change was done in direct violation of the provisions of the IDEA which indicates that notice shall be provided to the parents of a child with a disability before any evaluation procedures, including a change in eligibility. See 20 U.S.C. §§ 1414(b)(1) through 1414(c)(5).

Further, Respondent cannot rely upon N.J.A.C. 6A:14-2.3 to justify placing J.H. back into the general education program without any support. Petitioners consented to J.H. being found eligible for special education services but they never consented to the implementation of

the proposed initial IEP dated April 6, 2017 because they disagreed with the classification and placement option predetermined by the school district. At no time did Petitioners disagree that J.H. qualified for special education services.

Although the School District wishes to argue that no program could be implemented so they continued J.H.'s 504 Plan upon her return to school, this 504 Plan was outdated and was not the last service that J.H. received from the School District.   J.H. had been placed on home instruction by the school district from December 2016-June 2017, the stay put placement referred to in the Section 504 Plan dated December 2016, which was again provided to J.H. in mid-September 2017 for the 2017-2018 school year. The School District had an obligation to continue home instruction until an agreed upon IEP was in place.  Respondent knew that J.H. could not manage in the general education classes because she had been in the partial hospitalization ICCPC program and they even tried to classify her as Emotionally Disturbed. Further, Respondent knew that J.H. did not have a behavior issue and that her school related anxiety was preventing her from attending classes.  The school district was aware that J.H. was unable to return to school because she had severe anxiety issues related to being in a large school setting. Regardless of whether or not Petitioners signed the initial IEP, Respondent had a responsibility to determine her educational needs and act accordingly. If the parties could not agree on an educational placement, the district was responsible for providing J.H. with her stay put placement of home instruction. The district failed to do so. See generally 34 CFR § 300.301.

Moreover, it can be argued that the School District violated the stay put provisions by putting J.H. in the general education setting.   The Third Circuit has noted that "because the goal of 20 U.S.C. § 1415(j) is to maintain the status quo, if an IEP has already been implemented, that IEP would be the proper placement." See Valentino C. v. Sch. Dist of Phila., 2004 U.S. Dist. Lexis 2114, *17 (E.D.Pa. January 30, 2004) (citing Drinker v. Colonial Sch. Dist., 78 F.3d 859,

867 (3d Cir. 1996)).  However, when the "dispute arises *before* any IEP has been implemented, the current educational placement will be the operative placement under which the child is actually receiving instruction at the time the dispute arises." Drinker, supra, 78 F.3d at 867. (citing Thomas v. Cincinnati Bd. of Educ, 918 F.2d 618, 625-26 (6th Cir. 1990) (finding that although no IEP was implemented, child was receiving five hours of home instruction per week and determining that was the current educational placement.)) Id. Thus, the School District should have kept J.H. in the setting at which she was receiving instruction at the time of the dispute, which would have been home instruction. The school district violated J.H.'s rights to obtain an appropriate education and her stay put rights. Thus, Petitioners are entitled to prevail.

**POINT V-   PETITIONERS GAVE PROPER UNILATERAL PLACEMENT NOTICE**

The IDEA requires that prior to a unilateral placement by parents, that they provide the school district with 10 days written notice of such. 20 U.S.C. § 1412 provides that the parents of a child with a disability may be entitled to reimbursement from the agency for the costs of enrolling said child in a private school placement if the Court finds that the agency did not provide a free appropriate public education to that child in a timely manner, provided that the parents gave written notice to the public agency that they were rejecting the proposed placement, including an advisement of their concerns and their intent to enroll the child in a private school at the public's expense.  This written notice must be made 10 business days prior to the removal of the child from the public school setting.

In the present case, Petitioners testified that they received copies of several emails and letter between counsel in this matter giving the school district more than one of the required 10-day unilateral placement notice, as well as the fact that Petitioners planned on placing J.H. at the Purnell School. Said notices were timely and proper. Moreover, these correspondences show that Petitioners were making every good faith effort to find an appropriate placement for J.H. prior to

the start of the 2017-2018 school year, without any response from Respondent's counsel. (See Petitioners' counsel's emails dated May 22, 2017, May 26, 2017, August 18, 2017, August 24, 2017, August 26, 2017, August 29, 2017, and letters dated August 26, 2017 and September 16, 2017 contained in P27). Thus, Petitioners have satisfied their obligation under the 10-day rule.

