# DECISION COVER SHEET

This decision

 **has**

_____ **has not**

**been e-mailed to the parties. Please process accordingly.**



**State of New Jersey**
OFFICE OF ADMINISTRATIVE LAW

**FINAL DECISION**

OAL DKT. NO. EDS 10706-17

AGENCY DKT. NO. 2017/26311

F.H. AND M.H. ON BEHALF OF J.H.,

      Petitioners,

  v.

**WEST MORRIS REGIONAL BOARD OF EDUCATION,**

      Respondent.

---

**Julie Warshaw**, Esq., for Petitioners

**Jodi Howlett**, Esq., for Respondent (Cleary, Giacobbe, Alfieri, Jacobs, attorneys)

Record closed: February 11, 2019     Decided: February 13, 2019

BEFORE **THOMAS R. BETANCOURT**, ALJ:

## STATEMENT OF THE CASE AND PROCEDURAL HISTORY

Petitioners filed a Due Process Petition on June 5, 2017, with Office of Special Education Programs (OSEP) in the New Jersey Department of Education (DOE). OSEP transmitted the contested case pursuant to N.J.S.A. 52:14B-1 to 15 and N.J.S.A. 52:14f-1 TO 13, to the Office of Administrative Law (OAL) where it was filed on July 28, 2017.

A prehearing conference was held on August 11, 2017, and a prehearing Order was entered on the same date.

Petitioners filed a motion for summary decision on September 20, 2017. That motion was held in abeyance pending a decision on petitioners' motion for leave to amend the due process petition, which was filed with the OAL October 23, 2017.

Leave was granted to amend the due process petition by Order dated November 14, 2017; and, a briefing schedule for the summary decision motion was established.

Respondent filed its answer to the amended due process with the OAL on November 28, 2017.

Respondent filed its reply brief to Petitioners' summary decision motion on December 4, 2017. Petitioners filed a sur-reply brief on December 14, 2017. The motion for summary decision was denied by Order dated December 19, 2017.

Respondent filed a cross petition for due process with the OAL on February 13, 2018.

Respondent filed a brief on March 16, 2018, in support of its request in its cross petition for due process to limit the scope of the hearing to whether J.H meets the eligibility criteria to be eligible for special education and related services under the classification Specific Learning Disability, as defined in N.J.A.C. 6A:14-3.5(c)(12), as respondent alleges that petitioner revoked their consent to the classification of J.H. Petitioners filed their brief on March 14, 2018, in support of their right to have all issues heard at the hearing and in opposition to the relief requested by respondent in its cross petition to limit the scope of the hearing above stated.

Respondent then submitted a motion in limine on April 4, 2018, seeking to exclude evidence and expert reports pursuant to the "snapshot rule". Petitioners filed a responsive letter, also on April 4, 2018. Respondent submitted its sur-reply on April 6, 2018. Petitioners, in the responsive letter, requested the following: that respondent's

Answer to the Amended Due Process Petition be stricken for failure to provide discovery; that respondent be barred from presenting all of their evidence in this matter, also for failure to provide discovery; for counsel fees; and, that petitioners be permitted to present their entire case.

The initial due process petition was filed with OSEP on June 5, 2017, and requests relief for alleged IDEA and other violations for the 2017-2018 school year. The amended due process petition was filed with the OAL on October 23, 2017, and requests relief for alleged IDEA and other violations for the 2017-2018 and 2018-2019 school years.

Respondent filed its cross petition for due process with the OAL on February 13, 2018 and requests relief, _inter alia_, that the hearing be limited to whether J.H meets the eligibility criteria to be eligible for special education and related services under the classification Specific Learning Disability, as defined in N.J.A.C. 6A:14-3.5(c)(12), as respondent alleges that petitioners revoked their consent to the classification of J.H. as Emotionally Disturbed.

By Order dated April 20, 2018, respondent's motion in limine was granted in part and denied in part, as follows:

1. Respondent's motion in limine was granted as follows: all evidence presented by petitioner that was obtained after the date of the IEP shall not be considered for purposes of determining if respondent complied with the IDEA in developing the IEP;
2. Respondent's motion in limine was denied as follows: petitioners were permitted to submit evidence dated after the date of the IEP for purposes of demonstrating that respondent failed to comply with the IDEA after the date of the IEP.

Said Order dated April 20, 2018 also denied respondent's request in its cross petition to limit the scope of the hearing to whether J.H. meets the eligibility criteria to be

eligible for special education and related services under the classification Specific Learning Disability, as defined in N.J.A.C. 6A: 14-3(c)(12).

Said Order dated April 20, 2018 also denied petitioners' request in their responsive letter to respondent's motion, dated April 4, 2018, seeking to: strike respondent's Answer; bar all respondent's evidence; and, for counsel fees.

The hearing on the above captioned was held on April 9, 2018, April 23, 2018, July 25, 2018 and August 29, 2018.

Petitioners submitted their post hearing summation on December 17, 2018. Respondent submitted its post hearing summation on January 16, 2019. Petitioners were permitted to file a sur-reply post hearing summation which was submitted on January 29, 2019. Counsel was requested by the undersigned to confirm which exhibits were admitted into evidence due to confusion over duplicative exhibits. That was done February 11, 2019. The record closed February 11, 2019.

