# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **F.H. and M.H. o/b/o J.H.,** | *Civil Action* |
| Plaintiffs, | |
| v. | Docket No. 2:19-CV-14465 |
| **WEST MORRIS REGIONAL HIGH SCHOOL BOARD OF EDUCATION,** | |
| Defendant. | |

# RESPONDENT'S BRIEF

On The Brief:
**Jodi Howlett, Esq.**

CLEARY GIACOBBE ALFIERI JACOBS, LLC
955 State Route 34, Suite 200
Matawan, NJ 07747
(732) 583-7474 Phone
(732) 290-0753 Fax
Attorneys for Respondent West Morris Regional
High School Board of Education

## TABLE OF CONTENTS

Table of Authorities ............................................................................................. i, ii

I.     STATEMENT OF THE CASE AND PROCEDURAL HISTORY ............................... 1

II.    SUMMARY OF RELEVANT TESTIMONY ................................................. 5

       A.     Respondent's Case ........................................................... 5

       B.     Petitioners' Case ............................................................. 10

III.   FINDINGS OF FACT .................................................................... 17

IV.    LEGAL ANALYSIS ..................................................................... 20

       A.     Standard of Review ........................................................... 20

       B.     The Placement Proposed By The District Would Provide J.H. "With A
              Free Appropriate Public Education ("FAPE") In The Least Restrictive
              Environment .................................................................... 21

       C.     The District Appropriately Determined That J.H. Was Eligible For
              Special Education And Related Services Under The Classification Of
              "Emotionally Disturbed." ....................................................... 25

       D.     The District Has Demonstrated That It Complied With The IDEA After
              The Date Of The IEP. .......................................................... 27

       E.     Petitioners Are Not Entitled To Tuition Reimbursement Because They
              Failed To Provide The District With Timely Written Notice Of Removal
              As Required By The IDEA And N.J.A.C. 6A:14-2.10(C). ...................... 29

V.     CONCLUSION ......................................................................... 34

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

<u>C.H. v. Cape Henlopen Sch. Dist.</u>, 606 F.3d 59 (3d Cir. 2010)......................................................30

<u>Carlisle Area School v. Scott P.</u>, 62 F.3d 520 (3d Cir. 1995)........................................................21

<u>D.A. and A.A. o/b/o R.A. v. Haworth Bd. of Educ.</u>, 2008 WL 607630
    (N.J. Adm.), OAL Dkt. No. EDS 12450-07, Agency Ref. No.
    2008-13024 (Feb. 15, 2008)......................................................................................32

<u>D.D. and N.D. o/b/o A.D. v. Montclair Bd. of Educ.</u>, 2005 WL 2898687
    (N.J. Adm.), OAL Dkt. No. EDS 9295-05, Agency Ref. No.
    2006-10296 (Oct. 17, 2005)......................................................................................32

<u>D.P. ex rel. Maria P. v. Council Rock Sch. Dist.</u>, 482 F. App'x 669
    (3d Cir. 2012)...........................................................................................................28

<u>D.S. v. Bayonne Bd. of Educ.</u>, 602 F.3d 553 (3d Cir. 2010)...................................................21, 22

<u>H.L. and J.L. o/b/o V.L. v. Marlboro Twp. Bd. of Educ.</u>,
    2016 WL 7339138 (N.J. Adm.), OAL Dkt. No. EDS 08677-16,
    Agency Ref. No. 2016-24293, Final Decision (Nov. 29, 2016) .........................................30, 32

<u>Hendrick Hudson Cent. Sch. Dist. Bd. of Educ. v. Rowley</u>,
    458 U.S. 176 (1982)..............................................................................................22, 29

<u>I.H. ex rel. D.S. v. Cumberland Valley Sch. Dist.</u>,
    842 F. Supp. 2d 762 (M.D. Pa 2012) .......................................................................28

<u>K.M. and J.M. o/b/o K.M. v. Watchung Hills Reg. Bd. of Educ.</u>,
    2014 WL 3383281 (N.J. Adm.), OAL Dkt. No. EDS 18846-13,
    Agency Ref. No. 2014-20537 (June 5, 2014) .....................................................................32, 33

<u>K.S. and M.S. o/b/o A.S. v. Summit City Bd. of Educ.</u>, 2012 WL 5828603
    (N.J. Adm.), OAL Dkt. No. EDS 09012-12, Agency Ref. No.
    2012-18502 (Nov. 5, 2012).................................................................................32, 33

<u>L.E. v. Ramsey Bd. of Ed.</u>, 435 F.3d 384 (3d Cir. 2006) ...........................................................20

<u>Lascari v. Bd. of Educ. of Ramapo Indian Hills Reg'l High Sch. Dist.</u>,
    116 N.J. 30 (1989) ...............................................................................................22, 23

i

M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cnty.,
   303 F.3d 523 (4th Cir. 2002) ....................................................................28

Moorestown Bd. of Educ. v. M.D., 811 F. Supp. 2d 1057 (2011)................27

R.G. o/b/o E.G. v. Glen Ridge Bd. of Educ., 2005 WL 826101
   (N.J. Adm.), OAL Dkt. No. EDS 03714-04,
   Agency Ref. No. 2004-8632 (March 17, 2005) .......................................31

Sch. Comm. of Burlington v. Mass. Dep't of Educ., 471 U.S. 359 (1985) ...................30

Schreiber v. Ridgewood Board of Education,
   952 F. Supp. 205 (D.N.J. 1997) ...............................................................21

Shore Reg'l High School Bd. of Educ. v. P.S. ex rel. P.S.,
   381 F.3d 194 (3d Cir. 2004).....................................................................20

T.P. and P.P. ex rel. J.P. v. Bernards Twp. Bd. of Educ.,
   2004 WL 763589 (N.J. Adm.), OAL Dkt. No. EDS 6476-03,
   Agency Ref. No. 2004-8055, Final Decision (March 12, 2004)................29

T.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572 (3d Cir. 2000) ............22

W.D. o/b/o W.D. v. Watchung Hills Bd. of Educ.,
   2013 WL 1007188 (N.J. Adm.), OAL Dkt. No. EDS 15092-12,
   Agency Ref. No. 2013-18995 (March 5, 2013) .......................................32

**Statutes**

20 U.S.C. § 1400(d)(1)(A) ......................................................................... 29
20 U.S.C. § 1401(9) ................................................................................... 21
20 U.S.C. § 1412 ................................................................................. 21, 33
20 U.S.C. § 1412(1) ................................................................................... 29
20 U.S.C. § 1412(a) ................................................................................... 29
20 U.S.C. § 1412(a)(1) ............................................................................... 29
20 U.S.C. § 1412(a)(1)(A), (B) .................................................................. 21
20 U.S.C. § 1412(a)(10)(A)(i) ................................................................... 27
20 U.S.C. § 1412(a)(10)(C) ....................................................................... 30
20 U.S.C. § 1412(a)(4).............................................................................. 29
20 U.S.C. § 1412(a)(5)............................................................................... 23
20 U.S.C. § 1414(d)(1)(A)(i) ..................................................................... 22
20 U.S.C. § 1414(d)(1)(A)(i)(I)-(VII)......................................................... 22
20 U.S.C. § 1415(i)(2)(B)(iii) ............................................................. 20, 21
20 U.S.C. §§ 1401 to 1482......................................................................... 21, 29
34 C.F.R. § 300.1(a)................................................................................... 29

34 <u>C.F.R.</u> § 300.115 ................................................................................................................. 23

34 <u>C.F.R.</u> § 300.116(b)(3) ........................................................................................................ 23

<u>N.J.A.C.</u> 6A:14-1.1 ................................................................................................................... 23

<u>N.J.A.C.</u> 6A:14-1.1(d) .............................................................................................................. 21

<u>N.J.A.C.</u> 6A:14-2.10(c) ............................................................................................................ 33

<u>N.J.A.C.</u> 6A:14-2.3 (g) and (h) ............................................................................................... 31

<u>N.J.A.C.</u> 6A:14-2.7(k) .............................................................................................................. 22

<u>N.J.A.C.</u> 6A:14–3.4(h)6 .......................................................................................................... 26

<u>N.J.A.C.</u> 6A:14-3.5(c) .............................................................................................................. 25

