**Julie Warshaw, Esq. Bar ID. 027931993**
266 King George Road, Suite C2
Warren, New Jersey 07059
**Jamie Epstein, Esq. - Bar ID. 008081990**
17 Fleetwood Drive
Hamilton, New Jersey 08690
Attorneys for: Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

F.H., *et al*.,                              Civil Action No. 19-14465 (SDW)
               Plaintiffs,    (LDW)

v.

WEST MORRIS REGIONAL HIGH
SCHOOL BOARD OF
EDUCATION and NEW JERSEY
DEPARTMENT OF EDUCATION
and its COMMISSIONER,
ANGELICA ALLEN-MCMILLAN
(in her official and individual
capacity)                              **2D AMENDED COMPLAINT**
            Defendants


Plaintiffs F.H. And M.H., individually and on behalf of their daughter, J.H., by way of

Complaint say:

**INTRODUCTION**

1.      This action arises under the Individuals with Disabilities Act, 20 U.S.C. sec. 1400

et. seq., .

2.      This is an original civil action seeking reversal of the final decision, dated,

February 13, 2019, of a New Jersey Administrative Law Judge (ALJ), attached as Exhibit A.

1

3.      In this case the DISTRICT, Board of Education (hereinafter referred to as the "DISTRICT") failed to comply with its obligations under federal and state law to educate a high school student with disabilities in the least restrictive environment and consequently, deprived her of an education appropriately ambitious in light of her individual circumstances and designed to meet her unique needs.

4.      The ALJ erred in denying relief because he failed to measure the program offered by the school district against IDEA's explicit standards and erred as a matter of law in concluding that the school district provided FAPE.

## PARTIES

5.      Plaintiff J.H., who was born in 2001, is a student with disability who is eligible for the services and protections of the IDEA.

6.      J.H. is an aggrieved person based upon the decision in an administrative action.

7.      At all times relevant herein, J.H. resided in the Township of Long Valley, County of Morris and State of New Jersey.

8.      J.H.  attended school in the up until September 2017.

9.      Plaintiff F.H. is the father and legal guardian of J.H. and at all times relevant resided with her in the Township of Long Valley, County of Morris, State of New Jersey.

10.      Plaintiff M.H. is the mother and legal guardian of J.H. and at all times relevant resided with her in the Township of Long Valley, County of Morris, State of New Jersey.

11.      Defendant West Morris Regional High School Board of Education is charged with the conduct, supervision and management of the West Morris Regional Public High Schools

which is the school system established to provide a public education to children residing in West Morris Region.

12.     The DISTRICT's principal place of business is located at 10 S Four Bridges Road, Chester, New Jersey 07930.

13.     The DISTRICT is also a local educational authority as defined by 20 U.S.C. sec. 1401(a).

14.     Defendant New Jersey Department of Education (hereinafter referred to as NJDOE) whose principal place of business is located at 100 River View Plaza, Trenton, NJ 08625-0500 is the "State Educational Agency" under 20 U.S.C. § 1401(32) responsible for ensuring compliance with all federal mandates under the IDEA, 504 and ADA for school aged.

15.     Defendant COMMISSIONER, ANGELICA ALLEN-MCMILLAN is being sued in his individual and official capacity which is as the Commissioner of Defendant New Jersey Department of Education where she serves as New Jersey's chief executive school officer and as Secretary of the State Board of Education.

16.     New Jersey's special education statute, N.J.S.A. 18A:46-1 *et seq.,* grants the Commissioner a broad range of power and responsibilities, and any decisions made by the Commissioner have the force of law.

17.     As the education leader of the state, the Commissioner's responsibilities include recommending legislative initiatives and changes;

conducting educational initiatives promulgating regulations; ensuring that local school districts adhere to all legal requirements relating to school district operation; and apportioning state aid to local districts.

## JURISDICTION AND VENUE

18.     Jurisdiction is proper because DISTRICT has a principal place of business within Morris County, New Jersey.

19.     Venue is proper pursuant to Rule 4:3-2(a).

20.     This Complaint is brought seeking relief for denial of rights under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. sec. 1400 et. seq., Section 504 of the Rehabilitation Act, 29 U.S.C. sec. 794, and New Jersey's Special Education Law, N.J.S.A. 18A:46-1 et. seq.,

21.     This case comes to this Court following the February 13, 2019 final decision of Administrative Law Judge (ALJ) Thomas R. Betancourt, in an action brought by Plaintiffs on June 5, 2017 with the New Jersey Office of Special Education under Docket number OAL EDS 10706-17/Agency Ref. No. 2017/26311.