## POINT VI- THE PURNELL SCHOOL IS AN APPROPRIATE LEARNING ENVIRONMENT FOR J.H.

Petitioners presented sufficient evidence through documents and testimony of experts and witnesses that the Purnell School is meeting J.H.'s emotional and educational needs. She is thriving in this learning environment. The school Counselor at the Purnell School, Megan Du Vall testified regarding her impressions of J.H. when she entered the Purnell School as follows:

"Q    And can you describe J.H. at the time that she entered the Purnell School?

A    Sure. When she first got there -- her first day I think she had a little bit of harder time. She was very anxious about coming. Then she didn't stay for -- all the activities and in her first month just watching her, she was-- she kind of kept to herself at first just because I think she was new. It's a new environment, but after about the second month she was really putting herself out there, making friends, sitting with new people and just she was -- she was getting out of her comfort level. She was getting out of her shell.

Q    And can you describe J.H. emotionally from your knowledge, you know, at the end of this school year how was she?

A    Well, yeah. So at the beginning of the school year when I first started counseling her she was very shy, very reserved, didn't want to give too much information at first, but by the end of the year she was excited to come to our counseling session. She was like -- I want to talk to you about this week, so she was always willing to talk and like divulge so much information just to like tell me and get off her chest and see what's going on so we can process it together."

(August 29, 2018, 31:5-25; 32:1-8).

Ms. Du Vall testified that she believed J.H. gained coping skills that helped her deal with her anxiety and depression.

Referring to an October 12, 2017 letter regarding Ms. Du Vall's observations of J.H.'s first month at the Purnell School, Ms. Du Vall testified that J.H. was adjusting, that she was

organized and up-to-date on her schoolwork, not stressed about the school work, opening up and willing to work on school social anxiety. (August 29, 2018, 32:25; 33:1-7). She noted that J.H. had friends at Purnell. (August 29, 2018, 33:21-22).

Ms. Du Vall then described the school setting as "about 58 girls and it's a very small environment. We're very small community. The classroom sizes are small between five and it gets as big as 20 if that's a new seminar, but that only meets twice a week. It's just very a safe space. There -- they get comfortable with each other because they're always there the same people, because it's a boarding school. So they feel comfortable with the teachers and we get to know them on different levels and just speaking up more in class." (August 29, 2018, 33:10-20).

Ms. Du Vall recalled writing an undated letter (page 2 of P-40) in the spring, the second semester:

"Q     Okay. Can you describe to the Court what this letter says about J.H.?

A      This is just about her progress from when she started and then how she is, I mean that second semester and basically how much she has come out of her shell. For instance one thing I'm going to name in here is, you know, she does have performance anxiety and she has anxiety around some classrooms, but by the second semester she was a lead in the school play that she had to try out for and sing in front of everybody. She stayed in like a dance class. She doesn't want a dance class. She tried it and she had anxiety with it, but she stayed in it and she killed it, like she did so well. So she's just trying new things and like getting past her anxiety and coping with them so she can do fun thing and get out of her comfort zone."

\*\*\*

She further stated:

"Q     If a student is stressed or -- or needs a break, is there a place for them to go at the Purnell School?

A      And that's what's -- what's great about it. They can go to the dorm room. That's their safe space. A lot of the times though the girls actually come to the health center. They come to the health center to just relax in my office if they want to or in the health center they have rooms they can go to to just rest and like deep breath before they go back out."

(August 29, 2018, 35:16-25).

Ms. Du Vall stated that the Purnell School hired one psychologist last year and just hired a second one this year. (August 29, 2018, 35:10-11). Ms. Du Vall testified that J.H. is performing well academically. (August 29, 2018, 36:1). The staff has wellness meetings weekly where they go over the academic and social supports with the teachers and J.H. was never brought up academically. (August 29, 2018, 36:8-11). Ms. Du Vall stated: "She never struggled. She was never one of our students that we worried about academically at all. She was always one – [sic] higher achieving ones." (August 29, 2018, 36:11-14).

Ms. Du Vall testified that the school is a college prepatory school that is different because while the students focus on the same amount of work as a public or any other school, they dive into it instead of covering it quickly or skipping it. (August 29, 2018, 37:7-13). Ms. Du Vall stated J.H. has both spoken to her about going to college and has visited colleges. (August 29, 2018, 37:14-19).