## SUMMARY OF RELEVANT TESTIMONY

Joseph Cusack testified as follows:

He has been a guidance counselor since July 2007. He is employed by the District. He attends 504 team meetings, child study team meetings and I&RS meetings as a guidance counselor.

J.H. was part of his caseload when she was in eighth grade.     His     first impression of J.H. was that she was a lovely girl. There was nothing out of the ordinary. J.H., as a freshman in high school, did not have a 504 accommodation plan. She was also not classified for special education and related services.

J.H. was proficient in English and Math. She did well. There were no red flags.

J.H. had no issues in ninth grade. She had strong grades. There no reports from her teachers regarding any issues. She did have fifteen unexcused absences

spread throughout the year.  Towards the end of the school year J.H. had a medically excused absence.   He did not recall if petitioners contacted him with any concerns.

J.H.'s standardized testing did not reveal any concerns with him.

In tenth grade, in late September, he received a telephone call from petitioner M.H. advising that J.H. was having a difficult time and would be out of school.  Mr. Cusack advised her teachers and requested work for J.H.  Thereafter M.H. advised Mr. Cusack that J.H. would be attending a program at Immediate Care Children's Psychiatric Center (ICPCC).  J.H. was suffering from anxiety and depression and would not be returning to school.  In December 2016, J.H. was medically cleared to return to school.  A 504 accommodation plan was implemented, which was signed by petitioners.

J.H. returned to school on December 7, 2016.   The following Monday Mr. Cusack received an email advising him that J.H. suffered a setback on Friday and would not be in school that Monday.  He had not received any notification from any teacher regarding any setback.  J.H. did not return to school.

School was now at the winter break.  Petitioners advised Mr. Cusack that they may withdraw J.H. and place her in a small private school.  Petitioners asked if an out of district placement would be possible.  Petitioners advised they would take the winter break to consider their options.  After the winter break petitioners requested a Child Study Team (CST) evaluation.

Kendra Dickerson testified as follows:

She is the school psychologist at West Mendham High School.  She is also a case manager.

She received a CST referral for J.H.   An initial meeting was scheduled for January 9, 2017.  Petitioners and J.H. attended the meeting.  At the meeting certain evaluations were discussed and agreed upon.  Petitioners provided respondent with the psychiatric evaluation of J.H.  There were no concerns academically at this time.

An IEP meeting was held on April 6, 2017 where the CST determined that J.H. was eligible to receive special education and related services.  J.H. was classified as

"emotionally disturbed". An IEP was not completed at this time. Petitioners had agreed to look at the Being Successful Program (BSP) at Mendham High School, which was discussed at the meeting. At Central High School the BSP program is called the Behavioral Support Program.

A second IEP meeting was held on May 16, 2017 and IEP was proposed for J.H. The IEP proposed continued home instruction with a gradual return to the BSP program at Mendham High School, and taking advanced level classes within the BSP program. Petitioners signed the IEP.

Petitioners felt that the BSP program was not the right fit for J.H. and were concerned how academics could be modified to a higher level within that setting.

Tracy Costa testified as follows:

She is a social worker at Mendham High School. She is also a case manager for special education students and provides counseling.

She has worked in the BSP program since it was created about six to seven years ago. It is called the Being Successful Program. Previously it was called the Behavioral Support Program. She was unsure when the name was changed. The services did not change.

It is for students having problems in mainstream classes and with social and emotional issues. As a whole, students in the BSP program do not have disciplinary issues. Services are geared towards a student's individual needs.

Advanced Placement courses are not given within the BSP program. They are given within the General Education setting. The BSP program is not a self-contained program. Students are not in BSP all day.

BSP provides services to students with school based anxiety. They work to gradually get the student back into the classroom.

David Leigh testified as follows:

He is the principal of New Alliance Academy, a therapeutic high school located in Paramus, New Jersey. He also works part time as a licensed psychologist. He holds a doctorate in school psychology. He had been Director of Special Services for respondent.

Dr. Leigh consulted with Ms. Dickerson after reviewing the records for J.H. He recommended the BSP program at Mendham High School. Dr. Leigh created the program for students with emotional and psychiatric conditions. The goal was to create as many opportunities in district in the least restrictive environment. The BSP program offers all class academic content. It has a better teacher to student ratio. The student can get more individualized support in a less overwhelming setting. There are fewer students in the classroom. Teachers are very carefully selected and have special skills for working with emotionally fragile students.

The BSP program at Mendham is different from the BSP program at Central High School. BSP at Mendham is for students with anxiety, depression and psychiatric conditions impacting school attendance and learning. BSP at Central High School is for students with behavioral issues.

At the IEP meeting in April 2017 the BSP program at Mendham High School was discussed. Regarding a question posed at that meeting if the BSP program did not work for J.H. what would happen. Dr. Leigh stated the district would look at other options to see if a program in district was suitable. If not the district would look at a New Jersey approved private day placement that were therapeutic in nature.