<u>N.J.A.C.</u> 6A:14-3.5(c)(12) .................................................................................................. 26, 27

<u>N.J.A.C.</u> 6A:14-3.5(c)(5) .................................................................................................... 25, 26

<u>N.J.A.C.</u> 6A:14-3.7(e)(2) ......................................................................................................... 22

<u>N.J.A.C.</u> 6A:14-3.7(e)(3) ......................................................................................................... 22

<u>N.J.A.C.</u> 6A:14-4.2 ................................................................................................................... 23

<u>N.J.A.C.</u> 6A:14-4.3 ................................................................................................................... 23

<u>N.J.S.A.</u> 18A:46-1 to -55 ........................................................................................................ 29

<u>N.J.S.A.</u> 18A:46-1.1 ................................................................................................................ 21

I.     **STATEMENT OF THE CASE AND PROCEDURAL HISTORY**

1.     On or about May 30, 2017, Petitioners filed a Petition for Due Process ("Petition I") with the Office of Special Education Policy and Procedure ("OSEPP") seeking, *inter alia*:

    i.     a change in J.H.'s classification from "Emotionally Disturbed" to "Other Health Impaired;"

    ii.     compensatory education;

    iii.     the District accept Dr. Srinivasan's report;

    iv.     transportation to and from the private school and independent evaluations;

    v.     home instruction;

    vi.     compensatory damages;

    vii.     declaration that Petitioners are the prevailing party; and

    viii.     any and all other damages.

2.     Petition I was assigned Agency Reference No. 2017/26311 and OAL Docket. No. EDS 10706-2017.

3.     On July 27, 2017, the parties participated in a mediation conference with an OSEPP-assigned mediator.  The matter was not resolved at the mediation conference.

4.     A settlement conference at the Office of Administrative Law ("OAL") was scheduled for August 10, 2017.  At mutual request of the parties, the settlement conference was adjourned.

5.     On August 11, 2017, a prehearing conference was held before the Honorable Thomas R. Betancourt, ALJ, and a Pre-Hearing Order was issued on the same date.

6.     On September 20, 2017, Petitioners filed a Motion for Summary Decision ("MSD").

7.      On September 21, 2017, the parties participated in a telephone conference before Judge Betancourt.  At that time, Judge Betancourt set filing deadlines with respect to the MSD.

8.      On  September 27, 2017,  Petitioners  filed  a  second  Petition  for  Due  Process ("Petition II") with OSEPP.  Petition II seeks, *inter alia*:

   i.      consolidation with Petition I;

   ii.      reimbursement for J.H.'s attendance at Purnell School for the 2017-2018 and 2018-2019 school year;

   iii.      a change in J.H.'s classification of "Emotionally Disturbed" to "Other Health Impaired" and transportation to Purnell;

   iv.      compensatory education;

   v.      the District accept Dr. Srinivasan's report;

   vi.      the District accept Dr. Platt's report;

   vii.      the District accept Dr. Schuberth's report;

   viii.      transportation to and from the private school;

   ix.      compensatory damages;

   x.      a declaration that Petitioners are the prevailing party; and

   xi.      any and all other damages.

9.      On October 13, 2017, in a telephone conference before Judge Betancourt, the Court directed Petitioners to withdraw Petition II and file a Motion to Amend Petition I to include Petitioners' allegedly new claims.

10.      On October 23, 2017, Petitioners filed a Motion for Leave to Amend Petition I.

11.      On or about October 29, 2017, Petitioners withdrew Petition II.

12.      On November 14, 2017, this Court issued an Order consolidating Petition I and Petition II (collectively, "Amended Petition").  The Order also set forth deadlines for filing of

Respondent's Answer to the Amended Petition, as well as responsive pleadings to Petitioner's MSD.

13.     On November 27, 2017, Respondent filed an Answer to the Amended Petition.

14.     On December 4, 2017, Respondent filed an Opposition to Petitioner's MSD.

15.     On December 14, 2017, Petitioners filed a Reply to Respondent's Opposition to the MSD.

16.     On December 19, 2017, this Court issued an Order denying Petitioner's MSD.

17.     On February 12, 2018, Respondent filed a Cross-Petition for Due Process ("Cross-Petition").  The Cross-Petition sought, *inter alia*:

      i.      a judicial determination that Petitioners' conduct was *per se* revocations of their consent to classify J.H. for special education and related services under the category of "emotionally disturbed;"

      ii.      an Order narrowing the scope of the hearing to the issue of whether J.H. meets the eligibility criteria of "emotionally disturbed";

      iii.      a judicial determination that Petitioners' failure to meaningfully participate in the IEP process was unreasonable; and

      iv.      a judicial determination that Petitioners' removal of J.H. to Purnell School was unreasonable.

18.     On or about February 24, 2018, Petitioners filed an Answer to the Cross-Petition.

19.     On March 14, 2018, Petitioners filed a brief in opposition to Respondent's request to limit the scope of the due process hearing, as set forth in the Cross-Petition.

20.     On March 16, 2018, Respondent filed a brief in support of its request to limit the scope of the due process hearing, as set forth in the Cross-Petition.

21.     On April 4, 2018, Respondent filed a motion *in limine* ("Motion to Exclude"), seeking to exclude evidence and expert reports pursuant to the "snapshot rule."

22.     On April 6, 2018, Petitioners filed an Opposition to Respondent's Motion to Exclude, which seeks to strike Respondent's Answer, bar all evidence from Respondent, and counsel fees.

23.     On April 20, 2018, the Court issued an Order addressing the outstanding motions, as follows:

     i.     grants the Motion to Exclude, in that all evidence presented by Petitioners that was obtained after the date of the IEP (May 16, 2017) shall not be considered for purposes of determining if Respondent complied with the IDEA in developing the IEP;

     ii.    denies the Motion to Exclude, in that Petitioner shall be permitted to submit evidence dated after the date of the IEP (May 16, 2017) for the purposes of demonstrating that the District failed to comply with the IDEA after the date of the IEP;

     iii.   denies Respondent's request to limit the scope of the due process hearing to whether J.H. meets the eligibility criteria to be eligible for special education and related services under the classification of "Specific Learning Disability"; and

     iv.   denies Petitioners' request for relief sought in their Opposition to the Motion to Exclude.

24.     A plenary hearing was held on April 9, 2018; April 23, 2018; July 25, 2018; and August 29, 2018.

25.     On December 13, 2018, Petitioners filed a post-hearing submission.

26.     Pursuant to the Court's directive on December 17, 2018, Respondent filed its post-hearing submission on January 16, 2019, and Petitioners file a reply on or about January 23, 2019.

II.      **SUMMARY OF RELEVANT TESTIMONY**

      A.      **Respondent's Case**

            1.      **Joseph Cusack**

Mr. Cusack testified as follows:

Mr. Cusack is employed by the District as a guidance counselor at West Morris Central High School.  Transcript of Due Process Hearing, April 9, 2018 ("1Tr.") 12:13-16.  He participates in 504 Team, I&RS committee, and Child Study Team ("CST") meetings as a guidance counselor. 1Tr. 13:1-4.

Mr. Cusack became aware of J.H. when she was in eighth grade.  1Tr. 15:9-15.  He had previously worked with Petitioners with respect to two of their sons, since approximately 2008 or 2009. 1Tr. 15:15-19.  He worked as J.H.'s guidance counselor since September 2015.  1Tr. 16:11. At that time, J.H. was not classified and did not have a 504 Plan.  1Tr. 16:21-25; 17:1-3.

Upon review of J.H.'s records from eighth grade, he noted that J.H.'s attendance was "not unusual," that she was "a pleasure to have in class," and was "a cooperative student." 1Tr. 23:17-25; 24:1-16; Exhibit ("Ex.") J-7.  Similarly, J.H.'s standardized testing results did not "raise any red flags" to him.  1Tr. 28:1-7; 29:12-18; 31:2-3; Ex. R-34; R-33; R-35; R-36; R-37. During her ninth grade year, he did not receive any concerns from J.H.'s teachers about her, "academically or socially."  1Tr. 31:17-20.  He also did not recall receiving any concerns from Petitioners about J.H.  1Tr. 32:12-19.