## FACTS

22.     J.H. is a disabled minor who was entitled to receive  a   free   and appropriate  public education (FAPE) from the DISTRICT..

4

23.     J.H. has had and continues to have from the time she was in 10[h] grade a specific leaning disability, other health impaired, and at all times relevant has suffered from school related anxiety, school phobia and noise sensitivity.

24.     J.H. was enrolled in a therapeutic day program for a few months at the beginning of the 2016-2017 school year.

25.     J.H. attempted to return to school in December, 2016 but that was not successful due to her school related anxiety and school phobia.

26.     In December, 2016, the DISTRICT agreed to implement a 504 Plan allowing J.H. time and access to a quiet place or to the guidance counselor or nurse if she was feeling anxious.

27.     However, J.H. was only able to attend school for a few days and then had to stop, resulting in the DISTRICT placing her on home instruction.

28.     There was no Individualized Education Program (IEP) at that time.

29.     Thereafter, J.H.'s medical providers were of the view that J.H. was ready to attend a lesser restrictive out of district learning environment even though she was still suffering from school related anxiety and school phobia.

30.     In January 2017, Plaintiffs F.H. and M.H. requested a Child Study Team (CST) evaluation of J.H. as they believed she was in need of an IEP to address her particular issues.

31.     J.H. was evaluated by the CST and toward the end of the 2016-2017 school year, the DISTRICT proposed an IEP classifying J.H. as "Emotionally Disturbed" due to her school related anxiety.

32.     J.H. is not and has not ever been emotionally disturbed, as she does not meet the criteria for said classification.

33.     Although the parties did not agree on the classification of ,"emotionally disturbed," they did agree that J.H. was eligible for special education and related services.

34.     Although the DISTRICT attempted to characterize J.H.'s school related anxiety as defiance and school refusal, her therapist and psychiatrist never characterized her anxiety in that manner.

35.     J.H. does not and never did have behavioral issues.

36.     There were factual errors in the school's testing reports and instead of recognizing J. H.'s anxiety, they used wording in their reports that would suggest that J.H. had behavioral issues, despite no evidence to support such a conclusion.

37.     The psychological evaluation that the DISTRICT conducted on January 19, 2017, noted that J.H. scored in the low average range for Working Memory and overall in the average range for processing speed but her scores on the subtests varied considerably.

38.     The discrepancies in J.H.'s test scores should have led the DISTRICT to identify a learning disability but instead, these discrepancies in scores were ignored.

39.     The DISTRICT failed under Child Find to recognize that J.H. had an underlying learning disability and they failed to properly classify her.

40.     A report dated March 15, 2017 from psychiatrist, Dr. Shankar Srinivasan at Immediate Care Psychiatric Center  (ICPC) indicated that J.H.'s diagnosis was "major depressive recurrent, panic disorder and school issues; there was a recommendation for an out of district placement and nowhere was there a diagnosis for "emotionally disturbed."

41.     The initial IEP, dated April 6, 2017, did not include any present statements or present levels of academic achievement and functional performance from J.H.'s teachers including those who taught her the prior academic year.

42.     There was no information about the home instruction as to J.H.'s progress or any relevant information as to academics.

43.     There was no general education teacher in attendance at the April 6, 2017 meeting; there was no special education in attendance at the meeting; and the person who conducted a social assessment of J.H. was not present at the meeting.

44.    The IEP at the April 6th meeting was marked "Draft" but in reality it was fully completed with the Behavioral Support Program already listed as J.H.'s placement, without any input from J.H.'s parents.

45.    The DISTRICT  predetermined J.H.'s placement.

46.    Plaintiffs F.H. and M.H. expressed their concern about the Behavioral Support Program but these concerns fell on deaf ears as the DISTRICT had already made up its mind.

47.    J.H., who was at the meeting, broke down crying when she heard what the DISTRICT decided her placement should be.

48.    The concerns expressed by F.H. and M.H. and J.H.'s reaction to placement in the Behavioral Support Program were never included in any IEP.