Ms. Nicole Dowd, a STEM teacher, a learning specialist, and J.H.'s math teacher, also testified about how J.H. was performing at the Purnell School. Ms. Dowd testified that she was J.H.'s advisor for the year. She met with J.H. once a week regarding how she was feeling at school and academics. Her job responsibilities as advisor include contact with the parents and meeting the students once a week to discuss anything they wish to. She does not recall discussing academics with J.H. (August 29, 2018, 8:21-25; 9:1-10). She testified that J.H. was a very conscientious student, a good listener in class and always on time with the right materials. She was made aware that J.H. had a specific learning disability and she identified the learning issues of slower processing speed and dyscalculia, which is a math learning disability. She testified that she did not diagnose J.H. with dyscalculia. Maria Torrez (phonetic), the school educational psychologist at Purnell, told her at some point. She indicated that the learning environment is small classrooms with 8-10 students in a quiet setting with individualized

attention. Purnell is a college preparatory school. All classes are geared towards college and there's a 100% college admission rate for the last graduating class. J.H. fit in the academic environment. She also mentioned that students have a place to go if they are stressed or need a break. In between classes, they can go to the dorm room (which they are assigned even if they are not residential). The can go to the health center and sit with the nurse. There are quiet rooms. They can speak with a counselor. She testified that J.H. also had friends. (August 29, 2018, 8-15:1-12).

Ms. Dowd also testified that J.H. had all A's during the last year at Purnell. The other teachers had positive things to say about her. In her class, J.H. always had her calculator out but she does not know if J.H. used the extended time accommodation even though it was always offered. J.H. has not had any behavioral issue at school and J.H. has talked to her about attending college. As far as J.H.'s report cards go, Ms. Dowd testified that they accurately reflected Ms. Dowd's knowledge of her grades. She indicated that J.H. was allowed to use extended time and a four-function calculator on the non-calculator function of the College Boards. The College Boards are the PSAT and SAT and they approved J.H. for accommodations for testing including the use of a four-function calculator for use on the math sections, and time and half for the reading writing and math calculations. (August 29, 2018, 15-20, See P44). Ms. Dowd also testified that J.H. would not have been able to learn using a computer-based online program because she could not have used her accommodations or had the one-to-one interaction with a teacher. (August 29, 2018, 23-24:1-22).

F.H. also testifies about efforts to deal with the district before placing J.H. at the Purnell School:

> Q.   Okay. Do you believe that you and your wife did everything to -- you could to reach an amicable resolution with the District prior to placing your daughter at the Purnell School?

A Yes.

(April 23, 2018, 108:25; 109:1-3).

Q And is your daughter attending the Purnell School?

A She is.

Q Have you noticed any change in her since she started attending the Purnell School.

A Yes, night and day, she's made tremendous progress since she was there.

Q And can you describe for the Court a little bit about that progress?

A Sure. She has -- she's able to make friends now, she has many -- a couple of close friends, her anxiety levels are low. She was able to participate and had a lead in the school musical The Adams Family, she played Gomez.

So she is really coming out and academically she is, you know, getting "A's" and "B's" and doing really well and just a wonderful experience and that school helps so many girls that I really think the District should consider placing people there.

Q Were you at any time aware that your daughter was diagnosed with an issue with acute sounds bothering her?

A Yes, she would complain about the noisiness of the halls and she would complain if we had the TV on – even though we're old, we're not that old where we have it blasting but she would complain about that, so she had a sensitivity to noise.

(April 23, 2018, 109: 5-25; 110:1-6). F.H. testified that J.H. received all A's on her academic

report cards (P-42 and P-43). (April 23, 2018, 117:12-13, 16, 20 and 24).

M.H. also testified about J.H. at the Purnell School. She stated:

"Q What prompted you to unilaterally place your daughter at the Purnell School?

A It was her junior year of high school and we have to make an important decision, we couldn't have her languishing, you know, and maybe getting into the room and maybe not getting into the room at the BSP in Mendham.

I couldn't -- we couldn't gamble on that to see if she would -- you know, if she would even walk in the door and to waste weeks and months struggling with her anxiety and trying to even get into a place and then not even have a rigorous curriculum to go -- on top of that, it was just not an appropriate placement for her.