F.H., petitioner, testified as follows:

He is the father of J.H. J.H. attended Long Valley Middle school where she had a rough time. She was depressed. She struggled. She is a good student academically. Petitioners did not request an evaluation by the CST while J.H. was there.

During ninth grade J.H. did well academically. She was active in school. Though she had some difficulties, none seemed serious.

In tenth grade she started being very anxious, depressed and had panic attacks. J.H. felt she could no longer go to school due to anxiety. She attended a therapeutic day program at ICCPC. She attended there from October of tenth grade to beginning of December. J.H. returned to school with a 504 accommodation plan. She returned on December 6, 2016, but only stayed two days. Petitioners requested an evaluation for special education and related services. J.H. received home instruction.

At the IEP meeting in April 2017 he signed the Determination of Eligibility which classified J.H. as "emotionally disturbed". He did not feel this was the correct classification and wanted it changed. He would not have signed if he knew he was agreeing to this classification. He was not aware at this time of the statutory language regarding a classification of "emotionally disturbed".

At the May 16, 2017 IEP meeting he told the district J.H would be unilaterally placed in an out of district school if they could not work out the IEP. Petitioner visited the Purnell School after the May 16, 2017 meeting.

Petitioners filed their due process petition with OSEP on May 30, 2017.

Thereafter petitioners notified the District that J.H. would be attending Purnell School. Thereafter petitioners did not request a new IEP, or express any intent to return J.H. to the District.

The check payable to the Purnell school was dated August 31, 2017. The letter to the district advising them of the unilateral placement was undated. It was stamped "received" by the District on September 25, 2017.

M.H., petitioner, testified as follows:

She is the mother of J.H. She objected to the classification of "emotionally disturbed" at the April 7, 2017 IEP meeting. After the meeting she and J.H. went to Mendham High School to observe the BSP program. While Ms. Costas advised them that BSP was for students who had trouble getting to school or staying in school.

M.H. let J.H. decide if the BSP appropriate for her.  M.H. further stated petitioners could not "gamble" about whether or not J.H. would go the BPS at Mendham High School.

Melissa Dolgos testified as follows:

Ms. Dolgos is a senior clinician at ICCPC.  She worked with J.H. from October 2016 to December 2016, and then again from January through June 2017.

J.H.'s program at ICCPC consisted of an afterschool and then a day program.  She also provided J.H. with individual therapy and crisis management, had her in groups a "few times," and did family work with J.H. and Petitioners.

On October 23, 2016, she co-wrote a letter with Dr. Srinivasan to notify the school that J.H. was admitted to a partial hospitalization program due to severe depression and anxiety and requested home instruction.

Thereafter another letter, dated December 2, 2016, also co-authored with Dr. Srinivasan provided medical clearance for J.H. to return to school.  She also recommended a 504 Plan and accommodations, such as taking breaks and taking tests in a private room.

On January 6, 2017, Ms. Dolgos wrote a letter to Respondent recommending an IEP.  She also indicated that J.H. had major depressive disorder, recurrent severe without psychotic features, and generalized anxiety disorder.  After speaking with Dr. Srinivasan, they agreed that "it was better for [J.H.] to be in a smaller educational environment" that with help with her learning needs and anxiety.  The IEP proposed by the CST incorporated her recommendations.

She reviewed the IEP and determined that her recommendations were provided in the IEP.

She disagreed with the classification of "Emotionally Disturbed" because "[m]ost of the kids that have emotionally disturbed as the diagnoses in the IEP are behavior,

like oppositional defiant kids or kids that have more severe issues." She is not personally familiar with the Administrative Code regarding eligibility for special education and is not a specialist in IEP. She testified that J.H. exhibits the characteristics of "Emotionally Disturbed," such as depression, fears associated with school, an inability to maintain satisfactory interpersonal relationships.

She stopped treating J.H. in June 2017. At that time, Petitioners reported that they were "planning on doing a different placement."

On August 17, 2017, at the request of Petitioners, Ms. Dolgos wrote a letter suggesting "a structured but (sic) non-strict educational environment with more flexible schedules" for J.H. but without therapy. Her opinion was that J.H. was going to have therapy outside of school so "[she] figured that would be enough for her" and the accommodations in the IEP would be enough. Her recommendation was that J.H. be placed in a "school environment with supports."

She was not aware that the IEP could not be implemented without Petitioners consent or that Respondent provided J.H. with a 504 Plan for the 2017-2018 school year. She neither observed any program in West Morris Central or Mendham High School, nor contacted anyone from the BSP.

Ellen M. Platt testified as an expert in psychology without objection testified as follows:

She was hired by the District to do an evaluation of J.J. Her report is dated September 6, 2017.

She opined that J.H. was unable to function in her current academic environment. The school needed to provide a comfort level with reduced stimulation. She required a small building that was not overwhelming to navigate. She "needed to be in a place where there was never a question that the staff would respond to her in a sensitive manner."

Dr. Platt never visited the BSP program at Mendham High School or at Central High School. Dr. Platt met with J.H. once. She did not meet with petitioners.