During her ninth grade year, 2015-2016, J.H. was enrolled in "advanced level" courses. 1Tr. 34:13-17; Ex. R-26.  J.H. finished ninth grade with a "very strong GPA" and was on the "honor roll."  1Tr. 36:1-4; Ex. R-26.

For her tenth grade year, 2016-2017, J.H. was also enrolled in "advanced level" courses. 1Tr. 41:10-25; Ex. R-27.  In mid- to late-September, Mr. Cusack received a call from Petitioner

M.H., "indicating that she was having a difficult time and that she was going to be out of school." 1Tr. 42:4-15. Petitioners subsequently informed him that J.H. was going to attend a program at ICCPC for "depression and anxiety" and would not be returning to West Morris Central "anytime in the very near future." 1Tr. 43:7-11; 44:23-25; 45:1-4; 45:10-14; 48:2-15; Ex. J-22; J-23; J-12.

In December 2017, Mr. Cusack was advised that J.H. was medically cleared to return to school. 1Tr. 50:13-20; Ex. J-13. The District then worked with Petitioners to develop a 504 Plan for J.H. that incorporated the recommendations from ICPCC. 1Tr. 51:12-19; Ex. J-1. Petitioners signed the 504 Plan. 1Tr. 55:8-16; Ex. J-1.

J.H. returned to school for approximately one and one-half days. 1Tr. 55:19-25; 56:1-3; 56:14-16. Petitioners advised Mr. Cusack that "they were going to potentially withdraw [J.H.] and enroll in a small, private school," specifically American Christian. 1Tr. 57:3-11. He and Petitioners also discussed a CST evaluation. 1Tr. 57:12-15. Petitioners asked him if there would be "possibly an out-of-district placement that could be appropriate" for J.H. 1Tr. 57:15-17. Petitioners told him that they were going to take the holiday break to discuss whether to "withdraw her, enroll in a smaller school, or pursue a CST evaluation." 1Tr. 57:20-24; 74:4-12. Following the winter break, Petitioners requested a CST evaluation. 1Tr. 58:1-5; Ex. J-2. Petitioners again asked him if it "would be possible for J.H. to go to a smaller school setting while remaining within the district," such as Fusion Academy. 1Tr. 60:14-17; 61:10-25; 62:1-6; Ex. J-3.

2. **Kendra Dickerson**

Ms. Dickerson testified as follows:

She is employed by Respondent as a certified school psychologist at West Morris Central High School. 1Tr. 117:24-25. She also serves as a case manager. 1Tr. 118:18-19.

6

Ms. Dickerson first learned of J.H. through Mr. Cusack during the 2016-2017 school year. 1Tr. 119:5-8; 119:17.  She had conversations with Petitioners concerning the process of 504 and J.H.'s difficulties at school.  1Tr. 119:8-11.

An invitation to an evaluation planning meeting, dated January 3, 2017, was sent to Petitioners for a CST meeting on January 9, 2017.  1Tr. 121:7-8; 121:19; 122:15; Ex. J-4. Petitioners and J.H. attended the meeting on January 9, 2017.  1Tr. 124:1-1.  At the meeting, Petitioners consented to the proposed assessments and agreed to provide an update from J.H.'s treating psychiatrist.  1Tr. 123:21-25; 124:5-7.  She did not receive any reports from Petitioners or J.H.'s teachers that J.H. was having academic issues.  1Tr. 124:11-19.  She recalled J.H. was "a strong academic student."  1Tr. 124:19-20.  The proposed assessments were conducted by the District.  1Tr. 124:21-23.

The psychological assessment indicated that J.H.'s full-scale IQ is 104, which indicates that her intellectual functioning was within the average ranges.  1Tr. 136:20-25; 137:1-9; Ex. J-15. The report also indicated that J.H. was struggling with "social stress, anxiety, depression, [and] inadequacy."  1Tr. 140:15-21.

In addition to the assessments conducted by the CST, Petitioners provided the District with a psychiatric evaluation conducted by J.H.'s treatment provider at the time.  1Tr. 144:15-25; Ex. J-16.

At an IEP meeting on April 6, 2017, the CST determined J.H. was eligible for special education and "there had been a discussion of a proposed program at the BSP program over at Mendham."  1Tr. 133:14-20; 155:19-21; 183:9-13; Ex. J-9.  Specifically, J.H. was determined to meet the criteria for "emotionally disturbed."  1Tr. 156:1-4.  Petitioners signed the eligibility determination report.  1Tr. 159:2-6.  An IEP was not formalized at the meeting but Petitioners

agreed to go look at the proposed program at Mendham High School.  1Tr. 133:5-10; 133:19-20; 135:21-23.

A second IEP meeting was held on May 16, 2017, at which time the CST proposed an IEP. 1Tr. 134:3-16; 134:14-16; Ex. J-9.  The program proposed in the IEP was "to continue with some of the home instruction that was being provided and gradually do a return to the BSP program at Mendham High School" for the remainder of the 2016-2017 school year.  1Tr. 148:8-19; Ex. J-9. For the following 2017-2018 school year, the IEP proposed that J.H. would take advanced level courses in the "BSP program at Mendham."  1Tr. 148:21-23; 151:14-16; 152:14-25; Ex. J-9.  Ms. Dickerson testified that the acronym "BSP" stands for the "Being Successful Program" at Mendham High School.  1Tr. 149:1-4; 149:12-15.

### 3.   **Tracy Costa**

Ms. Costa testified to the following:

She is employed by Respondent as a school social worker at West Morris Mendham High School.  1Tr. 216:14-15.  She also serves as a case manager and provides school-based and crisis counseling for students.  1Tr. 216:20-24.  She has been part of the BSP at Mendham High School since it was created, approximately six to seven years ago.  1Tr. 218:4-19.

Ms. Costa testified that the purpose of the BSP is to provide "environment for students that might be having a difficult time in the mainstream classes for social emotional reasons." 1Tr. 219:16-24.  The BSP is not just for students with disciplinary issues, but addresses students whom have behaviors such as resistance to coming to school.  1Tr. 220:1-6; 222:6-10.  The BSP does not include any students who have been suspended or have had behavior issues in class. 1Tr. 231:3-5.  The target population for the BSP is students who suffer from major depressive disorder, school-related anxiety, and attendance issues.  1Tr. 221:4-20.

She indicated that she works in the BSP with three full-time teachers, a paraprofessional, and other case managers that also do school-based counseling.  1Tr. 222:15-21.  There are currently twenty-five students in the BSP.  1Tr. 222:22-23.  With respect to academics, the BSP is adapted to make classes less or more challenging to meet a student's individual needs. 1Tr. 222:4-25.

Ms. Costa testified that the BSP provides services to students with school-based anxiety, such as going to a student's home and working to gradually get them into the classroom. 1Tr. 225:2-25; 226:1-12; Ex. J-11.  The BSP also includes an individualized incentive program. 1Tr. 226:18-25; 227:1-13; Ex. J-11.

### 4. Dr. David Leigh

Dr. Leigh testified as follows:

Dr. Leigh is employed as Principal of the New Alliance Academy, a therapeutic high school in Paramus, New Jersey.  Transcript of Due Process Hearing, April 23, 2018 ("2Tr.") 5:19-21.  He also works part-time as a licensed psychologist.  2Tr. 5:21-23.  He previously was employed by Respondent as Director of Special Services.  2Tr. 6:5-9.

He became familiar with J.H. in 2016 and recalls that J.H. was struggling significantly with anxiety and depression.  2Tr. 8:11-22.  She had school-related anxiety and also had school refusal. 2Tr. 44:14-15.

After reviewing J.H.'s records, Dr. Leigh consulted with Ms. Dickerson about the appropriate program for J.H. and recommended the BSP at Mendham High School.  2Tr. 111-23. Specifically, he considered the two letters from IPCCP and private report of J.H.'s psychiatrist when making the recommendation to Ms. Dickerson.  2 Tr. 41:4-11.  Ex. J-13; J-14; J-16.