49.    The IEP was lacking in many areas:  it did not have any descriptions to how J.H.'s disability affected her involvement and progress in the general education curriculum, specifically there was no mention of her academic weakness as found by Ms. Wilk, the school psychologist; there were no measurable annual goals, there were no goals and objectives.

50.    J.H. meets the criteria under the Individuals with Disabilities Education Act (IDEA) as a person with a disability and is entitled to special education, related services, accommodations, and an appropriate placement under

the classification of Other Health Impaired, although the DISTRICT had failed to classify her properly or offer her an appropriate educational placement that meets her unique academic, social, emotional and physical needs.

51.    At the IEP meeting, which took place on May 16, 2017, the DISTRICT did not correct any deficiencies with the IEP drafted on April 6, 2017, and it was the same document proposed on April 6th with the BSP behavioral program at the Mendham High School listed as placement for J.H.

52.    The BSP program is a behavioral program with a therapeutic component.

53.    This program is a contained classroom with multi-levels of academics being taught at once throughout the classroom.

54.    There are counselors available to students if needed throughout the day.

55.    However, specials such as gym class are done on the computer rather than in actual class or gym.

56.    J.H. did not need a program with a therapeutic component as she was getting private counseling on her own, which was well known to the DISTRICT .

57.    The BSP program does not cater to students who are on a college track in that many classes are not offered all of the time and if those students want

to be on a college bound track they have to take classes in the larger general education setting which is contrary to J.H.'s needs.

58.     The BSP program has students who are dealing with issues completely different that J.H.'s such as involving the criminal justice system, truancy, substance abuse, etc.

59.     J.H. had done well academically on home instruction as she works well in a one to one or small classroom setting; she is academically oriented and plans to attend college after completion of her high school requirements.

60.     The DISTRICT would not consider any alternative placement other than the BSP Program.

61.     An out of district placement at a Flex School or a one to one learning environment with a social component or a private school with small classes and an appropriate peer group is what was necessary to meet J.H.'s needs academically and socially and which was recommended by numerous experts both independent and otherwise.

62.     The DISTRICT  agreed to pay for independent psychiatric and psycho-educational testing, however, did not acknowledge or follow the recommendations.

63.   J.H.'s therapist, Melissa Dolgos wrote a report dated August, 2017, wherein she noted that J.H. was unable to complete assignments due to anxiety in the DISTRICT  setting and was able to progress in managing anxiety in smaller group settings.

64.   Ms. Dolgos also noted that J.H. excels better when people around her are mature and college bound rather than peers who have behavioral issues.

65.   Ms. Dolgos also found that it was significant that J.H. does not respond well when others around her have behavioral issues as it distracts her and causes her to become anxious.

66.   Dr. Natalie Schuberth from Alexander Road Associates conducted independent psycho educational testing on July 31, August 2 and 3, 2017, and issued a report dated August 21, 2017.

67.   Dr. Schuberth indicated in her evaluation report that J.H. met the specific criteria for the diagnosis of Specific Learning Disorder with impairment in mathematics, specifically with fluent calculation and she had issues with processing speed.

68.   Dr. Schuberth also found that J.H. met the criteria for Major Depressive Disorder, Recurrent Episode and Generalized Anxiety Disorder.

69.     Dr. Schuberth also found that J.H. was suffering from acute sensitivity to noise to the extent that it would affect her "across the board" in academics and other areas of school such as in the cafeteria and in hallways.

70.     Dr. Schuberth concluded that J.H. would benefit in a small school environment without overwhelming stimulation.

71.     There was no finding by Dr. Schuberth that J. H. was "emotionally disturbed."

72.     In Dr. Ellen Platt's independent psychiatric report, she concluded that J.H. required an academic environment with the capacity of a great deal of emotional awareness and intervention.

73.     Neither Dr. Schuberth nor Dr. Platt indicated that J.H. needed a therapeutic school environment.

74.     Despite the conclusions and findings of the independent evaluations, the DISTRICT  never reconvened to discuss them or the effect they might have on J.H's IEP.

75.     The DISTRICT  failed to ensure that J.H. had an IEP in place and that it reflected her actual disabilities.

76.     The IEP failed to identify and address. J.H.'s particular educational needs, its goals and objectives were not stated in measurable and observable terms.