Q       Do you believe that you did everything you could to work with the District to
         come up with an appropriate placement for your daughter?

A       Yes, absolutely.  …".

(April 23, 2018, 156:7-23)

M.H. testifies further about the Purnell School:

"Q      Okay.  Since your daughter started at the Purnell School have you noticed any
         changes in her?

A       Yeah, huge changes.  As my husband commented, she's just a different person
         now.  It's a very calming experience there because it's set up like a – almost like a
         family farm and it's -- she receives a lot of support there.

         At the Purnell School, even though it's not technically a therapeutic school, it has
         a tremendous amount of support and therapy, as she has a Counselor, she has an
         Advisor, and there is a Learning Psychologist there as well.

Q       And with regard to the noise level there has she commented about that?

A       Yeah, it's pretty non-existent.  Also, they have -- she has a quiet place where she
         can rest in between classes.  It's sort of set up like a -- almost like a college
         schedule that you can go back and rest between classes, it's very quiet there.

Q       And academically does she have supports in her classes as well?

A       Yeah.  And she also -- her Math Teacher is also a Special Ed Teacher.  I just
         wanted to let you know, she has a Special Ed Math Teacher and they do what they
         call, "Reverse learning," where they watch a video and then they do all their work
         in the class in very small groups, there's maybe six or eight girls in each class.
         You cannot fall under the crack -- in the crack -- under the cracks in that school,
         it's just not possible, there's -- it's a very small group of people.

Q       Do they have any social supports for her?

A       They have lots of social supports.  Social therapeutic or social -- in what aspect of
         social?

Q       Do they promote friendships in any way?

A       Yeah, absolutely.  She's made two very dear friends and because it's such a small
         group of girls it's -- it's a family atmosphere.

Q       Do they have any group meetings or anything like that that would promote
         socialization?

A    All the time. I mean, they have morning meetings three times a week, you know, they eat lunch together, it's a very close knit group."

(April 23, 2018, 157:25; 158:1-25 and 159:1-16).

M.H. noted that J.H. attends school every day without any absentee issues. (April 23, 2018, 160:7-9). M.H. testified that the Purnell School has a 100% rate of getting students into college (April 23, 2018, 161:10-17). Thus, Petitioners have met their burden of proof that they provided the appropriate 10-day notice to the school district of their intention to unilaterally place J.H. at the Purnell School and that the Purnell School was an appropriate placement.

The Supreme Court has held that the IDEA authorizes courts to order school authorities to reimburse parents for their expenditures on private education for a child if the court ultimately decides that such placement, rather than the proposed IEP, is proper under the IDEA. Sch. Comm. of Burlington v. Dep't of Educ.,471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (U.S.1985). The Supreme Court noted that this reimbursement is not a form of "damages," but is reimbursement for expenses that the school "should have paid all along and would have borne in the first instance had it developed a proper IEP." Id. at 370, 105 S.Ct. 1996. D.B., at 773. Thus, Petitioners are entitled to prevail and to obtain reimbursement damages in addition to prospective tuition and costs associated with this unilateral placement as well as expert fees, attorney's fees and costs, and any and all other relief this Court deems fair and just.

## POINT VII- THE COURT COMMITTED REVERSIBLE ERROR

During the Due Process hearing, the Court denied J.H. the right to testify on her behalf. She was present at the hearing one day to testify as to her personal experience with anxiety, what she was feeling when she started having issues with attending the public school and she had information that contradicted the school district's witness testimony. She also wanted to testify

as to why she felt that the Purnell School was addressing her needs and to clarify details that only she had that were relevant to the Court. The Court indicated the following:

> THE COURT:  J., how are you?
>
> J.H.:  I'm good.
>
> THE COURT:  Okay.  I'm sure your – your attorney told you what I said --
>
> J.H.:  Yeah.
>
> THE COURT:  -- when I asked you to leave the room.  I didn't mean to be abrupt with you, but it is highly unusual for the child and you're still a child in a special education case to testify.  It's really -- and I don't mean -- I don't mean to be disrespectful.
>
> It is not going to help me make a decision what you're going to tell me.  What's going to help me make a decision are the factual statements that were made to me by the various witnesses from the school and by the -- by the witnesses that were called by your attorney to tell me what situation you're in and how that could be remedied.  So what you're going to tell me is you're going to help me -- it's highly unusual and quite frankly I didn't notice you were there in the beginning and – I didn't, because I was -- I had this view and you were -- you were -- your face was blocked out by the thing.
>
> When I finally realized well, that's a young girl there, that must be J.  Had I known initially I would have asked you and your Mom to go sit outside, because what has to be said about your situation can be trying to you and I think it's -- I really personally think it's not appropriate for you to be here and listen to what has to be said.
>
> I mean, in your situation it's not quite as bad as other children that have special ed. needs, but to hear what has to be said can be -- can be problematic for you.  I'm not going to allow it and I'm -- so for that matter we're done today.  Okay."

(July 25, 2018, 101:16-25; 102:1-25; 103:1-2).

Petitioners are required to present all issues relating to J.H.'s education at the due process hearing in order to comply with the exhaustion rule, set forth in the Individuals with Disabilities Education Act ("IDEA") and case law.  Under the IDEA, prior to filing a civil action, a petitioner must exhaust all available administrative remedies before having the right to file a lawsuit.

Pursuant to 20 U.S.C. § 1415(l):

Rule of construction. Nothing in this title [20 USCS §§ 1400 et seq.] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973 [29 USCS §§ 790 et seq.], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this part [20 USCS §§ 1411 et seq.], the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this part [20 USCS §§ 1411 et seq.].

The purpose of the so-called "exhaustion rule" is to "channel disputes related to the education of disabled children into an administrative process that could apply administrators' expertise in the area and promptly resolve grievances." Cane v. E. Meadow Union Free Sch. Dist., 514 F.3d 240, 245-246 (2d Cir. 2008) (quoting Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist., 288 F.3d 478, 487 (2d. Cir. 2002)).  Exhaustion also promotes the "strong" public policy reasons, including development of a record for review on appeal; encouraging the child's parents and the school to work together to formulate an IEP; and, again, allowing educators to apply their particular expertise and correct any errors. Batchelor v. Rose Tree Media Sch. Dist., 759 F.3d 266, 275 (3d Cir. 2014).

Thus, an aggrieved party only has a right to file suit in a federal or state court after exhausting all administrative procedures. Cane, supra, 514 F.3d at 245 (citing 20 U.S.C. § 1415(i)(2)(A)).  This restriction applies not only to suits filed under the IDEA, but all claims for relief available under same, regardless of the initiating cause of action. Id. at 246 (citing 20 U.S.C. §1415(l)).  See also Batchelor, 759 F.3d at 273.

Should the parties fail to exhaust all administrative remedies, the Court is left without subject matter jurisdiction, and suit cannot be filed. Id. at 245 (citing Polera, 288 F.3d at 483); see also Batchelor, 759 F.3d at 272. In David D. v. Dartmouth School Committee, 775 F.2d 411, 424 (1st Cir. 1985), the First Circuit observed that, because the District Court's role in reviewing education law cases is to "provide something short of a trial de novo, and can best be

characterized as conducting a review proceeding, we have previously held that for issues to be preserved for judicial review, they must first be presented to the administrative hearing officer."

Notably, the administrative remedies to first be exhausted include a parental right to request a due process hearing "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education." 20 U.S.C. §1415(b)(6)(A) (emphasis supplied).   Therefore, Petitioner must be permitted to be heard on all issues noticed in the due process complaint.   20 U.S.C. §§ 1415(b)(6)(A) and 1415(f)(3)(B).   This is for two reasons.   First, Petitioner must raise all disputed issues to preserve them for a potential future judicial review.   Second, Petitioner is required to create a complete record of all findings of fact and conclusions of law given the amount of deference given by a reviewing Court to the Administrative Hearing Officer. Therefore, to limit Petitioner's due process hearing by not allowing a key witness to testify would create an irreparable injustice to Petitioners and would be erroneous as a matter of law. As previously stated in the snap shot rule section of this brief, Petitioners must be heard on all of their issues presented in their Amended Request for Due Process. See 20 U.S.C. §1415(f)(3)(B). Therefore, Petitioners should have been able to have J.H. testify to present all issues completely and thoroughly relating to her education at the time of the due process hearing. Thus, it appears that the Court committed reversible error.