Nicole Dowd testified as follows:

She is a teacher at the Purnell School. J.H. is in her Algebra II class. J.H. has no academic issues. She provides J.H. accommodations for untimed tests and quizzes and permits the use of a calculator.

Classrooms are small, comprising of eight to ten students. Students receive quiet individualized attention. J.H. did very well academically at Purnell.

She never observed the BSP program at Mendham High School. She never reviewed the IEP.

Megan Duvall testified as follows:

She is a counsellor at Purnell School. She is J.H.'s counsellor. She met weekly with J.H. J.H. is doing well academically. She never struggled. J.H. has no behavioral problems.

She wrote two letters regarding J.H. The first, dated October 12, 2017, was written at the request of petitioners. The second, undated and written in the Spring of 2018, was at the request of petitioners' counsel.

She did not observe the BSP program at Mendham High School. She did not review the IEP.

Natalie Schubert testified as an expert in psychology without objection as follows:

Dr. Schubert was contacted by Petitioners' counsel to perform a pscyhoeducational evaluation of J.H. The evaluation took place over three days in

July, August and September of 2017. Dr. Schubert did not speak with anyone from the District.

Most of J.H.'s scores were above grade level. The only outlier was math. When J.H. was not timed she was above average in math. When she was timed she was below average.

She diagnosed J.H. with a specific learning disorder (SLD) in math fluency and speed. She recommended that J.H. would benefit from smaller classrooms and would require extra time to formulate responses. J.H. would need an academically vigorous classroom.

Dr. Schubert is not familiar with the definition of "emotionally disturbed" under the IDEA or the New Jersey Administrative Code.

She did not observe the BSP at Mendham High School.

## CREDIBILITY

When witnesses present conflicting testimonies, it is the duty of the trier of fact to weigh each witness's credibility and make a factual finding. In other words, credibility is the value a fact finder assigns to the testimony of a witness, and it incorporates the overall assessment of the witness's story in light of its rationality, consistency, and how it comports with other evidence. Carbo v. United States, 314 F.2d 718 (9th Cir. 1963); see Polk, supra, 90 N.J. 550. Credibility findings "are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record." State v. Locurto, 157 N.J. 463 (1999). A fact finder is expected to base decisions of credibility on his or her common sense, intuition or experience. Barnes v. United States, 412 U.S. 837, 93 S. Ct. 2357, 37 L. Ed. 2d 380 (1973).

The finder of fact is not bound to believe the testimony of any witness, and credibility does not automatically rest astride the party with more witnesses. In re

Perrone, 5 N.J. 514 (1950). Testimony may be disbelieved, but may not be disregarded at an administrative proceeding. Middletown Twp. v. Murdoch, 73 N.J. Super. 511 (App. Div. 1962). Credible testimony must not only proceed from the mouth of credible witnesses but must be credible in itself. Spagnuolo v. Bonnet, 16 N.J. 546 (1954).

When facts are contested, the trier of fact must assess and weigh the credibility of the witnesses for purposes of making factual findings. Credibility is the value that a finder of fact gives to a witness's testimony. It requires an overall assessment of the witness's story in light of its rationality, its internal consistency, and the manner in which it "hangs together" with the other evidence. Carbo v. United States, 314 F.2d 718, 749 (8th Cir. 1963).

Joseph Cusack testified in a direct and professional manner. He was familiar with J.H. He was familiar with the process that lead to the proposed IEP. His testimony was quite helpful in the instant matter. I deem him credible.

Kendra Dickerson also testified in a direct and professional manner. She too was familiar with J.H. and the circumstances that lead to the proposed IEP. I deem her credible.

The testimony of Tracy Costa was quite helpful, particularly regarding the BSP program. She was familiar with the program and testified as to the same in a direct and professional manner. I deem her credible.

Likewise was the testimony of David Leigh. Dr. Leigh developed the BSP program and recommended it for J.H. He testified professionally and directly. I deem him credible.

I had concerns with the testimony of F.H. On direct examination he stated that Dr. Leigh never told him the BSP program had a therapeutic element. On cross examination he admitted that Dr. Leigh did advise him of the therapeutic element of BSP at the May 2017 meeting.

I had concerns with the testimony of M.H.  When she and her daughter visited the BSP program at Mendham High School she allowed J.H. to determine if she would attend.  This to me is hardly a serious look at a recommended program.

Both F.H. and M.H. testified in a self-serving manner.  It seems from the totality of their respective testimony that an out of district placement was their intent.  They both stated that they had no input into the IEP process.  This is demonstrably false.  The District received the evaluations they authorized.  The District received the ICCPC information.  The IEP itself noted the Purnell School was requested by petitioners.

Further, both F.H. and M.H. clearly did not like the classification "emotionally disturbed".  Neither knew what criteria were used to so classify J.H.  It seemed that the mere words "emotionally disturbed" were offensive to them.

Melissa Dolgos testified in a direct and professional manner.  She offered that the proposed IEP incorporated her suggestions.  Her testimony regarding the classification of "emotionally disturbed" was of no moment as she was not familiar with the statutory or regulatory requirements for said classification.  I deem her credible regarding the IEP.