He created the BSP for students with emotional and psychiatric disorders or conditions. 2Tr. 12:7-9.  The goal was to create a program in-district that offers all of the core academic

content in a smaller setting with individualized supports.  2Tr. 17-24.  The teachers are certified in special education and highly-qualified in their content areas, and also have a "special skill, in working with students that are fragile emotionally." 2Tr. 13:1-5.  The BSP is tailored to meet an individual student's academic needs and challenges.  2Tr. 15:2-21.

He believed the BSP was appropriate for J.H. because she "presented with both an academic skill set and a psychiatric profile that was consistent with the type of student that was being targeted" by the program.  2Tr. 16:9-13.  Specifically, J.H. was struggling with getting to school and performing consistently.  2Tr. 16:14-18.  The BSP is "all about in real time trying to help the student understand what their anxiety was, what the sources were, and to target how to manage that." 2Tr. 16:19-22.  The academics in the BSP are tailored "individually based on need." 2Tr. 46:15-25; 47:1.

The BSP at Mendham High School is distinguishable from the Behavioral Support Program at West Morris Central High School in that the Mendham program is for students with anxiety, depression, and "more clear-cut psychiatric conditions impacting school attendance and learning," whereas the Central program is for students with behavioral issues.  2Tr. 49:23-25; 50:1-10.

At the IEP meeting on May 16, 2017, he discussed the BSP at Mendham High School. 2Tr. 17:13-21; Ex. P-50.  If the BSP did not work, they could then consider New Jersey-approved therapeutic private day placements.  2Tr. 17:22-25; Ex. P-50.

### B.    Petitioners' Case

#### 1.   F.H., Petitioner

Mr. F.H. testified as follows:

He is the father of J.H.  2Tr. 60:4-5.  J.H. attended middle school at Long Valley Middle School.  2Tr. 60:7-9.

J.H. attended a therapeutic day program at ICCPC from approximately the end of October through December 2016.  2Tr. 63:4-17.  After J.H. unsuccessfully returned to West Morris Central High School after returning in December 2016, Petitioners put together a list of approximately twenty schools for J.H.   2Tr. 122:10-23.   They considered out-of-district schools prior to requesting a CST evaluation on January 3, 2017, and prior to receiving the private psychiatric report from Dr. Srinivasan.  2Tr. 123:13-25; 124:1-19.

At the IEP meeting on April 6, 2017, F.H. signed the Determination of Eligibility, which indicated that J.H. was eligible for special education and related services under the criteria of "Emotionally Disturbed."  2Tr. 76:8-9; Ex. J-6.  He made it clear at the meeting that Petitioners "did not feel that [Emotionally Disturbed] was the correct classification" and "wanted that changed."  2Tr. 78:1-9; 125:1-22.  He would not have signed it if he knew he was agreeing to classify J.H. as "Emotionally Disturbed."  2Tr. 80:21-25.

The meeting ended after J.H. got upset when the CST spoke about the proposed program at Mendham High School and F.H. determined to get a lawyer.  2Tr. 82:12-18.

On May 30, 2017, Petitioners filed their Petition for Due Process.  2Tr. 132:11-25.

Petitioners subsequently sent a letter to the Principal of West Morris Central High School to inform him that J.H. would not be returning and was enrolled at Purnell School.  2Tr. 108:19-24; Ex. J-27.   The letter is marked as being received by Respondent on September 25, 2017.  2Tr. 129:12-23; Ex. J-27.  They have been paying Purnell School directly, commencing on August 31, 2017.  2Tr. 113: 19-25; 114:1; 129:3-11; Ex. J-29.

Following Petitioners' letter to Respondent that J.H. was enrolled in Purnell School, Petitioners never subsequently requested a new IEP or expressed an intent to reenroll J.H. in the District.  2Tr. 131:2-12.

### 2. Petitioner M.H.

Ms. M.H. testified as follows:

At the meeting on April 6, 2017, M.H. objected to J.H. being classified as "Emotionally Disturbed." 2Tr. 140:10-16. After the meeting, she went with J.H. to observe the proposed program at Mendham High School. 2Tr. 144:11-17. During the observation, Ms. Costa advised her that most of the students in the program "have trouble getting to school or staying in school." 2Tr. 147:9-16. She let J.H. decide whether the program at Mendham High School was appropriate and determined that "it just didn't seem appropriate." 2Tr. 147:20-25; 148:9-10.

J.H. started at Purnell School on September 11, 2017. 2Tr. 153 15-18. She testified that Petitioners "couldn't have [J.H.] languishing" and "gambling" about whether J.H. would go to the program at Mendham High School. 2Tr. 156: 9-17.

### 3. Melissa Dolgos

Ms. Dolgos testified as follows:

Ms. Dolgos is employed by ICCPC as a senior clinician.[1] Transcript of Due Process Hearing, July 25, 2018 ("3Tr.") 5:16-19; 6:1-2.

She worked with J.H. from October 2016 to December 2016, and then against from January through June 2017. 3Tr. 18:10-14.

She was involved in J.H.'s program at ICCPC, which consisted of an afterschool and then a day program. 3Tr. 9:2-8. She also provided J.H. with individual therapy and crisis management, had her in groups a "few times," and did family work with J.H. and Petitioners. 3Tr. 18:18-23.

---

[1] Petitioners proffered Ms. Dolgos as an expert in "counseling adolescents and anxiety." 3Tr. 11:3-12. The Court denied Petitioners' request and did not qualify her as an expert. 3Tr. 17:17-19.

On October 23, 2016, she co-wrote a letter with Dr. Srinivasan to notify the school that J.H. was admitted to a partial hospitalization program due to severe depression and anxiety and requested home instruction.  3Tr. 6-25; 21:1-8; Ex. J-12.

On December 2, 2016, she co-write a subsequent letter with Dr. Srinivasan which provided "medical clearance for [J.H.] to return to school" with a transition plan of half days of school and attendance at ICCPC in the afternoons.  3Tr. 23:12-19; Ex. J-13.  She also recommended a 504 Plan and accommodations, such as taking breaks and taking tests in a private room.  3Tr. 28:17-20.

On January 6, 2017, Ms. Dolgos wrote a letter to Respondent recommending an IEP. 3Tr. 31:11-12; Ex. J-14.  She also indicated that J.H. had major depressive disorder, recurrent severe without psychotic features, and generalized anxiety disorder.  3Tr. 35:7-19; Ex. J-14.  After speaking with Dr. Srinivasan, they agreed that "it was better for [J.H.] to be in a smaller educational environment" that with help with her learning needs and anxiety.  3Tr. 37:12-20.  The IEP proposed by the CST incorporated her recommendations.  3Tr. 50:15-25; 51:1-7.

She reviewed the IEP and determined that her recommendations were provided in the IEP. 3Tr. 55:11-19.

In a conversation with Mr. Cusack, she thought the school was "considering [Effective School Solutions] for" J.H.  3Tr. 26:9-14; 26:22-25; 38:2-9.

She disagreed with the classification of "Emotionally Disturbed" because "[m]ost of the kids that have emotionally disturbed as the diagnoses in the IEP are behavior, like oppositional defiant kids or kids that have more severe issues."  3Tr. 39:16-23.  She is not personally familiar with the Administrative Code regarding eligibility for special education and is not a specialist in IEP.  3Tr. 51:19-23; 52:21.  She testified that J.H. exhibits the characteristics of "Emotionally

Disturbed," such as depression, fears associated with school, an inability to maintain satisfactory interpersonal relationships.  3Tr. 53:13-25; 54:1-9.

She stopped treating J.H. in June 2017.  3Tr. 46:5-8.  At that time, Petitioners reported that they were "planning on doing a different placement."  3Tr. 18:10-14; 46:14-17.

On August 17, 2017, at the request of Petitioners, Ms. Dolgos wrote a letter suggesting "a structured but (sic) non-strict educational environment with more flexible schedules" for J.H. but without therapy.  3Tr. 44:10-18; 57:23-25; Ex. J-19.  Her opinion was that J.H. was going to have therapy outside of school so "[she] figured that would be enough for her" and the accommodations in the IEP would be enough.  3Tr. 58:20-24; 59:1-11.  Her recommendation was that J.H. be placed in a "school environment with supports."  3Tr. 62:25.