77.    The IEP was not reasonably calculated to offer J.H. a free and appropriate education in the least restrictive environment consistent with J.H.'s ability to learn and as a result the DISTRICT  has deprived J.H. of free and appropriate public education for two and one half years.

78.    Plaintiff filed a due process petition with the Commissioner of Education.

79.    A mediation session was thereafter conducted between Plaintiffs and DISTRICT.

80.    Plaintiffs indicated to the DISTRICT  they wanted J.H. to be placed at the Purnell School where she could receive the academic services that would address her unique and individualized issues.

81.    DISTRICT would not even consider the Purnell School as the only placement it would consider was the BSP Program as part of its predetermined IEP.

82.    J.H. thereafter applied and was accepted into the Purnell School.

83.    Meanwhile, after school started in September, 2017, the DISTRICT , without any consultation, knowledge or consent by the Plaintiffs, de-classified J.H. by now considering her a general education student with a 504 Plan that was

drafted in December, 2016, and which was not complete or up to date, in direct violation of the IDEA.  See 20 U.S.C. se. 1414(b)(1).

84.    Plaintiffs gave the DISTRICT notice and unilaterally placed J.H. at the Purnell School for which they are entitled to reimbursement of costs, tuition and transportation from DISTRICT

85.    Plaintiffs filed an amended due process petition under IDEA, 504 and ADA, and NJLAD to the New Jersey Department of Education on October 18, 2017.

86.    In that Petition, the Petitioners sought the following relief:

1.    Petitioners respectfully request that Petitioners be allowed to file this Amended Due Process action as OAL Docket No. EDS10706-2017N……as this Amended Due Process action is an updated version of events and violations, which have transpired since the prior Due Process filing…….
2.    Petitioners respectfully request that the school district reimburse Petitioners for their costs and expenses for tuition and fees and transportation for their daughter to attend the Purnell School for the school years 2017-2018 and 2018-2019, when it is anticipated she will graduate from high school.
3.    Petitioners respectfully request that based on the new independent evaluations and therapist reports, the district draft an IEP which reflects a classification of Other Health Impaired and places J.H. at the Purnell School as an out of district placement paid for by the school district including transportation for the next two (2) years and that the district reimburse Petitioners any and all costs and fees including attorney's fees associated with the first and this Amended due process action and unilateral placement incurred to date and throughout the entire unilateral placement.
4.    Petitioners respectfully request compensatory education, compensatory damages, damages for violating the IDEA, Section 504, Child

Find and the Law Against Discrimination, and reimbursement for any and all out of pocket expenses, including counseling at the Purnell School, costs, attorney's fees, and any other fees, as well as any and all expert fees and litigation costs as a result of the school district's failures and for having to bring this and the prior action.

5.      Petitioners respectfully request that the school district immediately accept Dr. Shankar Srinivasan's report from ICPC, which recommends an out of district placement but not therapeutic out of district placement.

6.      Petitioners respectfully request that the school district immediately accept Dr. Ellen Platt's independent psychiatric evaluation report.

7.      Petitioners respectfully request that the school district immediately accept Dr. Natalie Schuberth's independent psychoeducational evaluation report.

8.      Petitioners respectfully request that the school district pay for transportation to and from the private school and counseling fees.

9.      Petitioners respectfully request compensatory damages for violation of J.H.'s rights under the various theories of law as set forth herein.

10.      Petitioners respectfully request that they be declared the prevailing party.

11.      Petitioners respectfully request the foregoing relief and attorney's fees as well as any and all other damages, compensatory education, compensatory damages, punitive and other damages, and/or other relief this Court deems just and fair.

87.      The NJDOE transmitted the matter to the New Jersey Office of Administrative Law (NJOAL) for a due process hearing.

88.      A due process hearing was conducted before the Honorable Thomas Betancourt, ALJ, over the course of the following days: April 9 and 23, 2018;  July 25 and August 29, 2018.

89.    On February 13, 2019, the ALJ filed a final decision and order dismissing the amended due process petition after concluding that the DISTRICT offered FAPE and did not violate the IDEA.  **(Exhibit A).**

90.    The ALJ further designated said decision as final pursuant to 20 U.S.C. sec. 1415(i)(1)(A) and 34 C.F.R. sec. 514 (2018) and is appealable by filing a complaint and bringing a civil action in either in the Law Division of the Superior Court of New Jersey or in a District Court of the United Sates.  20 U.S.C. sec. 1415(i)(2); 34 C.F.R. Sec. 300.516 (2018).