It appears that the Court also erred by predetermining the outcome of this matter before all of the evidence had been presented. The Court indicated during Petitioners' case that the school district had established FAPE. This conversation was captured in the transcripts:

MS. HOWLETT:  -- we object again to this.   I don't -- I don't know how this demonstrates whether the District complied with the IDEA.

THE COURT: Neither do I, but I'm going to allow it.

MS. WARSHAW:  Your Honor, there's more to this than just the District complying to the IDEA.  We also have to show that the -- that the placement was appropriate for her that unilaterally placed her and I'm demonstrating that, that this was appropriate for her as well as that she was receiving --

THE COURT:  I understand --

MS. WARSHAW:  -- accommodations --

THE COURT:  -- what you're doing.  First, you got to establish that FAPE wasn't offered.  I mean, at this point -- I know you made a motion to dismiss which I denied, because we don't have that rule, but at this point the School District established FAPE.  You haven't rebutted it yet and you're going on to whether or not the placement was correct.

MS. WARSHAW:  Well, there is another witness coming --

THE COURT:  Okay.

MS. WARSHAW:  -- today that the expert witness that will certainly address that as well.

THE COURT:  Okay.  I'm going to allow the questions and -- and --

MS. WARSHAW:  Thank you, Your Honor.

THE COURT:  Okay.  Go ahead.

MS. WARSHAW:  Your Honor, I have to note at this time the concern of Petitioners that the Court has indicated that the School District has demonstrated FAPE when we're still in the middle of presenting evidence as to whether or not --

THE COURT:  I'm questioning -- I'm questioning why you're presenting a witness who's -- who's -- who's -- who's -- who's testimony seems to be that the Purnell School is the appropriate placement. That may well be and she's certainly testifying to that, but I mean, there's -- it's a two prong test.  The first test is whether or not FAPE was offered.  If FAPE wasn't offered then this is the appropriate next step and you --

MS. WARSHAW:  Correct.

THE COURT:  -- haven't addressed FAPE in your -- in your case.  Ms. Howlett has in her case obviously.  That's her burden.

MS. WARSHAW:  Well, we -- we have addressed it with certain witnesses to date, but also we have another witness coming at 10:30 that will address it as well.

THE COURT:  Very well.  Thank you."

(August 29, 2018, 20:12-25; 21-22:1-22).

New Jersey Rules of Court 1:12-1 and 1:12-2 govern the Disqualification and Disability of Judges. The latter provides cause for disqualification on the Court's Motion, and states that "[t]he judge of any court shall be disqualified on the court's own motion and shall not sit in any matter, if the judge . . . (d) has given an opinion upon a matter in question in the action." N.J. Ct. R. 1:12-1(d). Further, the same rule includes a catch-all provision for disqualification "when there is any other reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so." N.J. Ct. R. 1:12-1(g). Rule 1:12-2 provides that "[a]ny party, on motion made to the judge before the trial or argument and stating the reasons therefor, may seek that judge's disqualification."

Here, the Court should recuse itself on its own motion pursuant to N.J. Ct. R. 1:12-1(d) and (g) because it clearly found that the district had met its burden of proof in demonstrating it provided FAPE to J.H. prior to the conclusion of Petitioners' case, and consideration of all the evidence presented by the Petitioners. The Court's opinion was given over the undersigned's timely objection. Thus, because the Court clearly made up its mind in favor of the school district prior to the close of the case, it is reasonable for Petitioners to believe that the Court is unable to provide a fair and/or unbiased judgment, based upon the totality of the evidence, at this juncture. Therefore, the Court has an obligation to recuse itself at this time prior to issuing a Final Determination.

## CONCLUSION

For the foregoing reasons, Petitioners are entitled to prevail in this action and be declared the prevailing party, entitling them to reimbursement, for tuition, all costs and fees including transportation, expert fees and costs, attorney's fees and costs, and prospective relief for tuition and all costs and fees, including transportation, until J.H. graduates from the Purnell School, as

well as any and all other relief set forth in their Amended Request for Due Process and any and all other relief the Court deems fair and just.

Respectfully Submitted,
**WARSHAW LAW FIRM, LLC**
Attorney for Petitioners

By: _____
        Julie Warshaw, Esq.

Dated: December 10, 2018