I give little weight to the testimony of Dr. Ellen M. Platt.  Dr. Platt opined that J.H. was unable to function in her current academic environment.  However, Dr. Platt never visited the BSP program at Mendham High School.

The testimony of Nicole Dowd was of little assistance in the present matter. While I am sure she testified honestly and directly, she did not review the proposed IEP. She also did not visit the BSP program at Mendham High School.

The testimony of Megan Duvall was also of little assistance in the present matter for the same reasons noted above regarding the testimony of Ms. Dowd.

## FINDINGS OF FACT

1.      J.H. is the child of petitioner, F.H and M.H.

2.      Respondent West Morris Regional High School District the local education agency charged with providing J.H. with a free appropriate public education.

3.      In the 2015-2016 school year, J.H. attended ninth grade as a general education student at West Morris Central High School in Respondent's school district.

4.      Prior to attending West Morris Central High School, J.H. attended Long Valley Middle School as a general education student.

5.      In September of 2016 J.H. began to experience difficulties and was placed at ICCPC.  Petitioners advised the District that J.H. would not be attending school.

6.      J.H. was medically cleared to attend school in December 2016.

7.      On December 7, 2016, the District held a 504 Accommodation Plan meeting, in which Petitioners attended.

8.      Petitioners consented to implementation of the 504 Plan, developed on December 7, 2018.

9.      In January 2017, J.H. was referred to the CST to determine whether she was eligible for special education and related services.

10.     On January 9, 2017, the District held an Evaluation Planning Meeting, in which Petitioners attended.

11.     At the Evaluation Planning Meeting, Petitioners consented to the District conducting psychological and social history assessments.

12.     The District accepted a psychiatric assessment conducted by Dr. Srinivasan, dated March 15, 2017.

13.     On April 6, 2017, Respondent determined J.H. was eligible for special education and related services under the criteria of "Emotionally Disturbed."

14.     Petitioners executed the Eligibility Determination Report indicating that J.H. met the criteria of "Emotionally Disturbed."

15.     At the meeting on April 6, 2017, Petitioners did not consent to implementation of an IEP.

16.     A subsequent IEP meeting was held on May 16, 2017, in which Petitioners attended with counsel.

17.     The IEP proposed by the District placed J.H. at the BSP at Mendham High School.

18.     In the IEP, the CST used the term "Behavioral Supports Program" at Mendham High School to refer to the "Being Successful Program" at Mendham High School.  The two BSP programs are different programs and intended to address different needs of students

19.     At the meeting on May 16, 2017, Petitioners did not consent to implementation of the IEP.

20.     The IEP developed for J.H. was reasonably designed to offer a Free and Appropriate Public Education in the least restrictive environment for J.H.

21.     The District considered the information available to it at the time J.H. was classified.

22.     J.H. was properly classified at the time as "emotionally disturbed".

23.     On May 22, 2017, Petitioners, through counsel, requested an independent psychiatric, psychological, and educational assessments.

24.     In July and August 2017, Dr. Schuberth conducted an independent psychoeducational evaluation of J.H.

25.     Dr. Schuberth diagnosed J.H. under the DSM-V criteria for Major Depressive Disorder, Generalized Anxiety Disorder, and a Specific Learning Disorder with impairment in mathematics, specifically with fluent calculation.

26.     Dr. Schuberth did not determine that J.H. met the criteria for a Specific Learning Disability as defined by N.J.A.C. 6A:14-3.5(c).

27.     In September 2017, Dr. Platt conducted an independent psychiatric evaluation of J.H.

28.     Dr. Platt diagnosed J.H. under the DSM-V criteria for: (i) Major Depressive Disorder, recurrent episode, moderately severe (with irrational thinking); (ii) Generalized Anxiety Disorder; (iii) Panic Disorder; (iv) School avoidance; (v) Specific Learning Disorder with impairment in mathematics, specifically with fluent calculation, moderate; (vi) Major Depressive Disorder, recurrent, severe, without psychotic features; (vii) Central Auditory Processing Disorder; and (viii) Agoraphobia.

29.     Dr. Platt did not determine that J.H. met the criteria for a Specific Learning Disability as defined by N.J.A.C. 6A:14-3.5(c).

30.     On August 31, 2017, Petitioners submitted a tuition payment to Purnell School.

31.     J.H. began attending Purnell School on September 11, 2017.

32.     After J.H. began attending Purnell School, Petitioners notified the District that they were withdrawing J.H. from West Morris Central High School, effective immediately.

33.     Petitioners did not provide the District with at least ten days' notice of their intention to unilaterally place J.H. at Purnell School.

34.     Purnell School is not approved by the State of New Jersey for the provision of special education and related services.

35.     Since withdrawing J.H. from the District, Petitioners have not requested an IEP meeting with the CST.

36.     Since withdrawing J.H. from the District, Petitioners have not notified the District of their intention to reenroll J.H.