She was not aware that the IEP could not be implemented without Petitioners consent or that Respondent provided J.H. with a 504 Plan for the 2017-2018 school year.  3Tr. 60:19-25; 61:1-9.  She neither observed any program in West Morris Central or Mendham High School, nor contacted anyone from the BSP.  3Tr. 55:22-25; 56:1-13.

### 4.  Dr. Ellen Platt

Dr. Platt testified as follows:

Dr. Ellen Platt testified, without objection, as an expert in the field of child and adolescent psychiatry.  3Tr. 66:11-19; 67:5-6.

In September 2017, she was hired by Respondent to perform an independent psychiatric evaluation of J.H.  3Tr. 67:11-14; Ex. J-21.

She observed J.H. to be "relatively non-functional" with severe anxiety, irrational fears, with features of depression, even though she had not been to school for at least nine months. 3Tr. 70:14-22; 88:10-25; 89:1-2; 90:14-23; Ex. J-21.  J.H. may have been exhibiting stress from reasons not related to school.  3Tr. 90:10-22.

She noted that J.H. "manifested her depression interpersonally and behaviorally." 3Tr. 76:15-25; Ex. J-21.

She recommended that J.H. be placed in an educational environment where she would be protected from standard interactions of standard peers, and a place where J.H. "believed that her emotional reactivity could be understood." 3Tr. 78:4-10.  Specifically, Dr. Platt testified that J.H. needed a school that provided emotional support and had staff members with education in mental health.  3Tr. 82:4-13.

J.H. could benefit from having access to a counselor throughout the school day. 3Tr. 94:19-22.  She believes that J.H. also needed "immediate access" to support staff at school, including special education teachers, counselors, therapists, psychologists.  3Tr. 96:8-25.

Based upon her presentation, J.H. required a placement to address "primarily [J.H.'s] emotional needs… at some point her academic needs would have to be included."  3Tr. 98:19-25. She has not observed the BSP at Mendham High School.  3Tr. 94:7-15.

She believed that J.H. had an inability to maintain interpersonal relationships with peers, that J.H. had a pervasive mood of unhappiness or depression, and fears associated with school or being around other people.  3Tr. 92:23-25; 93:1-24.

### 5.  Nicole Dowd

Ms. Dowd testified to the following:

Ms. Dowd is employed by the Purnell School as a teacher in the STEM department and a learning specialist in the LAC program.  Transcript of Due Process Hearing, August 29, 2018 ("4Tr.") 5:6-12.  She is not a school counselor.  4Tr. 8:16-17.  She does not hold a New Jersey teaching license.  4Tr. 25:11-17.

J.H. was a student in her Algebra II class.  4Tr. 8:21.  She provided accommodations to J.H., such as untimed tests and quizzes and the use of a calculator.  4Tr. 13:9-12.

15

She did not observe the BSP at Mendham High School or review the proposed IEP. 4Tr. 26:4-8.

### 6. Megan Duvall

Ms. Duvall testified as follows:

Ms. Duvall is employed by the Purnell School as a school counselor.  4Tr. 28:18-22.

She was assigned to be J.H.'s counselor at Purnell School.  4Tr. 29:6-7.

In March 2018, she drafted correspondence regarding J.H. as requested by Petitioners' counsel.  4Tr. 40:20-25; 41:1-10; P-40.

She did not observe the BSP at Mendham High School or review the proposed IEP. 4Tr. 41:11-16.

### 7. Dr. Natalie Schuberth

Dr. Schuberth testified as follows:

Dr. Schuberth testified, without objection, as an expert in the field of psychology. 4Tr. 44:24-25; 45:18-19.  She is employed by Alexander Road Associates.  4Tr. 44:4-5.

She became aware of J.H. when she was contacted by Petitioners' counsel to perform a pscyhoeducational evaluation of J.H.   4Tr. 43:22-24; Ex. J-31.   She did not consult with Respondent prior to performing her evaluation.   4Tr. 46:19-23; Ex. J-31.   She conducted her evaluation over three days in July and August 2017.  4Tr. 57:2-10; Ex. J-31.

Her testing revealed that J.H.'s overall intelligence and verbal skills were in the average range, and her working memory was in the low average range.  4Tr. 49:2-9; Ex. J-31.  The result is that J.H. would need a little more time to answer questions and take in information in the classroom.  4Tr. 49:11-15; 50:5-14; Ex. J-31.

She did not observe a severe discrepancy in any area except for the subtest of "math fluency subtraction."  4Tr. 83:14-25; Ex. J-31.

She diagnosed J.H. under the DSM-V with specific learning disorder with impairment in mathematics, specifically with fluent calculation moderate, major depressive disorder, and generalized anxiety disorder.  4Tr. 17-23; 72:9-25; Ex. J-31; J-20.  She wrote the follow-up letter in December 2017 in response to a request from Petitioners' counsel.  4Tr. 82:2-13.

She is not familiar with classifying students under the IDEA.  4Tr. 1-5; J-31.  She is also not familiar with the Administrative Code regarding the criteria for special education. 4Tr. 81:8-11.

She indicated that J.H. reported an inability to build or maintain interpersonal relationships with peers, that J.H. presented with a general pervasive mood of unhappiness, and that J.H. had anxiety about attending school.  4Tr. 80:17-25; 81:1-7.

She recommended that J.H. would benefit from a small school setting, extra time to process information, and a classroom where she is challenged at her intellectual level.  4Tr. 67:7-18; Ex. J-31.  J.H. would also benefit from "counseling and support in the school to deal with the anxiety and helping her build friendships," as well as accommodations for her executive functioning and auditory sensitivity.  4Tr. 69:15-23; J-31.

She has not observed and is not familiar with the BSP at Mendham High School. 4Tr. 81:21-23.

## III.     FINDINGS OF FACT

1.      J.H. (born January 3, 2001) resides in Long Valley, New Jersey with her parents, F.H. and M.H. ("Parents" or "Petitioners").

2.      J.H. reached the age of majority on January 3, 2019.

3.      Respondent West Morris Regional High School District ("Respondent" or "District") was the local education agency charged with providing J.H. with a free appropriate public education.

4.      In the 2015-2016 school year, J.H. attended ninth (9th) grade as a general education student at West Morris Central High School in Respondent's school district.

5.      Prior to attending West Morris Central High School, J.H. attended Long Valley Middle School as a general education student.

6.      On December 7, 2016, the District held a 504 Accommodation Plan meeting, in which Petitioners attended.

7.      Petitioners consented to implementation of the 504 Plan, developed on December 7, 2018.

8.      In January 2017, J.H. was referred to the CST to determine whether she was eligible for special education and related services.

9.      On January 9, 2017, the District held an Evaluation Planning Meeting, in which Petitioners attended.

10.      At the Evaluation Planning Meeting, Petitioners consented to the District conducting psychological and social history assessments.

11.      The District accepted a psychiatric assessment conducted by Dr. Srinivasan, dated March 15, 2017.

12.      On April 6, 2017, Respondent determined J.H. was eligible for special education and related services under the criteria of "Emotionally Disturbed."

13.      Petitioners executed the Eligibility Determination Report indicating that J.H. met the criteria of "Emotionally Disturbed."

14.      At the meeting on April 6, 2017, Petitioners did not consent to implementation of an IEP.

15.     A subsequent IEP meeting was held on May 16, 2017, in which Petitioners attended with counsel.

16.     The IEP proposed by the District placed J.H. at the BSP at Mendham High School.

17.     In the IEP, the CST used the term "Behavioral Supports Program" at Mendham High School to refer to the "Being Successful Program" at Mendham High School.

18.     At the meeting on May 16, 2017, Petitioners did not consent to implementation of the IEP.

19.     On May 22, 2017, Petitioners, through counsel, requested an independent psychiatric, psychological, and educational assessments.

20.     In July and August 2017, Dr. Schuberth conducted an independent psychoeducational evaluation of J.H.

21.     Dr. Schuberth diagnosed J.H. under the DSM-V criteria for Major Depressive Disorder, Generalized Anxiety Disorder, and a Specific Learning Disorder with impairment in mathematics, specifically with fluent calculation.

22.     Dr. Schuberth did not determine that J.H. met the criteria for a Specific Learning Disability as defined by N.J.A.C. 6A:14-3.5(c).