91.    In reviewing witness credibility, the ALJ not only gave very little weight to the testimony of highly qualified independent professionals called by the Plaintiffs, but the ALJ completely overlooked much of the relevant testimony.

92.    The Order entered by the ALJ was based upon predisposition in that the ALJ ruled there was no denial of FAPE before the Plaintiffs presented their case and the conclusion of all the evidence.

93.    There were faulty rulings by the ALJ and a lack of consideration of pertinent evidence submitted through the testimony of independent, impressively qualified experts.

94.    The ALJ completely failed to consider the testimony of Dr. Schuberth, an independent expert, who evaluated J.H. over the course of three days when he

discussed the "Credibility" of the witnesses and the "weight" he gave to their testimony.

95.     The ALJ improperly failed to allow J.H., who was 17 years old at the time, testify at the due process hearing.

96.     On 12/8/20, this Court entered a Order [37] remanding this matter to ALJ Betencourt as mandated in this Court's 12/8/20 Opinion [36].

97.     On 12/9/20, Plaintiffs filed a Notice of Remand Letter [38] with ALJ Betancourt c/o the New Jersey Office of Administrative Law attaching this Court's Order [37] and Opinion [36].

98.     On 12/14/20, Plaintiffs filed a cover letter with a copy of the New Jersey Department of Education's administrative record with ALJ Betancourt c/o the New Jersey Office of Administrative Law.

99.     On 4/7/21, Plaintiffs wrote ALJ Betancourt and reminded him his compliance with this Court's mandate was overdue [39-2]

100.    ALJ Betancourt did not respond.

101.    On 4/12/21, Plaintiffs submitted a letter [39-1] noticing Defendant, NEW JERSEY DEPARTMENT OF EDUCATION COMMISSIONER, ANGELICA ALLEN-MCMILLAN that her compliance with this Court's mandate was overdue (attaching said 4/7/21 Letter to ALJ Betancourt).

17

102.   Defendant, COMMISSIONER, ANGELICA ALLEN-MCMILLAN did not respond.

## COUNT ONE
## (NOTICE OF APPEAL-IDEA)

103.   Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs of the Complaint with the same force and effect as though each were fully set forth at length herein.

104.   "The IDEA ensures that all children with disabilities have available to them a free appropriate public education [FAPE] in the least restrictive environment [LRE] that provides special education and related services to meet their unique needs and prepare them for further education, employment, and independent living, and ensures that the rights of such children and their parents are protected." J.T. v. Dumont Public Schools. 438 N.J. Super 241, 257 9App. Div. 2014), (citing 20 U.S.C. sec. 1400(d)(1)(A), (B).)

105.   Pursuant to IDEA, in return for federal education funding states must make available a free appropriate public education (FAPE) to all eligible children. Endrew F. v. Douglas Cnty Sch, Dist. 137 S.Ct. 988, 993 (2017).To that end, schools must provide special education, defined as "specially designed instruction…to meet the unique needs of a child with a disability."  In addition,

18

they must provide related services, which "are the support services to assist a child…to benefit from that instruction. Section 1401(29). A state covered by the IDEA must provide a disabled child with such special education and related services "in conformity with the [child's] individualized education program, " or IEP. Section 1401(9)(D). Id. at 994; Fry v. Napoleon Cmty. Sch., 137 s. Ct. 743, 748-749 (2017).

106.   The IEP is the centerpiece of the statute's education delivery system for children with disabilities. Id. (quoting Honig v. Doe, 484 U.S. 305, 311 (1988); see also Polk v. Cent. Susequehanna Intermediate Unit 16, 853 F. 2d 171, 173 (3d Cir. 1988).

107.   Endrew F. provides the following guidance regarding the provision of FAPE:

1. The IEP must be appropriately ambitious in light of the child's individual circumstances and unique strengths. Endrew F., 137 S. Ct. at 1000. "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." Id. at 1001.

2. To that end, each IEP "is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." Endrew F., at 999 (quoting 20 U.S.C. Sec. 1414(d)(1)(A)(i)(I)-(IV), (d)(3)(A)(i)- (iv)).