## LEGAL ANALYSIS AND CONCLUSION

Federal funding of state special education programs is contingent upon the states providing a "free and appropriate education" (FAPE) to all disabled children. 20 U.S.C.A. § 1412. The Individuals with Disabilities Act (IDEA) is the vehicle Congress

has chosen to ensure that states follow this mandate. 20 U.S.C.A. §§ 1400 et seq. "[T]he IDEA specifies that the education the states provide to these children 'specially [be] designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction.'" D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 556 (3d Cir. 2010) (citations omitted). The responsibility to provide a FAPE rests with the local public school district. 20 U.S.C.A. § 1401(9); N.J.A.C. 6A:14-1.1(d). Subject to certain limitations, FAPE is available to all children with disabilities residing in the State between the ages of three and twenty-one, inclusive. 20 U.S.C.A. § 1412(a)(1)(A), (B). The district bears the burden of proving that a FAPE has been offered. N.J.S.A. 18A:46-1.1.

New Jersey follows the federal standard that the education offered "must be 'sufficient to confer some educational benefit' upon the child." Lascari v. Bd. of Educ. of Ramapo Indian Hills Reg'l High Sch. Dist., 116 N.J. 30, 47 (1989) (citations omitted). The IDEA does not require that a school district "maximize the potential" of the student but requires a school district to provide a "basic floor of opportunity". Hendrick Hudson Cent. Sch. Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 200, 102 S. Ct. 3034, 3047, 73 L. Ed. 2d 690, 708 (1982). In addressing the quantum of educational benefit required, the Third Circuit has made clear that more than a "trivial" or "de minimis" educational benefit is required, and the appropriate standard is whether the child's education plan provides for "significant learning" and confers "meaningful benefit" to the child. T.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572, 577 (3d Cir. 2000) (internal citations omitted).

As noted in D.S., an individual education plan (IEP) is the primary vehicle for providing students with the required FAPE. D.S., supra, 602 F.3d at 557. An IEP is a written statement developed for each child that explains how FAPE will be provided to the child. 20 U.S.C.A. § 1414(d)(1)(A)(i). The IEP must contain such information as a specific statement of the student's current performance levels, the student's short-term and long-term goals, the proposed educational services, and criteria for evaluating the student's progress. See 20 U.S.C.A. § 1414(d)(1)(A)(i)(I)-(VII). It must contain both academic and functional goals that are, as appropriate, related to the Core Curriculum Content Standards of the general education curriculum and "be measurable" so both parents and educational personnel can be apprised of "the expected level of

achievement attendant to each goal." N.J.A.C. 6A:14-3.7(e)(2). Further, such "measurable annual goals shall include benchmarks or short-term objectives" related to meeting the student's needs. N.J.A.C. 6A:14-3.7(e)(3). The school district must then review the IEP on an annual basis to make necessary adjustments and revisions. 20 U.S.C.A. § 1414(d)(4)(A)(i).

A due process challenge can allege substantive and/or procedural violations of the IDEA. If a party files a petition on substantive grounds, the Administrative Law Judge (ALJ) must determine whether the student received a FAPE. N.J.A.C. 6A:14-2.7(k). If a party alleges a procedural violation, an ALJ may decide that a student did not receive a FAPE only if the procedural inadequacies: (1) impeded the child's right to a FAPE; (2) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of FAPE to the child; or (3) caused a deprivation of educational benefits. Ibid.   In the instant matter petitioners allege substantive violations of IDEA.

In New Jersey, State regulations track the requirement that a local school district provide "a free, appropriate public education" as that standard is set under the IDEA. N.J.A.C. 6A:14-1.1. New Jersey follows the federal standard requiring such entitlement to be "sufficient to confer some educational benefit," although the State is not required "to maximize the maximum potential of handicapped children." Lascari v. Ramapo Indian Hills Reg. Sch. Dist., 116 N.J. 30 (1989).

In determining where to deliver that instruction, it is clear that the district must be guided by the strong statutory preference for educating children in the "least restrictive environment." 20 U.S.C.A. § 1412(a)(5) mandates that

> [t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilitates, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily

.

The law describes a continuum of placement options, ranging from mainstreaming in a regular public school as least restrictive to enrollment in a non-approved residential private school as most restrictive. 34 CFR §300.115; N.J.A.C. 6A:14-4.3. Federal regulations further require that placement must be "as close as possible to the child's home." 34 CFR § 300.116(b)(3); see also N.J.A.C. 6A:14-4.2.

Either a parent of a student or a public agency may initiate a request for an initial evaluation to determine if the student is a student with a disability. 34 CFR § 300.301(b). The "child find" requirements of the IDEA (20 U.S.C.A. § 1412(a); 34 CFR § 300.111) require every state to implement policies and procedures to ensure that all children with disabilities residing in the state, who are in need of special education and related services, are identified, located and evaluated. While local school districts are responsible for conducting child find for children residing in the district, a parent's failure to request that a school district identify and evaluate a child does not relieve the school district of its child find obligation. Robertson County Sch. Sys. v. King, 24 IDELR 1036 (6th Cir. 1996).