23.     In September 2017, Dr. Platt conducted an independent psychiatric evaluation of J.H.

24.     Dr. Platt diagnosed J.H. under the DSM-V criteria for: (i) Major Depressive Disorder, recurrent episode, moderately severe (with irrational thinking); (ii) Generalized Anxiety Disorder; (iii) Panic Disorder; (iv) School avoidance; (v) Specific Learning Disorder with impairment in mathematics, specifically with fluent calculation, moderate; (vi) Major Depressive

19

Disorder, recurrent, severe, without psychotic features; (vii) Central Auditory Processing Disorder; and (viii) Agoraphobia.

25.     Dr. Platt did not determine that J.H. met the criteria for a Specific Learning Disability as defined by <u>N.J.A.C.</u> 6A:14-3.5(c).

26.     On August 31, 2017, Petitioners submitted a tuition payment to Purnell School.

27.     J.H. began attending Purnell School on September 11, 2017.

28.     After J.H. began attending Purnell School, Petitioners notified the District that they were withdrawing J.H. from West Morris Central High School, effective immediately.

29.     Petitioners did not provide the District with at least ten days' notice of their intention to unilaterally place J.H. at Purnell School.

30.     Purnell School is not approved by the State of New Jersey for the provision of special education and related services.

31.     Since withdrawing J.H. from the District, Petitioners have not requested an IEP meeting with the CST.

32.     Since withdrawing J.H. from the District, Petitioners have not notified the District of their intention to reenroll J.H.

## IV.     LEGAL ANALYSIS

### A.     Standard of Review

In reviewing an administrative determination in an IDEA case, "the district court applies a modified de novo review and is required to give due weight to the factual findings of the ALJ." <u>L.E. v. Ramsey Bd. of Ed.</u>, 435 F.3d 384 (3d Cir. 2006). While "the District Court must make its own findings by a preponderance of the evidence," the court "must also afford 'due weight' to the Administrative Law Judge's determination." <u>Shore Reg'l High School Bd. of Educ. v. P.S. ex rel. P.S.</u>, 381 F.3d 194 (3d Cir. 2004) (citing 20 <u>U.S.C.</u> § 1415(i)(2)(B)(iii)). "Factual findings from

the administrative proceedings are to be considered prima facie correct," and where the Administrative Law Judge has heard live testimony and made determinations of credibility, "that determination is due special weight." Id.  Specifically, this means that a District Court must accept the state agency's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." Carlisle Area School v. Scott P., 62 F.3d 520 (3d Cir. 1995).  (emphasis added).  Further, the burden is on the party challenging the administrative law decision to prove by a preponderance of the evidence that the decision was erroneous. Schreiber v. Ridgewood Board of Education, 952 F. Supp. 205 (D.N.J. 1997).

     **B.**    **The Placement Proposed By The District Would Provide J.H.**
              **"With A Free Appropriate Public Education ("FAPE") In The**
              **Least Restrictive Environment.**

Federal funding of state special education programs is contingent upon the states providing a "free and appropriate education" (FAPE) to all disabled children.  20 U.S.C. § 1412.  The Individuals with Disabilities Act (IDEA) is the vehicle Congress has chosen to ensure that states follow this mandate.  20 U.S.C. §§ 1400 et seq.  "[T]he IDEA specifies that the education the states provide to these children 'specially [be] designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction.'" D.S. v. Bayonne Bd. of Educ., 602 F.3d 553 (3d Cir. 2010) (citations omitted).  The responsibility to provide a FAPE rests with the local public school district.  20 U.S.C. § 1401(9); N.J.A.C. 6A:14-1.1(d).  Subject to certain limitations, FAPE is available to all children with disabilities residing in the State between the ages of three and twenty-one, inclusive.  20 U.S.C. § 1412(a)(1)(A), (B).  The district bears the burden of proving that a FAPE has been offered. N.J.S.A. 18A:46-1.1.

New Jersey follows the federal standard that the education offered "must be "sufficient to confer some educational benefit' upon the child." Lascari v. Bd. of Educ. of Ramapo Indian Hills

Reg'l High Sch. Dist., 116 N.J. 30 (1989) (citations omitted).  The IDEA does not require that a school district "maximize the potential" of the student but requires a school district to provide a "basic floor of opportunity."  Rowley, 458 U.S. at 200.  In addressing the quantum of educational benefit required, the Third Circuit has made clear that more than a "trivial" or "de minimis" educational benefit is required, and the appropriate standard is whether the child's education plan provides for "significant learning" and confers "meaningful benefit" to the child.  T.R.  v. Kingwood Twp. Bd. of Educ., 205 F.3d 572 (3d Cir. 2000) (internal citations omitted).

As noted in D.S., an individual education plan (IEP) is the primary vehicle for providing students with the required FAPE.  D.S., 602 F.3d at 557.  An IEP is a written statement developed for each child that explains how FAPE will be provided to the child.  20 U.S.C. § 1414(d)(1)(A)(i). The IEP must contain such information as a specific statement of the student's current performance levels, the student's short-term and long-term goals, the proposed educational services, and criteria for evaluating the student's progress.  See 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(VII).  It must contain both academic and functional goals that are, as appropriate, related to the Core Curriculum Content Standards of the general education curriculum and "be measurable" so both parents and educational personnel can be apprised of "the expected level of achievement attendant to each goal."  N.J.A.C.  6A:14-3.7(e)(2).  Further, such "measurable annual goals shall include benchmarks or short-term objectives" related to meeting the student's needs.  N.J.A.C. 6A:14-3.7(e)(3).  The school district must then review the IEP on an annual basis to make necessary adjustments and revisions.  20 U.S.C. § 1414(d)(4)(A)(i).

A due process challenge can allege substantive and/or procedural violations of the IDEA. If a party files a petition on substantive grounds, the Administrative Law Judge (ALJ) must determine whether the student received a FAPE.  N.J.A.C. 6A:14-2.7(k).  If a party alleges a

procedural violation, an ALJ may decide that a student did not receive a FAPE only if the procedural inadequacies: (1) impeded the child's right to a FAPE; (2) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of FAPE to the child; or (3) caused a deprivation of educational benefits.   Ibid.   In the instant matter Petitioners allege substantive violations of the IDEA.

In New Jersey, State regulations track the requirement that a local school district provide "a free appropriate public education" as that standard is set under the IDEA.  N.J.A.C. 6A:14-1.1. New Jersey follows the federal standard requiring such entitlement to be "sufficient to confer some educational benefit," although the State is not required "to maximize the potential of handicapped children."  Lascari, 116 N.J. 30.

In determining where to deliver that instruction, it is clear that the district must be guided by the strong statutory preference for educating children in the "lease restrictive environment."  20 U.S.C. § 1412(a)(5) mandates that, to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of such a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

The law describes a continuum of placement options, ranging from mainstreaming in a regular public school as least restrictive to enrollment in a non-approved residential private school as most restrictive.  34 C.F.R. § 300.115; N.J.A.C. 6A:14-4.3.  Federal regulations further require that placement must be "as close as possible to the child's home."  34 C.F.R. § 300.116(b)(3); see also, N.J.A.C. 6A:14-4.2.

Here, it is clear that the District used all the information available to it at the time of the eligibility meeting on April 6, 2017 and subsequent IEP meeting on May 16, 2017. Specifically, the CST conducted an initial evaluation, which included a psychological evaluation and a social history evaluation, as well as considered the psychiatric evaluation conducted by J.H.'s then-current treatment provider, Dr. Srinivasan.

Specifically, Dr. Srinivasan diagnosed J.H. with (i) major depression recurrent, and (ii) panic disorder. Dr. Srinivasan also states that, "[J.H.]'s psychiatric issues, specifically, pervasive mood disturbances, avoidance behaviors even when not under stress, along with irrational fears and anxiety secondary to school issues, all collectively at this time are directly impacting learning and ability to maintain and build satisfactory interpersonal relationships." The placement at BSP was based upon J.H.'s individual psychiatric needs and, specifically, her school-based anxiety.