3. "Every IEP begins by describing a child's present level of achievement, including explaining 'how the child's disability affects the child's involvement and progress in the general education curriculum.'" Id. at 1000 (quoting 20 U.S.C. Sec.1414(d)(1)(A)(i)(I)(aa)).

19

4. "It then sets out a statement of measurable annual goals . . . designed to . . . enable the child to be involved in and make progress in the general education curriculum,' along with a description of specialized instruction and services that the child will receive." Id. (quoting Sec.1414(d)(1)(A)(i)(II), (IV)).

5. "The instruction and services must likewise be provided with an eye toward 'progress in the general education curriculum.'" Id. (quoting Sec.1414(d)(1)(A)(i)(IV)(bb)).

6. An IEP "must be appropriately ambitious in light of [the child's] circumstances." Id. "When a child is fully integrated in the regular classroom, as the Act prefers, what that typically means is providing a level of instruction reasonably calculated to permit advancement through the general curriculum." Id.

108. The requirements outlined in the preceding are not merely "procedural" requirements. The procedures are there for a reason and "their focus provides insight into what it means, for purposes of the FAPE definition, to "meet the unique needs" of a child with a disability. Endrew F., 137 S. Ct. 10 1000 (citing 20 U.S.C. Sec.1401(9) (29)); see also Fry, 137 S. Ct. at 753-754 (IDEA's administrative procedures test whether a school has met its obligation to provide meaningful access to education based on individual needs); H.E. v. Walter D. Palmer Leadership Learning Partners Charter Sch., No. 17-1721, slip op. at 4 (3d Cir. Sept. 19, 2017) (citing Bd. of Educ. v. Rowley, 458 U.S. 176, 205 (1982)).

109. "The focus on the individual child is critical. The IEP 'is not a form document,' and must reflect 'careful consideration of the child's present levels of

achievement, disability and potential for growth.'" S.B., 2017 U.S. Dist. LEXIS 160056, at 34 (quoting Endrew F., 137 S. Ct. at 999).

110.    The IDEA contains protections to ensure meaningful parental participation in the development of a child's IEP.  A central purpose of the procedural protections for parents "is to facilitate the provision of FAPE through the development of an appropriate IEP." Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 524 (2007); see also Schaffer v. Weast, 546 U.S. 49, 60 (2005) (Congress assumed adequate compliance with procedures would result in substantively appropriate IEP's). "Parents are often in a position to be forceful advocates for their children and through their vigilance and perseverance to help fulfill the IDEA's promise of a free appropriate public education." G.L. 802 F.3d 601, 625 (3d Cir. 2015). Therefore, the regulations require that the Child Study Team (CST), with the participation of the Parent, develop the IEP.

111.    "Predetermination of an IEP can be grounds for finding a violation of the IDEA, in particular because predetermination can serve to exclude parents from meaningfully participating in the decision making process." D.B. v. Gloucester Twp. Sch. Dist., 751 F. Supp.2d 764 (D.N.J. 2010) (citing Spielberg v. Henrico County Pub. Sch., 853 F.2d 256, 259 (4th Cir. 1988); Deal v. Hamilton

21

County Bd. of Educ., 392 F.3d 840, 857-58 (6th Cir. 2004)), aff'd, 489 Fed. App'x
564 (3d Cir. 2012).

112.   "Further, a student's placement must be based on the IEP, and not the
other way around. 34 C.F.R. Sec. 300.442; 34 C.F.R. Part 300, App. C. Therefore
it is essential that the IEP is created prior to any final placement decisions." Id.

113.   School districts must educate children, including preschool children,
in the least restrictive environment  which permits them to derive educational
benefit. T.R. ex rel. N.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572, 578-579
(3d Cir. 2000); Sch. Dist. of Phila. v. Post, No. 15-4501, 2017 U.S. Dist. LEXIS
103273, at 22 (E.D. Pa. July 5, 2017). The District bears the burden of proving
compliance with the LRE mandate. Kingwood, 205 F.3d at 579. 83. Federal and
state law mandates reevaluation whenever a school district is considering
declassifying a child as eligible for special education. See 34 C.F.R. Sec.
300.305(e)(1) ("a public agency must evaluate a child with a disability in
accordance with Secs. 300.304 through 300.311 before determining that the child
is no longer a child with a disability"); N.J.A.C. 6A:14-3.8(d) ("reevaluation shall
be conducted when a change in eligibility is being considered").