In New Jersey, school districts are required to utilize strategies and interventions in the general education classroom prior to referring the student for an evaluation. N.J.A.C. 6A:14-3.3 provides:

> (b) Interventions in the general education setting shall be provided to students exhibiting academic difficulties and shall be utilized, as appropriate, prior to referring a student for an evaluation of eligibility for special education and related services . . .
>
> . . .
>
> (c)(1) When it is determined through analysis of relevant documentation and data concerning each intervention utilized that interventions in the general education program have not adequately addressed the educational difficulties and it is believed that the student may have a disability, the student shall be referred for evaluation to determine eligibility for special education programs and services under this chapter.

In the case at hand J.H. did well in eighth grade while at Long Valley Middle school.  She also did well while in ninth grade at West Morris Central High School.  It was not until September 2016 that the District became aware of any issues with J.H.  When J.H. was cleared to return to school in December 2016 the District convened a 504 accommodation plan meeting and a 504 plan was developed.  That plan was accepted by petitioners.  When J.H. was only able to remain in school a few days upon her return in January 2017 the District convened a CST meeting to determine if J.H. was eligible to receive special education and related services.  J.H. was classified as "emotionally disturbed" and an IEP was developed which provided, among other things, that J.H. be placed in the Being Successful Program at Mendham High School.  That program was developed by Dr. Leigh and recommended by him for J.H.  Her placement at BSP in Mendham High School was based upon her specific needs, specifically her school based anxiety.  The credible testimony, specifically that of Ms. Costa and Dr. Leigh, support a conclusion that the IEP was reasonably calculated to confer a meaningful academic benefit and was tailored to meet J.H.'s individual educational and therapeutic needs.

Regarding the classification of J.H. as "emotionally disturbed N.J.A.C. 6A:14-3.5(c) provides, in relevant part:

> (c) A student shall be determined eligible and classified "eligible for special education and related services" under this chapter when it is determined that the student has one or more of the disabilities defined in (c)1 through 14 below; the disability adversely affects the student's educational performance and the student is in need of special education and related services. Classification shall be based on all assessments conducted including assessment by child study team members and assessment by other specialists as specified below.
> …
> 5. "Emotionally disturbed" means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a student's educational performance due to:
> i. An inability to learn that cannot be explained by intellectual, sensory or health factors;
> ii. An inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

iii. Inappropriate types of behaviors or feelings under normal
circumstances;
iv. A general pervasive mood of unhappiness or depression; or
v. A tendency to develop physical symptoms or fears associated
with personal or school problems.

Clearly this was the appropriate classification given the information available to the district at the time the classification was made.

Once a student is enrolled at a private school due to a parent's unilateral decision, a district has no obligation to develop an IEP.  20 U.S.C. § 1412(a)(10)(A)(i) (requiring a school to provide "for such children special education and related services in accordance with [certain] requirements but not an IEP").  Once a student has been unilaterally placed, the district is not required to offer an IEP unless the parent: (1) requests that the district develop an IEP, conduct an evaluation, or both; or (2) seeks to return the student to public school.  Moorestown Bd. of Educ. v. M.D., 811 F. Supp. 2d 1057, 1068, 1072 (2011) (stating that districts "need not have in place an IEP for a child who has unilaterally enrolled in private school and thereby rejected the district's offer of a FAPE" unless the parent subsequently requests that the district provide an evaluation and/or IEP in connection with a return to the district); I.H. ex rel. D.S. v. Cumberland Valley Sch. Dist., 842 F. Supp. 2d 762, 772 (M.D. Pa 2012) (in the absence of reenrollment or a request for an IEP or evaluation, the IDEA does not require districts to provide FAPE to disenrolled students).

The Third Circuit has held that a "district is only required to continue developing IEPs for a disabled child no longer attending its schools when a prior year's IEP for the child is under administrative or judicial review."  D.P. ex rel. Maria P. v. Council Rock Sch. Dist., 482 F. App'x 669, 673 (3d Cir. 2012) (quoting M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cnty., 303 F.3d 523, 536 (4th Cir. 2002).  However, in order to trigger the duty to prepare an IEP, a parent must also communicate his or her intent to reenroll his or her child in the district's schools.  Id. at 672-73.  "A parent is entitled to request a reevaluation of the student's IEP at any time, ... [b]ut this obligation is contingent on the parent's request."  Id. at 673.  The Council Rock court ultimately determined that "without notification of an intent to reenroll in public school, the school district was under no obligation to update [the child's] IEP...".  Ibid.; see also M.M., supra, 303 F.3d at

536-36 (finding that where parents withdrew their child from the district in 1996, but did not request due process until 1998, the district had no duty to develop an IEP for the 1997 year).

Here, after filing their Petition for Due Process on May 30, 2017, Petitioners unilaterally placed J.H. at Purnell School for the 2017-2018 and 2018-2019 school years. While they subsequently provided the District with private evaluation reports as part of the instant litigation, Petitioners concede that they neither requested an IEP meeting nor communicated any intent to reenroll J.H. in the District. To the contrary, the Amended Petition seeks reimbursement from the District for J.H.'s continued attendance at Purnell through graduation. Because Petitioners did not express an intent to return J.H. to the District, nor did they specifically request an IEP and/or meeting with the CST, there is no evidence that the District failed to comply with its obligations to J.H. after she was unilaterally placed at Purnell School.