Additionally, the District was required to consider the continuum of placement options and consider the least restrictive environment when proposing an appropriate placement for J.H. The BSP at Mendham High School is tailored to meet the needs of students suffering from the same disabilities and challenges as J.H., including anxiety and depression that results in difficulties in attending school. Dr. Leigh testified that the BSP was appropriate for J.H. because she "presented with both an academic skill set and a psychiatric profile that was consistent with the type of student that was being targeted" by the program. In particular, J.H. was struggling with getting to school and performing consistently – which is exactly what the BSP was designed to address. The BSP would have provided J.H. with the small school setting and consistent availability of a school counselor, which was consistent with addressing J.H.'s mental health needs.

Moreover, the testimony of Ms. Costa and Dr. Leigh confirmed that J.H.'s academic needs were also considered when the BSP was proposed. While J.H. was a student of average intellectual

ability, the District confirmed that J.H. would have access to any advanced course in which she qualified, despite Petitioners' insistence that the full spectrum of academic opportunities would not be available.

The undisputed evidence in this matter demonstrated that the IEP proposed by the District on May 16, 2017 is reasonably calculated to confer a meaningful academic benefit, and was tailored to meet J.H.'s individual educational and therapeutic needs.

### C. The District Appropriately Determined That J.H. Was Eligible For Special Education And Related Services Under The Classification Of "Emotionally Disturbed."

N.J.A.C. 6A:14-3.5(c) provides, in relevant part:

> (c) A student shall be determined eligible and classified "eligible for special education and related services" under this chapter when it is determined that the student has one or more of the disabilities defined in (c)1 through 14 below; the disability adversely affects the student's educational performance and the student is in need of special education and related services. Classification shall be based on all assessments conducted including assessment by child study team members and assessment by other specialists as specified below.
>
> …
>
> 5. "Emotionally disturbed" means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a student's educational performance due to:
>
> i. An inability to learn that cannot be explained by intellectual, sensory or health factors;
>
> ii. An inability to build or maintain satisfactory interpersonal relationships with peers and teachers;
>
> iii. Inappropriate types of behaviors or feelings under normal circumstances;
>
> iv. A general pervasive mood of unhappiness or depression; or
>
> v. A tendency to develop physical symptoms or fears associated with personal or school problems.

N.J.A.C. 6A:14-3.5(c)(5).

25

Testimony offered by both Respondent's and Petitioners' witnesses at the due process hearing, unequivocally confirmed that J.H. exhibited each of the enumerated characteristics set forth in N.J.A.C. 6A:14-3.5(c)(5), and that those characteristics adversely affected J.H.'s academic performance.  In fact, Petitioners presented no evidence that J.H. did not meet the criteria for "Emotionally Disturbed."

Nonetheless, Petitioners' pleadings insist that J.H. more appropriately meets the classification of "Specific Learning Disability."  To that end, N.J.A.C. 6A:14-3.5(c)(12) provides:

> "Specific learning disability" corresponds to "perceptually impaired" and means a disorder in one or more of the basic psychological processes involved in understanding or using language, spoken or written, that may manifest itself in an imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia.
>
> > i. A specific learning disability can be determined when a severe discrepancy is found between the student's current achievement and intellectual ability in one or more of the following areas:
> >
> > > (1) Basic reading skills;
> > > (2) Reading comprehension;
> > > (3) Oral expression;
> > > (4) Listening comprehension;
> > > (5) Mathematical calculation;
> > > (6) Mathematical problem solving;
> > > (7) Written expression; and
> > > (8) Reading fluency.
> >
> > ii. A specific learning disability may also be determined by utilizing a response to scientifically based interventions methodology as described in N.J.A.C. 6A:14–3.4(h)6.
> >
> > iii. The term severe discrepancy does not apply to students who have learning problems that are primarily the result of visual, hearing, or motor disabilities, general cognitive deficits, emotional disturbance or environmental, cultural or economic disadvantage.

> iv. The district shall, if it utilizes the severe discrepancy methodology, adopt procedures that utilize a statistical formula and criteria for determining severe discrepancy. Evaluation shall include assessment of current academic achievement and intellectual ability.

N.J.A.C. 6A:14-3.5(c)(12).

Petitioners' contention, however, was categorically refuted by the testimony of Dr. Schuberth and Dr. Platt.  Both experts affirmed that they are unfamiliar with the Administrative Code and that their opinions were solely based **on the criteria in the DSM-V.** Despite a relative weakness in mathematics based upon a single subtest, none of the objective data in the evaluation reports, determined there to be a "severe discrepancy" between J.H.'s current achievement and intellectual ability in any of the eight identified areas.  Thus, there is simply no evidence that J.H. is eligible for special education and related services under the classification of "Specific Learning Disability."

### D. The District Has Demonstrated That It Complied With The IDEA After The Date Of The IEP.

Once a student is enrolled at a private school due to a parent's unilateral decision, a district has no obligation to develop an IEP.  20 U.S.C. § 1412(a)(10)(A)(i) (requiring a school to provide "for such children special education and related services in accordance with [certain] requirements but not an IEP").  Once a student has been unilaterally placed, the district is not required to offer an IEP unless the parent: (1) requests that the district develop an IEP, conduct an evaluation, or both; or (2) seeks to return the student to public school.  Moorestown Bd. of Educ. v. M.D., 811 F. Supp. 2d 1057 (2011) (stating that districts "need not have in place an IEP for a child who has unilaterally enrolled in private school and thereby rejected the district's offer of a FAPE" unless the parent subsequently requests that the district provide an evaluation and/or IEP in connection with a return to the district); I.H. ex rel. D.S. v. Cumberland Valley Sch. Dist., 842 F. Supp. 2d

27

762 (M.D. Pa 2012) (in the absence of reenrollment or a request for an IEP or evaluation, the IDEA does not require districts to provide FAPE to disenrolled students).

The Third Circuit has held that a "district is only required to continue developing IEPs for a disabled child no longer attending its schools when a prior year's IEP for the child is under administrative or judicial review." D.P. ex rel. Maria P. v. Council Rock Sch. Dist., 482 F. App'x 669 (3d Cir. 2012) (quoting M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cnty., 303 F.3d 523 (4th Cir. 2002). **However, in order to trigger the duty to prepare an IEP, a parent must also communicate his or her intent to reenroll his or her child in the district's schools.** Id. at 672-73. "A parent is entitled to request a reevaluation of the student's IEP at any time, ... [b]ut this obligation is contingent on the parent's request." Id. at 673. The Council Rock court ultimately determined that "without notification of an intent to reenroll in public school, the school district was under no obligation to update [the child's] IEP..." Ibid.; see also M.M., supra, 303 F.3d at 536-36 (finding that where parents withdrew their child from the district in 1996, but did not request due process until 1998, the district had no duty to develop an IEP for the 1997 year).

Here, after filing their Petition for Due Process on May 30, 2017, Petitioners unilaterally placed J.H. at Purnell School for the 2017-2018 and 2018-2019 school years.  While they subsequently provided the District with private evaluation reports as part of the instant litigation, Petitioners concede that they neither requested an IEP meeting nor communicated an intent to reenroll J.H. in the District.  To the contrary, the Amended Petition seeks reimbursement from the District for J.H.'s continued attendance at Purnell through graduation.  Because Petitioners did not express an intent to return J.H. to the District, nor did they specifically request an IEP and/or meeting with the CST, there is no evidence that the District failed to comply with its obligations to J.H. after she was unilaterally placed at Purnell School.

**E.    Petitioners Are Not Entitled To Tuition Reimbursement Because They Failed To Provide The District With Timely Written Notice Of Removal As Required By The IDEA And N.J.A.C. 6A:14-2.10(C).**

The Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. §§ 1401 to 1482, and New Jersey statutes, N.J.S.A. 18A:46-1 to -55, are designed to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living."  See 20 U.S.C. § 1400(d)(1)(A).  A state may qualify for federal funds under the IDEA by adopting "policies and procedures to ensure that it meets" several enumerated conditions.  See 20 U.S.C. § 1412(a).  These requirements for federal funding include the following conditions: all eligible children must be provided with a free appropriate public education ("FAPE"), 20 U.S.C. § 1412(a)(1), and education agencies and intermediate educational units must develop an IEP for each eligible child before the beginning of each school year.  See 20 U.S.C. § 1412(a)(4).