114.   The failure to comply with IDEA's procedures is actionable if it: (1)
"impeded the child's right to a free appropriate public education"; (2) "significantly

impeded the parents' opportunity to participate in the decision making process"; or (3) "caused a deprivation of educational benefits." 20 U.S.C. Sec. 1415(f)(3)(E).

115.  "Incurring unnecessary legal fees is, of course, a form of prejudice that denies a student and [her parent] an educational benefit." M.C. v. Antelope Valley Union High Sch. Dist., 852 F.3d 840, 849-850 (9th Cir. 2017).

116.  The DISTRICT  committed many violations of the IDEA and the ALJ erred as a matter of law when he did not measure J.H.'s IEP against IDEA's explicit requirements.

117.  With respect to an IEP, the DISTRICT failed to conduct an educational evaluation which is reflected in the lack of goals and objectives or academics in the IEP.

118.  The IEP did not include statements of academic achievement.

119.  The IEP had no information about J.H. 's academic achievement while on home instruction or any tutor from ICCPC.

120.  There was no mention of academic weaknesses as found by Ms. Wilk, the school psychologist.

23

121.   The IEP had no mention of Dr. Schuberth's findings about a specific learning disability and/or acute sensitivity to noise and its overall affect on the learning environment.

122.   The IEP did not contain any measurable annual goals, including academic and functional goals or how J.H.'s progress toward meeting those goals would be gauged.

123.   There were no special education services outlined to meet academic goals and objectives despite having sufficient information as to J.H.'s having issues.

124.   J.H.'s IEP was never amended or updated when independent reports were received, which in and of itself is a substantive violation of J.H.'s rights under the IDEA and denial of FAPE.

125.   The DISTRICT failed to adequately address any academic concerns as well as appropriate placement.

126.   The DISTRICT had predetermined the IEP, services, classification and recommended placement without consultation with parents and without consideration of expert reports, evaluations and recommendations.

127.   The DISTRICT   is not relieved of its obligations to provide appropriate special education services to meet J.H.'s unique needs simply because the parents and DISTRICT could not agree on a particular classification.

128.   As a result of the DISTRICT's violation of IDEA's requirements, J.H. was denied appropriate educational programming during school years 2016-2017, 2017-2018 and 2018-2019.

129.   Plaintiffs are entitled to tuition reimbursement because the DISTRICT failed to provide FAPE in the least restrictive environment because it improperly classified J.H. and then improperly declassified her.

WHEREFORE, Plaintiffs demand judgment for the following:

a.      Reversal of Order of ALJ;

b.      Tuition and transportation reimbursement;

c.      Reasonable attorney's fees and costs against all Defendants; and

d.      All other appropriate relief.

**COUNT TWO**
**(VIOLATION OF IDEA against Defendants NEW JERSEY DEPARTMENT**
**OF EDUCATION and its COMMISSIONER, ANGELICA ALLEN-**
**MCMILLAN)**

130.   Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs of the Complaint with the same force and effect as though each were fully set forth at length herein.

131.   Plaintiffs filed their due process petition on 10/29/12.

132.   Pursuant to federal law, Defendant NJDOE, as a recipient of federal funds, is required to comply with IDEA Part B, including, but not limited to, monitoring and reporting to USDOE its compliance with ensuring due process petitioners receive a final written decision within 45 days of the transmittal of Plaintiffs' petition to the New Jersey Office of Administrative Law.

133.   Defendants violated this Court's 12/8/20 Remand Order by failing to issue a new a new decision and order for over four moths.

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

a.   Find Defendants committed a *per se* violation of Plaintiffs' rights under IDEA to receive final written due process decision in a timely manner.

      b.     Find Defendants committed a substantive violation of

Plaintiffs' rights under IDEA to receive final written due process decision in

a timely manner.

      c.     Find Defendants unnecessarily delayed Plaintiffs' right under

IDEA to received a final written decision in a timely manner.

      d.     Award Plaintiffs prevailing party attorney's fees and costs.

      e.     For all other appropriate relief.

Warshaw Law Firm, LLC
Co-Counsel for Plaintiff

By: _____
Julie Warshaw, Esq.

Jamie Epstein, Esq.