Based upon the foregoing I **CONCLUDE** that the District offered FAPE for the 2017-2018 school year; and, that the District did not otherwise violated the IDEA thereafter, and, that petitioners' amended due process petition should be **DISMISSED**.

## ORDER

It is hereby **ORDERED** that Petitioners' amended due process petition is **DISMISSED**, with prejudice.

This decision is final pursuant to 20 U.S.C. § 1415(i)(1)(A) and 34 C.F.R. § 300.514 (2018) and is appealable by filing a complaint and bringing a civil action either in the Law Division of the Superior Court of New Jersey or in a district court of the United States. 20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.516 (2018). If the parent or adult student feels that this decision is not being fully implemented with respect to program or services, this concern should be communicated in writing to the Director, Office of Special Education Programs.

February 13, 2019
DATE

THOMAS R. BETANCOURT, ALJ

February 13, 2019

February 13, 2019

Date Received at Agency

Date Mailed to Parties:

## **APPENDIX**

### List of Witnesses

For Petitioner:

F.H., Petitioner

M.H., Petitioner

Melissa Dolgos

Ellen M. Platt

Nicole Dowd

Megan Duvall

Natalie Schubert


For Respondent:

Joseph Cusack

Kendra Dickerson

Tracy Costa

David Leigh

### List of Exhibits[i]

Joint Exhibits:

J-1    504 Student Accommodation Plan 12/7/16

J-2    Special Education Referral 1/3/17

J-3    Pre-referral intervention Information 1/3/17

J-4    Letter to parents re: Invitation to an Initial Identification Meeting 1/3/17

J-5    Letter to Parents re: Invitation to Meeting 3/22/17

J-6    Eligibility Meeting Participants 4/6/17

J-7    Evaluation Sequence

J-8    Eligibility Determination Report 4/6/17

J-9    Individualized Education Plan (IEP) 4/6/17

---

[i] The parties had failed to follow the prehearing order regarding consulting and submission of joint exhibits. Many exhibits in petitioners' and respondent's respective exhibit books were redundant. The parties were ordered to consult and submit a joint exhibit book and eliminate redundant exhibits. That was done for the most part. However, there remained some confusion as to what was in evidence. The exhibits listed herein are what the undersigned has determined to be in evidence based upon my hearing notes and the transcripts.

J-10    504 Student Accommodation Plan 12/7/16

J-11    Mendham High School Being Succesful Program

J-12    Letter ICCPC to West Morris Central H.S. 10/20/16

J-13    Letter ICCPC to West Morris Central H.S. 12/02/16

J-14    letter ICCPC to Joe Cusack 01/06/17

J-15    Report of Psychological Evaluation by Sherry J. Wilk, M.A. on behalf of
        Clifton Public Schools, Special Education Department 01/19/17

J-16    Psychiatric Evaluation by Shankar Srinivasan, M.D. on behalf of Immediate
        Care Psychiatric Center 03/15/17

J-17    Social History of Student prepared by Betina Goldberg-Rappoport, LCSW, MSW

J-18    Psychoeducational Testing Report prepared by Natalie Schubert, Psy.D., BCBA-
D,      on behalf of Alexander Road Associates

J-19    Letter from Melissa Dolgos re: student 08/17/17

J-20    Letter from Natalie Schuberth, PsyD, BCBA-D 12/13/17

J-21    Psychiatric Report of Ellen M. Platt, D.O. 09/06/17

J-22    Letter from petitioners to Mr. Cusack 10/10/16

J-23    Letter from Plaza Family Care, PC 10/11/16

J-24    email from P.H. to Mr. Cusack 10/15/16

J-25    Letter from petitioners to Mr. Cusack 01/04/17

J-26    email from petitioners to Mr. Cusack 09/08/17

J-27    Letter from petitioners to Stephen Ryan, Principal 09/25/17

J-28    Purnell School Enrollment Contract 2017-2018 school year

J-29    Petitioners proof of payment to Purnell School 2017-2018 school year

J-30    Ellen M. Platt, D.O. curriculum vitae

J-31    Natalie Schuberth, Psy.D., BCBA-D curriculum vitae


For Petitioner:

P-40    Megan Duvall letters (two) re: J.J.

P-42    2017-2018 Fall Term report card Purnell School

P-43    2017-2018 Spring Term report card Purnell School

P-44    College Board accommodation letter

P-46    C.V. Melissa Dolgos

P-48    C.V. Megan Duvall

P-49   Letter from Nicole Dowd

P-50   Audio file IEP meeting

For Respondent:

R-24   Report Card for J.H. 2013-2014

R-25   Report Card for J.H. 2014-2015

R-26   Official Student Transcript West Morris Central High School

R-27   Schedule View List (J.H. schedule West Morris Central High School)

R-33   New Jersey Ask Spring 2013 Individual Student Report

R-34   New Jersey Ask Spring 2014 Individual Student Report

R-35   Permanent Student Record (Science) May 2015

R-36   English Language Arts/Literacy Assessment Report 2015-2016

R-37   Mathematics Assessment Report 2015-2016

R-40   Letter from Megan Duvall 10/12/17