While the obligation to offer a FAPE is borne by a school district, "the IDEA contemplates a collaborative effort between the parties in the preparation of an IEP and makes available a host of procedural safeguards to counterbalance district bargaining advantages."  T.P. and P.P. ex rel. J.P. v. Bernards Twp. Bd. of Educ., 2004 WL 763589 (N.J. Adm.), OAL Dkt. No. EDS 6476-03, Agency Ref. No. 2004-8055, Final Decision (March 12, 2004); Hendrick Hudson Cent. Sch. Dist. Bd. of Educ. v. Rowley, 458 U.S. 176 (1982); see also, 20 U.S.C. § 1412(1); 34 C.F.R. § 300.1(a). A judicially created remedy been created whereby parents can make unilateral placement for their child if they are dissatisfied with the actions of the school district; however, this first requires that the parents meaningfully engage in the IEP process.  See H.L. and J.L. o/b/o V.L. v. Marlboro Twp. Bd. of Educ., 2016 WL 7339138 (N.J. Adm.), OAL Dkt. No. EDS 08677-16, Agency Ref.

No. 2016-24293, Final Decision (Nov. 29, 2016) (citing T.P., supra, EDS 6476-03) (additional citations omitted).  "[T]he IDEA was not intended to fund private school tuition for the children of parents who have not first given the public school a good faith opportunity to meet its obligations." Id. (quoting C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59 (3d Cir. 2010)).  "Parents who unilaterally change their child's placement…, without the consent of state or local school officials, do so at their own financial risk." Id. (quoting Sch. Comm. of Burlington v. Mass. Dep't of Educ., 471 U.S. 359 (1985)).

When a parent places a child into a school unilaterally, a court or hearing officer may require reimbursement where there is compliance with standards set forth in the federal Individuals with Disabilities in Education Act ("IDEA").  Specifically, 20 U.S.C. § 1412(a)(10)(C) states:

> (iii) Limitation on reimbursement
>
> The cost of reimbursement [for unilateral private school placement] may be reduced or denied –
>
> (I) if –
>
> > (aa)  at the most recent IEP meeting that the parents at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or
>
> > (bb)  10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa)

These provisions have been explicitly adopted under New Jersey law at <u>N.J.A.C.</u> 6A:14-2.10, which provides as follows:

> (c) **The parents must provide notice to the district board of education of their concerns and their intent to enroll their child in a nonpublic school at public expense.** The cost of reimbursement described in (b) above may be reduced or denied:
>
> 1. If at the most recent IEP meeting that the parents attended prior to the removal of the student from the public school, the parents did not inform the IEP team that they were rejecting the IEP proposed by the district;
>
> 2. At least 10 business days (including any holidays that occur on a business day) prior to the removal of the student from the public school, the parents did not give written notice to the district board of education of their concerns or intent to enroll their child in a nonpublic school;
>
> 3. If prior to the parents' removal of the student from the public school, the district proposed a reevaluation of the student and provided notice according to <u>N.J.A.C.</u> 6A:14-2.3 (g) and (h) but the parents did not make the student available for such evaluation; or
>
> 4. Upon a judicial finding of unreasonableness with respect to actions taken by the parents.

<u>N.J.A.C.</u> 6A:14-2.10(c) (emphasis added).

In New Jersey, it is well-settled that, where parents fail to provide notice of their intent to place a child in a private school prior to the removal of the student from the public school, they are not entitled to tuition reimbursement. <u>See</u>, <u>e.g.</u>, <u>R.G. o/b/o E.G. v. Glen Ridge Bd. of Educ.</u>, 2005 WL 826101 (N.J. Adm.), OAL Dkt. No. EDS 03714-04, Agency Ref. No. 2004-8632 (March 17, 2005) (district granted summary decision where parents had already entered into an agreement to enroll their child in the Craig School with a commitment to pay the full tuition and had not informed the district before sending their letter); <u>D.D. and N.D. o/b/o A.D. v. Montclair Bd. of Educ.</u>, 2005 WL 2898687 (N.J. Adm.), OAL Dkt. No. EDS 9295-05, Agency Ref. No.

2006-10296 (Oct. 17, 2005) (district granted summary decision where child was first enrolled in the Craig School by virtue of contract being signed by parents seven days before notifying the district of their intention to withdraw him from the public school); <u>K.S. and M.S. o/b/o A.S. v. Summit City Bd. of Educ.</u>, 2012 WL 5828603 (N.J. Adm.), OAL Dkt. No. EDS 09012-12, Agency Ref. No. 2012-18502 (Nov. 5, 2012) (district granted summary decision where parents entered into a contract with Purnell prior to and without involving the district in consideration of this placement); <u>H.L. and J.L. o/b/o V.L. v. Marlboro Twp. Bd. of Educ.</u>, 2016 WL 7339138 (N.J. Adm.), OAL Dkt. No. EDS 08677-16, Agency Ref. No. 2016-24293 (Nov. 28, 2016) (district granted summary decision where parents enrolled their child in the Lewis School without providing the district with at least ten days' written notice); <u>D.A. and A.A. o/b/o R.A. v. Haworth Bd. of Educ.</u>, 2008 WL 607630 (N.J. Adm.), OAL Dkt. No. EDS 12450-07, Agency Ref. No. 2008-13024 (Feb. 15, 2008) (district granted summary decision where parents failed to provide written notice at least ten business days prior to removing student from public school); <u>K.M. and J.M. o/b/o K.M. v. Watchung Hills Reg. Bd. of Educ.</u>, 2014 WL 3383281 (N.J. Adm.), OAL Dkt. No. EDS 18846-13, Agency Ref. No. 2014-20537 (June 5, 2014) (district granted summary decision where parents signed an enrollment agreement with private school prior to proving written notice to district); <u>W.D. o/b/o W.D. v. Watchung Hills Bd. of Educ.</u>, 2013 WL 1007188 (N.J. Adm.), OAL Dkt. No. EDS 15092-12, Agency Ref. No. 2013-18995 (March 5, 2013) (district granted summary decision where parent entered into contract with private school two weeks prior to notifying school district).

In the present matter, Petitioners executed an enrollment agreement and remitted a tuition payment to Purnell School on August 30, 2017.  "Removal" is defined as "the date a student is enrolled in private school."  <u>See</u> <u>W.D.</u>, <u>supra</u>, 2014 WL 3383281 at *5.  The District did not receive

32

notice of Petitioners' J.H.'s "removal" from West Morris Central High School until September 25, 2017 – two weeks after J.H. commenced attending Purnell School.  Accordingly, Petitioners failed to provide the requisite ten business days' notice that is required by 20 U.S.C. § 1412; N.J.A.C. 6A:14-2.10(c).

While Petitioners may assert that their Petition was sufficient to constitute "notice" to the District of unilateral placement, the Court affirmatively denied such premise.  Specifically, in K.M. and J.M. o/b/o K.M. v. Watchung Hills Reg. Bd. of Educ., OAL Dkt. No. EDS 18846-13, Agency Ref. No. 2014-20537 (June 5, 2014), 2014 WL 3383281, constructive notice is not sufficient. K.M., at *5.  Similarly, in that case, the district was not notified of the student's removal until after he had already been enrolled in an out-of-district program.  Judge Bingham held that the untimely letter coupled with a previously filed due process petition was insufficient to meet "the written-notification requirement, which could not be clearer in both the IDEA and New Jersey's supporting regulations."  Id. (citing K.S. & M.S. ex rel. A.S. v. Summit City Bd. of Educ., EDS 9012-12, Final Decision (Nov. 5, 2012)).

As such, because they did not provide the District with at least ten days' written notice of their intent to remove J.H. from West Morris Central High School, the Court found that Petitioners were not entitled to tuition reimbursement for J.H.'s attendance at Purnell School.

V.      **CONCLUSION**

In light of the foregoing, Respondent, West Morris Regional High School Board of Education, requests that this Honorable Court affirm the ruling of the Administrative Law Judge in the underlying case, and this matter be dismissed with prejudice.

CLEARY GIACOBBE ALFIERI JACOBS, LLC

Counsel for Appellee,
WEST MORRIS REGIONAL HIGH
SCHOOL BOARD OF EDUCATION,

By:   */s/ Jodi S. Howlett*
Dated: August 6, 2020          JODI S. HOWLETT, ESQ. (#039272007)